# EXHIBIT 8

# EXHIBIT 8a

Defendants' Motion in Limine to Preclude
the Testimony of Plaintiffs' Expert
Dr. Steven M. Weisman, Ph. D.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ASTELLAS PHARMA INC., *et al.*,

           Plaintiffs,

    v.

SANDOZ INC., *et al.*

           Defendants.

C.A. No. 20-1589-JFB-CJB
(Consolidated)

## DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE
## THE TESTIMONY OF PLAINTIFFS' EXPERT DR. STEVEN M. WEISMAN, PH.D.

Pursuant to Fed. R. Evid. 402-403 and 702, and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), Defendants respectfully move *in limine* to exclude all testimony from Plaintiffs' expert, Dr. Steven M. Weisman.  Plaintiffs plan to have Dr. Weisman  provide an irrelevant and ineffectual overview on regulatory requirements and guidance documents from the FDA without providing any opinion probative of infringement or validity of U.S. Patent No. 10,842,780 ("the '780 patent").  Dr. Weisman is not a person of ordinary skill in the art ("POSA")—rather, he is an FDA regulatory consultant offering unqualified opinions on a POSA's motivation to address mirabegron's food effect using a sustained release formulation.

**Dr. Weisman's Testimony Is Not Probative of Any Issue in the Case, and Should Be Excluded Under at Least Fed. R. Evid. 402 and 403**

The claims of the '780 patent are directed to pharmaceutical compositions comprising mirabegron in a sustained release hydrogel-forming formulation, comprising various hydrogel-forming polymers and additives, and exhibiting a particular drug dissolution rate.  All of the issues in the case are evaluated from the perspective of a POSA: infringement, obviousness, enablement, written description, and indefiniteness.

Plaintiffs have submitted three expert reports from Dr. Weisman, offering interpretations of no less than twenty FDA publications without addressing a single claim limitation.  Dr. Weisman did not review and is not offering an opinion on any defendants' ANDAs, ANDA products, or any prior art.  (Ex. A, Weisman Dep. Tr. at 64:20-25, 82:2-10, 89:12-24; Ex. B, Weisman Opening Rpt.; Ex. C, Weisman Rebuttal Rpt.; Ex. D, Weisman Reply Rpt.).  During his deposition, Dr. Weisman confirmed that he is not offering any opinion with respect to any particular patent claim and is specifically providing "regulatory perspective."  (Ex. A. at 47:16-49:5, 18:21-22.)

1

Federal Rule of Evidence 402 provides the "baseline for determining admissibility of evidence in the federal courts." *In re Nautilus Motor Tanker Co*., 85 F.3d 105, 112 (3rd Cir. 1996) (citing *Daubert*, 509 U.S. at 585-87). Dr. Weisman's testimony should be excluded because his testimony provides no probative value at all: he offers no opinion concerning infringement or validity of any claim of the '780 patent and never ties the FDA guidances, practices, and recommendations covered by his three opinions to the infringement or validity of the '780 patent claims. *See F'Real Food, LLC v. Hamilton Beach Brands, Inc.*, No. 16-41-CFC, 2019 WL 1578259, at *1 (D. Del. April 11, 2019) (granting motion *in limine* to exclude expert's testimony having "little if any probative value with respect to the infringement or validity of the [] patent, and [the expert] never ties these matters to the technical analysis he offers and for which he has specialized knowledge.").

A motion *in limine* is designed to narrow evidentiary issues for trial and to eliminate unnecessary interruptions during trial. *Bradley v. Pittsburgh Bd. of Educ*., 913 F.2d 1064, 1069 (3rd Cir. 1990). Dr. Weisman's needless overview of FDA recommendations and guidances will be a waste of the Court's time and resources. For all of these reasons Dr. Weisman's testimony should be excluded under Fed. R. Evid. 402 and 403.

### Unreliable Expert Testimony is Not Admissible

As gatekeeper, a trial judge must confirm the witness is a qualified expert, and that the proposed testimony is reliable and relates to matters requiring scientific technical, or specialized knowledge. *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3rd Cir. 2020). Dr. Weisman is not qualified to provide expert testimony as a POSA with respect to technical aspects of pharmaceutical formulation development because Dr. Weisman's professional experience in pharmaceutical formulation is limited to regulatory issues and his

graduate work focused on pharmacology—the study of how drugs work in the body. (Ex. A at 18:6-22; 27:3-28:17; 31:15-20; 46:17-47:2.) Dr. Weisman lacks direct and particular experience—much less several years of experience—in formulating or characterizing dosage forms containing pharmaceutically active compounds, and therefore fails to qualify as a POSA under either Defendants' or Plaintiffs' proposed definition[1,2].

An expert witness not qualified in the pertinent art may not testify to the motivation of a POSA. *See HVLPO2, LLC v. Oxygen Frog, LLC*, 949 F.3d 685, 689 (Fed. Cir. 2020). The Court should preclude Dr. Weisman from offering any opinions on whether a POSA would have been motivated to prepare the claimed hydrogel-forming pharmaceutical composition of mirabegron to address a food effect (*see* Ex. D, section VI), because opinions on the motivations of a POSA with experience in pharmaceutical formulation development is outside Dr. Weisman's expertise as an expert in FDA regulations for drug approval applications. *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1364 (Fed. Cir. 2008) ("it is an abuse of discretion to permit a witness to testify as an expert on the issues of noninfringement or invalidity unless that witness is qualified as an expert in the pertinent art."); (*see* Ex. A at 19:2-6; 41:11-19 (Dr. Weisman testifying that his opinions in this case are limited to the regulatory perspective).) For all of these reasons Dr. Weisman's testimony should be excluded under Fed. R. Evid. 702 and *Daubert*.

---

[1] Defendants' expert, Dr. Chambliss, defines a POSA as a skilled person with experience in pharmaceutical formulation who would have possessed at least a Bachelor's degree, and more likely a Master's or Doctoral degree, in the field of pharmaceutical sciences or a related discipline, and several years of experience formulating dosage forms containing pharmaceutically active compounds. A skilled person could have a lower level of formal education if such person had a higher degree of experience.

[2] Plaintiffs' expert, Dr. Little, defines a POSA as someone with at least a Ph.D. in pharmaceutical sciences or a related field and approximately two to three years of experience, research, and/or training in formulation and characterization of pharmaceutical dosage forms. Alternatively, a POSA could have had a bachelor's degree in pharmaceutical sciences or in a related field with a greater amount of experience, research, and/or training in formulation and characterization of pharmaceutical dosage forms.

HEYMAN ENERIO GATTUSO & HIRZEL LLP

*/s/Dominick T. Gattuso*
Dominick T. Gattuso (#3630)
Elizabeth A. DeFelice (#5474)
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law
edefelice@hegh.law

*Attorneys for Defendant Sandoz Inc. and Lek Pharmaceuticals d.d.*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/Pilar G. Kraman*
Pilar G. Kraman (#5199)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com

*Attorneys for Zydus Pharmaceuticals (USA) Inc. and Zydus Lifesciences Limited*

PHILLIPS, MCLAUGHLIN & HALL, P.A.

*/s/Megan C. Haney*
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
Megan C. Haney (#5016)
1200 N. Broom St
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com
mch@pmhdelaw.com

*Attorneys for Lupin Ltd. and Lupin Pharmaceuticals, Inc.*

HEYMAN ENERIO GATTUSO & HIRZEL LLP

*/s/Dominick T. Gattuso*
Dominick T. Gattuso (#3630)
Elizabeth A. DeFelice (#5474)
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law
edefelice@hegh.law

*Attorneys for Defendants Sawai Pharmaceutical Co., Ltd. and Sawai USA, Inc.*

# EXHIBIT 8a

Defendants' Motion in Limine to Preclude
the Testimony of Plaintiffs' Expert
Dr. Steven M. Weisman, Ph. D.

Proposed Order

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ASTELLAS PHARMA INC., ASTELLAS IRELAND CO., LTD., and ASTELLAS PHARMA GLOBAL DEVELOPMENT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SANDOZ INC., et al., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    C.A. No. 20-1589-JFB-CJB <br> )    (Consolidated) <br> ) <br> ) <br> ) <br> ) |

**[PROPOSED] ORDER**

IT IS HEREBY ORDERED that Defendants' Motion *in Limine* to Preclude the Testimony of Plaintiffs' Expert, Dr. Steven Weisman, Ph.D. is granted.

IT IS SO ORDERED this _____day of _____, 2023.


_____
United States Magistrate Judge

1

# EXHIBIT 8a

Defendants' Motion in Limine to Preclude
the Testimony of Plaintiffs' Expert
Dr. Steven M. Weisman, Ph. D.

Exhibit A

Page 1

```
1           IN THE UNITED STATES DISTRICT COURT
2               FOR THE DISTRICT OF DELAWARE
3
4   ASTELLAS PHARMA INC.,              )
    ASTELLAS IRELAND CO., LTD. and    )
5   ASTELLAS PHARMA GLOBAL            )
    DEVELOPMENT, INC.,                )
6                                     )
            Plaintiffs,               )
7                                     ) Case No.
       vs.                            ) 1:20-cv-01589
8                                     )
    SANDOZ, INC., ACTAVIS            )
9   ELIZABETH LLC, et al.,            )
                                      )
10          Defendants.               )
11
12
13
14         Deposition of STEVEN WEISMAN, Ph.D.
15             Taken November 21, 2022
16
17      The remotely held videotaped deposition of
18   STEVEN WEISMAN, Ph.D., taken by Maria S. Winn,
19   CSR, RPR and CRR, pursuant to the Federal Rules of
20   Civil Procedure for the United States District
21   Courts pertaining to the taking of depositions,
22   with the witness located in New York City,
23   New York at 9:12 a.m. EDT on Monday, November 21,
24   2022.
25
```

Page 2

```
 1   PRESENT (via Zoom):
 2
     MCDERMOTT WILL & EMERY
 3   By MR. CHRISTOPHER M. BRUNO
     MR. CONNER S. ROMM
 4   500 N Capitol Street NW
     The McDermott Building
 5   Washington DC 20001
     cbruno@mwe.com
 6   cromm@mwe.com
     (202) 756-8187
 7
 8      appeared on behalf of the Plaintiffs;
 9
10   LOCKE LORD LLP
     BY MS. EMILY SAVAS
11   111 South Wacker Drive - Suite 4100
     Chicago, Illinois  60606
12   esavas@lockelord.com
     (312) 443-0700
13
        appeared on behalf of the Defendant
14      Zydus Pharmaceuticals;
15
16   RAKOCZY MOLINO MAZZOCHI SIWIK LLP
     By MR. KEVIN P. BURKE
17   6 West Hubbard Street - Suite 500
     Chicago, Illinois  60654-4616
18   kburke@rmmslegal.com
19      appeared on behalf of the Defendant
        Sandoz Inc.;
20
21   KATTEN MUCHIN ROSENMAN LLP
     By MR. JOSEPH JANUSZ
22   525 West Monroe Street - Suite 1900
     Chicago, Illinois  60661-3693
23   joseph.janusz@katten.com
     (312) 902-5616
24
        appeared on behalf of the Defendant
25   Apotex Corp;
```

Page 3

```
 1   PRESENT (via Zoom cont'd):
 2
 3   KATTEN MUCHIN ROSENMAN LLP
     By MR. MARTIN S. MASAR III
 4   525 West Monroe Street - Suite 1900
     Chicago, Illinois  60661-3693
 5   martin.masar@katten.com
     (312) 902-5616
 6
        appeared on behalf of the Defendant
 7   Apotex Corp;
 8
     KNOBBE MARTENS OLSON & BEAR LLP
 9   By MS. ANDREA CHEEK
     1717 Pennsylvania Avenue - Suite 900
10   Washington DC 20006
     andrea.cheek@knobbe.com
11
        appeared on behalf of the
12      Lupin Defendants;
13
14
15   ALSO PRESENT:
16   MR. JUSTIN HENRICKSEN, Legal Videographer;
17   MR. CLINT THOMAS, Concierge Tech.
18
19
20
21
22
23
24
25
```

Page 4

```
 1            I N D E X
 2   WITNESS:                        PAGE:
 3   STEVEN WEISMAN
 4   Examination by Ms. Savas          8
 5   Examination by Ms. Cheek         83
 6   Examination by Mr. Masar         97
 7
 8
 9   EXHIBIT       DESCRIPTION        PAGE
10   Exhibit 1   Opening Expert Report of    10
             Steven M. Weisman, Ph.D
11
     Exhibit 2   Guidance for Industry:      50
12             Extended Release Oral Dosage
               Forms:  Development, Evaluation,
13             and Application of In Vitro/In
               Vivo Correlations
14
     Exhibit 3   Abbreviated New Drug Application  60
15
     Exhibit 4   Draft Guidance on Mirabegron  62
16
     Exhibit 5   Rebuttal Report of Steven M.  65
17             Weisman, Ph.D. Concerning the
               FDA's Recommendations
18             Regarding Drug Food Effects
19   Exhibit 6   Guidance for Industry        72
               Food-Effect Bioavailability and
20             Fed Bioequivalence Studies
21   Exhibit 7   Reply Expert Report of       77
               Steven M. Weisman, Ph.D.
22             Concerning the FDA's
               Recommendations Regarding
23             Bioequivalence and Comparative
               Dissolution Testing
24
25
```

Page 5

```
 1   EXHIBIT       DESCRIPTION         PAGE
 2   Exhibit 8   "Dissolution Similarity      122
               Requirements: How Similar or
 3             Dissimilar Are the Global
               Regulatory Expectations?"
 4
     Exhibit 9   Comparative dissolution profile  146
 5             for Myrbetriq (Mirabegron ER
               Tablets 25 mg) vs Mirabegron ER
 6             Tablets 25 mg
 7   Exhibit 10   Appendix D               150
 8   Exhibit 11   Guidance for Industry SUPAC-MR:  162
               Modified Release Solid Oral
 9             Dosage Forms
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1    THE VIDEOGRAPHER:  Good morning.  We are
2  going on the record at 9:05 a.m. on
3  November 21st, 2022.
4    Please note the deposition is being
5  conducted virtually.  The quality of the
6  recording depends on the quality of the camera
7  and internet connection of the participants.
8  What is seen from the witness and heard on
9  screen is what will be recorded.
10    Audio and video recording will continue
11  to take place until all parties agree to go
12  off the record.
13    This is Media Unit 1 of the
14  video-recorded deposition of Dr. Steven
15  Weisman, taken by counsel for the plaintiff,
16  in the matter of Astellas Pharma, Inc.,
17  et al., versus Sandoz Inc., et al., filed in
18  the United States District Court for the
19  District of Delaware, Case Number 20-CV-1589.
20    My name is Justin Henricksen,
21  representing Veritext.  I'm the videographer.
22    The court reporter is Maria Winn from the
23  firm Veritext.
24    I'm not related to any party in this
25  action, nor am I financially interested in

Page 7

1  the outcome.
2    If there are any objections to the
3  proceedings, please state them at the time of
4  your appearance.
5    Counsel and all present, including
6  remotely, will now state their appearance and
7  affiliation for the record, beginning with the
8  noticing attorney.
9    MS. SAVAS:  Emily Savas, from the law
10  firm of Locke Lord, on behalf of defendant
11  Zydus Pharmaceuticals.
12    MR. MASAR:  This is Marty Masar from
13  Katten, Muchin, Rosenman in Chicago, on behalf
14  of the Sawai defendants.
15    MS. CHEEK:  Andrea Cheek of Knobbe and
16  Martens on behalf of the Lupin defendants.
17    MR. BURKE:  Kevin Burke from the law firm
18  of Rakoczy, Molino, Mazzochi & Siwik, on
19  behalf of the Sandoz defendants.
20    MR. JANUSZ:  And Joe Janusz, from Katten,
21  Muchin, Rosenman on behalf of the Apotex
22  defendants.
23    THE VIDEOGRAPHER:  Thank you.
24    Will the court reporter please swear in
25  the witness?

Page 8

1    MR. BRUNO:  I'm sorry.  I think I have to
2  enter an appearance as well.
3    Christopher Bruno and Connor Romm on
4  behalf of the Astellas plaintiffs.
5    I'd also just like to make a note.  I
6  think the videographer inadvertently said this
7  deposition is being taken on behalf of the
8  plaintiffs.  It's being taken by the
9  defendants.
10    And I and Connor are of the law firm
11  McDermott, Will & Emery.
12    STEVEN WEISMAN,
13  having been first duly sworn, was examined and
14  testified as follows:
15    EXAMINATION
16  BY MS. SAVAS:
17    Q   Good morning, Mr. Weisman.  My name is
18  Emily Savas.  I will be asking you questions today
19  on behalf of my client, Zydus Pharmaceuticals, as
20  well as defendants as a group.
21    Could you please state your name for the
22  record.
23    A   Good morning, Ms. Savas.
24    I'm Dr. Steven Weisman.
25    Q   Have you been deposed before?

Page 9

1    A   I have.
2    Q   To start with some parameters, or ground
3  rules for the deposition today, please answer
4  every question verbally, as opposed to head nods
5  or physical movements, so the court reporter can
6  record your answer.  Okay?
7    A   I understand.  Yes.
8    Q   Also, please wait until I've completed my
9  question before responding.  Okay?
10    A   I'll do my best.
11    Q   And if you do not understand a question
12  or need it repeated, you can please ask.
13    A   Thank you.
14    Q   Sometimes I can't hear you, so just
15  please make sure to speak loud enough so I
16  can hear you.
17    Now, at times your attorney may make an
18  objection to a question.  But you do still need to
19  answer the question unless instructed not to.
20    Do you understand?
21    A   I understand.
22    Q   Now, do you understand you're not
23  permitted to discuss the substance of your
24  testimony today with your attorney?
25    A   I do understand that, yes.

3 (Pages 6 - 9)

1   Q   Is there any reason that you cannot
2 provide truthful testimony today?
3   A   No.
4   Q   Have you brought any materials with you
5 to today's deposition?
6   A   I have not.
7       MR. BRUNO:  Just to clarify the record,
8   Dr. Weisman does have in front of him the
9   folders that were sent to us by you, Emily.
10      MS. SAVAS:  Okay.
11 BY MS. SAVAS:
12  Q   Besides the folders that counsel sent to
13 you, Dr. Weisman, you have no other materials with
14 you today?
15  A   That's correct.
16      MS. SAVAS:  We'll mark the first exhibit
17  as the opening expert report of Steven M.
18  Weisman, Ph.D.
19      (Document marked as Exhibit No. 1
20      for identification.)
21      MS. SAVAS:  And if we can please go to
22  the second-to-last page, this is appendix --
23  in Appendix A.
24 BY MS. SAVAS:
25  Q   Dr. Weisman, this is a summary of your

1 expert witness testimony in the last four years;
2 is that correct?
3       MR. BRUNO:  Emily, I'd like to note that
4   the document is not yet reflected in the
5   Marked Exhibits folder in the Exhibit Share.
6       CONCIERGE:  Refresh your marked exhibits
7   folder now.  It should be in there now.
8       MR. BRUNO:  It just dropped in now.
9   Thank you.
10 BY MS. SAVAS:
11  Q   Okay.  Dr. Weisman, do you have before
12 you your summary of expert witness testimony in
13 the last four years?
14  A   I do, yes.
15  Q   Do you have updates to this list since it
16 was last updated August 25, 2022?
17  A   I do not.
18  Q   We're going to go through the cases
19 listed in your chart here.
20      And I'm going to ask you to identify for
21 the record which party in the litigation you
22 provided testimony for and the general subject
23 matter of the testimony.  I'm not asking for
24 confidential information, but just the general
25 subject matter of your testimony in that case.

1 Okay?
2   A   Yes.
3   Q   Okay.  So in the EpiPen marketing case,
4 which party did you provide testimony for?
5   A   I represented two parties:  Pfizer
6 Pharmaceuticals and Mylan Pharmaceuticals.
7   Q   What was the general subject matter of
8 your testimony?
9   A   My testimony related to FDA regulations
10 with respect to the development of combination
11 drug medical device products.
12  Q   And in the Absorption Pharmaceuticals
13 case, which party did you provide testimony for?
14  A   In this case, I represented Absorption
15 Pharmaceuticals.
16  Q   What was the general subject matter of
17 your testimony?
18  A   Again, related to FDA requirements as it
19 relates to the formulation of, in this case, an
20 over-the-counter product.
21  Q   Only the first case, EpiPen, has a date
22 for the case closed date.
23      So is it fair to say that all the other
24 cases in this chart are ongoing?
25  A   I don't know that I am in a position to

1 answer that.  I don't always get information with
2 respect to the disposition of any particular case.
3   Q   Okay.  Then moving on to the next case,
4 Sorrento Therapeutics, which party did you provide
5 testimony for?
6   A   In this case, I represented Sorrento
7 Therapeutics.
8   Q   What was the general nature of your
9 testimony?
10  A   My testimony related to FDA requirements
11 with respect to the development of drugs in this
12 commercial dispute.
13  Q   In the Novaquest case, which party did
14 you provide testimony for?
15  A   I provided testimony for Novaquest.
16  Q   What was the general subject matter of
17 your testimony?
18  A   This was related to a development
19 dispute.
20  Q   Regarding a pharmaceutical product?
21  A   I'm sorry.  Regarding a pharmaceutical
22 product and the regulations pertaining to the
23 development of such.
24  Q   In the In Re: Elysium case, which party
25 did you provide testimony for?

4 (Pages 10 - 13)

Page 14

1    A   In this case, I represented Elysium.  And
2 this case involved a claim dispute between two
3 competing supplement -- dietary supplement
4 products.
5    Q   In the I-Mab case, which party did you
6 provide testimony for?
7    A   Here, I provided testimony for Tracon.
8    Q   What was the general subject matter of
9 your testimony?
10    A   Regulatory requirements related to the
11 development of a cancer drug.
12    Q   In the Techfields Pharma matter, which
13 party did you provide testimony for?
14    A   In this case, I represented both
15 Techfields and Covance, and I believe Fisher as
16 well.
17    Q   What was the subject matter of your
18 testimony?
19    A   This related to FDA regulations with
20 respect to the conduct of clinical trials.
21    Q   In the next matter, challenge to Goli's
22 advertising, which party, if there were -- well,
23 which party did you provide testimony for in that
24 matter?
25    A   Well, in this case, I actually

Page 15

1 represented Golo in its challenged Goli's
2 advertising relating to a dietary supplement and
3 the regulations pertaining to such.
4    Q   In the Joseph Bayer matter, which party
5 did you provide testimony for?
6    A   In this case, I was representing the
7 defendant in this case, Boehringer Ingelheim.
8    Q   What was the general subject matter of
9 your testimony?
10    A   This was a product injury matter.  And I
11 was providing testimony with respect to the
12 regulatory requirements for, I believe in this
13 case, reporting adverse events.
14    Q   In the Seventh Circuit -- Seventh
15 Judicial District asbestos litigation, which party
16 did you provide testimony for?
17    A   In this case, I was providing testimony
18 for Chattem division of Sanofi.
19    Q   What was the general subject matter of
20 your testimony?
21    A   General subject matter related to FDA
22 regulations with respect to inactive ingredients
23 in a talc-containing body powder.
24    Q   In the Diaz matter, which party did you
25 provide testimony for?

Page 16

1    A   In this case, I provided testimony for
2 the Chattem division of Sanofi.
3    Q   And what was the general subject matter
4 of your testimony?
5    A   FDA regulations regarding the inactive
6 ingredients in talcum-containing body powders.
7    Q   And the last matter listed here,
8 Ranitidine products cases, which party did you
9 provide testimony for?
10    A   In this case, it was for Glaxo
11 Pharmaceuticals.
12    Q   What was the general subject matter of
13 your testimony?
14    A   This related to the product Zantac,
15 containing ranitidine, and the regulatory
16 requirements regarding such.
17    Q   In any of the cases in which you've
18 previously provided testimony, were these patent
19 litigations?
20    A   I don't believe any of these were patent
21 litigations, no.
22    Q   Have you -- sorry.
23        Before the present litigation, have you
24 ever provided testimony as an expert witness in a
25 patent litigation?

Page 17

1    A   I don't believe I have, no.
2    Q   In any of the cases in which you've
3 provided expert testimony, have you ever provided
4 testimony as an expert in the area of sustained
5 release formulations?
6    A   I am not sure if I have.  I have provided
7 testimony on a wide array of drugs that pretty
8 much could have contained sustained-release
9 products.
10    Q   You've never been qualified by a court as
11 an expert in sustained-release formulations.
12 Right?
13    A   I don't know what that means.
14    Q   What don't you understand?
15    A   I don't understand the premise of your
16 question.  If you would like to repeat it, I would
17 appreciate that.
18    Q   Have you ever been qualified as an expert
19 by a court before?
20    A   I -- again, I don't know, from the legal
21 perspective, what you mean by that.
22    Q   Let me go back to my question here.
23        So in any of your prior testimony, were
24 you providing testimony as an expert in
25 pharmaceutical formulation?

5 (Pages 14 - 17)

Page 18

1    A   Yes.
2    Q   In which case was that?
3    A   I think pretty much every one of these
4  cases that we just went through involved a
5  pharmaceutical formulation.
6    Q   And were you testifying on the technical
7  aspects of the formulation?
8        MR. BRUNO:  Objection, vague.
9    A   I don't know what you mean by
10 "technical."  I would imagine everything is pretty
11 technical in these matters.
12 BY MS. SAVAS:
13   Q   Were you providing testimony in any of
14 your prior cases as -- on aspects of the
15 formulation -- on components of the formulation as
16 they relate to pharmaceutical science, as compared
17 to a regulatory question?
18       MR. BRUNO:  Objection, vague.
19   A   Sorry.  I don't know what that
20 specifically means.
21       But in this particular matter, I'm
22 providing regulatory perspective.
23       MS. SAVAS:  I'm just wondering if the
24 court reporter got that full answer.
25

Page 19

1  BY MS. SAVAS:
2    Q   You're providing a regulatory perspective
3  in this case.
4        Is that what you just testified?  I
5  couldn't catch the answer.
6    A   Yes, that's what I said.
7    Q   Okay.  You understand that today, you are
8  here to testify on behalf of Astellas in the
9  matter of Astellas Pharma versus Sandoz, et al.?
10   A   I do understand that, yes.
11   Q   And when did you first become engaged in
12 this case, as an expert for Astellas?
13   A   I don't know the exact date, but it's
14 been several months since the initial engagement.
15   Q   Sometime in 2022?
16   A   Yes.
17   Q   And prior to your engagement as an expert
18 in this case, had you heard of the drug
19 mirabegron?
20   A   I had, yes.
21   Q   How did you hear of the drug mirabegron
22 prior to your work in this case?
23   A   Just in a general sense, I'm quite
24 aware -- well aware of drugs in general and drugs
25 in many categories.  So I'm pretty aware of drugs

Page 20

1  that are either on the market or in development.
2    Q   And prior to your engagement as an expert
3  in this case, had you heard of the drug product
4  Myrbetriq?
5    A   Yes.
6    Q   And how did you -- or do you recall in
7  what context you first heard about the drug
8  product Myrbetriq?
9    A   Just general awareness of drugs.  Being
10 very much involved in this industry, I follow drug
11 development and drug marketing.
12   Q   You are not an expert on mirabegron.
13 Correct?
14       MR. BRUNO:  Objection, calls for a legal
15 conclusion.
16   A   So I think my opinions with respect to
17 this drug are well spelled out in my report.
18 BY MS. SAVAS:
19   Q   Dr. Weisman, you're not an expert on
20 mirabegron, are you?
21       MR. BRUNO:  Objection, calls for a legal
22 conclusion.  Asked and answered.
23   A   So I'm not able to give a legal opinion.
24 I very much feel that I have the expertise to
25 provide the opinions that I provided in my report.

Page 21

1  BY MS. SAVAS:
2    Q   And prior to your engagement as an expert
3  in this case, had you worked for Astellas in any
4  other capacity?
5    A   I guess it depends on how you refer to
6  that.  I have done work with Yamanouchi in the
7  past, which I believe is one of the components
8  that makes up Astellas.
9    Q   What type of work did you perform for
10 Yamanouchi?
11       MR. BRUNO:  At this time, I'd like to
12 mark the transcript as confidential.
13 ███   ██  █████████████████████████████
14 ███████████████████████████████████████
15 ███████████████████████████████████
16 ████████████████████████
17 BY MS. SAVAS:
18   Q   Do you recall what period of time that
19 engagement lasted?
20   A   I don't recall, but it's many years back.
21 Probably in excess of 16 years.█████████████
22 █████████████████████████████████
23 ████████████████████████████████████████
24 ████████████████

Page 22



8      MR. BRUNO:  Objection -- sorry.
9   Objection, outside the scope.

16 BY MS. SAVAS:
17    Q   Switching topics slightly, I would like
18 to know if you've prepared for today's deposition.
19      MR. BRUNO:  Objection, form.
20    A   Is there a question?  I didn't quite --
21 BY MS. SAVAS:
22    Q   Did you prepare for today -- sorry.
23      Did you prepare for today's deposition?
24    A   I did.
25    Q   And did you speak with any attorneys to

Page 23

1 prepare for today's deposition?
2      MR. BRUNO:  Objection.
3      I'm just going to counsel the witness to
4   answer that yes or no.
5    A   My answer is yes.
6 BY MS. SAVAS:
7    Q   And to prepare for today's deposition,
8 did you speak with anyone from Astellas?
9    A   I did not.
10    Q   This is a yes-or-no question.
11      Did you review any documents to prepare
12 for today's deposition?
13    A   Yes.
14    Q   How much time did you spend preparing for
15 today's deposition?
16    A   I don't know exactly, but I would
17 estimate in the range of 20 to 25 hours.
18    Q   To prepare your reports in this case --
19 we've already looked at your opening report.
20 But -- and we'll get to your rebuttal and reply
21 report.
22      But when you prepared any of your reports
23 in this case, did you perform any research in that
24 preparation?
25      MR. BRUNO:  Objection, vague.

Page 24

1    A   Can you be more specific what you mean by
2 "research"?
3 BY MS. SAVAS:
4    Q   When you were preparing any of your
5 reports in this case, did you read any materials?
6    A   Sure.  I read a lot of materials.
7    Q   Did you read any materials that are not
8 cited in any of your reports?
9    A   I may have.  But what I cited in my
10 report is what I relied upon.
11    Q   And how did you find that other material
12 that you didn't cite in your report?
13      MR. BRUNO:  Objection, lack of
14   foundation.  Form.
15    A   Well, as a general rule in preparing for
16 any matter, I seek to understand the basic
17 background on the topic.  And so that would
18 include Google searching, PubMed searching, and
19 the like.
20 BY MS. SAVAS:
21    Q   Did you search any of your own files that
22 you have from previous work in your area?
23      MR. BRUNO:  Objection, lack of
24   foundation.  Vague.
25    A   I don't know exactly what that means.

Page 25

1      But I did confer with relevant guidance
2 documents and the like.  And whether I had those
3 previously in my files or not is unclear.
4 BY MS. SAVAS:
5    Q   Did you keep a record of any of the
6 materials that you reviewed while preparing your
7 reports?
8      MR. BRUNO:  Objection, vague.
9    A   As stated, I cited carefully any of the
10 material that I relied upon in coming to these
11 opinions in these reports.
12 BY MS. SAVAS:
13    Q   It's fair to say, then, if you did any
14 searching or researching of materials to prepare
15 your report and you found something, but it's not
16 cited in your report, you are not relying on it?
17      MR. BRUNO:  Objection, vague.
18    A   So I wouldn't say that.  I'm clearly
19 relying on 30 years of experience in this field
20 and general knowledge, as well as general review
21 of the literature.
22      So I would not agree with that.
23 BY MS. SAVAS:
24    Q   And the 30 years of experience in this
25 field and the general knowledge, what do you mean

7 (Pages 22 - 25)

Page 26

1 by -- which field are you referring to?
2    A   I'm really talking about my general
3 understanding of drug development and the opinions
4 that I'm rendering in this case related to the
5 regulatory requirements and recommendations
6 related to such.
7    Q    And the general knowledge that you just
8 referred to pertains to that same field?
9    A   My general knowledge pertains to drug
10 development and the regulations pertaining to
11 such.
12    Q   Let's return to Appendix A in your
13 opening report and look at your CV, or employment
14 history.
15       So did you prepare the CV shown here in
16 Weisman Exhibit 1, Appendix A?
17    A   Yes.
18    Q   When did you prepare the CV shown here in
19 Weisman Exhibit 1?
20    A   I don't know exactly.
21    Q   Did you prepare it for the purpose of
22 this report?
23    A   Absolutely not.
24    Q   Did you prepare it sometime in 2022?
25    A   Probably not.  I do update it

Page 27

1 periodically, to include new publications.  But I
2 recall this probably being several years old.
3    Q   You obtained a Ph.D. degree in
4 pharmacology from Cornell in 1986; is that
5 correct?
6    A   That is correct.
7    Q   And did you perform research as part of
8 your graduate training at Cornell?
9    A   I did.
10    Q   And what type of research?
11    A   Pharmacology research.
12    Q   And what was the topic of your thesis?
13    A   My thesis related to the role of
14 inflammatory agents in urological disorders,
15 particular ureteral obstruction.
16    Q   And did any of your thesis research
17 relate to overactive bladder?
18    A   Not specifically.  But it was
19 urologically focused and did involve the bladder,
20 but not necessarily overactive bladder.
21    Q   Were you studying any drugs as part of
22 your thesis?
23    A   Sure.  Pharmacology is the study of
24 drugs.
25    Q   Any drug in particular?

Page 28

1       MR. BRUNO:  Objection, vague.
2    A   I worked on all kinds of drugs as part of
3 my research work, including drugs for urological
4 conditions, but also anti-inflammatory drugs,
5 anti-effective drugs, and other types of drugs.
6 BY MS. SAVAS:
7    Q   Did you perform any formulation
8 development work as part of your graduate
9 training?
10       MR. BRUNO:  Objection, vague.
11    A   I don't specifically know what that
12 means.
13       But in the case of the research I just
14 cited, it really related to the effects of drugs
15 on a particular biological process.  I don't
16 believe it was necessarily formulation work as
17 part of that program.
18 BY MS. SAVAS:
19    Q   You understand what formulation
20 development is.  Right?
21    A   I do.
22    Q   Have you ever personally worked on
23 formulation development?
24    A   Yes.
25    Q   In what capacity?

Page 29

1    A   Many capacities, from the level of
2 designing new products.  And also, importantly,
3 overseeing the development of such and the
4 regulations relating to them.
5    Q   The level of designing new products, can
6 you explain a little bit more about what role you
7 had in designing new products?
8    A   That's a really broad question.  But I
9 have, over 30 years, been involved in all stages
10 of product development, from the concept phase all
11 the way through testing and marketing such
12 products.
13       So I've been involved in many, many
14 contexts.
15    Q   Was any of your work in that product
16 development bench work, where you were performing
17 experiments or work at the lab bench?
18    A   Yes.
19       MR. BRUNO:  Object -- objection, vague
20    and compound.
21    A   So if you're asking if I have worked at
22 the bench at some point in my career, the answer
23 to that is yes.
24 BY MS. SAVAS:
25    Q   And when was that?

8 (Pages 26 - 29)

Page 30

1    A   I worked at the bench from the time of my
2  graduation in '86 up probably through '91 or '92
3  or '3.
4    Q   And what type of work were you performing
5  in that period, 1986 to about 1991?
6    A   So my work had largely been focused on
7  mechanistic studies, how drugs work.
8        And I ran large-scale laboratories
9  designed to find mechanisms by which new drugs
10  might work.
11    Q   Have you ever performed a dissolution
12  study?
13    A   I have.
14    Q   Was any aspect of your graduate studies
15  related to dissolution?
16    A   My studies, yes.
17    Q   And so I just want to be clear.
18        You personally have performed a
19  dissolution experiment?
20    A   I have.
21    Q   And was that part of your graduate work?
22    A   I think I stated before that I did not do
23  formulation or dissolution work as part of my
24  graduation work -- I'm sorry -- my graduation
25  thesis work.

Page 31

1        In terms of graduate study, clearly,
2  dissolution would have been a critical component
3  of any pharmacology study.
4    Q   Did you perform any dissolution work
5  after -- after your graduate studies?
6    A   I don't know what you mean by
7  "dissolution work."
8        But as I mentioned, I ran a laboratory
9  that evaluated the effects of drugs, and
10  dissolution is an important aspect of how drugs
11  work.
12        So I would have been focused not only on
13  mechanism, but also the dissolution of the drug in
14  that context.
15    Q   What laboratory did you run?
16    A   I ran, for many years, the
17  immunopharmacology laboratory for the Procter &
18  Gamble company which, as I mentioned, was
19  responsible for developing data with respect to
20  the mechanism of many drugs.
21    Q   During your time at Procter & Gamble, did
22  you personally perform any dissolution experiment?
23        MR. BRUNO:  Objection.  I'm going to
24  allow the witness to answer this.
25        But please be cognizant of any

Page 32

1  confidentiality obligations you may owe to
2  Procter & Gamble.
3    A   So as I mentioned previously, in the
4  evaluation of any drug, in the context of looking
5  at mechanism of action, you need to know that the
6  drug associated was available for an effect on the
7  biological system.
8        So in that context, I would have done
9  dissolution work.  So that would have been a
10  common activity.
11  BY MS. SAVAS:
12    Q   In the lab you worked in, but not you
13  personally; is that right?
14        MR. BRUNO:  Objection, vague.
15    A   I don't know what that means.
16        But in the case of the laboratory I'm
17  talking about, I was the head of the laboratory
18  and responsible for all activities in that
19  laboratory, and prided myself on understanding the
20  techniques and activities of the laboratory.
21        So while it would not have necessarily
22  been my primary function, I would have been
23  overseeing and been involved.
24  BY MS. SAVAS:
25    Q   At any point in your career, have you

Page 33

1  ever calculated an f2 value?
2    A   I don't know that I would have personally
3  done so, no.
4    Q   After you received your Ph.D., you went
5  on to a post- -- as a postdoctoral fellow to Roche
6  Institute of Molecular Biology; is that correct?
7    A   That is correct.
8    Q   And how long was your postdoc period?
9    A   Roughly a year.
10    Q   And this is paragraph 7 of your opening
11  report, if we could go there.  It's page 4.
12    A   Um-hm.
13    Q   Here in paragraph 7, do you see where you
14  write:
15        "I contributed meaningful insight related
16  to the development of anti-inflammatory drugs."
17    A   I do.
18    Q   And what do you mean by this statement?
19    A   What I mean by this statement is that I
20  was very involved in the ascertainment of how
21  anti-inflammatory drugs work and, quite
22  interestingly, was very instrumental in the
23  discovery of the cyclooxygenase enzyme, which
24  turned out to be the most important as it relates
25  to anti-inflammatory drugs for arthritis.

9 (Pages 30 - 33)

Page 34

1    Q   During your postdoctorate studies, did
2  you perform any formulation development work?
3    A   I don't believe that I necessarily did
4  formulation development work.  But formulation
5  would have been a critical part of understanding
6  the nature of the drugs that I was working with
7  and the various biological systems.
8    Q   How so?
9    A   You know, my work was really very much
10  related to how a drug works.  And a drug can only
11  work if it disassociates, so dissolution is pretty
12  important to pretty much everything one does as a
13  pharmacologist.
14    Q   During your postdoctorate work, did you
15  perform any dissolution experiments?
16    A   I don't recall if I did -- I did or
17  didn't.
18    Q   Now, are you currently employed?
19    A   I am.
20    MS. SAVAS:  We can take down that section
21  of the report.
22  BY MS. SAVAS:
23    Q   What is your current job title?
24    A   I am the global president of Lumanity.
25    Q   And how long have you held that position?

Page 35

1    A   I have held the position for close to
2  20 years.  However, that title itself is about a
3  year old.  It relates to when we changed to
4  Lumanity.
5    Q   You have never worked at the FDA.
6  Correct?
7    A   That's correct.  I have never worked at
8  the FDA.
9    Q   You've never written an FDA guidance
10  document.  Correct?
11    A   I wouldn't say written one.  But I
12  certainly have contributed by being in workshops
13  and helped activities with the FDA.
14    But I would not say that I've written an
15  FDA guidance document.  Those are written by the
16  FDA.
17    Q   You do not have a degree related to FDA
18  regulations.  Correct?
19    A   I don't know what that means.  I don't
20  think there is such a thing.
21    But yes, my degree relates to the
22  development of drugs, and it definitely pertains
23  to the regulation of such.
24    Q   You don't have a graduate or
25  undergraduate degree in FDA regulations.  Correct?

Page 36

1    A   I don't know that such a thing exists.
2    But my training is directly relevant to
3  FDA regulations.
4    Q   And your training is relevant to FDA
5  regulations because drugs are approved for
6  marketing by FDA?
7    A   I don't know that I would say it that
8  simply.
9    But what I'm qualified to do is to
10  understand the nature of how drugs work and their
11  effect on the body.  And I've spent 30-plus years
12  dealing with regulations pertaining to such.
13    Q   You understand what an ANDA is, A-N-D-A?
14    A   I do.
15    Q   And you understand what an N-D-A is?
16    A   I do.
17    Q   You've never reviewed an application for
18  an ANDA or NDA drug product.  Correct?
19    A   That's not correct.
20    Q   During the approval process of an ANDA or
21  NDA, have you reviewed application materials?
22    A   I'm not sure I understand what you're
23  really asking.
24    But I review NDAs and ANDAs all the time.
25  In fact, just yesterday I was reviewing a very

Page 37

1  significant component of an NDA.
2    Q   Yeah.  I don't think my question was
3  worded correctly.
4    So the question is:  Have you ever
5  reviewed an NDA or ANDA application from the
6  viewpoint of approving that product for marketing?
7    A   From the viewpoint, yes.
8    Q   But you've never worked for FDA?
9    MR. BRUNO:  Objection, vague.
10    A   I think I've answered previously that I
11  was not and have not been employed by FDA.
12  BY MS. SAVAS:
13    Q   Let's return to your opening expert
14  report.  And this is in paragraph 10 on page 6.
15    Do you see here where you state that
16  you've had significant work in urological drugs,
17  including those used for overactive bladder?
18    A   I do.
19    Q   And what drugs for overactive bladder
20  have you worked on?
21    A   Well, as I noted in my report, I've
22  worked on Oxytrol.
23    Q   Any other drugs for overactive bladder?
24    A   I don't believe so, no.
25    Q   And about how many years did you spend

10 (Pages 34 - 37)

1 working on Oxytrol?
2   A   (Inaudible.)
3   Q   Can you repeat the answer?  I didn't hear
4 it.
5   A   I'm sorry.  I said "several."
6   Q   Several, okay.
7       And what is Oxytrol?
8   A   Oxytrol is a brand name of a drug called
9 oxybutin, which is used for overactive bladder.
10   Q   And your work on Oxytrol related to the
11 over-the-counter switch for Oxytrol?
12   A   That's correct.
13   Q   And do you recall the years that you
14 worked on this Oxytrol project?
15   A   I don't exactly.  I would say the early
16 2000s.
17   Q   Can you describe the general nature of
18 your work in this project?
19   A   Yeah.  My work was generally related to
20 helping the company in this case, Schering-Plough,
21 identify the most important regulatory path and
22 clinical studies to support the switch of the
23 product from prescription to over-the-counter use.
24   Q   In paragraph 11 of your opening report,
25 you mention you had a role in developing a

1 controlled release low-dose aspirin; is that
2 correct?
3   A   Yes, that is correct.
4   Q   And what was your -- what was your role
5 in this project?
6   A   In this case, I was the project lead
7 responsible for all aspects of the program, from
8 product development, clinical activities, and
9 regulatory.
10   Q   And how many years did you spend on that
11 project?
12   A   A lot.  I'm guessing somewhere between
13 seven and ten years.
14   Q   Now, in the present litigation --
15       MS. SAVAS:  You can take down the report.
16 BY MS. SAVAS:
17   Q   In the present litigation, you are not
18 offering any opinions related to the treatment of
19 overactive bladder.  Correct?
20       MR. BRUNO:  Objection, vague.
21   A   I think my reports are quite clear on
22 what my opinions are.  And I don't believe that
23 I've rendered any specific opinions on the medical
24 treatment of OAB, if that's what you're asking.
25

1 BY MS. SAVAS:
2   Q   And in the present litigation, you're not
3 offering any opinion on the technical aspects of
4 dissolution testing.  Correct?
5       MR. BRUNO:  Objection, vague.
6   A   I don't agree with that.  I think my
7 report provides details with respect to the
8 regulatory context by which dissolution testing is
9 conducted.
10 BY MS. SAVAS:
11   Q   Okay.  So your opinions in this case are
12 limited to the regulatory context of dissolution.
13 Correct?
14       MR. BRUNO:  Objection, vague.
15   A   I don't know specifically what that
16 means.
17       But again, I think my opinions are well
18 presented in my reports.  And those are, indeed,
19 my opinions.
20 BY MS. SAVAS:
21   Q   I was just, actually, restating what you
22 had said to me.
23       So is it correct, then, that your
24 opinions in this case are limited to the
25 regulatory context of dissolution?

1       MR. BRUNO:  Objection, vague.  Asked and
2   answered.
3   A   I don't know that I would agree with the
4 word "limited."
5       But what I do agree with is that my
6 opinions are quite clear in my report and do focus
7 largely on the regulatory context with respect to
8 how dissolution is looked at from a regulatory
9 perspective.
10 BY MS. SAVAS:
11   Q   In the present litigation, you're not
12 offering any opinions on the formulation
13 development of mirabegron.  Correct?
14       MR. BRUNO:  Objection, vague.
15   A   I'm not sure I know what that means.
16       But again, I think my opinions are pretty
17 clear about -- around the regulatory aspects
18 around how formulations impact mirabegron
19 performance.
20 BY MS. SAVAS:
21   Q   Are you familiar with the term in patent
22 law known as "a person of ordinary skill in the
23 art"?
24   A   As a general context, yes.
25   Q   Okay.  In this case, you are not

Page 42

1  providing a definition of a person of ordinary
2  skill in the art.  Correct?
3     A   Where it does not include a specific
4  definition, I'm aware that there are definitions,
5  in general, that are used.
6     Q   Are you aware of any of the definitions
7  of a person of ordinary skill in the art that are
8  being asserted in this case?
9     A   I am.
10    Q   And how did you become aware of the
11 definition of a person of ordinary skill in the
12 art in this case?
13       MR. BRUNO:  Objection, to the extent that
14    it asks for specific communications with an
15    attorney.
16       And, Dr. Weisman, I'm going to ask you to
17    exclude those communications.  But you can
18    otherwise answer.
19    A   I'm generally aware that there are
20 definitions from both the plaintiff and the
21 defendant in this matter.  And I believe that I've
22 seen definitions in both plaintiff and defense
23 expert reports.
24 BY MS. SAVAS:
25    Q   Okay.  Do you recall which plaintiff's

Page 43

1  expert reports you reviewed in this case?
2     A   I believe that I saw a definition in
3  Dr. Little's report.
4     Q   Did you review Dr. Little's entire
5  report?
6     A   I did not.
7     Q   And do you recall which of defendants'
8  reports you reviewed?
9     A   Are you asking reviewed in general, or
10 reviewed in the context of this definition?
11    Q   Did you review any of defendants' expert
12 reports?
13    A   Yes.
14    Q   And did you review the definition of a
15 person of ordinary skill in the art provided in
16 defendants' reports?
17    A   Yes.
18    Q   But you don't provide a definition of a
19 person of ordinary skill in the art in your
20 reports.  Correct?
21       MR. BRUNO:  Objection, asked and
22    answered.
23    A   So I think it was very clear.  I have not
24 made any -- not rendered any opinion with respect
25 to definitions in my reports.

Page 44

1  BY MS. SAVAS:
2     Q   In this case, you're not providing an
3  opinion from the viewpoint of a person of ordinary
4  skill in the art.  Correct?
5        MR. BRUNO:  Objection, vague.
6     A   I'm not sure exactly what you mean by
7  your question.
8        But in at least in one of my reports, I
9  do comment on opinions rendered by the defense
10 regarding this topic.  But -- not in terms of
11 providing any sort of definition, but merely
12 adopting their definition for that purpose.
13 BY MS. SAVAS:
14    Q   You personally have not offered an
15 opinion from the viewpoint of a person of ordinary
16 skill in the art.  Correct?
17       MR. BRUNO:  Objection, vague.  Asked and
18    answered.
19    A   So I think I was very clear that I have
20 not specifically rendered an opinion for any
21 definition.
22 BY MS. SAVAS:
23    Q   Okay.  In your opinion, do you qualify --
24 or do you fit the definition of a person of
25 ordinary skill in the art as defined by

Page 45

1  Dr. Little?
2        MR. BRUNO:  Objection, calls for a legal
3     conclusion.  Outside the scope.
4     A   I understand that there could be a legal
5  definition -- or there is a legal definition
6  associated with that.
7        If you're asking whether I have skill of
8  the type described, I would believe that I would
9  at least meet or exceed that.
10       (Reporter clarification)
11 BY MS. SAVAS:
12    Q   So in your opinion, you -- strike that.
13       So I'm going to represent to you
14 Dr. Little's definition of a person of ordinary
15 skill in the art.  And -- just to confirm that
16 it's your opinion that you meet or exceed that --
17 that level of skill.
18       It's someone with at least a Ph.D. in
19 pharmaceutical sciences or a related field, and
20 approximately two to three years of experience,
21 research, and/or training in formulation and
22 characterization of pharmaceutical dosage forms.
23       In your opinion, you meet or exceed that
24 level of skill?
25       MR. BRUNO:  Objection, calls for a legal

12 (Pages 42 - 45)

Page 46

1    conclusion. Outside the scope.
2    A   Right. I'm not able to comment on that
3    definition and its appropriateness.
4    But as I stated before, my background
5    aligns with that. And so as I said before, I
6    would feel that I meet or exceed that definition.
7    MR. BRUNO: We've been going for about an
8    hour. I don't want to interrupt your flow,
9    but if you're moving on to another topic, can
10   we take break?
11   MS. SAVAS: I just have a couple more
12   questions.
13   How much longer do we have -- we have,
14   probably, a couple more minutes left on the
15   tape too.
16   BY MS. SAVAS:
17   Q   Now, your Ph.D. is in pharmacology.
18   Correct?
19   A   That's correct.
20   Q   And the lab that you ran at Procter &
21   Gamble, that was a pharmacology program lab?
22   MR. BRUNO: Objection, asked and
23   answered.
24   A   So it was specifically an
25   immunopharmacology laboratory that studied drugs

Page 47

1    with their impact on the immune inflammatory
2    systems.
3    MS. SAVAS: Okay. Let's -- we can take a
4    break now, and for however long the witness
5    needs.
6    THE VIDEOGRAPHER: Okay. We're going off
7    the record at 10:05 a.m. This is the end of
8    Media Unit 1.
9    (WHEREUPON, a recess was taken,
10   after which the following
11   proceedings were held:)
12   THE VIDEOGRAPHER: Okay. We are back on
13   the record. The time is 10:16 a.m. This is
14   the beginning of Media Unit 2.
15   BY MS. SAVAS:
16   Q   Dr. Weisman, in this case you are not
17   providing any opinion that a defendant infringes
18   the asserted claims of the '780 patent; is that
19   correct?
20   MR. BRUNO: Objection, vague.
21   A   So I don't give any specific opinions
22   on -- with respect to any particular product
23   infringing. I do provide opinions relevant to the
24   infringement question.
25

Page 48

1    BY MS. SAVAS:
2    Q   Is it correct, then, in this case you're
3    not providing any opinion on whether any of the
4    asserted claims of the '780 patent are invalid?
5    MR. BRUNO: Objection, vague.
6    A   So I think the same point. I'm not
7    providing any legal opinions or rendering any
8    particular opinions regarding any particular
9    product.
10   But I do have general opinions with
11   respect to means by which one determines a
12   similarity.
13   BY MS. SAVAS:
14   Q   You offer no opinion on any claim
15   limitation of the '780 patent. Correct?
16   MR. BRUNO: Objection, vague.
17   A   I'm not even sure I know what that means.
18   But clearly, I'm not providing any legal
19   perspective.
20   BY MS. SAVAS:
21   Q   So just to make sure I understand.
22   Dr. Weisman, you're not providing any
23   opinion on whether any of the claims of the '780
24   patent are obvious.
25   A   I'm not providing any legal opinions or

Page 49

1    any opinions related to the writing of the patent
2    or the patent claims.
3    I have provided opinions with respect to
4    the nature of the invention, as it relates to the
5    food effect.
6    Q   You would agree with me that in the
7    claims of the '780 patent, there is no recitation
8    of a food effect. Correct?
9    MR. BRUNO: Objection, calls for a legal
10   conclusion. Outside the scope.
11   A   I have not rendered any opinions with
12   respect to that, and I'm clearly not qualified to
13   render legal opinions.
14   BY MS. SAVAS:
15   Q   Let's return to your opening report.
16   And this is in paragraph 19. It starts
17   at the end of page 9.
18   So -- yes, at the end of paragraph 19.
19   Do you see where you state that:
20   "...an ANDA applicant must demonstrate
21   bioequivalence between its generic product and the
22   RLD."
23   A   I do.
24   Q   And then you go on to say that:
25   "For novel formulations, including

13 (Pages 46 - 49)

Page 50

1 generic extended-release formulations, this also
2 requires demonstrating sufficient sameness of
3 dissolution profiles between generic
4 extended-release formulations and the RLD."
5     A   Yes, I see that.
6     Q   And you cite, in Footnote 8, to an FDA
7 "Guidance for Industry:  Extended Release Oral
8 Dosage Forms:  Development, Evaluation, and
9 Application of In Vitro/In Vivo Correlations."
10        Do you see that?
11    A   I do.
12        MS. SAVAS:  Let's mark as Weisman
13    Exhibit 2 FDA "Guidance for Industry:
14    Extended Release Oral Dosage Forms:
15    Development, Evaluation, and Application of In
16    Vitro/In Vivo Correlations."
17        This is Bates Number ASTMIRA 02231775 to
18    801.
19        (Document marked as Exhibit No. 2
20        for identification.)
21        MS. SAVAS:  And then, Clint, if we could
22    go to that document, please.
23        CONCIERGE:  Yes.  I'm marking the Exhibit
24    Share real quick.
25        MS. SAVAS:  Okay.  Thanks.

Page 51

1        MR. BRUNO:  And, Dr. Weisman, if you hit
2    refresh, I think the document will appear as
3    an option.
4        MS. SAVAS:  Okay.  If we can please go
5    to -- let's go to the first cited page that's
6    ending in Bates 2231788.
7        MR. BRUNO:  Can we go off the record for
8    a moment?
9        MS. SAVAS:  Sure.
10        CONCIERGE:  Justin, can you take us off
11    the record?
12        THE VIDEOGRAPHER:  Oh, sure.
13        We're going off the record at 10:23 a.m.
14        (WHEREUPON, a recess was taken,
15        after which the following
16        proceedings were held:)
17        THE VIDEOGRAPHER:  Okay.  We are back on
18    the record.  The time is 10:24 a.m.
19        MS. SAVAS:  Can we zoom in on the exhibit
20    a little?
21        Thank you.  Thank you.
22 BY MS. SAVAS:
23    Q   Okay.  Dr. Weisman, you've cited, as
24 support for the statement we just read, this page
25 here ending in Bates Number 2231788.

Page 52

1        And where on this page does it provide
2    support for the statement that FDA requires
3    sufficient sameness of dissolution profiles
4    between generic extended-release formulations and
5    the RLD?
6        MR. BRUNO:  Objection, misleading.
7    Mischaracterizes the document.
8     A   I don't think I stated that a particular
9 page in this document specifically said that.
10 BY MS. SAVAS:
11    Q   You didn't cite this page in support of
12 that statement?
13    A   I did -- I did cite this document.  And
14 as I'm looking at this page, I don't know that I
15 cited to a specific portion of this page.
16    Q   Well, is this a typo in this report?  You
17 shouldn't have cited to this page?
18    A   I don't know.
19    Q   You don't know?
20    A   I don't know if it's a typo or not.  But
21 I -- maybe you can ask your question again.
22    Q   Is there anything on this page, which
23 you've cited in support of your statement in
24 paragraph 19, that supports your statement on
25 paragraph 19?

Page 53

1        MR. BRUNO:  Objection, misleading.
2    Mischaracterizes the document.
3     A   I think, with that in mind, I'm going to
4    have to read that document and -- to answer any
5    questions you have about it.
6        If you would like me to do that...
7 BY MS. SAVAS:
8    Q   I'm asking you if there's anything on
9 this page, which is shown before you -- feel free
10 to read the page.  You've cited it in support of
11 your statement that we've just read.
12        And I'm asking you what part of this page
13 actually supports your document, and it seems like
14 you don't have a response.
15    A   First of all -- sorry.
16        MR. BRUNO:  Objection, form.
17    Argumentative.
18    A   I don't even see the page number in the
19 view that you're showing.  And so I'll have to
20 find it here.  And I'm actually struggling with
21 making this advance, too.
22        How do I advance this?
23        MR. BRUNO:  (Indicating)
24        So just to make the record clear, I'm
25    showing Dr. Weisman.  He's having a problem

14 (Pages 50 - 53)

Page 54

1 advancing the pages, and so I'm just showing
2 him right now how to do that, so that he can
3 flip through the document.
4     I haven't directed him to any specific
5 page.
6     MS. SAVAS: Why don't we have -- Clint,
7 why don't you -- can you give control to
8 Dr. Weisman?
9     CONCIERGE: I'm going to try. They're
10 not on a laptop, so we'll see if this works.
11 We'll see if I --
12     MR. BRUNO: We've resolved the issue. He
13 knows how to use the Exhibit Share to move
14 through pages now, so we've resolved the
15 issue.
16     MS. SAVAS: As long as counsel is not,
17 you know, flipping through the pages for the
18 exhibit for the witness.
19     MR. BRUNO: As I stated on the record
20 previously, I have not directed the witness to
21 a specific page. I was just showing him how
22 to move up and down through a page, through
23 the exhibit, in aid of the deposition.
24     THE WITNESS: This is the same thing.
25     MR. BRUNO: Dr. Weisman, you can't change

Page 55

1 the page -- sorry. There's a little confusion
2 here --
3     THE WITNESS: My page 11 is not the same
4 thing as this page 11.
5     MR. BRUNO: Well, I'll let the
6 questioning attorney ask her questions there.
7     I just want to note on the record that he
8 can't change the page as it's viewed on the
9 screen that is in the conference room.
10     He's changing the page as is viewed on
11 the laptop that's in front of him.
12     MS. SAVAS: Okay. He can change -- yeah.
13 I understand he cannot change the shared view.
14     And page 11 is the paper page. It's
15 probably different from the PDF page, if
16 that's what you're looking at, the page --
17 there's the PDF page, the page number on the
18 document, and then there's the Bates-numbered
19 page number.
20     THE WITNESS: I understand. I apologize.
21 I'm just trying to figure out how to use this,
22 because I can't see the actual page numbers.
23     Certainly, I'm having a hard time with
24 this. Is there a Bates number for this?
25 Because the page numbers don't match in the

Page 56

1 PDF, and I can't see --
2 BY MS. SAVAS:
3     Q    Well, can you go to PDF page 14,
4 "Biowavers for Changes in the Manufacturing of a
5 Drug Product"?
6     A    Thank you. That was very helpful. Thank
7 you.
8     Q    Okay. So going back to my question,
9 Dr. Weisman: Is there anything on this page,
10 which you have cited in your report at the end of
11 paragraph 19, that supports your statements in
12 paragraph 19?
13     A    Yeah. I think this specifically talks to
14 the importance of dissolution testing for
15 establishing an IVIVC, which is essentially
16 equivalent for determining bioequivalence.
17     Q    Okay. So in your opinion, established --
18 this portion of the document discussing IVIC
19 supports your statement that sufficient sameness
20 of dissolution profiles are required between
21 generic formulations and the RLD?
22     MR. BRUNO: Objection, mischaracterizes
23 previous testimony.
24     A    What this document specifically talks
25 about is the importance of dissolution testing for

Page 57

1 regulatory decision making, which I think is not
2 really the point that I cited.
3 BY MS. SAVAS:
4     Q    You also cited pages ending in Bates
5 Numbers 2231793 to 94.
6     MS. SAVAS: If we could go there on the
7 shared screen, please.
8     CONCIERGE: Sure. Will you just repeat
9 those numbers for me real quick?
10     MS. SAVAS: 02231793. It's PDF page 19,
11 and it goes to the following page.
12 BY MS. SAVAS:
13     Q    So, Dr. Weisman, if you can scroll to PDF
14 page 19. Yes.
15     You've also cited these two pages in
16 support of your same statements from paragraph 19.
17     Do you see that in your report?
18     A    Yes.
19     Q    The same question: Will you point us to
20 what portions of these pages support your
21 statements in paragraph 19 of your opening report?
22     MR. BRUNO: Objection, form.
23     Oh, I'm sorry. I thought you were done.
24 Objection, form.
25     A    Here again, this document spells out the

15 (Pages 54 - 57)

Page 58

1 importance of comparison dissolution profiles and
2 how they are independent of the model.
3       This is really giving details around the
4 elements of an IVIVC.
5 BY MS. SAVAS:
6    Q   Let's return to your opening report at
7 paragraph 25.
8       Dr. Weisman, do you see here where you
9 state in paragraph 25 that:
10       "ANDA applications," you state, "are
11 abbreviated such that a pharmaceutical company may
12 make a generic version of a drug already
13 approved..."
14    I'll let you get there.
15    A   Sure. I'm sorry. Can you --
16    Q   Yeah. I'm reading paragraph 25. Tell me
17 when you're there.
18    A   I am. Thank you.
19    Q   Okay. And in support of your statements
20 for paragraph 25 -- well, let's see. Back up.
21       In paragraph 25, you state that:
22       "ANDA applications are abbreviated such
23 that a pharmaceutical company may market a generic
24 version of a drug already approved under an NDA if
25 the ANDA can show that the proposed drug product

Page 59

1 is bioequivalent to the previously approved NDA
2 product that it seeks to duplicate."
3       Do you see that?
4    A   Yes.
5    Q   Now in your opinion, are all ANDA
6 products duplicates of the respective
7 reference-listed drug product?
8       MR. BRUNO: Objection, vague. Outside
9    the scope. Incomplete hypothetical.
10    A   So I don't know that I can answer that
11 question.
12       But this statement here only relates to
13 the ANDA product and its relationship to the
14 reference-listed drug.
15 BY MS. SAVAS:
16    Q   In support of your statement here in
17 paragraph 25, you cite to a portion of the FDA
18 website describing ANDAs.
19       Do you see that, Footnote 16?
20    A   Yes.
21    MS. SAVAS: So if we can mark the next
22    exhibit, which will be Weisman Exhibit 3.
23    This is Bates ASTMIRA 002231674 to 77.
24       THE WITNESS: Is it there yet?
25       CONCIERGE: I'll let you all know.

Page 60

1       (Document marked as Exhibit No. 3
2       for identification.)
3       CONCIERGE: All right. It is now marked.
4    Please refresh your exhibit folders now.
5       THE WITNESS: Okay. I have it.
6 BY MS. SAVAS:
7    Q   Okay. Dr. Weisman, is there a specific
8 portion of this document that supports your
9 statements in paragraph 25 of your opening report?
10    A   I'm going to think all of it. I mean,
11 this gives the broad definitions and tenets that
12 support an ANDA.
13    Q   It's not a requirement of FDA that an
14 ANDA must duplicate the referenced listed drug.
15 Correct?
16       MR. BRUNO: Objection, vague.
17    A   And my testimony really only notes that,
18 in this case, about how an ANDA drug compares to
19 the reference-listed drug NDA.
20       I didn't make any comment or intend to
21 specify that any and all ANDA drugs are
22 duplicates.
23 BY MS. SAVAS:
24    Q   And the FDA requires that the ANDA
25 product be bioequivalent to the reference-listed

Page 61

1 drug. Correct?
2    A   That is correct.
3    Q   And bioequivalence is established by
4 showing that the generic drug product delivers the
5 same amount of active ingredient into the
6 patient's bloodstream in the same amount of time
7 as the reference-listed drug. Right?
8       MR. BRUNO: Objection, vague. Incomplete
9    hypothetical.
10    A   I mean, I think that's a bit general,
11 that bioequivalence relates to the rate and extent
12 of absorption, if that's what you're asking.
13 BY MS. SAVAS:
14    Q   You agree with this statement here shown
15 on Bates 02231674, that's actually the last
16 sentence of the third paragraph:
17       "To be approved by FDA, the generic
18 version must deliver the same amount of active
19 ingredients into a bloodstream in the same amount
20 of time as the innovator drug."
21    A   So you're talking about -- I don't know
22 that Bates number.
23       Is that the same document we're looking
24 at that you're asking about?
25    Q   Yeah.

16 (Pages 58 - 61)

1    A   I'm sorry.  Yes?
2    Q   Yes.
3    A   And which page -- sentence are you
4 looking at?
5    Q   Oh.
6        CONCIERGE:  I mean, not to overstep my
7 bounds, but this is just the first page of the
8 document still.
9        MS. SAVAS:  I'll strike the question.
10 Let's just move on.  Strike the question.
11       We're going to -- if we could please mark
12 as Weisman Exhibit 4 FDA guidance regarding
13 mirabegron.
14       CONCIERGE:  Can I have the Bates number,
15 please?
16       MS. SAVAS:  Oh, sorry.  Yes.
17       ASTMIRA 02231748 to 749.
18       CONCIERGE:  Thank you.
19       (Document marked as Exhibit No. 4
20       for identification.)
21       CONCIERGE:  Okay.  Exhibit 4 has been
22 marked in Exhibit Share.  I'm putting it up on
23 the screen now.
24 BY MS. SAVAS:
25    Q   Dr. Weisman, have you seen Weisman

1 Exhibit 4 before?
2    A   I have, yes.
3    Q   Prior to this litigation, had you seen
4 the draft guidance on mirabegron?
5    A   I don't believe I have, no.
6    Q   I should have asked:  Weisman Exhibit 4
7 is FDA's draft guidance for ANDA applicants
8 submitting applications for mirabegron
9 extended-release tablets?
10   A   My understanding, this is the
11 product-specific guidance for mirabegron.
12   Q   The draft guidance for mirabegron
13 provides a suggestion on the methodology for
14 bioequivalence studies, ASTMIRA 02231674 to 77, a
15 suggestion on the methodology for bioequivalence
16 studies for mirabegron.  Correct?
17   A   I don't know that I would agree with the
18 word "suggestion," but it does provide FDA's best
19 thinking on -- with respect to how one should
20 conduct studies with mirabegron.
21   Q   The draft guidance for mirabegron
22 provides a method for dissolution and
23 bioequivalence testing; is that right?
24   A   It does provide FDA's recommendation to
25 generic sponsors on how to study extended-release

1 mirabegron tablets, yes.
2    Q   The draft guidance provides the same
3 method as USP Method 1; is that right?
4        MR. BRUNO:  Objection, vague.
5    A   I'm not really sure what you're asking.
6        But this does reference USP Apparatus 1.
7 BY MS. SAVAS:
8    Q   The draft guidance identifies
9 USP Method 1 as an appropriate dissolution method
10 for mirabegron?
11   A   It is one of the methods that's
12 referenced in this document, yes.
13   Q   You don't have any knowledge on whether
14 FDA would have allowed an ANDA applicant to use a
15 different method, do you?
16   A   I can't speak to what FDA would have done
17 or not done.
18       But what I can speak to is the clarity of
19 this guidance that's provided in this document.
20   Q   When you were preparing your opening
21 expert report in this case, you did not review any
22 of defendants' ANDAs in this case; is that
23 correct?
24   A   I did not, nor did I render any opinions
25 with respect to the defendants' ANDAs.

1        MS. SAVAS:  Let's move to your rebuttal
2 report.  This will be Weisman Exhibit 5.
3        (Document marked as Exhibit No. 5
4        for identification.)
5        THE WITNESS:  I have it.  Thank you.
6 BY MS. SAVAS:
7    Q   Okay.  Dr. Weisman, shown here on the
8 screen as Weisman Exhibit 5, this is your rebuttal
9 expert report concerning the FDA's recommendations
10 regarding drug food effects?
11   A   It appears to be.  I just see the table
12 of contents here, but it appears to be.  Correct.
13   Q   Okay.  There's the cover page.
14   A   Okay.  Thank you.
15   Q   Sitting here today, do you have any
16 corrections or additions to your rebuttal report?
17   A   I don't believe so, no.
18   Q   And I should have asked this with your
19 opening report.
20       Sitting here today, do you have any
21 corrections or additions to your opening expert
22 report, which is Weisman Exhibit 1?
23   A   I don't think so.
24   Q   Now in your rebuttal report, you are not
25 providing any opinion regarding whether a person

17 (Pages 62 - 65)

Page 66

1  of skill in the art would have been motivated to
2  develop a sustained-release formulation of
3  mirabegron that is claimed in the '780 patent.
4  Correct?
5      A   Well, I mean, I clearly do have opinions
6  with respect to whether a person skilled in the
7  art would have understood there to be a food
8  effect in the development of the product
9  accordingly.  So I would not agree with that
10 statement.
11     Q   Your opinions are limited to whether a
12 person of skill in the art understood there to be
13 a food effect from mirabegron; is that right?
14         MR. BRUNO:  Objection, vague.
15     Misleading.
16     A   That's why I don't know if that's the
17 extent of my opinions.
18         But my opinions are clearly noted in my
19 report, and those are my opinions.
20 BY MS. SAVAS:
21     Q   To prepare your rebuttal report, did you
22 review the opening expert report of any of
23 defendants' experts?
24     A   I did.
25     Q   Did you review the opening expert

Page 67

1  report -- or which opening expert report did you
2  review?
3      A   I read the opening reports, I believe, of
4  Dr. Shargel and Dr. Buckton, and a portion of
5  Dr. Chambliss', which I believe was just the
6  Appendix E.
7      Q   With respect to Dr. Chambliss, it's
8  correct that you reviewed only Appendix E of his
9  opening report; is that correct?
10     A   You know, quite frankly, I don't know if
11 it was his opening report or not.  But I know I
12 reviewed Appendix E only for the purpose of
13 writing my report.
14     Q   Okay.  Are you aware that Appendix E in
15 Dr. Chambliss' report is the technical background
16 section of his report on invalidity of the '780
17 patent?
18         MR. BRUNO:  Objection, vague.  Lack of
19     foundation.
20     A   I'm not sure I know necessarily how one
21 would characterize that document.
22         But I did read that document and
23 considered it in my rebuttal report.
24 BY MS. SAVAS:
25     Q   Did you review any of Dr. Chambliss'

Page 68

1  opinions on why the asserted claims of the '780
2  patent are obvious?
3          MR. BRUNO:  Objection, lack of
4      foundation.
5      A   So what I did review, as I stated, was
6  Appendix E.  And my understanding is he does cover
7  a considerable detail around why he felt that the
8  food effect might be obvious.
9  BY MS. SAVAS:
10     Q   Okay.  And to prepare your rebuttal
11 report, did you consider the '780 patent?
12     A   I considered the '780 patent for all
13 aspects of this work.
14     Q   But in your rebuttal report, you do not
15 opine on any particular claim limitation of the
16 '780 patent.  Correct?
17     A   I don't know what that means, but I'm
18 certainly not rendering any legal opinions.
19         And my opinions, as it relates to the
20 rebuttal, relates to comments made by the defense
21 experts and only that.
22     Q   Okay.  I'm not asking if you offered any
23 legal opinions.
24         I'm asking if you provide any opinion
25 addressing a particular claim limitation on the

Page 69

1  '780 patent in your rebuttal report.
2          And you don't.  Correct?
3      A   Again, I'm not sure I'm qualified to even
4  answer that question, because that seems to call
5  for a legal assessment.
6          But what I can tell you is that I
7  considered the opinions set forth by the defense
8  experts and provided rebuttal to some of them.
9      Q   You're not offering an opinion in your
10 rebuttal report on whether the formulation claimed
11 in the '780 patent does or does not solve a food
12 effect problem.  Correct?
13         MR. BRUNO:  Objection, lack of
14     foundation.
15     A   Well, as I've stated before, I have not
16 rendered any opinions with respect to any
17 particular claim.
18         I've provided perspective around the
19 regulatory understanding in this case around a
20 possible food effect.
21 BY MS. SAVAS:
22     Q   And you would agree that food effect
23 studies are usually conducted for new drugs and
24 new drug products during the IND stage?
25     A   I would agree that food effect studies

18 (Pages 66 - 69)

Page 70

1 are routinely conducted for most drugs and at
2 various stages of development, not just the IND
3 phase.
4     Q    You would agree that FDA recommends
5 applicants conduct food effect studies on all
6 orally administered modified release dosage forms.
7 Correct?
8     A    I do agree that FDA recommends food
9 effect studies for all drugs and pays particular
10 attention to such for controlled release
11 formulations.
12 BY MS. SAVAS:
13     Q    If we could go to paragraph 17 of the
14 rebuttal report.
15     A    Yes.
16         MR. BRUNO:  Let's go off the record.
17         THE VIDEOGRAPHER:  Okay.  We're going off
18 the record at 10:57 a.m.  This is the end of
19 Media Unit 2.
20         (WHEREUPON, a recess was taken,
21             after which the following
22             proceedings were held:)
23         THE VIDEOGRAPHER:  Okay.  We are back on
24 the record.  The time is 11:02 a.m.  This is
25 the beginning of Media Unit 3.

Page 71

1 BY MS. SAVAS:
2     Q    Okay.  Dr. Weisman, we were turning to
3 paragraph 17.  And in the first statement there,
4 you see that:
5         "Dr. Chambliss asserts that a skilled
6 person would have been motivated to develop a
7 sustained-release product to address mirabegron's
8 food effect."
9         Do you see that?
10     A    I do.
11     Q    Okay.  You don't cite a particular
12 portion of Dr. Chambliss' Appendix E, do you?
13     A    Clearly, here, I do not.
14     Q    If there were support for that particular
15 statement in Dr. Chambliss' Appendix E, you would
16 have cited to it.  Correct?
17     A    No, not necessarily.
18     Q    Why would you -- why would you not
19 necessarily cite to a portion of Dr. Chambliss'
20 report you're referring to?
21     A    Because this is the general context of
22 the Appendix E.  And I don't know that there's any
23 particular sentence or place to cite that would be
24 particularly relevant.
25     Q    Okay.  This is your opinion of the

Page 72

1 general context of Dr. Chambliss' report.
2 Correct?
3     A    That is correct.  This is my report and
4 my opinions related to this report.
5     Q    In paragraph 17, do you also see where
6 you state that:
7         "...the most common mechanism of
8 addressing a food effect is to provide
9 instructions on the product's label..."
10         Do you see that?
11     A    I do.
12     Q    And here, you do.  You cite to something.
13 You cite to FDA guidance.  This is the FDA
14 "Guidance for Industry, Food-Effect
15 Bioavailability and Fed Bioequivalence Studies";
16 is that correct?
17     A    I believe that's correct.
18     Q    Okay.
19         MS. SAVAS:  Let's mark as Weisman
20 Exhibit 6 the FDA guidance on food effect that
21 has Bates Number DEFS MIRA II-000861 to 872.
22         (Document marked as Exhibit No. 6
23             for identification.)
24 BY MS. SAVAS:
25     Q    Dr. Weisman, are you here at Weisman

Page 73

1 Exhibit 6, the Guidance for Industry, Food-Effect
2 Bioavailability and Fed Bioequivalence Studies?
3     A    I am.  Now I am, yes.
4     Q    Okay.  Now in paragraph 17 of your
5 rebuttal report regarding instructions on the
6 label for administration with or without food, you
7 cite to page 7 of this guidance; is that correct?
8     A    That is correct.
9         MS. SAVAS:  And if we can please go to
10 page 7.  I don't know the Bates number.
11 Sorry.
12 BY MS. SAVAS:
13     Q    Where on page 7 of this FDA guidance does
14 it state or provide support for the most common
15 way to address a food effect is to make a label
16 claim?
17         MR. BRUNO:  Objection, vague.
18     A    If you're asking me where exactly it is
19 on the page, I would need to read this page in
20 detail.
21 BY MS. SAVAS:
22     Q    Go ahead.
23     A    It does -- as I read it now, it does say
24 that -- if you look at the middle of the page, it
25 talks about the inclusion of information, the

19 (Pages 70 - 73)

Page 74

1 clinical pharmacology section, the labeling, as
2 the basis for making label recommendations.
3    Q    There's nothing in this guidance that
4 states the most common mechanism of addressing the
5 food effect is to provide instructions on the
6 product label.  Correct?
7    A    That says the most common -- it does talk
8 to a common method by which one would address the
9 food effect, by including the label.
10       In my experience, this would be the most
11 common method.
12    Q    And that's your personal opinion?
13    A    That's my personal informed opinion, yes.
14    Q    Returning to paragraph 17 in your
15 rebuttal report, the last sentence, you state
16 that:
17       "...even assuming that a skilled person
18 would have identified the food effect, they would
19 have had no motivation to develop the patented
20 solution."
21       Do you see that?
22    A    I do.
23    Q    What are you referring to when you say
24 "the patented solution"?
25    A    I am talking about a controlled release

Page 75

1 formulation with a particular release pattern
2 specifically designed to address a specific
3 problem.
4    Q    And what problem is that?
5    A    That problem relates to the effect of
6 food on the absorption of mirabegron.
7    Q    Your opinions in this case are directed
8 to whether there would have been motivation to
9 develop a controlled release formulation to
10 address the food effect problem of mirabegron.
11 Correct?
12       MR. BRUNO:  Objection, vague.
13    A    Yeah, not necessarily.  My report is a
14 rebuttal report to the opinions of Dr. Chambliss
15 related to the motivation for a development of a
16 food effect solution.
17 BY MS. SAVAS:
18    Q    Now, your opinions in your rebuttal
19 report are not from the viewpoint of a person of
20 ordinary skill in the art.  Correct?
21       MR. BRUNO:  Objection, calls for a legal
22 conclusion.
23    A    As I've stated before, I can't render a
24 legal opinion regarding the patent or the language
25 with respect to a skilled person.

Page 76

1       But this particular statement in my
2 rebuttal report adopts the definition
3 Dr. Chambliss used in making his opinion.
4 BY MS. SAVAS:
5    Q    Do you have any opinion on whether you
6 would have met the definition of a person of skill
7 in the art offered by Dr. Chambliss?
8    A    I believe I commented before that --
9 well, not being able to address the legal
10 definition, I believe that I would meet or exceed
11 the skills set forth by both the plaintiffs and
12 the defense in this matter.
13    Q    Now neither your opening nor your
14 rebuttal report provide the opinion you just
15 testified to, that you would have met the level of
16 skill under either plaintiffs' or defendants'
17 definition.  Correct?
18    A    That is correct.  And I render no
19 opinions with respect to the definitions or my
20 qualifications to serve as such a person.
21       What this particular report does is, it
22 provides a rebuttal opinion regarding
23 Dr. Chambliss' opinion.
24    Q    I don't think you understand the
25 question.  Sorry.

Page 77

1       Your opinions in your rebuttal or your
2 opening report do not state that you were offering
3 opinions from either the viewpoint of a skilled
4 person according to plaintiffs or according to
5 defendants.
6       I'm not asking about the definition.  I'm
7 saying:  Your reports do not state whether you are
8 offering any opinion or -- from the skilled person
9 as propounded by defendants or plaintiffs.
10 Correct?
11       MR. BRUNO:  Objection, form.
12    A    I think my reports are very clear in what
13 they say.  And I have not rendered an opinion in
14 any of my reports specifically around the
15 definition or whether I qualify as a skilled
16 person or not.
17       MS. SAVAS:  Let's mark the reply report
18 of Dr. Weisman.  This will be Weisman
19 Exhibit 7.
20       (Document marked as Exhibit No. 7
21       for identification.)
22 BY MS. SAVAS:
23    Q    Dr. Weisman, is Exhibit 7 the reply
24 expert report -- your reply expert report
25 concerning FDA's recommendations regarding

20 (Pages 74 - 77)

Page 78

1 bioequivalence and comparative dissolution
2 testing?
3    A   Yes.
4    Q   Sitting here today, do you have any
5 corrections to your reply report?
6    A   I don't believe so.
7    Q   If we could turn to paragraph 3, please.
8       You refer here to responding to the
9 reports of Dr. Shargel and Buckton.
10      Do you see that?
11   A   I do.
12   Q   And did you review the rebuttal reports
13 of any other experts regarding non-infringement by
14 defendant?
15   A   I don't know that -- the way that the
16 report is necessarily classified.
17      But as I mentioned previously, I did
18 review sections of the Chambliss report.
19   Q   You are not providing any opinion on
20 whether Zydus' proposed product infringes any of
21 these sort of claims of the '780 patent.  Correct?
22   A   I have not provided any opinions
23 regarding any product's potential infringement.
24      MS. SAVAS:  I'd like to take a short
25    break and -- so I can discuss a couple things

Page 79

1    with defense counsel.
2       THE VIDEOGRAPHER:  Okay.  We're going off
3    the record at 11:16 a.m.
4       MS. SAVAS:  Thank you.
5         (WHEREUPON, a recess was taken,
6            after which the following
7            proceedings were held:)
8       THE VIDEOGRAPHER:  Okay.  We are back on
9    the record.  The time is 11:27 a.m.
10 BY MS. SAVAS:
11   Q   Dr. Weisman, we have referred to, a
12 couple of times today, another expert in this
13 case, Dr. Little.
14      Do you recall that?
15   A   Yes.
16   Q   Now, did you ever speak or correspond
17 with Dr. Little during your work in this case?
18   A   I have not.
19   Q   I believe you said you had seen one of
20 the reports from Dr. Little; is that correct?
21   A   I believe I have seen some elements of
22 the report from Dr. Little.
23   Q   Did you review an entire report or just a
24 portion?
25   A   I don't believe it was the entire report,

Page 80

1 no.
2    Q   And did you review that portion of
3 Dr. Little's report before you drafted your
4 opening report?
5    A   I don't believe I did, no.
6    Q   Did you see the portion of Dr. Little's
7 report after you signed your opening report?
8    A   I believe so, yes.
9    Q   Okay.  So it's fair to say that the
10 portion of Dr. Little's report that you reviewed
11 was not a consideration in your opening expert
12 report; is that correct?
13   A   I believe that's correct.
14      As I just stated, I had not reviewed it
15 prior to either writing my report or signing my
16 report.
17   Q   Now the portion of Dr. Little's report
18 that you reviewed, did you review it before your
19 rebuttal report?
20   A   No, I don't believe so.
21   Q   Did you review it after you signed your
22 rebuttal report?
23   A   I believe I reviewed it after I signed my
24 rebuttal report, yes.
25   Q   And I want to go back now to a question

Page 81

1 about your rebuttal report.  And we can go
2 ahead -- we can go ahead and look at paragraph 3.
3       Yeah, I believe we were just there.
4       CONCIERGE:  I'm sorry.  That was
5    paragraph 3, you were starting to say?
6       MS. SAVAS:  Yes.
7 BY MS. SAVAS:
8    Q   Dr. Weisman, are you at paragraph 3?
9    A   Yes.
10   Q   Okay.  Now, the first sentence in
11 paragraph 3 you say:
12      "...I've been asked by counsel to opine
13 on the FDA's requirements concerning food
14 effects."
15      Do you see that?
16   A   I do.
17   Q   Now in your rebuttal report, you refer to
18 the FDA guidance on the food effect
19 bioavailability and fed bioequivalence studies.
20 Correct?
21   A   I believe that's correct, yes.
22   Q   You do not refer to any other FDA
23 guidance documents in your rebuttal opinions.
24 Correct?
25   A   I don't believe I've cited any additional

21 (Pages 78 - 81)

Page 82

1 ones, no.
2   Q   In your rebuttal report, you did not
3 refer to any other prior art documents from
4 defendants.  Correct?
5       MR. BRUNO:  Objection, lacks foundation.
6   Calls for a legal conclusion.
7   A   I'm not even sure what you mean by "prior
8 art documents from defendants."
9       But I have not been asked to render any
10 opinions with respect to that.
11 BY MS. SAVAS:
12   Q   You've not been asked to provide any
13 opinions except for those related to the FDA
14 guidance on food effect.  Correct?
15   A   No, that's not correct.  I've been asked
16 to also provide rebuttal opinions with respect to
17 the comments that were made by Dr. Chambliss with
18 respect to food effects.
19   Q   You did not review any documents that
20 Dr. Chambliss relies on; is that correct?
21   A   I don't know what Dr. Chambliss relies
22 on.
23       MS. SAVAS:  So we're done sharing the
24   report exhibit.
25       So, Dr. Weisman, thank you for your time.

Page 83

1   I'm going to step down from questioning, but
2   some other counsel of defendants have
3   questions, and I'm going to hand it over to
4   them.
5       THE WITNESS:  Thank you, Ms. Savas.
6           EXAMINATION
7 BY MS. CHEEK:
8   Q.  Hi, Dr. Weisman.
9       Can you hear me okay?
10   A   I can, Ms. Cheek.  How are you?
11   Q   Great.  How are you?
12       My name is Andrea Cheek.  I represent the
13 Lupin defendants in this case.  I have a few
14 questions for you today.
15       First, just following up on some of the
16 questions that counsel was asking you before,
17 regarding Dr. Little's expert report and the
18 portion that you reviewed.
19       Did you review that portion of
20 Dr. Little's expert report prior to signing your
21 reply report?
22   A   I don't believe I did, no.
23   Q   All right.  Thank you.
24       And did you review any other expert
25 reports from plaintiffs besides the portion of

Page 84

1 Dr. Little's report that you referred to?
2       MR. BRUNO:  Objection.  To the extent
3   that it calls for review that was conducted
4   with counsel in preparation for testimony, I
5   ask you to exclude those documents.
6       But you can otherwise answer the
7   question.
8   A   I don't believe there were other reports,
9 other than what I've considered and commented upon
10 in my reports.
11 BY MS. CHEEK:
12   Q   Thank you.
13       If we can turn back to Exhibit 7, your
14 reply report.
15       And I'd like to turn to paragraph 9.
16       Are you there?
17   A   I am.  It's just not on the screen as
18 well.
19       CONCIERGE:  Counsel, I'm sorry.  Please
20   repeat where you need me to go.
21       MS. CHEEK:  Paragraph 9.
22       CONCIERGE:  Thank you.
23 BY MS. CHEEK:
24   Q   And you state here in paragraph 9 of your
25 reply report:

Page 85

1       "...for extended-release products
2 containing mirabegron, the FDA recommends in vitro
3 comparative dissolution testing to establish that
4 the dissolution profile of an ANDA product closely
5 tracks that of the RLD."
6       Do you see that?
7   A   I do.
8   Q   Your report -- your reply report does not
9 define what it means for a dissolution profile to
10 closely track another dissolution profile; is that
11 correct?
12   A   I do not believe that's correct.
13       In fact, I spent quite a lot of time
14 talking about how FDA and other parties deem
15 something to be essentially similar.
16   Q   So what do you mean when you refer to a
17 dissolution profile closely tracking another
18 dissolution profile?
19   A   If you're asking what do I mean when it
20 closely tracks, I'm really referring to the
21 similarity between the dissolution profiles of the
22 reference-listed product and the generic
23 comparator.
24   Q   Is there any metric that you are
25 referring to when you refer to a dissolution

22 (Pages 82 - 85)

Page 86

1  profile closely tracking another dissolution
2  profile?
3      A   Yes.
4      Q   And what is that?
5      A   Specifically, comparability testing.  In
6  this case, an f2 assessment, which is an
7  assessment of similarity.
8      Q   And so when you say "closely tracked with
9  respect to dissolution profiles," are you
10 referring to an f2 value of 50 and above?
11     A   I wasn't referring to anything
12 particularly in this statement.
13         I was only talking to the point that FDA
14 recommends dissolution testing as part of their
15 assessment of equivalence.  And yes, I use the
16 word "tracks" to really refer to similarity
17 between the dissolution profiles.
18     Q   And you agree that f2 values are a
19 comparison between dissolution profiles.  Correct?
20     A   I do understand it to be comparison of
21 the complete profile, yes.
22     Q   Do you agree that f2 values are not a
23 comparison of dissolution at a single point in
24 time?
25     A   So I don't agree with that.

Page 87

1          As I mentioned, it represents the
2  dissolution profile, which is the complete curve.
3  But to be able to get to a curve, that the points
4  are incredibly important as well.
5      Q   But you would agree that an f2 value does
6  not give you any specific information about
7  dissolution at a particular point in time?
8      A   I actually disagree with that.
9      Q   Why do you disagree?
10     A   Because what the f2 comparison tells us
11 is the similarity of the profiles, and also tells
12 you that when you exceed 50, that individual
13 points cannot differ by more than 10 percent.
14         So it tells us a lot about the individual
15 time points as well.
16     Q   So you agree that even with an f2 value
17 above 50, that dissolution rate at any particular
18 point in time could differ by up to 10 percent?
19     A   I mean, I think we can't speak in
20 generalities.  I think it really depends on what
21 that number is.
22         But at 50, it means that they cannot
23 differ by more than 10 percent.  As you go above
24 50, it would even differ less.
25     Q   I would like to turn to paragraph 29 of

Page 88

1  your reply report.
2          And towards the end of paragraph 29, you
3  state -- are you there yet?
4      A   I am there, yes.
5      Q   Towards the end of paragraph 29 of your
6  reply report, you state:
7          "Even slight changes between the RLD and
8  the test drug product would cause the f2 value to
9  exponentially decrease."
10         And my question is:  What are you
11 referring to when you mention even slight changes
12 between the RLD and the test drug product?  As in,
13 what type of changes are you referring to?
14     A   I'm talking about any and all changes.  I
15 guess I'm really highlighting the point here that
16 formulation matters and any difference in
17 formulation could affect that.
18     Q   And you are not offering an opinion in
19 this case that any product with an f2 value of
20 50 or greater, as compared to Myrbetriq, will
21 necessarily meet the dissolution limitations of
22 the claims of the '780 patent; is that correct?
23         MR. BRUNO:  Objection, vague.
24     A   I -- I'm sorry.
25         MS. CHEEK:  Let me start over.

Page 89

1  BY MS. CHEEK:
2      Q   You've reviewed the '780 patent; is that
3  correct?
4      A   I have.
5      Q   And have you reviewed the claims of the
6  '780 patent?
7      A   I have.
8      Q   Do you understand what I mean when I say
9  the dissolution limitation of the claims of the
10 '780 patent?
11     A   I do.
12     Q   So I'll ask my question again.
13         You're not offering an opinion that any
14 product with an f2 value of 50 or greater, as
15 compared to Myrbetriq, will necessarily meet the
16 dissolution limitation of the claims of the '780
17 patent; is that correct?
18     A   I think my opinions are quite clear here.
19         My opinion is that if you have an f2
20 value exceeding 50, that the dissolution profiles
21 are essentially similar.
22         And I have not provided any particular
23 opinions regarding the terms of the patent as it
24 relates to that.
25     Q   I would like to turn back to paragraph 14

23 (Pages 86 - 89)

# EXHIBIT 8a

Defendants' Motion in Limine to Preclude
the Testimony of Plaintiffs' Expert
Dr. Steven M. Weisman, Ph. D.

Exhibit B

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| _____ ) | |
| ASTELLAS PHARMA INC. *et al.*, ) | **Contains Confidential Information** |
| ) | **of Astellas - Subject to Protective** |
| Plaintiffs ) | **Order** |
| ) | |
| v. ) | |
| ) | C.A. No. 20-1589-JFB-CJB |
| SANDOZ INC. et. al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## OPENING EXPERT REPORT OF STEVEN M. WEISMAN, PH.D.

# **TABLE OF CONTENTS**

I. Qualifications ................................................................................4

II. Background ..................................................................................8

    A.    Types of FDA Drug Marketing Approval Applications ......................8

    B.    Support for FDA Applications ..........................................10

    C.    FDA    Standards    for    Bioequivalence    in    ANDA Applications ..................................................................13

        1.    General Standards ..................................................13

        2.    Showing Sameness of Dissolution Profiles: $f_2$ Statistical Testing ................................................15

        3.    *In Vitro–In Vivo* Correlation (IVIVC) ....................17

        4.    Publication of Product-Specific Guidances ..............20

III. FDA Requirements Related to Mirabegron Extended- Release Tablets ..........23

    A.    Publication of Bioequivalence Guidance ............................23

    B.    Published Bioequivalence Guidance for Mirabegron Dissolution Testing ..........................................................24

Introduction

1.      My name is Dr. Steven M. Weisman. I currently serve as Global President
of Lumanity, a consulting company that assists companies in developing United
States Food & Drug Administration (FDA) regulatory strategies, product
development plans and preclinical and clinical testing programs in the
development and commercialization of pharmaceutical products.

2.      I have been asked by counsel for Astellas Pharma Inc., Astellas Ireland Co,
Ltd., and Astellas Pharma Global Development, Inc. (together, Astellas) to provide
expert opinions in *Astellas Pharma Inc. et al. v. Sandoz Inc. et al.*, Case No. 20-
1589-JFB-CJB, which I understand is currently pending in the United States
District Court for the District of Delaware.

3.      In preparing this report, I have relied on my background and experience,
which is summarized in my curriculum vitae attached as Appendix A to my report.
I have considered the documents identified in this report, including but not limited
to the pages cited in support of specific propositions. I have also reviewed U.S.
Patent No. 10,842,780.

4.      I am being compensated at my standard hourly rate of $750 for my
consulting work and testimony, plus expenses. My compensation is independent of
the conclusions or opinions I offer and independent of any outcome of this case.

5.      If I testify in relation to this case, I may cite other documents or information like those specifically identified here. I may also use graphics, animations, pictures, demonstratives, and/or other audio/visual aids to explain my analysis and opinions, including images in the references I cite, even if such images are not included in the body of my report.

## I.  QUALIFICATIONS

6.      In 1981, I received a Bachelor of Science degree in Biology from Fairleigh Dickinson University. Thereafter, I obtained a doctorate in Pharmacology from Cornell University Graduate School of Medical Sciences in 1986.  I am trained as a classical pharmacologist and have specific experience with respect to relevant subspecialities including pharmacokinetics, which is the evaluation of the rate and extent of the absorption of drug products. Of note, my thesis work was conducted in conjunction with the Department of Urology in the Cornell University School of Medicine and involved research related to urological conditions, including those involving the bladder.

7.      I also have specific postdoctoral training through my fellowship in Immunopharmacology at Roche Institute of Molecular Biology. During my fellowship, I contributed meaningful insight related to the development of anti-inflammatory drugs, including drugs for arthritis and other inflammatory conditions.

8.     Throughout my career, I have led development programs for drugs of all types. A critical component of this work is the assessment of the performance of the drug product, which requires a detailed understanding of principles of dissolution profiling and the establishment of bioequivalence, including interactions/meetings with FDA and other regulatory authorities on such topics.

9.     Bioavailability and bioequivalence are important considerations in the development of all drugs, not only to topics related to generic equivalence. I am a recognized expert in the 505(b)(2) New Drug Application approval process for drugs, as well the Biologics Price Competition and Innovation Act of 2009 (BPCIA), which created a similar abbreviated licensure pathway for biological products that are demonstrated to be biosimilar to or interchangeable with an FDA-approved biological product.  The fundamental requirement in both regulatory paradigms is the establishment of bioequivalence or comparability. Furthermore, I have managed bioequivalence studies and guided clients over the last 3 decades in their design and interpretation of results.

10.     In addition to my 30 years of practical experience as a pharmacologist, my various positions have often required me to interact with FDA regarding the conduct of clinical trials, bioequivalence studies and the assessment of data relative to the safety and effectiveness of drugs and biologics of all types. This work has relied heavily on my detailed knowledge and experience with the principles of

pharmacokinetics.  Throughout my career I have worked in almost every therapeutic category, including significant work in urologic drugs, including those used for overactive bladder. This has included work related to the over-the-counter switch of Oxytrol (oxybutin). This work, as well as other work related to reproductive and urologic health, has involved significant interaction with relevant review divisions within the FDA.

11.     In addition to direct interactions with the FDA, I have served in management roles that required frequent consideration of the FDA's decision-making process as part of drug development strategies. For example, I have led teams responsible for the development of extended and controlled release formulations of existing drugs where determination of dissolution, absorption and bioavailability have been key areas of focus.  Of note, I am a leading authority on low-dose aspirin for cardiovascular disease prevention and am widely respected for helping to bring these uses to the market.  As part of this work, I have led a global initiative to develop a controlled release, low-dose aspirin product to achieve cardiovascular disease prevention while reducing gastrointestinal bleeding risk.  I have also led developments related to long acting controlled/sustained release formulations of anti-inflammatory drugs, respiratory drugs as well as drugs intended for other therapeutic benefits.

12.     I am also a frequent speaker and author regarding FDA drug development strategy with a particular emphasis on how to enhance market impact by innovating on dosage form and delivery systems.

13.     I have personally been involved in the development of hundreds of drug products. As part of my experience, I have consulted on the design, conduct, and reporting of dozens of  bioequivalence studies and have engaged in numerous projects related to communicating with the FDA regarding drug dissolution properties. I am also a recognized expert in the Rx-to-OTC switch of drugs and have played a leading role in bringing many such products to the US market across multiple therapeutic categories.  In almost all of these cases, establishing bioequivalence of the OTC formulation to the Rx reference drug is a critical component.  All of these engagements have called on my detailed knowledge of pharmacology and pharmacokinetics as well as an understanding of regulatory requirements and positions.

14.     A complete summary of my qualifications can be found in my Curriculum Vitae, attached as Appendix A.

## II.  BACKGROUND

### A.     Types of FDA Drug Marketing Approval Applications

15.     Before a company can market a new drug in the United States, it must obtain

approval from the FDA. There are several regulatory pathways available to a

pharmaceutical company to obtain such approval.

16.     One type of application that may be submitted to the FDA for approval to

market a drug is a New Drug Application (NDA).[1] A company submitting an NDA

must demonstrate to the FDA that its product will be safe and effective under the

labeled conditions of use.[2] Typically, an NDA will be supported by results from a

series of clinical and non-clinical studies conducted by or on behalf of the sponsor

as well as comprehensive chemistry, manufacturing and control (CMC)

information relative to the drug product formulation.[3]

17.     Before conducting clinical trials on humans, an applicant typically files an

Investigational New Drug (IND) application. An IND application seeks an

---

[1] *See* Types of Applications, available at fda.gov/drugs/how-drugs-are-developed-and-approved/types-applications, last visited Aug. 29, 2022 (ASTMIRA_02234337–38 at ASTMIRA_02234337).

[2] *See* Types of Applications, available at fda.gov/drugs/how-drugs-are-developed-and-approved/types-applications, last visited Aug. 29, 2022 (ASTMIRA_02234337–38 at ASTMIRA_02234337); New Drug Application (NDA), available at https://www.fda.gov/drugs/types-applications/new-drug-application-nda, last visited Aug. 29, 2022 (ASTMIRA_02231899–904 at ASTMIRA_02231899).

[3] *See* New Drug Application (NDA), available at https://www.fda.gov/drugs/types-applications/new-drug-application-nda, last visited Aug. 29, 2022 (ASTMIRA_02231899–904 at ASTMIRA_02231899).

exemption allowing the shipment of an unapproved drug across state lines for the purpose of clinical study and "to administer [the] investigational drug or biological product to humans."[4] FDA reviews the IND and determines whether there is sufficient safety such that research subjects will not be subjected to an unreasonable risk.[5]

18.     Another type of application that may be submitted to the FDA for approval to market a drug is an Abbreviated New Drug Application (ANDA).[6] Under the ANDA pathway, a pharmaceutical company may gain approval to market a generic version of a drug already approved under an NDA if the ANDA demonstrates that the generic product meets certain pre-specified requirements.[7]

19.     Because an NDA applicant has already demonstrated that its product is safe and effective, an ANDA applicant can generally rely on FDA's previous findings

---

[4] *See, e.g.*, Investigational New Drug Applications (INDs) for CBER-Regulated Products, available at https://www.fda.gov/vaccines-blood-biologics/development-approval-process-cber/investigational-new-drug-applications-inds-cber-regulated-products, last visited Aug. 29, 2022 (ASTMIRA_02231866–69 at ASTMIRA_02231866); Types of Applications, available at fda.gov/drugs/how-drugs-are-developed-and-approved/types-applications, last visited Aug. 29, 2022 (ASTMIRA_02234337–38 at ASTMIRA_02234337).

[5] Investigational New Drug Applications (INDs) for CBER-Regulated Products, available at https://www.fda.gov/vaccines-blood-biologics/development-approval-process-cber/investigational-new-drug-applications-inds-cber-regulated-products, last visited Aug. 29, 2022 (ASTMIRA_02231866–869 at ASTMIRA_02231866).

[6] *See* Types of Applications, available at fda.gov/drugs/how-drugs-are-developed-and-approved/types-applications, last visited Aug. 29, 2022 (ASTMIRA_02234337–38 at ASTMIRA_02234337).

[7] *See* Abbreviated New Drug Application (ANDA), available at https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda, last visited Aug. 29, 2022 (ASTMIRA_02231674–77 at ASTMIRA_02231674).

of safety and efficacy for the approved drug, referred to as the reference listed drug (RLD). As further discussed below, an ANDA applicant must demonstrate bioequivalence between its generic product and the RLD. For novel formulations, including generic extended-release formulations, this also requires demonstrating sufficient sameness of dissolution profiles between generic extended-release formulations and the RLD.[8]

###### B.   Support for FDA Applications

20.   In support of the filing of an NDA or an ANDA, an applicant will often rely on data or information generated by third-party companies. One common example is reliance on a drug master file (DMF) that has been submitted to the FDA by a third-party manufacturer. DMFs are "submissions to FDA that may be used to provide confidential, detailed information about facilities, processes, or articles used in the manufacturing, processing, packaging, and storing of human drug products that are proprietary to the third-party manufacturer."[9]

---

[8] *See Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro/In Vivo Correlations*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER) (Sept. 1997) (available at https://www.fda.gov/media/70939/download) (ASTMIRA_02231775–801 at ASTMIRA_02231788, ASTMIRA_02231793–94).

[9] *Drug Master Files: Guidance for Industry*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Center for Biologics Evaluation and Research (CBER), Pharmaceutical Quality/CMC (October 2019) (available at https://www.fda.gov/media/131861/download) (ASTMIRA_02231750–74 at ASTMIRA_02231753).

21.     For example, a manufacturer/supplier of either an active or an inactive ingredient that an applicant intends to use in its drug product will disclose to the FDA the details of the manufacturing process and properties of the active or the excipient typically by way of a DMF, without fear that such information will be available to competitors, including the applicant. ███████████████████ ███████████████████████████████████

22.     Applicants themselves often provide detailed Chemistry, Manufacturing, and Control (CMC) documents that they generated in order to demonstrate to the FDA that their products would be manufactured in a manner that ensures quality in compliance with current good manufacturing practices.[11] For example, it is routine as part of an NDA or ANDA for a sponsor to submit its own validation studies and justification for ingredients used to formulate its product.[12] Validation protocols for

---

[10] █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[11] *See Guidance for Industry: Process Validation: General Principles and Practices*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Center for Biologics Evaluation and Research (CBER), Center for Veterinary Medicine (CVM), Current Good Manufacturing Practices (CGMP) (January 2011) (available at https://www.fda.gov/files/drugs/published/Process-Validation--General-Principles-and-Practices.pdf) (ASTMIRA_02231907–28 at ASTMIRA_02231913–15).

[12] *Analytical Procedures and Methods Validation for Drugs and Biologics: Guidance for Industry*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Center for Biologics Evaluation and Research (CBER),

manufacturing and for analytical methods are composed and studies are conducted, which then appear in defined regulatory submission sections. Analytical data generated for exhibit/submission batches is accompanied by certificates of analysis (COA), which are intended to show conformance with release specifications. Applications also include batch records acquired from the manufacture of exhibit batches, and analytical release and stability data acquired under a stability testing protocol.[13]

23.    ███████████████████████████████████████████

█████████████████████████████████████████

██████████████    These purchasing specifications are generated specifically to be relied upon by those interested in using the product. Accordingly, sometimes such specifications are publicly available, and other times, they are provided to potential customers in anticipation of a purchase order. In the context of drug development,

_____

Pharmaceutical Quality/CMC (July 2015) (available at https://www.fda.gov/media/87801/download) (ASTMIRA_02231678–95 at ASTMIRA_02231687).

[13] *See Analytical Procedures and Methods Validation for Drugs and Biologics: Guidance for Industry*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Center for Biologics Evaluation and Research (CBER), Pharmaceutical Quality/CMC (July 2015) (available at https://www.fda.gov/media/87801/download) (ASTMIRA_02231678–95 at ASTMIRA_02231686–88).

■ ██████████████████████████████████████
████████████████████████████████
█████████████████████████████████████████
██████████████████████████

potential purchasers will review the information provided to decide whether the ingredient fits the needs of the project.

24.     In addition to excipient-related information, manufacturer specifications often concern such aspects as packaging materials, drug product coating agents, drug substance and drug intermediate information, product validation methods, etc. And in the context of an FDA submission, FDA will require all relevant information disclosed in and may rely on a manufacturer's specification. The use and reliance on such materials is well-established in FDA applications.

### C.     FDA Standards for Bioequivalence in ANDA Applications

### 1.     General Standards

25.     As previously noted, a pharmaceutical company may pursue FDA approval of a generic version of a drug by submitting an application known as an ANDA.[15] ANDA applications are "abbreviated" such that a pharmaceutical company may market a generic version of a drug already approved under an NDA if the ANDA can show that the proposed drug product is bioequivalent to the previously approved NDA product it seeks to duplicate.[16]

---

[15] *See* Types of Applications, available at fda.gov/drugs/how-drugs-are-developed-and-approved/types-applications, last visited Aug. 29, 2022 (ASTMIRA_02231674–77 at ASTMIRA_02231674).

[16] *See* Abbreviated New Drug Application (ANDA), available at https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda, last visited Aug. 29, 2022 (ASTMIRA_02231674–77 at ASTMIRA_02231674); *Bioequivalence Studies with Pharmacokinetic Endpoints for Drugs Submitted Under an ANDA: Guidance for Industry*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for

26.     For applicants to take advantage of this abbreviated-approval pathway and limit the number of clinical studies necessary for approval, FDA's guidance requires sufficient sameness of dissolution profiles between generic extended-release formulations and the RLD.[17]   As discussed below, $f_2$ testing is commonly used to determine sameness of dissolution profiles, especially when dealing with low variability data.[18]

27.     Further, as part of an applicant's showing of sameness between dissolution profiles, FDA guidance directs ANDA applicants, in certain instances, to conduct a limited number of *in vivo* studies to determine their products' *In Vitro–In Vivo Correlation* (IVIVC). Such guidance may appear in FDA's product specific guidances that it publishes for certain drugs. The below further discusses $f_2$ dissolution testing, as well as FDA's product specific guidances and instances in which applicants may be required to establish an IVIVC.

---

Drug Evaluation and Research (CDER), Generics (Aug. 2021) (available at https://www.fda.gov/media/87219/download) (ASTMIRA_02231802–44 at ASTMIRA_1807).

[17] *See Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro/In Vivo Correlation*s, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER) (Sept. 1997) (available at https://www.fda.gov/media/70939/download) (ASTMIRA_02231775–801 at ASTMIRA_02231788, ASTMIRA_02231793–94).

[18] *See, e.g., FDA's Current Practice and Challenges in the Use of Dissolution Similarity Testing for Demonstration of Bioequivalence – Case Studies*, Zhen Zhang, Ph.D., Food and Drug Administration, Division of Bioequivalence I Office of Bioequivalence Office of Generic Drugs, (May 2019) (available at https://www.pharmacy.umaryland.edu/media/SOP/wwwpharmacyumarylandedu/centers/cersievents/dissolution-similarity/zhen-zhang-slides.pdf) (ASTMIRA_02234393–411 at ASTMIRA_02234407).

### 2. <u>Showing Sameness of Dissolution Profiles: $f_2$ Statistical Testing</u>

28.    A common method of comparing dissolution profiles is through $f_2$ testing, which is well established under the guidelines of U.S., Japanese, European, and other regulatory agencies as a metric for sameness of dissolution profiles.[19]  An $f_2$ value of over 50 (more particularly 50–100) is well accepted by the FDA for ensuring sameness or equivalence of two dissolution profiles.[20]

---

[19] *See,* e.g., *Bioequivalence Studies with Pharmacokinetic Endpoints for Drugs Submitted Under an ANDA: Guidance for Industry*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Generics (Aug. 2021) (available at https://www.fda.gov/media/87219/download) (ASTMIRA_02231802–44 at ASTMIRA_1818); *e.g.*, *Guidance for Industry: SUPAC-MR: Modified Release Solid Oral Dosage Forms*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), CMC (Sept. 1997), (available at https://www.fda.gov/media/70956/download) (ASTMIRA_02231959–02232010 at ASTMIRA_02231969, ASTMIRA_02231999); *Guidance for Industry: Dissolution Testing of Immediate Release Solid Oral Dosage Forms*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), (August 1997) (available at https://www.fda.gov/media/70936/download) (ASTMIRA_02231731–47 at ASTMIRA_02231741–42); *FDA's Current Practice and Challenges in the Use of Dissolution Similarity Testing for Demonstration of Bioequivalence – Case Studies*, Zhen Zhang, Ph.D., Food and Drug Administration, Division of Bioequivalence I Office of Bioequivalence Office of Generic Drugs, (May 2019) (available at https://www.pharmacy.umaryland.edu/media/SOP/wwwpharmacyumarylandedu/centers/cersievents/dissolution-similarity/zhen-zhang-slides.pdf) (ASTMIRA_02234393–411 at ASTMIRA_02234407); *Pharmaceuticals and Medical Devices Agency, Japan. Guideline for bioequivalence studies for formulation changes of oral solid dosage forms*, English translation of Attachment 3 of Division-Notification 0229 No. 10 of the Pharmaceutical and Food Safety Bureau. 2012 February (available at https://www.nihs.go.jp/drug/be-guide(e)/form/GL-E_120229_shohou.pdf) (ASTMIRA_02231852-865 at ASTMIRA_02231859–863); European Medicines Agency. Committee for medicinal products for human use. Guideline on the investigation of bioequivalence, CPMP/EWP/QWP/1401/98 Rev.1/Corr. 2010, (available at https://www.ema.europa.eu/en/documents/scientific-guideline/guideline-investigation-bioequivalence-rev1_en.pdf) (ASTMIRA_02234366–392 at ASTMIRA_02234385-386).

[20] *Guidance for Industry: SUPAC-MR: Modified Release Solid Oral Dosage Forms*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), CMC (Sept. 1997), (available at

29.     Statistical ($f_2$) testing is a model independent approach using a difference factor ($f_1$) and a similarity factor ($f_2$) to compare dissolution profiles.[21] The difference factor ($f_1$) calculates the percent (%) difference between two dissolution profile curves at each time point and measures the relative error between the curves. The similarity factor ($f_2$) represents a logarithmic reciprocal square root transformation of the sum of squared error and is a measurement of the similarity in the percent (%) dissolution between the two curves.

---

https://www.fda.gov/media/70956/download) (ASTMIRA_02231959-2010 at ASTMIRA_02231995)); *Guidance for Industry Dissolution Testing of Immediate Release Solid Oral Dosage Forms*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), (August 1997) (available at https://www.fda.gov/media/70936/download) (ASTMIRA_02231731–747 at ASTMIRA_02231742); *FDA's Current Practice and Challenges in the Use of Dissolution Similarity Testing for Demonstration of Bioequivalence – Case Studies*, Zhen Zhang, Ph.D., Food and Drug Administration, Division of Bioequivalence I Office of Bioequivalence Office of Generic Drugs, (May 2019) (available at https://www.pharmacy.umaryland.edu/media/SOP/wwwpharmacyumarylandedu/centers/cersievents/dissolution-similarity/zhen-zhang-slides.pdf) (ASTMIRA_02234393–411 at ASTMIRA_02234396); *SUPAC-IR: Immediate-Release Solid Oral Dosage Forms: Scale-Up and Post-Approval Changes: Chemistry, Manufacturing and Controls, In Vitro Dissolution Testing, and In Vivo Bioequivalence Documentation*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER) (Nov. 1995) (available at https://www.fda.gov/media/70949/download) (ASTMIRA_02231929–958 at ASTMIRA_02231954); *Waiver of In Vivo Bioavailability and Bioequivalence Studies for Immediate-Release Solid Oral Dosage Forms Based on a Biopharmaceutics Classification System: Guidance for Industry*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Biopharmaceutics (Dec. 2017) (available at https://collections.nlm.nih.gov/master/borndig/101720038/UCM070246.pdf) (ASTMIRA_02234347–365 at ASTMIRA_02234358).

[21] *Guidance for Industry: Dissolution Testing of Immediate Release Solid Oral Dosage Forms*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), (August 1997) (available at https://www.fda.gov/media/70936/download) (ASTMIRA_02231731–747 at ASTMIRA_02231741).

30.     Under such testing, (f$_1$) values up to 15 (0–15) and (f$_2$) values greater than 50 (50–100) "ensure sameness or equivalence of the two curves and, thus, of the performance of the test (postchange) and reference (prechange) products."[22]

31.     For most modified-release products, including extended-release products, "dissolution profiles for each strength should be generated using the recommended dissolution method. If the dissolution method has not been finalized, dissolution profiles should be generated under at least three conditions (e.g., pH 1.2, pH 4.5, and pH 6.8)."[23]

### 3.     *In Vitro–In Vivo* Correlation (IVIVC)

32.     Developing an IVIVC for an oral extended-release drug product has several significant advantages. ANDAs may use an IVIVC to determine dissolution specifications and to apply it "as a surrogate for in vivo bioequivalence."[24]

---

[22] *Guidance for Industry: Dissolution Testing of Immediate Release Solid Oral Dosage Forms*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), (August 1997) (available at https://www.fda.gov/media/70936/download) (ASTMIRA_02231731–747 at ASTMIRA_02231742).

[23] *See Bioavailability Studies Submitted in NDAs or INDs — General Considerations Guidance for Industry*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Clinical Pharmacology (April 2022) (available at https://www.fda.gov/media/121311/download) (ASTMIRA_02231696–728 at ASTMIRA_02231719).

[24] *Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro/In Vivo Correlations*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER) (Sept. 1997) (available at https://www.fda.gov/media/70939/download) (ASTMIRA_02231775–801 at ASTMIRA_02231778).

33.    In developing an IVIVC, ANDA applicants are encouraged to use either USP Apparatus I (basket) or USP Apparatus II (paddle) dissolution testing at "compendially recognized rotation speeds" of 100 rpm for basket testing or 50–75 rpm for paddle testing.[25]

34.    Of the various types of USP dissolution apparatuses, USP Apparatus II (paddle) is the most commonly used within the FDA Dissolution Database.[26] As of 2016, it had been "recommended for approximately 70% of the dissolution methods."[27] The database lists rotation speeds for USP Apparatus II (paddle) of between 25–200 rpm and for USP Apparatus I (basket) between 35–200 rpm.[28] In my experience, USP Apparatus II (paddle) and USP Apparatus I (basket) testing with rotation speeds up to 200 rpm are commonly utilized to support FDA

---

[25] *Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro/In Vivo Correlations*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER) (Sept. 1997) (available at https://www.fda.gov/media/70939/download) (ASTMIRA_02231775–801 at ASTMIRA_02231778).

[26] I. E. Shohin et al., A Brief Review of the FDA Dissolution Methods Database, 23 DISSOLUTION TECHNOLOGIES 6-10 (2016) (available at http://dissolutiontech.com/issues/201608/DT201608_A01.pdf) (ASTMIRA_02231503–07 at ASTMIRA_02231504).

[27] I. E. Shohin et al., A Brief Review of the FDA Dissolution Methods Database, 23 DISSOLUTION TECHNOLOGIES 6-10 (2016) (available at http://dissolutiontech.com/issues/201608/DT201608_A01.pdf) (ASTMIRA_02231503–07 at ASTMIRA_02231504).

[28] I. E. Shohin et al., A Brief Review of the FDA Dissolution Methods Database, 23 DISSOLUTION TECHNOLOGIES 6-10 (2016) (available at http://dissolutiontech.com/issues/201608/DT201608_A01.pdf) (ASTMIRA_02231503–07 at ASTMIRA_02231504).

submissions. Further, the paddle and basket dissolution testing methodologies and rotation speeds of up to 200 rpm are often used in foreign jurisdictions and regulatory agencies as well.[29]

35.    FDA recommends that the initial medium used to develop an IVIVC should be aqueous, *i.e.*, "either water or a buffered solution preferably not exceeding pH 6.8."[30]

36.    In vitro dissolution testing is especially useful for extended-release formulations as it can serve as an indicator for how the formulation will perform in vivo and can function "as a surrogate for human bioequivalence studies" once a sufficient IVIVC has been established.

---

[29] *See, e.g.*, General Chapter Dissolution <711>, official as of Feb. 1, 2012, United States Pharmacopeia ("This general chapter is harmonized with the corresponding texts of the *European Pharmacopoeia* and/or the *Japanese Pharmacopoeia*.") (ASTMIRA_02234339–46 at ASTMIRA_02234339); General Tests: 6.10 Dissolution Test, (Mar. 24, 2011), Japanese Pharmacopoeia (available at https://www.pmda.go.jp/files/000152816.pdf) at 137–41 (providing dissolution tests that are largely "harmonized with the European Pharmacopoeia and the U. S. Pharmacopeia") (ASTMIRA_02232011–4336 at ASTMIRA_02232164–168); *Guideline for Bioequivalence Studies of Generic Products*, Attachment 1 of Division-Notification 0229 No. 10 (English Translation), Japan Pharmaceutical and Food Safety Bureau (February 29, 2012) (available at http://www.nihs.go.jp/drug/be-guide(e)/Generic/GL-E_120229_BE.pdf) (ASTMIRA_02231870—98 at ASTMIRA_02231887) (reciting dissolution testing methods and speeds including Paddle testing at 50-200 rpm and Basket testing at 100-200 rpm).

[30] *Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro/In Vivo Correlations*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER) (Sept. 1997) (available at https://www.fda.gov/media/70939/download) (ASTMIRA_02231775–801 at ASTMIRA_02231782).

### 4.   Publication of Product-Specific Guidances

37.   Product-specific guidances, also known as PSGs, "describe FDA's current thinking on the evidence needed to demonstrate that a generic drug is therapeutically equivalent to the reference listed drug (RLD) product."[31] According to the FDA, such guidances are important because they "assist the generic pharmaceutical industry with identifying the most appropriate methodology and approaches for their generic drug development programs, including *in vivo* and/or *in vitro* bioequivalence (BE) studies, various waiver options (such as Biopharmaceutics Classification System (BCS)-based waiver), and dissolution testing methods."[32]

38.   Historically, FDA's guidance to ANDA filers regarding the design of bioequivalence studies was provided only *ad hoc* and on request from specific applicants.[33] Though FDA had issued guidance with broad recommendations for demonstrating bioequivalence, the Office of Generic Drugs nonetheless found that

---

[31] *FDA Product-Specific Guidance Snapshot*, U.S. Food & Drug Administration (June 23, 2021) (available at https://www.fda.gov/media/150142/download) (ASTMIRA_02231905–06 at ASTMIRA_02231905).

[32] *FDA Product-Specific Guidance Snapshot*, U.S. Food & Drug Administration (June 23, 2021) (available at https://www.fda.gov/media/150142/download) (ASTMIRA_02231905–06 at ASTMIRA_02231905).

[33] *See FDA Product-Specific Guidance Snapshot*, U.S. Food & Drug Administration (June 23, 2021) (available at https://www.fda.gov/media/150142/download) (ASTMIRA_02231905–06 at ASTMIRA_02231906).

it was expending significant time responding to individual applicant requests.[34]

Moreover, because OGD was providing responses often in letter format, only individual applicants were receiving the benefit of the FDA's considered views and recommendations.[35]

39.     So that FDA's bioequivalence-related product-specific input could be promulgated more widely, in June 2010, the FDA issued a new guidance announcing its intent to make product-specific guidances publicly available.[36] According to the FDA,

> Under this process, applicants planning to carry out such studies in support of their ANDAs will be able to access BE study guidance on the FDA Web site, rather than having to request this information from the Agency and wait for the Agency to respond, as has been the case in the past. The FDA believes that making this information available on the Internet

---

[34] *See Guidance for Industry: Bioequivalence Recommendations for Specific Products*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), OGD (June 2010) (available at https://www.fda.gov/files/drugs/published/Individual-Product-Bioequivalence-Recommendations-for-Specific-Products.pdf) (ASTMIRA_02231845–51 at ASTMIRA_02231849).

[35] *See Guidance for Industry: Bioequivalence Recommendations for Specific Products*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), OGD (June 2010) (available at https://www.fda.gov/files/drugs/published/Individual-Product-Bioequivalence-Recommendations-for-Specific-Products.pdf) (ASTMIRA_02231845–51 at ASTMIRA_02231849).

[36] *See Guidance for Industry: Bioequivalence Recommendations for Specific Products*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), OGD (June 2010) (available at https://www.fda.gov/files/drugs/published/Individual-Product-Bioequivalence-Recommendations-for-Specific-Products.pdf) (ASTMIRA_02231845–51 at ASTMIRA_02231849).

> will streamline the guidance process, making it more efficient than the previous process. This process also will provide a meaningful opportunity for the public to consider and comment on BE study recommendations for specific drug products.[37]

40.    As part of FDA's then-new process, FDA explained that "[p]roduct-specific BE recommendations may contain differing amounts of detail and background information regarding the specific basis for the recommendations, depending upon the novelty and complexity of the scientific considerations."[38]

41.    FDA considers the recommendations that it makes in PSGs to be of important assistance to a generic manufacturer seeking to demonstrate bioequivalence. Indeed, as of June 2021, "nearly 1,900 PSGs have been published."[39]

---

[37] *Guidance for Industry: Bioequivalence Recommendations for Specific Products*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), OGD (June 2010) (available at https://www.fda.gov/files/drugs/published/Individual-Product-Bioequivalence-Recommendations-for-Specific-Products.pdf) (ASTMIRA_02231845–51 at ASTMIRA_02231848).

[38] *Guidance for Industry: Bioequivalence Recommendations for Specific Products*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), OGD (June 2010) (available at https://www.fda.gov/files/drugs/published/Individual-Product-Bioequivalence-Recommendations-for-Specific-Products.pdf) (ASTMIRA_02231845–51 at ASTMIRA_02231850).

[39] *FDA Product-Specific Guidance Snapshot*, U.S. Food & Drug Administration (June 23, 2021) (available at https://www.fda.gov/media/150142/download) (ASTMIRA_02231905–06 at ASTMIRA_02231905).

# III.  FDA REQUIREMENTS RELATED TO MIRABEGRON EXTENDED-RELEASE TABLETS

## A.    Publication of Bioequivalence Guidance

42.    As mentioned above, the FDA often prepares and circulates PSGs to assist industry regarding requirements for demonstrating bioequivalence. In June 2013, the FDA issued a PSG for the mirabegron extended-release tablets (the Mirabegron Guidance).[40]

43.    The Mirabegron Guidance provides FDA's recommended methodology for ANDA applicants to refer to concerning mirabegron extended-release tablets, including *in vivo* and/or *in vitro* bioequivalence (BE) study expectations, dissolution testing methods, and whether waiver for *in vivo* testing is available (it is not).[41] The content of the Mirabegron Guidance is further discussed below.

44.    Additionally, FDA maintains a Dissolution Methods Database, where it provides "information on dissolution methods presently recommended by the Division of Biopharmaceutics, Office of Pharmaceutical Quality" regarding drugs

---

[40] Draft Guidance on Mirabegron (recommended June 2013) (available at https://www.accessdata.fda.gov/drugsatfda_docs/psg/Mirabegron_ER_tab_202611_RC06-13.pdf) (ASTMIRA_02231748–49).

[41] Draft Guidance on Mirabegron (recommended June 2013) (available at https://www.accessdata.fda.gov/drugsatfda_docs/psg/Mirabegron_ER_tab_202611_RC06-13.pdf) (ASTMIRA_02231748–49).

for which the United States Pharmacopeia (USP) has not provided dissolution test methods.[42]

## B. Published Bioequivalence Guidance for Mirabegron Dissolution Testing

45.     FDA provided significant guidance to generic drug manufacturers regarding the type of dissolution testing that they should rely upon in developing mirabegron extended-release tablets.

46.     In addition, the FDA recommended a specific methodology for identifying dissolution profiles: "USP Apparatus I at 100 rpm and/or USP Apparatus II at 50 rpm in at least three dissolution media (pH 1.2, 4.5, and 6.8 buffer)," although it permitted upward increases on the agitation speed where appropriate.[43] The Mirabegron Guidance also informed drug manufacturers that they should record sampling times of "1, 2, and 4 hours, and continue every 2 hours until at least 80% of the drug is released" in order to assure against premature drug release (i.e., "dose dumping").[44]

---

[42] Dissolution Methods Database, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/drugs/drug-approvals-and-databases/dissolution-methods-database (ASTMIRA_02231730).

[43] Draft Guidance on Mirabegron (recommended June 2013) (available at https://www.accessdata.fda.gov/drugsatfda_docs/psg/Mirabegron_ER_tab_202611_RC06-13.pdf) (ASTMIRA_02231748–49).

[44] Draft Guidance on Mirabegron (recommended June 2013) (available at https://www.accessdata.fda.gov/drugsatfda_docs/psg/Mirabegron_ER_tab_202611_RC06-13.pdf) (ASTMIRA_02231748–49 at ASTMIRA_02231749).

47.     As mentioned above, another source of information available to drug manufacturers regarding FDA's preferences for dissolution testing is the Dissolution Methods Database available on FDA's website.[45] Through the Dissolution Methods Database, FDA updates on a quarterly basis "information on dissolution methods presently recommended by the Division of Bioequivalence, Office of Generic Drugs" for drug products that do not have "a dissolution test method in the United States Pharmacopeia (USP)."[46]

48.     I searched the Dissolution Methods Database for "mirabegron" and, according to the results, the Dissolution Methods Database for mirabegron recommends ANDA applicants to perform USP Apparatus I (basket) testing for extended-release tablets.[47]  Additionally, the Dissolution Methods Database recommends that mirabegron extended-release tablets should be tested in 900 mL of a 6.8 pH phosphate buffer with sampling times of 1, 3, 5, 7, 8.5, 10 and 12 hours.

---

[45] *See* Dissolution Methods Database, available at https://www.fda.gov/drugs/drug-approvals-and-databases/dissolution-methods-database, last visited Aug. 22, 2022 (ASTMIRA_02231729); *see also* Draft Guidance on Mirabegron (recommended June 2013) (available at https://www.accessdata.fda.gov/drugsatfda_docs/psg/Mirabegron_ER_tab_202611_RC06-13.pdf) (ASTMIRA_02231748–49 at ASTMIRA_02231748) (identifying Dissolution Methods Database as a source of information).

[46] Dissolution Methods Database, available at https://www.fda.gov/drugs/drug-approvals-and-databases/dissolution-methods-database, last visited Aug. 22, 2022 (ASTMIRA_02231729).

[47] The database is available for search at https://www.accessdata.fda.gov/scripts/cder/dissolution/.

49.    In addition to providing guidance regarding measurement of mirabegron tablets' dissolution profiles, the FDA's Mirabegron Guidance also recommended that those attempting to demonstrate bioequivalence conduct 3 separate studies, as demonstrated below:[48]

**Recommended studies:**        3 studies

1.    Type of study: Fasting
       Design: Single-dose, two-way crossover in vivo
       Strength:  50 mg
       Subjects: Healthy males and nonpregnant females, general population.

2.    Type of study: Fed
       Design: Single-dose, two-way crossover in vivo
       Strength:  50 mg
       Subjects: Healthy males and nonpregnant females, general population.

3.    Type of study: Fasting
       Design: Single-dose, two-way crossover in vivo
       Strength:  25 mg
       Subjects: Healthy males and nonpregnant females, general population.

50.    Thus, FDA's Mirabegron Guidance directs ANDA applicants seeking approval for generic mirabegron extended-release tablets to conduct the above *in vivo* studies to establish an IVIVC. In addition, ANDA applicants are required to demonstrate sufficient sameness of dissolution profiles between their generic formulations and the RLD in order to establish bioequivalence.

---

[48] Draft Guidance on Mirabegron (recommended June 2013) (available at https://www.accessdata.fda.gov/drugsatfda_docs/psg/Mirabegron_ER_tab_202611_RC06-13.pdf) (ASTMIRA_02231748–49).

Dated:  <u>September 13, 2022</u>

Steven M. Weisman, Ph.D.

# Appendix A

## STEVEN M. WEISMAN, Ph.D.

### EDUCATION

1986: Postdoctoral Fellow, Immunopharmacology, Roche Institute of Molecular Biology, Nutley, NJ

1986: Ph.D., Pharmacology, Cornell University School of Medicine, New York,  NY

1981: B.S., Biology, Fairleigh Dickinson University, Madison, NJ

### EXPERIENCE

Dr. Weisman is the Chief Executive Officer at Lumanity (formerly Innovative Science Solutions) which provides consulting services to industry and counsel on regulated healthcare products. He has over 30 years of experience in pharmacology, toxicology, pharmaceutical product development, and marketing evaluation and communication. Previously, Dr. Weisman was Global Director of Medical and  Clinical Affairs at Bayer Corporation. Prior to joining Bayer, he was the Director of Strategic Research at Sterling Winthrop Inc. He has also held positions of responsibility with Hoffmann  La Roche and Procter & Gamble.

Dr. Weisman has extensive experience in developing regulatory strategies, product development plans, preclinical and clinical testing programs, regulatory submissions, and product defense/ communication strategies for drugs, foods, cosmetics, and dietary supplements. He has organized and presented at numerous symposia, FDA Advisory Panel and other regulatory meetings. His skills in analyzing the scientific and regulatory aspects of potential new products and the development of responses to FDA Rule-Makings are sought by numerous clients.

Dr. Weisman has been responsible for Investigational New Drug applications (INDs), New Drug Applications (NDAs), and other regulatory filings, managed clinical research efforts, and designed adverse event tracking systems. He is also an authority on developing new indications and claims for mature brands, and in crisis and media relations. In addition, he has extensive experience in global product development and communication strategies.

**EMPLOYMENT**

**Lumanity (formerly Innovative Science Solutions), Chief Executive Officer**

Dr. Weisman's diverse scientific consulting experiences focuses on the regulatory and clinical evaluation of a variety of therapeutic compounds and on communicating benefits to consumers, health care professionals, regulatory and legislative policy makers.

**The Weinberg Group, Practice Director Pharmaceuticals**

**Bayer Corporation, Consumer Care Division**. **Director, Medical and Clinical Affairs**

Responsible for ensuring the safe and effective use of Bayer products and all aspects of medical management of drug development, clinical research, public relations, FDA interaction, adverse event tracking and reporting, and product identification and evaluation.

**Sterling-Winthrop Inc., Director, Strategic Research, Consumer HealthGroup**

Responsible for managing OTC drug development process from idea generation through commercialization for $1 billion OTC division. Managed preclinical, clinical research, and strategic regulatory affairs activities.

**The Procter & Gamble Company,  Manager, Immunopharmacology,Health and Personal Care Division**

Managed pharmacology program for screening and evaluation of new drug compounds.

**Hoffmann La Roche, Inc., Research Associate, Allergy and Inflammation**

Conducted research on the mechanism of action of novel compounds for the treatment of allergic and inflammatory disorders.

**PUBLICATIONS**

Weisman S. Naproxen for Post-Operative Pain. Journal of Pharmacy & Pharmaceutical Sciences. 2021 Feb 12;24:62-70.

Weisman SM, Brunton S. Primary Prevention of CVD with Aspirin: Benefits vs Risks. The Journal of Family Practice. 2021 Jul;70(6S):S41-S46.

Weisman SM, Brunton S. Efficacy and Safety of Naproxen for Acute Pain. The Journal of Family Practice. 2020 Sep 1;69(7 Suppl):S33-8.

Gurbel, P., Tantry, U.; Weisman, S. (2018) A narrative review of the cardiovascular risks associated with concomitant aspirin and NSAID use. Journal of Thrombosis and Thrombolysis J Thromb Thrombolysis. 2019 Jan;47(1):16-30. doi: 10.1007/s11239-018-1764-5. Review.

Brunton S, Weisman SM. Efficacy and Safety of Naproxen vs Opioids for the Treatment of Musculoskeletal Pain. Journal of Family Practice. 2019 Oct 20;68(8):S20-5.

Coffey JW, Fiedler-Nagy C, Weisman SM, Woodworth TG, Welton AF. Retinoids as potential antirheumatic agents. Chemistry and biology of synthetic retinoids. CRC Press, 2018. 519-537.

Weisman SM, Manganaro AJ, Reizes JM, Garbani NI, Zywicki S, et al. (2017) Behavioral Impact of Community Based Cardiovascular Screening. J Community Med Health Educ 7: 527. doi:10.4172/2161-0711.1000527.

Angiolillo DJ, Weisman SM. Clinical Pharmacology and Cardiovascular Safety of Naproxen. Am J Cardiovasc Drugs. 2017 Apr;17(2):97-107.

Marone, P. A., Trampota, J., & Weisman, S. (2016). A safety evaluation of a nature-identical l-ergothioneine in sprague dawley rats. International Journal of Toxicology, doi:109158181 6653375 [pii].

Weisman SM, Garbani NI, Manganaro AJ. Community-based cardiovascular screening: Detection of disease in individuals with no self-reported risk factors. Open Journal of Preventive Medicine. 2015;5:78-83.

Weisman, S.M., Garbani, N.I., & Manganaro, A.J. (2015). Community-based screening and the detection of critical cartotid artery stenosis and abdominal aortic aneurysm. Open Journal of Preventive Medicine, 5, 38-46.

Weisman S, Brooks E. Costs and benefits of bundled community-based screening for carotid artery stenosis, peripheral artery disease, and abdominal aortic aneurysm. Managed Care. 2015(January):45-53.

Hiramoto JS, Katz R, Weisman SM, Conte MS. Gender-Specific Risk Factors for Peripheral Artery Disease in a Voluntary Screening Population. J Am Heart Assoc. 2014 Mar 13;3(2):e000651.

Weisman, S. M., Manganaro, A.J. Community-based screening: Identifying risk and motivating health lifestyle changes. Postgraduate Medicine 125:4, 18-27, 2013.

Weisman, S. M. 2011. Dietary supplements: Case studies in claims substantiation. Natural Products Insider (February 28).

Weisman SM, Schwartz D. Studying women in clinical trials: Scientific and legal implications. Gender Medicine 4: 3-7, 2007.

Pignone M, Anderson GK, Binns K, Tilson HH, Weisman SM. Aspirin use among adults aged 40 and older in the United States: Results of a national survey. Am J Prev Med 2007.

Weisman SM, Steiger L. In: Health Risk Assessment Strategies in the Food and Cosmetic Industry Toxocological Testing Handbook; Principles, Applications, and Data Interpretation. NY, NY: Informa Healthcare USA, Inc., p. 479-490, 2006.

Thomas M, Weisman SM. Calcium supplementation during pregnancy and lactation: effects on the mother and the fetus. Am J Obstet Gynecol 194: 937-45, 2006.

Weisman SM, Matkovic V. Potential use of biochemical markers of bone turnover for assessing the effect of calcium supplementation and predicting fracture risk. Clin Ther 27:

299-308, 2005.

Weisman SM. The calcium connection to bone health across a woman's lifespan: a roundtable. J Reprod Med 50: 879-84, 2005.

Sunyecz JA, Weisman SM. The role of calcium in osteoporosis drug therapy. J Womens Health (Larchmt) 14: 180-92, 2005.

Gorelick PB, Weisman SM. Risk of Hemorrhagic Stroke With Aspirin Use. An Update. Stroke 1801-7, 2005.

Weisman SM. Weighing the Benefits and Risks of Aspirin in Primary and Secondary Prevention of Ischemic Vascular Events. Cardiovascular Reviews & Reports 25: 58-65, 2004.

Hennekens CH, Schror K, Weisman S, FitzGerald GA. Terms and conditions: semantic complexity and aspirin resistance. Circulation 110: 1706-8, 2004.

Weisman S, Pollack CR, Gottschalk RW. Psoriasis disease severity measures: comparing efficacy of treatments for severe psoriasis. J Dermatolog Treat 14: 158-65, 2003.

Dog, T.L., Powell, K.L., Weisman, S.M. Critical evaluation of the safety of Cimicifuga racemosa in menopause symptom relief. Menopause. Jul-Aug 2003; 10(4):299-313.

Eidelman RS, Hebert PR, Weisman SM, Hennekens CH. An update on aspirin in the primary prevention of cardiovascular disease. Arch Intern Med 163: 2006-10, 2003.

Weisman SM, Graham DY. Evaluation of the benefits and risks of low-dose aspirin in the secondary prevention of cardiovascular and cerebrovascular events. Arch Intern Med 162: 2197- 202, 2002.

Weisman SM, Becker-Witkin K. The new FDA commissioner: Jane E. Henney, MD. Regulatory Affairs Journal 1: 1-2, 1999.

Weisman, S. and Rangan, U. Novel approaches for partnerships in Rx-to-OTC switch. Regulatory Affairs Focus. 1999. 3:22-24.

Weisman, S.M. and Rabe, C.S. Aspirin: New tricks for an old drug. Primary Care Reports. 1998. 4(25):239-246.

Weisman SM, Doyle MJ, Wehmeyer KR, Hynd BA, Eichhold TH, Clear RM, Coggeshall CW, Kuhlenbeck DL. Effects of tebufelone (NE-11740), a new anti-inflammatory drug, on arachidonic acid metabolism. Agents Actions 41: 156-63, 1994.

Charman WN, Charman SA, Monkhouse DC, Frisbee SE, Lockhart EA, Weisman S, FitzGerald GA. Biopharmaceutical characterisation of a low-dose (75 mg) controlled-release aspirin formulation. Br J Clin Pharmacol 36: 470-3, 1993.

Zander E, Weisman S. Treatment of acne vulgaris with salicylic acid pads. Clin Ther 14: 247-53, 1992.

Sirko SP, Schindler R, Doyle MJ, Weisman SM, Dinarello CA. Transcription, translation and secretion of interleukin 1 and tumor necrosis factor: effects of tebufelone, a dual cyclooxygenase/5-lipoxygenase inhibitor. Eur J Immunol 21: 243-50, 1991.

Doyle MJ, Eichhold TH, Hynd BA, Weisman SM. Determination of leukotriene B4 in human

4

plasma by gas chromatography using a mass selective detector and a stable isotope labelled internal standard. Effect of NE-11740 on arachidonic acid metabolism. J Pharm Biomed Anal 8: 137-42, 1990.

Weisman S, Nemzek R, Anderson C, Coffey J, Welton A. Oral retinoid treatment alters the development of arthritis induced by the transfer of spleen cells from rats with adjuvant arthritis. J Clin Invest 1989.

Weisman SM, Freund RM, Felsen D, Vaughan EDJ. Differential effect of platelet-activating factor (PAF) receptor antagonists on peptide and PAF-stimulated prostaglandin release in unilateral ureteral obstruction. Biochem Pharmacol 37: 2927-32, 1988.

Loo MH, Egan D, Vaughan EDJ, Marion D, Felsen D, Weisman S. The effect of the thromboxane A2 synthesis inhibitor OKY-046 on renal function in rabbits following release of unilateral ureteral obstruction. J Urol 137: 571-6, 1987.

Coffey J, Fiedler-Nagy C, Weisman S, Hope W, Welton A. In: Rand MJ, Raper Ce, eds. Anti-inflammatory activity of retinoid in animal models. Pharmacology. Amsterdam: Elsevier Science Publishers, 1987.

Weisman SM, Felsen D, Vaughan EDJ. The effect of sodium intake on renal prostaglandin production. Proc Soc Exp Biol Med 181: 357-63, 1986.

Weisman SM, Felsen D, Vaughan EDJ. Indications and contraindications for the use of nonsteroidal antiinflammatory drugs in urology. Semin Urol 3: 301-10, 1985.

Weisman SM, Felsen D, Vaughan EDJ. Platelet-activating factor is a potent stimulus for renal prostaglandin synthesis: possible significance in unilateral ureteral obstruction. J Pharmacol Exp Ther 235: 10-5, 1985.

**Steven M. Weisman, Ph.D.**

Summary of Expert Witness Testimony in Last Four Years

(last updated August 25, 2022)

| Case Name | Case No./Court | Testifying Dates | Case Closed Date |
|---|---|---|---|
| EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation-Consumer Class Cases | 2:17-MD-2785-DDC-JJ | 1/24/2020 (deposition) | 2/28/2022 |
| ABSORPTION PHARMACEUTICALS, LLC, a Delaware limited liability company, Plaintiff, v. RECKITT BENCKISER, LLC, a Delaware limited liability company, and DOES 1-50, Defendants | 2:17-cv-12872 (MCA) (JAD) | 3/9/2020 (deposition) | |
| SORRENTO THERAPEUTICS, INC., claimant, VS NANTPHARMA, LLC, respondent. | Case No: 01-19-0001-0303 | 10/14/2020 (deposition) 7/14/2021 (testified) | |
| NOVAQUEST CO-INVESTMENT FUND II, L.P. Claimant v. PFIZER INC., Respondent | AAA Case No. 01-18-0003-8870 | 11/24/2020 (arbitration) | |
| IN RE: ELYSIUM HEALTH-CHROMADEX LITIGATION | Case No. 1:17-cv-07394 (LJL) | 4/20/2021 (deposition) | |
| I-MAB, plaintiff, V. TRACON PHARMACEUTICALS, INC., defendant. | C.A. No. 2021-0176-PAF | 2/25/2022 (testified) | |

| Case Name | Case No./Court | Testifying Dates | Case Closed Date |
|---|---|---|---|
| TECHFIELDS PHARMA CO., LTD., plaintiff, VS. COVANCE, INC. AND FISHER CLINICAL SERVICES, INC., defendants. | CIVIL ACTION NO. 3:16-CV-01148-MAS-LHG | 12/2021 (deposition) | |
| RE: Challenge to Goli's Advertising for Goli Ashwagandha Dietary Supplement | National Advertising Division Complaint | 12/7/2021 (NAD meeting) | |
| JOSEPH BAYER, MARY BAYER, and GWENDOLYN CULVERSON, Plaintiffs, v. BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., et al. | Case No. 2021-L-000915 | Expert disclosure submitted 5/2/2022 | |
| In Re: Seventh Judicial District Asbestos Litigation JESSE WOODS AND SARAH WOODS, PLAINTIFFS, VS. KOLMAR LABORATORIES, INC., ET AL., DEFENDANTS. | Index # E2020003840 | 6/24/2022 (deposition) | |
| Diaz, plaintiff v. Chattem Inc., defendant | | 8/19/2022 (deposition) | |
| RANITIDINE PRODUCTS CASES | Coordination Proceeding JCCP NO. 5150 | 8/29/2022 (expert report submitted) | |

# EXHIBIT 8a

Defendants' Motion in Limine to Preclude
the Testimony of Plaintiffs' Expert
Dr. Steven M. Weisman, Ph. D.

Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| _____ ) | |
| ASTELLAS PHARMA INC. *et al.*, ) | |
| ) | |
| Plaintiffs ) | |
| ) | C.A. No. 20-1589-JFB-CJB |
| v. ) | |
| ) | |
| SANDOZ INC. *et. al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

<u>**REBUTTAL EXPERT REPORT OF STEVEN M. WEISMAN, PH.D.
CONCERNING THE FDA'S RECOMMENDATIONS REGARDING DRUG
FOOD EFFECTS**</u>

# TABLE OF CONTENTS

I. Introduction................................................................................................2

II. Professional Experience, Qualifications, Prior Testimony and Compensation....3

III. Summary of Opinions .........................................................................3

IV. Background on FDA Recommendations Concerning Food Effect Testing Based on Formulation and Drug Types ....................................................4

    A.   The FDA Provides Recommendations for Designing Food Effect Studies and for Indicating Food Effects on Product Labels ................................4

    B.   FDA Guidance Does Not Suggest Conducting Mechanistic Studies to Determine the Cause of a Drug's Food Effect.......................................6

    C.   Identifying a Food Effect Is Generally More Difficult for Formulations Containing BCS Class 3 Drugs than Those Containing BCS Class 1 Drugs........6

V. A Skilled Person Would Not Have Known of Mirabegron's Food Effect..........8

VI. There Would Have Been No Motivation to Address Mirabegron's Food Effect Using a Sustained Release Formulation Even If a Skilled Person Knew of It........10

VII. Conclusion ......................................................................................12

## I. INTRODUCTION

1.      I am the same Dr. Steven M. Weisman who provided the "Opening Expert Report of Steven M. Weisman, Ph.D.," dated September 13, 2022 ("Opening Report").

2.      I have been asked by Plaintiffs Astellas Pharma Inc., Astellas Ireland Co, Ltd., and Astellas Pharma Global Development, Inc. (together, Astellas) to provide expert opinions in *Astellas Pharma Inc. et al. v. Sandoz Inc. et al.*, Case No. 20-1589-JFB-CJB, which I understand is currently pending in the United States District Court for the District of Delaware.

3.      Relevant to this report, I have been asked by counsel to opine on the FDA's requirements concerning food effects. In particular, I was asked to opine on the challenges an applicant may face in meeting the FDA's requirements for determining the food effect of drugs and to what extent the FDA's guidance may or may not have motivated a skilled person to develop a sustained release formulation.

4.      I understand that Defendants in this case may have put forth additional assertions as to the FDA's recommendations regarding drug food effects and the motivations of a skilled person. I was not asked to respond to all of Defendants' assertions and was only asked to opine as to the FDA's recommendations concerning drug food effects, including as they relate to mirabegron and Astellas'

2

Myrbetriq® product.  To the extent I do not address the statements in Defendants'

expert reports that does not mean I agree with such statements.

5.      In preparing this report, I have relied on my background and experience,

which is summarized in my curriculum vitae provided as Appendix A to my

Opening Report. I have considered the documents identified in this report and

those identified in my Opening Report including but not limited to the pages cited

in support of specific propositions. As noted in my Opening Report, I have also

reviewed U.S. Patent No. 10,842,780.

## II.  PROFESSIONAL EXPERIENCE, QUALIFICATIONS, PRIOR TESTIMONY AND COMPENSATION

6.      In my Opening Report, I provided a description of my professional

experience, qualifications, prior testimony, and compensation, all of which remain

accurate and current.

## III.  SUMMARY OF OPINIONS

7.      As further explained below, it is my opinion that a skilled person would not

have been motivated to develop a sustained release mirabegron formulation based

on FDA guidance. The information submitted in IND and NDA applications is

confidential, and mirabegron's food effect was not publicly known prior to

September 30, 2008, which U.S. Patent No. 10,842,780 lists as the filing date of its

provisional application. Even if mirabegron's food effects were publicly known, a

skilled person (1) would likely have looked to conventional immediate release

formulations or other available alternatives or (2) might simply have indicated such food effect on the product label while providing instructions on whether the drug product should be administered with or without food.

## IV. BACKGROUND ON FDA RECOMMENDATIONS CONCERNING FOOD EFFECT TESTING BASED ON FORMULATION AND DRUG TYPES

### A. The FDA Provides Recommendations for Designing Food Effect Studies and for Indicating Food Effects on Product Labels

8.     The FDA has long recognized the challenges involved in identifying and predicting drug food effects.[1] Although it has been known since the 1970s that the presence of food can in some instances affect drug absorption, food effect was (and remains) a difficult phenomenon to identify and address for any given drug product.

9.     In 2002, the FDA issued food effect guidance ("FDA Guidance") that provided recommendations for applicants seeking to conduct food-effect bioavailability (BA) and fed bioequivalence (BE) studies for orally administered drug products for use in investigational new drug applications (INDs), new drug applications (NDAs), abbreviated new drug applications (ANDAs), and supplements to these applications.[2]

---

[1] *See, e.g.*, Ctr. for Drug Evaluation and Research, Food and Drug Admin., U.S. Dep't of Health and Human Servs., Guidance for Industry: Food-Effect Bioavailability and Fed Bioequivalence Studies (2002) ("FDA Guidance") (DEFS-MIRAII-000861-DEFSMIRAII-000872).

[2] FDA Guidance at 1.

10.     As noted in the FDA Guidance, food effect BA studies are often "conducted for new drugs and drug products during the IND period to assess the effects of food on the rate and extent of absorption of a drug when the drug product is administered shortly after a meal (fed conditions), as compared to administration under fasting conditions."[3] Relevant to this report, the FDA Guidance recommends that applicants conduct food effect BA studies on all orally administered modified-release dosage forms.[4] Specifically, the FDA recommends that applicants conduct a single study "comparing the BA under fasting and fed conditions for all orally administered modified-release drug products."[5]

11.     The FDA Guidance provides that the "studies may be exploratory and descriptive, or a sponsor may want to use a food-effect BA study to make a label claim."[6] Indeed, the purpose of recommending food effect BA studies is to enable applicants to "design clinical safety and efficacy studies and to provide information for the CLINICAL PHARMACOLOGY and/or DOSAGE AND ADMINISTRATION sections of product labels."[7] If applicants identify a food effect, they may then indicate such effect on the product label and provide

---

[3] FDA Guidance at 1.

[4] FDA Guidance at 4.

[5] FDA Guidance at 4.

[6] FDA Guidance at 6.

[7] FDA Guidance at 3.

instructions on whether the drug product should be administered with or without food.[8] Indeed, for some drugs, the applicant may wish to label the drug product to indicate that it should be sprinkled on certain foods or administered in tandem with certain beverages.[9]

### B. FDA Guidance Does Not Suggest Conducting Mechanistic Studies to Determine the Cause of a Drug's Food Effect

12. As the FDA Guidance notes, "it is difficult to determine the exact mechanism by which food changes the BA of a drug product without performing specific mechanistic studies."[10] The mechanism of a food effect can be specific to the drug, how the drug is formulated or both. Thus, rather than requiring mechanistic studies to single out and characterize the food effects of a particular formulation or API, the FDA only suggests applicants conduct food effect testing to determine if a particular drug formulation has a food effect, not why.[11]

### C. Identifying a Food Effect Is Generally More Difficult for Formulations Containing BCS Class 3 Drugs than Those Containing BCS Class 1 Drugs

13. Identifying a food effect can be more challenging for formulations containing certain types of APIs. For example, the FDA Guidance provides that,

---

[8] FDA Guidance at 7.

[9] FDA Guidance at 8.

[10] FDA Guidance at 2.

[11] FDA Guidance at 4-5 (providing recommendations for designing food BA studies and stating that "[t]he *formulation* to be tested should be administered on an empty stomach (fasting condition) in one period and following a test meal (fed condition) in the other period") (emphasis added).

for biopharmaceutics classification system ("BCS") Class 2, 3, and 4 immediate release drug products and for any modified-release drug products a "complex combination of factors that influence the *in vivo* dissolution of the drug product and/or the absorption of the drug substance" can influence a drug's food effect.[12] BCS is a standard model developed in 1995 and utilized by the FDA as well as the pharmaceutical industry generally.[13] It "is a scientific framework for classifying drug substances based on their aqueous solubility and intestinal permeability."[14] The BCS categorizes drugs into four different classes as provided below:

> Class 1: High Solubility — High Permeability
> Class 2: Low Solubility — High Permeability
> Class 3: High Solubility — Low Permeability
> Class 4: Low Solubility — Low Permeability [15]

14.     Relevant to this report, the challenges involved with identifying a food effect tend to be greater for formulations involving BCS Class 3 drugs (such as mirabegron) as compared to BCS Class 1 drug formulations.[16] For example, in

---

[12] FDA Guidance at 2.

[13] Vivek P Chavda et al., *Biological classification system (BCS); with a new perspective*, 3 MOJ Bioequiv Availab. 108 (2017) ("Chavda") (ASTMIRA_02236083-ASTMIRA_02236084), at 108 ("The BCS was first devised in 1995 and became a standard in the regulation of bioequivalence of oral dosage forms."); FDA Guidance at 2.

[14] HANDBOOK OF PHARMACEUTICAL MANUFACTURING FORMULATIONS COMPRESSED SOLID FORMULATIONS VOLUME II (Sarfaraz K. Niazi ed., 2004) ("Niazi II") (DEFS-MIRAII-002554-DEFS-MIRAII-002755), at 33.

[15] Niazi II at 33.

[16] FDA Guidance at 2.

immediate-release drug products containing BCS Class 1 drugs, the absorption of the drug substances "is usually pH- and site-independent and thus insensitive to differences in dissolution."[17] On the other hand, both immediate release and modified release formulations containing BCS Class 2, 3, and 4 drugs may be affected by a number of factors impacting "the in vivo dissolution of the drug product and/or the absorption of the drug substance."[18]

## V.  A SKILLED PERSON WOULD NOT HAVE KNOWN OF MIRABEGRON'S FOOD EFFECT

15.     Dr. Chambliss appears to opine that a skilled person would have necessarily discovered mirabegron's food effect based on FDA Guidance that recommends food effect studies be conducted for modified release formulations.[19] First, that the FDA would have required food effect testing on a mirabegron drug formulation is not relevant because the results of any such testing were not publicly known prior to September 30, 2008, which U.S. Patent No. 10,842,780 lists as the filing date of its provisional application. The FDA maintains the confidentiality of information submitted in IND and NDA applications, and thus the results of any of Astellas'

---

[17] FDA Guidance at 2.

[18] FDA Guidance at 2.

[19] *See, e.g.*, Appx. E to Chambliss's Opening Report, at ¶79 (stating that "[i]t was so well known in the early 2000s that food can affect the absorption of an API, that the FDA issued a guidance document to industry in 2002 describing the type of studies that pharmaceutical companies should conduct as part of the drug development process . . . ."); *id.* at ¶87 (arguing that a skilled person would have been motivated to address said food effect by developing a sustained release formulation that released mirabegron independent of food effect).

testing regarding mirabegron's food effect would not have been publicly available. Thus, a skilled person would not have known of mirabegron's food effect and would not have been motivated to address it.

16.     Further, Dr. Chambliss's opinion fails to consider that, as noted above, a given food effect directly depends on the specific formulation of the drug at issue.[20] The FDA Guidance only recommends testing to determine whether a food effect exists for a given formulation, not the mechanism underlying that effect. For example, the FDA Guidance states that "[t]he *formulation* to be tested should be administered on an empty stomach (fasting condition) in one period and following a test meal (fed condition) in the other period."[21] The FDA Guidance further provides that, if an applicant alters "the clinical trial *formulation* prior to approval, BE should be demonstrated between the to-be-marketed *formulation* and the clinical trial *formulation*."[22] Dr. Chambliss fails to explain what mirabegron formulations a skilled person would have developed and whether and to what extent such formulations would have had a food effect.

---

[20] FDA Guidance at 4-5 (providing recommendations for designing food BA studies and stating that "[t]he *formulation* to be tested should be administered on an empty stomach (fasting condition) in one period and following a test meal (fed condition) in the other period") (emphasis added).

[21] FDA Guidance at 4-5.

[22] FDA Guidance at 3.

## VI.  THERE WOULD HAVE BEEN NO MOTIVATION TO ADDRESS MIRABEGRON'S FOOD EFFECT USING A SUSTAINED RELEASE FORMULATION EVEN IF A SKILLED PERSON KNEW OF IT

17.     Dr. Chambliss asserts that a skilled person would have been motivated to develop a sustained release product to address mirabegron's food effect. I disagree. First, as previously noted, mirabegron's food effect was not publicly known prior to September 30, 2008. Even assuming that mirabegron's food effect had been identified, a person of skill would have no basis to pursue a particular solution. Indeed, the most common mechanism of addressing a food effect is to provide instructions on the product's label as to whether the drug product should be administered with or without food.[23] Thus, even assuming that a skilled person would have identified the food effect, they would have had no motivation to develop the patented solution.

18.     Next, even if a skilled person identified mirabegron's food effect and then identified a need to solve it, there would still be nothing in the FDA recommendations or in the regulatory approval process generally that would motivate the skilled person to use a sustained release formulation to overcome it. When developing an oral dosage form, formulators typically start with a solution or an immediate release formulation. Sustained release formulations are typically developed later (if at all) and only if there are problems with the immediate release

---

[23] *See, e.g.*, FDA Guidance at 7.

formulation or known benefits to using a sustained release formulation over an immediate release formulation for a given API.[24] That is, sustained release products "are chosen to accomplish therapeutic or convenience objectives not offered by conventional dosage forms such as a solution or an immediate release dosage form."[25] Thus, without a clear justification for developing a sustained release product, there is no reason to conclude that a skilled person would have chosen to pursue that solution.

19.    Dr. Chambliss's flawed analysis also fails to consider relevant differences between BCS drug classes. For example, Dr. Chambliss asserts that a "Model Drug" illustration from 1987 provides both a formulation and a dissolution profile that a skilled person would understand could be extrapolated to other APIs and formulations. Specifically, Dr. Chambliss asserts that this "Model Drug" would be understood by a skilled person as "referring to an API that has properties which can be used as a starting point to develop a sustained release hydrogel-forming tablet comprising a specific API."[26] The problem with Dr. Chambliss's assertion is

---

[24] *See, e.g.*, *Guidance for Industry: SUPAC-MR: Modified Release Solid Oral Dosage Forms*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), CMC (Sept. 1997), (available at https://www.fda.gov/media/70956/download) (ASTMIRA_02231959-2010 at ASTMIRA_02231996).

[25] *See, e.g.*, *Guidance for Industry: SUPAC-MR: Modified Release Solid Oral Dosage Forms*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), CMC (Sept. 1997), (available at https://www.fda.gov/media/70956/download) (ASTMIRA_02231959-2010 at ASTMIRA_02231996).

[26] Appx. E to Chambliss's Opening Report, at ¶134.

that it overlooks the fact that not all APIs are alike as was shown by the subsequent

adoption of the BCS in 1995, which is used by the FDA to this day.[27] There is

simply no magic bullet for developing a formulation that will work across all APIs.

20.     Similarly, Dr. Chambliss incorrectly asserts that a formulation containing

memantine hydrochloride (a BCS Class 1 drug) would provide a motivation for

developing a sustained release formulation as well as a particular dissolution

profile for mirabegron (a BCS Class 3 drug).[28] As previously explained these drug

classes have the opposite permeability profile. BCS Class 1 drugs are characterized

as having high permeability whereas BCS Class 3 drugs are characterized as

having low permeability. Dr. Chambliss fails to acknowledge the different BCS

classifications of memantine hydrochloride and mirabegron, and the fact that there

is simply no reason why a skilled person would have been motivated to develop a

sustain release mirabegron formulation based upon the dissolution profile of a

formulation containing the far more permeable memantine hydrochloride.

## VII.  CONCLUSION

21.     Mirabegron's food effect problem was unknown, and thus there was no

motivation to solve it.  Moreover, there is no one-size-fits-all approach to

addressing a food effect, and a skilled person would likely have looked to

---

[27] Chavda at 108 ("The BCS was first devised in 1995 and became a standard in the regulation of bioequivalence of oral dosage forms."); FDA Guidance at 2.

[28] Appx. E to Chambliss's Opening Report, at ¶121-27.

conventional immediate release formulations or other available alternatives. On the other hand, a food effect is not considered a problem by many applicants who opt to simply provide label instructions for administering such drugs, which the FDA allows. In any event, because FDA maintains the confidentiality of information submitted in IND and NDA applications, it would not have been publicly known that mirabegron exhibits a food effect, and thus there could have been no motivation to solve it.

Dated:  10/17/2022

Steven M. Weisman, Ph.D.

13

# EXHIBIT 8a

Defendants' Motion in Limine to Preclude
the Testimony of Plaintiffs' Expert
Dr. Steven M. Weisman, Ph. D.

Exhibit D

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| _____ | ) | |
| ASTELLAS PHARMA INC. *et al.*, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | C.A. No. 20-1589-JFB-CJB |
| | ) | |
| SANDOZ INC. *et. al*., | ) | **Outside Counsel Only –** |
| | ) | **Contains Confidential** |
| Defendants. | ) | **Information of Aurobindo,** |
| _____ | ) | **Lupin, Sawai, and Zydus** |

## REPLY EXPERT REPORT OF STEVEN M. WEISMAN, PH.D. CONCERNING THE FDA'S RECOMMENDATIONS REGARDING BIOEQUIVALENCE AND COMPARATIVE DISSOLUTION TESTING

## **TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................2

II. PROFESSIONAL EXPERIENCE, QUALIFICATIONS, PRIOR TESTIMONY AND COMPENSATION...........................................................................4

III. SUMMARY OF OPINIONS ................................................................4

IV. THE ROLE OF BIOEQUIVALENCE ..................................................5

V. THE ROLE OF F2 TESTING ...........................................................10

VI. SAWAI'S F2 TESTING....................................................................13

VII. CONCLUSION ...............................................................................16

## I. INTRODUCTION

1.      My name is Dr. Steven M. Weisman. I currently serve as Global President of Lumanity, a consulting company that assists companies in developing United States Food & Drug Administration (FDA) regulatory strategies, product development plans and preclinical and clinical testing programs in the development and commercialization of pharmaceutical products.

2.      In this matter, I previously provided an opening expert report dated September 13, 2022 ("Opening Report") and a rebuttal expert report dated October 17, 2022 ("Rebuttal Report"). Unless otherwise mentioned, I adhere to and incorporate here the opinions I expressed in my Opening Report and Rebuttal Report.

3.      I write this report in support of the opinions previously expressed, and in response to the "Rebuttal Expert Report of Leon Shargel, Ph.D., R.Ph.," dated October 18, 2022 ("Shargel Rebuttal Report") and the "Responsive Expert Report of Graham Buckton, Ph.D., D.Sc.," dated October 18, 2022 ("Buckton Rebuttal Report"). I have reviewed both the Shargel Rebuttal Report and the Buckton Rebuttal Report to prepare this report.

4.      I understand that the Shargel Rebuttal Report addresses my opinions concerning f2 testing and the Buckton Rebuttal Report addresses my opinions concerning both f2 testing and bioequivalence generally.  I further understand that

none of Defendants' Rebuttal Reports dispute any of my other opinions provided in my Opening Report.  I have fully considered the opinions and statements in the Shargel Rebuttal Report and the Buckton Rebuttal Report.  None of the responsive opinions and statements submitted by Drs. Shargel and/or Buckton change any of my opinions and conclusions concerning my Opening Report or my Rebuttal Report.

5.      In this report, I respond to certain opinions expressed and/or statements made in the Shargel Rebuttal Report and the Buckton Rebuttal Report.  To the extent that I do not explicitly address or rebut any statement in the Shargel Rebuttal Report or the Buckton Rebuttal Report, this should not be construed to mean that I agree with such a statement.  If asked, I will testify at trial about these opinions.

6.      I understand that Defendants in this case may have put forth additional assertions as to the FDA's recommendations for bioequivalence and comparative dissolution testing. I was not asked to respond to all of Defendants' assertions and was only asked to opine as to certain of the opinions and statements made in the Shargel Rebuttal Report and the Buckton Rebuttal Report.  To the extent I do not address the statements in Defendants' expert reports, that does not mean I agree with such statements.

7.     In preparing this report, I have relied on my background and experience, which is summarized in my curriculum vitae provided as Appendix A to my Opening Report. I have considered the documents identified in this report and those identified in my Opening Report and in my Rebuttal Report including but not limited to the pages cited in support of specific propositions. As noted in my Opening Report and in my Rebuttal Report, I have also reviewed U.S. Patent No. 10,842,780 (the "'780 Patent").

## II.  PROFESSIONAL EXPERIENCE, QUALIFICATIONS, PRIOR TESTIMONY AND COMPENSATION

8.     In my Opening Report, I provided a description of my professional experience, qualifications, prior testimony, and compensation, all of which remain accurate and current.

## III.  SUMMARY OF OPINIONS

9.     Similarity of dissolution profiles is an important factor in whether a drug product can demonstrate bioequivalence, particularly for extended release oral dosage forms. Accordingly, for extended release drug products containing mirabegron, the FDA recommends *in vitro* comparative dissolution testing to establish that the dissolution profile of an ANDA product closely tracks that of the

4

RLD.[1]   Although it need not be completely identical, an ANDA product's

dissolution profile must not significantly diverge from that of the RLD.

10.     Lupin and Sawai both utilized f2 dissolution testing—a common method for

demonstrating equivalency of dissolution profiles—and obtained values

demonstrating that the dissolution profiles of their ANDA products are highly

similar to that of Myrbetriq®. Lupin's and Sawai's f2 testing is relevant to the

dissolution limitation of the '780 patent because, as f2 values exceed 50, it

becomes increasingly likely that the dissolution rate at any given timepoint will be

closer, or potentially identical, to that demonstrated by Myrbetriq®.

## IV.  THE ROLE OF BIOEQUIVALENCE

11.     As I explained in my Opening Report, an Abbreviated New Drug

Application ("ANDA") is "abbreviated" in the sense that, because an NDA

applicant has already demonstrated that its product is safe and effective, an ANDA

applicant can generally rely on the FDA's findings for the previously approved

drug, referred to as the RLD.[2] Thus, an ANDA applicant need only demonstrate

bioequivalence to the RLD it seeks to duplicate (in this case, Myrbetriq®) and

need not perform many of the studies required of the previous NDA applicant. For

---

[1] Although this report primarily addresses the Buckton Rebuttal Report and the Shargel Rebuttal Report, which discuss Lupin's and Sawai's ANDA products, respectively, the statements made in this report regarding bioequivalence and comparative dissolution testing (including f2 testing where applicable) apply equally to the other Defendants' ANDA products and to generic extended-release formulations of mirabegron generally given the FDA guidance for mirabegron for the reasons stated herein.

[2] Weisman Opening Report, at ¶¶ 18-19.

extended release formulations such as those containing mirabegron, in which drug release rate plays a critical role in the drugs' safety and efficacy, the FDA recommends generic drug makers conduct *in vitro* comparative dissolution testing comparing their ANDA products to the RLD.[3]

12.     Although Dr. Buckton does not appear to dispute any of the statements in my Opening Report, he nevertheless contends that bioequivalence is irrelevant to the dissolution limitation of the '780 Patent.[4]  I disagree.

13.     First, Dr. Buckton asserts that "*in vitro* testing of an ANDA product, without the *in vivo* testing, does not demonstrate equivalence, irrespective of whether or not the ANDA mirabegron product has similarity to the RLD in a specific dissolution test."[5] In so doing, Dr. Buckton ignores the role of an *in vivo-in vitro* correlation ("IVIVC").

14.     As Dr. Buckton does not dispute, the purpose of establishing an IVIVC is to establish *in vitro* dissolution testing as a surrogate for *in vivo* performance.[6] That

---

[3] Draft Guidance on Mirabegron (recommended June 2013) (available at https://www.accessdata.fda.gov/drugsatfda_docs/psg/Mirabegron_ER_tab_202611_RC06-13.pdf) (ASTMIRA_02231748–49).

[4] Buckton Rebuttal Report, at ¶ 88.

[5] Buckton Rebuttal Report, at ¶ 88.

[6] *See* Buckton Rebuttal Report, at ¶ 92 ("After the development of an IVIVC for a specific formulation, obtained by collecting *in vivo* data and finding a dissolution method that can produce the observed *in vivo* rate *in vitro*, that specific dissolution rate can be used for that formulation in order to predict *in vivo* performance.").

the FDA permits an IVIVC to substitute for *in vivo* testing demonstrates that *in vitro* testing can be sufficient to establish equivalence.

15.     As explained in my Opening Report, developing an IVIVC is useful for ANDA applicants, both for determining dissolution specifications and for use "as a surrogate for *in vivo* bioequivalence."[7]  For companies seeking to manufacture a generic mirabegron ANDA product, the FDA recommends both *in vitro* and *in vivo* testing to show bioequivalence to Myrbetriq®. Thus, unless an applicant adopts an alternative approach acceptable to the FDA—a difficult task where the FDA has already provided product specific guidance—bioequivalence requires, *inter alia*, that applicants conduct satisfactory *in vitro* dissolution testing comparing their product to Myrbetriq®.[8] Thus, any determination of bioequivalence for a generic mirabegron product requires consideration of both *in vivo* and *in vitro* testing.

16.     Second, Dr. Buckton asserts that it "would be incorrect to infer that the bioequivalence of two different products, such as Lupin's ANDA products and Myrbetriq®, means that they have the same *in vitro* dissolution."[9] He further

---

[7] Opening Report, at ¶ 32; *Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro/In Vivo Correlations*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER) (Sept. 1997) (available at https://www.fda.gov/media/70939/download) (ASTMIRA_02231775–801 at ASTMIRA_02231778).

[8] Draft Guidance on Mirabegron (recommended June 2013) (available at https://www.accessdata.fda.gov/drugsatfda_docs/psg/Mirabegron_ER_tab_202611_RC06-) (ASTMIRA_02231748–49).

[9] Buckton Rebuttal Report, at ¶ 94.

concludes that Lupin's comparative testing between its ANDA products and Myrbetriq®, demonstrate that its ANDA products have "non-identical dissolution profiles" to Myrbetriq®.[10]

17.     As a preliminary matter, it is my understanding that the '780 patent does not require that a product have the "same" dissolution profile as Myrbetriq® in order to infringe. Rather, it is my understanding that the '780 patent instead requires only that an infringing product satisfy certain dissolution timepoints. Thus, whether a product's dissolution profile is the "same" as Myrbetriq®'s is not dispositive of whether the product infringes.

18.     That said, bioequivalence provides a meaningful understanding of the relationship of two dissolution profiles, particularly in the case of an extended-release oral dosage form. Even though two products need not have completely identical dissolution profiles in order to be bioequivalent, one significant factor in determining bioequivalence is whether products have sufficiently similar dissolution profiles.

19.     Indeed, based on my experience in reviewing FDA dissolution data, it is rare for two drug samples to have a perfectly identical dissolution profile, even if the samples are drawn from the same manufacturing batch of a given drug product.

---

[10] Buckton Rebuttal Report, at ¶¶ 53-58.

20.     For the purposes of the FDA's bioequivalence determination, similarity in dissolution profiles will support a showing of bioequivalence if there is no significant departure from the RLD's dissolution profile—a standard more lenient than demonstrating complete identicality.[11]

21.     Moreover, for mirabegron, I understand that each of Defendants' ANDA products that have demonstrated bioequivalence have separately exhibited similar dissolution profiles as Myrbetriq® in comparative dissolution testing.[12] Accordingly, Dr. Buckton's criticism does not undermine the value of the dissolution profile data here, where bioequivalence closely tracks the similarity of the generic products' dissolution profiles to the RLD.

22.     Because, in the context of mirabegron extended release tablets, bioequivalence requires Defendants' ANDA products to have a sufficiently similar dissolution profile as Astellas' Myrbetriq®, it provides useful information regarding the dissolution profiles of Defendants' ANDA Products.

_____

[11] *See* FDA Guidance for Industry, Dissolution Testing of Immediate Release Solid Oral Dosage Forms, August 1997 (ASTMIRA_02231731–747) at 9; Ex. 18 to Buckton Rebuttal Report (Shah et al., In Vitro Dissolution Profile Comparison—Statistics and Analysis of the Similarity Factor, f2, Pharmaceutical Research, 15(6):889-896 (1998) ("Shah")), at 890.

[12] *See e.g.*, Aurobindo Exhibit 3 (AURO_MBN_0002433-595) at AURO_MBN_0002455; AURO_MBN2_0060775-779 at AURO_MBN2_0060775; Lupin Exhibit 8 (LMIR0031190-240) at LMIR0031202-207; LMIR0102888-892 at LMIR0102888; Sawai Exhibit 118 (SAW-MIR 0000450-456) at SAW-MIR 0000452, 456; SAWMIRA0000139-146 at SAWMIRA0000141; Kannan Exhibit 4 (ZYDMYB0004628-889) at ZYDMYB0004829-830, 834-835; ZYDMYB0173723-728 at ZYDMYB0173723.

## V.  THE ROLE OF F2 TESTING

23.    Drs. Buckton and Shargel contend that f2 testing of Lupin's and Sawai's

ANDA products is not relevant to determining whether they infringe the

dissolution limitation of the '780 patent, because f2 testing considers the similarity

of the entire dissolution profiles at issue.[13] I disagree.

24.    As explained in my Opening Report, f2 testing provides a degree of

similarity of dissolution profile between two products.[14]  If the applicant conducts

f2 testing comparing the dissolution profile of their ANDA product to that of the

RLD and obtains an f2 value of 50 or greater, then the dissolution profiles of the

two products are considered equivalent.[15]

25.    Although f2 testing does not report similarity at specific time points, Drs.

Buckton and Shargel are incorrect that f2 testing provides no relevant information.

26.    To obtain an f2 value of 50, the minimum value necessary to show

similarity, there typically can be an average difference of no more than 10% at the

measured time points.[16] As an f2 value increases above 50, thus demonstrating

increased similarity between the dissolution profiles, the average difference at the

---

[13] Buckton Rebuttal Report, at ¶¶ 96-99; Shargel Rebuttal Report, at ¶ 46.

[14] Opening Report, at ¶¶ 26, 28-30.

[15] Opening Report, at ¶ 30; *see also* Shargel Rebuttal Report, at ¶ 42.

[16] Shah, at 890; D. A. Diaz, *et al.*, "Dissolution Similarity Requirements: How Similar or Dissimilar Are the Global Regulatory Expectations?," AAPS Journal, Vol. 18, No. 1, 15–22 (2016) ("Diaz") (SAWMIR 0903615-622) at 18.

10

measured time points shrinks. Accordingly, as the f2 value increases above 50, it is increasingly likely that the dissolution rate at any given timepoint will be closer, or potentially identical, to that demonstrated by Myrbetriq®.

27.    Neither Dr. Buckton nor Dr. Shargel dispute that the f2 values for Lupin's and Sawai's ANDA products, respectively, as compared to Myrbetriq® are greater than 50.[17] Thus, they do not dispute that the f2 comparative analysis establishes equivalence between the dissolution profiles of Lupin's and Sawai's ANDA products and Myrbetriq®'s dissolution profile.

28.    Dr. Buckton contends that only an f2 value of 100 would "provide any information regarding similarity at a particular point on the dissolution curve."[18] Similarly, Dr. Shargel analyzed the f2 values for Sawai's ANDA product and determined that its dissolution profile is "not identical" to Myrbetriq®'s.[19]

29.    This ignores the fact that, as dissolution curves become more similar, the chances that specific time points will be closer or identical to one another increases. To obtain an f2 value even approaching 100, the dissolution profile of the test drug product would have to be so nearly identical to that of the RLD that it would exceed even the level of similarity expected from dissolution curves derived

---

[17] Buckton Rebuttal Report, at ¶¶ 96-99; Shargel Rebuttal Report, at ¶ 46.

[18] Buckton Rebuttal Report, at ¶ 97.

[19] Shargel Rebuttal Report, at ¶ 46.

from samples of the same batch of the same drug product. Indeed, "due to the batch-to-batch variation in dissolution profiles, it is not expected to have an f2 value be anywhere near 100 even when the two dissolution curves are generated from the same batch of tablets (or capsules)."[20] Considering the extremely low batch-to-batch variation that would be expected from samples of the same batch of the same drug product, achieving an even greater f2 value would require the target drug product's dissolution rate to be a near perfect copy of the RLD's dissolution rate at any timepoint analyzed. Even slight changes between the RLD and the test drug product would cause the f2 value to exponentially decrease.[21] This underscores how highly similar two dissolution curves must be to achieve an f2 value of greater than 50.

30.     Ultimately, the f2 similarity analyses provides useful information about the dissolution profiles of Lupin's and Sawai's ANDA products, including their relationship to Myrbetriq®. As the f2 value increases above 50, it is increasingly likely that the dissolution rate at any given timepoint will be closer, or potentially identical, to that demonstrated by Myrbetriq®. Based on the f2 data I reviewed, Lupin's and Sawai's ANDA Products have dissolution profiles similar to that of Myrbetriq®.

---

[20] Shah, at 890.

[21] Diaz, at 17.

## VI.  SAWAI'S F2 TESTING

31.    Dr. Shargel also disputes the conclusions to be drawn from Sawai's f2 testing of its proposed ANDA product against Myrbetriq® based on the methodology employed to calculate the f2 testing.

32.    Specifically, Dr. Shargel criticizes Sawai's f2 testing because it evaluated "f2 values for the entire dissolution curve (including multiple points after 85% dissolution are achieved)."[22] According to Dr. Shargel, an appropriate methodology for conducting f2 analysis would include only one measurement "after 85% dissolution of both [drug] products."[23] Furthermore, according to Dr. Shargel, had this methodology been applied to Sawai's f2 testing, certain measurements would have been excluded, resulting in an f2 calculation of, at the lowest, 53 rather than 56.[24]

33.    As a preliminary manner, even were Dr. Shargel correct, I disagree with his conclusion that the results of the f2 testing are not meaningful. Dr. Shargel's analysis still results in f2 values exceeding 50.[25] For the reasons explained above, f2 values exceeding 50 demonstrate that two dissolution profiles are highly similar.

---

[22] Shargel Rebuttal Report, at ¶ 46.

[23] Shargel Rebuttal Report, at ¶ 45 (citing FDA Guidance for Industry, Dissolution Testing of Immediate Release Solid Oral Dosage Forms, August 1997 (ASTMIRA_02231731–747) at 9).

[24] Shargel Rebuttal Report, at ¶ 45; Appx. D to Shargel Rebuttal Report, at 6-7.

[25] Shargel Rebuttal Report, at ¶¶ 45-46; Appx. D to Shargel Rebuttal Report.

34.     In any event, Dr. Shargel did not follow his own proposed methodology when analyzing Sawai's comparative dissolution between its ANDA product and Myrbetriq® as measured in a 6.8 pH buffer. To obtain this f2 value, Dr. Shargel included a timepoint (6 hours) where Sawai's drug product had a dissolution rate above 85%, but Myrbetriq® had not yet reached 85%.[26] This testing did not, as Dr. Shargel's methodology requires, include a measurement where *both* drug products had reached 85% dissolution.[27] Thus, Dr. Shargel's calculations obtaining the lower (but still greater than 50) f2 value for the dissolution rates measured in a 6.8 pH buffer may be safely disregarded as unsubstantiated by his own rationale, contrary to Sawai's f2 testing submitted in its ANDA, and, in any event, unable to show an f2 value below 50.

35.     Dr. Shargel also criticizes reliance on Sawai's f2 testing, "especially for the '39% or less at 1.5 hours' part of the Dissolution Limitation,"[28] because "the initial dissolution rates for Sawai's ANDA product are consistently higher at earlier time points (i.e., <5 hours) compared to the RLD."[29] Dr. Shargel's criticism is misplaced.

---

[26] Appx. D to Shargel Rebuttal Report at 7.

[27] *See* FDA Guidance for Industry, Dissolution Testing of Immediate Release Solid Oral Dosage Forms, August 1997 (ASTMIRA_02231731–747) at 9.

[28] Shargel Rebuttal Report, at ¶ 46.

[29] Shargel Rebuttal Report, at ¶ 45.

36.     First, minor differences between Sawai's ANDA product's dissolution profile and that of Myrbetriq®, whether higher or lower, do not alter the fact that Sawai's ANDA product and Myrbetriq® have highly similar dissolution profiles as demonstrated through f2 testing.

37.     Further, contrary to Dr. Shargel's claim that the 1.5 hour dissolution time point is "especially" implicated, the dissolution curve comparing Sawai's ANDA product and Myrbetriq® that Dr. Shargel highlights shows how closely similar the products are before the 2-hour mark:



38.     As the chart above demonstrates, at the ~1.5 hour timepoint, the dissolution curves closely track one another.

39.     Moreover, as previously noted, neither Dr. Buckton nor Dr. Shargel dispute that Lupin's and Sawai's ANDA products have similar dissolution profiles to Myrbetriq®.

---

[30] Shargel Rebuttal Report, at ¶¶ 45-46.

## VII. CONCLUSION

40.    Drug release is a critical feature of extended release formulations such as those containing mirabegron. Demonstrating sufficient similarity of dissolution profiles requires that the dissolution profile of an ANDA product cannot significantly diverge from that of the RLD. Lupin and Sawai both conducted f2 testing comparing the dissolution profiles of their ANDA products to Astellas' Myrbetriq®. While Lupin's and Sawai's f2 testing does not, by itself, show that their ANDA products practice the '780 Patent's dissolution limitations, the f2 values reported by Lupin and Sawai demonstrate that the dissolution profiles of their ANDA products closely tracks that of Myrbetriq®.


Dated:  November 10, 2022             Steven M. Weisman, Ph.D.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ASTELLAS PHARMA INC., *et al.*, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) C.A. No. 20-1589 (JFB) (CJB) |
| v. | ) CONSOLIDATED |
| | ) |
| SANDOZ INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**<u>ASTELLAS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE ("MIL") TO
PRECLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT DR. STEVEN M.
WEISMAN, PH.D.</u>**

Plaintiffs respectfully request the Court deny Defendants' motion *in limine* to preclude any testimony from Plaintiffs' FDA expert witness, Dr. Steven M. Weisman, Ph.D. ("Defendants' MIL").  Dr. Weisman is a pharmacologist with 30+ years of experience, including extensive expertise in regulatory submissions to FDA.  In fact, Dr. Weisman testified repeatedly during his deposition that he met and exceeded the definitions of a person of ordinary skill in the art ("POSA") offered by both Plaintiffs' and Defendants' expert witnesses.  While Dr. Weisman does not opine on the ultimate issues of infringement or validity (nor was he asked to do so), his three expert reports provide his expert opinions concerning FDA regulations and guidance documents relevant to this case.  Dr. Weisman's analyses were also considered by Plaintiffs' formulation expert witness, Prof. Steven Little, who ultimately provides his overall infringement and validity opinions concerning the patent claims at issue here, as part of a large array of evidence considered. As a result, Defendants are wrong in asserting that Dr. Weisman's opinions are not "probative" or are "unqualified."  To the contrary, Dr. Weisman's testimony will assist the Court in understanding the contents of case-specific FDA guidance documents and regulations relevant to the infringement and validity issues in this case.

**1. Dr. Weisman's Testimony is Relevant to Infringement and Validity Issues in this Case**

With respect to infringement, Dr. Weisman's opinions center on the analysis of a critical FDA guidance document in this case, namely FDA's specific mirabegron bioequivalence guidance that each of Defendants' ANDA products needed to meet to secure FDA approval.  In particular, the guidance requires Defendants to compare dissolution of their proposed ANDA products with Plaintiffs' branded Myrbetriq® product for similarity.  The main infringement dispute between the

parties centers on the "dissolution element" of the two independent patent claims.[1]  As a result, this guidance—and  Defendants' application of it to their ANDA products—is probative of Defendants' infringement of the patent at issue in this case, making it relevant under F.R.E. 402.[2]  And while Dr. Weisman does not provide the ultimate infringement opinions in this case, Prof. Little ties these expert regulatory opinions to the patent claims as issue, and relies, *inter alia*, on Dr. Weisman's opinions in opining on infringement and validity.  As a result, Dr. Weisman's opinions are probative and relevant and should not be excluded.[3]

Dr. Weisman also provided opinions regarding mirabegron's "food effect," a phenomenon which limits the bioavailability of mirabegron when taken with food, a key benefit of the innovative extended-release dosage forms at issue in this case. *See, e.g.*, Ex. A, U.S. 10,842,780 at 1:16-20, 2:21-29.  This food-effect issue is directly responsive to invalidity opinions offered by Defendants, making Dr. Weisman's analysis of FDA food regulations relevant to this case.  Indeed, Dr. Weisman explains FDA's regulatory framework for food-effect studies and product labeling, issues raised by Defendants' invalidity expert Dr. Chambliss.

While Defendants attempt to marginalize Dr. Weisman's opinions by arguing that he did not review any specific ANDA filings in this case, that analysis was performed by Plaintiffs' formulation expert, Prof. Little, who also considered Dr. Weisman's expert analysis of the FDA regulations specific to this case.  Moreover, Dr. Weisman provided his opinions within his own

---

[1] D.I. 429, Plaintiffs Nov. 9, 2022, Opening Letter, at 3, 3 n.5; D.I. 434, Plaintiffs Nov. 16, 2022, Reply Letter, at 2; D.I. 440, Nov. 21, 2022, Oral Order; Dec. 22, 2022, Hearing Tr. at 27:2-5.
[2] This FDA guidance has been central to infringement from the start of this case.  D.I. 1 (Complaint) at ¶¶ 115-116.
[3] Defendants' reliance on *F'Real Food, LLC v. Hamilton Beach Brands, Inc.* is misplaced as that court excluded only specific paragraphs from the expert report that improperly concerned state of mind, or contained facts not used by the expert at all in his technical analysis—an argument Defendants do not even attempt to make here. No. 16-41-CFC, 2019 WL 1578259, at *1 (D. Del. April 11, 2019).

expertise, which is entirely proper.  *See e.g. Hospira v. Amneal*, 285 F. Supp. 3d 776, 811 (D. Del. 2018) (admitting expert biostatistician's testimony concerning non-infringement—despite not being a POSA); *Braintree Lab'ys, Inc. v. Novel Lab'ys, Inc.,* No. CIV.A. 11-1341 PGS, 2013 WL 211252, at *19 (D.N.J. Jan. 18, 2013), *vacated in part and remanded on other grounds,* 749 F.3d 1349 (Fed. Cir. 2014) (admitting expert attorney declaration "because it contains factual evidence of the FDA's conduct towards [Plaintiffs product] and [Defendant]'s ANDA").  As a result, Dr. Weisman's analysis of FDA's mirabegron guidance document and support regulations are probative of the disputes the Court will need to decide, making them relevant and admissible under the Federal Rules of Evidence.

### 2.  Defendants' *Daubert* Challenge Is Untimely and Unsupported

Defendants also attempt to exclude Dr. Weisman's opinions under F.R.E. 702 and *Daubert*. However, as a threshold matter, Defendants were required to obtain leave of Court before raising any *Daubert* challenges in this case, but they failed to do so. D.I. 406 (Ordering a status conference on December 22, 2022 "with any hearing on case dispositive motions or ***Daubert motions TBD pending a decision on whether such motions will even be permitted in the first place***") (emphasis added).  As a result, the Court should deny their *Daubert* challenges to Dr. Weisman as they are contrary to the orders of this Court.

Nonetheless, Defendants' assertions that Dr. Weisman is not a POSA are unsupported.  In fact, Dr. Weisman repeatedly testified in his deposition that he exceeded the definitions of a POSA offered by both Astellas and Defendants' experts.  *See, e.g.*, Ex. A to Defendants' MIL, at 44:23-45:1; 45:4-45:24; 46:2-6; 76:5-12.  Moreover, Defendants do not take issue with his training and expertise in FDA regulatory issues, which are the very issues he addresses in his expert reports.  Thus, even if Defendants' challenges were timely, they would also fail on the merits as Dr. Weisman in eminently qualified to provide the opinions in his expert reports.

Dated: January 5, 2023

*Of Counsel*:                                          MCCARTER & ENGLISH, LLP

                                                       /s/ Daniel M. Silver
Simon D. Roberts                                       Daniel M. Silver (#4758)
Jason A. Leonard                                       Alexandra M. Joyce (#6423)
Nitya Anand                                            405 N. King St., 8th Floor
Vincent Li                                             Wilmington, DE 19801
Jayita Guhaniyogi                                      (302) 984-6331
One Vanderbilt Avenue                                  dsilver@mccarter.com
New York, NY 10017-3852                                ajoyce@mccarter.com
(212) 547-5700

Christopher M. Bruno                                   *Attorneys for Plaintiffs*
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
(202) 756-8000

Maxwell A. Fox
2049 Century Park East, Suite 3200
Los Angeles, CA 90067-3206
(310) 277-4110

Stephen M. Hash
303 Colorado Street, Suite 2200
Austin, TX 78701
(512) 726-2600

Meng Xu
18565 Jamboree Road, Suite 250
Irvine, CA 92612-2565
(949) 851-0633

Connor Romm
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
(617) 535-4000

Rodney Swartz
650 Live Oak Avenue, Suite 300
Menlo Park, CA 94025-4885
(650) 815-7400

# EXHIBIT A

TO ASTELLAS' OPPOSITION TO DEFENDANTS'
MOTION IN LIMINE TO PRECLUDE THE TESTIMONY OF
PLAINTIFFS' EXPERT DR. STEVEN M. WEISMAN, PH.D.

US010842780B2

(12) **United States Patent**
Takaishi et al.

(10) Patent No.: **US 10,842,780 B2**
(45) Date of Patent: **Nov. 24, 2020**

(54) **PHARMACEUTICAL COMPOSITION FOR MODIFIED RELEASE**

(71) Applicant: **ASTELLAS PHARMA INC.**, Tokyo (JP)

(72) Inventors: **Yuuki Takaishi**, Tokyo (JP); **Yutaka Takahashi**, Tokyo (JP); **Takashi Nishizato**, Tokyo (JP); **Daisuke Murayama**, Tokyo (JP); **Emiko Murayama**, Tokyo (JP); **Soichiro Nakamura**, Tokyo (JP); **Kazuhiro Sako**, Tokyo (JP)

(73) Assignee: **ASTELLAS PHARMA INC.**, Tokyo (JP)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/432,854**

(22) Filed: **Feb. 14, 2017**

(65) **Prior Publication Data**

US 2017/0231965 A1     Aug. 17, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 12/568,313, filed on Sep. 28, 2009, now abandoned.

(60) Provisional application No. 61/101,338, filed on Sep. 30, 2008.

(51) **Int. Cl.**
| | |
|---|---|
| *A61K 31/426* | (2006.01) |
| *A61K 9/20* | (2006.01) |
| *A61K 9/28* | (2006.01) |

(52) **U.S. Cl.**
CPC .......... *A61K 31/426* (2013.01); *A61K 9/2009* (2013.01); *A61K 9/2013* (2013.01); *A61K 9/2031* (2013.01); *A61K 9/2054* (2013.01); *A61K 9/2095* (2013.01); *A61K 9/2853* (2013.01); *A61K 9/2866* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,929,629 | A | 5/1990 | Jeffery |
| 5,681,582 | A | 10/1997 | Gilis et al. |
| 6,204,285 | B1 | 3/2001 | Fabiano et al. |
| 6,346,532 | B1 | 2/2002 | Maruyama et al. |
| 6,368,628 | B1 | 4/2002 | Seth |
| 6,436,441 | B1 | 8/2002 | Sako et al. |
| 6,699,503 | B1 | 3/2004 | Sako et al. |
| 7,442,387 | B2 | 10/2008 | Sugihara et al. |
| 8,877,214 | B2 | 11/2014 | Takaishi et al. |
| 2001/0006982 | A1 | 7/2001 | Cruz et al. |
| 2003/0198619 | A1 | 10/2003 | Dong et al. |
| 2003/0203024 | A1 | 10/2003 | Sako et al. |
| 2004/0033263 | A1 | 2/2004 | Seroff et al. |
| 2004/0213845 | A1 | 10/2004 | Sugihara et al. |
| 2005/0100602 | A1 | 5/2005 | Sako et al. |
| 2005/0100603 | A1 | 5/2005 | Sako et al. |
| 2005/0261328 | A1 | 11/2005 | Wienrich |
| 2005/0287185 | A1 | 12/2005 | Wong et al. |
| 2006/0099257 | A1 | 5/2006 | Langridge et al. |
| 2006/0115540 | A1 | 6/2006 | Takasu et al. |
| 2008/0275076 | A1 | 11/2008 | Holm et al. |
| 2009/0011018 | A1 | 1/2009 | Kondo et al. |
| 2009/0093529 | A1 | 4/2009 | Takasu et al. |
| 2010/0144807 | A1 | 6/2010 | Takaishi et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| AU | 199889288 | B2 | 5/1999 |
| CA | 2263659 | A1 | 2/1998 |
| CA | 2315235 | A1 | 6/1999 |
| CA | 2328348 | A1 | 10/1999 |
| CA | 2336853 | A1 | 1/2000 |
| CA | 2507266 | A1 | 6/2004 |
| CA | 2144077 | C | 5/2005 |
| CA | 2490299 | C | 8/2008 |
| CA | 2305802 | C | 11/2008 |
| CA | 2387705 | C | 6/2009 |
| EP | 1 205 190 | A1 | 5/2002 |
| EP | 1 440 969 | A1 | 7/2004 |
| EP | 1 559 427 | A1 | 8/2005 |
| EP | 1 974 725 | A1 | 10/2008 |
| EP | 2 345 410 | A1 | 7/2011 |
| EP | 2 554 168 | B1 | 1/2018 |
| GB | 2356197 | A | 5/2001 |
| JP | S40-2053 | | 2/1965 |

(Continued)

OTHER PUBLICATIONS

Daewoong Pharmaceutical Co., Ltd.; Petitioner's Brief; 2017 Dang 473 Patent Invalidation Action; Feb. 21, 2017.
Australian Patent Application No. 2009300752, Examination Report, dated Dec. 14, 2012, 11 pages.
Canadian Patent Application No. 2,740,342, Office Action, dated Jun. 3, 2013, 3 pages.
Canadian Patent Application No. 2,740,342, Second Office Action, dated Feb. 14, 2014, 2 pages.
Chinese Patent Application No. 200980138691.9, Decision on Rejection, dated Feb. 14, 2014, 5 pages.

(Continued)

*Primary Examiner* — Jeffrey S Lundgren
*Assistant Examiner* — Michael J Schmitt
(74) *Attorney, Agent, or Firm* — Venable LLP

(57)     **ABSTRACT**

A pharmaceutical composition for modified release, comprising (1) (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, or a pharmaceutically acceptable salt thereof, (2) at least one additive which ensures penetration of water into the pharmaceutical composition and which has a solubility such that the volume of water required for dissolving 1 g of the additive is 10 mL or less, and (3) a hydrogel-forming polymer having an average molecular weight of approximately 100,000 or more, or a viscosity of 12 mPa·s or more at a 5% aqueous solution at 25° C. is disclosed.

**25 Claims, 1 Drawing Sheet**

US 10,842,780 B2

Page 2

(56)        **References Cited**

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 3140465 | B2 | 3/2001 |
| JP | 2001-114736 | A | 4/2001 |
| JP | 2005-162736 | A | 6/2005 |
| JP | 2008-532953 | A | 8/2006 |
| JP | 3815496 | B2 | 8/2006 |
| JP | 5625855 | B2 | 11/2014 |
| JP | 5849946 | B2 | 2/2016 |
| KR | 10-0355130 | B | 1/2003 |
| KR | 2005-0072809 | A | 7/2010 |
| KR | 2005-0107298 | A | 9/2011 |
| WO | 94/06414 | A1 | 3/1994 |
| WO | 02/00622 | A2 | 1/2002 |
| WO | 02/48134 | A2 | 6/2002 |
| WO | 2004/041276 | A1 | 5/2004 |
| WO | 2009/019599 | A2 | 2/2009 |
| WO | 2009/052353 | A2 | 4/2009 |
| WO | 2010/038690 | A1 | 4/2010 |

OTHER PUBLICATIONS

Chinese Patent Application No. 200980138691.9, first Office Action, dated Jun. 18, 2013, 14 pages (English translation).
Chinese Patent Application No. 200980138691.9, second Office Action, dated Jun. 18, 2013, 13 pages (English translation).
Decision of the Rejection, dated Jul. 3, 2015, CN Patent Application No. 200980138691.9, 43 pages (includes English translation).
Extended Search Report, dated Oct. 30, 2014, EP Application No. 09 81 7723, 5 pages.
Final Office Action, dated May 17, 2013, U.S. Appl. No. 13/073,721.
Final Office Action, dated Nov. 21, 2013, U.S. Appl. No. 13/073,677.
Hercules Incorporated, "Klucel Hydroxypropylcellulose, Physical and Chemical Properties," Aqualon Division, http://www.brenntagspecialties.com/en/downloads/product/multi_market_principals/aqualon/klucel_hpc_booklet.pdf, 2001, 26 pages.
Intellectual Property Office of the Philippines; Subsequent Substantive Examination Report; PH Application No. 1/2011/500628; 3 pages; dated Jan. 11, 2016.
International Search Report of Application No. PCT/JP2009/066742 dated Nov. 10, 2009.
Ishikawa et al., "Preparation of rapidly disintegrating tablet using new types of microcrystalline cellulose (PH-M series) and low-substituted-hydroxypropylceliulose or spherical sugar granules by direct compression method," Chem. Pharm. Bull. 49(2) 134-139, 2001.
Israeli Patent Application No. 212033, First Substantive Examination Report, 4 pages (English translation).
Japanese Patent Application No. 2010-531838, first Office Action, dated Oct. 12, 2010, 8 pages (English translation).
Japanese Patent Application No. 2010-531838, first Office Action, dated Dec. 28, 2010, 4 pages (English translation).
Korean Patent Application No. 10-2011-7009897, Notice of Final Rejection, dated Nov. 17, 2014 (with English translation) 6 pages.
Korean Patent Application No. 10-2011-7009897, Notice of Preliminary Rejection, dated Mar. 20, 2014, 10 pages (includes English translation).
Mexican Institute of Industrial Property; First Office Action from Examiner; MX Application No. MX/a/2011/003445; 7 pages; dated Mar. 1, 2016.
Michel et al.,The Pharmacokinetc Profile of Tamsulosin Oral Controlled Absorption System (OCAS®), 2005, European Urology Supplements, vol. 4, pp. 15-24.
MX Application No. MX/a/2011/003445, Second Office Action dated Sep. 2, 2016, 2 pages. (English translation 3 pgs.).
Non-Final Office Action; U.S. Appl. No. 14/584,933 dated Nov. 17, 2016, 17 pages.
Office Action, dated May 13, 2013, U.S. Appl. No. 13/073,677.
Office Action, dated Oct. 18, 2012, U.S. Appl. No. 13/073,721.
Office Action, dated Sep. 17, 2012, U.S. Appl. No. 13/073,677.

PH Patent Application No. 1/2011/500628, Second Examination Report (Office Action), dated May 26, 2014, 2 pages.
Philippines Patent Application No. 1/2011/500628, Examination Report, dated Jul. 18, 2013, 2 pages.
Reexamination Notice, dated Jan. 30, 2015, Chinese Patent Application No. 200980138691.9, 14 pages (includes English translation).
Russia Patent Application No. 2011117274/15, Office Action, dated Mar. 6, 2013, 6 pages (English translation).
Shin-Etsu Chemical Co., Ltd, "Low-substituted hydroxypropyl cellulose NF, L-HPC" http://www.elementoorgankia.ru/files/lhpc.pdf, Cellulose & Pharmaceutical Department, 23 pages, accessed on Jun. 30, 2014.
U.S. Non—Final Office Action, U.S. Appl. No. 13/073,721, dated Jul. 30, 2014, 24 pages.
Indonesian Patent Application No. W00201101572, First Office Action dated Aug. 1, 2018, 4 pages.
Andersson, et al; Pharmacological treatment of overactive bladder: report from the International Consultation on Incontinence; Current Opinion in Urology; 2009; 19:380-394.
Benner et al; Patent-reported reasons for discontinuing overactive bladder medication; Journal Complication; 2009, BJU International; 105; 1276-1282.
Non-final Office Action; U.S. Appl. No. 14/584,933; dated Jan. 19, 2018.
The U.S. Patent and Trademark Office; Final Office Action in U.S. Appl. No. 14/584,933 dated Jul. 18, 2017.
D'Souza, et al; Persistence, Adherence, and Switch Rates Among Extended-Release and Immediate-Release Over Active Bladder Medications in a Regional Managed Care Plan; JMCP vol. 14, No. 3, Apr. 2008, pp. 291-301.
Controller of Patents, Indian Patent Office; Examination Report; dated May 29, 2017; Application No. 2738/CHENP/2011.
State Intellectual Property Office of the People's Republic of China; First Office Action; CN Patent Application No. 201510642287.2; dated Nov. 3, 2017.
European Patent Office; Communication Pursuant to Article 94(3) EPC dated Feb. 14, 2017 in Application No. 11 762 748.9-1468.
European Patent Office; Communication Pursuant to Article 114(2) EPC dated Feb. 2, 2017 in Application No. 11762748.9-1468/2554168.
BETMIGA® Tablets—Annex I, Summary of Product Characteristics; Dec. 2012.
Prescribing Information of MYRBETRIQ®; Aug. 2016.
European Medicines Agency—Assessment Report; dated Oct. 2012.
The U Co., Ltd; Petitioner's Brief; Korean Case No. 2017 Dang 569 Patent Invalidation Action re KR 10-1524164; Apr. 14, 2017.
Mexican Institute of Industrial Property; Communication of results of the examination on the merits; PCT Patent Application No. MX/a/2011/003445; dated Mar. 22, 2017.
State Intellectual Property Office of the People's Republic of China; Chinese Patent Application No. 201510642287.2; Notification of the Second Office Action; dated Jul. 25, 2018.
European Patent Office; First Official Communication pursuant to Article 94(3)EPC; Application No. 09817723.1-1114; dated Apr. 30, 2018.
European Patent Office; Third Party Observation—Communication pursuant to Rule 114(2)EPC; Application No. 09817723.1-1114; dated May 8, 2018.
Final Office Action dated Jan. 23, 2019 in U.S. Appl. No. 14/584,933.
European Patent Office; Official Communication pursuant to Article 94(3)EPC in European Application No. 09817723.1 dated Dec. 20, 2018.
Summons to Attend Oral Proceedings in re Opposition to European Patent No. 2 554 168 B1 (Jul. 17, 2019).
"<711> Dissolution" in USP30-NF25, vol. 1; The United States Pharmacological Convention: Rockville, pp. 277-284 (May 2007).
Guidance for Industry: Food-Effect Bioavailability and Fed Bioequivalence Studies, pp. 1-9, 2 (Dec. 2002) (emphasis added).
Sathish Ummadi et al., "Overview on Controlled Release Dosage Form," 3(4) Int. J. Pharma Sci. 258-269 (2013).
Christer Tannergren et al., "Toward an Increased Understanding of the Barriers to Colonic Drug Absorption in Humans Implications for

## US 10,842,780 B2

Page 3

(56)                References Cited

OTHER PUBLICATIONS

Early Controlled Release Candidate Assessment," 6(1) Mol. Pharmaceutics 60-73 (Feb. 2009).

Marilyn N. Martinez et al., "A Mechanistic Approach to Understanding the Factors Affecting Drug Absorption: A Review of Fundamentals," 42 J. Clin. Pharmacol. 620-643 (2002).

"Colonic Drug Absorption and Metabolism," Bieck ed., pp. 21-22 (1993).

Center for Drug Evaluation and Research, Application Number: 202611orig1s000, Clinical Pharmacology and Biopharmaceutics Review(s)—Mirabegron, 218 pages (Mar. 2012).

Preliminary Office Action in Brazilian Application No. PI0919466-5 (dated Sep. 2, 2019).

Submission by Lederer & Keller Patentanwälte Partnerschaft mbB in re Opposition to European Patent No. 2 554 168 (Oct. 10, 2019).

Submission by Hexal AG in re Opposition to European Patent No. 2 554 168 (Oct. 10, 2019).

"Yamanouchi Shaklee Pharma Licenses OCAS Drug Delivery Technology from Yamanouchi Pharmaceutical Co., Ltd.," Pharmaceutical Online, pp. 1-2 (May 1999).

Submission by STADA Arzneimittel AG in re Opposition to European Patent No. 2 554 168 (Oct. 10, 2019).

Communication pursuant to Article 94(3) EPC in European Application No. 09817723.1 (dated Sep. 4, 2019).

Center for Drug Development Assistance, National Institute of Food and Drug Safety Evaluation 11-1470550-000003-08, Dec. 2009, 121 pages and 5 pages English translation, Korea.

Chapple, Christopher R., The Development of the Oral Controlled Absorption System (OCAS®): A New Improved Formulation of Tamsulosin, European Urology Supplements, 2005, pp. 1-4, vol. D4, Elsevier B.V., UK.

Takasu, T, et al., Effect of ®-2-(2-aminothiazol-4-yl)-4'-{2-[(2-hydroxy-2-phenylethyl)amino]ethyl} acetanilide (YM178), a novel selective beta3-adrenoceptor agonist, on bladder function, J Pharmacol Exp Ther., May 2007, p. 321-322, vol. 642-7, Epub 2007. (Abstract only).

Hoffmann Eitle, Letter to European Patent Office responding to Official Action dated Feb. 14, 2017 in European Patent Application No. 11 762 758.9, dated Aug. 2, 2017, 5 pages.

clinicaltrials.gov, Pharmacokinetics of Oral Mirabegron With Different Release Rates Versus Intravenous (IV) Mirabegron, U.S. National Library of Medicine, Jul. 2013, 6 pages.

clinicaltrials.gov, History of Changes for Study: NCT00940121, Pharmacokinetics of Oral Mirabegron With Different Release Rates Versus Intravenous (IV) Mirabegron, U.S. National Library of Medicine, Jul. 2013, 7 pages.

Anlage A with Translation of the evidence during Opposition proceeding from opponent Notice of Opposition from STADA Arzneimittel AG dated Oct. 24, 2018 (99 pages) See #33 below.

Mauger et al., Intrinsic Dissolution Performance Testing of the USP Dissolution Apparatus 2 (Rotating Paddle) Using Modified Salicylic Acid Calibrator Tablets: Proof of Principle, Dissolution Technologies, Aug. 2003, pp. 6-15.

Andersson, Karl-Erik, Prospective Pharmacologic Therapies for the Overactive Bladder, Therapeutic Advances in Urology, 2009, 1(2) 71-83.

Dressman, et al., Oral Drug Absorption Prediction and Assessment, Drugs and the Pharmaceutical Sciences, 2000, Pages Preface, 183-228, Marcel Dekker, Inc., New York, USA.

Skelly et al., In Vitro and In Vivo Testing and Correlation for Oral Controlled/Modified Release Dosage Forms. Report of the 2nd Workshop Held Dec. 1988, Washington, DC, U.S.A., Journal of Controlled Release, 1990, pp. 95-106, vol. 14, Elsevier Science Publishers B.V., Amsterdam, The Netherlands.

The European Agency for the Evaluation of Medicinal Products, Note for Guidance on Modified Release Oral and Transdermal Dosage Forms: Section II (Pharmacokinetic and Clinical Evaluation), Jul. 1999, 12 pages, London.

Lachman et al., Sustained Release Dosage Forms, The Theory and Practice of Industrial Pharmacy, 3rd Edition, Chapter 14, Aug. 10, 2011, pp. 430-456.

Chapple et al., "Add-on" Tolterodine Extended Release Improves Overactive Bladder Symptoms in Men Receiving Alpha-Blocker Therapy, Eur Urol Suppl 2008; 7(3):239, Abstract 674.

Andersson et al., Pharmacological Treatment of Overactive Bladder: Report from the International Consultation on Incontinence, Current Opinion in Urology, 2009, pp. 380-394, vol. 19, Wolfers Klower Health.

clinicaltrials.gov, History of Changes for Study: NCT00662909, Study to Test the Efficacy and Safety of the Beta-3 Agonist YM178 in Patients with Symptoms of Overactive Bladder, U.S. National Library of Medicine, Nov. 2017, 8 pages.

clinicaltrials.gov, History of Changes for Study: NCT00912964, A Study to Test the Efficacy and Safety of the Beta-3 Agonist YM178 in Subjects with Symptoms of Overactive Bladder, U.S. National Library of Medicine, Nov. 2017, 8 pages.

clinicaltrials.gov, History of Changes for Study: NCT00689104, Study to Test the Efficacy and Safety of the Beta-3 Agonist YM178 in Subjects with Symptoms of Overactive Bladder, U.S. National Library of Medicine, Nov. 2017, 8 pages.

clinicaltrials.gov, History of Changes for Study: NCT00940121, Pharmacokinetics of Oral Mirabegron With Different Release Rates Versus Intravenous (IV) Mirabegron, U.S. National Library of Medicine, Jul. 2013, 8 pages.

clinicaltrials.gov, History of Changes for Study: NCT00965926, A Study to Investigate the Food Effect on the Pharmacokinetics of YM178 in Healthy, Non-elderly Volunteers, U.S. National Library of Medicine, Jul. 2013, 6 pages.

clinicaltrials.gov, History of Changes for Study: NCT00939757, Study of the Effect of Food on the Pharmacokinetics of Mirabegron, U.S. National Library of Medicine, Jul. 2013, 6 pages.

Bikiaris et al., New Aspects in Sustained Drug Release Formulations, Recent Patents on Drug Delivery & Formulation, 2007, pp. 201-213, vol. 1, No. 3, Bentham Science Publishers Ltd., Greece.

Wen et al., Oral Controlled Release Formulation Design and Drug Delivery, Theory to Practice, 2010, Pages preface and 1-9, John Wiley & Sons, Inc.

Siepmann et al., Polymer Blends for Controlled Release Coatings, Journal of Controlled Release, 2008, pp. 1-15, vol. 125, Elsevier B.V.

Gupta et al., Recent Trends in Oral Drug Delivery: A Review, Recent Patents on Drug Delivery & Formulation, 2009, pp. 162-173, vol. 3, Bentham Science Publishers Ltd.

Notice of Opposition to a European Patent, Patent No. EP2554168 to Astellas Pharma Inc., Opponent Hexal AG, Dated Oct. 24, 2018.

Notice of Opposition to a European Patent, Patent No. EP2554168 to Astellas Pharma Inc., Opponent STADA Arzneimittel AG, Dated Oct. 24, 2018.

Notice of Opposition to a European Patent, Patent No. EP2554168 to Astellas Pharma Inc., Opponent Alfred E. Tiefenbacher (GmbH & Co. KG), Dated Oct. 30, 2018.

Notice of Opposition to a European Patent, Patent No. EP2554168 to Astellas Pharma Inc., Opponent Lederer & Keller Patentanwalte Partnerschaft mbB, Dated Oct. 24, 2018.

Decision of Rejection in Chinese Application No. 201510642287.2 (dated Nov. 5, 2019).

European Patent Office; Official Communication pursuant to Rule 114(2) EPC in European Application No. 09817723.1 dated Jan. 10, 2019.

Amendment submitted dated May 30, 2012 by Applicant in U.S. Appl. No. 12/568,313—identified as T1 in the Official Communication cited herein.

Amendment submitted dated Aug. 26, 2013 by Applicant in U.S. Appl. No. 12/568,313—identified as T2 in the Official Communication cited herein.

Response to Communication Pursuant to Art. 94(3) EPC in European Application No. 09817723.1 (dated May 13, 2020).

Mitsuru Hashida (ed.), "Design and Evaluation of Formulations for Oral Administration," pp. 33, 35, 293-294 (Feb. 1995) (Exhibit A1).

ASTMIRA_00002883

**US 10,842,780 B2**

Page 4

(56)         **References Cited**

OTHER PUBLICATIONS

A. Dokoumetzidis et al., "IVIVC of Controlled Release Formulations: Physiological—Dynamical Reasons for Their Failure," 129 J. Control. Release 76 (2008) (Exhibit A2).

Guidelines for the Design and Evaluation of Oral Prolonged Release Dosage Forms, Pharmaceutical Affairs Council, Ministry of Health and Welfare, Japan, (1), No. 5, pp. 1-4 (Mar. 1988) (Exhibit A3).

Idada Sadao et al. (eds.), "Comprehensive Techniques for Development System of New Formulations, Volume for Bases and Additive," pp. 424-429 (Jul. 1985) (Exhibit A4).

Kazuhiro Sako, "Formulations and Particle Design: Design of Novel Oral Controlled-Release System (OCAS) for Continuous Drug Absorption," 14(6) Pharm Tech Japan 85-98 (Jun. 1998) (Exhibit A5).

Hiroyasu Ogata, "1. Pharmacokinetics: Absorption," 30 (3) Jpn. J. Clin. Pharmacol. Ther. 617, 619 (May 1999) (Exhibit A9).

Written Demand for Trial for Invalidation of Japanese Patent No. 5849946 (dated Apr. 2020).

Non-Final Office Action in U.S. Appl. No. 14/584,933 (dated Jun. 10, 2020).

Response to Communication Pursuant to Rules 70(2) and 70a(2) EPC in European Application No. 11762748.9 (dated Nov. 2015).

Response to Communication Pursuant to Art. 94(3) EPC and Third Party Observations in European Application No. 11762748.9 (dated Aug. 2, 2017).

Observations in Response to Oppositions to European Patent No. 2 554 168 B1 (Mar. 25, 2019).

Response to Summons in Oppositions to European Patent No. 2 554 168 B1 (Oct. 10, 2019).

Response to Submissions of Opponents in Oppositions to European Patent No. 2 554 168 B1 (Oct. 18, 2019).

Decision in Oppositions and Oral Proceeding Minutes in European Patent No. 2 554 168 B1 (Mar. 2, 2020).

Response to Communication Pursuant to Rules 70(2) and 70a(2) EPC in European Application No. 09817723.1 (dated May 18, 2015).

Response to Communication Pursuant to Art. 94(3) EPC and Third Party Observations in European Application No. 09817723.1 (dated Aug. 28, 2018).

Response to Communication Pursuant to Art. 94(3) EPC and Third Party Observations in European Application No. 09817723.1 (dated May 20, 2019).

Response to Communication Pursuant to Art. 94(3) EPC in European Application No. 09817723.1 (dated Mar. 13, 2020).

Communication Pursuant to Art. 94(3) EPC in European Application No. 09817723.1 (dated Apr. 2, 2020).

Yoshinobu Yamazaki et al., "Species Differences in the Distribution of β3-Adrenoceptor Subtypes in Bladder Smooth Muscle," 124 Brit. J. Pharmacol. 593-599 (1998).

Osamu Yamaguchi, "β3-Adrenoceptors in Human Detrusor Muscle", 59 (Suppl. 5A) Urology 25-29 (2002).

Peter G. Welling, "Effects of Food on Drug Absorption," 16 Annu. Rev. Nutr. 383-415 (1996).

Nobuyuki Tanaka et al., "β3-Adrenoceptor Agonists for the Treatment of Frequent Urination and Urinary Incontinence: 2-[4-(2-{[(1S,2R)-2-Hydroxy-2-(4-hydroxyphenyl)-1-methylethyl]amino}ethyl)phenoxy]-2-methylpropionic Acid," 9 Bioorgan. Med. Chem. 3265-3271 (2001).

Nobuyuki Tanaka et al., "Discovery of Novel N-Phenylglycine Derivatives as Potent and Selective β3-Adrenoceptor Agonists for the Treatment of Frequent Urination and Urinary Incontinence," 44 J. Med. Chem. 1436-1445 (Apr. 2001).

Hiroo Takeda et al., "Role of the β3-Adrenoceptor in Urine Storage in the Rat: Comparison between the Selective β3-Adrenoceptor Agonist, CL316,243, and Various Smooth Muscle Relaxants," 293 J. Pharmacol. Exp. Ther. 939-945 (2000).

Brahma N. Singh, "Effects of Food on Clinical Pharmacokinetics," 37(3) Clin. Pharmacokinet. 213-255 (Sep. 1999).

Paul Abrams et al., "The Standardisation of Terminology in Lower Urinary Tract Function: Report from the Standardisation Sub-Committee of the International Continence Society," 21 Neurourol. Urodyn. 167-178 (2002).

K.-E. Andersson, "Overactive Bladder—Pharmacological Aspects," 210 Scand. J. Urol. Nephrol. Suppl. 72-81 (2002).

Richard J. Bastin et al., "Salt Selection and Optimisation Procedures for Pharmaceutical New Chemical Entities," 4(5) Org. Process Res. Dev. 427-435 (2000).

David P. Benziger et al., "Differential Effects of Food on the Bioavailability of Controlled-Release Oxycodone Tablets and Immediate-Release Oxycodone Solution," 85(4) J. Pharm. Sci. 407-410 (1996).

Harry G. Brittain, "Methods for the Characterization of Polymorphs and Solvates," Ch. 6 in Polymorphism in Pharmaceutical Solids, pp. 227-278 (1999).

Artur Burger, "The Relevance of Polymorphism," in Topics in Pharmaceutical Sciences 1983, pp. 347-358 (1983).

Stephen R. Byrn, Solid-State Chemistry of Drugs, pp. 6-11 (1982).

Stephen Bym et al., "Pharmaceutical Solids: A Strategic Approach of Regulatory Considerations," 12(7) Pharm. Res. 945-954 (1995).

Mino R. Caira, "Crystalline Polymorphism of Organic Compounds," in Topics in Current Chemistry, vol. 198, pp. 163-208 (1999).

Jens T. Carstensen, "Preformulation," Ch. 7 in Modem Pharmaceutics 213-237 (1996).

Drug Data Report, 21(7), p. 619.

Daniel S. Elliott et al., "Medical Management of Overactive Bladder," 76(4) Mayo Clin Proc. 353-355 (Apr. 2001).

Guideline for Industry: Guideline for Submitting Supporting Documentation for the Manufacture of and Controls for Drug Products, Center for Drugs and Biologics, Food and Drug Administration, pp. 1-17 (Feb. 1987).

David Fleisher et al., "Drug, Meal and Formulation Interactions Influencing Drug Absorption After Oral Administration," 36(3) Clin. Pharmacokinet. 233-254 (Mar. 1999).

Takao Fujimura et al., "Expression and Possible Functional Role of the β3-Adrenoceptor in Human and Rat Detrusor Muscle," 161 J. Urol. 680-685 (1999).

Janice J. MacKichan et al., "Pharmacokinetic Considerations for Drug Delivery," Ch. 2 in Gibaldi's Drug Delivery Systems in Pharmaceutical Use, pp. 11-22 (2007).

Dharmesh H. Doshi, "Oral Delivery Systems," Ch. 3 in Gibaldi's Drug Delivery Systems in Pharmaceutical Use, pp. 23-41 (2007).

Philip L. Gould, "Salt Selection for Basic Drugs," 33(1-3) Int. J. Pharm. 201-217 (1986).

John Haleblian et al., "Pharmaceutical Applications of Polymorphism," 58(8) J. Pharm. Sci 911-929 (Aug. 1969).

Bruno C. Hancock et al., "Characteristics and Significance of the Amorphous State in Pharmaceutical Systems," 86(1) J. Pharm. Sci. 1-12 (Jan. 1997).

Y. Igawa et al., "Possible β3-Adrenoceptor-Mediated Relaxation of the Human Detrusor", 164 Acta Physiol Scand 117-118 (1998).

Rajendra K. Khankari et al., "Pharmaceutical Hydrates," 248 Thermochimica Acta 61-79 (1995).

Penelope A. Longhurst et al., "Pharmacological techniques for the in vitro study of the urinary bladder," 45 J. Pharmacol. Tox. Met. 91-108 (2001).

"Hydrates," in Encyclopedia of Pharmaceutical Technology, vol. 7, p. 393 (1993).

Donna J. Sellers et al., "Potential therapeutic targets for treatment of overactive bladder," 19 World J. Ural. 307-311 (2001).

Technical Examination Report in Brazilian Application No. PI0919466-5 (dated Jul. 10, 2020).

Technical Examination Report in Brazilian Application No. BR122019026041-9 (dated Jul. 10, 2020).

ASTMIRA_00002884

**U.S. Patent**          Nov. 24, 2020          US 10,842,780 B2



ASTMIRA_00002885

US 10,842,780 B2

**1**

# PHARMACEUTICAL COMPOSITION FOR MODIFIED RELEASE

## CROSS REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 12/568,313, filed Sep. 28, 2009, which application claims the benefit of priority to U.S. Patent Application No. 61/101,338, filed Sep. 30, 2008, the teachings of which are hereby incorporated by reference.

## TECHNICAL FIELD

The present invention relates to a pharmaceutical composition for modified release capable of reducing food effects, which are observed in conventional tablets, by combining an active ingredient with specific ingredients to control a releasing rate of the active ingredient.

More particularly, the present invention relates to a pharmaceutical composition comprising (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide or a pharmaceutically acceptable salt thereof, an additive which ensures penetration of water into the pharmaceutical composition (hereinafter sometimes referred to as a hydrophilic base), and a polymer which forms a hydrogel, in which the changes in AUC and Cmax caused by the intake of food can be decreased by controlling a releasing rate of the active ingredient.

## BACKGROUND ART

(R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide has been created by Astellas Pharma Inc., and it has been reported that this compound has not only both an activity of promoting insulin secretion and an activity of enhancing insulin sensitivity, but also an antiobestic activity and an antihyperlipemic activity based on an activity of selectively stimulating a β3 receptor, and is useful in treating diabetes (see, for example, patent literature 1).

Further, it has been reported that the compound can be used as a therapeutic agent for overactive bladder, such as overactive bladder accompanied by prostatic hyperplasia, or overactive bladder accompanied by urinary urgency, urinary incontinence, and urinary frequency (see, for example, patent literature 2).

A clinical trial of (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide in the form of conventional formulations revealed disadvantages, for example, that pharmacokinetic data unexpectedly varied according to the presence or absence of the intake of food (not published). For example, the rate of decrease of Cmax in a fed state was 67%, and the rate of decrease of AUC in the fed state was 47%, in comparison with those in a fasted state. In this case, Cmax in the fasted state was three times higher than that in the fed state. These problems are considered to be raised by, for example, the changes in pharmacokinetics caused by food, and therefore, the development of a formulation capable of avoiding the effects by food intake is desired.

As a technique of preparing a formulation for modified release, a hydrogel sustained release tablet containing an additive which ensures penetration of water into the tablet, and a hydrogel-forming polymer is disclosed (see, for example, patent literature 3).

**2**

However, patent literature 3 does not refer to (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, and further improvements are needed to produce a pharmaceutical composition.

## CITATION LIST

### Patent Literature

[patent literature 1] International Publication No. WO 99/20607 (Example 41)
[patent literature 2] International Publication No. WO 2004/041276
[patent literature 3] International Publication No. WO 94/06414

## SUMMARY OF INVENTION

### Technical Problem

An object of the present invention is to provide a pharmaceutical composition for modified release comprising (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide or a pharmaceutically acceptable salt thereof, in which the pharmaceutical composition has efficacy the same as or higher than those of conventional formulations and has no limitations on food intake, and a process of manufacturing the pharmaceutical composition.

### Solution to Problem

The elimination half-life ($T_{1/2}$) of (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide is long (approximately 18 to 24 hours), and thus, a formulation thereof for modified release is not necessarily needed to maintain its blood level. Taking into consideration the results of the clinical trial described above, the present inventors conducted intensive studies to design the formulation by paying attention to the control of a release rate of the drug from a formulation to the extent that the release is not affected by food intake or the like, rather than the addition of release control.

On the basis of blood concentration profiles (in a fasted state/after the intake of food) after administration of a conventional formulation (rapid release formulation), the absorption rate of the drug in a fed state was calculated by a deconvolution method to predict continuous absorption for about 4 hours. The present inventors considered from this result that a formulation capable of continuous drug release for 4 hours or more would be able to reduce the effects by food, because the drug release from the formulation would become the rate-limiting step for absorption.

The present inventors carried out a clinical trial in human using three types of formulations in which the release rate of the drug was controlled (Time when the release percentage of the drug from the unit formulation was 80% (T80%)=4 hr, 6 hr, and 10 hr), and found that all formulations could reduce the effects by food, to complete the present invention.

It is generally known that the retention time in the stomach and the release rate of formulations for modified release vary according to the presence or absence of food intake, and as a result, there is a possibility that blood concentration profiles is changed. However, surprisingly, when using this formulation, the change of the blood concentration profiles was small in the presence or absence of food intake.

ASTMIRA_00002886

US 10,842,780 B2

**3**

The present invention is characterized by providing a pharmaceutical composition for modified release which is not affected by the effects of food intake and exhibits a decreased change in AUC or Cmax.

The present invention provides:

[1] a pharmaceutical composition for modified release, comprising (1) (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, or a pharmaceutically acceptable salt thereof, (2) at least one additive which ensures penetration of water into the pharmaceutical composition and which has a solubility such that the volume of water required for dissolving 1 g of the additive is 10 mL or less, and (3) a hydrogel-forming polymer having an average molecular weight of approximately 100,000 or more, or a viscosity of 12 mPa·s or more at a 5% aqueous solution at 25° C.;

[2] the pharmaceutical composition for modified release of [1], wherein the additive which ensures penetration of water into the pharmaceutical composition is one compound, or two or more compounds selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, D-sorbitol, xylitol, lactose, sucrose, anhydrous maltose, D-fructose, dextran, glucose, polyoxyethylene hydrogenated castor oil, polyoxyethylene polyoxypropylene glycol, polyoxyethylene sorbitan higher fatty acid ester, sodium chloride, magnesium chloride, citric acid, tartaric acid, glycine, β-alanine, lysine hydrochloride, and meglumine;

[3] the pharmaceutical composition for modified release of [2], wherein the additive which ensures penetration of water into the pharmaceutical composition is one compound, or two or more compounds selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, lactose, sucrose, sodium chloride, and polyoxyethylene polyoxypropylene glycol;

[4] the pharmaceutical composition for modified release of any one of [1] to [3], wherein an amount of the additive which ensures penetration of water into the pharmaceutical composition is 5% by weight to 75% by weight with respect to the total weight of the pharmaceutical composition;

[5] the pharmaceutical composition for modified release of [4], wherein an amount of the additive which ensures penetration of water into the pharmaceutical composition is 5% by weight to 70% by weight with respect to the total weight of the pharmaceutical composition;

[6] the pharmaceutical composition for modified release of any one of [1] to [5], wherein the hydrogel-forming polymer is one compound, or two or more compounds selected from the group consisting of polyethylene oxide, hydroxypropyl methylcellulose, hydroxypropyl cellulose, carboxymethyl cellulose sodium, hydroxyethyl cellulose, and a carboxyvinyl polymer;

[7] the pharmaceutical composition for modified release of [6], wherein the hydrogel-forming polymer is one compound, or two or more compounds selected from the group consisting of polyethylene oxide, hydroxypropyl methylcellulose, and hydroxypropyl cellulose;

[8] the pharmaceutical composition for modified release of any one of [1] to [7], wherein an amount of the hydrogel-forming polymer is 1% by weight to 70% by weight with respect to the total weight of the pharmaceutical composition;

[9] the pharmaceutical composition for modified release of any one of [1] to [8], further comprising an antioxidant;

[10] the pharmaceutical composition for modified release of [9], wherein the antioxidant is one compound, or two or

**4**

more compounds selected from the group consisting of butyl hydroxytoluene, propyl gallate, and sodium ascorbate;

[11] the pharmaceutical composition for modified release of claim 10, wherein the antioxidant is butyl hydroxytoluene;

[12] the pharmaceutical composition for modified release of any one of [9] to [11], wherein an amount of the antioxidant is 0.025% by weight to 0.25% by weight;

[13] the pharmaceutical composition for modified release of any one of [1] to [12], further comprising a stabilizer;

[14] the pharmaceutical composition for modified release of [13], wherein the stabilizer is one compound, or two or more compounds selected from the group consisting of yellow ferric oxide, red ferric oxide, and black iron oxide;

[15] the pharmaceutical composition for modified release of [14], wherein the stabilizer is yellow ferric oxide and/or red ferric oxide;

[16] the pharmaceutical composition for modified release of any one of [13] to [15], wherein an amount of the stabilizer is 0.05% by weight to 1% by weight;

[17] a process of manufacturing a pharmaceutical composition for modified release, characterized by comprising mixing (1) (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, or a pharmaceutically acceptable salt thereof with (2) at least one additive which ensures penetration of water into the pharmaceutical composition and which has a solubility such that the volume of water required for dissolving 1 g of the additive is 10 mL or less and (3) a hydrogel-forming polymer having an average molecular weight of approximately 100,000 or more, or a viscosity of 12 mPa·s or more at a 5% aqueous solution at 25° C., wherein an amount of the additive is 5% by weight to 75% by weight with respect to the total weight of the pharmaceutical composition, and an amount of the hydrogel-forming polymer is 1% by weight to 70% by weight with respect to the total weight of the pharmaceutical composition;

[18] the process of [17], wherein the additive which ensures penetration of water into the pharmaceutical composition is one compound, or two or more compounds selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, D-sorbitol, xylitol, lactose, sucrose, anhydrous maltose, D-fructose, dextran, glucose, polyoxyethylene hydrogenated castor oil, polyoxyethylene polyoxypropylene glycol, polyoxyethylene sorbitan higher fatty acid ester, sodium chloride, magnesium chloride, citric acid, tartaric acid, glycine, β-alanine, lysine hydrochloride, and meglumine; and

[19] the process of [17] or [18], wherein the hydrogel-forming polymer is one compound, or two or more compounds selected from the group consisting of polyethylene oxide, hydroxypropyl methylcellulose, hydroxypropyl cellulose, carboxymethyl cellulose sodium, hydroxyethyl cellulose, and a carboxyvinyl polymer.

As formulation techniques for reducing or avoiding the changes in pharmacokinetics such as AUC or Cmax accompanied by food intake, a formulation technique concerning a sustained-release pharmaceutical composition containing tamsulosin hydrochloride is disclosed (see Japanese Unexamined Patent Publication (Kokai) No. 2005-162736 and Japanese Unexamined Patent Publication (Kokai) No. 2005-162737). This formulation technique is limited to tamsulosin, and applied to a formulation containing the drug at a low dose (0.4 mg per unit formulation). This formulation enables to control the release of tamsulosin therefrom by being mainly composed of a sustained-release base. By

ASTMIRA_00002887

US 10,842,780 B2

**5**

contrast, the pharmaceutical composition contains the drug at a high dose (i.e., high content per unit formulation), and it is considered difficult to control the release rate of the drug from a formulation containing the sustained-release base at a low content, and therefore, the present invention is technically quite different from the formulation disclosed in these references.

### Effects of Invention

According to the present invention, a pharmaceutical composition for modified release which has no limitations on food intake and is stable (for example, reduction of changes in a sequential dissolution profile) can be provided.

Further, a pharmaceutical composition for modified release in which AUC is not reduced can be provided.

With respect to a conventional formulation, the rate of decrease of Cmax in the fed state was 67% in comparison with that in a fasted state. By contrast, with respect to the pharmaceutical composition for modified release of the present invention, the rate of decrease of Cmax in the fed state was 42% in comparison with that in a fasted state, and this result showed that reduction of Cmax caused by food intake could be significantly alleviated by forming its formulation into the pharmaceutical formulation for modified release.

### BRIEF DESCRIPTION OF DRAWINGS

The FIGURE is a graph showing dissolution profiles of the pharmaceutical composition for modified release prepared in Example 11, and the time courses thereof.

### DESCRIPTION OF EMBODIMENTS

The pharmaceutical composition for modified release of the present invention will be explained hereinafter.

The term "rapid release formulation (conventional formulation)" as used herein means a formulation in which the dissolution rate of the drug from the formulation is 85% or more after 30 minutes from the beginning a dissolution test, which is carried out in accordance with a dissolution test (paddle method) described in the United States Pharmacopoeia under the conditions that 900 mL of an appropriate test fluid (such as a USP buffer, pH 6.8) is used and the paddle rotation speed is 100 rpm. Alternatively, the term means a formulation in which the dissolution rate of the drug from the formulation is 85% or more after 30 minutes from the beginning a dissolution test, which is carried out in accordance with a dissolution test, method 2 described in the Japanese Pharmacopoeia under the conditions that 900 mL of an appropriate test fluid (such as a Mc. Ilvain buffer, pH 6.8) is used and the paddle rotation speed is 50 rpm.

The term "pharmaceutical composition for modified release" as used herein means a formulation in which the dissolution rate of the drug from the formulation is less than 85% after 30 minutes from the beginning a dissolution test carried out under the above conditions, and the drug release is controlled to the extent that the effects by food are reduced. More particularly, it is a formulation in which an additive (hydrophilic base) which ensures penetration of water into the formulation is combined with a polymer which forms a hydrogel.

The wording "the effects by food are reduced" as used herein means, for example, a 10% reduction, a 20% reduction in another embodiment, and a 30% reduction in still another embodiment, in comparison with Cmax of a con-

**6**

ventional formulation. Alternatively, the term means, for example, a 10% reduction with respect to the rate of decrease of Cmax and AUC in administration after food intake, in comparison with Cmax and AUC in administration in the fasted state, a 20% reduction in another embodiment, and a 30% reduction in still another embodiment.

The rates of decrease of Cmax and AUC are calculated by the following equations:

$$Rd(Cmax) = [Cmax(FS) - Cmax(FI)] \times 100/Cmax(FS)$$

$$Rd(AUC) = [AUC(FS) - AUC(FI)] \times 100/AUC(FS)$$

Rd(Cmax): Rate of decrease of Cmax (%)
Cmax(FS): Cmax in administration in the fasted state
Cmax(FI): Cmax in administration after food intake
Rd(AUC): Rate of decrease of AUC (%)
AUC(FS): AUC in administration in the fasted state
AUC(FI): AUC in administration after food intake

The term "formulation in which the effects by food are reduced" as used herein means a formulation in which the dissolution rate of the drug from the formulation is 75% or less after 1.5 hours and 100% or less after 4 hours from the beginning a dissolution test, which is carried out under the above conditions [in accordance with a dissolution test (paddle method) described in the United States Pharmacopoeia under the conditions that 900 mL of an appropriate test fluid (such as a USP buffer, pH 6.8) is used and the paddle rotation speed is 50 to 200 rpm]. In another embodiment, the term means a formulation in which the dissolution rate of the drug from the formulation is 75% or less after 1.5 hours and 75% or more to 100% or less after 7 hours.

The term "stable" as used herein means that it is stable against, for example, heat, temperature, humidity, or light. More particularly, the term means that, for example, when a plastic bottle is filled with a pharmaceutical composition and sealed, and then, the bottle is preserved for three months under the conditions at 40° C. and 75% RH or at 60° C., the change in the dissolution rate at the point showing a dissolution rate of 50% is within ±5% or less. Alternatively, the term means that, for example, when a pharmaceutical composition is exposed to 1.2 million Lux·hr of light, the change in the dissolution rate at the point showing a dissolution rate of 50% is within ±5% or less.

(R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenyl-ethyl)amino]ethyl]acetic acid anilide (hereinafter sometimes referred to as compound A) is represented by the following structural formula.

[Chem. 1]



Compound A may be used in a free form which is not a salt, and may form a salt with an acid in other embodiments. Examples of such a salt include an acid addition salt with a mineral acid such as hydrochloric acid, hydrobromic acid, hydroiodic acid, sulfuric acid, nitric acid, phosphoric acid, or the like; and an acid addition salt with an organic acid such as formic acid, acetic acid, propionic acid, oxalic acid, malonic acid, succinic acid, fumaric acid, maleic acid, lactic

US 10,842,780 B2

7
8

acid, malic acid, citric acid, tartaric acid, carbonic acid, picric acid, methanesulfonic acid, ethanesulfonic acid, glutamic acid, or the like.

The dose of compound A may be appropriately selected in accordance with symptom, age, sex, and the like of the patient to be treated. The daily dose of compound A for oral administration to an adult is generally 0.01 to 100 mg/kg, which is administered once or divided into two to four doses per day.

The content of compound A per formulation is, for example, 1% by weight to 70% by weight, 5% by weight to 70% by weight in another embodiment, and 5% by weight to 50% by weight in still another embodiment. The content of compound A per formulation is 1 mg to 500 mg, and 10 mg to 200 mg in another embodiment.

It is necessary that the hydrogel-forming polymer used in the present invention can control the release rate of the drug, to the extent that the blood concentration profile of the drug is not affected by the presence or absence of food intake.

The molecular weight of the hydrogel-forming polymer is, for example, 100,000 or more, 100,000 to 8,000,000 in another embodiment, 100,000 to 5,000,000 in still another embodiment, and 100,000 to 2,000,000 in still another embodiment. The viscosity of the hydrogel-forming polymer is, for example, 12 mPa·s or more in a 5% aqueous solution at 25° C.; 12 mPa·s or more in a 5% aqueous solution at 25° C., and 40,000 mPa·s or less in a 1% aqueous solution at 25° C. in another embodiment; 400 mPa·s or more in a 2% aqueous solution at 25° C., and 7,500 mPa·s or less in a 1% aqueous solution at 25° C. in still another embodiment; and 400 mPa·s or more in a 2% aqueous solution at 25° C., and 5,500 mPa·s or less in a 1% aqueous solution at 25° C. in still another embodiment.

In the pharmaceutical composition for modified release of the present invention, the release period of time of the drug from the formulation can be arbitrarily controlled by adjusting the viscosity of the polymer which is used as the hydrogel-forming polymer.

The hydrogel-forming polymer used in the present invention is not particularly limited, so long as the release of the drug can be controlled to the extend that the effects of food on compound A may be reduced. Examples of the hydrogel-forming polymer include polyethylene oxide, hydroxypropyl methylcellulose, hydroxypropyl cellulose, carboxymethyl cellulose sodium, hydroxyethyl cellulose, and carboxyvinyl polymers. Examples of the hydrogel-forming polymer in another embodiment include polyethylene oxide, hydroxypropyl methylcellulose, and hydroxypropyl cellulose.

Examples of polyethylene oxide (hereinafter sometimes referred to as PEO) include product names, Polyox WSR-308 [average molecular weight: 8,000,000, viscosity: 10,000-15,000 mPa·s (1% aqueous solution at 25° C.)], Polyox WSR-303 [average molecular weight: 7,000,000, viscosity: 7,500-10,000 mPa·s (1% aqueous solution at 25° C.)], Polyox WSR Coagulant [average molecular weight: 5,000,000, viscosity: 5,500-7,500 mPa·s (1% aqueous solution at 25° C.)], Polyox WSR-301 [average molecular weight: 4,000,000, viscosity: 1,650-5,500 mPa·s (1% aqueous solution at 25° C.)], Polyox WSR-N-60K [average molecular weight: 2,000,000, viscosity: 2,000-4,000 mPa·s (2% aqueous solution at 25° C.)], Polyox WSR-N-12K [average molecular weight: 1,000,000, viscosity: 400-800 mPa·s (2% aqueous solution at 25° C.)], Polyox WSR-1105 [average molecular weight: 900,000, viscosity: 8,800-17, 600 mPa·s (5% aqueous solution at 25° C.)], Polyox WSR-205 [average molecular weight: 600,000, viscosity: 4,500-

8,800 mPa·s (5% aqueous solution at 25° C.)], Polyox WSR-N-750 [average molecular weight: 300,000, viscosity: 600-1200 mPa·s (5% aqueous solution at 25° C.)], Polyox WSR-N-80 [average molecular weight: 200,000, viscosity: 55-90 mPa·s (5% aqueous solution at 25° C.)], TC-5RW (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 6 mPa·S), TC-5S (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 15 mPa·S), TC-5R (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 6 mPa·S), TC-5M (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 4.5 mPa·S), TC-5E (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 3 mPa·S), Metolose 60SH-50 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 50 mPa·s), Metolose 65SH-50 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 50 mPa·s), Metolose 90SH-100 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 100 mPa·s), Metolose 90SH-100SR (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 100 mPa·s), Metolose 65SH-400 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 400 mPa·s), Metolose 90SH-400 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 400 mPa·s), Metolose 65SH-1500 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 1,500 mPa·s), Metolose 60SH-4000 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 4,000 mPa·s), Metolose 65SH-4000 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 4,000 mPa·s), Metolose 90SH-4000 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 4,000 mPa·s), Metolose 90SH-4000SR (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 4,000 mPa·s), Metolose 90SH-15000 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 15,000 mPa·s), Metolose 90SH-15000SR (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 15,000 mPa·s), and Metolose 90SH-30000 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 30,000 mPa·s).

Examples of hydroxypropyl cellulose (hereinafter sometimes referred to as HPC) include HPC-SSL (product name, Nippon Soda Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: 2.0-2.9 mPa·S), HPC-SL (product name, Nippon Soda Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: 3.0-5.9 mPa·S), HPC-L (product name, Nippon Soda Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: 6.0-10.0 mPa·S), HPC-M (product name, Nippon Soda Co.,

US 10,842,780 B2

9

Ltd.) (viscosity in a 2% aqueous solution at 20° C.: 150-400 mPa·S), and HPC-H (product name, Nippon Soda Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: 1,000-4,000 mPa·S).

Examples of methylcellulose (hereinafter sometimes referred to as MC) include Metolose SM15 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 15 mPa·S), Metolose SM25 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 25 mPa·S), Metolose SM100 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 100 mPa·S), Metolose SM400 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 400 mPa·S), Metolose SM1500 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 1,500 mPa·S), and Metolose SM4000 (product name, Shin-Etsu Chemical Co., Ltd.) (viscosity in a 2% aqueous solution at 20° C.: approximately 4,000 mPa·S).

Examples of carboxymethyl cellulose sodium (hereinafter sometimes referred to as CMCNa) include product names, Sunrose F-30MC [viscosity: 250-350 mPa·s (1% aqueous solution at 25° C.)], Sunrose F-150MC [average molecular weight: 200,000, viscosity: 1,200-1,800 mPa·s (1% aqueous solution at 25° C.)], Sunrose F-600MC [viscosity: 6,000-8,000 mPa·s (1% aqueous solution at 25° C.)], Sunrose F-1000MC [average molecular weight: 420,000, viscosity: 8,000-12,000 mPa·s (the same)], Sunrose F-1400MC [viscosity: 12,000-15,000 mPa·s (1% aqueous solution at 25° C.)], and Sunrose F-300MC [average molecular weight: 300,000, viscosity: 2,500-3,000 mPa·s (the same)] (Nippon Paper Chemicals Co., Ltd.).

Examples of hydroxyethyl cellulose (hereinafter sometimes referred to as HEC) include product names, HEC DAICEL SE850 [average molecular weight: 1,480,000, viscosity: 2,400-3,000 mPa·s (1% aqueous solution at 25° C.)], and HEC DAICEL SE900 [average molecular weight: 1,560,000, viscosity: 4,000-5,000 mPa·s (1% aqueous solution at 25° C.)](Daicel chemical Industries, Ltd.).

Examples of carboxyvinyl polymers include Carbopol 71G (viscosity: 4,000-11,000 mPa·s), Carbopol 971P (viscosity: 4,000-11,000 mPa·s), Carbopol 981 (viscosity: 4,000-10,000 mPa·s), Carbopol 941 (viscosity: 4,000-10,000 mPa·s), Carbopol 934 (viscosity: 30,500-39,400 mPa·s), and Carbopol 934P (viscosity: 29,400-39,400 mPa·s)(B.F.-Goodrich Chemical).

These hydrogel-forming polymers may be used alone, or as an appropriate combination of two or more thereof. A combination of different lots may be used.

The content of the hydrogel-forming polymer is not particularly limited, so long as it is an amount to the extent that the blood concentration profile of the drug is not affected by the presence or absence of food intake. The content of the hydrogel-forming polymer is, for example, 1% by weight to 70% by weight with respect to the total weight of the formulation, and 3% by weight to 70% by weight in another embodiment. The content of the hydrogel-forming polymer is 5% by weight to 70% by weight with respect to the total weight of the formulation, 10% by weight to 60% by weight in another embodiment, and 10% by weight to 40% by weight in still another embodiment. The content of the hydrogel-forming polymer is 0.1% by weight to 1,000% by weight with respect to the weight of the drug, 1% by weight to 500% by weight in another embodiment, and 5% by weight to 300% by weight in still another embodiment.

10

A polymer of which the viscosity (before mixing) is beyond the specific range can be used as an appropriate combination with one or more other polymers, in case that the mixture obtained by mixing these plural polymers has a viscosity (as measured before the use) within the specific range.

In the additive which ensures penetration of water into the pharmaceutical composition of the present invention (hydrophilic base), the amount of water necessary to dissolve 1 g of the hydrophilic base at 20±5° C. is 10 mL or less, 6 mL or less in another embodiment, 5 mL or less in still another embodiment, and 4 mL or less in still another embodiment. When the hydrophilic base has a high solubility to water, the effect that allows water to penetrate into the formulation is high.

Examples of the hydrophilic base include water-soluble polymers, such as polyethylene glycol [PEG: for example, product names PEG 400, PEG 1500, PEG 4000, PEG 6000, and PEG 20000 (NOF Corporation)], polyvinyl pyrrolidone (PVP: for example, product name PVP K30 (BASF), and the like; sugar alcohols, such as D-mannitol, D-sorbitol, xylitol, and the like; saccharides, such as lactose, sucrose, anhydrous maltose, D-fructose, dextran (for example, Dextran 40), glucose, and the like; surfactants, such as polyoxyethylene hydrogenated castor oil [HCO: for example, Cremophor RH40 (BASF), HCO-40, HCO-60 (Nikko Chemicals)], polyoxyethylene polyoxypropylene glycol [for example, Pluronic F68 (Asahi Denka and the like)], polyoxyethylene sorbitan higher fatty acid esters [Tween: for example, Tween 80 (Kanto Chemical)], and the like; salts, such as sodium chloride, magnesium chloride, and the like; organic acids, such as citric acid, tartaric acid, and the like; amino acids, such as glycine, β-alanine, lysine hydrochloride, and the like; and aminosaccharides, such as meglumine and the like.

As another embodiment, PEG, PVP, D-mannitol, D-sorbitol, xylitol, lactose, sucrose, anhydrous maltose, D-fructose, dextran, glucose, polyoxyethylene polyoxypropylene glycol, sodium chloride, magnesium chloride, citric acid, tartaric acid, glycine, β-alanine, lysine hydrochloride, or meglumine may be used. As still another embodiment, PEG, PVP, D-mannitol, lactose, sucrose, sodium chloride, polyoxyethylene polyoxypropylene glycol, or the like may be used.

These hydrophilic bases may be used alone, or as an appropriate combination of two or more thereof.

The content of the hydrophilic base is not particularly limited, so long as it is an amount capable of controlling the release of the drug to the extent that the release of the drug is not affected by food. The content of the hydrophilic base is, for example, 5% by weight to 75% by weight, 5% by weight to 70% by weight in another embodiment, and 20% by weight to 60% by weight in still another embodiment.

The pharmaceutical composition for modified release of the present invention may be prepared as various dosage forms, which include, for example, formulations for oral administration such as tablets, capsules (including microcapsules), granules, and powder, and formulations for parenteral administration such as suppositories (for example, rectal suppositories or vaginal suppositories). These formulations may be safely administered orally or parenterally. Formulations for oral administration such as tablets, capsules, and granules may be selected in another embodiment.

The pharmaceutical composition for modified release of the present invention may be prepared by mixing the drug, the hydrogel-forming polymers, and the hydrophilic base, and forming the mixture into a predetermined shape. The mixing and forming may be carried out in accordance with

ASTMIRA_00002890

US 10,842,780 B2

11

conventional methods widely used in the technical field for formulation. A pharmaceutically acceptable carrier may be used in the mixing and/or forming, if desired.

In the preparation of the pharmaceutical composition for modified release of the present invention, further various pharmaceutical additives may be used, if desired. Such pharmaceutical additives are not particularly limited, so long as they are pharmaceutically acceptable. Examples of the pharmaceutical additives include various organic or inorganic carrier substances which are widely used as formulation materials, such as fillers, lubricants, binders, and disintegrating agents. Other formulation additives such as preservatives, antioxidants, stabilizers, film coating agents, coloring agents, and sweeteners may be used, if desired.

Examples of the fillers include lactose, sucrose, D-mannitol, D-sorbitol, starch, gelatinized starch, dextrin, crystalline cellulose, low substituted hydroxypropyl cellulose, carboxymethyl cellulose sodium, gum arabic, dextrin, pullulan, light anhydrous silicic acid, synthetic aluminum silicate, magnesium aluminate metasilicate, and the like.

Examples of the lubricants include magnesium stearate, calcium stearate, talc, colloidal silica, and the like.

Examples of the binders include gelatinized starch, sucrose, gelatin, gum arabic, methylcellulose, carboxymethyl cellulose, carboxymethyl cellulose sodium, crystalline cellulose, sucrose, D-mannitol, trehalose, dextrin, pullulan, hydroxypropyl cellulose, hydroxypropyl methylcellulose, polyvinylpyrrolidone, and the like.

Examples of the disintegrating agents include lactose, sucrose, starch, carboxymethyl cellulose, carboxymethyl cellulose calcium, croscarmellose sodium, carboxymethyl starch sodium, light anhydrous silicic acid, low substituted hydroxypropylcellulose, and the like.

Examples of the preservatives include p-hydroxybenzoate esters, chlorobutanol, benzyl alcohol, phenethyl alcohol, dehydroacetic acid, sorbic acid, and the like.

The antioxidants are not particularly limited, so long as it can avoid the effects of dissolution behavior. Examples of the antioxidants include butylated hydroxytoluene (BHT), propyl gallate (PG), butylhydroxyanisol (BHA), ascorbic acid, sodium ascorbate, erythorbic acid, sodium nitrite, sodium bisulfite, sodium pyrosulfite, citric acid, and edetate sodium; BHT, PG, and sodium ascorbate in another embodiment; and BHT in still another embodiment.

Examples of the stabilizers include yellow ferric oxide, red ferric oxide, black iron oxide, and the like.

Examples of the film coating agents include pharmaceutically commonly-used bases, such as water-soluble polymers, plasticizers, and inorganic substances, or a combination thereof.

Examples of the coloring agents include water-soluble edible tar pigments (examples: edible pigments such as food red No. 2, food red No. 3, food yellow No. 4, food yellow No. 5, food blue No. 1, and food blue No. 2), water-insoluble lake pigments (examples: aluminum salts of the above water-soluble edible tar pigments), natural pigments (examples: β-carotene, chlorophyll, and colcothar), and the like.

Examples of the sweeteners include saccharin sodium, dipotassium glycyrrhizinate, aspartame, stevia, and the like.

These carriers or formulation additives may be used alone, or as an appropriate combination of two or more thereof.

With respect to the contents thereof, they may be used in appropriate amounts. For example, the content of the antioxidant is 0.025% by weight to 0.25% by weight with respect to the total weight of the formulation, and that of the

12

stabilizer is 0.05% by weight to 1% by weight with respect to the total weight of the formulation.

Hereinafter, the process of manufacturing the pharmaceutical composition for modified release of the present invention will be explained, the present invention is not limited to the following particular embodiments.

The pharmaceutical composition for modified release of the present invention may be prepared by known methods per se, such as dry granulation, wet granulation, fluidized bed granulation, intermittent granulation, agitation granulation, or the like.

As a method of de-lumping or pulverizing the drug, conventional crushing or pulverizing methods may be applied, for example, using an impact mill (Hosokawa Micron Corporation; Fine Impact Mill), a dry & wet mill (Powrex Corporation: Comil), or a cutting mill granulator (Dalton Corporation; Power Mill).

As a method of pulverizing the hydrophilic base, the hydrogel-forming polymer, or the formulation additives, conventional pulverizing methods may be applied, for example, using an impact mill (Hosokawa Micron Corporation; Fine Impact Mill or Sample Mill) or a jet mill (Horkos Corp; Jet Mill).

As a method of granulating the drug, conventional granulation methods may be used. Examples of such methods include a fluidized bed granulation method, an intermittent granulation method, an agitation granulation method, a high-speed agitation granulation method, a tumbling fluidized bed granulation method, an extrusion granulation method, a pulverization granulation method, a dry granulation method, and the like. In another embodiment, examples thereof include a fluidized bed granulation method, an intermittent granulation method, an agitation granulation method, a high-speed agitation granulation method, a tumbling fluidized bed granulation method, and a dry granulation method, and any method capable of granulating the drug may be used. Examples of a granulator include a fluidized bed granulator (for example, Flow Coater; Freund Corporation, or GPCG; Glatt GmbH), a granulation and coating apparatus equipped with a horizontal rotating disc having a flat powder contact portion [for example, a centrifugal fluidizing granulator (for example, CF granulator; Freund Corporation)], a granulation and coating apparatus having a rotating disk with a flat surface placed at the bottom of a fluidized bed and having an aeration portion (for example, Spiralflow, or Flowcoater with a rotor container; Freund Corporation), and a dry granulator in which material powder is directly compressed, molded, crushed, and sieved (for example, Roller Compactor; Freund Corporation).

In the dry granulation, for example, the drug, the hydrogel-forming polymer, the hydrophilic base, and additives such as a filler may be compression-molded using a dry granulator, and then, may be crushed and sieved to obtain granulated products having a desired size.

In the wet granulation, for example, while the drug, the hydrogel-forming polymer, the hydrophilic base, and additives such as a filler is fluidized, an appropriate amount of water or a liquid containing the hydrophilic base and the binder may be sprayed. The liquid containing the hydrophilic base may be prepared by dissolving or dispersing the essential component in a solvent such as water, ethanol, methanol, or the like. These solvents may be used as an appropriate mixture thereof.

The amount of water used in the granulation is not particularly limited, so long as the binder or formulation additives may be uniformly dissolved and/or suspended (dispersed) in the water. When the hydrophilic base is used

ASTMIRA_00002891

US 10,842,780 B2

13

14

in the solid form, the amount of water is not particularly limited, so long as the hydrogel-forming polymer can be granulated.

When the hydrophilic base is used in the liquid form, the amount of water to the hydrogel-forming polymer is generally 10% by weight or less, 8% by weight or less in another embodiment, and 5% by weight or less in still another embodiment. A method of adding water in the granulation is not particularly limited, so long as a nonuniform mixture consisting of untreated powder and aggregates, which are generally powdery, is not generated. Examples thereof include a continuous spray method in which water is continuously added, an intermittent spray method in which a dry step (and a shaking step, if desired) is carried out during the granulation step, and the like.

The addition rate of water in the granulation is not particularly limited, so long as a nonuniform mixture consisting of untreated powder and aggregates, which are generally powdery, is not generated. In the fluidized bed granulation, the addition rate of water to the hydrogel-forming polymer is generally 0.1% by weight/min. to 1% by weight/min., 0.2% by weight/min. to 0.8% by weight/min. in another embodiment, and 0.4% by weight/min. to 0.6% by weight/min. in still another embodiment.

The temperature of the powder in the granulation is not particularly limited, so long as it does not induce thermal denaturation of the hydrogel-forming polymer. The temperature is, for example, 20° C. to the melting point (62° C. to 67° C.) of the hydrogel-forming polymer, 20° C. to 50° C. in another embodiment, 20° C. to 35° C. in still another embodiment, and 25° C. to 30° C. in still another embodiment.

The concentration of the binder liquid as a solid content which may be used in the granulation is, for example, 1% to 20% as a formulation amount. The binder is not particularly limited, so long as it is pharmaceutically acceptable.

The binder may be added in the solid form to a granulator, and then, water may be sprayed as the binder liquid. Alternatively, the binder may be dissolved in water, and then, the resulting binder liquid may be sprayed.

An appropriate spray rate of the binder liquid varies according to a production method to be applied or its production scale. In a 1-kg scale production by the fluidized bed granulation, the spray rate is 2 g/min. to 20 g/min., and 5 g/min. to 15 g/min. in another embodiment.

An appropriate temperature of the product in the granulation is 15° C. to 50° C., and 15° C. to 40° C. in another embodiment.

The resulting granulated products may be, for example, dried or heated.

In the drying step, an apparatus and a method are not particularly limited, so long as the granulated products can be dried. Examples of an apparatus for drying include a fluidized bed granulator (for example, Flow Coater; Freund Corporation, or GPCG; Glatt GmbH), a granulation and coating apparatus equipped with a horizontal rotating disc having a flat powder contact portion [for example, a centrifugal fluidizing granulator (for example, CF granulator; Freund Corporation)], a granulation and coating apparatus having a rotating disk with a flat surface placed at the bottom of a fluidized bed and having an aeration portion (for example, Spiraflow, or Flowcoater with a rotor container; Freund Corporation), and the like. The conditions for drying are not particularly limited, so long as the granulated products may be generally dried in the fluidized bed. The drying of the granulated products will be almost completed, for example, under the conditions in which the dry inlet air

temperature is 50° C. and the drying is carried out until the temperature of the granulated products becomes 40° C. and, in another embodiment, under the conditions in which the dry inlet air temperature is 40° C. and the drying is carried out until the temperature of the granulated products becomes 30° C. As the drying method, forced-air drying or drying under reduced pressure may be used.

After the completion of the granulation, an anti-oxidant may be added.

The granulated products may be sieved.

In the sieving step, an apparatus and a method are not particularly limited, so long as the granulated products can be sieved. Examples of an apparatus for sieving include a screen, a dry & wet mill (Powrex Corporation: Comil), a cutting mill granulator (Dalton Corporation; Power Mill), and the like. The conditions for sieving are not particularly limited, so long as the granulated products may be generally sieved to obtain particles having a desired size.

After the completion of the sieving, an anti-oxidant may be added.

Examples of tabletting include a direct tabletting method in which the drug, the hydrophilic base, and the hydrogel-forming polymer are mixed with an appropriate additive(s), and the mixture is compression-molded to obtain tablets; a method in which a composition obtained by a wet granulation (the granulation is carried out by spraying a mixture of the drug, the hydrophilic base, the hydrogel-forming polymer, and additives with a binder liquid) or a melting granulation (the granulation is carried out by heating a mixture of the drug, the hydrophilic base, the hydrogel-forming polymer, and an appropriate low-melting substance) is formed into tablets; and the like.

A rotary tabletting machine, a single punch tabletting machine, and the like may be used as a tabletting machine. A method as well as an apparatus is not particularly limited, so long as a compression-molded product (preferably tablets) can be pharmaceutically produced.

After the tabletting, the obtained tablets may be dried. The initial water content of the tablet is, for example, 2% by weight/tablet or less, 1.5% by weight/tablet or less in another embodiment, and 0.9% by weight/tablet or less in still another embodiment.

After the tabletting, the obtained tablets may be film coated using a pan coating machine at an amount of 1% by weight to 5% by weight per tablet.

EXAMPLES

The present invention will now be further illustrated by, but is by no means limited to, the following Examples.

Example 1

In a mortar, 10 g of compound A, 2.5 g of polyethylene oxide (Dow chemical; product name: WSR N-60K; The same compound was used in the following Examples, unless otherwise specified.), and 7.5 g of polyethylene glycol (Sanyo Chemical Industries, Ltd.; PEG 6000; The same compound was used in the following Examples.) were mixed well. The mixture was formed into tablets using Autograph (Shimadzu; The same apparatus was used in the following Examples.) to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 400 mg.

Example 2

In a mortar, 10 g of compound A, 3.5 g of polyethylene oxide, and 6.5 g of polyethylene glycol were mixed well,

ASTMIRA_00002892

US 10,842,780 B2

15                                                                16

and the mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 400 mg.

### Example 3

In a mortar, 10 g of compound A, 6.25 g of polyethylene oxide, and 5 g of polyethylene glycol were mixed well, and the mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 425 mg.

### Example 4

In a mortar, 10 g of compound A, 5 g of hydroxypropyl methylcellulose (Shin-Etsu Chemical Co., Ltd.; HPMC90SH-4000SR), and 5 g of polyethylene glycol were mixed well, and the mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 400 mg.

### Example 5

In a mortar, 10 g of compound A, 5 g of hydroxypropyl methylcellulose (Shin-Etsu Chemical Co., Ltd.; HPMC90SH-100000SR), and 5 g of polyethylene glycol were mixed well, and the mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 400 mg.

### Example 6

In a mortar, 10 g of compound A, 7.5 g of hydroxypropyl methylcellulose (Shin-Etsu Chemical Co., Ltd.; HPMC90SH-100SR), and 2.5 g of polyethylene glycol were mixed well, and the mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 400 mg.

### Example 7

After 400 g of compound A, 140 g of polyethylene oxide, 251.2 g of polyethylene glycol, 0.8 g of finely ground BHT (Merck; The same compound was used in the following Examples.) and 8 g of magnesium stearate were weighed out, these compounds were mixed using a mixer. The mixture was compression-molded using Roller Compactor Mini (Freund Corporation) and sieved to obtain a pharmaceutical composition for modified release (granules) of the present invention. The obtained granules were formed into tablets using a rotary tabletting machine (Hata Iron Works Co., Ltd.; The same apparatus was used in the following Examples.) to obtain a pharmaceutical composition for modified release (tablets) of the present invention having a tablet weight of 400 mg.

### Example 8

The tablets obtained in Example 7 were coated with a film coating agent [Colorcon; Opadry (containing yellow ferric oxide as a stabilizer); The same agent was used in the following Examples, unless otherwise specified.] dispersed into water to obtain a pharmaceutical composition for modified release (tablets) of the present invention.

### Example 9

Into a fluidized bed granulating apparatus GPCG-5 (Freund Corporation; The same apparatus was used in the following Examples.), 1500 g of de-lumped compound A, 1050 g of polyethylene oxide, and 1764 g of polyethylene glycol were loaded, and granulated with 1350 g of a 10% by weight aqueous solution of hydroxypropyl cellulose (Nippon Soda Co., Ltd.; HPC-SL; The same compound was used in the following Examples.) to obtain a pharmaceutical composition for modified release (granules) of the present invention. The resulting pharmaceutical composition for modified release (granules) of the present invention was sieved and mixed with 4 g of finely ground BHT and 30 g of magnesium stearate, and the mixture was formed into tablets using a rotary tabletting machine to obtain a pharmaceutical composition for modified release (tablets) of the present invention having a tablet weight of 300 mg. The obtained tablets were spray-coated with an aqueous dispersion of the film coating agent using HiCoater to obtain a pharmaceutical composition for modified release (tablets) of the present invention having a tablet weight of 309 mg.

### Example 10

Into a fluidized bed granulating apparatus GPCG-5, 1500 g of de-lumped compound A, 1050 g of polyethylene oxide, 1764 g of polyethylene glycol, and 135 g of hydroxypropyl cellulose (HPC-SL) were loaded, and granulated with purified water to obtain a pharmaceutical composition for modified release (granules) of the present invention. The resulting pharmaceutical composition for modified release (granules) of the present invention was sieved and mixed with 4 g of finely ground BHT and 30 g of magnesium stearate, and the mixture was formed into tablets using a rotary tabletting machine to obtain a pharmaceutical composition for modified release (tablets) of the present invention having a tablet weight of 300 mg. The obtained tablets were spray-coated with an aqueous dispersion of the film coating agent using HiCoater to obtain a pharmaceutical composition for modified release (tablets) of the present invention having a tablet weight of 309 mg.

### Example 11

After 400 g of compound A, 100 g of polyethylene oxide, 290 g of polyethylene glycol, 2 g of finely ground BHT, and 8 g of magnesium stearate were weighed out, these compounds were mixed using a mixer. The mixture was compression-molded using Roller Compactor Mini and sieved to obtain a pharmaceutical composition for modified release (granules) of the present invention. The obtained granules were formed into tablets using a rotary tabletting machine to obtain a pharmaceutical composition for modified release (tablets) of the present invention having a tablet weight of 400 mg.

### Example 12

In a mortar, 10 g of compound A, 2.5 g of polyethylene oxide (Dow chemical; product name: WSR Coagulant), and 12.5 g of polyethylene glycol were mixed well. The mixture was formed into tablets using Autograph to obtain a phar-

ASTMIRA_00002893

US 10,842,780 B2

**17**

maceutical composition for modified release of the present invention having a tablet weight of 400 mg.

### Example 13

In a mortar, 10 g of compound A, 0.5 g of polyethylene oxide (Dow chemical; product name: WSR 301), and 5 g of polyethylene glycol were mixed well. The mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 310 mg.

### Example 14

In a mortar, 5 g of compound A, 15 g of polyethylene oxide, and 5 g of polyethylene glycol were mixed well. The mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 250 mg.

### Example 15

In a mortar, 10 g of compound A, 10 g of polyethylene oxide (Dow chemical; product name: WSR N-12K), and 5 g of D-mannitol (Towa Chemical Industry Co., Ltd; product name: Mannit P) were mixed well. The mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 500 mg.

### Example 16

In a mortar, 2 g of compound A, 2 g of polyethylene oxide, and 10 g of polyethylene glycol were mixed well. The mixture was formed into tablets using Autograph to obtain a pharmaceutical composition for modified release of the present invention having a tablet weight of 350 mg.

### Example 17

Into a fluidized bed granulating apparatus GPCG-5, 400 g of de-lumped compound A, 1120 g of polyethylene oxide, and 2313.6 g of polyethylene glycol were loaded, and granulated with 1200 g of a 10% by weight aqueous solution of hydroxypropyl cellulose to obtain a pharmaceutical composition for modified release (granules) of the present invention. The resulting pharmaceutical composition for modified release (granules) of the present invention was sieved and mixed with 6.4 g of finely ground BHT and 40 g of magnesium stearate, and the mixture was formed into tablets using a rotary tabletting machine to obtain a pharmaceutical composition for modified release (tablets) of the present invention having a tablet weight of 250 mg. The obtained tablets were spray-coated with an aqueous dispersion of the film coating agent (containing yellow ferric oxide and red ferric oxide as stabilizers) using HiCoater to obtain a pharmaceutical composition for modified release (tablets) of the present invention having a tablet weight of 257.5 mg.

The formulations in Examples 1 to 17 are shown in Tables 1 to 3.

#### TABLE 1

| Examples | 1 | 2 | 3 | 4 | 5 | 6 |
| --- | --- | --- | --- | --- | --- | --- |
| compound A (g) | 10 | 10 | 10 | 10 | 10 | 10 |
| PEO WSR N-60K (g) | 2.5 | 3.5 | 6.25 | — | — | — |

**18**

#### TABLE 1-continued

| Examples | 1 | 2 | 3 | 4 | 5 | 6 |
| --- | --- | --- | --- | --- | --- | --- |
| HPMC 90SH-4000SR (g) | — | — | — | 5 | — | — |
| HPMC 90SH-100000SR (g) | — | — | — | — | 5 | — |
| HPMC 90SH-100SR (g) | — | — | — | — | — | 7.5 |
| PEG (g) | 7.5 | 6.5 | 5 | 5 | 5 | 2.5 |

#### TABLE 2

| Examples | 7 | 8 | 9 | 10 | 11 |
| --- | --- | --- | --- | --- | --- |
| compound A (g) | 400 | 400 | 1500 | 1500 | 400 |
| PEO WSR N-60K (g) | 140 | 140 | 1050 | 1050 | 100 |
| PEG (g) | 251.2 | 251.2 | 1764 | 1764 | 290 |
| HPC-SL (g) | — | — | 135 | 135 | — |
| magnesium stearate (g) | 8 | 8 | 30 | 30 | 8 |
| BHT (g) | 0.8 | 0.8 | 4 | 4 | 2 |
| film coating agent (g) | — | 23.7 | 134 | 134 | — |

#### TABLE 3

| Examples | 12 | 13 | 14 | 15 | 16 | 17 |
| --- | --- | --- | --- | --- | --- | --- |
| compound A (g) | 10 | 10 | 5 | 10 | 2 | 400 |
| PEO WSR N-60K (g) | — | — | 15 | — | 2 | 1120 |
| PEO WSR coagulant (g) | 2.5 | — | — | — | — | — |
| PEO WSR 301 (g) | — | 0.5 | — | — | — | — |
| PEO WSR N-12K (g) | — | — | — | 10 | — | — |
| PEG (g) | 12.5 | 5 | 5 | — | 10 | 2313.6 |
| D-mannitol | — | — | — | 5 | — | — |
| HPC-SL (g) | — | — | — | — | — | 120 |
| magnesium stearate (g) | — | — | — | — | — | 40 |
| BHT (g) | — | — | — | — | — | 6.4 |
| film coating agent (g) | — | — | — | — | — | 120 |

### Comparative Example 1

After 400 g of pulverized compound A was mixed with 1200 g of D-mannitol, 320 g of purified water was further added, and the whole was kneaded using an agitation granulator (Powrex Corporation; VG-25). The resulting aggregate was sieved through a screen having an opening of 850 μm, and dried using a fluidized bed granulating apparatus (Freund Corporation; FLO-1). The dried products were sieved through a screen having an opening of 500 μm, and filled into No. 1 capsules at a content of 320 mg per capsule to obtain a pharmaceutical composition for comparison containing 80 mg of compound A.

### EXPERIMENTAL EXAMPLES

1. Dissolution test

The pharmaceutical compositions prepared in Examples 2, 8, and 9 were subjected to a dissolution test carried out in accordance with a USP dissolution test (paddle method). As a test fluid, 900 mL of a phosphate buffer (pH 6.8) was used. The pharmaceutical composition prepared in Comparative Example 1 was tested in accordance with a dissolution test, method 2 described in the Japanese Pharmacopoeia. As a test fluid, 900 mL of a Mc. Ilvain buffer (pH 6.8) was used, and the paddle rotation speed was 50 rpm.

The results are shown in Table 4. The dissolution rate after 1.5 hours of the pharmaceutical composition for modified release prepared in each Example was less than 40%. By contrast, the composition prepared in Comparative Example 1 showed a high dissolution rate of 85% or more after 0.5 hour.

ASTMIRA_00002894

US 10,842,780 B2

19

TABLE 4

|  | Example 2 | Example 8 | Example 9 | Comparative Example 1 |
|---|---|---|---|---|
| 0.5 hr. | — | — | — | 95% |
| 1.5 hr. | 35% | 39% | 32% | — |
| 2.5 hr. | 57% | 61% | 54% | — |
| 4.5 hr. | 93% | 95% | 92% | — |

2. Stability Test

Plastic bottles were filled with the pharmaceutical composition for modified release prepared in Example 11, and sealed. These bottles were preserved under the conditions at 40° C. and 75% RH or at 60° C. for 3 months. After the preservation, each pharmaceutical composition was subjected to a dissolution test carried out in accordance with a USP dissolution test (paddle method). As a test fluid, 900 mL of a phosphate buffer (pH 6.8) was used. The results are shown in FIG. 1. The acceleration of a dissolution rate was not observed after the preservation for 3 months under the conditions at 40° C. and 75% RH or at 60° C., and the results were indicative that the pharmaceutical composition was stable.

The pharmaceutical compositions for modified release prepared in Examples 8 and 9 were packed with aluminum/aluminum blister, and preserved under the conditions at 40° C. and 75% RH for 6 months. After the preservation, each pharmaceutical composition was subjected to a dissolution test carried out in accordance with a USP dissolution test (paddle method). As a test fluid, 900 mL of a phosphate buffer (pH 6.8) was used. As a result, changes in the dissolution rate at the point showing a dissolution rate of approximately 50% were 2% and 3%, with respect to the pharmaceutical compositions prepared in Examples 8 and 9, respectively, and the results were indicative that the pharmaceutical compositions were stable.

The pharmaceutical composition for modified release prepared in Example 17 was exposed to 1.2 million Lux·hr of light. After the exposure, the pharmaceutical composition was subjected to a dissolution test carried out in accordance with a USP dissolution test (paddle method). As a test fluid, 900 mL of a phosphate buffer (pH 6.8) was used. As a result, the change in the dissolution rate at the point showing a dissolution rate of approximately 50% was less than 1%, and the result was indicative that the pharmaceutical composition was stable.

3. Pharmacokinetics (PK) Test in Human

The pharmaceutical composition for modified release prepared in Example 8, which contained the equivalent corresponding to 200 mg of compound A, was administered to healthy persons in a fasted state or after 30 minutes from the intake of food, and the plasma levels of the drug were measured.

For comparison, 2 capsules of the pharmaceutical composition (conventional formulation) prepared in Comparative Example 1, which contained the equivalent corresponding to 160 mg of compound A, was administered to healthy persons in a fasted state or after 30 minutes from the intake of food, and the plasma levels of the drug were measured.

With respect to the conventional formulation, the rate of decrease of Cmax in the fed state was 67%, in comparison with that in a fasted state, and the rate of decrease of AUC was 47% (Cmax in the fasted state was approximately three times higher than that in the fed state). With respect to the pharmaceutical composition for modified release of the present invention, the rate of decrease of Cmax in free-feeding was 42%, in comparison with that in a fasted state,

20

and the rate of decrease of AUC was 25%. These results indicated that the reductions of Cmax and AUC caused by food intake could be significantly alleviated by the pharmaceutical composition for modified release of the present invention.

INDUSTRIAL APPLICABILITY

According to the present invention, a pharmaceutical composition for modified release in which the changes in AUC and Cmax caused by food intake can be decreased by controlling a releasing rate of the active ingredient can be provided.

As above, the present invention was explained with reference to particular embodiments, but modifications and improvements obvious to those skilled in the art are included in the scope of the present invention.

The invention claimed is:

1. A pharmaceutical composition, comprising 10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, or a pharmaceutically acceptable salt thereof, in a sustained release hydrogel-forming formulation comprising a hydrogel-forming polymer having an average molecular weight of 100,000 to 8,000,000 and an additive having a water solubility of at least 0.1 g/mL at 20±5° C.,

wherein the hydrogel-forming polymer is at least one compound selected from the group consisting of polyethylene oxide, hydroxypropyl methylcellulose, hydroxypropyl cellulose, carboxymethyl cellulose sodium, hydroxyethyl cellulose, and a carboxyvinyl polymer,

wherein the additive is at least one selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, D-sorbitol, xylitol, lactose, sucrose, anhydrous maltose, D-fructose, dextran, glucose, polyoxyethylene hydrogenated castor oil, polyoxyethylene polyoxypropylene glycol, polyoxyethylene sorbitan higher fatty acid ester, sodium chloride, magnesium chloride, citric acid, tartaric acid, glycine, β-alanine, lysine hydrochloride, and meglumine, and

wherein a drug dissolution rate from the pharmaceutical composition is 39% or less after 1.5 hours, and at least 75% after 7 hours, as measured in accordance with United States Pharmacopoeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm.

2. The pharmaceutical composition according to claim 1, wherein the additive is at least one selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, lactose, sucrose, sodium chloride, and polyoxyethylene polyoxypropylene glycol.

3. The pharmaceutical composition according to claim 1, wherein an amount of the additive is 5% by weight to 75% by weight with respect to a total weight of the pharmaceutical composition.

4. The pharmaceutical composition according to claim 3, wherein the amount of the additive is 5% by weight to 70% by weight with respect to the total weight of the pharmaceutical composition.

5. The pharmaceutical composition according to claim 1, wherein the hydrogel-forming polymer is at least one compound selected from the group consisting of polyethylene oxide, hydroxypropyl methylcellulose, and hydroxypropyl cellulose.

6. The pharmaceutical composition according to claim 1, further comprising an antioxidant.

ASTMIRA_00002895

US 10,842,780 B2

21

**7**. The pharmaceutical composition according to claim **6**, wherein the antioxidant is at least one compound selected from the group consisting of butyl hydroxytoluene, propyl gallate, and sodium ascorbate.

**8**. The pharmaceutical composition according to claim **7**, wherein the antioxidant is butyl hydroxytoluene.

**9**. The pharmaceutical composition according to claim **6**, wherein an amount of the antioxidant is 0.025% by weight to 0.25% by weight with respect to a total weight of the pharmaceutical composition.

**10**. The pharmaceutical composition according to claim **1**, further comprising a stabilizer.

**11**. The pharmaceutical composition according to claim **10**, wherein the stabilizer is at least one compound selected from the group consisting of yellow ferric oxide, red ferric oxide, and black iron oxide.

**12**. The pharmaceutical composition according to claim **11**, wherein the stabilizer is yellow ferric oxide and/or red ferric oxide.

**13**. The pharmaceutical composition according to claim **10**, wherein an amount of the stabilizer is 0.05% by weight to 1% by weight with respect to a total weight of the pharmaceutical composition.

**14**. The pharmaceutical composition according to claim **1**, wherein the drug dissolution rate from the pharmaceutical composition is at least 92% after 4.5 hours.

**15**. The pharmaceutical composition according to claim **1**, wherein the average molecular weight of the hydrogel-forming polymer is 100,000 to 2,000,000.

**16**. The pharmaceutical composition according to claim **1**, comprising 10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide.

**17**. A tablet, comprising the pharmaceutical composition according to claim **1**.

22

**18**. A tablet, comprising the pharmaceutical composition according to claim **16**.

**19**. A method for treating overactive bladder comprising administering the tablet according to claim **17** to a subject in need thereof.

**20**. A method for treating overactive bladder comprising administering the tablet according to claim **18** to a subject in need thereof.

**21**. The pharmaceutical composition according to claim **1**, wherein the average molecular weight of the hydrogel-forming polymer is 100,000 to 5,000,000.

**22**. A pharmaceutical composition, comprising 10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, or a pharmaceutically acceptable salt thereof, in a sustained release hydrogel-forming formulation comprising a means for forming a hydrogel and a means for ensuring penetration of water into the pharmaceutical composition,

wherein a drug dissolution rate from the pharmaceutical composition is 39% or less after 1.5 hours, and at least 75% after 7 hours, as measured in accordance with United States Pharmacopoeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm.

**23**. The pharmaceutical composition according to claim **22**, comprising 10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide.

**24**. A tablet, comprising the pharmaceutical composition according to claim **22**.

**25**. A tablet, comprising the pharmaceutical composition according to claim **23**.

\* \* \* \* \*

ASTMIRA_00002896

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 10,842,780 B2                                    Page 1 of 2.
APPLICATION NO.   : 15/432854
DATED             : November 24, 2020
INVENTOR(S)       : Yuuki Takaishi et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page

Item [56] REFERENCES CITED:

Page 2
Column 1:
Line 4, Foreign References "JP 2008-532953 8/2006" should read --JP 2008-532953 8/2008--;
Line 26, Other Publications "tion Report, 4 pages (English translation)." should read --tion Report, received Feb. 4, 2014, 4 pages (English translation).--;
Line 30, "Japanese Patent Application No. 2010-531838, first Office Action, dated Dec. 28, 2010, 4 pages (English translation)." should read --Japanese Patent Application No. 2010-531838, second Office Action, dated Dec. 28, 2010, 4 pages (English translation).--;
Column 2:
Line 17, "dated Aug. 1, 2018," should read --mailed Aug. 1, 2018,--;
Line 70, "Humans" should read --Humans:--;

Page 3
Column 2:
Lines 9-10, "Wolfers Klower" should read --Wolters Kluwer--;

Page 4
Column 1:
Line 21, "Nov. 2015)." should read --Nov. 9, 2015).--;
Column 2:
Line 22, "Stephen Bym et al.," should read --Stephen Byrn et al.,--; and
Line 64, "World J. Ural." should read --World J. Urol.--.

Signed and Sealed this
Thirteenth Day of July, 2021

Drew Hirshfeld
*Performing the Functions and Duties of the*
*Under Secretary of Commerce for Intellectual Property and*
*Director of the United States Patent and Trademark Office*

ASTMIRA_00002897

**CERTIFICATE OF CORRECTION (continued)**                          Page 2 of 2
**U.S. Pat. No. 10,842,780 B2**

In the Specification

<u>Column 2:</u>
Line 54, "a clinical trial in human" should read --a human clinical trial--; and
Line 64, "profiles is" should read --profiles are--.

<u>Column 5:</u>
Line 52, "Mc. Ilvain buffer," should read --McIlvaine buffer,--.

<u>Column 6:</u>
Line 13, "$Rd$(AUC)=[AUC(FS)-AUC(FI)]1×100/AUC(FS)" should read --$Rd$(AUC)=[AUC(FS)-AUC(FI)]×100/AUC(FS)--.

<u>Column 7:</u>
Line 41, "extend" should read --extent--.

<u>Column 10:</u>
Line 3, "in case" should read --in the case--.

<u>Column 12:</u>
Line 57, "is fluidized," should read --are fluidized,--.

<u>Column 18:</u>
Line 60, "Mc. Ilvain buffer" should read --McIlvaine buffer--.

<u>Column 19:</u>
Line 25, "alminum/" should read --aluminum/--; and
Line 26, "alminum blister," should read --aluminum blister,--.

In the Claims

<u>Column 20:</u>
Line 41, "(3-alanine," should read --β-alanine,--; and
Line 61, "claim" should be deleted.

ASTMIRA_00002898

# EXHIBIT 8a

Defendants' Reply in Support of Their Motion in Limine to Preclude the Testimony of Plaintiffs' Expert Steven M. Weisman, Ph.D.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ASTELLAS PHARMA INC., *et al*.,

              Plaintiffs,

       v.

SANDOZ INC., *et al*.

              Defendants.

C.A. No. 20-1589-JFB-CJB
(Consolidated)

**DEFENDANTS' REPLY
IN SUPPORT OF THEIR MOTION *IN LIMINE* TO PRECLUDE THE TESTIMONY OF
<u>PLAINTIFFS' EXPERT STEVEN M. WEISMAN, PH.D.</u>**

Plaintiffs' opposition primarily relies on two incorrect assumptions—that Dr. Weisman's experience with FDA regulations qualifies him as an expert in sustained release formulation techniques, and that FDA's draft guidance for mirabegron bioequivalence testing relates to a disputed issue in the case.

If Dr. Weisman's testimony "is directly responsive to invalidity opinions offered by … Dr. W. Chambliss," (Pl. Opp. at 2), that falls squarely within the purview of a POSA with experience in formulation techniques and analysis. Plaintiffs' opposition does not establish Dr. Weisman's qualifications necessary to reliably opine on motivations to minimize mirabegron's food effect. *See Sundance, Inc. v. DeMonte Fabricating Ltd*., 550 F.3d 1356, 1364 (Fed. Cir. 2008) (a witness not qualified in the pertinent art may not testify on the motivation of a POSA); *Hospira v. Amneal,* 285 F. Supp. 3d 776, 811 (D. Del. 2018) (permitting a non-POSA expert to testify because the expert "did not offer opinions based on matters within the expertise of a POSA"). Dr. Weisman's testimony declaring himself a POSA does not make it so. Defendants' citation to *Daubert* does not transform their motion into a *Daubert* motion. *See Sundance*, 550 F.3d 1356 at n.8 (citing *Daubert* when reversing district court's denial of motion *in limine* regarding an expert without technical expertise).

FDA's draft guidance for mirabegron bioequivalence testing does not relate to a disputed issue in the case. First, Plaintiffs' expert Dr. Little does not rely on bioequivalence as a basis for finding purported infringement. (*See* Ex. A, Excerpt of Reply Report of Dr. Little.) Second, Dr. Weisman's food effect opinions do not address any claim limitation. (*See* Ex. A of Pl. Opp., highlighting no claims.) Third, unlike the attorney declaration in *Braintree*, Dr. Weisman's opinions on FDA recommendations do not relate to FDA's conduct towards any party. *Braintree Labs., Inc. v. Novel Laby's, Inc*., 2013 WL 211252, at *19 (D.N.J. Jan. 18, 2018).

HEYMAN ENERIO GATTUSO & HIRZEL
LLP

/s/Dominick T. Gattuso
Dominick T. Gattuso (#3630)
Elizabeth A. DeFelice (#5474)
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law
edefelice@hegh.law

*Attorneys for Defendant Sandoz Inc. and Lek
Pharmaceuticals d.d.*

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

/s/Pilar G. Kraman
Pilar G. Kraman (#5199)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com

*Attorneys for Zydus Pharmaceuticals (USA)
Inc. and Zydus Lifesciences Limited*

PHILLIPS, MCLAUGHLIN & HALL, P.A.

/s/Megan C. Haney
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
Megan C. Haney (#5016)
1200 N. Broom St
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com
mch@pmhdelaw.com

*Attorneys for Lupin Ltd. and
Lupin Pharmaceuticals, Inc.*

HEYMAN ENERIO GATTUSO & HIRZEL
LLP

/s/Dominick T. Gattuso
Dominick T. Gattuso (#3630)
Elizabeth A. DeFelice (#5474)
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law
edefelice@hegh.law

*Attorneys for Defendants Sawai
Pharmaceutical Co., Ltd. and Sawai USA,
Inc.*

# EXHIBIT 8a

Defendants' Reply in Support of Their Motion in Limine to Preclude the Testimony of Plaintiffs' Expert Steven M. Weisman, Ph.D.

Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| ASTELLAS PHARMA INC., et al., | ) | C.A. No. 20-1589-JFB-CJB |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) | **Outside Counsel Only - Contains** |
| v. | ) | **Confidential Information of Astellas,** |
|  | ) | **Apotex, Lupin, Prinston, Sandoz, Sawai,** |
| SANDOZ INC., et al., | ) | **Zydus, Aurobindo, and Actavis** |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

**REPLY EXPERT REPORT OF PROF. STEVEN R. LITTLE, PH.D.
<u>CONCERNING INFRINGEMENT OF U.S. PATENT NO. 10,842,780</u>**

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

# Table of Contents

I.  Introduction ................................................................................................ 3

II.  Professional Experience, Qualifications, Prior Testimony and Compensation ................... 5

III.  Materials Considered ................................................................................... 5

IV.  Person Of Ordinary Skill In The Art ............................................................... 6

V.  Summary of Opinions .................................................................................. 6

VI.  Technology Background ............................................................................... 7

   A.  Dissolution Mechanism Of Hydrogel Systems .............................................. 8

   B.  Responses to Criticisms About The Paddle Method In General ......................... 9

VII.  Prof. Thisted's Statistical Prediction Model ..................................................... 11

   A.  Correlation Between USP I and II Dissolution for Myrbetriq® ........................ 11

   B.  Differences in Composition and Manufacturing Processes Between Myrbetriq® and Defendants' ANDA Products Do Not Impact Prof. Thisted's Statistical Model ................... 15

   C.  Dissolution Profile Shape Does Not Change the Infringement Results Provided by Prof. Thisted's Model ........................................................................................... 20

VIII.  Defendants' ANDA Product Samples Are Probative of Infringement ....................... 22

   A.  Dissolution Testing of Defendants' ANDA Products Support Infringement by Defendants ................................................................................................... 22

   B.  Samples Beyond Their Proposed Shelf-Life Period Support Infringement During Shelf-Life ........................................................................................................ 24

   C.  Responses to Criticisms About Chain of Custody, Sample Handling, and Open Vials  26

   D.  Any Tablet Meeting All Claim Elements Establishes Infringement ..................... 27

IX.  Apotex, Prinston, and Sandoz Infringe the Asserted Claims ................................. 28

X.  Sawai Infringes the '780 Patent ................................................................... 28

   A.  f2 is Used To Support Rationale For Prof. Thisted's Model Not As a Proxy For Infringement ................................................................................................ 29

   B.  Prof. Thisted's Statistical Predictions Establish Infringement ........................... 29

   C.  Ms. Gray's Testing Further Supports Infringement ...................................... 30

      1.  Aged Samples Are Still Probative ..................................................... 30

      2.  Responses to Criticisms on Sample Handling ........................................ 31

      3.  Any Tablet Meeting All Claim Elements Establishes Infringement ............... 32

   D.  Dissolution Trend is Consistent with Sawai's ANDA Data ............................. 32

   E.  Dissolution Trends For Sawai's ANDA Product are Consistent with Ms. Gray's Testing of Other Defendants' ANDA Products ................................................................. 35

   F.  Conclusion that Sawai's ANDA Product Meets The Dissolution Element ............. 36

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

XI.     Lupin Infringes the '780 Patent ........................................................................ 37

  A.    Prof. Thisted's Statistical Predictions Establish Infringement ..................................... 37

    1.    Similarities Between Lupin's ANDA Products and Myrbetriq® Justify Reliability of Prof. Thisted's Model As To Lupin ................................................ 37

    2.    The Shape of the Dissolution Profile Has No Impact On Prof. Thisted' Model ........ 40

    3.    Similarities in Comparative Dissolution Profiles Between Lupin's ANDA Products and Myrbetriq® Of USP I Data And USP II Data Further Support Reliability of Prof. Thisted's Model As To Lupin .................................................... 40

  B.    Ms. Gray's Testing Of Aged Samples Further Supports Infringement ......................... 41

    1.    Aged Samples Are Still Probative ................................................................. 41

    2.    Responses to Criticisms on Sample Handling ............................................ 42

  C.    The Direction of Dissolution Trend Over Time For Lupin's ANDA Products Is Predictable And Further Supports Infringement ........................................................ 42

  D.    Bioequivalence Is Not Relied Upon For Infringement ................................................ 43

  E.    f2 is Used To Support Rationale For Prof. Thisted's Model Not As a Proxy For Infringement ................................................................................................ 44

  F.    The Dissolution Profiles of Other Defendants' ANDA Products Are Probative Given The Similarities With Lupin's ANDA Products ................................................ 44

  G.    Conclusion that Lupin's ANDA Products Meet The Dissolution Element ................. 44

XII.    Zydus Infringes the '780 Patent ...................................................................... 44

  A.    Prof. Thisted's Statistical Predictions Establish Infringement ..................................... 45

  B.    Ms. Gray's Testing of Aged Samples Further Supports Infringement ......................... 48

    1.    Aged Samples Are Still Probative ................................................................. 48

    2.    Responses to Criticisms on Chain of Custody and Sample Handling ...................... 48

    3.    Any Tablet Meeting All Claim Elements Establishes Infringement ...................... 49

  C.    The Direction of Dissolution Trend Over Time For Zydus's ANDA Products Is Predictable And Further Supports Infringement ........................................................ 49

  D.    Responses to Inconsistences in Zydus ANDA And Ms. Gray's Testing ...................... 50

XIII.   Reservation of Rights ...................................................................................... 51

2

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

least for the same reasons described in Section VIII.B above, I disagree that direction of dissolution change over time could not be described using a correlation. ███████████ ███████████████████████████████████████████████ Furthermore, as explained in Section X.D, comparison of Ms. Gray's testing of Sawai's 6.5 year samples using Sawai's own USP I (basket) method at 100 rpm with Sawai's own long-term USP I data clearly demonstrates that the dissolution rate went up as the samples aged beyond the expiration of the proposed 3-year shelf-life.  This further provides support to my opinions concerning aged samples of Lupin's ANDA Products.



D.  **Bioequivalence Is Not Relied Upon For Infringement**

101.    Dr. Buckton contends that bioequivalence is not probative of the claimed dissolution parameters.[154]  Here, bioequivalence is not disputed.  However, in this case, as Dr. Weisman explains, the draft bioequivalence guidance of mirabegron requires generic companies

---

[154] Buckton Rebuttal Report, ¶¶ 87-95.

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

to establish similarity of dissolution profiles as part of showing bioequivalence.[155]

### E.  f2 is Used To Support Rationale For Prof. Thisted's Model Not As a Proxy For Infringement

102.    Dr. Buckton contends that f2 values are not probative of the claimed dissolution parameters.[156]  As explained in ¶¶ 34-37, I cite to f2 as a premise to establish reliability of Prof. Thisted's model to predict USP II data using Defendants' ANDA Products.

### F.  The Dissolution Profiles of Other Defendants' ANDA Products Are Probative Given The Similarities With Lupin's ANDA Products

103.    Dr. Buckton contends that the dissolution profiles of the other defendants' ANDA Products are not probative of infringement by Lupin given formulation differences.[157]  For the same reasons described above in Section VII.B and in my Supplemental Report, I disagree that other Defendants' ANDA Products have no probative value in this infringement analysis.

### G.  Conclusion that Lupin's ANDA Products Meet The Dissolution Element

104.    For the reasons stated in Sections II.A.8 and II.N.6 in **Appendix L.2** to my Opening Report, and for the further reasons stated above in Sections XI.A through XI.F, in my opinion, Lupin's ANDA Products meet the Dissolution Element.

### XII.    Zydus Infringes the '780 Patent

105.    As I provided in my Opening Report, Zydus's ANDA Products infringe Claims 1-5 and 15-25 of the '780 Patent.[158]  Since Dr. Fassihi does not contest my analysis of any other claim elements other than the Dissolution Element, I focus my responses only on the Dissolution Element of the Asserted Claims of the '780 Patent.

---

[155] Weisman Opening Report, ¶¶ 19, 26, 50; Weisman Reply Report, ¶¶ 9 & fn. 1, 11, 15, 18, 20.
[156] Buckton Rebuttal Report, ¶¶ 96-99.
[157] Buckton Rebuttal Report, ¶¶ 100-101.
[158] Opening Report, **Appendix L.6** (Zydus).

# EXHIBIT 8b

Defendants' Motion in Limine to Preclude
the Modeling Testimony of Plaintiffs'
Expert Prof. Ronald A. Thisted, Ph.D.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ASTELLAS PHARMA INC., *et al*., | |
| Plaintiffs, | |
| v. | C.A. No. 20-1589-JFB-CJB (Consolidated) |
| SANDOZ INC., *et al*. | |
| Defendants. | |

**DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE
THE MODELING TESTIMONY OF PLAINTIFFS' EXPERT PROF. RONALD A.
THISTED, PH.D.**

Pursuant to Fed. R. Evid. 402-403 and 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), Defendants respectfully request that the Court preclude Plaintiffs from using or relying on at trial certain modeling done by Plaintiffs' expert, Dr. Ronald A. Thisted, which was disclosed for the first time in his Reply Report.

## I.    Factual Background

The asserted claims of the '780 patent include a dissolution testing limitation where certain parameters are "measured in accordance with United States Pharmacopoeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm." Defendants' ANDAs include a different type of dissolution testing.

On September 15, 2022, Plaintiffs served Dr. Thisted's Opening Report, which was 414 pages long and included a significant amount of statistical modeling that was not previously disclosed by Plaintiffs during the fact discovery period. (*See* Ex. 1, Thisted Opening Report.) Pursuant to the schedule, Defendants only had until October 17, 2022 to respond.

Notwithstanding its length, Dr. Thisted's Opening Report purposefully omitted a specific analysis.  Specifically, in Paragraphs 20 and 62 of his Opening Report, Dr. Thisted mentioned modeling USP Apparatus II (paddle) dissolution testing at 50 rpm from USP I (basket) results at 100 rpm "as demonstrated using certain lots of Sawai's ANDA Product and Myrbetriq Products" (the "Modeling"). (*Id.*)  Tellingly, Dr. Thisted's Report (including its many appendices) lacked any  details about the Modeling, and Plaintiffs' related production did not contain the underlying models or data.

Defendants raised this glaring omission with Plaintiffs before their responsive expert reports were due.  On October 11, Defendants cited the omissions and sought confirmation that Plaintiffs would not be relying on the Modeling in this case based on their failure to disclose.  (*See*

Ex. 2, Thisted Emails at 5.)  On October 17, after several follow ups, Plaintiffs finally provided a response, albeit unhelpful.  Instead of providing the missing Modeling, Plaintiffs told Defendants they could depose Dr. Thisted on the analysis omitted from his Opening Report.  (*See id.* at 3.) Plaintiffs' response failed to address the clear prejudice that Defendants were deprived of the opportunity to have their expert(s) review the Modeling and respond.  On October 19, Defendants responded that Dr. Thisted's report clearly mentioned the Modeling, but failed to disclose the underlying analysis or any data in support thereof which was in clear violation of the Federal Rules of Civil Procedure.  (*See id.* at 2.)  Because it would be improper for Dr. Thisted to testify about undisclosed opinions, Defendants advised Plaintiffs that they would move to strike any such testimony.  Plaintiffs still refused to produce the Modeling.  (*See id.* at 1.)

It was not until Dr. Thisted's deposition on December 13, 2022 that Defendants learned **<u>Plaintiffs' failure to timely provide the Modeling was an intentional, tactical decision</u>**.  During his deposition, Dr. Thisted testified that he completed the Modeling *before* his Opening Report and did not know why counsel omitted it.  (*See* Ex. 3, Thisted Dep. Tr. at 11:13–12:12, 15:9–18.)

Defendants timely served responsive reports on October 18, 2022.  However, Defendants' retained experts were unable to consider or respond to the Modeling due to Plaintiffs' gamesmanship.  On November 11, 2022, Plaintiffs provided the missing Modeling in Dr. Thisted's Reply Report.  It is present in Section VII (¶¶ 106–12) and Appendices Z (at § Z.10, pp. 60–86), Z-1, and Z-2.  (Ex. 4, Thisted Reply Report.)  But, by this time, it was too late, Defendants reports were already completed.

## II.   Discussion

Plaintiffs made the tactical decision not to timely disclose the Modeling, and should not benefit from that choice.  Rule 26(a)(2)(B)(i)-(ii) requires experts to provide a written report

containing "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them."

A party that, without substantial justification, fails to disclose information required by Rule 26(a) shall not, unless such failure is harmless, be permitted to use as evidence at a trial any information not so disclosed. Fed. R. Civ. P. 37(c)(1). In the Third Circuit, courts evaluate the following factors when considering whether to exclude the testimony of potential witnesses: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order. *Meyers v. Pennypack Woods Home Ownership Ass'n.*, 559 F.2d 894, 904-05 (3d Cir. 1977).

Applying this framework, courts have excluded materials not timely provided in an opening report. *See Praxair, Inc. v. ATMI, Inc.*, 231 F.R.D. 457, 463 (D. Del. 2005), *rev'd on other grounds* (excluding new testing, conclusions and theories of invalidity not contained in opening report and where additional expert discovery to cure the prejudice would undoubtedly disrupt the trial process).

Here, Plaintiffs withheld the Modeling referred to in Dr. Thisted's Opening Report hoping to gain a tactical edge, even though the Modeling had been referenced and the underlying analysis completed and, thus, available to disclose.  Plaintiffs' strategy precluded Defendants and their experts from fully considering the Modeling in forming and drafting responsive reports within the rebuttal timeframe, which carries significant prejudice especially given the overall volume of material that needed to be considered.  The Modeling should be excluded as should any opinion of Dr. Thisted relying on such Modeling.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Pilar G. Kraman* _____
Pilar G. Kraman (#5199)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com

*Attorneys for Zydus Pharmaceuticals (USA)*
*Inc. and Zydus Lifesciences Limited*


PHILLIPS, MCLAUGHLIN & HALL, P.A.

*/s/ Megan C. Haney* _____
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
Megan C. Haney (#5016)
1200 N. Broom St
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com
mch@pmhdelaw.com

*Attorneys for Lupin Ltd. and*
*Lupin Pharmaceuticals, Inc.*


HEYMAN ENERIO GATTUSO & HIRZEL LLP

*/s/ Dominick Gattuso* _____
Dominick T. Gattuso (#3630)
Elizabeth A. DeFelice (#5474)
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law
edefelice@hegh.law

*Attorneys for Defendants Sawai Pharmaceutical*
*Co., Ltd. and Sawai USA, Inc.*

# EXHIBIT 8b

Defendants' Motion in Limine to Preclude
the Modeling Testimony of Plaintiffs'
Expert Prof. Ronald A. Thisted, Ph.D.

Proposed Order

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ASTELLAS PHARMA INC., ASTELLAS IRELAND CO., LTD., and ASTELLAS PHARMA GLOBAL DEVELOPMENT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SANDOZ INC., et al., <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    C.A. No. 20-1589-JFB-CJB<br>(Consolidated) |

**[PROPOSED] ORDER**

IT IS HEREBY ORDERED that Defendants' Motion *in Limine* to Preclude the Modeling Testimony (i.e. ¶¶ 20 and 62 of the Thisted Opening Report and Section VII (¶¶ 106–12) and Appendices Z (at § Z.10, pp. 60–86), Z-1, and Z-2 of the Thisted Reply Report) of Plaintiffs' Expert Professor Ronald A. Thisted, Ph.D. is granted.

IT IS SO ORDERED this _____day of _____, 2023.

_____
United States Magistrate Judge

1

# EXHIBIT 8b

Defendants' Motion in Limine to Preclude
the Modeling Testimony of Plaintiffs'
Expert Prof. Ronald A. Thisted, Ph.D.

Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ASTELLAS PHARMA INC., et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| SANDOZ INC., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

C.A. No. 20-1589-JFB-CJB

**Outside Counsel Only - Contains Confidential Information of Astellas, Apotex, Aurobindo, Lupin, Prinston, Sawai, and Zydus**

**OPENING EXPERT REPORT OF PROF. RONALD A. THISTED, PH.D. CONCERNING INFRINGEMENT OF U.S. PATENT NO. 10,842,780**

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

I.      Introduction ......................................................................................................................... 3

II.     Professional Experience and Qualifications ...................................................................... 4

    A.      Prior Expert Testimony ................................................................................................ 7

    B.      Compensation ............................................................................................................... 9

III.    Materials Considered ......................................................................................................... 9

IV.     Summary of Opinions ........................................................................................................ 9

V.      Background ....................................................................................................................... 10

    A.      Dissolution Test Methods .......................................................................................... 10

    B.      Statistical Principles .................................................................................................. 10

        1.      Statistical Estimation ........................................................................................... 11

        2.      Confidence Intervals ............................................................................................ 12

        3.      Linear Regression ................................................................................................. 13

        4.      Mixed-Effects Regression Analysis ..................................................................... 15

        5.      Predictive Modeling ............................................................................................. 16

        6.      Predictive Accuracy ............................................................................................. 18

    C.      FDA Draft Guidance On Mirabegron ........................................................................ 20

VI.     The Asserted Patent .......................................................................................................... 21

VII.    Statistical Modeling .......................................................................................................... 22

    A.      What I was asked to do ............................................................................................... 22

    B.      Prediction Model for USP Apparatus II (Paddle) Dissolution Based on USP Apparatus I (Basket) Data ......................................................................................................................... 24

    C.      Final Prediction Model for USP Apparatus II (Paddle) Dissolution Based On USP Apparatus I (basket) Data ........................................................................................................ 37

VIII.   Analysis of USP Apparatus I (Basket) Data for Myrbetriq® ......................................... 38

IX.     Analysis of dissolution data from defendants .................................................................. 40

    A.      Apotex ........................................................................................................................ 40

    B.      Aurobindo ................................................................................................................... 43

    C.      Lupin ........................................................................................................................... 46

    D.      Prinston ....................................................................................................................... 48

    E.      Sawai .......................................................................................................................... 51

    F.      Zydus ........................................................................................................................... 54

1

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

X.  Sensitivity analyses ................................................................................................................ 56

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

## I.      Introduction

1.      I, Ronald A. Thisted, Ph.D., have been retained in the above-captioned case on behalf of Plaintiffs Astellas Pharma Inc., Astellas Ireland Co., Ltd., and Astellas Pharma Global Development, Inc. (collectively, "Astellas" or "Plaintiffs") to provide statistical analyses and opinions concerning the extent to which dissolution profiles for given lots of Astellas' Myrbetriq® (mirabegron extended-release tablets) 25 mg and 50 mg products ("Myrbetriq 25 mg Product" and "Myrbetriq 50 mg Product", collectively "Myrbetriq Products") obtained using USP Method 2 can be predicted from the dissolution profiles obtained from tablets in the same lot using USP Method 1.  I have also been asked to conduct statistical prediction of dissolution rates for certain batches of proposed generic mirabegron extended-release tablet products ("ANDA Products") of defendants Apotex Inc. and Apotex Corp. (collectively, "Apotex"), Aurobindo Pharma Ltd., Aurobindo Pharma USA, Inc., and Aurolife Pharma LLC (collectively, "Aurobindo"),[1] Lupin Ltd. and Lupin Pharmaceuticals, Inc. (collectively, "Lupin"), Prinston Pharmaceutical Inc., Zhejiang Huahai Pharmaceutical Co. Ltd., Huahai US Inc., and Solco Healthcare US LLC (collectively "Prinston"), Sawai Pharmaceutical Co., Ltd., Sawai USA, Inc., Strides Pharma Science Limited, and Solara Active Pharma Sciences Limited, (collectively, "Sawai"), and Zydus Pharmaceuticals (USA) Inc. and Zydus Lifesciences Limited, (collectively,

---

[1] I understand from counsel that infringement issues with respect to Aurobindo are stayed in this case.  Nevertheless, I have included statistical prediction of dissolution rates for batches of Aurobindo's ANDA Products that further bolster some of my opinions set forth in this Opening Report.

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

"Zydus") (all collectively, "Defendants").  I have also been asked to opine on the extent to which specific lots of Defendants' ANDA Products conform to the drug dissolution rate elements of Claims 1 and 22 of Astellas' U.S. Patent No. 10,842,780 ("the '780 Patent").[2]  I understand from counsel that this litigation concerns the '780 Patent that covers Astellas' Myrbetriq Products.  I have not been asked to provide any additional opinions on infringement or validity of asserted claims.  I understand that the results of my statistical analyses will be provided to another expert, Prof. Steven R. Little, for the purposes of determining infringement.

2.      This Opening Report sets forth my qualifications, statistical analyses, and results of dissolution profiles of certain lots of Astellas' Myrbetriq Products and Defendants' ANDA Products.

3.      I expect to testify in this matter, at trial or by deposition, concerning the matters set forth in this report.  I reserve the right to create figures and demonstratives to assist me in my trial testimony.  I also reserve the right to provide tutorials as part of my testimony, including but not limited to the underlying principles of statistics and statistical analyses.

4.      I reserve the right to supplement and/or amend this report if additional information is provided to me, or to rebut any opinions offered by Defendants.

## II.   Professional Experience and Qualifications

5.      I am Professor Emeritus in the Departments of Statistics and Public Health Sciences at the University of Chicago.  At the time of my retirement in 2018, I also held faculty

---

[2] ASTMIRA_00002881-ASTMIRA_00002898.

CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER

appointments in the Department of Anesthesia & Critical Care and the Committee on Clinical Pharmacology and Pharmacogenomics.

6.      I received a bachelor's degree (B.A.) in mathematics and philosophy in 1972 from Pomona College in Claremont, California.  In 1973 and 1977, respectively, I completed a Master's degree (M.S.) and a Doctor of Philosophy degree (Ph.D.) in statistics at Stanford University in Palo Alto, California.

7.      I have more than 45 years of research, academic, and practical experience in the area of biostatistics.  My research has focused on biostatistics and epidemiology, statistical computation, and the effectiveness of medical intervention from a statistical perspective.

8.      I have held positions on the faculty of the University of Chicago since 1976.  I was Co-Director of the Clinical Research Training Program (1999–2012), Chairman of the Department of Health Studies [now Public Health Sciences] (1999–2012), Director of Population Sciences for the Institute for Translational Medicine (2007–2014), and Scientific Director for the Biostatistics Core Facility at the University of Chicago Cancer Research Center (1999–2014). From 2014 until my retirement, I was Vice Provost for Academic Affairs at the University.

9.      I have taught courses on statistics and biostatistics for over forty years.  I have also taught courses on statistical methods, computation, epidemiology, and clinical research methods.  I have been awarded the Llewellyn John and Harriet Manchester Quantrell Award for Excellence in Undergraduate Teaching.

10.      I am an Elected Fellow of the American Association for the Advancement of Science (1992) and of the American Statistical Association (1988).  I have also been a member

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

of several professional societies related to statistics and computation, including the Association for Computing Machinery, the International Biometric Society, the Institute of Mathematical Statistics, the Royal Statistical Society, and the Society for Industrial and Applied Mathematics.

11.     I have authored over one hundred publications in the area of biostatistics and epidemiology in peer-reviewed journals including the *New England Journal of Medicine*, the *Journal of the American Medical Association*, and *The Lancet*.  I also served as Associate Editor of the *Journal of the American Statistical Association* (1979–1985, 1987–1988) and of *ACM Transactions on Mathematical Software* (1990–1992).

12.     I have served as Database Editor (1994), Managing Editor (1995), and Editor (1996–1998) for *Current Index to Statistics*.  I sat on the editorial board of *SIAM Journal of Scientific and Statistical Computing* from 1983 to 1985.  I have served as a referee for several journals related to biostatistics, including *Annals of Statistics*, *PLoS One*, and *Statistics in Medicine*.  As a journal referee, I reviewed submitted articles for scientific quality.  I have also acted as a reviewer for the National Institutes of Health (NIH) and the National Science Foundation (NSF).  In that capacity, I reviewed grant proposals for potential funding by NIH or NSF.

13.     Since the late 1970s, I have consulted for the pharmaceutical and medical device industries on the design of clinical trials and statistical analysis of clinical trial results.  I have consulted regarding the design of Phase I, Phase II, and Phase III clinical trials, including design of pharmacokinetic studies; designed data collection methods; planned and overseen statistical

6

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

analysis of results; prepared reports for use by the FDA; and presented statistical aspects of clinical studies to the FDA.

14.    I have extensive experience consulting in the pharmaceutical industry on the design and analysis of clinical and pre-clinical studies. My teaching and consulting practices have also included design and/or analysis of pharmacokinetic and pharmacodynamic experiments and trials, bioequivalence and bioavailability studies, and dissolution studies of pharmaceutical formulations.

15.    My current curriculum vitae is attached as **Appendix A**.

**A.    Prior Expert Testimony**

16.    Since May 2018, I have provided deposition, cross-examination, and/or at trial testimony in the following matters:

i.    *InCyte Corporation v. Concert Pharmaceuticals, Inc.*, Case IPR2017-01256, Patent No. 9,249,149. US PTO, Patent Trial and Appeal Board,

ii.    *Galderma Laboratories L.P., Galderma S.A., and Nestlé Skin Health S.A. v. Teva Pharmaceuticals USA, Inc.*, US District Court, District of Delaware., C. A. No. 17-1783 (RGA),

iii.    *Mylan Pharmaceuticals Inc. v. Biogen MA, Inc.*, Case IPR2018-01403, Patent 8,399,514B2, US PTO, Patent Trial and Appeal Board,

iv.    *Biogen International GMBH and Biogen Pharma MA Inc. v. Mylan Pharmaceuticals, Inc.*, C. A. No. 1:17-cv-116-IMK (Northern District of West Virginia),

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

v. *AFT Pharmaceuticals Australia Pty Ltd v Reckitt Benckiser (Australia) Pty Ltd*, Federal Court of Australia, District of New South Wales, General Division, No. NSD 252 of 2019,

vi. *Bayer Inc. and Bayer Intellectual Property GMBH v. Teva Canada Limited and Apotex Inc.*, Federal Court of Canada Court Files T-1960-18 and T-2093-18,

vii. *Biodelivery Sciences International, Inc., and Arius Two, Inc., v. Alvogen PB Research & Development LLC, Alvogen Malta Operations Ltd., Alvogen Pine Brook LLC, Alvogen, Inc., and Alvogen Group, Inc.*, C. A. No. 1:18-1395-CFC; and *Biodelivery Sciences International, Inc., and Arius Two, Inc., v. Chemo Research, S.L., Intelgenx Corp., and Intelgenx Technologies Corp.*, C. A. No. 1:19-cv-00444-CFC, (District of Delaware),

viii. *AstraZeneca AB v. Zydus Pharmaceuticals (USA) Inc.*, 1:18-cv-00664-RGA (D. Del.),

ix. *Allergan Sales, LLC et al. v. Sandoz, Inc. et al.*, 2:17-cv-10129-CCC-MF (D. New Jersey),

x. *Amgen Inc. v. Sandoz Inc.*, C.A. No. 18-11026(MAS)(DEA) (D. NJ),

xi. *Craig Couturier v. C. R. Bard, Inc, et al.*, 2:19-cv-12497-ILRL-DPC (E. Dist. Louisiana).

8

CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER

### B.        Compensation

17.        I am being compensated for my time at my standard hourly rate of $850 per hour. My compensation is not contingent upon my opinions or the outcome of this or any other proceeding.

## III.    Materials Considered

18.        In addition to materials explicitly cited in this report, a list of materials considered is contained in **Appendix B**.  I have also relied on my knowledge, education, experience, and training as a statistician.

## IV.    Summary of Opinions

19.        In my opinion, results from USP Apparatus II (paddle) dissolution testing with a paddle rotation speed of 200 rpm can be reliably predicted from USP Apparatus I (basket) dissolution testing data with a basket rotation speed of 100 rpm with very little error, as demonstrated using certain lots of the Myrbetriq Products.

20.        In my opinion, results from certain USP I Apparatus (basket) dissolution testing at 100 rpm can reliably predict USP II Apparatus (paddle) dissolution testing with a paddle rotation speed of 50 rpm with very little error, as demonstrated using certain lots of Sawai's ANDA Product and Myrbetriq Products.

21.        In my opinion, USP apparatus I (basket) testing data at 100 rpm of lots from each of defendants Apotex, Lupin, Prinston, Sawai, and Zydus indicate that the dissolution data obtained at release from all or most of the mirabegron tablets tested by the defendants as part of

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

their ANDAs would not have exceeded 39% dissolution at 1.5 hours if tested using the USP Apparatus II (paddle) at 200 rpm instead of the USP Apparatus I (basket) at 100 rpm at release.

22.     Furthermore, in my opinion, USP Apparatus I (basket) testing data at 100 rpm of lots from each of defendants Apotex, Lupin, Prinston, Sawai, and Zydus indicate that the dissolution data obtained at release from all of the mirabegron tablets tested by the defendants as part of their ANDAs would have all exceeded 75% dissolution at 7 hours if tested using the USP Apparatus II (paddle) at 200 rpm instead of the USP Apparatus I (basket) at 100 rpm at release.

## V.     Background

### A.     Dissolution Test Methods

23.     USP Apparatus I (basket) and USP Apparatus II (paddle) are two different types of dissolution apparatus that are used for measuring dissolution rates in tablet products.[3]

### B.     Statistical Principles

24.     In this section, I provide a general overview of the statistical concepts and methods that I employ in the analysis on which my opinions are based.

25.     The specific concepts include statistical estimation, confidence intervals, linear regression, mixed-effects regression analysis, predictive modeling, and predictive accuracy. I illustrate these concepts with specific examples related to dissolution of tablets such as the mirabegron tablets discussed in the '780 Patent. For clarity in this, I have emphasized the basic concepts in the main text and have placed technical details in footnotes.

---

[3] USP Stage 6 Monograph (25 Feb 2011), Chapter 711 ("Dissolution") https://www.usp.org/sites/default/files/usp/document/harmonization/gen-method/stage_6_monograph_25_feb_2011.pdf, accessed 23 August 2022.

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

### 1. Statistical Estimation

26. Quantities such as average percent dissolution of a drug after 1.5 hours using a USP Apparatus II (paddle) apparatus, or the slope of a line relating percent dissolution to time under test, must be estimated based on observed data. Because no two tablets are identical in every respect, the results will typically vary from one tablet to the next. Consequently, one uses the *sample mean,* that is, the average value, of observations from multiple tablets. The USP standards specify that the dissolution results from 6, 12, or 24 samples of an extended-release dosage form be averaged, where the number of samples ("sample size") depends on how much variability the samples exhibit, as reproduced below:

**Acceptance Table 2**

| Level | Number Tested | Criteria |
|-------|---------------|----------|
| $L_1$ | 6 | No individual value lies outside each of the stated ranges, and no individual value is less than the stated amount at the final test time. |
| $L_2$ | 6 | The average value of the 12 units ($L_1 + L_2$) lies within each of the stated ranges and is NLT the stated amount at the final test time; none is >10% of labeled content outside each of the stated ranges; and none is >10% of the labeled content below the stated amount at the final test time. |
| $L_3$ | 12 | The average value of the 24 units ($L_1 + L_2 + L_3$) lies within each of the stated ranges and is NLT the stated amount at the final test time; NMT 2 of the 24 units are more than 10% of labeled content outside each of the stated ranges; NMT 2 of the 24 units are >10% of labeled content below the stated amount at the final test time; and none of the units are >20% of labeled content outside each of the stated ranges or >20% of labeled content below the stated amount at the final test time. |

[4]

27. A standard measure of variability from one tablet to another in the sample is the *standard deviation,* which is a measure of how far individual measurements can either above or below the mean value. Typically, about 95% of all tablet values will fall within two standard deviations of the mean.

---

[4] USP Stage 6 Monograph (25 Feb 2011), Chapter 711 ("Dissolution") https://www.usp.org/sites/default/files/usp/document/harmonization/gen-method/stage_6_monograph_25_feb_2011.pdf, accessed 23 August 2022.

11

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

28.     While the standard deviation measures the extent to which tablets vary, a related quantity, the *standard error,* measures the degree of precision with which the mean has been estimated. The greater the sample size, the smaller the standard error of the sample mean will be. Similarly, the smaller the tablet-to-tablet variability (*i.e.,* the standard deviation), the smaller the standard error of the mean will be.

### 2.     Confidence Intervals

29.     It is often useful to have an indication of the range of values for a quantity (such as the value on a dissolution curve at a particular time point) that are consistent with the data that have been used to estimate that quantity of interest. When the quantity of interest is estimated from a sample mean, the most commonly used method is the *95% confidence interval,* which is simply the mean value $\pm$ 2 times the standard error of the mean[5].

30.     For instance, the mean dissolution percentage obtained from the six Myrbetriq® samples from lot G1500164 of batch K1400128 tested using the USP Apparatus I (basket) apparatus with rotation speed of 100 rpm at t=3 hours was 29.3%, with a standard error of 0.56%. The 95% confidence interval was 27.9–30.8%. Similarly, the samples from the same lot tested using the USP Apparatus II (paddle) apparatus with rotation speed of 200 rpm at t=1.5 hours was 26.8%, with a standard error of 0.31%, and a 95% confidence interval of 26.0–27.6%.

---

[5] While conventionally the 95% confidence interval is reported, it is possible to construct wider confidence intervals (which correspond to greater confidence that they contain the true quantity of interest) or narrower confidence intervals (which contain the quantity of interest less often). For example, the 90% interval is the mean $\pm$ 1.645 x standard error, and the 99% confidence interval is the mean $\pm$ 2.576 x standard error.

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

6

31.     Thus, the dissolution percentage after 3 hours with this apparatus can be estimated to within ± 1 percentage point with a sample of size 6. Moreover, one can say that, based on the observed data, the dissolution percentage using the USP Apparatus I (basket) apparatus with rotation speed of 100 rpm at t=3 hours is likely to be between 28 and 31 percent, with the most likely value near 29%.

### 3.     Linear Regression

32.     The Myrbetriq® dissolution data (as well as the dissolution data from mirabegron tablets obtained by defendants) display a roughly constant rate of dissolution from the start of the dissolution tests until the time at which nearly all of the mirabegron has been dissolved. That is to say that the dissolution curves closely follow straight lines when dissolution is plotted against time.

33.     For the data from one of the testing apparatuses in a single data set, one can use a method called *linear regression* to estimate the line that best fits these observed data points[7].

---

[6] Appendix J, Section J.1; ASTMIRA_02228953-54 (Analytical Testing Report for Myrbetriq® Lot No. G1500164) at ASTMIRA_02228953; ASTMIRA_02228850-53 (Certificate of compliance and certificates of analysis for Myrbetriq® Batch No. K1400128).

[7] A straight-line relationship is described by the equation y= a + bt, where y is the amount dissolved at t hours of testing. The quantity a is called the *intercept* or *constant,* and the quantity b is called the *slope* of the line. In linear regression, the estimates for the slope and intercept are the values for a and b that minimize the (squared) distance of the observed data at each time point to the corresponding position on the line at each time point. For this reason, linear regression is often described as *least-squares regression. See*, for instance, Weisberg, S. *Applied Linear Regression.* Third edition. Chapter 2 ("Simple Linear Regression"). New York: Wiley (2005).

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

When linear regression is applied to the dissolution percentages observed at a set of time points, the slope of the resulting line is an estimate for the average dissolution rate over the time period observed.

34.     Since we know that 0% of the test tablets have dissolved at 0 hours of testing, it is possible to find the straight line that best fits the data while also having 0% dissolution at time zero. This method is called *linear regression with a zero intercept.*

35.     The average dissolution data from the USP Apparatus I (basket) data at 100 rpm for Myrbetriq® Batch K1400128, Lot G1500164, together with the corresponding linear regression line, is shown in the left-hand panel of **Figure 1** below, while the zero-intercept regression is shown in the right-hand panel. The differences are barely distinguishable.



**Figure 1.** Examples of linear regression with and without an intercept for dissolution data from testing on one lot of Myrbetriq® 25 mg tablets.

36.     In the small data set above, both linear regressions fit well which is to say that they approximate the actual dissolution curve closely over the time range from 0 to 8.5 hours. The estimated slope is about 11.7 percentage points dissolution per hour for the regression model

14

CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER

with an intercept, and about 11.3 percentage points dissolution per hour for the model with a zero intercept. *See* Appendix J, Section J.2.1.

37.     The results for samples from the same lot tested using the USP Apparatus II (paddle) were similar, except that the regression lines for USP Apparatus II (paddle) were steeper, with slopes of 22.1 and 21.5 percentage points dissolution per hour for the models with and without an intercept, respectively. *See* Appendix J, Section J.2.2.

### 4.     Mixed-Effects Regression Analysis

38.     In developing the predictive model on which my opinions are based, I combined information about the average dissolution rates for the different apparatuses from multiple data sets. Doing so made it possible to get much more accurate estimates of the average dissolution rates (due to the increased sample size) and also to determine the extent to which the rates of dissolution might vary from one batch or lot to another.

39.     To get an estimate of the average dissolution rate, allowing for the possibility that the dissolution rate might vary somewhat from one lot to the next, I used a generalization of linear regression, called *mixed effects regression analysis.* This method obtains both an average dissolution rate over the multiple data sets and a measure of the extent to which the individual slopes vary about this average[8].

40.     For example, mixed-effects regression analysis of 7 USP Apparatus I (basket)

---

[8] In effect, the mixed-effects model estimates the slope for each data set and reports an average of these slopes (the *fixed effects*) as well as the standard deviation of these slopes (the *random effect*).

CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER

data sets[9] for 25 mg tablets produced average estimated slopes of about 11.6 and 11.2 percentage points dissolution per hour for models with and without an intercept, respectively. The analysis indicates that slopes for individual lots will typically fall within ±0.6 percentage points per hour for both models. *See* **Appendix J**, Section J.3.1.

41.     Similarly, mixed-effects regression analysis of the USP Apparatus 2 (paddle) data sets for 25 mg tablets from the same 7 lots produced average estimated slopes of about 21.6 and 20.9 percentage points dissolution per hour for models with and without an intercept, respectively. *See* **Appendix J**, Section J.3.2.

### 5.     Predictive Modeling

42.     A *predictive model* is a mathematical approximation to the relationship between a set of *input measurements* (e.g., dissolution data obtained using the USP Apparatus I (basket) method under specified conditions) and another set of measurements (e.g., dissolution data obtained using the USP Apparatus II (paddle) method under a possibly different set of conditions), which we call the *outcome measurements*.  This approximation can then be used to obtain predicted outcomes that correspond to any particular set of inputs.

43.     Building a predictive model requires data on both the input measurements and the corresponding outcome measurements. The model building process starts by considering a possible form for the relationship between inputs and outcomes (a proposed model). For example, one might propose that dissolution occurs at a constant rate, which means that the

---

[9] The seven data sets referred to here were the seven USP I (basket) 25 mg data sets used in the training set that was used in developing the predictive model. The data sets used in the training set for predictive modeling are identified in Table 2 in the Statistical Modeling section, below.

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

dissolution curve relating time (input) to dissolution percentage (output) is a straight line. The next step is to use the observed data sets—times and dissolution percentage—to estimate which particular straight line (the fitted model) most closely reproduces the observed outcomes. The fitted model is then examined to determine whether it adequately captures differences in the outcome measurements. If not, an alternative mathematical form for the relationship is proposed (an alternative model), fitted to the data, and then examined for adequacy.

44.     The specific final fitted model is then used to predict values for outcome measurements when data are only available for the inputs. This is called the *predictive model.*

45.     In developing the predictive model it is possible that the fitting process, which by definition provides the best fit to the specific data set used to estimate it, the same fitted model will generally not do as well when used to predict outcomes in another data set. To know the extent to which this occurs, it is best practice to split the collection of available data on both inputs and outcomes into two data sets which are held separately during the model-building process. The first of these data sets is termed the *training set;* the second data set is termed the *validation set.*

46.     Only data from the training set are used in proposing, fitting, and comparing alternative predictive models. Once a final predictive model is settled on, one then assesses the performance of the model when it is applied to the validation set. Because the outcome measurements are known in the validation set, we can determine the extent to which the predicted outcomes calculated from the inputs using the final predictive model match the actual outcomes seen in the data.

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

### 6.      Predictive Accuracy

47.      A useful model will give predicted values that are close to the actual observed outcome measurements over a relevant range of conditions.

48.      For example, in the analysis below I develop a predictive model for mirabegron dissolution percentages obtained by the USP Apparatus II (paddle) apparatus at 200 rpm. In the matter at hand, in view of Claim 1 of the '780 Patent, a relevant range of conditions would be for times near 1.5 hours.

49.      A commonly used measure of "closeness" of predicted values to observed values obtained from a predictive model is the root-mean-square-error ("RMSE") of prediction[10]. When RMSE is zero, it means that observed and predicted values are identical, *i.e.,* the predictions are perfect. The larger the RMSE is, the less well the model predicted values approximate the observed values.

50.      RMSE can be thought of as an average amount by which the predictions deviate from the actual observations, but with greater weight being given to larger deviations than

---

[10] See, for example, Y. Wang, J. Moss, and R. Thisted, "Predictors of body surface area," *Journal of Clinical Anesthesia,* **4:1**, 4–10 (1992), in which "[u]sing 395 actual [body surface area] measurements in the literature, 15 prediction formulas were assessed for accuracy using the root mean squared error (RMSE) method of prediction."

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

smaller ones[11]. Assessing predictive accuracy using RMSE is widely used for predictive models related to pharmaceutical dissolution curves[12].

51. For example, for the predictive model for USP Apparatus II (paddle) outcomes based on USP Apparatus I (basket) inputs derived from the training set of 25-mg Myrbetriq® lots, the RMSE in the validation set of lots was 1.43 percentage points at 1.5 hours. *See* Appendix C, Section C.8.1.

---

[11] The formula for RMSE is $\sqrt{\sum(\hat{y_i} - y_i)^2/n}$, where $\hat{y_i}$ and $y_i$ are the $i$-th predicted and observed values, respectively.

[12] *See, e.g.*, Navas-Bachiller, Persoons, and D'Arcy, "Exploring bulk volume, particle size and particle motion definitions to increase the predictive ability of in vitro dissolution simulations," *European Journal of Pharmaceutical Sciences,* **174**, 106185 (2022) ["experimental dissolution profiles were compared to the simulated MPS and PSD profiles for each time point by calculating the percentage predicted error (PE%) and the root mean square error (RMSE) to illustrate predictability over the whole profile." at 5]; Galata, *et al.,* "Fast, Spectroscopy-Based Prediction of In Vitro Dissolution Profile of Extended Release Tablets Using Artificial Neural Networks," *Pharmaceutics,* **11**, 400 (2019) ["The predicted and measured dissolution profile of the test tablets were compared by calculating the RMSEP [RMSE of prediction] values, and the models were characterized by the sum of these RMSEP values." at 5]; Gendre, *et al.,* "Real-time predictions of drug release and end point detection of a coating operation by in-line near infrared measurements," *International Journal of Pharmaceutics,* **421**, 237–243 (2011) ("The most appropriate PLS models were selected from their predictive abilities based on the root mean square error of prediction (RMSEP), given by Naes et al. (2002):

$$RMSEP = \sqrt{\frac{\sum_{i=1}^{N_p}(\hat{y_i} - y_i)^2}{N_p}} \qquad (1)$$

where $\hat{y_i}$ and $y_i$ correspond to predicted and measured percentages of released drug, respectively. $N_p$ is the number of samples included to [*sic*] the validation set." at 239).

19

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

### C.     FDA Draft Guidance On Mirabegron

52.     The FDA's Dissolution Database[13] provides the following dissolution methods

for mirabegron extended-release tablets, as reproduced in the Table below:

| USP Apparatus | Speed (RPMs) | Medium | Volume (mL) | Recommended Sampling Times (minutes) |
|---|---|---|---|---|
| I (Basket) | 100 | Phosphate Buffer, pH 6.8 | 900 | 1, 3, 5, 7, 8.5, 10 and 12 hours |

**Table 1**: Dissolution Conditions for Mirabegron Extended-Release Tablets Reproduced From The FDA's Dissolution Database

53.     The FDA's Draft Guidance on Mirabegron ("Mirabegron Guidance") additionally

states that "dissolution profiles on 12 dosage units each of test and reference products generated

using USP Apparatus I at 100 rpm and/or Apparatus II at 50 rpm in at least three dissolution

media (pH 1.2, 4.5 and 6.8 buffer) should be submitted in the application."  The Mirabegron

Guidance further provides that "[a]gitation speeds may have to be increased if appropriate," and

further recommends the inclusion of "early sampling times of 1, 2, and 4 hours and [to] continue

every 2 hours until at least 80% of the drug is released, to provide assurance against premature

release of drug (dose dumping) from the formulation."[14]

54.     Based on my review of the Astellas documents and Defendants' ANDA

---

[13] FDA's Dissolution Methods Database, available at https://www.accessdata.fda.gov/scripts/cder/dissolution/dsp_getallData.cfm.

[14] Mirabegron Guidance, available at https://www.accessdata.fda.gov/drugsatfda_docs/psg/Mirabegron_ER_tab_202611_RC06-13.pdf.

CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER

documents,[15] I note that most Defendants used the USP Apparatus I (basket) using 900 mL of

phosphate buffer at pH 6.8 at rotation speed of 100 rpm. Sawai used both USP Apparatus I

(basket) at 100 rpm and USP Apparatus II (paddle) at 50 rpm using 900 mL of phosphate buffer

at pH 6.8.[16]

## VI. The Asserted Patent

55. The '780 Patent is titled "Pharmaceutical Composition For Modified Release." I

understand that the claims of the '780 Patent generally cover pharmaceutical composition

comprising mirabegron, tablet, and method for treating overactive bladder, and require, *inter*

*alia,* a dissolution rate element, which is emphasized below in paragraphs 56-57.

56. Claim 1 of the '780 Patent states:

A pharmaceutical composition, comprising 10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4′-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, or a pharmaceutically acceptable salt thereof, in a sustained release hydrogel-forming formulation comprising a hydrogel-forming polymer having an average molecular weight of 100,000 to 8,000,000 and an additive having a water solubility of at least 0.1 g/mL at 20±5° C.,

wherein the hydrogel-forming polymer is at least one compound selected from the group consisting of polyethylene oxide, hydroxypropyl methylcellulose, hydroxypropyl cellulose, carboxymethyl cellulose sodium, hydroxyethyl cellulose, and a carboxyvinyl polymer,

wherein the additive is at least one selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, D-sorbitol, xylitol, lactose, sucrose, anhydrous maltose, D-fructose, dextran, glucose, polyoxyethylene hydrogenated castor oil, polyoxyethylene polyoxypropylene glycol, polyoxyethylene sorbitan higher fatty acid ester, sodium chloride,

---

[15] *See* **Appendix B**.

[16] Additionally, while all Defendants have also submitted dissolution data at pH 1.2 and pH 4.5, I have also not considered those data in rendering my opinions.

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

magnesium chloride, citric acid, tartaric acid, glycine, (3-alanine, lysine hydrochloride, and meglumine, and

wherein *a drug dissolution rate from the pharmaceutical composition is 39% or less after 1.5 hours, and at least 75% after 7 hours, as measured in accordance with United States Pharmacopoeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm*.

'780 Patent at 20:19-47 (emphasis added).

57.     Claim 22 of the '780 Patent states:

A pharmaceutical composition, comprising 10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic    acid anilide, or a pharmaceutically acceptable salt thereof, in a sustained release hydrogel-forming formulation comprising a means for forming a hydrogel and a means for ensuring penetration of water into the pharmaceutical composition,

*wherein a drug dissolution rate from the pharmaceutical composition is 39% or less after 1.5 hours, and at least 75% after 7 hours, as measured in accordance with United States Pharmacopoeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm*.

'780 Patent at 22:13-25 (emphasis added).


**VII.    Statistical Modeling**

**A.    What I was asked to do**

58.     I was asked to determine the extent to which dissolution data for a particular lot of Myrbetriq® tablets obtained using the USP Apparatus I (basket) measure with a rotation speed of 100 rpm ("USP I (basket)") could be used to reliably predict the dissolution data for that same lot when the USP Apparatus II (paddle) measured with a rotation speed of 200 rpm ("USP II

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

(paddle)").[17]

59.     I was asked to develop a predictive model for USP II (paddle) data based on USP I (basket) data.

60.     I was also asked to determine: a) the extent to which individual USP II (paddle) dissolution at 1.5 hours exceed 39%, b) the extent to which predicted USP II (paddle) dissolutions at 1.5 hours obtained from the predictive model based on USP I (basket) exceed 39% (based on those lots for which both USP Apparatus I (basket) and USP II (paddle) methods were carried out), c) the extent to which predicted USP II (paddle) dissolution at 1.5 hours exceed 39% in the Astellas data obtained from lots in which only USP I (basket) testing was carried out, and d) the extent to which predicted USP II (paddle) dissolution at 1.5 hours exceed 39% in the data sets obtained from Defendants for which USP I (basket) testing was carried out.

61.     I was also asked to determine a) the extent to which individual USP II (paddle) dissolution at 7 hours were less than 75%, b) the extent to which predicted USP II (paddle) dissolutions at 7 hours obtained from the predictive model based on USP I (basket) were less than 75%, (based on those lots for which both USP I (basket) and USP II (paddle) methods were carried out), c) the extent to which predicted USP II (paddle)  dissolution at 7 hours were less than 75%, in the Astellas data obtained from lots in which only USP I (basket) testing was carried out, and d) the extent to which predicted USP II (paddle)  dissolution at 7 hours were less

---

[17] In this report, I the terms "USP I (basket)" to refer to USP Apparatus I (basket) with 900 mL of USP buffer at a pH of 6.8 and a rotation speed of 100 rpm.  And, I also used the term "USP II (paddle)" to refer to USP Apparatus II (paddle) with 900 mL of USP buffer at a pH of 6.8 and a rotation speed of 200 rpm, unless otherwise noted.

# EXHIBIT 8b

Defendants' Motion in Limine to Preclude the Modeling Testimony of Plaintiffs' Expert Prof. Ronald A. Thisted, Ph.D.

Exhibit 2

| | |
|---|---|
| **From:** | Roberts, Simon <simonroberts@mwe.com> |
| **Sent:** | Wednesday, October 19, 2022 2:40 PM |
| **To:** | Masar, Martin S. |
| **Cc:** | Astellas_MyrbetriqMWETeam; pkraman@ycst.com; Smitha Uthaman; Dominick Gattuso; USR-Mirabegron; anelson; Deanne Mazzochi; Dominick Gattuso; Greg Goldblatt; Kevin Burke; Rachel Waldron; William A. Rakoczy; Brent Batzer; Richard Weinblatt; Shashank Upadhye; Stamatios Stamoulis; Yixin Tang; Andrea.Cheek@knobbe.com; Carol Pitzel; John C. Phillips (jcp@pgmhlaw.com); Megan C. Haney; William Zimmerman (2wrz@knobbe.com); Mukerjee, Deepro R.; Schurr, Jillian M.; Janusz, Joe; seaman@abramsbayliss.com; Soderstrom, Lance A.; Brooke McLain; Cortlan Hitch; Dennies Varughese; Kenneth Dorsney; Sasha Rao; Anand, Nitya; Carolyn Blessing; David Abramowitz; Emily Savas; Leah Brackensick; mgaertner@lockelord.com |
| **Subject:** | RE: Astellas v. Sandoz (20-cv-1589) | Astellas Opening Expert Reports |

*EXTERNAL EMAIL – EXERCISE CAUTION*

Dear Marty,

Debating the propriety of your original email via further email correspondence is not helpful.  I suggest we let the court decide what opinions, and whether they have sufficient basis, the experts are entitled to express at the appropriate time after expert discovery is complete.

Best regards,
Simon

SIMON D. ROBERTS
Partner
**McDermott Will & Emery LLP**  One Vanderbilt Avenue, New York, NY 10017-3852
**Tel** +1 212 547 5868    **Email** sdroberts@mwe.com
Website | vCard | Twitter | LinkedIn

---

**From:** Masar, Martin S. <martin.masar@katten.com>
**Sent:** Wednesday, October 19, 2022 3:15 PM
**To:** Roberts, Simon <simonroberts@mwe.com>
**Cc:** Astellas_MyrbetriqMWETeam <Astellas_MyrbetriqMWETeam@mwe.com>; pkraman@ycst.com; Smitha Uthaman <smitha.uthaman@lockelord.com>; Dominick Gattuso <dgattuso@hegh.law>; USR-Mirabegron <USR-Mirabegron@katten.com>; anelson <anelson@hegh.law>; Deanne Mazzochi <dmazzochi@rmmslegal.com>; Dominick Gattuso <dgattuso@hegh.law>; Greg Goldblatt <ggoldblatt@rmmslegal.com>; Kevin Burke <kburke@rmmslegal.com>; Rachel Waldron <rpernicwaldron@rmmslegal.com>; William A. Rakoczy <wrakoczy@rmmslegal.com>; Brent Batzer <brent@ipfdalaw.com>; Richard Weinblatt <weinblatt@swdelaw.com>; Shashank Upadhye <shashank@ipfdalaw.com>; Stamatios Stamoulis <stamoulis@swdelaw.com>; Yixin Tang <yixin@ipfdalaw.com>; Andrea.Cheek@knobbe.com; Carol Pitzel <carol.pitzel.cruz@knobbe.com>; John C. Phillips (jcp@pgmhlaw.com) <jcp@pgmhlaw.com>; Megan C. Haney <mch@pgmhlaw.com>; William Zimmerman (2wrz@knobbe.com) <2wrz@knobbe.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Schurr, Jillian M. <jillian.schurr@katten.com>; Janusz, Joe <joe.janusz@katten.com>; seaman@abramsbayliss.com; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Brooke McLain <bmclain@sternekessler.com>; Cortlan Hitch <chitch@morrisjames.com>; Dennies Varughese <dvarughese@sternekessler.com>; Kenneth Dorsney <kdorsney@morrisjames.com>; Sasha Rao <srao@sternekessler.com>; Anand, Nitya <Nanand@mwe.com>; Carolyn Blessing <cblessing@lockelord.com>; David Abramowitz <dabramowitz@lockelord.com>; Emily Savas <esavas@lockelord.com>; Leah Brackensick

<lbrackensick@lockelord.com>; mgaertner@lockelord.com
**Subject:** RE: Astellas v. Sandoz (20-cv-1589) | Astellas Opening Expert Reports

<mark>[ External Email ]</mark>
Dear Simon,

We (all Defendants) are a bit at a loss as to your email below.  We were not seeking expert testimony via email, but rather for the disclosure of the bases/factual support for the opinions in Paragraphs 20 and 62 expressly required by the FRCP or withdrawal of such unsupported opinions.

Paragraph 20 provides:

> 20.  In my opinion, results from certain USP I Apparatus (basket) dissolution testing at 100 rpm can reliably predict USP II Apparatus (paddle) dissolution testing with a paddle rotation speed of 50 rpm with very little error, as demonstrated using certain lots of Sawai's ANDA Product and Myrbetriq Products.

There is no citation in this paragraph.  There is no disclosure of the model or the results and no identification of the "certain lots of Sawai's ANDA Product and Myrbetriq Products."

Paragraph 62 provides:

> 62.  I was asked to develop a predictive model for USP Apparatus II (paddle) dissolution testing with a paddle rotation speed of 50 rpm using certain USP Apparatus I (basket) dissolution testing at 100 rpm from Sawai's ANDA, as additional evidence to show that my prediction model works as expected.

Again, there is no citation in this paragraph.  There is no disclosure of the specific "predictive model," any results, or which are the "certain" dissolution testing used.

Thus, it is Defendants' view that Astellas has failed to comply with Rule 26(a)(2)(B)(i)-(iii).  Given that your email below failed to identify the required disclosures under the FRCP for these opinions, Defendants consider the opinions in Pars. 20 and 62 to be improper for Dr. Thisted to testify about at trial and we plan on moving to strike any attempt by Astellas to rely on such opinions in this case.

Best,
Marty

**Martin S. Masar III, Ph.D.**
Counsel

**Katten**
Katten Muchin Rosenman LLP
525 W. Monroe Street | Chicago, IL 60661-3693
direct +1.312.902.5616
martin.masar@katten.com | katten.com

**From:** Roberts, Simon <simonroberts@mwe.com>
**Sent:** Monday, October 17, 2022 5:26 PM
**To:** Masar, Martin S. <martin.masar@katten.com>; Anand, Nitya <Nanand@mwe.com>; Carolyn Blessing

<cblessing@lockelord.com>; David Abramowitz <dabramowitz@lockelord.com>; Emily Savas <esavas@lockelord.com>; Leah Brackensick <lbrackensick@lockelord.com>; mgaertner@lockelord.com; pkraman@ycst.com; Smitha Uthaman <smitha.uthaman@lockelord.com>; Sodikoff, Brian <brian.sodikoff@katten.com>; Dominick Gattuso <dgattuso@hegh.law>; USR-Mirabegron <USR-Mirabegron@katten.com>; Holub, Matthew M. <matthew.holub@katten.com>; anelson <anelson@hegh.law>; Deanne Mazzochi <dmazzochi@rmmslegal.com>; Dominick Gattuso <dgattuso@hegh.law>; Greg Goldblatt <ggoldblatt@rmmslegal.com>; Kevin Burke <kburke@rmmslegal.com>; Rachel Waldron <rpernicwaldron@rmmslegal.com>; William A. Rakoczy <wrakoczy@rmmslegal.com>; Brent Batzer <brent@ipfdalaw.com>; Richard Weinblatt <weinblatt@swdelaw.com>; Shashank Upadhye <shashank@ipfdalaw.com>; Stamatios Stamoulis <stamoulis@swdelaw.com>; Yixin Tang <yixin@ipfdalaw.com>; Andrea.Cheek@knobbe.com; Carol Pitzel <carol.pitzel.cruz@knobbe.com>; John C. Phillips (jcp@pgmhlaw.com) <jcp@pgmhlaw.com>; Megan C. Haney <mch@pgmhlaw.com>; William Zimmerman (2wrz@knobbe.com) <2wrz@knobbe.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Schurr, Jillian M. <jillian.schurr@katten.com>; Janusz, Joe <joe.janusz@katten.com>; seaman@abramsbayliss.com; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Brooke McLain <bmclain@sternekessler.com>; Cortlan Hitch <chitch@morrisjames.com>; Dennies Varughese <dvarughese@sternekessler.com>; Kenneth Dorsney <kdorsney@morrisjames.com>; Sasha Rao <srao@sternekessler.com>

**Cc:** Astellas_MyrbetriqMWETeam <Astellas_MyrbetriqMWETeam@mwe.com>
**Subject:** RE: Astellas v. Sandoz (20-cv-1589) | Astellas Opening Expert Reports

*EXTERNAL EMAIL – EXERCISE CAUTION*

Counsel,

Email is not an appropriate vehicle for seeking Astellas's experts' opinions.  To the extent Sawai's counsel believes it needs clarification, such questions may be put to the experts during their depositions after all reports have been served.  That assumes, of course, your client(s) choose to participate.

Best regards,
Simon

SIMON D. ROBERTS
Partner

McDermott Will & Emery LLP  One Vanderbilt Avenue, New York, NY 10017-3852
Tel +1 212 547 5868   Email sdroberts@mwe.com
Website | vCard | Twitter | LinkedIn

---

**From:** Masar, Martin S. <martin.masar@katten.com>
**Sent:** Friday, October 14, 2022 8:39 AM
**To:** Anand, Nitya <Nanand@mwe.com>; Carolyn Blessing <cblessing@lockelord.com>; David Abramowitz <dabramowitz@lockelord.com>; Emily Savas <esavas@lockelord.com>; Leah Brackensick <lbrackensick@lockelord.com>; mgaertner@lockelord.com; pkraman@ycst.com; Smitha Uthaman <smitha.uthaman@lockelord.com>; Sodikoff, Brian <brian.sodikoff@katten.com>; Dominick Gattuso <dgattuso@hegh.law>; USR-Mirabegron <USR-Mirabegron@katten.com>; Holub, Matthew M. <matthew.holub@katten.com>; anelson <anelson@hegh.law>; Deanne Mazzochi <dmazzochi@rmmslegal.com>; Dominick Gattuso <dgattuso@hegh.law>; Greg Goldblatt <ggoldblatt@rmmslegal.com>; Kevin Burke <kburke@rmmslegal.com>; Rachel Waldron <rpernicwaldron@rmmslegal.com>; William A. Rakoczy <wrakoczy@rmmslegal.com>; Brent Batzer <brent@ipfdalaw.com>; Richard Weinblatt <weinblatt@swdelaw.com>; Shashank Upadhye <shashank@ipfdalaw.com>; Stamatios Stamoulis <stamoulis@swdelaw.com>; Yixin Tang <yixin@ipfdalaw.com>; Andrea.Cheek@knobbe.com; Carol Pitzel <carol.pitzel.cruz@knobbe.com>; John C. Phillips (jcp@pgmhlaw.com) <jcp@pgmhlaw.com>; Megan C. Haney <mch@pgmhlaw.com>; William Zimmerman (2wrz@knobbe.com) <2wrz@knobbe.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Schurr, Jillian M. <jillian.schurr@katten.com>; Janusz, Joe <joe.janusz@katten.com>; seaman@abramsbayliss.com; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Brooke McLain <bmclain@sternekessler.com>; Cortlan Hitch

<chitch@morrisjames.com>; Dennies Varughese <dvarughese@sternekessler.com>; Kenneth Dorsney <kdorsney@morrisjames.com>; Sasha Rao <srao@sternekessler.com>
**Cc:** Astellas_MyrbetriqMWETeam <Astellas_MyrbetriqMWETeam@mwe.com>
**Subject:** RE: Astellas v. Sandoz (20-cv-1589) | Astellas Opening Expert Reports

[ External Email ]
Counsel-

Please let us know when we can expect a response from Astellas regarding my email below.

Best,
Marty

**Martin S. Masar III, Ph.D.**
Counsel

# Katten

Katten Muchin Rosenman LLP
525 W. Monroe Street | Chicago, IL 60661-3693
direct +1.312.902.5616
martin.masar@katten.com | katten.com

---

**From:** Masar, Martin S. <martin.masar@katten.com>
**Sent:** Tuesday, October 11, 2022 7:04 PM
**To:** Anand, Nitya <Nanand@mwe.com>; Carolyn Blessing <cblessing@lockelord.com>; David Abramowitz <dabramowitz@lockelord.com>; Emily Savas <esavas@lockelord.com>; Leah Brackensick <lbrackensick@lockelord.com>; mgaertner@lockelord.com; pkraman@ycst.com; Smitha Uthaman <smitha.uthaman@lockelord.com>; Sodikoff, Brian <brian.sodikoff@katten.com>; Dominick Gattuso <dgattuso@hegh.law>; USR-Mirabegron <USR-Mirabegron@katten.com>; Holub, Matthew M. <matthew.holub@katten.com>; anelson <anelson@hegh.law>; Deanne Mazzochi <dmazzochi@rmmslegal.com>; Dominick Gattuso <dgattuso@hegh.law>; Greg Goldblatt <ggoldblatt@rmmslegal.com>; Kevin Burke <kburke@rmmslegal.com>; Rachel Waldron <rpernicwaldron@rmmslegal.com>; William A. Rakoczy <wrakoczy@rmmslegal.com>; Brent Batzer <brent@ipfdalaw.com>; Richard Weinblatt <weinblatt@swdelaw.com>; Shashank Upadhye <shashank@ipfdalaw.com>; Stamatios Stamoulis <stamoulis@swdelaw.com>; Yixin Tang <yixin@ipfdalaw.com>; Andrea.Cheek@knobbe.com; Carol Pitzel <carol.pitzel.cruz@knobbe.com>; John C. Phillips (jcp@pgmhlaw.com) <jcp@pgmhlaw.com>; Megan C. Haney <mch@pgmhlaw.com>; William Zimmerman (2wrz@knobbe.com) <2wrz@knobbe.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Schurr, Jillian M. <jillian.schurr@katten.com>; Janusz, Joe <joe.janusz@katten.com>; seaman@abramsbayliss.com; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Brooke McLain <bmclain@sternekessler.com>; Cortlan Hitch <chitch@morrisjames.com>; Dennies Varughese <dvarughese@sternekessler.com>; Kenneth Dorsney <kdorsney@morrisjames.com>; Sasha Rao <srao@sternekessler.com>
**Cc:** Astellas_MyrbetriqMWETeam <Astellas_MyrbetriqMWETeam@mwe.com>
**Subject:** RE: Astellas v. Sandoz (20-cv-1589) | Astellas Opening Expert Reports

Counsel-

In Paragraphs 20 and 62 of his Opening Report, Dr. Thisted mentions modeling USP Apparatus II (paddle) dissolution testing at 50 rpm from USP I (basket) results at 100 rpm.  However, Dr. Thisted's report (including all appendices) does not provide any details about this modeling and we could not identify any of the underlying models or data in your production.  Thus, it is our understanding that Astellas and Dr. Thisted do not intend to rely on any such modeling of USP II at 50 rpm data from USP I at 100 rpm data.  Please confirm that is the case as soon as possible.

Best,
Marty

**Martin S. Masar III, Ph.D.**
Counsel

# Katten

Katten Muchin Rosenman LLP
525 W. Monroe Street | Chicago, IL 60661-3693
direct +1.312.902.5616
martin.masar@katten.com | katten.com

---

**From:** Anand, Nitya <Nanand@mwe.com>
**Sent:** Monday, October 3, 2022 12:58 PM
**To:** Carolyn Blessing <cblessing@lockelord.com>; David Abramowitz <dabramowitz@lockelord.com>; Emily Savas <esavas@lockelord.com>; Leah Brackensick <lbrackensick@lockelord.com>; mgaertner@lockelord.com; pkraman@ycst.com; Smitha Uthaman <smitha.uthaman@lockelord.com>; Sodikoff, Brian <brian.sodikoff@katten.com>; Dominick Gattuso <dgattuso@hegh.law>; USR-Mirabegron <USR-Mirabegron@katten.com>; Holub, Matthew M. <matthew.holub@katten.com>; anelson <anelson@hegh.law>; Deanne Mazzochi <dmazzochi@rmmslegal.com>; Dominick Gattuso <dgattuso@hegh.law>; Greg Goldblatt <ggoldblatt@rmmslegal.com>; Kevin Burke <kburke@rmmslegal.com>; Rachel Waldron <rpernicwaldron@rmmslegal.com>; William A. Rakoczy <wrakoczy@rmmslegal.com>; Brent Batzer <brent@ipfdalaw.com>; Richard Weinblatt <weinblatt@swdelaw.com>; Shashank Upadhye <shashank@ipfdalaw.com>; Stamatios Stamoulis <stamoulis@swdelaw.com>; Yixin Tang <yixin@ipfdalaw.com>; Andrea.Cheek@knobbe.com; Carol Pitzel <carol.pitzel.cruz@knobbe.com>; John C. Phillips (jcp@pgmhlaw.com) <jcp@pgmhlaw.com>; Megan C. Haney <mch@pgmhlaw.com>; William Zimmerman (2wrz@knobbe.com) <2wrz@knobbe.com>; Mukerjee, Deepro R. <deepro.mukerjee@katten.com>; Schurr, Jillian M. <jillian.schurr@katten.com>; Janusz, Joe <joe.janusz@katten.com>; seaman@abramsbayliss.com; Soderstrom, Lance A. <lance.soderstrom@katten.com>; Brooke McLain <bmclain@sternekessler.com>; Cortlan Hitch <chitch@morrisjames.com>; Dennies Varughese <dvarughese@sternekessler.com>; Kenneth Dorsney <kdorsney@morrisjames.com>; Sasha Rao <srao@sternekessler.com>
**Cc:** Astellas_MyrbetriqMWETeam <Astellas_MyrbetriqMWETeam@mwe.com>
**Subject:** Astellas v. Sandoz (20-cv-1589) | Astellas Opening Expert Reports

*EXTERNAL EMAIL – EXERCISE CAUTION*
Counsel,

Pursuant to Paragraphs 15 and 20 of the Protective Order, your will be receiving a link to download the following redacted versions of Astellas Opening Expert Reports:  1) versions of Astellas's opening reports with Astellas Confidential Information redacted, and 2) versions of Astellas' opening reports with Confidential Information identified by Zydus and Aurobindo redacted.  No other Defendants have identified if and/or what portions of their Confidential Information should be redacted from Astellas' opening reports, as required by Paragraph 15 of the Protective Order.  Accordingly, should Defendants seek to share Astellas's opening report with their in-house representatives designated under the Protective Order, which we understand at least some Defendants wish to do, Defendants should coordinate amongst themselves regarding what information can be shared.

Best,

Nitya.


NITYA ANAND
Associate
**McDermott Will & Emery LLP**  One Vanderbilt Avenue, New York, NY 10017-3852
**Tel** +1 212 547 5333     **Email** nanand@mwe.com

Website | vCard | Twitter | LinkedIn

*************************************************************************************************
This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our Privacy Policy explains how we may use your personal information or data and any personal information or data provided or made available to us. Thank you.
*************************************************************************************************

Please visit http://www.mwe.com/ for more information about our Firm.
```
============================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the
exclusive
use of the individual or entity to whom it is addressed and may contain information that
is
proprietary, privileged, confidential and/or exempt from disclosure under applicable
law.  If you
are not the intended recipient, you are hereby notified that any viewing, copying,
disclosure or
distribution of this information may be subject to legal restriction or sanction.  Please
notify
the sender, by electronic mail or telephone, of any unintended recipients and delete the
original
message without making any copies.
============================================================
NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability partnership
that has
elected to be governed by the Illinois Uniform Partnership Act (1997).
============================================================
```

# EXHIBIT 8b

Defendants' Motion in Limine to Preclude
the Modeling Testimony of Plaintiffs'
Expert Prof. Ronald A. Thisted, Ph.D.

## Exhibit 3

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 1

1

2      ** C O N F I D E N T I A L **

3      IN THE UNITED STATES DISTRICT COURT

       FOR THE DISTRICT OF DELAWARE

4      C.A. No. 20-1589-JFB-CJB

       ------------------------------------x

5      ASTELLAS PHARMA INC., et al.,

6            Plaintiffs,

7

8         - against -

9

10     SANDOZ INC., et al.,

11           Defendants.

       ------------------------------------x

12                December 13, 2022

                  8:04 a.m.

13

14

15        Videotaped Deposition of RONALD

16     THISTED, Ph.D., taken by Defendants,

17     pursuant to Notice, held at the offices of

18     McDermott Will & Emery LLP, One Vanderbilt

19     Avenue, New York, New York, before Todd

20     DeSimone, a Registered Professional

21     Reporter and Notary Public of the State of

22     New York.

23

24

25

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 2

1
2  A P P E A R A N C E S :
3  McDERMOTT WILL & EMERY LLP
       One Vanderbilt Avenue
4  New York, New York 10017
       Attorneys for Plaintiffs
5  BY:   JASON LEONARD, ESQ.
         jleonard@mwe.com
6
          - and -
7
    McDERMOTT WILL & EMERY LLP
8  650 Live Oak Avenue
       Suite 300
9  Menlo Park, California 94025
       BY:   RODNEY D. SWARTZ, Ph.D., ESQ.
10        rswartz@mwe.com
11
12
    LOCKE LORD LLP
13 111 South Wacker Drive
    Chicago, Illinois 60606
14     Attorneys for Zydus Defendants
       BY:   DAVID B. ABRAMOWITZ, ESQ.
15       dabramowitz@lockelord.com
         LEAH M. BRACKENSICK, ESQ.
16       lbrackensick@lockelord.com
17
18
    KATTEN MUCHIN ROSENMAN LLP
19 525 West Monroe Street
    Chicago, Illinois 60661
20     Attorneys for Sawai Defendants
       BY:  MARTIN S. MASAR, III, ESQ. (Via Zoom)
21       martin.masar@katten.com
22
23
24
25

Page 3

1
2  A P P E A R A N C E S : (Continued)
3  KNOBBE MARTENS OLSON & BEAR LLP
       1717 Pennsylvania Avenue
4  Suite 900
       Washington, DC 20006
5      Attorneys for Lupin Defendants
       BY:   ANDREA CHEEK, ESQ. (Via Zoom)
6        andrea.cheek@knobbe.com
7
8
9  ALSO PRESENT:
10  ROBERT RUDIS, Videographer
11  JOSH HOEPPNER (Via Zoom),
       Concierge Tech
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1    THISTED - CONFIDENTIAL
2       THE VIDEOGRAPHER: Good morning.
3  We are going on the record at 8:04 a.m.
4  on December 13th, 2022.
5       Please note that the
6  microphones are sensitive and may pick
7  up whispering and private
8  conversations.  Please mute your cell
9  phones at this time.  Audio and video
10 recording will continue to take place
11 unless all parties agree to go off the
12 record.
13      This is media unit one of the
14 video-recorded deposition of Dr. Ronald
15 Thisted taken by counsel for defendant
16 in the matter of Astellas Pharma Inc.,
17 et al., versus Sandoz Inc., et al.,
18 filed in the United States District
19 Court for the District of Delaware,
20 civil action number 20-1589-JFB-CJB.
21 The location of this deposition is
22 McDermott Will & Emery, One Vanderbilt
23 Avenue, New York, New York.
24      My name is Robert Rudis.  I'm
25 with Veritext.  I am the videographer.

Page 5

1    THISTED - CONFIDENTIAL
2  The court reporter is Todd DeSimone
3  also from Veritext.  I am not related
4  to any party in this action nor am I
5  financially interested in the outcome.
6       If there are any objections to
7  proceeding please state them at the
8  time of your appearance, beginning with
9  the noticing attorney.  Thank you.
10      MR. ABRAMOWITZ:  Good morning,
11 David Abramowitz of Locke Lord LLP,
12 with me today is Leah Brackensick also
13 of Locke Lord LLP, for the Zydus
14 defendants.
15      I believe also on the Zoom is
16 Andrea Cheek of Knobbe Martens for the
17 Lupin defendants and Martin Masar of
18 Katten Muchin for the Sawai defendants.
19      MR. LEONARD:  Jason Leonard
20 from McDermott Will & Emery on behalf
21 of the plaintiffs and the witness.
22 With me here today is Rodney Swartz
23 also of McDermott.
24      THE VIDEOGRAPHER:  Would the
25 court reporter please swear in the

2 (Pages 2 - 5)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 6

1      THISTED - CONFIDENTIAL
2  witness and then counsel can proceed.
3          *   *   *
4      R O N A L D   T H I S T E D, Ph.D.,
5  called as a witness, having been first
6  duly sworn, was examined and testified
7  as follows:
8  EXAMINATION BY MR. ABRAMOWITZ:
9      Q.    Good morning, Dr. Thisted.
10     A.    Good morning.
11     Q.    I know you have done this a lot
12  of times before. I'm not going to trouble
13  you with many of the rules and
14  introductions. As is customary, could you
15  please state your name for the record.
16     A.    Ronald Thisted.
17     Q.    And could you state your
18  current position and place of employment?
19     A.    I am a professor emeritus at
20  the University of Chicago, and I do
21  consulting as well.
22     Q.    We will try and keep the rules
23  pretty simple. As usual, I'm going to try
24  and do my best not to speak over you. We
25  have a court reporter here. Please let me

Page 7

1  know if any of my questions you don't
2  understand or can't hear, I will repeat
3  them. If you don't understand a question,
4  please let me know, I will try to clarify
5  and repeat.
6      I am happy to take a break
7  whenever. I just ask that we don't take a
8  break while a question is pending. I'm
9  certain that your counsel will object to
10  questions. Of course you still have to
11  answer the question unless he specifically
12  instructs you not to answer.
13     Is there anything this morning
14  that would prevent you from providing
15  truthful testimony?
16     A.    No, there is not.
17     Q.    Could you ballpark for me how
18  many times you have been deposed before?
19     A.    I would say over the last 40
20  years, probably about 30 times.
21     Q.    And about how many of those
22  approximately 30 were pharmaceutical cases?
23     A.    Maybe 60 percent.
24     Q.    And of those 60 percent, how
25  

Page 8

1      THISTED - CONFIDENTIAL
2  many were for the patent holder?
3      A.    The bulk of them.
4      Q.    I'm going to mark for the
5  record three exhibits for you right away.
6  Thisted 1, your opening expert report in
7  this matter.
8          (Thisted Exhibit 1 marked for
9  identification.)
10     Q.    Thisted 2, your reply expert
11  report in this matter.
12         (Thisted Exhibit 2 marked for
13  identification.)
14     Q.    And Thisted 3, your
15  supplemental reply expert report in this
16  matter.
17         (Thisted Exhibit 3 marked for
18  identification.)
19     Q.    If you could start with Thisted
20  1 and take a glance and let me know if you
21  recognize this document.
22     A.    Yes. Thisted 1 is the opening
23  expert report that I submitted in this case
24  together with the appendices to that
25  report.

Page 9

1      THISTED - CONFIDENTIAL
2      Q.    And I know you had some
3  replacement and corrections. I believe we
4  have tried to place those in there for you.
5      A.    Let me just check. I believe
6  there was only one, only one in the report
7  proper, and then the replacement for the
8  supporting calculation appendix. But yes,
9  this contains the corrected -- let me just
10  check. Yes, this is the corrected.
11     Q.    If you could turn to page 61.
12  Is that your signature on page 61?
13     A.    Yes, it is.
14     Q.    And did you sign this report on
15  the 15th of September 2022?
16     A.    Yes, I did.
17     Q.    Why don't we turn to Thisted 2
18  which is the reply report. Could you let
19  me know whether you recognize this
20  document?
21     A.    Yes, this is the reply expert
22  report that I submitted in this matter
23  together with the two appendices.
24     Q.    And if we go to page 48.
25     A.    Yes.

3 (Pages 6 - 9)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 10

THISTED - CONFIDENTIAL

1
2    Q.    Is that your signature?
3    A.    Yes.
4    Q.    And you signed it on the 10th
5 of November 2022; is that right?
6    A.    Yes.
7    Q.    Looking at Exhibit 3, is this
8 the supplemental reply report that you
9 served in this matter?
10    A.    It is.
11    Q.    I know it is brief, but is that
12 your signature on page 6?
13    A.    Yes.
14    Q.    And you signed it on November
15 18th; is that right?
16    A.    That's right.
17    Q.    Now, I'm going to ask sort of a
18 general question, because you have three
19 reports here.  Could you explain for me
20 what your original assignment from counsel
21 was, without getting into the actual
22 details, but to the extent that you were
23 asked to provide an opinion, what was your
24 assignment?
25    A.    I believe that I described that

Page 11

THISTED - CONFIDENTIAL

1
2 in my opening expert report, and I
3 described that beginning on page 22 of my
4 opening expert report.
5    Q.    And in 22 you have a section,
6 What I Was Asked to Do; is that right?
7    A.    Yes, and that describes what I
8 was asked to do.
9    Q.    And were those the only
10 requests made to you by counsel with
11 respect to your original set of opinions?
12    A.    I believe that's correct.
13    Q.    I want to ask a quick question
14 on page 24 about paragraph 62.
15    A.    Yes.
16    Q.    Now, you discuss here being
17 asked about the predictive model related to
18 some USP apparatus II testing associated
19 with Sawai.  Do you see that?
20    A.    That is correct.
21    Q.    Now, you did not provide that
22 model in this opening report; is that
23 right?
24    A.    The details of the calculations
25 were not in my opening report.

Page 12

THISTED - CONFIDENTIAL

1
2    Q.    When did you actually do those
3 calculations?
4    A.    I did those calculations prior
5 to submitting my opening report.
6    Q.    And without going into reasons,
7 discussions with counsel, is there a
8 specific reason why those calculations
9 weren't in this opening report?
10    A.    I'm not sure why they weren't
11 in the opening report.  It was my intention
12 to include all of those details.
13    Q.    Now, in your reports, you deal
14 with two types of data, data from a method
15 called USP I and a method called USP II; is
16 that right?
17    A.    That is correct.
18    Q.    Did you obtain that data from
19 counsel?
20    A.    The data that I used were
21 provided to me by counsel, together with
22 the underlying documents that supported
23 those data, which I also reviewed.
24    Q.    Are you familiar with the USP I
25 dissolution test, how that works?

Page 13

THISTED - CONFIDENTIAL

1
2    A.    Yes.
3    Q.    And are you familiar with the
4 USP II dissolution test and how that works?
5    A.    Yes, I am.
6    Q.    Now, prior to working on this
7 case, had you ever done statistics
8 associated with dissolution testing?
9    A.    Yes.
10    Q.    In doing that work, did you
11 ever create predictive models associated
12 with dissolution testing?
13    A.    I don't believe that the times
14 I've had to do statistical analysis on
15 dissolution data involved predictive
16 modeling, so I think the answer to that is
17 no.
18    Q.    Previously was your work
19 associated with calculating F2 values?
20    A.    I believe I calculated F2
21 values, but it wasn't restricted to that.
22 It involved other aspects of the
23 dissolution curves.
24    Q.    And was that work in
25 association with determining

4 (Pages 10 - 13)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 14

THISTED - CONFIDENTIAL
1
2 bioavailability or bioequivalence?
3        MR. LEONARD:  Before you
4    answer, I just caution the witness not
5    to reveal information that is
6    confidential or subject to the
7    protective order.  But if you can
8    answer, please go ahead.
9    A.   I don't recall whether it was
10 involved in assessing bioequivalence or if
11 it was for some other reason.  It was in a
12 patent litigation context.
13    Q.   That was going to be my next
14 question.  So was that work only done in a
15 patent litigation context?
16    A.   It was.
17    Q.   So in your actual research
18 work, have you done any research associated
19 with dissolution testing?
20    A.   No.
21    Q.   Have you ever performed a
22 dissolution test?
23    A.   No.
24    Q.   Have you ever actually seen
25 what a dissolution apparatus looks like?

Page 15

THISTED - CONFIDENTIAL
1
2    A.   No, aside from illustrations
3 and diagrams, but I have never seen the
4 physical apparatus.
5    Q.   The data you received is sort
6 of laid out in the appendices to your
7 opening report; is that correct?
8    A.   I tried to do that, yes.
9    Q.   And I should be a little more
10 precise.  And there is some Sawai data that
11 wasn't in the original opening report that
12 you appended to your reply report; is that
13 correct?
14    A.   That's correct.  The data
15 related to the 50 RPM USP II data and the
16 surrounding calculations, the data for
17 those were supplied I believe in the
18 appendix to my reply report.
19    Q.   And I just want to make sure,
20 the only USP II data that you reviewed
21 associated with a 200 RPM speed was on
22 samples of Astellas' Myrbetriq product; is
23 that right?
24        MR. LEONARD:  I object to form.
25    Q.   Let me strike that.

Page 16

THISTED - CONFIDENTIAL
1
2    A.   Sure.
3    Q.   Let me strike that.
4        As far as data based on samples
5 that was generated before the litigation,
6 the only data at 200 RPM that you reviewed
7 for any of the parties involved was data
8 for Astellas' Myrbetriq product; is that
9 right?
10        MR. LEONARD:  I object to form.
11    A.   I believe the only 200 RPM data
12 that I used, that I assessed, was generated
13 prior to the litigation, was done on
14 Myrbetriq.
15    Q.   And the only 200 RPM data for
16 USP II that you used in generating your
17 model was associated with using Myrbetriq,
18 correct?
19        MR. LEONARD:  I object to form.
20    A.   That's right.
21    Q.   Now, if we could open Thisted
22 Exhibit 1.  I think you already have it
23 open.
24    A.   Uh-huh.
25    Q.   Looking at page 24, paragraph

Page 17

THISTED - CONFIDENTIAL
1
2 63.  This is where you begin your
3 explanation of how you built your model; is
4 that right?
5    A.   I believe that is correct.
6    Q.   And to build your model, you
7 used some dissolution data provided
8 associated with the Myrbetriq product,
9 correct?
10    A.   Yes, the model was built using
11 data on Myrbetriq.
12    Q.   No data for any other
13 mirabegron product was used in generating
14 that model, correct?
15    A.   That's right.
16    Q.   And you used two types of data,
17 you used the USP I basket data at 100 RPM
18 and the paddle, USP II paddle data, at 200
19 RPM, correct?
20    A.   Yes, in building my model I
21 used data from those two sources.
22    Q.   And we will get into more of
23 the model building in a second.  But
24 essentially when you built your model you
25 had 26 datasets available to you; is that

5 (Pages 14 - 17)

# EXHIBIT 8b

Defendants' Motion in Limine to Preclude
the Modeling Testimony of Plaintiffs'
Expert Prof. Ronald A. Thisted, Ph.D.

Exhibit 4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ASTELLAS PHARMA INC., et al., | ) ) ) |
| Plaintiffs, | ) ) C.A. No. 20-1589-JFB-CJB |
| v. | ) ) **Outside Counsel Only - Contains** |
| SANDOZ INC., et al., | ) ) **Confidential Information of Astellas, Apotex, Aurobindo, Lupin, Prinston,** |
| Defendants. | ) ) **Sawai, and Zydus** |
| | ) |

## REPLY EXPERT REPORT OF PROF. RONALD A. THISTED, PH.D. CONCERNING INFRINGEMENT OF U.S. PATENT NO. 10,842,780

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

## Contents

I.   Introduction .................................................................................................... 1

II.  Background, Qualifications, and Compensation ............................................ 2

III. Summary of Opinions ................................................................................... 2

IV.  Additional Background .................................................................................. 3

V.   Issues related to predictive modeling ........................................................... 9

    A.   Defendants' Experts err in asserting that I assume that dissolution curves are linear. ........................................................................................ 9

    B.   Using sigmoidal dissolution curves for predicting USP II dissolution at 1.5 hours is less favorable to Defendants than predicting USP II dissolution using the methods of my Opening Expert Report ............................. 14

    C.   Opinions concerning predictive modeling ........................................... 17

    D.   The shapes of the USP I Basket method dissolution curves for Myrbetriq® and the generic defendants are similar over time periods that correspond to 1.5 hours using the USP II Paddle method. ........................... 18

    E.   Although different apparatuses give different results, it is possible for the results obtained from one method to closely predict the results obtained from another method. ........................................................... 19

VI.  Statistical issues ......................................................................................... 24

    A.   Confidence intervals ............................................................................ 24

    B.   Prof. Betensky mischaracterizes the assessment of prediction error in my Opening Expert Report. .................................................................. 24

    C.   Prof. Betensky's suggestion that $c$ should be estimated from the average of the slopes in Figure 3 of my Opening Expert Report results in no material difference ....................................................................... 25

    D.   Prof. Betensky is incorrect in asserting that using linear interpolation in constructing the time-scale correlation plots of Figure 3 in my Opening Expert Report introduces "circularity" that "imposed linearity" in that Figure. ...................................................................... 26

    E.   Taking account of the variability in $c$ does not materially affect the confidence intervals for the predicted mean dissolutions of USP II. ................ 28

    F.   Prof. Betensky is incorrect in asserting that linear interpolation "has error not accounted for in the calculation of the confidence intervals". ................ 30

    G.   Prof. Betensky's comparison of my predictions for Apotex's product to Ms. Gray's analysis of 2022 Apotex samples is inappropriate. .................... 30

VII. Sawai's data indicate that the ATD model can be used to predict USP II results for Sawai's mirabegron product from USP I data for that same product, and that an ATD model built using Myrbetriq® data can accurately predict USP II results for Sawai's product. .................... 32

i

CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER

VIII.   Defendants' Experts' opinions that differences between Myrbetriq and Defendants' ANDA products make it impossible to predict USP II results for the latter.................................. 39

IX.   Similarities In Comparative Dissolution Profiles Between Lupin's and Zydus's ANDA Products and Myrbetriq® For USP I Data and USP II Data Further Support Reliability Of My Model  ................................................................................................................................. 41

CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER

any differences between predictions based on new samples and tests done on older samples, even in the absence of batch differences.

**VII.** ███████████████████████████████████████████
████████████████

106.   ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████



| Exhibit Batch No.[9] | Sheet No.[10] | Mean Dissolution | 95% C.I. Lower Limit | 95% C.I. Upper Limit |
|---|---|---|---|---|
| ██████████████ | █ | █ | █ | █ |
| ██████████████ | █ | | ██ | █ |
| ██████████████ | █ | | | █ |

**Table 2.** Predicted Mean Dissolution and 95% Confidence Interval Upper Limit (UL) and Lower Limit (LL) Corresponding to Initial Release Testing for Sawai's Exhibit Batch Nos.[11]

107.   Drs. Fassihi, Buckton, and Betensky all criticize my statistical model because it is based on Myrbetriq®, which they assert has a different formulation that each of the Defendants' ANDA Products.  (Buckton Rebuttal Report at ¶¶ 41, 50, 70; Fassihi Rebuttal Report at ¶ 82; Betensky Rebuttal Report at ¶¶ 44-45).  ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[9] Opening Report, Appendix H (Sawai) at [H.4].
[10] Opening Report, ¶ 136, footnote 39.
[11] Opening Report, Appendix H (Sawai) at [H.34].

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**



In this section, I describe how the ATD model I adopted in my Opening Expert Report can accurately predict Sawai's dissolution rates.

108.    I was provided with Excel workbooks containing additional dissolution data compiled from Sawai's ANDA, attached as **Appendix Z-1 and Appendix Z-2.**[12]

109.    While data from the USP Apparatus II (paddle) method conducted at a paddle rotation speed of 50 rpm produces a different (slower) rate of dissolution than would the same



CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER

method conducted at a paddle rotation speed of 200 rpm (as referenced in the '780 Patent), the availability of both USP Apparatus II (paddle) method data and USP Apparatus I (basket) method data on the same batches of Sawai's mirabegron product conducted at about the same time provides further evidence of the accuracy of the ATD predictive model based on USP Apparatus I (basket) method data.

110.    The availability of such data also makes it possible to consider whether differences in the formulation of generic mirabegron products and Myrbetriq® cause USP II Paddle method data to differ in ways that are not predicted from the USP I Basket method data (a hypothetical possibility suggested by Defendants' Experts).

111.    I examined four aspects of these data. First, I constructed time-scale correlation plots to determine whether the underlying time-scale compression characteristics (as seen in my Opening Expert Report relating USP Apparatus I Basket method data to USP Apparatus II Paddle method at a paddle rotation speed of 200 rpm) also hold when relating USP Apparatus I Basket method data to USP Apparatus II Paddle method data when the latter is caried out at a paddle rotation speed of 50 instead of 200 rpm. If so, this would confirm the appropriateness of the ATD model.

112.    ███████████████████████████████████████████ ████████████████████████████████████████████████ I analyzed these data to determine whether the USP Apparatus I Basket method data can predict the corresponding USP Apparatus II Paddle method data at a rotation speed of 50 rpm, and specifically if the ATD model applies to Sawai's mirabegron product. If it does so, this would replicate my ability to predict Myrbetriq® USP Apparatus II Paddle method data in another setting, namely, in the use of a paddle rotation speed of 50 instead of 200 rpm.

34

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

113.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████

114.   ████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████

115.    The time-scale correlation plots for Sawai's Myrbetriq® and for Sawai's mirabegron product dissolution studies are shown in **Figure 7**. ████████████████████

████████████████████████████████████████████████

██████████████████    lines on these plots indicate that the ATD model relating the dissolution curves for the two apparatuses holds.

Appendix Z
Computational Appendix to
Reply Expert Report of Ronald A. Thisted, Ph.D.

Ronald A Thisted

9 November 2022

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

# Contents

**Z Computational Appendix to Reply Expert Report**      **3**

   Z.1   Examples of Weibull vs linear interpolation . . . . . . . . . . . . . . . 3

       Z.1.1   Astellas example . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       Z.1.2   Lupin example . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   Z.2   Create working data sets . . . . . . . . . . . . . . . . . . . . . . . . 6

   Z.3   Estimates for $c$ from Weibull models . . . . . . . . . . . . . . . . . . 8

   Z.4   Cross-validation estimates of RMSE . . . . . . . . . . . . . . . . . . 15

       Z.4.1   Leave-one-out cross-validation . . . . . . . . . . . . . . . . . . 15

       Z.4.2   5-fold cross-validation . . . . . . . . . . . . . . . . . . . . . . 16

       Z.4.3   5-fold cross-validation with 100 replications . . . . . . . . . . . 18

       Z.4.4   10-fold cross-validation with 100 replications . . . . . . . . . . . 19

   Z.5   Comparison linear interpolation to Weibull fits of Defendants' USP I data . 19

       Z.5.1   Apotex . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

       Z.5.2   Aurobindo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

       Z.5.3   Lupin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       Z.5.4   Prinston . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

       Z.5.5   Sawai . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

       Z.5.6   Zydus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   Z.6   ATD predictions for Lu and Fahissi (2017) data . . . . . . . . . . . . . 26

   Z.7   Calculation of $c$ from time-scale correlation plots . . . . . . . . . . . . 30

   Z.8   Time-correlation plots . . . . . . . . . . . . . . . . . . . . . . . . . . 33

   Z.9   Effects of estimating $c$ on confidence intervals for predictions . . . . . . 38

       Z.9.1   Product of variances method . . . . . . . . . . . . . . . . . . . 38

       Z.9.2   Defendant best-case analysis . . . . . . . . . . . . . . . . . . . 43

   Z.10   Analysis of Sawai USP 2 data at 50 rpm . . . . . . . . . . . . . . . . . 60

       Z.10.1   MYRBETRIQ® data . . . . . . . . . . . . . . . . . . . . . . . 60

       Z.10.2   Sawai mirabegron data . . . . . . . . . . . . . . . . . . . . . . 68

       Z.10.3   Time-scale correlation plots . . . . . . . . . . . . . . . . . . . 79

   Z.11   Technical derivations . . . . . . . . . . . . . . . . . . . . . . . . . . 87

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*CONTENTS* 2

Z.11.1 Effects of estimating $c$ and of interpolation on confidence intervals . 87

Z.12 Modeling dissolution using the Hill sigmoidal function . . . . . . . . . . . 89

Z.13 Comparative dissolution of Lupin and Zydus ANDA Products and Myrbetriq® 97

  Z.13.1 Lupin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

  Z.13.2 Zydus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

# Appendix Z

# Computational Appendix to Reply Expert Report

## Z.1   Examples of Weibull vs linear interpolation

### Z.1.1   Astellas example

[Z.1]
```
. // Reply-Weibull vs interpolation example.do
. use "/Volumes/MASM Confidential/MASM/Compendium/Data/usp1.dta", clear
.        gen frac = pct/100
.        keep if sheet==1
.        local lot = lot[1]
```

[Z.2]
```
.        nl (frac = 1-exp(-{alpha}*t^{beta})) if sample!="Avg.", nolog
```

| Source | SS | df | MS | | | |
|---|---|---|---|---|---|---|
| | | | | Number of obs = | | 24 |
| Model | 8.6810688 | 2 | 4.34053441 | R-squared = | | 0.9969 |
| Residual | .02733126 | 22 | .00124233 | Adj R-squared = | | 0.9966 |
| | | | | Root MSE = | | .0352467 |
| Total | 8.7084001 | 24 | .362850004 | Res. dev. = | | -94.55762 |

| frac | Coefficient | Std. err. | t | P>|t| | [95% conf. interval] | |
|---|---|---|---|---|---|---|
| /alpha | .0334924 | .0053707 | 6.24 | 0.000 | .0223542 | .0446306 |

3

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z. COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     4

```
           /beta |   2.110921    .1034973    20.40   0.000    1.896281    2.325561
       ---------------------------------------------------------------------------
```

[Z.3]
```
       .         sort t
       .         input x y

                    x          y
          1.        2.79 0
          2.        2.79 29.76
          3.        end
```

[Z.4]
```
       .         twoway scatter pct t if sample=="Avg." , msize(small) ///
       >            || function y=100*(1-exp(-_b[/alpha]*x^_b[/beta])), range(0 13) ///
       >            || line pct t if sample=="Avg." ///
       >            || line y x, ///
       >                  legend(label(1 Observed) label(2 Weibull) ///
       >                         label(3 Interpolation) order(1 2 3) r(1)) ///
       >                  ylab(0(20)100, angle(horizontal)) xlab(0 2.8 5(5)15) ///
       >                  ti("Astellas USP1 Basket Lot 'lot'") name(z1, replace)
```

[Z.5]
```
       . graph export ../Figures/Reply/Weibull-example-Astellas.pdf, replace
```

## Z.1.2   Lupin example

[Z.6]
```
       . use "/Volumes/MASM Confidential/MASM/Compendium/Data/Lupin", clear
       . drop if pct==.
       . keep if sheet==1
       . collapse (mean) pct (sem) sem=pct, by(sheet t mg batch)
```

[Z.7]
```
       . gen frac = pct/100
       .         local batch = batch[1]
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*      5



Figure Z.1: Observed dissolution data from a typical lot of Myrbetriq® tested using USP I Basket method, together with linear interpolation, best-fitting Weibull curve, and interpolation at $t = 2.8$.

[Z.8]    `.        nl (frac = 1-exp(-{alpha}*t^{beta})), nolog`

```
      Source |       SS           df       MS          Number of obs =        8
-------------+------------------------------        R-squared     =   0.9980
       Model |  4.2797686          2  2.13988432      Adj R-squared =   0.9974
    Residual |  .00843275          6  .001405459      Root MSE      =   .0374895
-------------+------------------------------        Res. dev.     = -32.13757
       Total |  4.2882014          8  .536025174
```

```
------------------------------------------------------------------------------
        frac | Coefficient  Std. err.      t    P>|t|     [95% conf. interval]
-------------+----------------------------------------------------------------
      /alpha |   .0579354   .0163813     3.54   0.012     .0178519    .098019
       /beta |     1.8155   .1703963    10.65   0.000     1.398555   2.232445
------------------------------------------------------------------------------
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.9]
```
.       sort t
.       input x y

                x          y
  1.            2.79 0
  2.            2.79 33.2
  3.            end
```

[Z.10]
```
.       twoway scatter pct t , msize(small) ///
>       || function y=100*(1-exp(-_b[/alpha]*x^_b[/beta])), range(0 13) ///
>       || line pct t ///
>       || line y x, ///
>               legend(label(1 Observed) label(2 Weibull) ///
>                   label(3 Interpolation) order(1 2 3) r(1)) ///
>               ylab(0(20)100, angle(horizontal)) xlab(0 2.8 5(5)15) ///
>               ti("Lupin USP1 Basket Batch 'batch'") name(z2, replace)
```

[Z.11]
```
. graph export ../Figures/Reply/Weibull-example-Lupin.pdf, replace
```

## Z.2   Create working data sets

[Z.12]
```
. // Reply-Create 3-hr and 1.5-hr summary data sets
. use "/Volumes/MASM Confidential/MASM/Compendium/Data/usp12.dta", clear
. drop J-L
. drop if pct==.
(1,134 observations deleted)
```

[Z.13]
```
. // create data set with actual 1.5-hour USP II data
. preserve
. keep if apparatus=="Paddle"
(756 observations deleted)
. keep if t==1.5
(567 observations deleted)
. rename pct actual
. keep if sample=="Avg."
(162 observations deleted)
. keep sheet batch lot actual
. sort sheet
```



Figure Z.2: Observed dissolution data from a typical lot of Lupin ANDA product tested using USP I Basket method, together with linear interpolation, best-fitting Weibull curve, and interpolation at $t = 2.8$.

```
. save ../Data/USP2Actual, replace
file ../Data/USP2Actual.dta saved
. restore
```

[Z.14]
```
. // create data set with USP I 3-hour data
. preserve
. keep if apparatus=="Basket"
(756 observations deleted)
. keep if t==3
(567 observations deleted)
. rename pct usp1hr3
. keep if sample=="Avg."
(162 observations deleted)
. keep sheet batch lot usp1hr3
. sort sheet
. save ../Data/USP1hr3, replace
file ../Data/USP1hr3.dta saved
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.15]

```
. restore
```

## Z.3   Estimates for $c$ from Weibull models

[Z.16]

```
. // Reply-Weibull estimates of c.do
. use "/Volumes/MASM Confidential/MASM/Compendium/Data/usp12.dta", clear
. drop J-L
. drop if pct==.
(1,134 observations deleted)
```

[Z.17]

```
. gen paddle=(apparatus=="Paddle")
. gen frac = pct/100
```

[Z.18]

```
. mat C = J(27,11,.)
. matrix colnames C = a11 a12 b11 b12 bdiff p r2 c d2hat alpha beta
```

[Z.19]

```
. // qui foreach i of numlist 1/27 {
. //        preserve
. //        keep if sheet=='i'
. //        nl (frac = 1-exp(-{alpha1}*t^{beta1})*paddle      ///
. //                  -exp(-{alpha2}*t^{beta2})*(1-paddle)) ///
. //               if sample!="Avg.", nolog
. //        mat C['i',1]= _b[/alpha1]
. //        mat C['i',2]= _b[/alpha2]
. //        mat C['i',3]= _b[/beta1]
. //        mat C['i',4]= _b[/beta2]
. //        mat C['i',5]= _b[/beta1]/_b[/beta2]-1
. //        nlcom _b[/beta1]/_b[/beta2]-1
. //        mat C['i',6]= r(table)["pvalue",1]
. //        nl (frac = 1-exp(-{alpha}*t^{beta}) ) ///
. //               if sample!="Avg." & apparatus=="Basket", nolog
. //        mat C['i',7]= e(r2)
. //        nl (frac  = 1-exp(-{alpha}*((1+({c}-1)*paddle)*t)^{beta})) ///
. //               if sample!="Avg.", nolog initial(c 1)
. //        mat C['i',8]= _b[/c]
. //        mat C['i',9]= 100*(1-exp(-_b[/alpha]*(1.5*1.886)^_b[/beta]))
. //        mat C['i',10]= _b[/alpha]
. //        mat C['i',11]= _b[/beta]
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*      9

```
. //        restore
. // }
. qui foreach i of numlist 1/27 {
```

[Z.20]

```
. // allow for batch effects
. encode batch, gen(batchnum)
. menl frac = 1-exp(-({alpha1}*exp({U1[batchnum]}))*t^{beta})*paddle ///
>            -exp(-({alpha2}*exp({U1[batchnum]}))*t^{beta})*(1-paddle) ///
>                           if sample!="Avg.", nolog stddev

Mixed-effects ML nonlinear regression        Number of obs    =      1,296
Group variable: batchnum                     Number of groups =         14

                                             Obs per group:
                                                          min =         48
                                                          avg =       92.6
                                                          max =        144

Linearization log likelihood =  2744.9377
------------------------------------------------------------------------------
        frac | Coefficient  Std. err.      z    P>|z|     [95% conf. interval]
-------------+----------------------------------------------------------------
      /alpha1 |   .1103469   .0023318    47.32   0.000     .1057766    .1149171
      /alpha2 |   .0291285   .0007304    39.88   0.000     .0276969    .0305601
        /beta |    2.10093   .0105057   199.98   0.000     2.08034    2.121521
------------------------------------------------------------------------------


------------------------------------------------------------------------------
  Random-effects parameters |   Estimate   Std. err.     [95% conf. interval]
-----------------------------+------------------------------------------------
batchnum: Identity           |
                     sd(U1) |   .0673594   .0133382     .0456927    .0993001
-----------------------------+------------------------------------------------
                sd(Residual) |   .0285966   .0005648     .0275109    .0297253
------------------------------------------------------------------------------


// calculate c in this model
. nlcom (_b[/alpha1]/_b[/alpha2])^(1/_b[/beta])

        _nl_1: (_b[/alpha1]/_b[/alpha2])^(1/_b[/beta])
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*      10

```
------------------------------------------------------------------------
        frac | Coefficient  Std. err.      z    P>|z|    [95% conf. interval]
-------------+----------------------------------------------------------
       _nl_1 |   1.885065    .006236   302.29   0.000    1.872843    1.897288
------------------------------------------------------------------------
```

[Z.21]  . // overall effects (simultaneous fitting assuming constant \alpha and \beta)
. nl (frac = 1-exp(-{alpha}*((1+({c}-1)*paddle)*t)^{beta})) ///
>               if sample!="Avg.", nolog initial(c 1)

```
      Source |       SS           df       MS            Number of obs   =      1,296
-------------+----------------------------------         R-squared       =     0.9967
       Model |  405.11708         3   135.039027         Adj R-squared   =     0.9967
    Residual |  1.3462228      1293   .001041162         Root MSE        =    .032267
-------------+----------------------------------         Res. dev.       =  -5225.288
       Total |   406.4633      1296   .313629091

------------------------------------------------------------------------
        frac | Coefficient  Std. err.      t    P>|t|    [95% conf. interval]
-------------+----------------------------------------------------------
      /alpha |   .0292238    .000571    51.18   0.000    .0281037     .030344
          /c |   1.885275   .0070327   268.07   0.000    1.871478    1.899072
       /beta |    2.10016   .0118314   177.51   0.000    2.076949    2.123371
------------------------------------------------------------------------
```

[Z.22]  . // allow for random effects in \alpha and c
. menl frac = 1-exp(-({alpha}*exp({U1[sheet]})) ///
>                    *((1+(({c}*exp({Uc[sheet]}))-1)*paddle)*t)^{beta}) ///
>                if sample!="Avg.", nolog stddev cov(U1 Uc, un)

```
Mixed-effects ML nonlinear regression         Number of obs    =      1,296
Group variable: sheet                         Number of groups =         27

                                              Obs per group:
                                                          min =         48
                                                          avg =       48.0
                                                          max =         48


Linearization log likelihood =  2787.5274
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

```
-------------------------------------------------------------------------------
        frac | Coefficient  Std. err.      z    P>|z|     [95% conf. interval]
--------------+----------------------------------------------------------------
      /alpha |   .0291277    .000642    45.37   0.000     .0278694    .0303859
       /beta |   2.101734   .0099226   211.81   0.000     2.082286    2.121182
          /c |   1.885166   .0101847   185.10   0.000     1.865204    1.905128
-------------------------------------------------------------------------------
```

```
-------------------------------------------------------------------------------
  Random-effects parameters  |   Estimate   Std. err.     [95% conf. interval]
-----------------------------+-------------------------------------------------
sheet: Unstructured          |
                    sd(U1) |   .0764606   .0114036      .0570804    .1024209
                    sd(Uc) |   .0228814   .0046796       .015325    .0341639
                 corr(U1,Uc) |  -.3412247   .2145412     -.6812177    .1198479
-----------------------------+-------------------------------------------------
                sd(Residual) |   .0270021   .0005418      .0259608    .0280851
-------------------------------------------------------------------------------
```

[Z.23]  . matlist C, format(%6.3f)

| | a11 | a12 | b11 | b12 | bdiff | p | r2 | c | d2hat | alpha |
|---|---|---|---|---|---|---|---|---|---|---|
| r1 | 0.114 | 0.033 | 2.089 | 1.954 | 0.069 | 0.151 | 0.998 | 2.020 | 21.373 | 0.029 |
| r2 | 0.119 | 0.030 | 2.155 | 2.120 | 0.016 | 0.762 | 0.997 | 1.929 | 23.907 | 0.030 |
| r3 | 0.118 | 0.032 | 2.145 | 2.079 | 0.032 | 0.582 | 0.998 | 1.926 | 23.868 | 0.030 |
| r4 | 0.112 | 0.030 | 2.109 | 2.115 | -0.002 | 0.962 | 0.997 | 1.873 | 23.413 | 0.030 |
| r5 | 0.123 | 0.033 | 2.052 | 2.095 | -0.020 | 0.699 | 0.998 | 1.852 | 25.234 | 0.034 |
| r6 | 0.109 | 0.026 | 2.140 | 2.182 | -0.019 | 0.736 | 0.996 | 1.884 | 22.628 | 0.027 |
| r7 | 0.124 | 0.033 | 2.006 | 2.100 | -0.045 | 0.321 | 0.998 | 1.792 | 26.158 | 0.036 |
| r8 | 0.115 | 0.027 | 2.106 | 2.195 | -0.041 | 0.468 | 0.997 | 1.872 | 23.567 | 0.029 |
| r9 | 0.118 | 0.028 | 2.110 | 2.177 | -0.031 | 0.582 | 0.997 | 1.877 | 24.169 | 0.030 |
| r10 | 0.111 | 0.029 | 2.123 | 2.131 | -0.004 | 0.946 | 0.997 | 1.881 | 23.229 | 0.029 |
| r11 | 0.106 | 0.029 | 2.123 | 2.176 | -0.024 | 0.671 | 0.996 | 1.760 | 24.884 | 0.031 |
| r12 | 0.108 | 0.029 | 2.141 | 2.159 | -0.008 | 0.888 | 0.996 | 1.816 | 24.239 | 0.030 |
| r13 | 0.113 | 0.026 | 2.070 | 2.168 | -0.045 | 0.396 | 0.996 | 1.893 | 22.363 | 0.028 |
| r14 | 0.131 | 0.031 | 2.155 | 2.135 | 0.010 | 0.859 | 0.998 | 1.980 | 24.711 | 0.031 |
| r15 | 0.117 | 0.026 | 2.077 | 2.152 | -0.035 | 0.529 | 0.996 | 1.934 | 22.310 | 0.028 |
| r16 | 0.120 | 0.027 | 2.115 | 2.179 | -0.029 | 0.619 | 0.996 | 1.942 | 22.950 | 0.028 |
| r17 | 0.102 | 0.023 | 2.061 | 2.191 | -0.059 | 0.172 | 0.997 | 1.845 | 21.199 | 0.026 |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

```
r18 |   0.108   0.030   2.032   2.039  -0.003   0.922   0.999   1.861  22.375   0.031
r19 |   0.109   0.026   2.046   2.148  -0.047   0.308   0.997   1.870  21.874   0.028
r20 |   0.101   0.028   2.080   2.072   0.004   0.915   0.998   1.880  21.070   0.027
r21 |   0.108   0.022   2.059   2.185  -0.058   0.185   0.997   1.939  20.305   0.025
r22 |   0.112   0.029   2.012   2.069  -0.027   0.481   0.998   1.876  22.211   0.030
r23 |   0.106   0.026   2.089   2.147  -0.027   0.487   0.998   1.888  21.634   0.027
r24 |   0.108   0.029   2.050   2.066  -0.008   0.845   0.998   1.868  22.296   0.030
r25 |   0.109   0.025   2.041   2.127  -0.040   0.319   0.997   1.920  20.950   0.027
r26 |   0.112   0.029   2.012   2.069  -0.027   0.481   0.998   1.876  22.211   0.030
r27 |   0.106   0.027   2.075   2.110  -0.017   0.692   0.997   1.871  21.909   0.028

       |   beta
------+--------
   r1 |   2.020
   r2 |   2.137
   r3 |   2.111
   r4 |   2.112
   r5 |   2.073
   r6 |   2.161
   r7 |   2.051
   r8 |   2.150
   r9 |   2.144
  r10 |   2.127
  r11 |   2.149
  r12 |   2.150
  r13 |   2.118
  r14 |   2.144
  r15 |   2.115
  r16 |   2.148
  r17 |   2.124
  r18 |   2.035
  r19 |   2.096
  r20 |   2.076
  r21 |   2.121
  r22 |   2.040
  r23 |   2.118
  r24 |   2.058
  r25 |   2.083
  r26 |   2.040
  r27 |   2.093
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     13

[Z.24]
```
. preserve
. drop _all
. svmat C, names(col)
number of observations will be reset to 27
Press any key to continue, or Break to abort
Number of observations (_N) was 0, now 27.
```

[Z.25]
```
. sum p

    Variable |        Obs        Mean    Std. dev.       Min        Max
-------------+---------------------------------------------------------
           p |         27    .5917713    .2507785    .1513517   .9624946
```

[Z.26]
```
. ci means c

    Variable |        Obs        Mean    Std. err.     [95% conf. interval]
-------------+---------------------------------------------------------------
           c |         27    1.886104    .0102842      1.864964    1.907243
```

[Z.27]
```
. gen sheet=_n
. sort sheet
. save ../Data/foo, replace
```

[Z.28]
```
. use ../Data/foo, clear
. merge 1:1 sheet using ../Data/USP2Actual, nogen

    Result                      Number of obs
    -----------------------------------------
    Not matched                             0
    Matched                                27
    -----------------------------------------
```

[Z.29]
```
. merge 1:1 sheet using ../Data/USP1hr3, nogen

    Result                      Number of obs
    -----------------------------------------
    Not matched                             0
    Matched                                27
    -----------------------------------------
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*    14

[Z.30]
```
. drop in 26
(1 observation deleted)
```

[Z.31]
```
. sort sheet

. merge 1:1 sheet using ../Data/Usp12Slopes, nogen

    Result                           Number of obs
    -----------------------------------------
    Not matched                                0
    Matched                                   26
    -----------------------------------------
```

[Z.32]
```
. gen interphat = (1.5*1.8609/3)*usp1hr3
```

[Z.33]
```
. count if d2hat>interphat
  0
```

[Z.34]
```
. gen wdiff = d2hat-actual

. gen idiff = interphat-actual
```

[Z.35]
```
. sum idiff wdiff

    Variable |        Obs        Mean    Std. dev.         Min         Max
-------------+----------------------------------------------------------
       idiff |         26    .8245058    1.224803     -1.0865      3.9135
       wdiff |         26   -2.314476    1.282601   -4.626892    .8835812
```

[Z.36]
```
. gen w2 = wdiff^2

. gen i2 = idiff^2
```

[Z.37]
```
. sum w2

    Variable |        Obs        Mean    Std. dev.         Min         Max
-------------+----------------------------------------------------------
          w2 |         26    6.938593    5.723032     .025085    21.40813
```

[Z.38]
```
. local wrmse = sqrt(r(mean))
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     15

[Z.39]
```
. sum i2

    Variable |        Obs        Mean    Std. dev.        Min         Max
-------------+---------------------------------------------------------
          i2 |         26    2.122255    3.504579    .0002873    15.31548
```

[Z.40]
```
. local irmse = sqrt(r(mean))
```

[Z.41]
```
. display _newline ///
>          "Weibull       RMSE = " %5.2f `wrmse' _newline ///
>               "Interpolation RMSE = " %5.2f `irmse' _newline

Weibull       RMSE =  2.63
Interpolation RMSE =  1.46
```

[Z.42]
```
. save ../Data/temp, replace
. restore
```

## Z.4   Cross-validation estimates of RMSE

This section evaluates the RMSE for the "estimate $c$/interpolate $D_1$ at $t = 1.5 \times c$" procedure, using three cross-validation methods.

### Z.4.1   Leave-one-out cross-validation

[Z.43]
```
. // Reply-LOOCV.do
. // USP I and II slopes for 26 data sets
. use ../Data/USP12slopes, clear
```

[Z.44]
```
. // add info on observed USP I at 3 hrs and actual USP II at 1.5 hours
. merge 1:1 sheet using ../Data/temp, nogen

    Result                           Number of obs
    -----------------------------------------
    Not matched                                  0
    Matched                                     26
    -----------------------------------------
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.45]
```
. gen mse = .
(26 missing values generated)
. gen chat = .
(26 missing values generated)
```

[Z.46]
```
. // replace c values from Weibul (in temp data set) with slope ratio
. replace c = paddle/basket
(26 real changes made)
```

[Z.47]
```
. // carry out LOOCV
. quietly foreach i of numlist 1/26 {
```

[Z.48]
```
. sum c mse
```

```
        Variable |        Obs        Mean    Std. dev.        Min         Max
    -------------+--------------------------------------------------------------
               c |         26    1.862077    .0476285     1.74758    2.008944
             mse |         26    2.208234     3.65049    .0004399    15.99878
```

[Z.49]
```
. di _newline "Leave-one-out cross-validation RMSE = " %5.2f sqrt(r(mean))

Leave-one-out cross-validation RMSE =  1.49
```

### Z.4.2   5-fold cross-validation

[Z.50]
```
. // Reply-K-fold cross validation.do
. local K = 5                        // K-fold cross validation
. local R = 1                        // replications of K-fold cross-validation
. local n = int(26/`K')              // determine subset size
```

[Z.51]
```
. // USP I and II slopes for 26 data sets
. use ../Data/USP12slopes, clear
```

[Z.52]
```
. // add info on observed USP I at 3 hrs and actual USP II at 1.5 hours
. merge 1:1 sheet using ../Data/temp, nogen
```

```
    Result                           Number of obs
    -----------------------------------------
    Not matched                                  0
    Matched                                     26
    -----------------------------------------
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     17

[Z.53]
```
. gen mse = .
(26 missing values generated)
. gen chat = .
(26 missing values generated)
. gen pred = .
(26 missing values generated)
```

[Z.54]
```
. // replace c values from Weibul (in temp data set) with slope ratio
. replace c = paddle/basket
(26 real changes made)
```

[Z.55]
```
. // carry out LOOCV
. set seed 5710483
. capture postclose cv
. postfile cv fold cbar mse using ../Data/cv, replace
```

[Z.56]
```
. gen u=.
(26 missing values generated)
. gen fold=.
(26 missing values generated)

// qui foreach j of numlist 1/'R' {
//  replace u = uniform()
//  sort u
//  replace fold = int((_n-1)/'n')+1     // subsets of size K (or less)
//  replace fold = 'K' if fold==('K'+1)  // add leftovers to last subset
//
//       foreach i of numlist 1/'K' {
//       preserve
//       sum c if fold!='i'
//       local c = r(mean)
//       replace pred = (1.5*'c'/3)*usp1hr3 if fold=='i'
//       replace chat = 'c' if fold=='i'
//       replace mse = (pred-actual)^2 if fold=='i'
//       sum chat
//       local chat = r(mean)
//       sum mse
//       list sheet mse chat pred actual usp1hr3
//       local mse = r(mean)
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*    18

```
//       post cv (`i') (`chat') (`mse')
//       restore
//   }
// }
. qui foreach j of numlist 1/`R' {
```

[Z.57]
```
. postclose cv
. use ../data/cv, clear
```

[Z.58]
```
. sum cbar mse

    Variable |        Obs        Mean    Std. dev.        Min        Max
-------------+----------------------------------------------------------
        cbar |          5     1.86212     .0049955    1.856516     1.8666
         mse |          5    2.198478    1.204893    .4771155    3.776271
```

[Z.59]
```
. di _newline "`K'-fold cross-validation with `R' replications RMSE = " %5.2f sqrt(r(mean))

5-fold cross-validation with 1 replications RMSE =  1.48
```

### Z.4.3   5-fold cross-validation with 100 replications

[Z.60]
```
. // Reply-K-fold cross validation.do
. local K =   5                   // K-fold cross validation
. local R = 100                   // replications of K-fold cross-validation
. local n = int(26/`K')           // determine subset size

[duplicated code omitted]
```

[Z.61]
```
. use ../data/cv, clear
```

[Z.62]
```
. sum cbar mse

    Variable |        Obs        Mean    Std. dev.        Min        Max
-------------+----------------------------------------------------------
        cbar |        500    1.862081    .0044076    1.850091    1.872797
         mse |        500    2.198723     1.42598    .0186506    6.885187
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.63]
```
. di _newline "`K'-fold cross-validation with `R' replications RMSE = " %5.2f sqrt(r(mean))

5-fold cross-validation with 100 replications RMSE =  1.48
```

### Z.4.4   10-fold cross-validation with 100 replications

[Z.64]
```
. // Reply-K-fold cross validation.do
. local K =  10                    // K-fold cross validation
. local R = 100                    // replications of K-fold cross-validation
. local n = int(26/`K')            // determine subset size

[duplicated code omitted]
```

[Z.65]
```
. use ../data/cv, clear
```

[Z.66]
```
. sum cbar mse
```

```
    Variable |        Obs        Mean    Std. dev.       Min        Max
-------------+---------------------------------------------------------
        cbar |      1,000    1.862058    .0028364   1.852728   1.871269
         mse |      1,000    2.189379    2.382364   .0012349   12.73192
```

[Z.67]
```
. di _newline "`K'-fold cross-validation with `R' replications RMSE = " %5.2f sqrt(r(mean))

10-fold cross-validation with 100 replications RMSE =  1.48
```

## Z.5   Comparison linear interpolation to Weibull fits of Defendants' USP I data

[Z.68]
```
. // Reply-Weibull v linear interp.do
```

### Z.5.1   Apotex

[Z.69]
```
. use "../Data/Apotex", clear
. collapse (mean) pct (sem) sem=pct, by(sheet t mg batch)
. gen frac = pct/100
. drop if pct==.
(0 observations deleted)
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     20

[Z.70]
```
. foreach i of numlist 1/6 {
  2.            qui nl (frac = 1-exp(-{alpha}*t^{beta})) if sheet==`i', nolog
  3.            two sc pct t if sheet==`i' || line pct t if sheet==`i' ///
  >             || function y=100*(1-exp(-_b[/alpha]*x^(_b[/beta]))), ///
  >                    range(0 12) xlab(0 2.8 5(5)12) ///
  >                    ti("Sheet `i'",size(medium)) yla(,angle(horizontal)) ///
  >                    legend(off) name(a`i', replace)
  4. }
```

[Z.71]
```
. graph combine a1 a2 a3 a4 a5 a6, ti(Apotex) name(Apotex, replace)
. graph export ../Figures/Reply/Apotex-weibull.pdf, replace
```



Figure Z.3: Apotex USP I Basket Method data with linear interpolation and Weibull fits

### Z.5.2   Aurobindo

[Z.72]
```
. use "../Data/Aurobindo", clear
. collapse (mean) pct (sem) sem=pct, by(sheet t mg batch)
. gen frac = pct/100
. drop if pct==.
(0 observations deleted)
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.73]
```
 . foreach i of numlist 1/3 {
   2.          qui nl (frac = 1-exp(-{alpha}*t^{beta})) if sheet==`i', nolog
   3.          two sc pct t if sheet==`i' || line pct t if sheet==`i' ///
   >              || function y=100*(1-exp(-_b[/alpha]*x^(_b[/beta]))), ///
   >                  range(0 12) xlab(0 2.8 5(5)12) ///
   >                  ti("Sheet `i'",size(medium)) yla(,angle(horizontal)) ///
   >                  legend(off) name(a`i', replace)
   4. }
```

[Z.74]
```
 . graph combine a1 a2 a3 a4 a5 a6, ti(Aurobindo) name(Aurobindo, replace)
 . graph export ../Figures/Reply/Aurobindo-weibull.pdf, replace
```



Figure Z.4: Aurobindo USP I Basket Method data with linear interpolation and Weibull fits

### Z.5.3   Lupin

[Z.75]
```
 . use "../Data/Lupin", clear
 . collapse (mean) pct (sem) sem=pct, by(sheet t mg batch)
 . gen frac = pct/100
 . drop if pct==.
 (0 observations deleted)
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.76]
```
. foreach i of numlist 1/6 {
  2.           qui nl (frac = 1-exp(-{alpha}*t^{beta})) if sheet==`i', nolog
  3.           two sc pct t if sheet==`i' || line pct t if sheet==`i' ///
  >              || function y=100*(1-exp(-_b[/alpha]*x^(_b[/beta]))), ///
  >                   range(0 12) xlab(0 2.8 5(5)12) ///
  >                   ti("Sheet `i'",size(medium)) yla(,angle(horizontal)) ///
  >                   legend(off) name(a`i', replace)
  4. }
```

[Z.77]
```
. graph combine a1 a2 a3 a4 a5 a6, ti(Lupin) name(Lupin, replace)
. graph export ../Figures/Reply/Lupin-weibull.pdf, replace
```



Figure Z.5: Lupin USP I Basket Method data with linear interpolation and Weibull fits

## Z.5.4   Prinston

[Z.78]
```
. use "../Data/Prinston", clear
. collapse (mean) pct (sem) sem=pct, by(sheet t mg batch)
. gen frac = pct/100
. drop if pct==.
(0 observations deleted)
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z. COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*   23

[Z.79]
```
. foreach i of numlist 1/6 {
  2.              qui nl (frac = 1-exp(-{alpha}*t^{beta})) if sheet==`i', nolog
  3.              two sc pct t if sheet==`i' || line pct t if sheet==`i' ///
>                   || function y=100*(1-exp(-_b[/alpha]*x^(_b[/beta]))), ///
>                   range(0 12) xlab(0 2.8 5(5)12) ///
>                   ti("Sheet `i'",size(medium)) yla(,angle(horizontal)) ///
>                   legend(off) name(a`i', replace)
  4. }
```

[Z.80]
```
. graph combine a1 a2 a3 a4 a5 a6, ti(Prinston) name(Prinston, replace)
. graph export ../Figures/Reply/Prinston-weibull.pdf, replace
```



Figure Z.6: Prinston USP I Basket Method data with linear interpolation and Weibull fits

### Z.5.5  Sawai

[Z.81]
```
. use "../Data/Sawai-corrected-ub", clear
. collapse (mean) pct (sem) sem=pct, by(sheet t mg batch)
. gen frac = pct/100
(12 missing values generated)
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*    24

```
. drop if pct==.
(12 observations deleted)
```

[Z.82]
```
. foreach i of numlist 1/3 {
  2.          qui nl (frac = 1-exp(-{alpha}*t^{beta})) if sheet==`i', nolog
  3.          two sc pct t if sheet==`i' || line pct t if sheet==`i' ///
>            || function y=100*(1-exp(-_b[/alpha]*x^(_b[/beta]))), ///
>                   range(0 8) xlab(0 2 2.8 4 6 8) ///
>                   ti("Sheet `i'",size(medium)) yla(,angle(horizontal)) ///
>                   legend(off) name(a`i', replace)
  4. }
```

[Z.83]
```
. graph combine a1 a2 a3, ti(Sawai) name(Sawai, replace)
. graph export ../Figures/Reply/Sawai-weibull.pdf, replace
```



Figure Z.7: Sawai USP I Basket Method data with linear interpolation and Weibull fits

### Z.5.6  Zydus

[Z.84]
```
. use "../Data/Zydus", clear
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     25

```
. collapse (mean) pct (sem) sem=pct, by(sheet t mg batch)
. gen frac = pct/100
. drop if pct==.
(0 observations deleted)
```

[Z.85]
```
. foreach i of numlist 1/6 {
  2.           qui nl (frac = 1-exp(-{alpha}*t^{beta})) if sheet=='i', nolog
  3.           two sc pct t if sheet=='i' || line pct t if sheet=='i' ///
    >           || function y=100*(1-exp(-_b[/alpha]*x^(_b[/beta]))), ///
    >                 range(0 12) xlab(0 2.8 5(5)12) ///
    >                 ti("Sheet 'i'",size(medium)) yla(,angle(horizontal)) ///
    >                 legend(off) name(a'i', replace)
  4. }
```

[Z.86]
```
. graph combine a1 a2 a3 a4 a5 a6, ti(Zydus) name(Zydus, replace)
. graph export ../Figures/Reply/Zydus-weibull.pdf, replace
```



Figure Z.8: Zydus USP I Basket Method data with linear interpolation and Weibull fits

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

## Z.6   ATD predictions for Lu and Fahissi (2017) data

[Z.87]
```
. // Reply-LuFahissi Figure 1.do
. version 17.0
. set seed 484841
. set more off
```

[Z.88]
```
. import excel using ../Raw/Lu2017Example.xlsx, clear first
(7 vars, 17 obs)
. gen bfrac = Basket/100
. gen pfrac = Paddle/100
```

[Z.89]
```
. nl (pfrac=1-exp(-(x/{Td})^{beta})), nolog initial(Td 10 beta 1)
```

|      Source | SS        | df | MS          |   |                     |           |
|------------:|-----------|----|-------------|---|---------------------|-----------|
|       Model | 2.6033129 | 2  | 1.30165644  |   | Number of obs =     | 6         |
|    Residual | .00111758 | 4  | .000279395  |   | R-squared =         | 0.9996    |
|             |           |    |             |   | Adj R-squared =     | 0.9994    |
|             |           |    |             |   | Root MSE =          | .0167151  |
|       Total | 2.6044305 | 6  | .434071743  |   | Res. dev. =         | -34.50284 |

|   pfrac | Coefficient | Std. err. | t     | P>|t| | [95% conf. interval] |          |
|--------:|-------------|-----------|-------|-------|----------------------|----------|
|     /Td | 2.250213    | .0505118  | 44.55 | 0.000 | 2.109969             | 2.390456 |
|   /beta | 1.132467    | .0507447  | 22.32 | 0.000 | .9915772             | 1.273357 |

[Z.90]
```
. nl (bfrac=1-exp(-(x/{Td})^{beta})), nolog initial(Td 10 beta 1)
```

|      Source | SS        | df | MS          |   |                     |           |
|------------:|-----------|----|-------------|---|---------------------|-----------|
|       Model | 3.1903714 | 2  | 1.59518572  |   | Number of obs =     | 12        |
|    Residual | .00229548 | 10 | .000229548  |   | R-squared =         | 0.9993    |
|             |           |    |             |   | Adj R-squared =     | 0.9991    |
|             |           |    |             |   | Root MSE =          | .0151508  |
|       Total | 3.1926669 | 12 | .266055577  |   | Res. dev. =         | -68.68611 |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     27

```
------------------------------------------------------------------------
      bfrac |  Coefficient  Std. err.      t    P>|t|    [95% conf. interval]
------------+-----------------------------------------------------------
        /Td |    9.895246   .1490334     66.40   0.000     9.563179    10.22731
      /beta |    1.157093   .0294318     39.31   0.000     1.091514    1.222671
------------------------------------------------------------------------
```

[Z.91]  . stack x Basket50 x Paddle100, into(t pct) wide clear
        . gen paddle = _stack-1
        . gen frac=pct/100
        (16 missing values generated)
        . drop if missing(pct)
        (16 observations deleted)

[Z.92]  . nl (frac = 1-exp(-{alpha}*t^{beta})) if paddle==1, nolog

```
      Source |       SS           df       MS            Number of obs =         6
-------------+----------------------------------        R-squared     =    0.9996
       Model |  2.6033129         2   1.30165644        Adj R-squared =    0.9994
    Residual |  .00111758         4   .000279395        Root MSE      =   .0167151
-------------+----------------------------------        Res. dev.     =  -34.50284
       Total |  2.6044305         6   .434071743
```

```
------------------------------------------------------------------------
       frac |  Coefficient  Std. err.      t    P>|t|    [95% conf. interval]
------------+-----------------------------------------------------------
     /alpha |    .3991337   .0208747     19.12   0.000     .3411764    .4570911
      /beta |    1.132467    .050745     22.32   0.000     .9915763    1.273358
------------------------------------------------------------------------
```

[Z.93]  . nl (frac = 1-exp(-{alpha}*t^{beta})) if paddle==0, nolog

```
      Source |       SS           df       MS            Number of obs =        12
-------------+----------------------------------        R-squared     =    0.9993
       Model |  3.1903714         2   1.59518572        Adj R-squared =    0.9991
    Residual |  .00229548        10   .000229548        Root MSE      =   .0151508
-------------+----------------------------------
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     28

```
        Total |  3.1926669           12  .266055577   Res. dev.    =  -68.68611

        ------------------------------------------------------------------------
         frac | Coefficient  Std. err.      t    P>|t|     [95% conf. interval]
        ------+-----------------------------------------------------------------
       /alpha |   .0705017   .0045054    15.65   0.000     .060463    .0805403
        /beta |   1.157093   .0294318    39.31   0.000    1.091514    1.222671
        ------------------------------------------------------------------------
```

[Z.94]  `. nl (frac = 1-exp(-{alpha}*(({c}*paddle + (1-paddle))*t)^{beta})), ///`
        `>    initial(c 1) nolog`

```
        Source |       SS          df       MS              Number of obs =        18
       --------+------------------------------------        F(3, 15)      =
        Model |  5.7936382          3  1.93121272          R-squared     =    0.9994
     Residual |   .00345923        15  .000230615          Adj R-squared =    0.9993
       --------+------------------------------------        Root MSE      =    .015186
        Total |  5.7970974         18  .322060966          Res. dev.     =  -102.9457

        ------------------------------------------------------------------------
         frac | Coefficient  Std. err.      t    P>|t|     [95% conf. interval]
        ------+-----------------------------------------------------------------
       /alpha |   .0715757   .0039088    18.31   0.000     .0632442    .0799072
           /c |   4.395292   .1108947    39.63   0.000     4.158925    4.631658
        /beta |    1.14993   .0248231    46.33   0.000     1.097021     1.20284
        ------------------------------------------------------------------------
```

[Z.95]  `. // record time-scale acceleration factor c based on Weibull`
        `. local cw = _b[/c]`

[Z.96]  `. // calculate time-scale acceleration factor c using approx slope method`
        `. nl (frac = {beta}*t*(1-paddle) + {c}*{beta}*t*paddle) if frac<0.8, ///`
        `>    initial(c 1) nolog`

```
        Source |       SS          df       MS              Number of obs =        14
       --------+------------------------------------        R-squared     =    0.9922
        Model |  2.6535714          2  1.32678568
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     29

```
    Residual |  .02096741        12  .001747284    Adj R-squared =     0.9909
-------------+------------------------------------   Root MSE      =    .0418005
       Total |  2.6745388        14  .191038484    Res. dev.     =  -51.32353

    ----------------------------------------------------------------------
        frac |  Coefficient  Std. err.      t    P>|t|     [95% conf. interval]
    -------------+--------------------------------------------------------------
       /beta |   .0645102   .0020947    30.80   0.000     .0599463    .0690742
          /c |   4.108893   .2177329    18.87   0.000     3.634494    4.583292
    ----------------------------------------------------------------------
```

[Z.97]   . local ci = _b[/c]

[Z.98]   . gen t2 = t/`ci'
         . gen t3 = t/`cw'

[Z.99]   . two sc Paddle100 t if t<6 || line Basket50 t2 , ///
         >      yla(0(20)100, angle(horizontal))  xti("Time (hours)")  ///
         >      ti("Slope ratio + interpolation") ///
         >      legend(label(1 "Observed") label(2 "Predicted")) name(f, replace)

[Z.100]  . nl (frac = 1-exp(-{alpha}*t^{beta})) if paddle==0, nolog

```
      Source |       SS         df       MS
-------------+------------------------------------   Number of obs =         12
       Model |  3.1903714         2  1.59518572    R-squared     =     0.9993
    Residual |  .00229548        10  .000229548    Adj R-squared =     0.9991
-------------+------------------------------------   Root MSE      =    .0151508
       Total |  3.1926669        12  .266055577    Res. dev.     =  -68.68611

    ----------------------------------------------------------------------
        frac |  Coefficient  Std. err.      t    P>|t|     [95% conf. interval]
    -------------+--------------------------------------------------------------
      /alpha |   .0705017   .0045054    15.65   0.000     .060463    .0805403
       /beta |   1.157093   .0294318    39.31   0.000     1.091514    1.222671
    ----------------------------------------------------------------------
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*      30

[Z.101]
```
. two sc Paddle100 t if t<6 ///
>      || function y=100*(1-exp(-_b[/alpha]*(`cw'*x)^_b[/beta])), range(0 5) ///
>      yla(0(20)100, angle(horizontal))  xti("Time (hours)")  ///
>          ti("Weibull ATD Model") ///
>          legend(label(1 "Observed") label(2 "Predicted")) name(g, replace)
```

[Z.102]
```
. graph combine f g, ti("Observed and Predicted Dissolution" ///
>          "For USP II Paddle Method at 100 rpm" ///
>              "Based on USP I Basket Method data at 50 rpm", size(medium)) ///
>              note("Data source: Lu and Fahissi (2017), Figure 1") name(h, replace)
```

[Z.103]
```
. graph export ../Figures/Reply/LuFig1Fit.pdf, replace
```



Figure Z.9: ATD predictions for Lu and Fahissi (2017 data

## Z.7   Calculation of $c$ from time-scale correlation plots

[Z.104]
```
. // reply-time-scale-correlation.do
. // time-scale correlation estimates for c
. use ../Data/sampletemp, clear
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.105]   `. gen t2 = t`

[Z.106]   `. replace t2=. if apparatus=="Basket"`
`(182 real changes made, 182 to missing)`

[Z.107]   `. gen tp = .`
`(364 missing values generated)`

[Z.108]   `. // qui foreach i of numlist 1/27 {`
`. //      if (`i'==26) {`
`. //              continue`
`. //      }`
`. //      ipolate t2 pct if sheet==`i', gen(new) epolate`
`. //      replace tp = new if sheet==`i'`
`. //      drop new`
`. // }`
`. qui foreach i of numlist 1/27 {`

[Z.109]   `. keep if apparatus=="Basket"`
`(182 observations deleted)`

[Z.110]   `. // two sc tp t || lfit tp t, by(sheet lot, ///`
`. //      ti("Time-scale Correlation Plots") legend(off) ) ///`
`. //      yla(, angle(horiz)) ///`
`. //      xti("USP 1 time")`
`. // graph export "../Figures/time-scale corrlation.pdf", replace`
`. //`
`.`
`. mat C = J(27,4,.)`

[Z.111]   `. matrix colnames C = constant slope12 cons21 slope21`

[Z.112]   `. // qui foreach i of numlist 1/27 {`
`. //      if (`i'==26) {`
`. //              continue`
`. //      }`
`. //      regress tp t if sheet==`i'`
`. //      mat C[`i', 1]=_b[_cons]`
`. //      mat C[`i', 2]=_b[t]`
`. //      regress t tp if sheet==`i'`
`. //      mat C[`i', 3]=_b[_cons]`
`. //      mat C[`i', 4]=_b[t]`
`. // }`
`. qui foreach i of numlist 1/27 {`

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     32

[Z.113]   . mat list C

```
C[27,4]
        constant      slope12      cons21      slope21
  r1    .01857068    .49691214   -.03676416   2.0121342
  r2   -.01464568    .52866876    .0284424    1.8912022
  r3    .00319341    .52437634   -.00602033   1.9069952
  r4    .00761521    .53919741   -.01378868   1.8544584
  r5    .00267457    .54122835   -.00464887   1.847518
  r6   -.00492264    .53949952    .00923981   1.8535178
  r7    .03263426    .55352724   -.05545633   1.8050843
  r8   -.01486155    .54503106    .02777156   1.8345321
  r9   -.01337662    .53922278    .02577492   1.8540834
 r10    .00537352    .53461595   -.01001502   1.8704852
 r11    .03299072    .56246211   -.05624452   1.7768735
 r12    .02758407    .5443619    -.04974445   1.836605
 r13   -.02607823    .54022996    .04936689   1.8505666
 r14   -.04326242    .52765958    .08742958   1.8926111
 r15   -.04932503    .53737045    .10178261   1.8563029
 r16   -.04500749    .53394486    .08849719   1.8709036
 r17    -.0307799    .54961825    .05918559   1.8180213
 r18   -.00264674    .5403819     .0049378    1.8505252
 r19   -.02042706    .54428958    .03947164   1.8363844
 r20    .01843517    .52903255   -.03439889   1.8900393
 r21   -.04383575    .53371224    .08632392   1.8717269
 r22   -.00735049    .53587638    .01396526   1.8659892
 r23   -.02607823    .54022996    .04936689   1.8505666
 r24   -.00284246    .54002665    .00532789   1.8517315
 r25   -.02181401    .53374491    .04251034   1.8728015
 r26         .            .            .            .
 r27    .00973213    .53902955   -.01761355   1.8549882
```

[Z.114]   . drop _all
          . svmat C, names(col)
          number of observations will be reset to 27
          Press any key to continue, or Break to abort
          Number of observations (_N) was 0, now 27.

[Z.115]   . gen recip = 1/slope12
          (1 missing value generated)

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.116]
```
. sum slope12 recip slope21
```

```
    Variable |        Obs        Mean    Std. dev.         Min         Max
-------------+--------------------------------------------------------------
     slope12 |         26    .5374712    .0115768    .4969122    .5624621
       recip |         26     1.86142    .0413459    1.777898    2.012428
     slope21 |         26     1.86064    .0414383    1.776874    2.012134
```

[Z.117]
```
. ci means slope12 recip slope21
```

```
    Variable |        Obs        Mean    Std. err.       [95% conf. interval]
-------------+--------------------------------------------------------------
     slope12 |         26    .5374712    .0022704       .5327952    .5421472
       recip |         26     1.86142    .0081086        1.84472     1.87812
     slope21 |         26     1.86064    .0081267       1.843903    1.877378
```

## Z.8   Time-correlation plots

[Z.118]
```
. // reply-time-scale-correlation-linearity.do
. // time-scale correlation estimates for c
. use ../Data/sampletemp, clear
```

[Z.119]
```
. gen t2 = t
. replace t2=. if apparatus=="Basket"
. gen tp = .
. gen tp2 = .
. gen str12 lot2="Hypothetical"
. keep if sheet==2
(350 observations deleted)
```

[Z.120]
```
. ipolate t2 pct, gen(new) epolate
. replace tp = new
```

[Z.121]
```
. drop new
. sort apparatus t
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*    34

[Z.122]

```
. list sheet apparatus t pct

     +-----------------------------+
     | sheet   appara~s     t   pct |
     |-----------------------------|
  1. |   2      Basket      0     0 |
  2. |   2      Basket    1.5     . |
  3. |   2      Basket    2.5     . |
  4. |   2      Basket      3    29 |
  5. |   2      Basket    4.5     . |
     |-----------------------------|
  6. |   2      Basket      5    57 |
  7. |   2      Basket    8.5    98 |
  8. |   2      Paddle      0     0 |
  9. |   2      Paddle    1.5    27 |
 10. |   2      Paddle    2.5    55 |
     |-----------------------------|
 11. |   2      Paddle      3     . |
 12. |   2      Paddle    4.5    98 |
 13. |   2      Paddle      5     . |
 14. |   2      Paddle    8.5     . |
     +-----------------------------+
```

[Z.123]

```
. // create hypothetical Paddle dissolution data
. gen pct2 = pct
. replace pct2=60 in 9
. replace pct2=85 in 10
. replace pct2=95 in 12
```

[Z.124]

```
. list sheet apparatus t pct pct2

     +-------------------------------------+
     | sheet   appara~s     t   pct   pct2 |
     |-------------------------------------|
  1. |   2      Basket      0     0      0 |
  2. |   2      Basket    1.5     .      . |
  3. |   2      Basket    2.5     .      . |
  4. |   2      Basket      3    29     29 |
  5. |   2      Basket    4.5     .      . |
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     35

```
     |-----------------------------------|
 6. |    2     Basket     5    57      57 |
 7. |    2     Basket   8.5    98      98 |
 8. |    2     Paddle     0     0       0 |
 9. |    2     Paddle   1.5    27      60 |
10. |    2     Paddle   2.5    55      85 |
     |-----------------------------------|
11. |    2     Paddle     3     .       . |
12. |    2     Paddle   4.5    98      95 |
13. |    2     Paddle     5     .       . |
14. |    2     Paddle   8.5     .       . |
     +-----------------------------------+
```

[Z.125]
```
. ipolate t2 pct2, gen(new) epolate
(6 missing values generated)
. replace tp2 = new
(8 real changes made)
. drop new
. local lot = lot[1]
```

[Z.126]
```
. two   sc pct t if apparatus=="Paddle" ///
>    || sc pct t if apparatus=="Basket" ///
>       || line pct t if apparatus=="Paddle" ///
>       || line pct t if apparatus=="Basket", ///
>       ti("Astellas `lot'") legend(off) name(a, replace)
```

[Z.127]
```
. graph export ../Figures/Reply/tc1.pdf, replace
```

[Z.128]
```
. two   sc pct2 t if apparatus=="Paddle" ///
>    || sc pct2 t if apparatus=="Basket" ///
>       || line pct2 t if apparatus=="Paddle" ///
>       || line pct2 t if apparatus=="Basket", ///
>       ti("Hypothetical USP II") legend(off) name(b, replace)
```

[Z.129]
```
. graph export ../Figures/Reply/tc2.pdf, replace
```

[Z.130]
```
. keep if apparatus=="Basket"
(7 observations deleted)
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z. COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     36



Figure Z.10: Actual and hypothetical data for dissolution curves obtained by two USP methods

[Z.131]
```
. two sc tp t || line tp t, lcolor(dkorange) || lfit tp t, lcolor(blue) ///
>       ti("Time-Scale Correlation Plot "Astellas 'lot'", size(medium)) ///
>       yla(, angle(horiz)) ///
>           legend(label(1 "Equal % dissolution times") label(2 "Interpolated") ///
>               label(3 "Best line") row(1)) ///
>           xti("USP 1 time") name(c,replace)
```

[Z.132]
```
. graph export ../Figures/Reply/tc3.pdf, replace
```

[Z.133]
```
. two sc tp2 t || line tp2 t, lcolor(dkorange) || lfit tp2 t, lcolor(blue) ///
>       ti("Time-Scale Correlation Plot "Hypothetical USP II", size(medium)) ///
>       yla(, angle(horiz)) ///
>           legend(label(1 "Equal % dissolution times") label(2 "Interpolated") ///
>               label(3 "Best line") row(1)) ///
>           xti("USP 1 time") name(d,replace)
```

[Z.134]
```
. graph export ../Figures/Reply/tc4.pdf, replace
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*      37



Figure Z.11:  Actual and hypothetical time-scale correlation plots for the for dissolution curves depicted in Figure Z.10

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

## Z.9     Effects of estimating $c$ on confidence intervals for predictions

### Z.9.1    Product of variances method

[Z.135]
```
. // Betensky confidence intervals.do
. // confidence intervals for predictions at 1.5 hours
. // with and without accounting for variability in c
```

[Z.136]
```
. use ../Data/Usp12Slopes, clear
. sort sheet
. merge 1:1 sheet using ../Data/samplecode

    Result                      Number of obs
    -----------------------------------------
    Not matched                            0
    Matched                               26  (_merge==3)
    -----------------------------------------
```

[Z.137]
```
. ci means ratio                    // overall standard error from combined set
```

| Variable | Obs | Mean | Std. err. | [95% conf. interval] | |
|---|---|---|---|---|---|
| ratio | 26 | 1.862077 | .0093407 | 1.842839 | 1.881314 |

[Z.138]
```
. ci means ratio if insample==1
```

| Variable | Obs | Mean | Std. err. | [95% conf. interval] | |
|---|---|---|---|---|---|
| ratio | 10 | 1.866525 | .0222259 | 1.816247 | 1.916804 |

[Z.139]
```
. display r(se)^2
.00049399
```

[Z.140]
```
. sum ratio     if insample==1
```

| Variable | Obs | Mean | Std. dev. | Min | Max |
|---|---|---|---|---|---|
| ratio | 10 | 1.866525 | .0702846 | 1.74758 | 2.008945 |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     39

[Z.141]
```
. display r(Var)                // Variance of estimated c values
.00493992
```

[Z.142]
```
. local sec = r(sd)/sqrt(r(N))   // standard error of c from training samples
```

[Z.143]
```
. local c = 1.8656                      // use c derived from training set
. use ../Data/temp15, clear
. drop if sheet==26                     // omit duplicate data set
(0 observations deleted)
```

[Z.144]
```
. sort sheet batch lot mg
. merge m:1 sheet batch lot mg using ../Data/samplecode, nogen // add insample status

    Result                    Number of obs
    -----------------------------------------
    Not matched                           0
    Matched                             936
    -----------------------------------------
```

[Z.145]
```
. keep if t<=3 & t>0                    // keep predictions at 1.5 and USP
> 1 3-hr
(624 observations deleted)
```

[Z.146]
```
. drop if insample==1
(120 observations deleted)
. sort sheet sample
```

[Z.147]
```
. matrix A = J(26,11,.)
```

[Z.148]
```
. matrix colnames A = sheet mg insample ll ul mean se semod lbmod ubmod ubratio
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     40

[Z.149]
```
. // qui foreach s of numlist 1/26 {       // calculate CI and store in matrix A
. //        preserve
. //        keep if newsheet == 's'
. //        ci means pred if predictpoint==1
. //        mat A['s',1]= sheet[1]
. //        mat A['s',2]= mg[1]
. //        mat A['s',3]= insample[1]
. //        mat A['s',4]= r(lb)
. //        mat A['s',5]= r(ub)
. //        mat A['s',6]= r(mean)
. //        mat A['s',7]= r(se)
. //        ci means pct if t==3
. //        local sep = sqrt((('c')^2*r(se)^2 + (r(mean)*('sec'))^2-(r(se)*('sec'))^2)/4)
. //        mat A['s',8]= 'sep'
. //        mat A['s',9]=  A['s',6] - invttail(r(N)-1,0.025)*'sep'
. //        mat A['s',10]= A['s',6] + invttail(r(N)-1,0.025)*'sep'
. //        mat A['s',11]= (A['s',6] + invttail(r(N)-1,0.025)*'sep')/A['s',5]
. //        restore
. // }
. qui foreach s of numlist 1/26 {       // calculate CI and store in matrix A
```

[Z.150]
```
. mat list A, format(%5.3f)
```

```
A[26,11]
```

| | sheet | mg | insample | ll | ul | mean | se | semod | lbmod |
|---|---|---|---|---|---|---|---|---|---|
| r1 | . | . | . | . | . | . | . | . | . |
| r2 | . | . | . | . | . | . | . | . | . |
| r3 | 3.0 | 25.000 | 0.000 | 25.888 | 28.836 | 27.362 | 0.573 | 0.659 | 25.667 |
| r4 | 4.0 | 25.000 | 0.000 | 24.996 | 28.796 | 26.896 | 0.739 | 0.806 | 24.825 |
| r5 | 5.0 | 25.000 | 0.000 | 27.284 | 29.306 | 28.295 | 0.393 | 0.518 | 26.963 |
| r6 | 6.0 | 25.000 | 0.000 | 23.802 | 28.435 | 26.118 | 0.901 | 0.953 | 23.668 |
| r7 | . | . | . | . | . | . | . | . | . |
| r8 | . | . | . | . | . | . | . | . | . |
| r9 | 9.0 | 25.000 | 0.000 | 26.033 | 29.002 | 27.518 | 0.578 | 0.664 | 25.811 |
| r10 | 10.0 | 25.000 | 0.000 | 25.386 | 27.784 | 26.585 | 0.466 | 0.564 | 25.136 |
| r11 | . | . | . | . | . | . | . | . | . |
| r12 | 12.0 | 25.000 | 0.000 | 27.365 | 28.603 | 27.984 | 0.241 | 0.411 | 26.927 |
| r13 | 13.0 | 25.000 | 0.000 | 23.674 | 27.319 | 25.497 | 0.709 | 0.771 | 23.514 |
| r14 | 14.0 | 25.000 | 0.000 | 26.467 | 29.501 | 27.984 | 0.590 | 0.678 | 26.242 |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*    41

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| r15 | . | . | . | . | . | . | . | . | . |
| r16 | . | . | . | . | . | . | . | . | . |
| r17 | 17.0 | 50.000 | 0.000 | 23.264 | 25.553 | 24.408 | 0.445 | 0.532 | 23.041 |
| r18 | 18.0 | 50.000 | 0.000 | 23.886 | 26.175 | 25.030 | 0.445 | 0.536 | 23.653 |
| r19 | 19.0 | 50.000 | 0.000 | 23.947 | 26.424 | 25.186 | 0.482 | 0.567 | 23.727 |
| r20 | . | . | . | . | . | . | . | . | . |
| r21 | 21.0 | 50.000 | 0.000 | 22.082 | 24.558 | 23.320 | 0.482 | 0.556 | 21.891 |
| r22 | . | . | . | . | . | . | . | . | . |
| r23 | . | . | . | . | . | . | . | . | . |
| r24 | 24.0 | 50.000 | 0.000 | 23.947 | 26.424 | 25.186 | 0.482 | 0.567 | 23.727 |
| r25 | 25.0 | 50.000 | 0.000 | 22.756 | 25.127 | 23.942 | 0.461 | 0.542 | 22.548 |
| r26 | 27.0 | 50.000 | 0.000 | 23.462 | 26.598 | 25.030 | 0.610 | 0.679 | 23.285 |

| | ubmod | ubratio |
|---|---|---|
| r1 | . | . |
| r2 | . | . |
| r3 | 29.057 | 1.008 |
| r4 | 28.966 | 1.006 |
| r5 | 29.626 | 1.011 |
| r6 | 28.569 | 1.005 |
| r7 | . | . |
| r8 | . | . |
| r9 | 29.225 | 1.008 |
| r10 | 28.034 | 1.009 |
| r11 | . | . |
| r12 | 29.041 | 1.015 |
| r13 | 27.479 | 1.006 |
| r14 | 29.726 | 1.008 |
| r15 | . | . |
| r16 | . | . |
| r17 | 25.775 | 1.009 |
| r18 | 26.407 | 1.009 |
| r19 | 26.644 | 1.008 |
| r20 | . | . |
| r21 | 24.749 | 1.008 |
| r22 | . | . |
| r23 | . | . |
| r24 | 26.644 | 1.008 |
| r25 | 25.336 | 1.008 |
| r26 | 26.776 | 1.007 |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     42

[Z.151]   . drop _all  // restrict to data above to summarize

[Z.152]   . svmat A, names(col)
          number of observations will be reset to 26
          Press any key to continue, or Break to abort
          Number of observations (_N) was 0, now 26.

[Z.153]   . format %5.2f mean ll ul se semod lbmod ubmod

[Z.154]   . format %5.3f ubratio

[Z.155]   . order sheet mg mean se ll ul semod lb ubmod ubratio

[Z.156]   . // only list rows from validation sample
          . drop if sheet==.
          (10 observations deleted)

[Z.157]   . list sheet mean se semod ll lbmod ul ubmod ubratio

```
      +----------------------------------------------------------------------+
      | sheet    mean     se   semod      ll   lbmod      ul   ubmod  ubratio |
      |----------------------------------------------------------------------|
  1.  |     3   27.36    0.57    0.66   25.89   25.67   28.84   29.06    1.008 |
  2.  |     4   26.90    0.74    0.81   25.00   24.83   28.80   28.97    1.006 |
  3.  |     5   28.29    0.39    0.52   27.28   26.96   29.31   29.63    1.011 |
  4.  |     6   26.12    0.90    0.95   23.80   23.67   28.43   28.57    1.005 |
  5.  |     9   27.52    0.58    0.66   26.03   25.81   29.00   29.22    1.008 |
      |----------------------------------------------------------------------|
  6.  |    10   26.58    0.47    0.56   25.39   25.14   27.78   28.03    1.009 |
  7.  |    12   27.98    0.24    0.41   27.36   26.93   28.60   29.04    1.015 |
  8.  |    13   25.50    0.71    0.77   23.67   23.51   27.32   27.48    1.006 |
  9.  |    14   27.98    0.59    0.68   26.47   26.24   29.50   29.73    1.008 |
 10.  |    17   24.41    0.45    0.53   23.26   23.04   25.55   25.78    1.009 |
      |----------------------------------------------------------------------|
 11.  |    18   25.03    0.45    0.54   23.89   23.65   26.17   26.41    1.009 |
 12.  |    19   25.19    0.48    0.57   23.95   23.73   26.42   26.64    1.008 |
 13.  |    21   23.32    0.48    0.56   22.08   21.89   24.56   24.75    1.008 |
 14.  |    24   25.19    0.48    0.57   23.95   23.73   26.42   26.64    1.008 |
 15.  |    25   23.94    0.46    0.54   22.76   22.55   25.13   25.34    1.008 |
      |----------------------------------------------------------------------|
 16.  |    27   25.03    0.61    0.68   23.46   23.28   26.60   26.78    1.007 |
      +----------------------------------------------------------------------+
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.158]

```
. sum ll ul lbmod ubmod ubratio

    Variable |        Obs        Mean    Std. dev.         Min         Max
-------------+---------------------------------------------------------
          ll |         16    24.63996    1.601572    22.08176    27.36488
          ul |         16     27.4025    1.591579    24.55824    29.50053
       lbmod |         16    24.41397    1.554893    21.89064    26.96344
       ubmod |         16     27.6285    1.611903    24.74935    29.72583
     ubratio |         16    1.008236    .0023908    1.004714    1.015316
```

## Z.9.2   Defendant best-case analysis

[Z.159]

```
. // Reply-Defendant best case.do
. version 17.0
. set seed 44969
. set more off
```

[Z.160]

```
. local c = 1.8776    // use c from full data set + 2 se(c)
```

[Z.161]

```
. // Apotex analysis
. use ../Data/Apotex, clear
. capture drop if sample=="Avg."
```

[Z.162]

```
. // predict dissolution at 1.5 hours for USP 2
. sort sheet t
. expand 3 if t==0                       // add time points at which to predict
(144 observations created)
. sort sheet sample t                    //     USP 2 at 1.5 hours
. generate predictpoint = 0
```

[Z.163]

```
. by sheet sample t: replace pct=. if _n>=2
(144 real changes made, 144 to missing)
. by sheet sample t: replace predictpoint=1 if _n==2  // lower claim 1 threshold
(72 real changes made)
. by sheet sample t: replace predictpoint=2 if _n==3  // upper claim 1 threshold
(72 real changes made)
. replace t=1.5*`c' if predictpoint==1
(72 real changes made)
. replace t=7.0*`c' if predictpoint==2
(72 real changes made)
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*      44

[Z.164]  `. sort sheet sample t`
`. by sheet sample: ipolate pct t, gen(pred) epolate  // obtain value via linear interp`
`. replace pred = min(100,pred)                        // truncate predictions at 100%`
`(153 real changes made)`

[Z.165]  `. count if pred>39 & predictpoint==1              //    in Basket data`
`   0`

[Z.166]  `. count if pred<75 & predictpoint==2`
`   0`

[Z.167]  `. sum pred if predictpoint==1 & mg==25`

```
    Variable |        Obs        Mean    Std. dev.       Min        Max
-------------+---------------------------------------------------------
        pred |         36    28.49761    1.728209     25.4394    32.8886
```

[Z.168]  `. sum pred if predictpoint==1 & mg==50`

```
    Variable |        Obs        Mean    Std. dev.       Min        Max
-------------+---------------------------------------------------------
        pred |         36    26.23312     1.06406     24.3476    29.0722
```

[Z.169]  `. sum pred if predictpoint==2 & mg==25`

```
    Variable |        Obs        Mean    Std. dev.       Min        Max
-------------+---------------------------------------------------------
        pred |         36         100           0         100        100
```

[Z.170]  `. sum pred if predictpoint==2 & mg==50`

```
    Variable |        Obs        Mean    Std. dev.       Min        Max
-------------+---------------------------------------------------------
        pred |         36    99.90874    .3132776     98.4284        100
```

[Z.171]  `. sum pct if t==8.5`

```
    Variable |        Obs        Mean    Std. dev.       Min        Max
-------------+---------------------------------------------------------
         pct |         72    90.77778    3.285573          85         98
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.172]
```
. save ../Data/foo, replace
. // confidence intervals for predictions at 1.5 hours
. use ../Data/foo, clear
. quietly sum sheet
. local n = r(max)
```

[Z.173]
```
. sort sheet batch lot mg
. keep if predictpoint==1
(648 observations deleted)
. sort mg sheet sample
```

[Z.174]
```
. matrix A = J(`n',6,.)
. matrix colnames A = sheet mg n dissolution ll ul
```

[Z.175]
```
. // quietly foreach s of numlist 1/`n' {      // calculate CI and store in matrix A
. //      preserve
. //      keep if sheet == `s'
. //      ci means pred
. //      mat A[`s',1]= sheet[1]
. //      mat A[`s',2]= mg[1]
. //  mat A[`s',3]= r(N)
. //  mat A[`s',4]= r(mean)
. //      mat A[`s',5]= r(lb)
. //      mat A[`s',6]= r(ub)
. //      restore
. // }
. quietly foreach s of numlist 1/`n' {      // calculate CI and store in matrix A
```

[Z.176]
```
. mat list A
```

A[6,6]

|    | sheet | mg | n | dissolution | ll | ul |
|----|-------|----|----|-------------|-----|-----|
| r1 | 1 | 50 | 12 | 26.558534 | 25.918406 | 27.198661 |
| r2 | 2 | 25 | 12 | 28.323017 | 27.764916 | 28.881118 |
| r3 | 3 | 50 | 12 | 26.32465 | 25.56277 | 27.086531 |
| r4 | 4 | 50 | 12 | 25.816184 | 25.235481 | 26.396887 |
| r5 | 5 | 25 | 12 | 27.491317 | 26.383554 | 28.599081 |
| r6 | 6 | 25 | 12 | 29.678484 | 28.572019 | 30.784949 |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z. COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     46

[Z.177]
```
. clear
. svmat A, names(col)
number of observations will be reset to 6
Press any key to continue, or Break to abort
Number of observations (_N) was 0, now 6.
```

[Z.178]
```
. table mg , stat(frequency) stat(mean dissolution ll ul) nototals nformat(%5.2f mean)

    ------------------------------------------------
        | Frequency              Mean
        |               dissolution     ll      ul
    ----+-------------------------------------------
    mg  |
     25 |          3         28.50   27.57   29.42
     50 |          3         26.23   25.57   26.89
    ------------------------------------------------
```

[Z.179]
```
. // Aurobindo analysis
. use ../Data/Aurobindo, clear
. capture drop if sample=="Avg."
```

[Z.180]
```
. // predict dissolution at 1.5 hours for USP 2
. sort sheet t
. expand 3 if t==0                       // add time points at which to predict
(72 observations created)
. sort sheet sample t                    //    USP 2 at 1.5 hours
. generate predictpoint = 0
```

[Z.181]
```
. by sheet sample t: replace pct=. if _n>=2
(72 real changes made, 72 to missing)
. by sheet sample t: replace predictpoint=1 if _n==2  // lower claim 1 threshold
(36 real changes made)
. by sheet sample t: replace predictpoint=2 if _n==3  // upper claim 1 threshold
(36 real changes made)
. replace t=1.5*`c' if predictpoint==1
(36 real changes made)
. replace t=7.0*`c' if predictpoint==2
(36 real changes made)
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     47

[Z.182]    . sort sheet sample t
           . by sheet sample: ipolate pct t, gen(pred) epolate  // obtain value via linear interp

[Z.183]    . replace pred = min(100,pred)                        // truncate predictions at 100%
           (19 real changes made)

[Z.184]    . count if pred>39 & predictpoint==1                  //    in Basket data
             0

[Z.185]    . count if pred<75 & predictpoint==2
             0

[Z.186]    . sum pred if predictpoint==1 & mg==25

```
    Variable |        Obs        Mean    Std. dev.       Min        Max
-------------+----------------------------------------------------------
        pred |          0
```

[Z.187]    . sum pred if predictpoint==1 & mg==50

```
    Variable |        Obs        Mean    Std. dev.       Min        Max
-------------+----------------------------------------------------------
        pred |         36    23.20794    2.514671    16.25972    26.97416
```

[Z.188]    . sum pred if predictpoint==2 & mg==25

```
    Variable |        Obs        Mean    Std. dev.       Min        Max
-------------+----------------------------------------------------------
        pred |          0
```

[Z.189]    . sum pred if predictpoint==2 & mg==50

```
    Variable |        Obs        Mean    Std. dev.       Min        Max
-------------+----------------------------------------------------------
        pred |         36    98.71567    1.227404     96.2858        100
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*      48

[Z.190]   `. sum pct if t==8.5`

```
    Variable |        Obs        Mean    Std. dev.         Min         Max
-------------+------------------------------------------------------------
         pct |         36    85.44167    3.835799        72.3        90.9
```

[Z.191]   `. save ../Data/foo, replace`

[Z.192]   `. // confidence intervals for predictions at 1.5 hours`
`. use ../Data/foo, clear`
`. quietly sum sheet`
`. local n = r(max)`
`. sort sheet batch lot mg`
`. keep if predictpoint==1`
`(360 observations deleted)`

[Z.193]   `. sort mg sheet sample`
`. matrix A = J(`n',6,.)`
`. matrix colnames A = sheet mg n dissolution ll ul`

[Z.194]   `. quietly foreach s of numlist 1/`n' {       // calculate CI and store in matrix A`

[Z.195]   `. mat list A`

```
A[3,6]
         sheet           mg            n  dissolution           ll           ul
r1           1           50           12     21.85935    20.725132    22.993569
r2           2           50           12    25.570774    24.864978    26.276569
r3           3           50           12    22.193694    20.573438     23.81395
```

[Z.196]   `. clear`

[Z.197]   `. svmat A, names(col)`
`number of observations will be reset to 3`
`Press any key to continue, or Break to abort`
`Number of observations (_N) was 0, now 3.`

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     49

[Z.198]  `. table mg , stat(frequency) stat(mean dissolution ll ul) nototals nformat(%5.2f mean)`

```
-------------------------------------------------
      | Frequency             Mean
      |               dissolution    ll      ul
-----+-------------------------------------------
mg   |
  50 |           3            23.21  22.05  24.36
-------------------------------------------------
```

[Z.199]  `. // Lupin analysis`
`. use ../Data/Lupin, clear`
`. capture drop if sample=="Avg."`

[Z.200]  `. // predict dissolution at 1.5 hours for USP 2`
`. sort sheet t`
`. expand 3 if t==0                    // add time points at which to predict`
`(144 observations created)`
`. sort sheet sample t                 //     USP 2 at 1.5 hours`
`. generate predictpoint = 0`

[Z.201]  `. by sheet sample t: replace pct=. if _n>=2`
`(144 real changes made, 144 to missing)`

[Z.202]  `. by sheet sample t: replace predictpoint=1 if _n==2  // lower claim 1 threshold`
`(72 real changes made)`

[Z.203]  `. by sheet sample t: replace predictpoint=2 if _n==3  // upper claim 1 threshold`
`(72 real changes made)`

[Z.204]  `. replace t=1.5*'c' if predictpoint==1`
`(72 real changes made)`

[Z.205]  `. replace t=7.0*'c' if predictpoint==2`
`(72 real changes made)`

[Z.206]  `. sort sheet sample t`
`. by sheet sample: ipolate pct t, gen(pred) epolate  // obtain value via linear interp`

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     50

[Z.207]  . replace pred = min(100,pred)                // truncate predictions at 100%
         (117 real changes made)

[Z.208]  . count if pred>39 & predictpoint==1           //    in Basket data
           1

[Z.209]  . count if pred<75 & predictpoint==2
           0

[Z.210]  . sum pred if predictpoint==1 & mg==25

```
    Variable |        Obs        Mean    Std. dev.        Min        Max
-------------+---------------------------------------------------------
        pred |         36    31.88013    5.011856     22.3476     39.246
```

[Z.211]  . sum pred if predictpoint==1 & mg==50

```
    Variable |        Obs        Mean    Std. dev.        Min        Max
-------------+---------------------------------------------------------
        pred |         36    24.22265    3.334637     18.8984     30.7968
```

[Z.212]  . sum pred if predictpoint==2 & mg==25

```
    Variable |        Obs        Mean    Std. dev.        Min        Max
-------------+---------------------------------------------------------
        pred |         36    98.79369    1.711958     94.5716        100
```

[Z.213]  . sum pred if predictpoint==2 & mg==50

```
    Variable |        Obs        Mean    Std. dev.        Min        Max
-------------+---------------------------------------------------------
        pred |         36    99.80963    .7153691     96.2864        100
```

[Z.214]  . sum pct if t==8.5

```
    Variable |        Obs        Mean    Std. dev.        Min        Max
-------------+---------------------------------------------------------
         pct |         72          88    10.97372         64        105
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.215]   `. save ../Data/foo, replace`

[Z.216]   ```
. // confidence intervals for predictions at 1.5 hours
. use ../Data/foo, clear
. quietly sum sheet
. local n = r(max)
. sort sheet batch lot mg
. keep if predictpoint==1
(648 observations deleted)
```

[Z.217]   ```
. sort mg sheet sample
. matrix A = J(`n',6,.)
. matrix colnames A = sheet mg n dissolution ll ul
```

[Z.218]   `. quietly foreach s of numlist 1/`n' {      // calculate CI and store in matrix A`

[Z.219]   `. mat list A`

```
A[6,6]
        sheet          mg          n   dissolution           ll           ul
r1          1          25         12     33.341884    30.430988     36.25278
r2          2          25         12     28.866467    25.321787    32.411148
r3          3          25         12     33.432051     31.14621    35.717892
r4          4          50         12     23.541601    21.543513    25.539688
r5          5          50         12     25.407167    22.956389    27.857945
r6          6          50         12     23.719184    21.888685    25.549683
```

[Z.220]   ```
. clear
. svmat A, names(col)
number of observations will be reset to 6
Press any key to continue, or Break to abort
Number of observations (_N) was 0, now 6.
```

[Z.221]   `. table mg , stat(frequency) stat(mean dissolution ll ul) nototals nformat(%5.2f mean)`

```
-------------------------------------------------
         | Frequency                Mean
         |              dissolution     ll     ul
-----+-------------------------------------------
mg       |
      25 |          3         31.88  28.97  34.79
      50 |          3         24.22  22.13  26.32
-------------------------------------------------
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     52

[Z.222]
```
. // Prinston analysis
. use ../Data/Prinston, clear
. capture drop if sample=="Avg."
```

[Z.223]
```
. // predict dissolution at 1.5 hours for USP 2
. sort sheet t
. expand 3 if t==0                      // add time points at which to predict
(144 observations created)
. sort sheet sample t                   //    USP 2 at 1.5 hours
. generate predictpoint = 0
```

[Z.224]
```
. by sheet sample t: replace pct=. if _n>=2
(144 real changes made, 144 to missing)
```

[Z.225]
```
. by sheet sample t: replace predictpoint=1 if _n==2  // lower claim 1 threshold
(72 real changes made)
```

[Z.226]
```
. by sheet sample t: replace predictpoint=2 if _n==3  // upper claim 1 threshold
(72 real changes made)
```

[Z.227]
```
. replace t=1.5*`c' if predictpoint==1
(72 real changes made)
```

[Z.228]
```
. replace t=7.0*`c' if predictpoint==2
(72 real changes made)
```

[Z.229]
```
. sort sheet sample t
. by sheet sample: ipolate pct t, gen(pred) epolate  // obtain value via linear interp
```

[Z.230]
```
. replace pred = min(100,pred)                    // truncate predictions at 100%
(99 real changes made)
```

[Z.231]
```
. count if pred>39 & predictpoint==1              //    in Basket data
    0
```

[Z.232]
```
. count if pred<75 & predictpoint==2
    0
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.233]    . sum pred if predictpoint==1 & mg==25

```
    Variable |        Obs        Mean    Std. dev.        Min        Max
-------------+---------------------------------------------------------
        pred |         36    32.52977    1.371203     29.9804     35.705
```

[Z.234]    . sum pred if predictpoint==1 & mg==50

```
    Variable |        Obs        Mean    Std. dev.        Min        Max
-------------+---------------------------------------------------------
        pred |         36    28.63405    1.615711     25.2558     31.705
```

[Z.235]    . sum pred if predictpoint==2 & mg==25

```
    Variable |        Obs        Mean    Std. dev.        Min        Max
-------------+---------------------------------------------------------
        pred |         36    99.28172     1.08074     96.4284        100
```

[Z.236]    . sum pred if predictpoint==2 & mg==50

```
    Variable |        Obs        Mean    Std. dev.        Min        Max
-------------+---------------------------------------------------------
        pred |         36    99.43254    .8361241     97.4284        100
```

[Z.237]    . sum pct if t==8.5

```
    Variable |        Obs        Mean    Std. dev.        Min        Max
-------------+---------------------------------------------------------
         pct |         72    95.44444    4.930186          82        102
```

[Z.238]    . save ../Data/foo, replace

[Z.239]    . // confidence intervals for predictions at 1.5 hours
           . use ../Data/foo, clear
           . quietly sum sheet
           . local n = r(max)
           . sort sheet batch lot mg
           . keep if predictpoint==1
           (648 observations deleted)

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     54

[Z.240]
```
. sort mg sheet sample
. matrix A = J(`n',6,.)
. matrix colnames A = sheet mg n dissolution ll ul
. quietly foreach s of numlist 1/`n' {      // calculate CI and store in matrix A
```

[Z.241]
```
. mat list A

A[6,6]
           sheet            mg           n  dissolution            ll            ul
r1             1            25          12    32.146251     31.566426     32.726075
r2             2            25          12    31.517834     30.965944     32.069723
r3             3            25          12    33.925217     33.291981     34.558453
r4             4            50          12    29.289967      28.39012     30.189814
r5             5            50          12    27.299251     26.547387     28.051114
r6             6            50          12    29.312917     28.417892     30.207943
```

[Z.242]
```
. clear
. svmat A, names(col)
number of observations will be reset to 6
Press any key to continue, or Break to abort
Number of observations (_N) was 0, now 6.
```

[Z.243]
```
. table mg , stat(frequency) stat(mean dissolution ll ul) nototals nformat(%5.2f mean)

     ------------------------------------------------
      | Frequency              Mean
      |              dissolution      ll      ul
     -----+------------------------------------------
     mg   |
       25 |            3          32.53   31.94   33.12
       50 |            3          28.63   27.79   29.48
     ------------------------------------------------
```

[Z.244]
```
. // Sawai analysis
. use ../Data/Sawai-corrected, clear
. capture drop if sample=="Avg."
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     55

[Z.245]   . // predict dissolution at 1.5 hours for USP 2
          . sort sheet t
          . expand 3 if t==0                      // add time points at which to predict
          (36 observations created)
          . sort sheet sample t                   //      USP 2 at 1.5 hours
          . generate predictpoint = 0

[Z.246]   . by sheet sample t: replace pct=. if _n>=2
          (36 real changes made, 36 to missing)

[Z.247]   . by sheet sample t: replace predictpoint=1 if _n==2  // lower claim 1 threshold
          (18 real changes made)

[Z.248]   . by sheet sample t: replace predictpoint=2 if _n==3  // upper claim 1 threshold
          (18 real changes made)

[Z.249]   . replace t=1.5*'c' if predictpoint==1
          variable t was int now float
          (18 real changes made)

[Z.250]   . replace t=7.0*'c' if predictpoint==2
          (18 real changes made)

[Z.251]   . sort sheet sample t
          . by sheet sample: ipolate pct t, gen(pred) epolate  // obtain value via linear interp
          . replace pred = min(100,pred)                        // truncate predictions at 100%
          (65 real changes made)

[Z.252]   . count if pred>39 & predictpoint==1                  //     in Basket data
            1

[Z.253]   . count if pred<75 & predictpoint==2
            0

[Z.254]   . sum pred if predictpoint==1 & mg==25

| Variable | Obs | Mean | Std. dev. | Min | Max |
|---|---|---|---|---|---|
| pred | 18 | 36.84117 | 2.173483 | 30.7968 | 39.246 |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     56

[Z.255]  . sum pred if predictpoint==1 & mg==50

```
    Variable |        Obs        Mean    Std. dev.        Min         Max
-------------+---------------------------------------------------------------
        pred |          0
```

[Z.256]  . sum pred if predictpoint==2 & mg==25

```
    Variable |        Obs        Mean    Std. dev.        Min         Max
-------------+---------------------------------------------------------------
        pred |         18         100           0         100         100
```

[Z.257]  . sum pred if predictpoint==2 & mg==50

```
    Variable |        Obs        Mean    Std. dev.        Min         Max
-------------+---------------------------------------------------------------
        pred |          0
```

[Z.258]  . sum pct if t==8.5

```
    Variable |        Obs        Mean    Std. dev.        Min         Max
-------------+---------------------------------------------------------------
         pct |          0
```

[Z.259]  . save ../Data/foo, replace

[Z.260]  . // confidence intervals for predictions at 1.5 hours
         . use ../Data/foo, clear
         . quietly sum sheet
         . local n = r(max)
         . sort sheet batch lot mg
         . keep if predictpoint==1
         (162 observations deleted)
         . sort mg sheet sample

[Z.261]  . matrix A = J(`n',6,.)
         . matrix colnames A = sheet mg n dissolution ll ul
         . quietly foreach s of numlist 1/`n' {      // calculate CI and store in matrix A

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.262]
```
. mat list A

A[3,6]
        sheet        mg         n  dissolution          ll          ul
r1          1         25         6    37.225501    36.488314    37.962687
r2          2         25         6    38.140534    36.891514    39.389555
r3          3         25         6    35.157467    32.089485    38.225449
```

[Z.263]
```
. clear
. svmat A, names(col)
number of observations will be reset to 3
Press any key to continue, or Break to abort
Number of observations (_N) was 0, now 3.
```

[Z.264]
```
. table mg , stat(frequency) stat(mean dissolution ll ul) nototals nformat(%5.2f mean)

------------------------------------------------
       | Frequency              Mean
       |              dissolution     ll      ul
-----+------------------------------------------
mg   |
  25 |          3          36.84   35.16   38.53
------------------------------------------------
```

[Z.265]
```
. // Zydus analysis
. use ../Data/Zydus, clear
. capture drop if sample=="Avg."
```

[Z.266]
```
. // predict dissolution at 1.5 hours for USP 2
. sort sheet t
. expand 3 if t==0                      // add time points at which to predict
(144 observations created)
. sort sheet sample t                   //     USP 2 at 1.5 hours
. generate predictpoint = 0
```

[Z.267]
```
. by sheet sample t: replace pct=. if _n>=2
(144 real changes made, 144 to missing)
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     58

[Z.268]
```
. by sheet sample t: replace predictpoint=1 if _n==2  // lower claim 1 threshold
(72 real changes made)
```

[Z.269]
```
. by sheet sample t: replace predictpoint=2 if _n==3  // upper claim 1 threshold
(72 real changes made)
```

[Z.270]
```
. replace t=1.5*`c' if predictpoint==1
(72 real changes made)
```

[Z.271]
```
. replace t=7.0*`c' if predictpoint==2
(72 real changes made)
```

[Z.272]
```
. sort sheet sample t
. by sheet sample: ipolate pct t, gen(pred) epolate  // obtain value via linear interp
```

[Z.273]
```
. replace pred = min(100,pred)                   // truncate predictions at 100%
(87 real changes made)
```

[Z.274]
```
. count if pred>39 & predictpoint==1             //    in Basket data
  0
```

[Z.275]
```
. count if pred<75 & predictpoint==2
  0
```

[Z.276]
```
. sum pred if predictpoint==1 & mg==25
```

| Variable | Obs | Mean | Std. dev. | Min | Max |
|---|---|---|---|---|---|
| pred | 36 | 27.71333 | 2.01137 | 23.84136 | 31.67024 |

[Z.277]
```
. sum pred if predictpoint==1 & mg==50
```

| Variable | Obs | Mean | Std. dev. | Min | Max |
|---|---|---|---|---|---|
| pred | 36 | 23.17949 | 1.562321 | 20.09252 | 26.6968 |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.278]  . sum pred if predictpoint==2 & mg==25

```
    Variable |        Obs        Mean    Std. dev.       Min        Max
-------------+---------------------------------------------------------
        pred |         36         100           0        100        100
```

[Z.279]  . sum pred if predictpoint==2 & mg==50

```
    Variable |        Obs        Mean    Std. dev.       Min        Max
-------------+---------------------------------------------------------
        pred |         36         100           0        100        100
```

[Z.280]  . sum pct if t==8.5

```
    Variable |        Obs        Mean    Std. dev.       Min        Max
-------------+---------------------------------------------------------
         pct |         72    84.16528    6.586994        72.2       98.3
```

[Z.281]  . save ../Data/foo, replace

[Z.282]  . // confidence intervals for predictions at 1.5 hours
         . use ../Data/foo, clear
         . quietly sum sheet
         . local n = r(max)
         . sort sheet batch lot mg
         . keep if predictpoint==1
         (648 observations deleted)
         . sort mg sheet sample

[Z.283]  . matrix A = J(`n',6,.)
         . matrix colnames A = sheet mg n dissolution ll ul
         . quietly foreach s of numlist 1/`n' {      // calculate CI and store in matrix A

[Z.284]  . mat list A

```
    A[6,6]
            sheet           mg            n    dissolution              ll              ul
    r1          1           25           12      28.736001        27.301918       30.170084
    r2          2           25           12      27.701821        26.530472       28.873169
    r3          3           25           12       26.70216        25.776456       27.627865
    r4          4           50           12       23.67875        23.077015       24.280486
    r5          5           50           12       23.48233        22.242414       24.722247
    r6          6           50           12      22.377384        21.481702       23.273066
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.285]
```
. clear
. svmat A, names(col)
number of observations will be reset to 6
Press any key to continue, or Break to abort
Number of observations (_N) was 0, now 6.
```

[Z.286]
```
. table mg , stat(frequency) stat(mean dissolution ll ul) nototals nformat(%5.2f mean)

    ------------------------------------------------
        |  Frequency                Mean
        |               dissolution     ll      ul
    ----+-------------------------------------------
    mg  |
     25 |          3          27.71   26.54   28.89
     50 |          3          23.18   22.27   24.09
    ------------------------------------------------
```

## Z.10   Analysis of Sawai USP 2 data at 50 rpm

### Z.10.1   MYRBETRIQ® data

**Data input**

[Z.287]
```
. // Sawai supplemental MYRBETRIQ analysis.do
. version 17.0
. set seed 44969
. set more off
```

[Z.288]
```
. local generic   = "Sawai"
. local file      = "`generic' MYRBETRIQ data"
. local batchcol  = "M"
. local batchrow  = "3"
. local batchloc  = "`batchcol'`batchrow'"
. local startcell = "B2"
. local endcell   = "J13"
```

[Z.289]
```
. local firsttime = 1
. local sheetnum  = 0
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.290]
```
      . foreach pane in "K1400128_USP II_50 rpm" ///
      >                   "K1400128_USP I_100 rpm_Set 1"  ///
      >                   "K1400128_USP I_100 rpm_Set 2" {
        2. quietly {
        3. import excel using "../raw/`file'.xlsx", clear ///
      >          cellrange(`batchloc':`batchloc') sheet("`pane'")
        4. local batch = `batchcol'[1]
        5. local lot   = ""
        6. local sheetnum = 1+`sheetnum'
        7. local mg     = 25
        8. import excel using "../raw/`file'.xlsx", clear ///
      >          cellrange(`startcell':`endcell') sheet("`pane'")
        9. noi list if `firsttime'==1
       10.
      . // extract batch number, lot number, mg of tablet, and sheet id number
      . generate sheet = `sheetnum'
       11. // di "`pane' `batch' `lot' `mg'"
      .
      . // add apparatus identifiers
      . generate apparatus = "Basket"
       12. if (`sheetnum'==1) {
       13.          replace apparatus = "Paddle50"
       14. }
       15.
      . // ensure correct for #GENERIC#
      . if (`sheetnum'==2) {
       16.          rename B sample
       17.          rename C pct0
       18.          rename D pct10
       19.          rename E pct30
       20.          rename F pct50
       21.          rename G pct70
       22.          rename H pct85
       23.          rename I pct100
       24.          rename J pct120
       25.          }
       26. else {
       27.          rename B sample
       28.          rename C pct0
       29.          rename D pct10
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

```
30.          rename E pct20
31.          rename F pct40
32.          rename G pct60
33.          rename H pct80
34.          rename I pct100
35.          rename J pct120
36.          }
37.
. // Note: Average (if present) is still preserved as if it were an additional sample
. reshape long pct, i(sample) j(t)
38. gen batch = "'batch'"
39. gen lot = "'lot'"
40. gen mg  = 'mg'
41. order sheet batch lot mg apparatus sample t
42.
. // recode t to corresond to observation time
. replace t=t/10
43.
. if ('firsttime' == 1) {
44.          save ../Data/'generic'-MYRBETRIQ, replace
45.          local firsttime = 0
46. }
47. else {
48. save ../Data/foo, replace
49. use "../Data/'generic'-MYRBETRIQ", clear
50. append using ../Data/foo
51. save "../Data/'generic'-MYRBETRIQ", replace
52. }
53. }
54. }
```

```
    +-------------------------------------------+
    | B   C   D    E    F    G    H    I    J |
    |-------------------------------------------|
 1. | 1   0   11   23   50   76   93   97   98 |
 2. | 2   0   10   22   49   75   92   98   98 |
 3. | 3   0    9   20   44   67   84   95   97 |
 4. | 4   0   11   23   52   78   94   98   98 |
 5. | 5   0    8   17   38   58   74   87   95 |
    |-------------------------------------------|
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

```
  6. |  6   0   9   18   41   61   77   90   97 |
  7. |  7   0   9   19   44   70   90   96   96 |
  8. |  8   0  11   23   52   75   93   95   95 |
  9. |  9   0  11   23   52   77   93   95   95 |
 10. | 10   0   8   18   40   61   75   85   91 |
     |-------------------------------------------|
 11. | 11   0  10   23   51   75   92   95   95 |
 12. | 12   0  10   21   48   72   91   95   95 |
     +-------------------------------------------+
```

## Dissolution curve shape

[Z.291]
```
. use "../Data/Sawai-MYRBETRIQ", clear
. collapse (mean) pct, by(sheet apparatus t)
. two line pct t, by(sheet apparatus) name(a, replace)
. two line pct t if t<10, by(sheet apparatus) name(b, replace)
. two line pct t if t>=2 & t<10, by(sheet apparatus) name(c, replace) yla(0(50)100)
. graph combine a b c, name(d, replace)
. graph export ../Figures/Sawai-MYRBETRIQ-dissolution.pdf, replace
```

## Slope and $c$

[Z.292]
```
. use "../Data/Sawai-MYRBETRIQ", clear
```

[Z.293]
```
. mixed pct t if (t>0 & t<10) & sheet==1 , noco || sample: t, noco reml nolog stddev
```

```
Mixed-effects REML regression              Number of obs     =         60
Group variable: sample                     Number of groups  =         12

                                           Obs per group:
                                                         min =          5
                                                         avg =        5.0
                                                         max =          5

                                           Wald chi2(1)      =    1342.64
Log restricted-likelihood = -161.24909     Prob > chi2       =     0.0000

------------------------------------------------------------------------
        pct | Coefficient  Std. err.     z   P>|z|    [95% conf. interval]
-------------+----------------------------------------------------------
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**



Figure Z.12: Dissolution curves for $t < 10$

```
            t |   11.23623    .3066478     36.64    0.000     10.63521    11.83724
-------------------------------------------------------------------------------


-------------------------------------------------------------------------------
  Random-effects parameters  |   Estimate   Std. err.     [95% conf. interval]
-----------------------------+-------------------------------------------------
sample: Identity             |
                      sd(t)  |   1.034497    .2326231      .6657686    1.607443
-----------------------------+-------------------------------------------------
                sd(Residual) |   2.653938    .2708664      2.172778     3.24165
-------------------------------------------------------------------------------
LR test vs. linear model: chibar2(01) = 55.18          Prob >= chibar2 = 0.0000

[Z.294]  . local b1 = _b[t]
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     65

[Z.295]   `. mixed pct t if (t>0 & t<10) & sheet==2 , noco || sample: t, noco reml nolog stddev`

```
Mixed-effects REML regression              Number of obs     =         60
Group variable: sample                     Number of groups  =         12
                                           Obs per group:
                                                         min =          5
                                                         avg =        5.0
                                                         max =          5
                                           Wald chi2(1)      =   15597.21
Log restricted-likelihood = -169.87693     Prob > chi2       =     0.0000

------------------------------------------------------------------------------
         pct | Coefficient  Std. err.      z    P>|z|     [95% conf. interval]
-------------+----------------------------------------------------------------
           t |   11.65467   .0933203   124.89   0.000     11.47176    11.83757
------------------------------------------------------------------------------


------------------------------------------------------------------------------
  Random-effects parameters  |   Estimate   Std. err.     [95% conf. interval]
-----------------------------+------------------------------------------------
sample: Identity             |
                      sd(t)  |   .0004827   .0942797      2.7e-170    8.6e+162
-----------------------------+------------------------------------------------
                sd(Residual) |   4.040885   .3719937      3.373782    4.839895
------------------------------------------------------------------------------
LR test vs. linear model: chibar2(01) = 0.00          Prob >= chibar2 = 1.0000
```

[Z.296]   `. local b2 = _b[t]`

[Z.297]   `. mixed pct t if (t>0 & t<10) & sheet==3 , noco || sample: t, noco reml nolog stddev`

```
Mixed-effects REML regression              Number of obs     =         60
Group variable: sample                     Number of groups  =         12
                                           Obs per group:
                                                         min =          5
                                                         avg =        5.0
                                                         max =          5
                                           Wald chi2(1)      =   19492.56
Log restricted-likelihood =   -157.657     Prob > chi2       =     0.0000
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     66

```
     -----------------------------------------------------------------
         pct | Coefficient  Std. err.      z    P>|z|    [95% conf. interval]
     -------------+---------------------------------------------------------------
           t |   12.06198    .0863941   139.62   0.000    11.89265    12.23131
     -----------------------------------------------------------------


     -----------------------------------------------------------------
      Random-effects parameters  |   Estimate   Std. err.    [95% conf. interval]
     -----------------------------+---------------------------------------------------
     sample: Identity            |
                         sd(t) |   1.28e-07    .0002334           0           .
     -----------------------------+---------------------------------------------------
                    sd(Residual) |   3.292059    .3030586    2.748579    3.943003
     -----------------------------------------------------------------
     LR test vs. linear model: chibar2(01) = 0.00         Prob >= chibar2 = 1.0000
```

[Z.298]    . local b3 = _b[t]

[Z.299]    . local c2 = `b1'/`b2'

[Z.300]    . local c3 = `b1'/`b3'

[Z.301]    . local ca = (`c2'+`c3')/2

[Z.302]    . di _newline "  c2  =  " %6.4f `c2' _newline "  c3  =  " %6.4f `c3' _newline ///
           >            "  ca  =  " %6.4f `ca'

             c2  =  0.9641
             c3  =  0.9315
             ca  =  0.9478


**Observed vs predicted USP 2 @ 50 rpm data**

[Z.303]    . use "../Data/Sawai-MYRBETRIQ", clear
           . collapse (mean) pct, by(sheet apparatus t)
           . keep if sheet==1
           . save ../Data/foo, replace

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     67

[Z.304]
```
. use "../Data/Sawai-MYRBETRIQ", clear
. collapse (mean) pct, by(sheet apparatus t)
. keep if sheet!=1
(8 observations deleted)
```

[Z.305]
```
. rename pct pred
. generate t4 = t/`ca'        // ca = 0.9478
. append using ../Data/foo
```

[Z.306]
```
. sort sheet t
. list, sepby(sheet)

     +---------------------------------------------------------+
     | sheet   appara~s    t      pred       t4        pct |
     |---------------------------------------------------------|
  1. |    1    Paddle50    0         .         .          0 |
  2. |    1    Paddle50    1         .         .       9.75 |
  3. |    1    Paddle50    2         .         .   20.833334 |
  4. |    1    Paddle50    4         .         .      46.75 |
  5. |    1    Paddle50    6         .         .   70.416664 |
  6. |    1    Paddle50    8         .         .   87.333336 |
  7. |    1    Paddle50   10         .         .   93.833336 |
  8. |    1    Paddle50   12         .         .   95.833336 |
     |---------------------------------------------------------|
  9. |    2    Basket      0         0         0          . |
 10. |    2    Basket      1  9.083333  1.055054          . |
 11. |    2    Basket      3      31.5  3.165163          . |
 12. |    2    Basket      5     60.75  5.275271          . |
 13. |    2    Basket      7      86.5  7.385379          . |
 14. |    2    Basket    8.5 95.083336   8.96796          . |
 15. |    2    Basket     10     95.75  10.55054          . |
 16. |    2    Basket     12 96.166664  12.66065          . |
     |---------------------------------------------------------|
 17. |    3    Basket      0         0         0          . |
 18. |    3    Basket      1         9  1.055054          . |
 19. |    3    Basket      2 19.666666  2.110108          . |
 20. |    3    Basket      4        47  4.220217          . |
 21. |    3    Basket      6 76.083336  6.330325          . |
 22. |    3    Basket      8 95.833336  8.440434          . |
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*      68

```
23. |   3      Basket    10       97.25    10.55054          . |
24. |   3      Basket    12    97.416664   12.66065          . |
    +------------------------------------------------------+
```

[Z.307]
```
. two line pct t if sheet==1 || scatter pred t4 if sheet==2, name(i, replace) legend(off)
. two line pct t if sheet==1 || scatter pred t4 if sheet==3, name(i, replace) legend(off)
. graph combine h i, name(j, replace) b1("Time (hours)") ///
>         ti("Sawai MYRBETRIQ® USP 2 @ 50 rpm")
```

### Z.10.2   Sawai mirabegron data

**Data input**

[Z.308]
```
. // Sawai supplemental mirabegron analysis.do
. version 17.0
. set seed 44969
. set more off
```

[Z.309]
```
. local generic   = "Sawai"
. local file      = "`generic' mirabegron 15KP001C data"
. local batchcol  = "M"
. local batchrow  = "3"
. local batchloc  = "`batchcol'`batchrow'"
. local startcell = "B2"
. local endcell   = "J13"
```

[Z.310]
```
. local firsttime = 1
. local sheetnum  = 0

    rename I pct100
24.         rename J pct120
25.         }
26. else {
27.         rename B sample
28.         rename C pct0
29.         rename D pct10
30.         rename E pct20
31.         rename F pct40
32.         rename G pct60
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

```
33.        rename H pct80
34.        rename I pct100
35.        rename J pct120
36.        }
37.
. // Note: Average (if present) is still preserved as if it were an additional sample
. reshape long pct, i(sample) j(t)
38. gen batch = "'batch'"
39. gen lot = "'lot'"
40. gen mg  = 'mg'
41. order sheet batch lot mg apparatus sample t
42.
. // recode t to corresond to observation time
. replace t=t/10
43.
. if ('firsttime' == 1) {
44.        save ../Data/'generic'-mirabegron, replace
45.        local firsttime = 0
46. }
47. else {
48. save ../Data/foo, replace
49. use "../Data/'generic'-mirabegron", clear
50. append using ../Data/foo
51. save "../Data/'generic'-mirabegron", replace
52. }
53. }
54. }
```

```
     +---------------------------------------------+
     | B   C   D    E    F    G    H     I     J |
     |---------------------------------------------|
  1. | 1   0   14   26   55   84   101   103   103 |
  2. | 2   0   14   28   58   85   102   102   103 |
  3. | 3   0   11   21   43   65    83    96   102 |
  4. | 4   0   11   21   43   65    81    94   100 |
  5. | 5   0   15   29   60   84   100   101   102 |
     |---------------------------------------------|
  6. | 6   0   14   28   59   88   101   102   103 |
  7. | 7   0   14   27   55   83    99   101   101 |
  8. | 8   0   16   31   63   88   100   100   100 |
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     70

```
  9. |  9   0   16   32   64   90   101   102   102 |
 10. | 10   0   14   27   55   83    99   101   101 |
     |-------------------------------------------|
 11. | 11   0   14   28   55   84   100   101   101 |
 12. | 12   0   15   29   58   85   100   100   101 |
     +-------------------------------------------+
```

**Dissolution curve shape**

[Z.311]
```
. use "../Data/Sawai-mirabegron", clear
. collapse (mean) pct, by(sheet apparatus t)
```

[Z.312]
```
. two line pct t, by(sheet, ti("All time points")) name(a, replace)
. two line pct t if t<10, by(sheet, ti("Times < 10 hours")) name(b, replace)
. graph export ../Figures/Sawai-mirabegron-dissolution.pdf, replace
```

[Z.313]
```
. two line pct t if t>0 & t<10, by(sheet, ti("0 < t < 10")) name(c, replace)
. graph combine a b c, name(d, replace)
```

[Z.314]
```
. graph export ../Figures/mirabegron-curves.pdf, replace
```

**Slope and $c$**

```
use "../Data/Sawai-mirabegron", clear
```

[Z.315]
```
. mixed pct t if (t>0 & t<10) & sheet==1 , noco || sample: t, noco reml nolog stddev
```

```
Mixed-effects REML regression              Number of obs      =        60
Group variable: sample                     Number of groups   =        12

                                           Obs per group:
                                                         min =         5
                                                         avg =       5.0
                                                         max =         5
                                           Wald chi2(1)       =   1510.38
Log restricted-likelihood = -190.64889     Prob > chi2        =    0.0000

------------------------------------------------------------------------------
         pct | Coefficient  Std. err.      z    P>|z|     [95% conf. interval]
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**



Figure Z.13: Graphs illustrating linearity of dissolution curves over first 8–8.5 hours

```
------------+----------------------------------------------------------------
          t |   12.9022    .331987     38.86    0.000    12.25152    13.55289
------------+----------------------------------------------------------------


-----------------------------------------------------------------------------
  Random-effects parameters  |   Estimate   Std. err.    [95% conf. interval]
-----------------------------+-----------------------------------------------
sample: Identity             |
                      sd(t) |   1.063725   .2657166      .65193    1.735634
-----------------------------+-----------------------------------------------
                sd(Residual) |   4.808309    .490746    3.936561    5.873105
-----------------------------------------------------------------------------
LR test vs. linear model: chibar2(01) = 22.61          Prob >= chibar2 = 0.0000
```

[Z.316]    . local b1 = _b[t]

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     72



Figure Z.14: Dissolution curves over different time ranges, showing linearity until near-complete dissolution

[Z.317]

```
. mixed pct t if (t>0 & t<10) & sheet==2 , noco || sample: t, noco reml nolog stddev

Mixed-effects REML regression              Number of obs       =          60
Group variable: sample                     Number of groups    =          12
                                           Obs per group:
                                                         min =           5
                                                         avg =         5.0
                                                         max =           5
                                           Wald chi2(1)        =     8973.80
Log restricted-likelihood = -191.30516     Prob > chi2         =      0.0000

------------------------------------------------------------------------------
         pct | Coefficient  Std. err.      z    P>|z|     [95% conf. interval]
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     73

```
--------------+----------------------------------------------------------
            t |  12.71147   .1341861    94.73   0.000    12.44847   12.97447
--------------------------------------------------------------------------


--------------------------------------------------------------------------
 Random-effects parameters  |   Estimate   Std. err.    [95% conf. interval]
----------------------------+---------------------------------------------
sample: Identity            |
                     sd(t)  |   2.47e-06   .0027974            0          .
----------------------------+---------------------------------------------
             sd(Residual)   |   5.810428   .5348933    4.851194   6.959333
--------------------------------------------------------------------------
LR test vs. linear model: chibar2(01) = 0.00          Prob >= chibar2 = 1.0000
```

[Z.318]   . local b2 = _b[t]

[Z.319]   . mixed pct t if (t>0 & t<10) & sheet==3 , noco || sample: t, noco reml nolog stddev

```
Mixed-effects REML regression                   Number of obs     =         60
Group variable: sample                          Number of groups  =         12
                                                Obs per group:
                                                              min =          5
                                                              avg =        5.0
                                                              max =          5
                                                Wald chi2(1)      =    9889.97
Log restricted-likelihood = -180.54175          Prob > chi2       =     0.0000


--------------------------------------------------------------------------
          pct |  Coefficient  Std. err.     z    P>|z|     [95% conf. interval]
--------------+-----------------------------------------------------------
            t |   13.51309    .1358805    99.45   0.000    13.24676   13.77941
--------------------------------------------------------------------------


--------------------------------------------------------------------------
 Random-effects parameters  |   Estimate   Std. err.    [95% conf. interval]
----------------------------+---------------------------------------------
sample: Identity            |
                     sd(t)  |   .1808595   .2820835    .0085062   3.845438
----------------------------+---------------------------------------------
             sd(Residual)   |   4.780281   .4878842    3.913616   5.838867
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     74

```
--------------------------------------------------------------------------------
LR test vs. linear model: chibar2(01) = 0.12          Prob >= chibar2 = 0.3656
```

[Z.320]   . local b3 = _b[t]

[Z.321]   . mixed pct t if (t>0 & t<10) & sheet==4 , noco || sample: t, noco reml nolog stddev

```
Mixed-effects REML regression                    Number of obs      =        60
Group variable: sample                           Number of groups   =        12
                                                 Obs per group:
                                                               min =         5
                                                               avg =       5.0
                                                               max =         5
                                                 Wald chi2(1)       =   4476.41
Log restricted-likelihood = -214.8944            Prob > chi2        =    0.0000

--------------------------------------------------------------------------------
        pct | Coefficient  Std. err.      z    P>|z|     [95% conf. interval]
------------+-------------------------------------------------------------------
          t |   13.39093   .2001456    66.91   0.000     12.99866    13.78321
--------------------------------------------------------------------------------

--------------------------------------------------------------------------------
  Random-effects parameters  |   Estimate   Std. err.     [95% conf. interval]
-----------------------------+--------------------------------------------------
sample: Identity             |
                     sd(t)   |   .0000807   .0614816             0           .
-----------------------------+--------------------------------------------------
              sd(Residual)   |   8.666559   .7978394      7.235782    10.38025
--------------------------------------------------------------------------------
LR test vs. linear model: chibar2(01) = 0.00          Prob >= chibar2 = 1.0000
```

[Z.322]   . local b4 = _b[t]

[Z.323]   . local c2 = `b1'/`b2'
          . local c3 = `b1'/`b3'
          . local c4 = `b1'/`b4'

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     75

[Z.324]
```
. local ca = (`c2'+`c3')/2
. local cb = (`c2'+`c3' +`c4')/3
```

[Z.325]
```
.
. di _newline " c2  =  " %6.4f `c2' _newline "  c3  =  " %6.4f `c3' ///
>    _newline "  c4  =  " %6.4f `c4' _newline ///
>    _newline "  ca  =  " %6.4f `ca' ///
>    _newline "  cb  =  " %6.4f `cb'

  c2  =  1.0150
  c3  =  0.9548
  c4  =  0.9635

  ca  =  0.9849
  cb  =  0.9778
```

**Observed vs predicted USP 2 @ 50 rpm data**

[Z.326]
```
. use "../Data/Sawai-mirabegron", clear
. collapse (mean) pct, by(sheet apparatus t)
. keep if sheet==1
. save ../Data/foo, replace
```

[Z.327]
```
. use "../Data/Sawai-mirabegron", clear
. collapse (mean) pct, by(sheet apparatus t)
. keep if sheet!=1
. rename pct pred
. generate t4 = t/`cb'         // cb = 0.9778
```

[Z.328]
```
. append using ../Data/foo
. sort sheet t
```

[Z.329]
```
. list, sepby(sheet)

     +------------------------------------------------------+
     | sheet    appara~s    t       pred       t4       pct |
     |------------------------------------------------------|
  1. |    1     Paddle50    0          .        .         0 |
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*    76

```
  2. |    1    Paddle50    1          .          .          14 |
  3. |    1    Paddle50    2          .          .       27.25 |
  4. |    1    Paddle50    4          .          .    55.666668 |
  5. |    1    Paddle50    6          .          .          82 |
  6. |    1    Paddle50    8          .          .       97.25 |
  7. |    1    Paddle50   10          .          .      100.25 |
  8. |    1    Paddle50   12          .          .   101.58334 |
     |--------------------------------------------------------|
  9. |    2     Basket     0          0          0           . |
 10. |    2     Basket     1       13.75   1.022738           . |
 11. |    2     Basket     3   39.583332   3.068215           . |
 12. |    2     Basket     5   69.166664   5.113692           . |
 13. |    2     Basket     7   94.583336   7.159169           . |
 14. |    2     Basket    8.5        99.5   8.693276           . |
 15. |    2     Basket    10      100.25  10.22738           . |
 16. |    2     Basket    12      100.25  12.27286           . |
     |--------------------------------------------------------|
 17. |    3     Basket     0          0          0           . |
 18. |    3     Basket     1   14.083333   1.022738           . |
 19. |    3     Basket     2   26.833334   2.045477           . |
 20. |    3     Basket     4   56.833332   4.090954           . |
 21. |    3     Basket     6          87    6.13643           . |
 22. |    3     Basket     8      102.25   8.181908           . |
 23. |    3     Basket    10   103.08334  10.22738           . |
 24. |    3     Basket    12   103.41666  12.27286           . |
     |--------------------------------------------------------|
 25. |    4     Basket     0          0          0           . |
 26. |    4     Basket     1          11   1.022738           . |
 27. |    4     Basket     3   41.916668   3.068215           . |
 28. |    4     Basket     5        74.5   5.113692           . |
 29. |    4     Basket     7   99.666664   7.159169           . |
 30. |    4     Basket    8.5   104.16666   8.693276           . |
 31. |    4     Basket    10   104.41666  10.22738           . |
 32. |    4     Basket    12   104.58334  12.27286           . |
     +--------------------------------------------------------+
```

[Z.330]  . two line pct t if sheet==1 || scatter pred t4 if sheet==2, name(a, replace) legend(off)
      . two line pct t if sheet==1 || scatter pred t4 if sheet==3, name(b, replace) legend(off)
      . two line pct t if sheet==1 || scatter pred t4 if sheet==4, name(c, replace) legend(off)

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     77

[Z.331]  . graph combine a b c, b1("Time (hours)") ///
         >          ti("USP2@50 rpm Sawai mirabegron predictions" ///
         >              "Predictions from three USP 1 data sets") name(d, replace)

[Z.332]  . graph export ../Figures/mirabegron-prediction-compare.pdf, replace
         file /Volumes/MASM
             Confidential/MASM/Compendium-Sawai-Supplemental/Analysis/../Figures/mirabegron-predicti
             > are.pdf saved as PDF format



Figure Z.15: Showing predicted USP 2 values from three different USP 1 data sets

[Z.333]  . // show predictions based on Myrbetriq data applied to Sawai mirabegron data
         . use "../Data/Sawai-mirabegron", clear
         . collapse (mean) pct, by(sheet apparatus t)
         . keep if sheet==1
         . save ../Data/foo, replace

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     78

[Z.334]   `. use "../Data/Sawai-mirabegron", clear`
`. collapse (mean) pct, by(sheet apparatus t)`
`. keep if sheet!=1`
`. rename pct pred`
`. generate t4 = t/0.9478        // ca = 0.9478`
`. append using ../Data/foo`

[Z.335]   `. sort sheet t`
`. list, sepby(sheet)`

```
+-------------------------------------------------------+
| sheet   appara~s    t       pred      t4        pct |
|-------------------------------------------------------|
1. |    1    Paddle50    0        .         .          0 |
2. |    1    Paddle50    1        .         .         14 |
3. |    1    Paddle50    2        .         .      27.25 |
4. |    1    Paddle50    4        .         .  55.666668 |
5. |    1    Paddle50    6        .         .         82 |
6. |    1    Paddle50    8        .         .      97.25 |
7. |    1    Paddle50   10        .         .     100.25 |
8. |    1    Paddle50   12        .         .  101.58334 |
|-------------------------------------------------------|
9. |    2      Basket    0        0         0          . |
10. |    2      Basket    1    13.75  1.055075          . |
11. |    2      Basket    3 39.583332  3.165225          . |
12. |    2      Basket    5 69.166664  5.275374          . |
13. |    2      Basket    7 94.583336  7.385524          . |
14. |    2      Basket  8.5     99.5  8.968137          . |
15. |    2      Basket   10   100.25 10.55075          . |
16. |    2      Basket   12   100.25  12.6609          . |
|-------------------------------------------------------|
17. |    3      Basket    0        0         0          . |
18. |    3      Basket    1 14.083333  1.055075          . |
19. |    3      Basket    2 26.833334  2.11015          . |
20. |    3      Basket    4 56.833332   4.2203          . |
21. |    3      Basket    6       87  6.33045          . |
22. |    3      Basket    8   102.25 8.440599          . |
23. |    3      Basket   10 103.08334 10.55075          . |
24. |    3      Basket   12 103.41666  12.6609          . |
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

```
      |-----------------------------------------------------------|
 25. |    4     Basket      0           0          0          . |
 26. |    4     Basket      1          11    1.055075          . |
 27. |    4     Basket      3    41.916668   3.165225          . |
 28. |    4     Basket      5        74.5    5.275374          . |
 29. |    4     Basket      7   99.666664   7.385524          . |
 30. |    4     Basket    8.5   104.16666   8.968137          . |
 31. |    4     Basket     10   104.41666   10.55075          . |
 32. |    4     Basket     12   104.58334    12.6609          . |
      +-----------------------------------------------------------+
```

[Z.336]   . two line pct t if sheet==1 || scatter pred t4 if sheet==2, name(aa, replace) legend(off)
         . two line pct t if sheet==1 || scatter pred t4 if sheet==3, name(bb, replace) legend(off)
         . two line pct t if sheet==1 || scatter pred t4 if sheet==4, name(cc, replace) legend(off)

[Z.337]   . graph combine aa bb cc, b1("Time (hours)") ///
         >        t1("ATD Predictions of Sawai mirabegron Dissolution"  ///
         >              "Curve From USP II Paddle Method @ 50 rpm", ///
         >              size(medium)) ///
         >              note("Predictions based on Sawai's USP I data using c derived from Sawai'
         > IQ® data")

[Z.338]   . graph export ../Figures/mirabegron-predictions-from-Myrbetriq.pdf, replace

### Z.10.3   Time-scale correlation plots

[Z.339]   . use "../Data/Sawai-MYRBETRIQ", clear
         . collapse (mean) pct, by(sheet batch apparatus t)
         . gen t2 = t
         . replace t2=. if apparatus=="Basket"
         (16 real changes made, 16 to missing)
         . gen tp = .
         (24 missing values generated)

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     80



Figure Z.16:  Predictions of USP 2 @ 50 rpm data based on USP 1 data with $c$ from
MYRBETRIQ® analysis

[Z.340]
```
. foreach i of numlist 2/3 {
  2.          ipolate t2 pct if (sheet==`i' | sheet==1) & pct<100, gen(new) epolate
  3.          replace tp = new if sheet==`i'
  4.          list
  5.          drop new
  6. }
(8 missing values generated)
(8 real changes made)
```

| | sheet | batch | appara~s | t | pct | t2 | tp | new |
|---|---|---|---|---|---|---|---|---|
| 1. | 1 | K1400128 | Paddle50 | 0 | 0 | 0 | . | 0 |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     81

```
 2. |    1  K1400128   Paddle50    1     9.75     1        .          1 |
 3. |    1  K1400128   Paddle50    2  20.833334   2        .          2 |
 4. |    1  K1400128   Paddle50    4    46.75     4        .          4 |
 5. |    1  K1400128   Paddle50    6  70.416664   6        .          6 |
    |-----------------------------------------------------------------|
 6. |    1  K1400128   Paddle50    8  87.333336   8        .          8 |
 7. |    1  K1400128   Paddle50   10  93.833336  10        .         10 |
 8. |    1  K1400128   Paddle50   12  95.833336  12        .         12 |
 9. |    2  K1400128     Basket    0     0         .        0          0 |
10. |    2  K1400128     Basket    1   9.083333    .  .9316239   .9316239 |
    |-----------------------------------------------------------------|
11. |    2  K1400128     Basket    3    31.5       .  2.823151  2.8231511 |
12. |    2  K1400128     Basket    5    60.75      .  5.183099  5.1830987 |
13. |    2  K1400128     Basket    7    86.5       .  7.901477  7.9014776 |
14. |    2  K1400128     Basket  8.5  95.083336    .    11.25      11.25 |
15. |    2  K1400128     Basket   10    95.75      .  11.91666  11.916664 |
    |-----------------------------------------------------------------|
16. |    2  K1400128     Basket   12  96.166664    .  12.33333  12.333328 |
17. |    3  K1400128     Basket    0     0         .        .          . |
18. |    3  K1400128     Basket    1     9         .        .          . |
19. |    3  K1400128     Basket    2  19.666666    .        .          . |
20. |    3  K1400128     Basket    4    47         .        .          . |
    |-----------------------------------------------------------------|
21. |    3  K1400128     Basket    6  76.083336    .        .          . |
22. |    3  K1400128     Basket    8  95.833336    .        .          . |
23. |    3  K1400128     Basket   10    97.25      .        .          . |
24. |    3  K1400128     Basket   12  97.416664    .        .          . |
    +-----------------------------------------------------------------+
(8 missing values generated)
(8 real changes made)


    +-----------------------------------------------------------------+
    | sheet     batch   appara~s    t      pct   t2       tp      new |
    |-----------------------------------------------------------------|
 1. |    1  K1400128   Paddle50    0     0        0        .          0 |
 2. |    1  K1400128   Paddle50    1     9.75     1        .          1 |
 3. |    1  K1400128   Paddle50    2  20.833334   2        .          2 |
 4. |    1  K1400128   Paddle50    4    46.75     4        .          4 |
 5. |    1  K1400128   Paddle50    6  70.416664   6        .          6 |
    |-----------------------------------------------------------------|
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     82

```
   6. |   1   K1400128    Paddle50     8   87.333336    8         .            8 |
   7. |   1   K1400128    Paddle50    10   93.833336   10         .           10 |
   8. |   1   K1400128    Paddle50    12   95.833336   12         .           12 |
   9. |   2   K1400128      Basket     0          0     .         0            . |
  10. |   2   K1400128      Basket     1   9.083333     .  .9316239            . |
      |-------------------------------------------------------------------------|
  11. |   2   K1400128      Basket     3       31.5     .  2.823151            . |
  12. |   2   K1400128      Basket     5      60.75     .  5.183099            . |
  13. |   2   K1400128      Basket     7       86.5     .  7.901477            . |
  14. |   2   K1400128      Basket   8.5   95.083336    .     11.25            . |
  15. |   2   K1400128      Basket    10      95.75     .  11.91666            . |
      |-------------------------------------------------------------------------|
  16. |   2   K1400128      Basket    12   96.166664    .  12.33333            . |
  17. |   3   K1400128      Basket     0          0     .         0            0 |
  18. |   3   K1400128      Basket     1          9     .  .9230769     .92307692 |
  19. |   3   K1400128      Basket     2   19.666666    .  1.894737     1.8947367 |
  20. |   3   K1400128      Basket     4         47     .  4.021127     4.0211268 |
      |-------------------------------------------------------------------------|
  21. |   3   K1400128      Basket     6   76.083336    .  6.669951     6.6699511 |
  22. |   3   K1400128      Basket     8   95.833336    .        12           12 |
  23. |   3   K1400128      Basket    10      97.25     .  13.41666     13.416664 |
  24. |   3   K1400128      Basket    12   97.416664    .  13.58333     13.583328 |
      +-------------------------------------------------------------------------+
```

[Z.341]  . keep if apparatus=="Basket"
         (8 observations deleted)

[Z.342]  . two sc tp t || lfit tp t, by(sheet batch, ///
         >     ti("Time-scale Correlation Plots" "USP 2 @ 50 rpm vs USP 1" ///
         >        "Sawai MYRBETRIQ® tablets") legend(off)) ///
         >     yla(, angle(horiz)) ///
         >        xti("USP 1 time")

[Z.343]  . graph export "../Figures/Sawai MYRBETRIQ-time-scale correlation.pdf", replace

[Z.344]  . use "../Data/Sawai-mirabegron", clear
         . collapse (mean) pct, by(sheet batch apparatus t)
         . gen t2 = t
         . replace t2=. if apparatus=="Basket"
         (24 real changes made, 24 to missing)

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*    83

[Z.345]   `. gen tp = .`
          `(32 missing values generated)`

[Z.346]   `. foreach i of numlist 2/4 {`
```
  2.          ipolate t2 pct if (sheet=='i' | sheet==1) & pct<100, gen(new) epolate
  3.          replace tp = new if sheet=='i'
  4.          list
  5.          drop new
  6. }
(20 missing values generated)
(6 real changes made)
```

```
     +------------------------------------------------------------------+
     | sheet     batch     appara~s     t       pct    t2       tp       new |
     |------------------------------------------------------------------|
 1.  |    1   15KP001C   Paddle50    0        0     0        .         0 |
 2.  |    1   15KP001C   Paddle50    1       14     1        .         1 |
 3.  |    1   15KP001C   Paddle50    2    27.25     2        .         2 |
 4.  |    1   15KP001C   Paddle50    4 55.666668    4        .         4 |
 5.  |    1   15KP001C   Paddle50    6       82     6        .         6 |
     |------------------------------------------------------------------|
 6.  |    1   15KP001C   Paddle50    8    97.25     8        .         8 |
 7.  |    1   15KP001C   Paddle50   10   100.25    10        .         . |
 8.  |    1   15KP001C   Paddle50   12 101.58334   12        .         . |
 9.  |    2   15KP001C    Basket     0        0     0        .         0 |
10.  |    2   15KP001C    Basket     1    13.75     .  .9821429 .98214286 |
     |------------------------------------------------------------------|
11.  |    2   15KP001C    Basket     3 39.583332    .  2.868035 2.8680351 |
12.  |    2   15KP001C    Basket     5 69.166664    .  5.025316 5.0253162 |
13.  |    2   15KP001C    Basket     7 94.583336    .  7.650273 7.6502736 |
14.  |    2   15KP001C    Basket   8.5     99.5     .  8.295082 8.295082 |
15.  |    2   15KP001C    Basket    10   100.25     .        .         . |
     |------------------------------------------------------------------|
16.  |    2   15KP001C    Basket    12   100.25     .        .         . |
17.  |    3   15KP001C    Basket     0        0     .        .         . |
18.  |    3   15KP001C    Basket     1 14.083333    .        .         . |
19.  |    3   15KP001C    Basket     2 26.833334    .        .         . |
20.  |    3   15KP001C    Basket     4 56.833332    .        .         . |
     |------------------------------------------------------------------|
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     84

```
21. |     3    15KP001C    Basket     6        87       .          .          . |
22. |     3    15KP001C    Basket     8      102.25     .          .          . |
23. |     3    15KP001C    Basket    10    103.08334    .          .          . |
24. |     3    15KP001C    Basket    12    103.41666    .          .          . |
25. |     4    15KP001C    Basket     0         0       .          .          . |
    |---------------------------------------------------------------------------|
26. |     4    15KP001C    Basket     1        11       .          .          . |
27. |     4    15KP001C    Basket     3    41.916668    .          .          . |
28. |     4    15KP001C    Basket     5       74.5      .          .          . |
29. |     4    15KP001C    Basket     7    99.666664    .          .          . |
30. |     4    15KP001C    Basket    8.5   104.16666    .          .          . |
    |---------------------------------------------------------------------------|
31. |     4    15KP001C    Basket    10    104.41666    .          .          . |
32. |     4    15KP001C    Basket    12    104.58334    .          .          . |
    +---------------------------------------------------------------------------+
```

(21 missing values generated)
(5 real changes made)

```
    +---------------------------------------------------------------------------+
    | sheet    batch     appara~s    t       pct     t2        tp        new |
    |---------------------------------------------------------------------------|
 1. |     1    15KP001C   Paddle50    0         0      0         .          0 |
 2. |     1    15KP001C   Paddle50    1        14      1         .          1 |
 3. |     1    15KP001C   Paddle50    2      27.25     2         .          2 |
 4. |     1    15KP001C   Paddle50    4    55.666668   4         .          4 |
 5. |     1    15KP001C   Paddle50    6        82      6         .          6 |
    |---------------------------------------------------------------------------|
 6. |     1    15KP001C   Paddle50    8      97.25     8         .          8 |
 7. |     1    15KP001C   Paddle50   10     100.25    10         .          . |
 8. |     1    15KP001C   Paddle50   12    101.58334  12         .          . |
 9. |     2    15KP001C    Basket     0         0      .         .          0 |
10. |     2    15KP001C    Basket     1      13.75     .     .9821429       . |
    |---------------------------------------------------------------------------|
11. |     2    15KP001C    Basket     3    39.583332   .     2.868035       . |
12. |     2    15KP001C    Basket     5    69.166664   .     5.025316       . |
13. |     2    15KP001C    Basket     7    94.583336   .     7.650273       . |
14. |     2    15KP001C    Basket    8.5     99.5      .     8.295082       . |
15. |     2    15KP001C    Basket    10     100.25     .         .          . |
    |---------------------------------------------------------------------------|
16. |     2    15KP001C    Basket    12     100.25     .         .          . |
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*    85

```
17. |     3   15KP001C    Basket    0          0    .          0          0 |
18. |     3   15KP001C    Basket    1  14.083333    .   1.006289  1.0062893 |
19. |     3   15KP001C    Basket    2  26.833334    .   1.968554  1.9685535 |
20. |     3   15KP001C    Basket    4  56.833332    .   4.088607  4.0886074 |
    |------------------------------------------------------------------------|
21. |     3   15KP001C    Basket    6         87    .   6.655738  6.6557377 |
22. |     3   15KP001C    Basket    8     102.25    .          .          . |
23. |     3   15KP001C    Basket   10  103.08334    .          .          . |
24. |     3   15KP001C    Basket   12  103.41666    .          .          . |
25. |     4   15KP001C    Basket    0          0    .          .          . |
    |------------------------------------------------------------------------|
26. |     4   15KP001C    Basket    1         11    .          .          . |
27. |     4   15KP001C    Basket    3  41.916668    .          .          . |
28. |     4   15KP001C    Basket    5       74.5    .          .          . |
29. |     4   15KP001C    Basket    7  99.666664    .          .          . |
30. |     4   15KP001C    Basket  8.5  104.16666    .          .          . |
    |------------------------------------------------------------------------|
31. |     4   15KP001C    Basket   10  104.41666    .          .          . |
32. |     4   15KP001C    Basket   12  104.58334    .          .          . |
    +------------------------------------------------------------------------+
(21 missing values generated)
(5 real changes made)
```

```
    +------------------------------------------------------------------------+
    | sheet      batch   appara~s    t        pct   t2         tp      new |
    |------------------------------------------------------------------------|
 1. |     1   15KP001C   Paddle50    0          0    0          .          0 |
 2. |     1   15KP001C   Paddle50    1         14    1          .          1 |
 3. |     1   15KP001C   Paddle50    2      27.25    2          .          2 |
 4. |     1   15KP001C   Paddle50    4  55.666668    4          .          4 |
 5. |     1   15KP001C   Paddle50    6         82    6          .          6 |
    |------------------------------------------------------------------------|
 6. |     1   15KP001C   Paddle50    8      97.25    8          .          8 |
 7. |     1   15KP001C   Paddle50   10     100.25   10          .          . |
 8. |     1   15KP001C   Paddle50   12  101.58334   12          .          . |
 9. |     2   15KP001C    Basket     0          0    .          0          . |
10. |     2   15KP001C    Basket     1      13.75    .  .9821429          . |
    |------------------------------------------------------------------------|
11. |     2   15KP001C    Basket     3  39.583332    .   2.868035          . |
12. |     2   15KP001C    Basket     5  69.166664    .   5.025316          . |
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*    86

```
13. |    2    15KP001C     Basket    7    94.583336    .    7.650273         . |
14. |    2    15KP001C     Basket   8.5       99.5     .    8.295082         . |
15. |    2    15KP001C     Basket   10      100.25     .         .           . |
    |-------------------------------------------------------------------------|
16. |    2    15KP001C     Basket   12      100.25     .         .           . |
17. |    3    15KP001C     Basket    0         0       .         0           . |
18. |    3    15KP001C     Basket    1    14.083333    .    1.006289         . |
19. |    3    15KP001C     Basket    2    26.833334    .    1.968554         . |
20. |    3    15KP001C     Basket    4    56.833332    .    4.088607         . |
    |-------------------------------------------------------------------------|
21. |    3    15KP001C     Basket    6        87       .    6.655738         . |
22. |    3    15KP001C     Basket    8      102.25     .         .           . |
23. |    3    15KP001C     Basket   10    103.08334    .         .           . |
24. |    3    15KP001C     Basket   12    103.41666    .         .           . |
25. |    4    15KP001C     Basket    0         0       .         0           0 |
    |-------------------------------------------------------------------------|
26. |    4    15KP001C     Basket    1        11       .   .7857143    .78571429 |
27. |    4    15KP001C     Basket    3    41.916668    .   3.032258   3.0322581 |
28. |    4    15KP001C     Basket    5       74.5      .    5.43038   5.4303797 |
29. |    4    15KP001C     Basket    7    99.666664    .   8.316939   8.3169396 |
30. |    4    15KP001C     Basket   8.5   104.16666    .         .           . |
    |-------------------------------------------------------------------------|
31. |    4    15KP001C     Basket   10    104.41666    .         .           . |
32. |    4    15KP001C     Basket   12    104.58334    .         .           . |
    +-------------------------------------------------------------------------+
```

[Z.347]   . keep if apparatus=="Basket"
          (8 observations deleted)

[Z.348]   . two sc tp t || lfit tp t, by(sheet batch, ///
          >      ti("Time-scale Correlation Plots" "USP 2 @ 50 rpm vs USP 1" ///
          >           "Sawai mirabegron tablets") legend(off) ) ///
          >   yla(, angle(horiz)) ///
          >        xti("USP 1 time")

[Z.349]   . graph export "../Figures/Sawai mirabegron-time-scale correlation.pdf", replace

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

## Z.11   Technical derivations

### Z.11.1   Effects of estimating $c$ and of interpolation on confidence intervals

The confidence intervals reported in my opening report for the predictions of USB 2 Paddle method dissolution rates are calculated as follows.  Since all of the values for $c$ used for predictions in my opening report are less than 2, the estimated times at which USP 1 Basket method dissolutions equal those for USP 2 Paddle method at 1.5 hours ($= 1.5 \times c$) are at times less than 3 hours.  Consequently, the linear interpolation used to obtain USP 1 Basket dissolutions interpolate between time 0 hours and time 3 hours.

The confidence intervals for the 1.5-hour USP 2 Paddle dissolution predictions are

$$\frac{\hat{c} \times 1.5}{3} \cdot \left( \bar{y} \pm t_{n-1, 0.025} \cdot \text{se}(\bar{y}) \right),$$

or equivalently,

$$\frac{\hat{c}}{2} \cdot \left( \bar{y} \pm t_{n-1, 0.025} \cdot \frac{s}{\sqrt{n}} \right),$$

where $\bar{y}$ is the mean of the 3-hour USP 1 Basket method samples, $\text{se}(\bar{y})$ is the standard error of $\bar{y}$, $n$ is the number of such samples, $s$ is the sample standard deviation of those samples, and $\hat{c}$ is the value of $c$ estimated from the data.

This calculation assumes that $\hat{c}$ is a constant, rather than a quantity estimated from the data.  Taking this into account, the confidence interval would be

$$\frac{\hat{c} \cdot \bar{y}}{2} \pm t_{n-1, 0.025} \cdot \text{se} \left( \frac{\hat{c} \cdot \bar{y}}{2} \right).$$

To assess the effect of estimating $c$ on the confidence intervals for the mean dissolution at 1.5 hours using USP 2 Paddle method, it is necessary to estimate the standard error of $\hat{c} \cdot \bar{y}$. If $\hat{c}$ is obtained from training samples, then it is statistically independent of any estimated $\bar{y}$ obtained from the validation samples.  Consequently, obtaining the standard error of $\hat{c} \cdot \bar{y}$ comes down to obtaining an estimate for the product of two statistically independent random variables.

Goodman ["On the Exact Variance of Products," *Journal of the American Statistical Association*, 55:292 (1960), 708–713] shows how to obtain the variance of such a product. (The standard error we need is just the square root of this estimate.)

Specifically, equation (5) of Goodman (1960) gives

$$\widehat{\text{Var}} \left( \frac{\hat{c} \cdot \bar{y}}{2} \right) = \frac{1}{4} \left[ \hat{c}^2 \frac{s^2}{n} + \bar{y}^2 \cdot \widehat{\text{Var}(\hat{c})} - \frac{s^2}{n} \cdot \widehat{\text{Var}(\hat{c})} \right],$$

where $\widehat{\text{Var}(\hat{c})}$ is an unbiased estimate for the variance of $\hat{c}$. An unbiased estimate for this quantity can be obtained from the 10 values of $c$ obtained in the training sample, namely

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     88

the squared standard error of the 10 values for $c$ from the training sample. This value is quite small (0.00049399). [Exhibit Z, at Z.nn]

When applied to the 16 data sets in the validation sample, the resulting confidence intervals are wider than when assuming $c$ is a known constant. The upper bounds for the predicted dissolution at 1.5 hours with USP 2 Paddle method are about 0.8% greater.

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

## Z.12   Modeling dissolution using the Hill sigmoidal function

[Z.350]
```
. // Reply-Hill.do
. use "/Volumes/MASM Confidential/MASM/Compendium/Data/usp12.dta", clear
. drop if apparatus=="Paddle"
```

[Z.351]
```
. mat B = J(27,3,.)
```

[Z.352]
```
. // qui foreach i of numlist 1/27 {
. //      preserve
. //      keep if sheet==`i'
. //      gen frac = pct/100
. //      nl (frac = t^{n}/({k}^{n}+t^{n})) if sample!="Avg.", nolog initial(n 1 k 4)
. //      mat B[`i',1]= _b[/k]
. //      mat B[`i',2]= _b[/n]
. //      mat B[`i',3]= e(r2)
. //      local K = _b[/k]^_b[/n]
. //      twoway scatter pct t if sample=="Avg."  ///
. //        || function y=100*(x^_b[/n])/(`K'+x^_b[/n]), range(0 10) ///
. //        || line pct t if sample=="Avg.", ///
. //           legend(off) ti("USP12 Basket `i'") name(z2`i', replace)
. //      restore
. // }
. qui foreach i of numlist 1/27 {
```

[Z.353]
```
.
. matlist B, format(%6.3f)

             |    c1     c2     c3
-------------+------------------------
          r1 |  4.593  2.844  0.994
          r2 |  4.214  3.131  0.992
          r3 |  4.237  3.071  0.992
          r4 |  4.287  3.101  0.991
          r5 |  4.152  3.106  0.992
          r6 |  4.325  3.186  0.990
          r7 |  4.095  3.135  0.993
          r8 |  4.246  3.215  0.990
          r9 |  4.191  3.204  0.990
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

```
        r10 |   4.293    3.127    0.991
        r11 |   4.121    3.224    0.990
        r12 |   4.173    3.178    0.990
        r13 |   4.400    3.155    0.990
        r14 |   4.135    3.171    0.992
        r15 |   4.405    3.120    0.989
        r16 |   4.306    3.181    0.989
        r17 |   4.527    3.164    0.990
        r18 |   4.477    2.986    0.994
        r19 |   4.477    3.108    0.990
        r20 |   4.579    3.011    0.993
        r21 |   4.635    3.150    0.991
        r22 |   4.496    3.028    0.993
        r23 |   4.478    3.133    0.992
        r24 |   4.462    3.019    0.993
        r25 |   4.596    3.075    0.991
        r26 |   4.496    3.028    0.993
        r27 |   4.470    3.073    0.992
```

[Z.354]  . graph combine z21 z22 z23 z24 z25 z26 z27 z28 z29 z210 z211 z212, ///
         >         name(foo, replace) title("Hill function fits to USP I data" ///
         >              "From 12 Typical Astellas Data Sets")
         . graph export ../Figures/Reply/Hill.pdf, replace

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**



Figure Z.17: Twelve typical Astellas USP I data sets showing fit of Hill function

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     92

[Z.355]
```
. graph display z22
. graph export ../Figures/Reply/HillExample.pdf, replace
```



Figure Z.18: Example showing detail of Hill fit to a typical USP I data set

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     93

[Z.356]  `. // show Weibull vs Hill for a typical Myrbetriq USP I data set`
`. keep if sheet==2`
`. gen frac = pct/100`
`. nl (frac = t^{n}/({k}^{n}+t^{n})) if sample!="Avg.", nolog initial(n 1 k 4)`

```
      Source |       SS           df       MS            Number of obs =         24
-------------+----------------------------------        R-squared     =     0.9917
       Model |  8.1179901          2   4.05899506        Adj R-squared =     0.9910
    Residual |     .06781         22   .003082273        Root MSE      =    .0555182
-------------+----------------------------------        Res. dev.     =  -72.74934
       Total |  8.1858001         24   .341075005

-------------------------------------------------------------------------------
        frac |  Coefficient  Std. err.      t    P>|t|     [95% conf. interval]
-------------+-----------------------------------------------------------------
          /n |    3.131178   .2300388     13.61   0.000     2.654106    3.608249
          /k |    4.213943   .0974224     43.25   0.000     4.011902    4.415985
-------------------------------------------------------------------------------
```

[Z.357]  `. local K = _b[/k]^_b[/n]`
`. local n = _b[/n]`

[Z.358]  `. nl (frac = 1-exp({alpha}*t^{beta})) if sample!="Avg.", nolog`

```
      Source |       SS           df       MS            Number of obs =         24
-------------+----------------------------------        R-squared     =     0.9974
       Model |  8.1646984          2   4.08234918        Adj R-squared =     0.9972
    Residual |  .02110176         22   .000959171        Root MSE      =    .0309705
-------------+----------------------------------        Res. dev.     = -100.7658
       Total |  8.1858001         24   .341075005

-------------------------------------------------------------------------------
        frac |  Coefficient  Std. err.      t    P>|t|     [95% conf. interval]
-------------+-----------------------------------------------------------------
      /alpha |   -.0303976   .0042327     -7.18   0.000    -.0391757   -.0216196
       /beta |    2.120328   .0879179     24.12   0.000     1.937997    2.302659
-------------------------------------------------------------------------------
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     94

[Z.359]
```
. twoway scatter pct t if sample=="Avg."  ///
>   || function y=100*(x^`n')/(`K'+x^`n'), range(0 10) ///
>   || function y=100*(1-exp(_b[/alpha]*x^_b[/beta])), range(0 10) ///
>     || line pct t if sample=="Avg.", ///
>        legend(off) ti("USP12 Basket Sheet 2" "Interpolation, Weibull, Hill") name(s4, r
```

[Z.360]
```
. graph export ../Figures/Reply/HillVsWeibull.pdf, replace
```



Figure Z.19: Comparison of Hill vs. Weibull fits, showig that the Weibull fit (green line) is
superior to Hill (red line) for a typical data set

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     95

[Z.361]
```
. // Show effect of using Hill instead of linear interpolation in Lupin data as an example
. use "../Data/Lupin", clear
. collapse (mean) pct (sem) sem=pct, by(sheet t mg batch)
. gen frac = pct/100
. drop if pct==.
(0 observations deleted)
```

[Z.362]
```
. foreach i of numlist 1/6 {
  2.          qui nl (frac = t^{n}/({k}^{n}+t^{n})) if sheet==`i', nolog initial(n 1 k 4)
  3.          local K = _b[/k]^_b[/n]
  4.          two sc pct t if sheet==`i' || line pct t if sheet==`i' ///
>            || function y=100*(x^_b[/n])/(`K'+x^_b[/n]), ///
>               range(0 12) xlab(0 2.8 5(5)12) ///
>               ti("Sheet `i'",size(medium)) yla(,angle(horizontal)) ///
>               legend(off) name(a`i', replace)
  5. }
```

[Z.363]
```
. graph combine a1 a2 a3 a4 a5 a6, ti(Lupin with Hill Model Fit) name(Lupin, replace)
. graph export ../Figures/Reply/Lupin-Hill.pdf, replace
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**



Figure Z.20: Lupin data showing linear interpolation and fit to the Hill function. The Hill function fits the Lupin data no better than it fits the Myrbetriq® data shown above, underestimating early observations and underestimating late ones.

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

## Z.13   Comparative dissolution of Lupin and Zydus ANDA Products and Myrbetriq®

### Z.13.1   Lupin

[Z.364]
```
. do "/Volumes/MASM Confidential/MASM/Compendium/Analysis/Reply-Lupin-comparision.do"
```

[Z.365]
```
. // Reply-Lupin-comparision.do
// ================= Astellas predictions =================
. use ../Data/temp15, clear
. drop if sheet==26
. sort sheet batch lot mg
. merge m:1 sheet batch lot mg using ../Data/samplecode, nogen

    Result                      Number of obs
    -----------------------------------------
    Not matched                             0
    Matched                               936
    -----------------------------------------
. keep if predictpoint==1
. sort sheet sample
```

[Z.366]
```
. capture postclose batches
. postfile batches sheet str9 batch mean min max ll ul using ../Data/bar, replace
```

[Z.367]
```
. // qui foreach s of numlist 1/26 {
. //      preserve
. //      keep if newsheet==`s'
. //      ci means pred
. //      local ul = r(ub)
. //      local ll = r(lb)
. //      sum pred
. //      post batches (sheet[1]) (batch[1]) (r(mean)) (r(min)) (r(max)) (`ll') (`ul')
. //      restore
. // }
. qui foreach s of numlist 1/26 {
```

[Z.368]
```
. postclose batches
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     98

[Z.369]  . use ../Data/bar, clear

[Z.370]  . format mean-ul %5.1f
         . list sheet batch mean ll ul, sep(0) noobs

```
+--------------------------------------+
| sheet     batch   mean    ll    ul   |
|--------------------------------------|
|     1   K1500140  24.7   23.9   25.5 |
|     2   K1500140  27.4   26.0   28.7 |
|     3   K1500140  27.4   25.9   28.8 |
|     4   M1400111  26.9   25.0   28.8 |
|     5   M1400111  28.3   27.3   29.3 |
|     6   M1400111  26.1   23.8   28.4 |
|     7   J1400217  28.6   27.6   29.6 |
|     8   J1400217  26.9   25.8   28.0 |
|     9   L1300068  27.5   26.0   29.0 |
|    10   H1300020  26.6   25.4   27.8 |
|    11   C1300164  28.1   26.5   29.8 |
|    12   C1300164  28.0   27.4   28.6 |
|    13   C1300164  25.5   23.7   27.3 |
|    14   C1300168  28.0   26.5   29.5 |
|    15   C1300168  26.0   24.1   27.9 |
|    16   H1400003  26.4   24.8   28.0 |
|    17   K1300338  24.4   23.3   25.6 |
|    18   K1300338  25.0   23.9   26.2 |
|    19   J1400223  25.2   23.9   26.4 |
|    20   H1300092  24.1   23.0   25.2 |
|    21   K1300334  23.3   22.1   24.6 |
|    22   K1300334  24.6   22.7   26.4 |
|    23   A1400225  24.4   23.7   25.1 |
|    24   A1400225  25.2   23.9   26.4 |
|    25   A1400225  23.9   22.8   25.1 |
|    27   K1300335  25.0   23.5   26.6 |
+--------------------------------------+
```

[Z.371]  . // ================= Lupin samples =================
         . // predict dissolution at 1.5 hours for USP 2
         . // quietly {

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*     99

```
. //      local c = 1.8609                     // use c derived from full data set
. //      use "../Data/Lupin-corrected", clear
. //      capture drop if sample=="Avg."
. //
. //      sort sheet t
. //      expand 3 if t==0                      // add time points at which to predict
. //      sort sheet sample t                   //     USP 2 at 1.5 hours
. //      generate predictpoint = 0
. //      by sheet sample t: replace pct=. if _n>=2
. //      by sheet sample t: replace predictpoint=1 if _n==2  // lower claim 1 threshold
. //      by sheet sample t: replace predictpoint=2 if _n==3  // upper claim 1 threshold
. //      replace t=1.5*`c' if predictpoint==1
. //      replace t=7.0*`c' if predictpoint==2
. //      sort sheet sample t
. //      by sheet sample: ipolate pct t, gen(pred) epolate  // obtain value via linear int
. //      replace pred = min(100,pred)                       // truncate predictions at 100
. //      save ../Data/foo, replace
. // }
. quietly {
```

[Z.372]
```
. use ../Data/foo, clear
. quietly sum sheet
. local n = r(max)
. sort sheet batch lot mg
. keep if predictpoint==1
. sort mg sheet sample
```

[Z.373]
```
. capture postclose lupin
. postfile lupin sheet str9 batch mean min max ll ul using ../Data/bar2, replace
```

[Z.374]
```
. // qui foreach i of numlist 1/6 {
. //      preserve
. //      keep if sheet==`i'
. //      ci means pred
. //      local ul = r(ub)
. //      local ll = r(lb)
. //      sum pred
. //      post lupin (sheet[1]) (batch[1]) (r(mean)) (r(min)) (r(max)) (`ll') (`ul')
. //      restore
. // }
. qui foreach i of numlist 1/6 {
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*    100

[Z.375]  . postclose lupin

[Z.376]  . use ../Data/bar2, clear

[Z.377]  . format mean-ul %5.1f
         . list sheet batch mean ll ul, sep(0) noobs

```
         +-------------------------------------+
         | sheet    batch   mean    ll     ul |
         |-------------------------------------|
         |    1   M590788   33.0   30.2   35.9 |
         |    2   M590789   28.6   25.1   32.1 |
         |    3   M590790   33.1   30.9   35.4 |
         |    4   M590785   23.3   21.3   25.2 |
         |    5   M590786   25.2   22.7   27.6 |
         |    6   M590787   23.5   21.7   25.3 |
         +-------------------------------------+
```

[Z.378]  . // ================== Observed Astellas data ==================
         . use ../data/usp12, clear
         . keep if t==1.5
         . drop if sample=="Avg."

[Z.379]  . capture postclose usp12
         . postfile usp12 sheet str9 batch mean min max ll ul using ../Data/bar3, replace

[Z.380]  .
         . // qui foreach i of numlist 1/27 {
         . //      preserve
         . //      keep if sheet==`i'
         . //      ci means pct
         . //      local ul = r(ub)
         . //      local ll = r(lb)
         . //      sum pct
         . //      post usp12 (sheet[1]) (batch[1]) (r(mean)) (r(min)) (r(max)) (`ll') (`ul')
         . //      restore
         . // }
         . qui foreach i of numlist 1/27 {

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

[Z.381]   `. postclose usp12`

[Z.382]   `. use ../Data/bar3, clear`
          `. drop if sheet==26`

[Z.383]   `. format mean-ul %5.1f`
          `. list sheet batch mean ll ul, sep(0) noobs`

```
      +--------------------------------------+
      | sheet      batch   mean     ll    ul |
      |--------------------------------------|
      |     1   K1500140   26.2   25.7   26.6 |
      |     2   K1500140   26.8   26.0   27.6 |
      |     3   K1500140   26.8   25.4   28.2 |
      |     4   M1400111   25.3   24.5   26.2 |
      |     5   M1400111   27.0   25.7   28.3 |
      |     6   M1400111   25.2   24.1   26.2 |
      |     7   J1400217   26.3   24.9   27.8 |
      |     8   J1400217   26.3   25.2   27.4 |
      |     9   L1300068   26.5   25.9   27.1 |
      |    10   H1300020   25.5   24.4   26.6 |
      |    11   C1300164   24.2   22.9   25.4 |
      |    12   C1300164   25.2   24.4   26.0 |
      |    13   C1300164   25.3   23.9   26.8 |
      |    14   C1300168   28.5   27.9   29.1 |
      |    15   C1300168   25.5   24.1   26.9 |
      |    16   H1400003   27.0   26.1   27.9 |
      |    17   K1300338   22.7   22.1   23.2 |
      |    18   K1300338   23.5   22.9   24.1 |
      |    19   J1400223   24.2   23.4   25.0 |
      |    20   H1300092   23.0   23.0   23.0 |
      |    21   K1300334   24.2   23.1   25.2 |
      |    22   K1300334   24.3   23.2   25.4 |
      |    23   A1400225   23.7   23.1   24.2 |
      |    24   A1400225   23.7   22.2   25.1 |
      |    25   A1400225   23.7   22.6   24.8 |
      |    27   K1300335   23.2   22.4   24.0 |
      +--------------------------------------+
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*    102

### Z.13.2   Zydus

[Z.384]
```
. // Zydus Myrbetriq analysis.do
. version 17.0
. set seed 44969
. set more off
```

[Z.385]
```
. local batchcol  = "M"
. local batchrow  = "3"
. local batchloc  = "`batchcol'`batchrow'"
. local startcell = "B2"
. local endcell   = "J13"
```

[Z.386]
```
. local sheetnum  = 0
. import excel using "../raw/Zydus Myrbetriq test.xlsx", clear ///
>           cellrange(`batchloc':`batchloc') sheet("`pane'")
(1 var, 1 obs)
```

[Z.387]
```
. local batch = `batchcol'[1]
. local lot   = ""
. local sheetnum = 7
. local mg        = 50
```

[Z.388]
```
. import excel using "../raw/Zydus Myrbetriq test.xlsx", clear ///
>           cellrange(`startcell':`endcell') sheet("`pane'")
(9 vars, 12 obs)
```

[Z.389]
```
. // extract batch number, lot number, mg of tablet, and sheet id number
. generate sheet = `sheetnum'
. // add apparatus identifiers
. generate apparatus = "Basket"
```

[Z.390]
```
. rename B sample
. rename C pct0
. rename D pct10
. rename E pct20
. rename F pct30
. rename G pct50
. rename H pct70
. rename I pct85
. rename J pct100
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*   103

[Z.391]
```
. reshape long pct, i(sample) j(t)
(j = 0 10 20 30 50 70 85 100)

Data                              Wide   ->   Long
-----------------------------------------------------------------------------
Number of observations              12   ->   96
Number of variables                 11   ->   5
j variable (8 values)                    ->   t
xij variables:
                    pct0 pct10 ... pct100 ->   pct
-----------------------------------------------------------------------------
```

[Z.392]
```
. gen batch = "`batch'"
. gen lot = "`lot'"
. gen mg  = `mg'
. order sheet batch lot mg apparatus sample t
```

[Z.393]
```
. // recode t to corresond to observation time
. replace t=t/10
variable t was byte now float
(84 real changes made)
```

[Z.394]
```
. // predict dissolution at 1.5 hours for USP 2
. local c = 1.8609                      // use c derived from full data set
```

[Z.395]
```
. sort sheet t
. expand 3 if t==0                      // add time points at which to predict
(24 observations created)
```

[Z.396]
```
. sort sheet sample t                   //     USP 2 at 1.5 hours
. generate predictpoint = 0
```

[Z.397]
```
. by sheet sample t: replace pct=. if _n>=2
. by sheet sample t: replace predictpoint=1 if _n==2  // lower claim 1 threshold
. by sheet sample t: replace predictpoint=2 if _n==3  // upper claim 1 threshold
```

[Z.398]
```
. replace t=1.5*`c' if predictpoint==1
. replace t=7.0*`c' if predictpoint==2
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

*APPENDIX Z.  COMPUTATIONAL APPENDIX TO REPLY EXPERT REPORT*   104

[Z.399]
```
. sort sheet sample t
. by sheet sample: ipolate pct t, gen(pred) epolate  // obtain value via linear interp
. replace pred = min(100,pred)                        // truncate predictions at 100%
(9 real changes made)
```

[Z.400]
```
. // confidence intervals for predictions at 1.5 hours
. keep if predictpoint==1
(108 observations deleted)
```

[Z.401]
```
. ci means pred

    Variable |        Obs        Mean    Std. err.       [95% conf. interval]
-------------+---------------------------------------------------------------
        pred |         12    21.79955    .2331801        21.28632    22.31277
```

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

# APPENDIX Z-1 TO:

**REPLY EXPERT REPORT OF PROF. RONALD A. THISTED, PH.D.
CONCERNING INFRINGEMENT OF
U.S. PATENT NO. 10,842,780**

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

**K1400128_GST2II_50 rpm**

| Apparatus | Sample No. | 0 | 1 | 2 | 4 | 6 | 8 | 10 | 12 |
|---|---|---|---|---|---|---|---|---|---|
| Apparatus II (Paddle), 50 rpm, pH 6.8 | 1 | 0 | 11 | 23 | 50 | 76 | 93 | 97 | 98 |
| | 2 | 0 | 10 | 22 | 49 | 75 | 92 | 98 | 98 |
| | 3 | 0 | 9 | 20 | 44 | 67 | 84 | 95 | 97 |
| | 4 | 0 | 11 | 23 | 52 | 78 | 94 | 98 | 98 |
| | 5 | 0 | 8 | 17 | 38 | 58 | 74 | 87 | 95 |
| | 6 | 0 | 9 | 18 | 41 | 61 | 77 | 90 | 97 |
| | 7 | 0 | 9 | 19 | 44 | 70 | 90 | 96 | 96 |
| | 8 | 0 | 11 | 23 | 52 | 75 | 93 | 95 | 95 |
| | 9 | 0 | 11 | 23 | 52 | 77 | 93 | 95 | 95 |
| | 10 | 0 | 8 | 18 | 40 | 61 | 75 | 85 | 91 |
| | 11 | 0 | 10 | 23 | 51 | 75 | 92 | 95 | 95 |
| | 12 | 0 | 10 | 21 | 48 | 72 | 91 | 95 | 95 |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

K1400128_USPII_50 rpm

| Product | MYRBETRIQ Extended Release 25 mg tablets |
|---|---|
| Finished Product Batch No. | K1400128 |
| Exp. Date | Jun. 2017 |
| Test Date | 3/20/2016 |
| Bates | SAW-MIR 0028148-54 at #8154 |
| Method | USP II at 50 rpm (pH 6.8) |

CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER

**K1400128_USP_100 rpm_Set 1**

| Apparatus | Sample No. | 0 | 1 | 3 | 5 | 7 | 8.5 | 10 | 12 |
|---|---|---|---|---|---|---|---|---|---|
| Apparatus II (Paddle), 100 rpm, pH 6.8 | 1 | 0 | 9 | 32 | 61 | 86 | 94 | 94 | 94 |
| | 2 | 0 | 9 | 31 | 60 | 84 | 91 | 92 | 92 |
| | 3 | 0 | 9 | 34 | 61 | 87 | 96 | 96 | 96 |
| | 4 | 0 | 9 | 33 | 63 | 86 | 92 | 92 | 93 |
| | 5 | 0 | 9 | 31 | 59 | 88 | 98 | 99 | 99 |
| | 6 | 0 | 8 | 29 | 57 | 85 | 91 | 93 | 94 |
| | 7 | 0 | 9 | 32 | 62 | 89 | 96 | 97 | 97 |
| | 8 | 0 | 10 | 31 | 60 | 85 | 95 | 95 | 95 |
| | 9 | 0 | 9 | 31 | 63 | 87 | 99 | 100 | 101 |
| | 10 | 0 | 9 | 32 | 63 | 89 | 96 | 96 | 98 |
| | 11 | 0 | 10 | 33 | 63 | 87 | 97 | 99 | 99 |
| | 12 | 0 | 9 | 29 | 57 | 85 | 96 | 96 | 96 |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

K1400128_USP I 100 rpm_Set 1

| | |
|---|---|
| **Product** | MYRBETRIQ Extended Release 25 mg tablets |
| **Finished Product Batch No.** | K1400128 |
| **Exp. Date** | Jun. 2017 |
| **Test Date** | 3/19/2016 |
| **Bates** | SAW-MIR 0028148-54 at #8150; SAW-MIR 0088198-200 at #8198-99 |
| **Method** | USP I at 100 rpm (pH 6.8) |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

K1400128_USP_600 rpm_Set 2

| Apparatus | Sample No. | 0 | 1 | 2 | 4 | 6 | 8 | 10 | 12 |
|---|---|---|---|---|---|---|---|---|---|
| Apparatus II (Paddle), 50 rpm, pH 6.8 | 1 | 0 | 9 | 20 | 45 | 76 | 96 | 97 | 97 |
| | 2 | 0 | 9 | 20 | 46 | 75 | 94 | 94 | 94 |
| | 3 | 0 | 9 | 19 | 44 | 73 | 96 | 97 | 97 |
| | 4 | 0 | 9 | 20 | 47 | 75 | 96 | 97 | 97 |
| | 5 | 0 | 10 | 20 | 49 | 77 | 96 | 97 | 98 |
| | 6 | 0 | 8 | 18 | 44 | 75 | 94 | 96 | 96 |
| | 7 | 0 | 9 | 19 | 48 | 79 | 97 | 98 | 98 |
| | 8 | 0 | 9 | 20 | 48 | 74 | 94 | 98 | 99 |
| | 9 | 0 | 9 | 20 | 49 | 77 | 98 | 99 | 99 |
| | 10 | 0 | 9 | 20 | 48 | 78 | 97 | 98 | 98 |
| | 11 | 0 | 9 | 21 | 48 | 78 | 97 | 98 | 98 |
| | 12 | 0 | 9 | 19 | 48 | 76 | 95 | 98 | 98 |

CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER

| Product | MYRBETRIQ Extended Release 25 mg tablets |
|---|---|
| Finished Product Batch No. | K1400128 |
| Exp. Date | Jun. 2017 |
| Test Date | 3/22/2016 |
| Bates | SAW-MIR 0028148-54 at #8151 |
| Method | USP I at 100 rpm (pH 6.8) |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

# APPENDIX Z-2 TO:

**REPLY EXPERT REPORT OF PROF. RONALD A. THISTED, PH.D.
CONCERNING INFRINGEMENT OF
U.S. PATENT NO. 10,842,780**

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

15KP001C_USP II_50 rpm

| Apparatus | Sample No. | 0 | 1 | 2 | 4 | 6 | 8 | 10 | 12 |
|---|---|---|---|---|---|---|---|---|---|
| Apparatus II (Paddle), 50 rpm, pH 6.8 | 1 | 0 | 14 | 26 | 55 | 84 | 101 | 103 | 103 |
| | 2 | 0 | 14 | 28 | 58 | 85 | 102 | 102 | 103 |
| | 3 | 0 | 11 | 21 | 43 | 65 | 83 | 96 | 102 |
| | 4 | 0 | 11 | 21 | 43 | 65 | 81 | 94 | 100 |
| | 5 | 0 | 15 | 29 | 60 | 84 | 100 | 101 | 102 |
| | 6 | 0 | 14 | 28 | 59 | 88 | 101 | 102 | 103 |
| | 7 | 0 | 14 | 27 | 55 | 83 | 99 | 101 | 101 |
| | 8 | 0 | 16 | 31 | 63 | 88 | 100 | 100 | 100 |
| | 9 | 0 | 16 | 32 | 64 | 90 | 101 | 102 | 102 |
| | 10 | 0 | 14 | 27 | 55 | 83 | 99 | 101 | 101 |
| | 11 | 0 | 14 | 28 | 55 | 84 | 100 | 101 | 101 |
| | 12 | 0 | 15 | 29 | 58 | 85 | 100 | 100 | 101 |

CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER

15KP001C_USP II_50 rpm

| Product | Sawai's Mirabegron Extended Release 25 mg tablets |
|---|---|
| **Finished Product Batch No.** | 15KP001C |
| **Mfg. Date** | Oct. 2015 |
| **Exp. Date** | Oct. 2018 [proposed] |
| **Test Date** | 3/20/2016 |
| **Bates** | SAW-MIR 0028148-54 at #8154 |
| **Method** | USP II at 50 rpm (pH 6.8) |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

15KP001C_USP\_100 rpm\_Set 1

| Apparatus | Sample No. | 0 | 1 | 3 | 5 | 7 | 8.5 | 10 | 12 |
|---|---|---|---|---|---|---|---|---|---|
| Apparatus II (Paddle), 100 rpm, pH 6.8 | 1 | 0 | 13 | 40 | 68 | 96 | 99 | 99 | 100 |
| | 2 | 0 | 14 | 41 | 72 | 96 | 99 | 100 | 100 |
| | 3 | 0 | 14 | 40 | 69 | 95 | 100 | 100 | 100 |
| | 4 | 0 | 14 | 39 | 70 | 97 | 99 | 99 | 99 |
| | 5 | 0 | 13 | 40 | 70 | 94 | 97 | 97 | 96 |
| | 6 | 0 | 14 | 40 | 69 | 94 | 99 | 99 | 99 |
| | 7 | 0 | 15 | 42 | 71 | 96 | 100 | 101 | 101 |
| | 8 | 0 | 12 | 33 | 60 | 84 | 100 | 103 | 103 |
| | 9 | 0 | 14 | 43 | 71 | 94 | 101 | 102 | 102 |
| | 10 | 0 | 14 | 38 | 70 | 97 | 100 | 101 | 101 |
| | 11 | 0 | 14 | 40 | 70 | 96 | 100 | 101 | 101 |
| | 12 | 0 | 14 | 39 | 70 | 96 | 100 | 101 | 101 |

CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER

15KP001C_USP I 100 rpm_Set 1

| Product | Sawai's Mirabegron Extended Release 25 mg tablets |
|---|---|
| **Finished Product Batch No.** | 15KP001C |
| **Mfg. Date** | Oct. 2015 |
| **Exp. Date** | Oct. 2018 [proposed] |
| **Test Date** | 3/19/2016 |
| **Bates** | SAW-MIR 0028148-54 at #8150 |
| **Method** | USP I at 100 rpm (pH 6.8) |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

| Apparatus | Sample No. | 0 | 1 | 2 | 4 | 6 | 8 | 10 | 12 |
|---|---|---|---|---|---|---|---|---|---|
| Apparatus II (Paddle), 50 rpm, pH 6.8 | 1 | 0 | 14 | 27 | 59 | 92 | 102 | 99 | 102 |
| | 2 | 0 | 14 | 27 | 59 | 87 | 103 | 103 | 104 |
| | 3 | 0 | 15 | 28 | 58 | 89 | 103 | 103 | 104 |
| | 4 | 0 | 15 | 28 | 60 | 88 | 102 | 103 | 103 |
| | 5 | 0 | 13 | 25 | 54 | 86 | 103 | 104 | 103 |
| | 6 | 0 | 12 | 24 | 51 | 83 | 97 | 98 | 98 |
| | 7 | 0 | 15 | 28 | 60 | 89 | 103 | 105 | 106 |
| | 8 | 0 | 15 | 29 | 60 | 92 | 104 | 105 | 105 |
| | 9 | 0 | 16 | 28 | 58 | 90 | 105 | 106 | 106 |
| | 10 | 0 | 12 | 23 | 48 | 77 | 100 | 104 | 103 |
| | 11 | 0 | 14 | 27 | 56 | 84 | 102 | 103 | 103 |
| | 12 | 0 | 14 | 28 | 59 | 87 | 103 | 104 | 104 |

CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER

| Product | Sawai's Mirabegron Extended Release 25 mg tablets |
|---|---|
| **Finished Product Batch No.** | 15KP001C |
| **Mfg. Date** | Oct. 2015 |
| **Exp. Date** | Oct. 2018 [proposed] |
| **Test Date** | 3/22/2016 |
| **Bates** | SAW-MIR 0028148-54 at #8151 |
| **Method** | USP I at 100 rpm (pH 6.8) |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

15KP001C_USP 500 rpm_Set 3

| Apparatus | Sample No. | 0 | 1 | 3 | 5 | 7 | 8.5 | 10 | 12 |
|---|---|---|---|---|---|---|---|---|---|
| Apparatus II (Paddle), 50 rpm, pH 6.8 | 1 | 0 | 14 | 41 | 70 | 100 | 107 | 107 | 108 |
| | 2 | 0 | 8 | 33 | 66 | 96 | 103 | 104 | 104 |
| | 3 | 0 | 10 | 36 | 69 | 99 | 109 | 110 | 112 |
| | 4 | 0 | 11 | 38 | 70 | 98 | 103 | 103 | 103 |
| | 5 | 0 | 10 | 35 | 66 | 95 | 104 | 104 | 104 |
| | 6 | 0 | 8 | 32 | 65 | 94 | 100 | 100 | 100 |
| | 7 | 0 | 11 | 46 | 80 | 104 | 106 | 106 | 105 |
| | 8 | 0 | 13 | 43 | 74 | 101 | 104 | 104 | 104 |
| | 9 | 0 | 17 | 61 | 93 | 105 | 105 | 105 | 105 |
| | 10 | 0 | 9 | 53 | 91 | 103 | 103 | 103 | 103 |
| | 11 | 0 | 13 | 44 | 81 | 103 | 104 | 104 | 104 |
| | 12 | 0 | 8 | 41 | 69 | 98 | 102 | 103 | 103 |

CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER

15KP001C_USP I 100 rpm_Set 3

| Product | Sawai's Mirabegron Extended Release 25 mg tablets |
|---|---|
| Finished Product Batch No. | 15KP001C |
| Mfg. Date | Oct. 2015 |
| Exp. Date | Oct. 2018 [proposed] |
| Test Date | 6/1/2017 |
| Bates | SAW-MIR 0088198-200 at #8198 |
| Method | USP I at 100 rpm (pH 6.8) |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

# APPENDIX Z-3 TO:

**REPLY EXPERT REPORT OF PROF. RONALD A. THISTED, PH.D.
CONCERNING INFRINGEMENT OF
U.S. PATENT NO. 10,842,780**

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

**A150008860 mg)**

| Apparatus | Sample No. | 0 | 1 | 2 | 3 | 5 | 7 | 8.5 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| Apparatus I (Basket), 100 rpm, pH 6.8 | 1 | 0 | 8.1 | 15 | 24.2 | 47.9 | 70.6 | 83.9 | 93.4 |
| | 2 | 0 | 8.1 | 16.1 | 25 | 48.8 | 68.6 | 85.1 | 94.9 |
| | 3 | 0 | 6.2 | 15.5 | 23.3 | 47.1 | 70.8 | 81.3 | 93.5 |
| | 4 | 0 | 5.3 | 14.6 | 22.5 | 46 | 67.4 | 79.4 | 92.8 |
| | 5 | 0 | 7.9 | 12.2 | 23.6 | 49.3 | 73.7 | 88.7 | 91.3 |
| | 6 | 0 | 8.8 | 17.4 | 23.3 | 49.9 | 69 | 84.9 | 88.8 |
| | 7 | 0 | 5 | 17.5 | 22.2 | 43.4 | 66.7 | 80.3 | 93.4 |
| | 8 | 0 | 5.9 | 13.7 | 24.2 | 48.8 | 72.4 | 80.4 | 95 |
| | 9 | 0 | 4.8 | 13.3 | 24 | 49.5 | 70.2 | 86.3 | 90.8 |
| | 10 | 0 | 5.1 | 12.8 | 22.3 | 46.5 | 70.7 | 86.4 | 92.9 |
| | 11 | 0 | 5 | 13.5 | 24.5 | 46.5 | 69.3 | 85.7 | 93.7 |
| | 12 | 0 | 5.9 | 13.5 | 25.3 | 48.6 | 70 | 83.9 | 93 |
| | | | | | | | | | |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

A1500088 (50 mg)

| Product | MYRBETRIQ®(Mirabegron) Extended-Release Tablets 50 mg |
|---|---|
| **Finished Product Batch No.** | A1500088 |
| **Exp. Date** | Aug. 2017 |
| **Test Date** | 12/29/2015 |
| **Bates** | ZYDMYB0003344-3465 at #3390 |

**CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ASTELLAS PHARMA INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) C.A. No. 20-1589 (JFB) (CJB) |
| v. | ) CONSOLIDATED |
| | ) |
| SANDOZ INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## ASTELLAS' OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE THE MODELING TESTIMONY OF PLAINTIFFS' EXPERT PROF. RONALD A. THISTED, PH.D.

Defendants' motion *in limine* to preclude a narrow, rebuttal opinion offered by Plaintiffs' statistician, Prof. Ronald Thisted, should be denied as it was timely disclosed in his reply expert report.[1]   In fact, Defendants' sole stated basis for its exclusion is because it allegedly was "purposefully" withheld from Prof. Thisted's opening expert report as "gamesmanship" by counsel, but they cite no relevant law stating disclosure of rebuttal opinions is required in opening expert reports.   Instead, they present a half-hearted analysis of the *Pennypack* factors, but gloss over the admitted fact that his reply expert report was timely served rebuttal, a prerequisite to any *Pennypack* analysis.[2]   *See e.g.*, *Merck Sharp & Dohme Corp. v. Fresenius Kabi USA, LLC*, No. 2:14-cv-4989-SRC-CLW (D.N.J. June 13, 2016) (D.I. 167) (**Ex. A**) at *2 (distinguishing *Pennypack* because the expert report was timely within the scheduling order).

Under the applicable legal analysis for rebuttal opinions, the opinion Defendants seek to exclude was timely disclosed in Prof. Thisted's reply expert report and should not be excluded. *See e.g.*, *Withrow v. Spears*, 967 F. Supp. 2d 982, 1001 (D. Del. 2013) ("A rebuttal or reply expert report is proper if the intent of the report is solely to contradict or rebut evidence on the same subject matter identified by the opposing party's expert report.") (internal quotation omitted); *Merck Sharp & Dohme* (**Ex. A**) at *2 ("[Plaintiffs'] additional testing was a direct response to the issues raised in Defendant's own expert report, and thus . . . was a proper rebuttal of that report."). Indeed, this opinion narrowly addresses Defendants' criticisms of the modeling technique used by

---

[1]   Pretrial evidentiary exclusions under Fed. R. Evid. 403 should rarely be granted in a bench trial.  *See e.g.*, *Wright v. Elton Corp.*, No. CV 17-286-JFB, 2022 WL 1091280, at *1 (D. Del. Apr. 12, 2022).  While Defendants also cite Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), Defendants failed to raise timely any *Daubert* challenges as required by the Court's order, thereby waiving them. *See* D.I. 406.

[2]   While Defendants cite to *Praxair v. ATMI, Inc.*, that case is inapplicable here as it involved supplemental expert reports served after the close of expert discovery, whereas all of Prof. Thisted's expert reports were timely served.  231 F.R.D. 457, 463 (D. Del. 2005)

Prof. Thisted, but does not address infringement itself.[3]  As a result, Prof. Thisted need not rebuke these criticisms in his opening report, and appropriately disclosed these opinions to address the criticisms upon reply—and only if Defendants' experts criticized his modeling technique.

Indeed, courts have rejected any bright-line rule requiring anticipatory rebuttal in opening expert reports.  *See Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (Information supplied in a reply report is not excluded merely because "an expert could have included [it] in his or her original report" and "[s]uch a rule would lead to the inclusion of vast amounts of arguably irrelevant material in an expert's report on the off chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing the relevant material."); *see also Haskins v. First Am. Title Ins. Co.*, No. CIV.A. 10-5044 RMB, 2013 WL 5410531, at *2 (D.N.J. Sept. 26, 2013) ("[C]ourts have refrained from automatically excluding anything an expert could have included in his or her original report.") (internal quotation omitted).

While Prof. Thisted was under no obligation to provide potential anticipatory rebuttal in his opening report, he did allude to having performed this analysis.  Def. Mot., Ex. 1 at ¶¶ 20, 62. Thus, Defendants could have had their own expert, Dr. Betensky, perform that analysis in response.  But she did not do the analysis (despite admittedly being aware of this opinion), or— oddly—any calculations or modeling at all for the entire case.  **Ex. B** (Betensky Tr.) at 61:1-12; 130:8-16; *see also* at 100:25-101:16; 129:14-23; 132:19-25; 149:9-18; 171:9-15.  Tellingly, it was Defendants' counsel who instructed her not to do any calculations.  *Id*. at 67:7-9; 130:14-16.

---

[3]   The calculations that Defendants seek to exclude use USP II dissolution data at 50 rpm, whereas the patent claims require 200 rpm.  Thus, while the calculations support the appropriateness and robustness of Prof. Thisted's modeling technique presented in his opening expert report, they do not speak directly to infringement of the asserted claims, making them rebuttal material.  Defendant's Motion ("Def. Mot."), Ex. 1 at ¶¶ 20, 62.

Rather than having their expert statistician perform the analysis, Defendants' counsel instead chose to send an email demanding Prof. Thisted's underlying calculations, and threatening exclusion should it not be provided immediately.  Def. Mot., Ex. 2 at 2.  But given that it was only rebuttal material, Prof. Thisted provided it in his reply expert report, the appropriate place for such rebuttal opinions.[4]  Def. Mot., Ex. 4 at ¶ 107.

Apparently unable to respond to the merits of these calculations, Defendants now attempt to paint it as "tactical," "intentional," and "gamesmanship" **by counsel** for failing to disclose all the details in Prof. Thisted's opening expert report, without citation to any evidence of such a plan.  There is no basis for such an accusation.  Indeed, the only statement by Prof. Thisted concerning the omission was that "[he was] not sure why [the supporting calculations] weren't in the opening report."  Def. Mot., Ex. 3 at 12:10-11.  At no point did Prof. Thisted suggest that the omission was demanded by counsel to prejudice Defendants—despite Defendants' unsupported "gamesmanship" assertions to the contrary.  Def. Mot. At 2.

Defendants also lack any legitimate argument over prejudice.  Indeed, their own actions, such as instructing Dr. Betensky not to perform any calculations, or inactions, such as not requesting a sur-reply—despite having ample time to do so[5]—put them in the position they face today. *See, e.g., Bayer HealthCare v. Baxalta Inc.*, No. 16-1122, 2019 WL 297039, at *6 (D. Del. Jan 22, 2019).  Thus, any claims of prejudice are self-inflicted and counsel against exclusion.

For all these reasons, Defendants' motion *in limine* should be denied.

---

[4]  It turns out that Dr. Betensky did not even look at all the calculations Prof. Thisted provided in his Opening Report, undermining Defendants' argument that she needed even more calculations to respond to Prof. Thisted's opinions.  *See e.g.*, **Ex. B** at 35:15-21 ("I didn't read every single page of [Prof. Thisted's] appendices")

[5]  For example, Defendants served supplemental expert reports in this case as late as December 23, 2022, more than one month following service of Prof. Thisted's Reply Report.  D.I. 488.

Dated: January 5, 2023

*Of Counsel*:                                       MCCARTER & ENGLISH, LLP

                                                    /s/ Daniel M. Silver
Simon D. Roberts                                    Daniel M. Silver (#4758)
Jason A. Leonard                                    Alexandra M. Joyce (#6423)
Nitya Anand                                         405 N. King St., 8th Floor
Vincent Li                                          Wilmington, DE 19801
Jayita Guhaniyogi                                   (302) 984-6331
One Vanderbilt Avenue                               dsilver@mccarter.com
New York, NY 10017-3852                             ajoyce@mccarter.com
(212) 547-5700

Christopher M. Bruno                                *Attorneys for Plaintiffs*
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
(202) 756-8000

Maxwell A. Fox
2049 Century Park East, Suite 3200
Los Angeles, CA 90067-3206
(310) 277-4110

Stephen M. Hash
303 Colorado Street, Suite 2200
Austin, TX 78701
(512) 726-2600

Meng Xu
18565 Jamboree Road, Suite 250
Irvine, CA 92612-2565
(949) 851-0633

Connor Romm
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
(617) 535-4000

Rodney Swartz
650 Live Oak Avenue, Suite 300
Menlo Park, CA 94025-4885
(650) 815-7400

# EXHIBIT A

TO ASTELLAS' OPPOSITION TO DEFENDANTS'
MOTION IN LIMINE TO PRECLUDE THE MODELING TESTIMONY OF
PLAINTIFFS' EXPERT PROF. RONALD A. THISTED, PH.D.

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CHAMBERS OF
**CATHY L. WALDOR**
UNITED STATES MAGISTRATE JUDGE

MARTIN LUTHER KING COURTHOUSE
50 WALNUT ST.
ROOM 4040
NEWARK, NJ 07101
973-776-7862

### <u>LETTER ORDER</u>

Re:    **Merck Sharp & Dohme Corp. v. Fresenius Kabi USA, LLC**
       <u>**Civil Action No. 2:14-cv-4989-SRC-CLW**</u>

Dear Counsel:

This matter comes before the Court on Defendant, Fresenius Kabi's ("Fresenius") Motion to Strike Portions of the Reply Expert Report of Professor Eric J. Munson (ECF Nos. 109, 120) and Merck Sharp & Dohme's ("Merck") opposition (ECF No. 115). Based on Rule 26(a)(2) of the Federal Rules of Civil Procedure, Defendant seeks to have paragraphs 55, 62-64, and 71 of the Reply Expert Report of Professor Eric J. Munson (henceforth, "Munson Reply Report") stricken or in the alternative, to be able to conduct further testing and provide another expert report in response. The Court declined to hear oral argument pursuant to Rule 78 and for the reasons set forth below, the Court denies the motion.

The Defendant argues that in the Munson Reply Report, Professor Munson relied on new experiments that were not performed or disclosed in the opening round of expert reports. Fresenius alleges that allowing Professor Munson's new testing to be admitted would be unfairly prejudicial because it will not have "an opportunity to respond with its own testing." Brief at 5. According to the Defendant, Professor Munson should have known to conduct the additional tests when submitting the Opening Report; if the tests were so important, then Merck should have done the tests sooner; and allowing the Defendant to provide a reply report in response to Professor Munson's testing will not fully cure the error because it will cause delays and disrupt the trial of the case. Brief at 6-7.

Plaintiff notes that the Scheduling Order agreed to by the parties (ECF No. 88), allowed for opening, rebuttal, and reply expert reports with depositions to take place after all three were complete. Opposition Brief ("Opp. Brief") at 1. Merck maintains that it acted in accordance with the Court's Scheduling Order. The additional tests performed by Professor Munson, included in his reply report, were a direct response to criticisms by Plaintiff's expert, Dr. Rienstra. Counsel also had the opportunity to depose Professor Munson based on both his opening and reply reports. Opp. Brief at 2-5.

The following factors apply to the determination of whether to exclude evidence as a discovery sanction: "1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified or the excluded evidence would have been offered; 2) the ability of

that party to cure the prejudice; 3) the extent to which allowing such witnesses or evidence would disrupt the orderly and efficient trial of the case or of other cases in the court; 4) any bad faith or willfulness in failing to comply with the court's order; and 5) the importance of the excluded evidence." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012) (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977)) (internal quotations omitted).

The Court recognizes that Plaintiff submitted the reply report in accordance with the agreed to Scheduling Order, but the issue remains whether the contents of that report go beyond the parameters of an appropriate reply report. A "[r]ebuttal cannot be used to correct a party's oversights in its case-in-chief . . . [and] should be stricken if it contains new opinions." *Haskins v. First American Title Ins. Co.*, C.A. No. 10-5044, 2013 WL 5410531, at *2 (D.N.J. Sept. 26, 2013). But, "so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert" and "contains merely an elaboration of and [is] consistent with an opinion/issue previously addressed in the expert's initial report" the rebuttal is not problematic. *Id.* (quoting *Withrow v. Spears*, 967 F. Supp. 2d 982, 1003 (D. Del. 2013)) (internal quotations omitted). There is no bright-line rule and the mere fact that an expert opinion could have been included in a preliminary report is not dispositive. In fact, "automatically excluding rebuttal reports containing information that *could have been* included in an expert's original report" could have the adverse effect and cause parties to include a vast amount of irrelevant information in opening reports to preclude the information from being barred in the future. *Id.* (citing *Crowley v. Chait*, 322 F.Supp.2d 530, 551 (D.N.J. 2004)) (emphasis added).

Unlike the case law relied upon by the Defendant in its briefing (ECF No. 109, 120), the Plaintiff in this case is not introducing a new expert nor is it submitting expert reports beyond what was previously agreed to in the Scheduling Order. *See AstraZeneca LP v. Breadth Ltd.*, No. 08-1512, 2014 WL 4798477, at **3-4 (D.N.J. Sept. 26, 2014). Rather, Defendant received all the reports in question, prior to deposing Professor Munson and had the opportunity to question him on both the opening and reply reports during his deposition. Professor Munson's additional testing was a direct response to the issues raised in Defendant's own expert report and thus, the Munson Reply Report was a proper rebuttal of that report. The Court is not persuaded that Defendant will be unfairly prejudiced by admission of the Munson Reply Report. Nor has there been any adequate showing of bad faith or failure to comply with a court order on the part of the Plaintiff.

The Court is wary to give Defendant the opportunity to reply to Professor Munson's Reply Report when there has been no significant showing of prejudice to the Defendant. Moreover, granting such a request outside the bounds of the agreed to Scheduling Order would open the Court up to "parties [] continually asking for leave to serve more and more supplemental expert reports." *Haskins*, 2013 WL 5410531, at *6.

Based on the applicable law and facts presented, the Court declines to impose the extreme sanction sought by Defendant. Accordingly, Defendant's Motion to Strike Portions of the Reply Expert Report of Professor Eric J. Munson (ECF No. 109) or, in the alternative, have the opportunity to conduct further testing and reply to Professor Munson's Reply Report is **DENIED**.

**SO ORDERED**


Dated:     **June 13, 2016**

                                       *s/Cathy L. Waldor*
                                       **CATHY L. WALDOR**
                                       **United States Magistrate Judge**

# EXHIBIT B

TO ASTELLAS' OPPOSITION TO DEFENDANTS'
MOTION IN LIMINE TO PRECLUDE THE MODELING TESTIMONY OF
PLAINTIFFS' EXPERT PROF. RONALD A. THISTED, PH.D.

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
CASE No. 20-cv-01589-JFB-CJB

ASTELLAS PHARMA INC., et al,      )
                                  )
              Plaintiffs,         )
                                  )
        vs.                       )
                                  )
SANDOZ, et al,                    )
                                  )
                                  )
                                  )
              Defendants.         )
_____   )


CONFIDENTIAL




VIDEO-RECORDED DEPOSITION OF

REBECCA BETENSKY, PH.D.

New York, New York

Friday, December 9, 2022




Reported by:
PATRICIA A. BIDONDE
Registered Professional Reporter
Realtime Certified Reporter
Job No.: 6115

CONFIDENTIAL

Page 35

1     Appendix C to the "Opening Expert Report of

2     Vivian Gray Concerning Dissolution Testing."

3     Is that right?

4          A.     Yes.

5          Q.     And it's your recollection that

6     you only looked at certain portions of that

7     report.  Is that correct?

8          A.     Yes.

9          Q.     Listed above that is the "Opening

10    Expert Report of Professor Ronald A. Thisted

11    Concerning Infringement of US Patent Number

12    10,842,780."

13               Do you see that?

14         A.     Yes.

15         Q.     Did you fully consider the

16    information included in that report when

17    forming your opinions in Betensky Exhibit 1?

18         A.     I read the entire report and

19    parts of the appendices.  I didn't read every

20    single page of the appendix -- of the

21    appendices.

22         Q.     Do you recall what information

23    was included in those appendices?

24         A.     So much of it included the code

25    and the output for the statistical analysis.

CONFIDENTIAL

Page 61

1         A.    So I think this is what we talked

2    about previously.  Counsel provided me this

3    list.  And this may not be the only list.

4    There may be other things as well.  I don't

5    know.

6         Q.    But collectively, your entire

7    understanding of what important information

8    may have been included in the model came from

9    counsel?

10        A.    This table came from counsel, and

11   I don't -- I didn't receive any other

12   information, yes, so ...

13        Q.    Okay.  So it's yes.  So any

14   understanding of what additional information

15   could have been included in the model came

16   from counsel?

17        A.    Well, I suppose as well as, you

18   know, reading Dr. Thisted's report, seeing

19   what he considered and understanding about,

20   you know, a little bit about the structure of

21   the experiments, you know, the fact that there

22   are batches and things like that.

23        Q.    And just to close the loop on

24   that, though, you -- outside of the

25   information provided from counsel and as cited

CONFIDENTIAL

Page 67

1          Q.     Now, as part of your analysis,

2    you didn't try to build a predictive model to

3    include any of these distinct differences.  Is

4    that correct?

5          A.     Correct.  I didn't build any

6    model.

7          Q.     Did counsel ever ask you to build

8    a model?

9          A.     No.

10         Q.     Outside of the information

11    provided in your reports, did you do any other

12    calculations that have not been provided?

13         A.     No.

14         Q.     If you could turn to paragraph 28

15    of Betensky Exhibit 1.

16         A.     Yes.

17         Q.     And do you see this is the

18    section that starts discussing the '780

19    patent?

20         A.     Yes.

21         Q.     I know we talked about that

22    earlier today.  If I could now focus you on

23    paragraph 31 of Betensky Exhibit 1.

24         A.     Okay.

25         Q.     And could you read that paragraph

CONFIDENTIAL

Page 100

1                    "There are multiple known ways to

2            calculate the 95 percent confidence

3            interval for a set of data."

4        A.    Yes.

5        Q.    Do you see that?

6              So what do you mean, "multiple

7    known ways"?

8        A.    I really just mean multiple ways.

9    There are approximate methods that make

10   certain approximations that, again, typically

11   would hold very well in some settings but not

12   in other settings.  So those would be

13   approximate methods.

14              And then there are what's called

15   "exact methods" that don't make

16   approximations, that are based on what we call

17   "exact calculations" as opposed to approximate

18   calculations.

19              I also listed here a bootstrap

20   method which is a computational method that

21   involves resampling from data, and it's very

22   useful in complex situations in which it might

23   be hard to derive an analytical or approximate

24   method.

25        Q.    With respect to

CONFIDENTIAL

Page 101

1    Professor Thisted's predictive dissolution

2    model and the 95 percent confidence intervals

3    that he provided, did you calculate yourself

4    any of those confidence intervals as well?

5         A.    I did not calculate any

6    confidence intervals.

7         Q.    Okay.  And you say there's

8    multiple known ways to calculate them.

9              Did you consider recalculating

10   any of the confidence intervals he provided

11   using a different method than

12   Professor Thisted?

13        A.    I evaluated, you know, one aspect

14   of his calculation that he provided in his

15   second report.  But I didn't do any

16   calculations myself.

17        Q.    Okay.  And which aspect are you

18   referring to that you evaluated?

19        A.    So his derivation of a confidence

20   interval that would account for the

21   variability of that constant c in his -- that

22   he provided in an appendix.

23        Q.    Okay.  And like I said, we'll get

24   to that c value in a moment.  But in your

25   reports you actually did calculate a few

CONFIDENTIAL

Page 129

1    inappropriate.  I'm saying perhaps there are

2    better ways of splitting the data in order to

3    assess error and optimize error.

4         Q.    Okay.  Now, in paragraph 35 you

5    suggest this K-fold cross-validation approach

6    as the way the dataset should be split.  Is

7    that right?

8         A.    Given that -- again, given that

9    all that's available are the 26 datasets then,

10   you know, my understanding of this kind of

11   modeling is that that would be preferable than

12   just a single random selection of a subset to

13   hold out.

14        Q.    Now, as part of your opinions in

15   this case, you did not go ahead and do that

16   cross-fold-validation approach to build a

17   predictive model.  Is that right?

18        A.    Correct.

19        Q.    And did you have all the

20   information that you needed to do such a

21   predictive model using the K-fold split?

22        A.    I wasn't analyzing any data.  So

23   I didn't consider that.

24        Q.    Okay.  My question was just:

25   Could you have taken the data from

CONFIDENTIAL

Page 130

1    Dr. Thisted's report and then done this K-fold

2    cross-validation split to see if it would

3    have, in your opinion, provided a better

4    measure of the prediction error?

5         A.    I don't know.  I never considered

6    whether the raw data are in his report.  So I

7    don't know.

8         Q.    Did you look through the raw

9    data?

10        A.    I wasn't tasked with doing any

11   data analysis.  And I didn't -- I didn't

12   initiate any data analysis myself.  So I never

13   considered that.

14        Q.    Okay.  And you weren't tasked by

15   whom?

16        A.    Counsel.

17        Q.    If you could turn to paragraph 21

18   of Betensky Exhibit 1.

19        A.    Yes.

20        Q.    Could you read that paragraph to

21   yourself and then let me know when you're

22   done.

23        A.    Okay.

24              (Document review.)

25              Okay.

CONFIDENTIAL

Page 132

1    subsets is just generally small.

2            Q.    Okay.  And it's 26 datasets.

3    Correct?

4            A.    26 evaluations of the two

5    apparatuses.

6            Q.    And with respect to each set,

7    there's multiple pieces of data within it.

8    Correct?

9            A.    Yes.

10           Q.    So we're not just talking about

11   26 pieces of data -- right? -- we're talking

12   about a collection of 26 datasets.  Right?

13           A.    Yes.

14           Q.    And when you decided it was not

15   large enough, did you reference any articles

16   or textbooks in statistics?

17           A.    No.  Again, it's based on my

18   expertise.

19           Q.    Okay.  And I think we covered

20   this, but when you concluded that the dataset

21   was not large enough, you then did not

22   undertake to see if your K-fold

23   cross-validation would provide a better

24   prediction of the error.  Is that right?

25           A.    I didn't do any data analysis.

CONFIDENTIAL

Page 149

1    clarify.

2           Q.    Okay.  So you're only aware of

3    one instance where he uses the average

4    difference?

5           A.    I think so.

6           Q.    And that's based on your

7    recollection?

8           A.    Yeah.

9           Q.    Now, with respect to that

10   particular value, could you have yourself

11   calculated the root mean square error to see

12   if the methods produced a different outcome?

13          A.    I was not doing any data

14   analysis, so I never even considered that, but

15   I don't think I could have in that case

16   because I don't think he provides the observed

17   and predicted at the observation level.  But

18   I'm not sure.

19          Q.    Okay.  But it's your

20   understanding -- you didn't even look into

21   doing it?

22          A.    I didn't do any data analysis.

23          Q.    If you could turn back to

24   Betensky Exhibit 3, which is

25   Professor Thisted's opening report.

CONFIDENTIAL

Page 171

1          A.     With the qualification, "for

2     example."  Yes.

3          Q.     Yes.  Understood.  But the one

4     example that you used --

5          A.     Yes.

6          Q.     -- which is just an example, was

7     a sigmoidal curve.  Is that right?

8          A.     Right.  Correct.

9          Q.     Okay.  In preparing your expert

10    reports in the case, did you make any attempt

11    at using a sigmoidal curve in the prediction

12    model?

13         A.     No.

14         Q.     Why not?

15         A.     I didn't do any data analysis.

16         Q.     Do you understand that in

17    Professor Thisted's reply report, he did fit

18    the data using a sigmoidal curve?

19         A.     Yes, he used a Weibull curve.

20         Q.     And you would agree that a

21    Weibull curve is a type of sigmoidal curve?

22         A.     It's an example of a sigmoidal

23    curve, yes.

24         Q.     And that's the -- or that's an

25    example of the example you gave in paragraph

# EXHIBIT 8b

Defendants' Reply in Support of Their Motion in Limine to Preclude the Testimony of Plaintiffs' Expert Prof. Ronald A. Thisted, Ph.D.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| ASTELLAS PHARMA INC., *et al*.,<br><br>        Plaintiffs,<br><br>    v.<br><br>SANDOZ INC., *et al.*<br><br>        Defendants. | C.A. No. 20-1589-JFB-CJB<br>(Consolidated) |

**DEFENDANTS' REPLY
IN SUPPORT OF THEIR MOTION *IN LIMINE* TO PRECLUDE THE TESTIMONY OF
PLAINTIFFS' EXPERT PROF. RONALD A. THISTED, PH.D.**

Contrary to Plaintiffs' argument (Opp. at 1), the Modeling was directly related to Dr. Thisted's opening opinion on infringement and was characterized in his Opening Report as "additional evidence to show that [Dr. Thisted's] prediction model works as expected." (**Ex. 1**, at ¶ 62.) Instead of properly disclosing the basis for this opinion, Astellas deliberately withheld the underling models, data and calculations.

Plaintiffs now argue for the first time that Dr. Thisted's Modeling opinion was only a potential rebuttal contingent on what opinions Defendants' expert set forth. *See* **Ex. 2**, at 3. If that was the case, it would not have been referenced in his Opening Report. When Defendants asked Plaintiffs to support or withdraw the opinion, Plaintiffs stonewalled, and expressly requested that the Court determine the issue. *Id*. at 1. Without question, that was a strategic choice.

Plaintiffs have failed to show "substantial justification" for their decision, and the near 60-day delay in disclosing the basis of the Modeling opinion was not harmless. *See* Fed. R. Civ. P. 37. The withheld materials are extensive, constituting forty-three pages with complex calculations and citation to numerous documents. Plaintiffs and Dr. Thisted had months to create the Modeling; Defendants had no sur-reply to respond. Plaintiffs' decision to pocket the Modeling for nearly two months despite Dr. Thisted's reliance on it effectively robbed Defendants of a fair opportunity to respond.

For these reasons and the reasons set forth in Defendants' motion *in limine*, Defendants respectfully request that the Modeling be stricken and Plaintiffs and their expert, Dr. Thisted, be prohibited from presenting any opinions in reliance on the Modeling at trial.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Pilar G. Kraman*
Pilar G. Kraman (#5199)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com

*Attorneys for Zydus Pharmaceuticals (USA) Inc. and Zydus Lifesciences Limited*

PHILLIPS, MCLAUGHLIN & HALL, P.A.

*/s/ Megan C. Haney*
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
Megan C. Haney (#5016)
1200 N. Broom St
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com
mch@pmhdelaw.com

*Attorneys for Lupin Ltd. and Lupin Pharmaceuticals, Inc.*

HEYMAN ENERIO GATTUSO & HIRZEL LLP

*/s/ Dominick Gattuso*
Dominick T. Gattuso (#3630)
Elizabeth A. DeFelice (#5474)
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law
edefelice@hegh.law

*Attorneys for Defendants Sawai Pharmaceutical Co., Ltd. and Sawai USA, Inc.*

# EXHIBIT 8c

Defendants' Motion in Limine to Preclude
the Comparison of Defendants' ANDA
Products as Purported Evidence of
Infringement

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| ASTELLAS PHARMA INC., *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> SANDOZ INC., *et al*. <br><br> Defendants. | C.A. No. 20-1589-JFB-CJB <br> (Consolidated) |

<u>**DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE
THE COMPARISON OF DEFENDANTS' ANDA PRODUCTS AS PURPORTED
EVIDENCE OF INFRINGEMENT**</u>

Pursuant to Fed. R. Evid. 401-403, Lupin, Sandoz, Sawai, and Zydus ("the Trial Defendants") respectfully move *in limine* to preclude Plaintiffs from improperly presenting evidence attempting to prove infringement by relying on irrelevant and prejudicial comparisons of Defendants' unrelated and substantially different ANDA products to bolster opinions regarding alleged infringement of U.S. Patent No. 10, 842,780 ("the '780 patent).

**BACKGROUND**

Each asserted claim of the '780 patent requires: "a drug dissolution rate from the pharmaceutical composition is 39% or less after 1.5 hours, and at least 75% or more after 7 hours, as measured in accordance with United States Pharmacopeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm" (the "dissolution limitation").

Four defendants remain in this case, the Trial Defendants.  Plaintiffs previously asserted the '780 patent against several other defendants, including Actavis, Apotex, Aurobindo, and Prinston ("the Former Defendants").

Plaintiffs' infringement experts include Dr. Little, who offers overall conclusions regarding alleged infringement relying on several other experts, including Prof. Thisted and Ms. Gray. Prof. Thisted developed a statistical model that purportedly predicts dissolution test results for Defendants' ANDA products under the conditions prescribed by the claims based on dissolution data using other types of tests and different mirabegron products.  Ms. Gray presents dissolution test data for certain samples of Defendants' ANDA products.  Plaintiffs' infringement position against each Trial Defendant is based, in part, on the opinions of Plaintiffs' experts regarding the Former Defendants' ANDA products and other Trial Defendants' ANDA products.  For example, as part of Dr. Little's infringement opinions, he asserts that:

> Because of similarities in the formulations between Astellas's Myrbetriq® Products and Defendants' ANDA Products, including Actavis's ANDA Products, Apotex's

1

ANDA Products, Aurobindo's ANDA Product, Lupin's ANDA Products, Sandoz's ANDA Products, Sawai's ANDA Products, and Zydus's ANDA Products, I consider the dissolution test results regarding each of those products generated by Ms. Gray to be informative to the infringement inquiry regarding each of those other products.

*See* Ex. 1 (Little Op. Rpt.) at App'x L.2 ¶ 41; App'x L.4 ¶ 38; App'x L.5 ¶ 48; App'x L.6 ¶ 51.

Dr. Little also asserts with respect to Lupin, Sawai, and Zydus that "Prof. Thisted's predictions with other defendants' dissolution data provide further support" for Prof. Thisted's predictions regarding Lupin, Sawai, and Zydus. *See* Ex. 1 (Little Op. Rpt.) at App'x L.2 ¶ 30; App'x L.5 ¶ 37; App'x L.6 ¶ 41.

## ARGUMENT

### Legal Standard

Under the Federal Rules of Evidence and the Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), "a trial judge acts as a 'gatekeeper' to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (internal quotations omitted). This gatekeeping function applies to bench trials. *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832-33 (3d Cir. 2020).

To be relevant, evidence must be both probative and material. Fed. R. Evid. 401 ("Evidence is relevant if (a) it has the tendency to make a fact more or less probable than it would without the evidence; and (b) the fact is of consequence in determining the action."). Only relevant evidence is admissible. Fed. R. Evid. 402. Even if testimony is relevant, however, such evidence may be excluded if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

**The Only Relevant ANDA Product to an Infringement Inquiry for a Trial Defendant is the ANDA Product of that Trial Defendant**

Literal infringement requires the patentee to prove that each accused device contains each limitation of the asserted claims. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). Thus, if multiple, separate products are accused of infringement, Plaintiffs must separately show that each accused product meets every limitation of the asserted claims.

It is well-settled that the Hatch-Waxman inquiry begins and ends with each Defendant's ANDA product as described in their respective ANDAs. *See Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997) ("[T]he question of infringement must focus on what the ANDA applicant will likely market if its application is approved . . . ."); *see also Ferring B.V. v. Watson Labs., Inc.-Fla.*, 764 F.3d 1401, 1408 (Fed. Cir. 2014) ("[T]he ultimate infringement inquiry provoked by [an ANDA filing] is focused on a comparison of the asserted patent claims against the product that is likely to be sold *following ANDA approval* and determined by traditional patent law principles.") (emphasis added). As a result, when relying on testing data, a patentee can attempt to prove infringement only by testing samples of a product that: (1) have been manufactured using the same process described in an ANDA, (2) contain the exact same quantitative and qualitative composition set forth in the ANDA, and (3) meet the same specifications and expiry described in a defendant's ANDA. *See Merck Sharp & Dohme Corp. v. Amneal Pharms. LLC*, 881 F.3d 1376, 1385 (Fed. Cir. 2018) ("[t]he critical inquiry is whether [the ANDA Product sample] is representative of what is likely to be approved and marketed."); *see also Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002) ("Because drug manufacturers are bound by strict statutory provisions to sell only those products that comport with the ANDA's description of the drug, an ANDA specification defining a proposed generic drug in a manner that directly addresses the issue of infringement will control the infringement

3

inquiry."); *Ferring*, 764 F.3d at 1409 ("Watson cannot sell the uncoated cores alone because it would not comply with its ANDA specification; to do so would be to sell both an unapproved and adulterated drug in violation of the law.") Simply put, infringement must be assessed on a Defendant-by-Defendant basis, based on evidence as to the specific products that each individual Defendant will market under its respective ANDA.

Despite this clear standard, Astellas seeks to rely on testing conducted on other Defendants' ANDA products in an attempt to prove infringement of the disputed dissolution limitation by each Trial Defendant based on perceived "similarities" with other defendants' product formulations. *See*, *e.g.*, Ex. 1 (Little Op. Rpt.) at App'x L.2 ¶¶ 30, 41; App'x L.4 ¶ 38; App'x L.5 ¶¶ 37, 48; App'x L.6 ¶¶ 41, 51. But dissolution test results on another Defendant's ANDA product have no relevance to the infringement inquiry that must be conducted for each Trial Defendant's ANDA products. Because such comparisons are not relevant, Plaintiffs should be precluded from offering testimony and other evidence regarding infringement based on other Defendants' ANDA products.

### Any Probative Value of Other Defendants' ANDA Products to the Infringement Inquiry is Outweighed by Prejudice to the Trial Defendants

Plaintiffs also should be precluded from introducing evidence and testimony of infringement based on other Defendants' unrelated ANDA products, at least because any probative value of such evidence is substantially outweighed by the risk of prejudice, confusion, and waste of time.

Plaintiffs' experts have not conducted a meaningful comparison of the Trial Defendants' ANDA products to each other or to any of the Former Defendants' ANDA products. Instead, Dr. Little makes the conclusory assertion that Prof. Thisted's predictions and Ms. Gray's dissolution testing regarding other defendants' ANDA products "support" or are "informative" to

the infringement inquiry against each Trial Defendant.  *See*, *e.g.*, Ex. 1 (Little Op. Rpt.) at App'x L.2 ¶¶ 30, 41; App'x L.4 ¶ 38; App'x L.5 ¶¶ 37, 48; App'x L.6 ¶¶ 41, 51.  But nowhere does Dr. Little conduct a meaningful analysis of the similarities (and significant differences) between these products or the dissolution test results for these products.  Nor does Dr. Little explain *how* Dr. Thisted's predictions or Ms. Gray's dissolution testing regarding other products somehow demonstrates infringement by a different product.

Plaintiffs may argue that this evidence should be admitted because, in certain circumstances, courts have permitted plaintiffs to present comparisons of an accused product to a commercial embodiment of the claims as part of an infringement analysis.  But here, no Former or Trial Defendant has conceded its ANDA products are embodiments of the asserted claims, and neither Astellas nor its experts have ever argued as much.  Indeed, Plaintiffs' experts have not offered any opinions that Actavis, Aurobindo, or Prinston's ANDA Products meet any claim limitations besides the dissolution limitation.[1]  Thus, there is no basis in the record to present infringement evidence based on a comparison to these ANDA products, and Plaintiffs should be precluded on that basis.  Moreover, allowing Plaintiffs to attempt to prove infringement by the Trial Defendants based on a comparison to the Former Defendants' or other Trial Defendants' ANDA products would require Plaintiffs to first establish that each of those products is an embodiment of the claims.  Doing so would be a substantial waste of trial time.

It appears Plaintiffs hope that, by avoiding any meaningful comparison between Defendants' ANDA products, they can shortcut their infringement case based on the improper suggestion that if one or more generic versions of Myrbetriq® infringes the asserted claims, then

---

[1] Indeed, Plaintiffs' experts never cite or discuss any details regarding the formulation of Actavis's ANDA products or Prinston's ANDA products.

all others must as well because all ANDA products must be bioequivalent to Myrbetriq®.  But meeting the regulatory requirements for bioequivalence does not establish infringement in the patent context.  Allowing such inappropriate testimony would prejudice the Trial Defendants and waste the Court's and parties' time.

**CONCLUSION**

A motion *in limine* is designed to narrow evidentiary issues for trial and to eliminate unnecessary interruptions during trial.  *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3rd Cir. 1990).  This patent case does not require analysis whether the ANDA products of numerous other Defendants (including the Former Defendants) meet all limitations of the asserted claims, including but not limited to the dissolution limitation.  Dr. Little's opinions (relying on Prof. Thisted's modeling and Ms. Gray's dissolution testing) regarding other Defendants' ANDA products offer a needless and unhelpful distraction from the contested infringement issues, the presentation of which would be a waste of the Court's time and resources.

For these reasons, testimony and other evidence regarding other Defendants' ANDA products offered in support of infringement should be excluded under Fed. R. Evid. 401-403.

HEYMAN ENERIO GATTUSO & HIRZEL LLP

/s/ Dominick T. Gattuso
Dominick T. Gattuso (#3630)
Elizabeth A. DeFelice (#5474)
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law
edefelice@hegh.law

Attorneys for Defendant Sandoz Inc. and Lek Pharmaceuticals d.d.

PHILLIPS, MCLAUGHLIN & HALL, P.A.

/s/ Megan C. Haney
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
Megan C. Haney (#5016)
1200 N. Broom St
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com
mch@pmhdelaw.com

Attorneys for Lupin Ltd. and Lupin Pharmaceuticals, Inc.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Pilar G. Kraman
Pilar G. Kraman (#5199)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com

Attorneys for Zydus Pharmaceuticals (USA) Inc. and Zydus Lifesciences Limited

HEYMAN ENERIO GATTUSO & HIRZEL LLP

/s/ Dominick T. Gattuso
Dominick T. Gattuso (#3630)
Elizabeth A. DeFelice (#5474)
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law
edefelice@hegh.law

Attorneys for Defendants Sawai Pharmaceutical Co., Ltd. and Sawai USA, Inc.

7

# EXHIBIT 8c

Defendants' Motion in Limine to Preclude the Comparison of Defendants' ANDA Products as Purported Evidence of Infringement

Proposed Order

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| ASTELLAS PHARMA INC., ASTELLAS IRELAND CO., LTD., and ASTELLAS PHARMA GLOBAL DEVELOPMENT, INC., | ) ) ) ) |  |
| Plaintiffs, | ) ) ) | C.A. No. 20-1589-JFB-CJB |
| v. | ) ) | (Consolidated) |
| SANDOZ INC., et al., | ) ) |  |
| Defendants. | ) ) |  |

## [PROPOSED] ORDER

IT IS HEREBY ORDERED that Defendants' Motion *in Limine* to Preclude the Comparison of Defendants' ANDA Products as Purported Evidence of Infringement is granted.

IT IS SO ORDERED this _____day of _____, 2023.

_____
United States Magistrate Judge

1

# EXHIBIT 8c

Defendants' Motion in Limine to Preclude
the Comparison of Defendants' ANDA
Products as Purported Evidence of
Infringement

Exhibit 1

**EXHIBIT 1**

**CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| ASTELLAS PHARMA INC., et al., | ) | |
| | ) | C.A. No. 20-1589-JFB-CJB |
| Plaintiffs, | ) | |
| | ) | **Outside Counsel Only - Contains** |
| v. | ) | **Confidential Information of Astellas,** |
| | ) | **Apotex, Lupin, Prinston, Sandoz, Sawai,** |
| SANDOZ INC., et al., | ) | **Zydus, Aurobindo, and Actavis** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**OPENING EXPERT REPORT OF PROF. STEVEN R. LITTLE, PH.D.
CONCERNING INFRINGEMENT OF U.S. PATENT NO. 10,842,780**

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

# Table of Contents

I.      Introduction .................................................................................................... 5

II.     Qualifications .................................................................................................. 5

III.    Materials Considered ...................................................................................... 11

IV.     Summary of Opinions ..................................................................................... 11

V.      Legal Standards ............................................................................................... 12

VI.     Person of Ordinary Skill in the Art (POSA) ................................................... 14

VII.    Claim Construction .......................................................................................... 14

VIII.   Technology Background ................................................................................... 15

    A.      Drug Dosage Forms .................................................................................. 15

    B.      Hydrogels and Hydrogel-Forming Polymers .......................................... 16

    C.      Molecular Weight of Hydrogel-Forming Polymers ................................. 18

    D.      Dissolution Methods ................................................................................. 21

    E.      F2 Similarity ............................................................................................. 22

IX.     The Asserted Patent ........................................................................................ 23

X.      Astellas' Myrbetriq® Products ...................................................................... 24

    A.      Mirabegron ............................................................................................... 24

    B.      Myrbetriq® ............................................................................................... 24

XI.     Statistical Modeling by Prof. Ronald Thisted ................................................ 25

XII.    Dissolution Testing by Ms. Vivian Gray ........................................................ 28

XIII.   Plain Meaning of Claim Terms ....................................................................... 29

    A.      "a pharmaceutical composition" .............................................................. 29

    B.      "(R)-2-(2-aminothiazol-4-yl)-4′-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide" ...................................................................................................... 29

    C.      "a sustained release hydrogel-forming formulation" ............................... 30

    D.      "a hydrogel-forming polymer" ................................................................. 32

    E.      "an average molecular weight" ................................................................. 33

    F.      "an additive" ............................................................................................. 38

    G.      "water solubility of at least 0.1 g/mL at 20±5 °C" ................................. 40

    H.      "a drug dissolution rate" .......................................................................... 41

    I.      "39% or less after 1.5 hours" ................................................................... 43

    J.      "at least 75% after 7 hours" ..................................................................... 43

    K.      "measured in accordance with United States Pharmacopoeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm" ...................................................................................................... 44

L.    "antioxidant" ................................................................................................ 46

M.    "stabilizer" .................................................................................................. 47

N.    "yellow ferric oxide" and "red ferric oxide" ................................................... 47

O.    "tablet" ........................................................................................................ 48

P.   "a means for forming a hydrogel" ..................................................................... 50

Q.    "a means for ensuring penetration of water into the pharmaceutical composition" ...... 51

XIV.    Astellas' Myrbetriq® Products Meet the Claim Elements of the Patent-in-Suit ........... 53

A.    Claim 1 ....................................................................................................... 53

1.    "A pharmaceutical composition" .................................................................. 54

2.    "10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4′-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, or a pharmaceutically acceptable salt thereof" 54

3.    "in a sustained release hydrogel-forming formulation" ............................................. 55

4.    "a hydrogel-forming polymer having an average molecular weight of 100,000 to 8,000,000" ........ 56

5.    "wherein the hydrogel-forming polymer is at least one compound selected from the group consisting of polyethylene oxide, hydroxypropyl methylcellulose, hydroxypropyl cellulose, carboxymethyl cellulose sodium, hydroxyethyl cellulose, and a carboxyvinyl polymer" ................................................................................................... 57

6.    "an additive having a water solubility of at least 0.1 g/mL at 20±5° C." ................. 58

7.    "wherein the additive is at least one selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, D-sorbitol, xylitol, lactose, sucrose, anhydrous maltose, D-fructose, dextran, glucose, polyoxyethylene hydrogenated castor oil, polyoxyethylene polyoxypropylene glycol, polyoxyethylene sorbitan higher fatty acid ester, sodium chloride, magnesium chloride, citric acid, tartaric acid, glycine, ([3-alanine] b-alanine, lysine hydrochloride, and meglumine" ................................................... 58

8.    "wherein a drug dissolution rate from the pharmaceutical composition is 39% or less after 1.5 hours, and at least 75% after 7 hours, as measured in accordance with United States Pharmacopoeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm." ....................................................................................... 59

B.    Preamble of Claims 2-13, 15-18, 21 ........................................................... 62

1.    "The pharmaceutical composition according to claim [1]" or "comprising the pharmaceutical composition according to claim [1]" ............................................. 63

C.    Claim 2 ....................................................................................................... 63

1.    "wherein the additive is at least one selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, lactose, sucrose, sodium chloride, and polyoxyethylene polyoxypropylene glycol." ................................................... 63

D.    Claim 3 ....................................................................................................... 63

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

1.   "wherein an amount of the additive is 5% by weight to 75% by weight with respect to a total weight of the pharmaceutical composition."................................................................ 63

E.   Claim 4 ...................................................................................................................... 64

1.   "wherein the amount of the additive is 5% by weight to 70% by weight with respect to the total weight of the pharmaceutical composition." ...................................................... 64

F.   Claim 5 ...................................................................................................................... 65

1.   "wherein the hydrogel-forming polymer is at least one compound selected from the group consisting of polyethylene oxide, hydoxypropyl methylcellulose, and hydroxypropyl cellulose.".............................................................................................................................. 65

G.   Claims 6-9 .................................................................................................................. 65

1.   "further comprising an antioxidant.".......................................................................... 65

2.   "wherein the antioxidant is at least one compound selected from the group consisting of butyl hydroxytoluene, propyl gallate, and sodium ascorbate." ....................................... 66

3.   "wherein the antioxidant is butyl hydroxytoluene"................................................... 66

4.   "wherein an amount of the antioxidant is 0.025% by weight to 0.25% by weight with respect to a total weight of the pharmaceutical composition." ............................................ 67

H.   Claims 10-13 ............................................................................................................. 67

1.   "further comprising a stabilizer." .............................................................................. 67

2.   "wherein the stabilizer is at least one compound selected from the group consisting of yellow ferric oxide, red ferric oxide, and black iron oxide.".................................................. 68

3.   "wherein the stabilizer is yellow ferric oxide and/or red ferric oxide." .................... 69

4.   "wherein an amount of the stabilizer is 0.05% by weight to 1% by weight with respect to a total weight of the pharmaceutical composition." ............................................ 69

I.   Claim 15 ..................................................................................................................... 70

1.   "wherein the average molecular weight of the hydrogel-forming polymer is 100,000 to 2,000,000.".......................................................................................................................... 70

J.   Claim 16 ..................................................................................................................... 71

1.   "comprising 10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4′-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide." ...................................................................... 71

K.   Claims 17 and 18 ....................................................................................................... 71

1.   "A tablet." ................................................................................................................... 71

L.   Claim 19 ..................................................................................................................... 71

1.   "A method for treating overactive bladder" ............................................................... 72

2.   "comprising administering the tablet according to claim 17 to a subject in need thereof." ................................................................................................................................. 72

M.   Claim 20 ..................................................................................................................... 73

1.   "A method for treating overactive bladder" ............................................................... 73

3

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

2. "comprising administering the tablet according to claim 18 to a subject in need thereof." ................................................................................................... 73

N. Claim 21 ........................................................................................................ 73

1. "wherein the average molecular weight of the hydrogel-forming polymer is 100,000 to 5,000,000." ................................................................................................ 73

O. Claim 22 ........................................................................................................ 74

1. "A pharmaceutical composition" ................................................................ 74

2. "comprising 10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4′-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide, or a pharmaceutically acceptable salt thereof" 74

3. "in a sustained release hydrogel-forming formulation" ............................... 74

4. "comprising a means for forming a hydrogel" ........................................... 75

5. "and a means for ensuring penetration of water into the pharmaceutical composition" 75

6. "wherein a drug dissolution rate from the pharmaceutical composition is 39% or less after 1.5 hours, and at least 75% after 7 hours, as measured in accordance with United States Pharmacopoeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm." ......................................................................................... 76

P. Preamble of Claims 23-25 ............................................................................. 76

1. "The pharmaceutical composition according to claim [22]" ..................... 76

Q. Claim 23 ........................................................................................................ 76

1. "comprising 10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4′-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl]acetic acid anilide." ............................................... 77

R. Claims 24 and 25 ........................................................................................... 77

1. "A tablet." .................................................................................................. 77

XV. Defendants' Mirabegron Extended-Release Products Will Infringe One or More Claims of the '780 Patent ........................................................................................................... 77

A. Apotex ............................................................................................................ 77

B. Lupin .............................................................................................................. 78

C. Prinston .......................................................................................................... 78

D. Sandoz ........................................................................................................... 78

E. Sawai .............................................................................................................. 79

F. Zydus ............................................................................................................. 79

XVI. Reservation of Rights ....................................................................................... 80

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

Dated: 9/6/22

Steven R. Little, Ph.D

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

# APPENDIX L.2 (LUPIN)

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

testing using USP I methodology against Astellas' Myrbetriq® product.[48]

30.     As described in Section XI of my Opening Report, Prof. Thisted developed a statistical model to predict the dissolution values that would have been generated had the dissolution method specified in the patent claim been used (i.e., USP II (paddle) at 200 rpm) using Astellas' data from Myrbetriq® lots Defendants in this action used to support comparative dissolution testing in their respective ANDAs.  To apply this model to Lupin's data, Prof. Thisted used Lupin's own dissolution testing data of exhibit batches of the Lupin ANDA Products measured with USP Apparatus I (basket) at 100 rpm at the time of initial release testing.  Similarly, Prof. Thisted also applied his prediction model for dissolution data from other defendants, as explained in **Appendices L.1** and **L.5-L.6**.[49]  Prof. Thisted's predictions with other defendants' dissolution data provide further support for this prediction.

31.     Lupin submitted in its ANDA, dissolution testing results of exhibit batches of its 25 mg and 50 mg ANDA Products generated at the time of initial release testing using USP Apparatus I (basket) in 900 mL of a USP phosphate buffer at a pH of 6.8 and a rotation speed of 100 rpm.[50]  According to the Certificates of Analyses submitted by Lupin, the manufacturing date for is exhibit batches is Dec. 2015 and the Expiration Date is Nov. 2017.[51]

32.     Lupin's dissolution results reflect initial dissolution percent values at the time of

---

[48] *See e.g.*, LMIR0001104-94 at LMIR0001140-146; Lupin Exhibit 8 (LMIR0031190-240) at LMIR0031197-207.

[49] Prof. Thisted also applied his prediction model for dissolution data from Aurobindo.  See Thisted Opening Report at Section IX.B.

[50] *See, e.g.*, LMIR0001195-1282 at LMIR0001231-1236; Lupin Exhibit 8 (LMIR0031190-240) at LMIR0031197-207.

[51] *See, e.g.*, LMIR0003350-57; LMIR0003358-65; LMIR0003366-73; LMIR0003374-81; LMIR0003382-89; LMIR0003390-97.

these samples were at least 6 years old when tested by Ms. Gray, which is outside of the proposed 2-year expiration date for these lots.[60]

41.     Because of the similarities in the formulations between Astellas's Myrbetriq® Products and Defendants' ANDA Products, including Actavis's ANDA Products, Apotex's ANDA Products, Aurobindo's ANDA Product, Lupin's ANDA Products, Sandoz's ANDA Products, Sawai's ANDA Products, and Zydus's ANDA Products, I consider the dissolution test results regarding each of those products generated by Ms. Gray to be informative to the infringement inquiry regarding each of those other products.  *See* **Appendices L.1, L.4-L.6**; Gray Appendices A-C and E-I.

42.     Given that Lupin's Litigation Samples were beyond their proposed expiration date when Ms. Gray tested them, it would be expected that their dissolution behavior would have changed due to aging of the polymers.  ████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

---

[60] Gray Appendix C, ¶¶ 1-3.

[61] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

# APPENDIX L.4 (SANDOZ)

"produced unexpired samples of its ANDA Products to Astellas on November 1, 2021."[58]

38.     Because of the similarities in the formulations between Astellas' Myrbetriq®

Products and Defendants' ANDA Product, including Actavis's ANDA Products, Apotex's

ANDA Products, Aurobindo's ANDA Product, Lupin's ANDA Products, Sandoz's ANDA

Products, Sawai's ANDA Products, and Zydus's ANDA Products, I consider the dissolution test

results regarding each of those products generated by Ms. Gray to be informative to the

infringement inquiry regarding each of those other products.  *See* **Appendices L.1-L.2, L.5-L.6**;

Gray Appendices A-C and E-I.

39.     As explained in the Gray Opening Report, Ms. Gray performed dissolution testing

of Sandoz's Litigation Samples using USP Apparatus II (paddle) in 900 mL of a USP buffer

having a pH of 6.8 at 200 rpm as recited in Claim 1.[59]

40.     As stated in Section XII of my Opening Report, I reviewed the dissolution

protocol followed by Ms. Gray,[60] and in my opinion, Ms. Gray's dissolution protocol is

consistent with the dissolution methods described in Astellas' NDA, which are consistent with

those described in the USP and FDA's Draft Guidance for mirabegron, and demonstrates the

dissolution rate of Sandoz's Litigation Samples under the conditions set forth in the Dissolution

Element in Claim 1 of the '780 Patent.  Sandoz's ANDA also describes dissolution methods that

are consistent with the USP.[61]

41.     Ms. Gray's dissolution test results for the 25 mg Sandoz Litigation Samples are

---

[58] January 21, 2022 Sandoz, Inc.'s Answers and Objections to Plaintiffs' Second Set of
Interrogatories (Nos. 17-19) ("Sandoz's Answers to Plaintiffs' Second Interrogatories") at 4-6
(Sandoz's Responses to Rog Nos. 18-19).
[59] Gray Opening Report, Exhibit 4; Gray Appendix E.
[60] Gray Opening Report, ¶¶ 42-49, Exhibit 4.
[61] *See supra* Section II.A.8; *see also* SANMIR 0115753-771 at SANMIR 0115756-756.

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

# APPENDIX L.5 (SAWAI)

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER



CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER



CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER



CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

# APPENDIX L.6 (ZYDUS)

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████████

██████████████████████████████████████████████████

### i.     Zydus's Exhibit Batches

38.     As part of its ANDA, Zydus generated several "exhibit batches" of its ANDA Products.  For its 25 mg ANDA Product, Zydus manufactured Batch Nos. EGE365, EGE368, and EGE371.[54]  For its 50 mg ANDA Product, Zydus manufactured Batch Nos. EGE366, EGE369, and EGE370.[55]

### ii.     Zydus's Comparison to Myrbetriq®

39.     Zydus conducted dissolution testing in ████████████████████████ ████████████████████████████████ with certain exhibit batches of its 25 mg Product and 50 mg Product and compared their dissolution profiles with certain lots for Myrbetriq® 25 mg and 50 mg Products, respectively.[56]  Zydus's ANDA provides that its goal was to achieve a "similar" drug release profile as that of Myrbetriq®.[57]

### iii.     Predictive Statistical Modeling For USP II Testing of Zydus's ANDA Products

40.     ████████████████████████████████████████ ████████████████████████████████.

41.     As described in Section XI of my Opening Report, Prof. Thisted developed a statistical model to predict the dissolution values that would have been generated had the dissolution method specified in the patent claim been used (i.e., USP II (paddle) at 200 rpm)

---

[54] *See e.g.*, ZYDMYB0006072.
[55] *Id.*
[56] *See e.g.*, Kannan Exhibit 4 (ZYDMYB0004628-889) at ZYDMYB0004829, ZYDMYB0004834; ZYDMYB0003222-343 at ZYDMYB0003300-311; ZYDMYB0003344-465 at ZYDMYB0003422-433; ZYDMYB0008746-802 at ZYDMYB0008762-773.
[57] *See e.g.*, Kannan Exhibit 4 (ZYDMYB0004628-889) at ZYDMYB0004667.

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

using Astellas' data from Myrbetriq® lots Defendants in this action used to support comparative

dissolution testing in their respective ANDAs.  To apply this model to Zydus's data, Prof.

Thisted used Zydus's own dissolution testing data of exhibit batches of the Zydus ANDA

Products measured with ███████████████████████████████████████████████

██████.  Similarly, Prof. Thisted also applied his prediction model for dissolution data from other

defendants, as explained in **Appendices L.1-L.2,** and **L.5**.[58]  Prof. Thisted's predictions with

other defendants' dissolution data provide further support for this prediction.

42.     Zydus submitted in its ANDA, dissolution testing results of exhibit batches of its

25 mg and 50 mg ANDA Products generated ████████████████████████████

███████████████████████████████████████████████████████████████

██████.[59]  According to the Certificates of Analyses submitted by Zydus, the manufacturing

date for is exhibit batches is Dec. 2015 and the Expiration Date is Nov. 2017.[60]  Zydus's

dissolution results reflect initial dissolution percent values ████████████████████

███████████████████████████████████████████████████████████

███████████████ for its exhibit batches for the Zydus 25 mg Product with Batch Nos. EGE365,

EGE368, and EGE371,[61] and for its exhibit batches for the Zydus 50 mg Product with Batch

Nos. EGE366, EGE369, and EGE370.

43.     By applying his prediction model to the initial ████████████████████

---

[58] Prof. Thisted also applied his prediction model for dissolution data from Aurobindo. *See*
Thisted Opening Report at Section IX.B.

[59] *See, e.g.*, ZYDMYB0003344-465 at ZYDMYB0003428-430; ZYDMYB0003344-465 at
ZYDMYB0003422-424.

[60] *See, e.g.*, ZYDMYB0006083-092 at ZYDMYB0006084, ZYDMYB0006087,
ZYDMYB0006090; ZYDMYB0006073-082 at ZYDMYB0006074, ZYDMYB0006077,
ZYDMYB0006080.

[61] *See, e.g.*, ZYDMYB0003344-465 at ZYDMYB0003428-430.

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

no value less than 100%, and 100% for the 50 mg Product, with no value less than 100%.[65]

47.    Based on Prof. Thisted's prediction results, in my opinion, these exhibit batches meet the Dissolution Element of Claim 1 at least at the time of initial release testing.

48.    For at least these reasons, in my opinion, Zydus's ANDA Products meet this limitation.

### iv.    Dissolution Testing of Zydus's ANDA Products Using USP II

49.    I understand that Zydus produced the following samples of its ANDA Products in either this litigation or a prior litigation concerning Myrbetriq® (C.A. No. 16-905) ("Zydus's Litigation Samples"): Lot Nos. EGE368 (sample of the Zydus 25 mg Product) and EGE366 (sample of the Zydus 50 mg Product).[66]  These lots are exhibit batches submitted in its ANDA.[67]

50.    According to the certificates of analyses for these exhibit batches, the manufacturing date is Dec. 2015, with an Expiration Date of Nov. 2017.[68]  I understand that these samples were at least 6 years old when tested by Ms. Gray, which is outside of the proposed 2-year expiration date for these lots.[69]

51.    Because of the similarities in the formulations of Astellas's Myrbetriq® Products, and Defendants' ANDA Products, including Actavis's ANDA Products, Apotex's ANDA Products, Aurobindo's ANDA Product, Lupin's ANDA Products, Sandoz's ANDA Products, Sawai's ANDA Products, and Zydus's ANDA Products, I consider the dissolution test results regarding each of those products generated by Ms. Gray to be informative to the infringement

---

[65] Thisted Opening Report, ¶ 148.
[66] Gray Appendix G, ¶ 1.
[52] *See e.g.*, ZYDMYB0006072 (3.2.P.5.4 Batch Analysis).
[68] *See, e.g*., ZYDMYB0006083-092 at ZYDMYB0006084, ZYDMYB00060087, ZYDMYB00060090; ZYDMYB0006073-082 at ZYDMYB0006077-079.
[69] Gray Appendix G, ¶¶ 1-3.

CONTAINS CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

inquiry regarding each of those other products.  *See* **Appendices L.1-L.2, L.4-L.5**; Gray Appendices A-C and E-I.

52.      Given that Zydus's Litigation Samples were beyond their proposed expiration date when Ms. Gray tested them, it would be expected that their dissolution behavior would have changed due to aging of the polymers. ███████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████. ███████████████

██████████████████████████████.[70]

Thus, I would expect that the dissolution data produced by Ms. Gray to show an increased dissolution rate compared to the dissolution rate predicted by Prof. Thisted, i.e., initial release dissolution data.

53.      As explained in the Gray Opening Report, Ms. Gray performed dissolution testing of Zydus's Litigation Samples using USP Apparatus II (paddle) in 900 mL of a USP buffer having a pH of 6.8 at 200 rpm as recited in Claim 1.[71]

54.      As stated in Section XII of my Opening Report, I reviewed the dissolution protocol followed by Ms. Gray,[72] and in my opinion, Ms. Gray's dissolution protocol is

---

[70] *See, e.g.*, APOMIRA00024524-549 at APOMIRA00024549 ████████████████████████████████

████████████████████████████████████; Aurobindo Exhibit 3 (AURO_MBN_0002433-595) at AURO_MBN_0002452 ████████████████████████

████████████████████████████████).

[71] Gray Opening Report, Exhibit 4; Gray Appendix G.

[72] Gray Opening Report, ¶¶ 42-49; Gray Exhibit 4.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ASTELLAS PHARMA INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. No. 20-1589 (JFB) (CJB) |
| | ) CONSOLIDATED |
| SANDOZ INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

## ASTELLAS' OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE THE COMPARISON OF DEFENDANTS' ANDA PRODUCTS AS PURPORTED EVIDENCE OF INFRINGEMENT

The Court should deny Defendants' motion *in limine* seeking to improperly preclude Plaintiffs from presenting evidence concerning *other* defendants' ANDA products against each Defendant at trial. This evidence is probative of, and relevant to, infringement in this case and should not be excluded.[1] The main infringement dispute remaining between the parties appears limited to the "dissolution element" of the two independent patent claims.[2] And while Plaintiffs are fully prepared to present evidence concerning dissolution of each of Defendants' ANDA products against that specific Defendant, this motion concerns whether Plaintiffs can use that same evidence—collectively—against all Defendants. While Defendants argue that the law limits relevant evidence in the ANDA context to that specific ANDA product alone, they are incorrect. As discussed below, not only does the law permit such comparisons of products, the collective use of the dissolution data in this specific case is particularly relevant and appropriate. And while Defendants additionally argue that it would be unfairly prejudicial and a waste of time, those erroneous assertions too should be rejected as this is a bench trial and the Court will not be confused by the evidence presented, both individually and collectively. For the reasons stated herein, the Court should deny Defendants' motion *in limine*.

## 1. Relevant Infringement Evidence is Not Limited to Each Defendants' ANDA Product Alone

In their motion, Defendants argue that infringement in these ANDA cases must "focus" exclusively on the exact product they seek to commercially market. But the real legal question at issue here is whether other, similar products can be used to support an infringement finding, including in the ANDA context. The answer to this question is a resounding yes.

---

[1] This evidence is also relevant to several validity issues, but Defendants apparently do not seek to exclude its use in that context. D.I. 462, Plaintiffs' Dec. 2, 2022 Reply Letter at 2.

[2] D.I. 429, Plaintiffs Nov. 9, 2022, Opening Letter, at 3, 3 n.5; D.I. 434, Plaintiffs Nov. 16, 2022, Reply Letter, at 2; D.I. 440, Nov. 21, 2022, Oral Order; Dec. 22, 2022, Hearing Tr. at 27:2-5.

It is blackletter law that "[a] patentee may prove infringement by any method of analysis that is probative of the fact of infringement, and circumstantial evidence may be sufficient." *Martek Biosciences Corp. v. Nutrinova, Inc*., 579 F.3d 1363, 1372 (Fed. Cir. 2009) (internal quotation and citations omitted).  And while testing of the ANDA product itself may serve as the most direct infringement evidence in ANDA cases—which Plaintiffs have done—the law does not reject other evidence that is also probative of the infringement question.  Indeed, the cases cited by Defendants all recognize this broad evidentiary rule in the ANDA context.[3]

More importantly, none of the caselaw limits "relevant evidence" to testing of the specific ANDA product alone.  Indeed, courts have allowed other relevant evidence as a substitute for direct testing.  *See, e.g*., *Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc*., 477 F. Supp. 3d 306, 346 (D. Del. 2020), *aff'd sub nom.*, 858 Fed. App'x. 359 (Fed. Cir. 2021) (allowing other infringement evidence where actual testing of the ANDA product was not conducted).  Similarly, courts have allowed comparative testing with other product samples, which is exactly what Plaintiffs have done here.  *See, e.g*., *In re Gabapentin Pat. Litig*., 393 F. Supp. 2d 278, 290 (D.N.J. 2005) (allowing comparative pH testing against standardized gabapentin samples).

Furthermore, none of the cases cited by Defendants suggest otherwise.  In those cases, infringement was resolved with testing evidence outside the four corners of the ANDA.[4]  While the infringement analysis "focused" on the specific ANDA product, which has certainly been done

---

[3] *See Ferring B.V. v. Watson Laboratories, Inc.–Fla*., 764 F.3d 1401, 1409 (Fed. Cir. 2014) (endorsing "reference to relevant evidence"); *Abbott Lab'ys v. TorPharm, Inc*., 300 F.3d 1367, 1373 (Fed. Cir. 2002) (same); *Glaxo Inc. v. Novopharm Ltd*., 110 F.3d 1562, 1570 (Fed. Cir. 1997) (same); *Merck Sharp & Dohme Corp. v. Amneal Pharms. LLC*, 881 F.3d 1376, 1385 (Fed. Cir. 2018) (same).

[4] *See Ferring*, 764 F.3d at 1409-1410 (dissolution testing); *Abbott*, 300 F.3d at 1375 (testing of samples made by ANDA manufacturing process); *Glaxo*, 110 F.3d at 1566 (testing of API samples by various analytical methods); *Merck*, 881 F.3d at 1385-86 (same).

here, Defendants cite nothing from those cases limiting evidence solely to that product alone.

In short, the law permits "other relevant evidence" to be considered for infringement, including in ANDA cases, and the Court should not exclude such evidence here.

### 2. The Court Must Consider Other Relevant Evidence Outside the ANDA To Decide This Case

Because the dissolution specifications in the ANDAs at issue here do not use the exact dissolution testing method in the asserted claims, the Court necessarily must consider *other relevant evidence* to resolve infringement. *See Sunovion Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.*, 731 F.3d 1271, 1279-80 (Fed. Cir. 2013) (endorsing other evidence "relevant to the infringement inquiry because the ANDA specification itself did not resolve the question of infringement in the first instance"). And given the state of the law discussed above, it is entirely appropriate to look beyond testing of each Defendants' ANDA product. In fact, each Defendant was required by FDA to closely match the dissolution profile of their proposed ANDA products with that of Astellas' Myrbetriq® product, which they all completed and dutifully reported to the FDA.

In an attempt to deflect from this probative evidence concerning dissolution of their ANDA Products, Defendants simply declare (without citation to any authority) that "meeting the regulatory requirements for bioequivalence does not establish infringement in the patent context." But notably left out of this statement is the specific mirabegron FDA bioequivalence guidance at issue in this case, which requires extensive comparative dissolution studies to Astellas' Myrbetriq® product, a product that meets the claim limitations, including the dissolution

limitation.[5]  At bottom, Defendants' comparative dissolution studies to Myrbetriq® are probative and relevant to infringement in this case and should not be excluded.

**3.  The "Similarities" or "Differences" Between the ANDA Products Does Not Render the Collective Dissolution Evidence Irrelevant**

In a last-ditch effort to avoid this relevant dissolution evidence, Defendants attempt to bait the Court with a red herring—arguing that "similarities" or "differences" between components of each of the Defendants' ANDA products (and even Myrbetriq®) make the comparison of the dissolution evidence between the Defendants improper.  But this argument misses the point.  When viewed collectively, dissolution testing from each of Defendants' ANDA products presents powerful evidence that such "similarities" or "differences" do not impact the dissolution properties enough to avoid infringement.[6]  Simply put, you do not need to match the exact composition of Myrbetriq® to meet the dissolution limitation of the asserted claims.  Indeed, that is how Plaintiffs' expert Prof. Little intends to use the collective dissolution data at trial, which directly responds to—and entirely undermines—the inconsequential hole-poking arguments Defendants had hoped to present for the dissolution testing conduced on each ANDA product separately.

It is also important to note that this presentation of the collective dissolution data makes perfect sense given that each Defendant developed its product using Myrbetriq® as the comparator for dissolution, thereby serving as the common thread linking all of this dissolution data together.  As a result, Defendants' red herring argument does not diminish the relevance of this collective dissolution evidence, but instead amplifies its importance when considering Defendants' purported criticisms of Plaintiffs' dissolution evidence against each Defendant alone.

---

[5] Defendants have made no legitimate efforts to dispute that Astellas' Myrbetriq® product meets all of the limitations of the asserted claims, including the dissolution limitation at issue here.
[6] This comparison is also used by Prof. Little to rebut several validity arguments targeting the dissolution limitation of the asserted claims, including enablement and definiteness.  But Defendants apparently have not challenged that use of this comparison at trial.

The law also supports admissibility of infringement evidence by comparison to commercial products.  It is well accepted that "when a commercial product meets all the claim limitations, then a comparison [of the accused product] to that [commercial] product may support a finding of infringement." *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc*., 920 F.3d 777, 788 (Fed. Cir. 2019) (internal quotation and citation omitted).  Such comparisons are particularly relevant here because each Defendant was required to compare the dissolution properties of its proposed ANDA product to the commercial product Myrbetriq®.[7]  And while Defendants complain that none of the Defendants have conceded infringement, they all—collectively—compared their products to a product that does meet the claim limitations—Myrbetriq®.  Thus, Plaintiffs' presentation of this dissolution data—collectively—is a simple logical extension of this principle of using a known commercial product which embodies the claimed invention.

Unable to escape the obvious relevance of this collective dissolution data, Defendants also take a swipe at the completeness of the comparison performed by Prof. Little.  However, Prof. Little provided detailed analysis of why each of the ANDA products meet each of the claim limitations.  And if Defendants believe it is not complete enough, that can be explored through cross examination rather than exclusion.  But this hollow criticism in no way renders his analysis irrelevant.

### 4.  The Collective Dissolution Evidence is Not Unfairly Prejudicial or a Waste of Time

As the collective dissolution analysis is plainly relevant and should not be excluded under FRE 402, Defendants also make a run at exclusion under FRE 403.  However, Courts have repeatedly held that "*pretrial* Rule 403 exclusions should rarely be granted. . . . [A] court cannot fairly ascertain the potential relevance of evidence for Rule 403 purposes until it has a full record

---

[7] *See supra* n.5.

5

relevant to the putatively objectionable evidence." *In re Paoli R.R. Yard PCB Litig*., 916 F.2d 829, 859 (3d Cir. 1990) (emphasis in original).  Indeed, this Court recently explained, "Where the court has assumed the role of fact-finder in a bench trial, the better course is to hear the testimony, and continue to sustain objections when appropriate . . . Indeed, motions in limine often present issues for which final decision is best reserved for a specific trial situation."  *Wright v. Elton Corp*., No. CV 17-286-JFB, 2022 WL 1091280, at *1 (D. Del. Apr. 12, 2022) (internal citations and quotation omitted); *see also Par Pharm., Inc. v. Hospira, Inc*., No. CV 17-944-JFB-SRF, 2019 WL 2571165, at *3 (D. Del. June 21, 2019) (finding no danger of confusion, misunderstanding, or misapplication of the law in bench trials).  As a result, the Court should reject Defendants' arguments concerning FRE 403 out of hand and allow the evidence at trial.

And even if the Court entertains Defendants' FRE 403 arguments, those too fail upon closer inspection.  First, Defendants argue unfair prejudice because the products are "different."  But this is a bench trial and the Court will be able to keep track of the evidence and its application to each Defendant.  In reality, Defendants' prejudice argument amounts to a difference in opinions between experts concerning the "similarities" and "differences," a point Defendants are free to present through their own experts and through cross-examination of Plaintiffs' experts at trial. Furthermore, given that at least four ANDA products are already at issue, presentation of similar other products is not a waste of judicial resources.[8]

---

[8] Defendants cite *Bradley v. Pittsburgh Bd. of Educ*. to argue unnecessary interruptions.  For the reasons stated, that argument does not apply here.  *See* 913 F.2d 1064, 1068-70 (3rd Cir. 1990) (reversal of improper *sua sponte* grant of summary judgment on a motion *in limine*).

Dated: January 5, 2023

*Of Counsel*:                                              MCCARTER & ENGLISH, LLP

Simon D. Roberts                                    */s/ Daniel M. Silver*
Jason A. Leonard                                    Daniel M. Silver (#4758)
Nitya Anand                                            Alexandra M. Joyce (#6423)
Vincent Li                                                405 N. King St., 8th Floor
Jayita Guhaniyogi                                   Wilmington, DE 19801
One Vanderbilt Avenue                         (302) 984-6331
New York, NY 10017-3852                   dsilver@mccarter.com
(212) 547-5700                                       ajoyce@mccarter.com

Christopher M. Bruno
The McDermott Building                       *Attorneys for Plaintiffs*
500 North Capitol Street, NW
Washington, DC 20001-1531
(202) 756-8000

Maxwell A. Fox
2049 Century Park East, Suite 3200
Los Angeles, CA 90067-3206
(310) 277-4110

Stephen M. Hash
303 Colorado Street, Suite 2200
Austin, TX 78701
(512) 726-2600

Meng Xu
18565 Jamboree Road, Suite 250
Irvine, CA 92612-2565
(949) 851-0633

Connor Romm
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
(617) 535-4000

Rodney Swartz
650 Live Oak Avenue, Suite 300
Menlo Park, CA 94025-4885
(650) 815-7400

# EXHIBIT 8c

Defendants' Reply in Support of Their Motion in Limine to Preclude the Comparison of Defendants' ANDA Products as Purported Evidence of Infringement

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ASTELLAS PHARMA INC., *et al*.,

        Plaintiffs,

    v.

SANDOZ INC., *et al*.

        Defendants.

C.A. No. 20-1589-JFB-CJB
(Consolidated)

**DEFENDANTS' REPLY
IN SUPPORT OF ITS MOTION *IN LIMINE* TO PRECLUDE
THE COMPARISON OF DEFENDANTS' ANDA PRODUCTS AS
<u>PURPORTED EVIDENCE OF INFRINGEMENT</u>**

Astellas broadly asserts that circumstantial evidence may be probative of infringement. This general principle, however, does not address whether the specific evidence it seeks to proffer is probative of infringement – it is not.

Contrary to Astellas' implications, Defendants do not seek to exclude all evidence other than their own ANDAs or testing of their ANDA products, nor do they seek to exclude comparative dissolution studies of their ANDA products to Myrbetriq®. Rather, Defendants only seek to exclude comparisons of each Trial Defendant's accused ANDA products to the ANDA products of each other, or the ANDA products of former defendants. Astellas cannot compensate for its lack of direct evidence of infringement by simply arguing that Trial Defendants' products are all purportedly "similar" to products from other defendants. Comparisons to another product are only relevant to infringement if the other product has been shown to be an embodiment of the asserted claims. *See TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 788 (Fed. Cir. 2019) (***if*** a commercial product meets all of the claim limitations, ***then*** a comparison of the accused product to the commercial product may be relevant to infringement).

Astellas side-steps the key issue of whether its experts' comparisons of each Trial Defendant's accused ANDA products to the ANDA products of each other, or the ANDA products of former defendants, are probative of infringement. Indeed, its experts have not: (i) conducted any meaningful comparative analysis of the Defendants' various formulations; or (ii) established that the other ANDA products are embodiments of the asserted claims. Moreover, Astellas' experts have not offered any opinions that certain previous defendants' ANDA products meet any claim limitation besides the dissolution limitation,[1] nor have they even provided any disclosure or

---

[1] Astellas assert "Prof. Little provided detailed analysis of why each of the ANDA products meet each of the claim limitations."  Pl. Br. at 5.  Astellas provide no citation to such analyses for the

1

analysis of the formulation of Actavis's or Prinston's ANDA Products. Thus, Astellas' attempt to rely on this "circumstantial evidence" is quintessential bootstrapping.

Essentially conceding that it has not met the prerequisites for a comparison to other products, Astellas instead asserts without support that the comparisons between different ANDA products are a "simple logical extension of this principle of using a known commercial product which embodies the claimed invention" because "each Defendant was required to compare dissolution properties of its proposed ANDA product to the commercial product of Myrbetriq®." *See* Pl. Br. at 5. That each Defendant compared dissolution of its ANDA products to Myrbetriq® (under dissolution conditions different than those required by the claims) does not establish that those products are embodiments of the claims. Although each Defendant used Myrbetriq® as a comparator for dissolution testing for regulatory purposes using a different test than the claims, ***no one*** has conducted comparative dissolution testing of the various ANDA products. With no meaningful comparison of the formulations or dissolution of each ANDA product to the others, and with no analysis of how certain products fall within the scope of the claims, Astellas should not be permitted to present this legally irrelevant evidence at trial.

Nothing mandates that this Court waste time with irrelevant evidence just because the upcoming trial is a bench trial. *See, e.g.*, *In re Unisys Savings Plan Litigation*, 173 F.3d 145, 158 ("When the role of the gatekeeper to admit or exclude evidence (the judge) and the role of the factfinder to assess and weigh the evidence that was admitted (the jury) are one and the same, the judge . . . should not be required to waste judicial time. *See* Fed.R.Evid. 403.").

Defendants respectfully request their motion *in limine* be granted.

---

Actavis, Aurobindo, or Prinston products. Nor do Astellas dispute that its experts do not discuss the formulations of the Actavis or Prinston products.

Dated:  January 11, 2023

HEYMAN ENERIO GATTUSO & HIRZEL LLP

/s/ Dominick T. Gattuso
Dominick T. Gattuso (#3630)
Elizabeth A. DeFelice (#5474)
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law
edefelice@hegh.law

Attorneys for Defendant Sandoz Inc. and Lek Pharmaceuticals d.d.


PHILLIPS, MCLAUGHLIN & HALL, P.A.


/s/ Megan C. Haney
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
Megan C. Haney (#5016)
1200 N. Broom St
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com
mch@pmhdelaw.com

Attorneys for Lupin Ltd. and
Lupin Pharmaceuticals, Inc.


YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Pilar G. Kraman
Pilar G. Kraman (#5199)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com

Attorneys for Zydus Pharmaceuticals (USA) Inc. and Zydus Lifesciences Limited


HEYMAN ENERIO GATTUSO & HIRZEL LLP

/s/ Dominick T. Gattuso
Dominick T. Gattuso (#3630)
Elizabeth A. DeFelice (#5474)
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law
edefelice@hegh.law

Attorneys for Defendants Sawai Pharmaceutical Co., Ltd. and Sawai USA, Inc.

3