# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

ASTELLAS PHARMA INC., *et al.*,

    *Plaintiffs*,

           v.

SANDOZ INC., *et al.*,

    *Defendants*.

)
)
)
)
)
)
)
)
)
)
)

C.A. No. 20-1589-JFB-CJB

██████████████████████
████████████████
████████████

**Public Version Filed: March 22, 2023**

## PROPOSED FINDINGS OF FACT IN SUPPORT OF DEFENDANTS'
## <u>OPENING POST-TRIAL BRIEF</u>

# TABLE OF CONTENTS

I.     THE '780 PATENT ................................................................................................. 1

II.    PERSON OF ORDINARY SKILL IN THE ART ................................................. 1

III.   TECHNOLOGY BACKGROUND ....................................................................... 2

   A.   Water Soluble Additives ............................................................................. 3

   B.   Hydrogel-Forming Polymers ...................................................................... 3

   C.   API Form ..................................................................................................... 4

IV.    STATEMENT OF THE CASE ............................................................................. 5

V.     INVALIDITY OF THE ASSERTED CLAIMS FOR LACK OF ENABLEMENT ............ 6

   A.   Summary of Invalidity for Lack of Enablement .......................................... 6

   B.   Breadth of the Claims ................................................................................. 7

      1.   The Asserted Claims Include Structural and Functional Claim Elements ............. 7

      2.   The Structural Claim Elements Cover Millions of Candidate Formulations .......... 9

         a.   Independent Claim 1 ..................................................................... 9

         b.   Asserted Claims 5 and 20 .......................................................... 12

         c.   Asserted Claim 25 ...................................................................... 13

      3.   Dr. Little Did Not Attempt to Calculate the Claim Scope or Analyze the Breadth of the Asserted Claims as Written ..................................... 14

         a.   Dr. Little Made Admissions Corroborating Dr. Chambliss's Calculations for the Breadth of the Claims ............................ 15

   C.   Predictability or Unpredictability of the Art; Nature of the Invention; and State of the Prior art ................................................................................. 17

      1.   The Drug Dissolution Rate of a Hydrogel Formulation is Unpredictable and Must be Measured Experimentally Because it is the Result of Many Factors ............... 17

         a.   API Factors ................................................................................. 19

         b.   Hydrogel-Forming Polymer Factors .......................................... 21

         c.   Water Soluble Additive Factors ................................................. 25

         d.   Other Excipient Factors .............................................................. 28

         e.   Dosage Form Factors ................................................................. 30

      2.   The Prosecution History of the '780 Patent Confirms that Drug Dissolution Rates are Unpredictable .................................................... 30

      3.   The Prosecution History of the '780 Patent Confirms that the Structural Elements of the Asserted Claims Cover Hydrogel Formulations that Do Not Meet the Functional Dissolution Limitation .................................................. 32

4.  Dr. Little Admitted that Drug Dissolution Rates Need to be Determined Experimentally and that Numerous Factors Influence the Dissolution Profile ...... 34

5.  Dr. Buckton Corroborated that Gel Strength and Dissolution Rates are Influenced by Numerous Factors ................................................................................ 35

D. Amount of Direction or Guidance Presented; Presence or Absence of Working Examples ................................................................................................................ 36

1.  No Guidance in the Specification of the '780 Patent ............................................. 37

a.  Hydrogel-Forming Polymers ..................................................................... 37

b.  Water Soluble Additives ............................................................................. 38

c.  Other Excipients ......................................................................................... 40

d.  Dr. Little Admitted that there is No Guidance in the Specification ............... 40

e.  Design of Experiments and DOE Software ................................................. 41

2.  Presence or Absence of Working Examples ............................................................ 42

a.  Examples 2, 8 and 9 are Not Working Examples ........................................ 42

i.  Astellas' Erroneous Contentions that Examples 2, 8 and 9 are Working Examples .................................................................................. 44

b.  Examples 2, 8 and 9 are Extremely Narrow ............................................... 46

E. Quantity of Experimentation Necessary .................................................................... 48

1.  Defendants' ANDA Product Development Work is Irrelevant .............................. 49

F. Relative Skill of Those in the Art .............................................................................. 50

VI.  THE INVENTORS' WORK CORROBORATES LACK OF ENABLEMENT AND WRITTEN DESCRIPTION ......................................................................................... 50

1.  The Inventors Corroborated Dr. Chambliss's Testimony on the Breadth of the Claims ............................................................................................................... 52

2.  The Inventors Corroborated Dr. Chambliss's Testimony on the Level of Predictability or Unpredictability ....................................................................... 53

VII.  INVALIDITY FOR LACK OF WRITTEN DESCRIPTION SUPPORT IN THE SPECIFICATION. ...................................................................................................... 55

A. Summary of Invalidity for Lack of Written Description ............................................ 55

B. The Relevant Genus that Must be Supported by the Specification ............................ 55

C. The Specification Does Not Disclose a Representative Species ................................. 56

1.  Examples 2, 8 and 9 are Not Embodiments of the Asserted Claims ...................... 56

2.  Examples 2, 8 and 9 are Extremely Narrow .......................................................... 56

D. The Specification Does Not Disclose Structural Features Characteristic of the Genus 59

VIII.  ISSUES OF FACT REGARDING INVALIDITY OF THE ASSERTED CLAIMS FOR
       INDEFINITENESS ............................................................................................................. 59

## TABLE OF ABBREVIATIONS

| ABBREVIATION | TERM |
|---|---|
| The '780 patent | U.S. Patent No. 10,842,780 |
| The '313 application | U.S. Patent Application No. 12/568,313 |
| Abbreviated New Drug Application | ANDA |
| API | Active Pharmaceutical Ingredient |
| CMC-sodium | Carboxymethyl cellulose sodium |
| CVP | Carboxyvinyl polymer |
| DOE | Design of Experiments |
| FDA | U.S. Food & Drug Administration |
| HEC | Hydroxyethyl cellulose |
| HFA 227 | 1,1,1,2,3,3,3-heptafluoropropane |
| HFP | Hydrogel forming polymer |
| HPC | Hydroxypropyl cellulose |
| HPMC | Hydroxypropyl methylcellulose |
| HVC | Hepatitis C virus |
| INV | Invalidity |
| MW | Molecular weight |
| New Drug Application | NDA |
| NI | Noninfringement |
| PEG | Polyethylene glycol |
| PEO | Polyethylene oxide |
| PFF | Defendants Proposed Findings of Fact |
| PK | Pharmacokinetics |
| PolyOx | Dow trade name for Polyethylene oxide products |
| POSA | Person of ordinary skill in the art |
| PTO | Patent & Trademark Office |
| PVP | polyvinylpyrrolidone |
| TU | Testosterone undecanoate |
| USP | United States Pharmacopeia |
| WSA | Water soluble additive |

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| JTX-2 | The '780 patent |
| JTX-39 | Myrbetriq Label (Revised April 2021) |
| DTX-2004 | Walter G. Chambliss CV and Testimony Disclosure |
| DTX-2022 | Dow METHOCEL Brochure, published in July 2000 ("2000 Dow Brochure") |
| DTX-2025 | The '313 application prosecution history ('313 App. PH') |
| DTX-2042 | U.S. Patent Application Publication No. 2003/0203024 A1, which published on October 30, 2003 ("Sako '024") |
| DTX-2073 | Formulating Sustained Release Pharmaceutical Products With METHOCEL, Dow Chemical Company, 1987 ("1987 Dow Methocel Brochure") |
| DTX-2076 | Hiroyuki Kojima et al., *Extended Release of a Large Amount of Highly Water- Soluble Diltiazem Hydrochloride by Utilizing Counter Polymer in Polyethylene Oxides (PEO)/Polyethylene Glycol (PEG) Matrix Tablets*, 70 EUR. J. OF PHARMACEUTICS AND BIOPHARMACEUTICS 556 (2008) ("Kojima 2008") |
| DTX-2077 | Rong-Kun Chang, *Sustained Drug Release from Tablets and Particles Through Coating*, in PHARMACEUTICAL DOSAGE FORMS: TABLETS VOLUME 3 (Herbert A. Lieberman et. al. eds., 2nd Ed., 1990) ("Lieberman") |
| DTX-2078 | M. Victoria Velasco et al., *Influence of Drug:Hydroxypropylmethylcellulose Ratio, Drug and Polymer Particle Size and Compression Force on the Release of Diclofenac Sodium from HPMC Tablets*, 57 J. OF CONTROLLED RELEASE 75 (1999) ("Velasco 1999") |
| DTX-2081 | NDA Module 3.2.S.1.3 Drug Substance |
| DTX-2084 | EA/A178 CTD M3 Planning Meeting |
| DTX-2111 | HANDBOOK OF PHARMACEUTICAL EXCIPIENTS 89-92, 97-100, 158-160, 200-202, 247-49, 255-56, 283-86, 289-93, 297 305, 323-32, 371-77, 381-82, 447-50, 454-59, 460-61, 469-83, 508- 13, 556-59, 596-99, 622-25, 644-45, 694-97 (Raymond C. Rowe et al. eds., 4th ed. 2003) ("2003 HPE") |
| DTX-2112 | PHARMACEUTICS: THE SCIENCE OF DOSAGE FORM DESIGN, Chapters 1, 9, 15, 18 (Michael E. Aulton ed., 1988) ("Aulton") |
| DTX-2114 | Gurvinder Singh Rekhi et al., *Identification of Critical Formulation and Processing Variables for Metoprolol Tartrate Extended-Release (ER) Matrix Tablets*, 59 J. CONTROLLED RELEASE 327 (1999) ("Rekhi 1999") |
| DTX-2125 | HANDBOOK OF PHARMACEUTICAL MANUFACTURING FORMULATIONS COMPRESSED SOLID FORMULATIONS VOLUME I (Sarfaraz K. Niazi ed., 2004) (Niazi I") |

| Exhibit No. | Description |
|---|---|
| DTX-2142 | Yuuki Kasashima et al., Oral Sustained Release of a Hydrophilic Drug Using the Lauryl Sulfate Salt/Complex, 64 CHEM. PHARM. BULL. 1304 (2016) ("Kasashima 2016") |
| DTX-2146 | THE THEORY AND PRACTICE OF INDUSTRIAL PHARMACY 221 (Leon Lachman et al. eds., 1986) ("Lachman 1986") |
| DTX-2178 | L. Maggi et al., *Photostability of Extended-Release Matrix Formulations*, 55 EUR. J. OF PHARMACEUTICS AND BIOPHARMACEUTICS 99 (2003) ("Maggi 2003") |
| DDX 9-1 to 9-105 | Demonstrative Exhibits of Walter G. Chambliss, Ph.D. – Invalidity |
| PDX-6001 to PDX-6130 | Demonstrative Exhibits of Steven R. Little, Ph.D. – Infringement |
| PDX-8001 to PDX-8064 | Demonstrative Exhibits of Steven R. Little, Ph.D. – Validity |

## I.     THE '780 PATENT

1.      Astellas filed the application leading to the '780 patent, Application No. 15/432,854 ("the '854 application"), on February 14, 2017.  *See e.g.,* JTX-2.1 (cover page).

2.      The '854 application is a continuation of Application No. 12/568,313 ("the '313 application"), filed on September 28, 2009.  *See e.g.*, JTX-2.1 (cover page).

3.      The '780 patent and '313 application share a common specification.  *See* Tr. 1036:22 – 1037:4 (Chambliss Direct); 1220:4-5 (Chambliss Cross).

4.      The earliest priority date for the '780 patent is September 30, 2008, which is the filing date of Provisional Application No. 61/101,338.  *See* Tr. 1036:11-21 (Chambliss Direct); JTX-2.1 (cover page); DDX 9-2.

5.      The Asserted Claims in this case are dependent claims 5, 20, and 25.  *See e.g.*, Tr. 1036:8-15 (Chambliss Direct); DDX 9-2.

## II.    PERSON OF ORDINARY SKILL IN THE ART

6.      Defendants have established that a person of ordinary skill in the art ("POSA") of the '780 patent as of September 30th, 2008 would have expertise in pharmaceutical formulations, a bachelor's degree or more likely a master's degree or doctoral degree in pharmaceutical sciences or a related discipline, and several years of experience formulating dosage forms containing active compounds.  A skilled person could have a lower level of formal education if such person had a higher degree of experience.  Furthermore, because drug discovery and development is a multidisciplinary effort, a pharmaceutical scientist may interface or consult with individuals having specialized expertise such as a physician with experience treating patients with overactive bladder.  *See* Tr. 1037:10 – 1038:5 (Chambliss Direct); *see also* DDX 9-3.

7.      Dr. Chambliss is currently Professor Emeritus of Pharmaceutics and Drug Delivery, as well as Research Professor Emeritus for the Research Institute of Pharmaceutical Sciences, at

the University of Mississippi.  *See* Tr. 1029:16 – 1030:14 (Chambliss Direct); *see also* DTX 2004.2.

8.     Dr. Chambliss has a bachelor's degree in pharmacy, a master's degree in pharmaceutics, a Ph.D. in pharmaceutics and over thirty years of experience in the field of pharmaceutical formulations.  *See* Tr. 1029:3 – 1029:15 (Chambliss Direct); *see also* DTX 2004.2-5.

9.     Dr. Chambliss is an expert in pharmaceutical science, including pharmaceutical formulation of sustained release compositions and the use of *in vitro* dissolution techniques.  *See* Tr. 1035:21 – 1036:3.

10.     Dr. Chambliss was at least a POSA in September of 2008, and he analyzed the '780 patent from the perspective of a POSA.  *See* Tr. 1037:10 – 1038:18 (Chambliss Direct).

## III.    TECHNOLOGY BACKGROUND

11.     The basic components of a pharmaceutical composition are the drug (i.e., the active pharmaceutical ingredient ("API")) and the inactive ingredients or excipients.  *See* Tr. 1039:2-23 (Chambliss Direct); DDX 9-6.

12.     The formulator of a pharmaceutical composition typically starts with the desired dosage form, which is generally dictated by the route of administration (e.g., orally, by injection, by suppository, by application to the skin), evaluates the properties of the API, and selects the excipients to mix with the API in order to make the pharmaceutical composition.  *See* Tr. 1039:2-23 (Chambliss Direct); DDX 9-6.

13.     There are many different types of excipients (e.g., stabilizers, binders, etc.), and the "grade" does not refer to its purity, but rather different physical forms (e.g., different particle sizes or molecular weights) which have different physical and chemical properties that influence the properties of the formulation.  *See* Tr. 1039:24 – 1040:11 (Chambliss Direct).

2

### A.  WATER SOLUBLE ADDITIVES

14.     A POSA would look to the Handbook of Pharmaceutical Excipients, Fourth Edition (DTX 2111 ("HPE 2003")) for information on the physical and chemical properties of excipients, such as the water soluble additives covered by the Asserted Claims.  *See* Tr. 1040:12 – 1041:4 (Chambliss Direct); DDX 9-7.

15.     At least 151 different grades of the claimed water soluble additives with different physical and chemical properties were listed in the HPE 2003.  *See* Tr. 1040:12 – 1041:10 (Chambliss Direct); DTX 2111 at 158-59, 227, 255, 326, 328-29, 371, 374, 449, 456, 458, 474-77, 479, 508-09, 556, 596, 598, 622, 644, 694, 697.

### B.  HYDROGEL-FORMING POLYMERS

16.     Hydrogel-forming polymers are polymers that can absorb water or other fluids, swell, and form a gel.  *See* Tr. 1041:19-25 (Chambliss Direct); DDX 9-8.

17.     Different types of hydrogel-forming polymers are unique chemical entities with their own chemical structures, and, depending on the grade, have their own unique physical properties.  *See* Tr. 1042:1-5 (Chambliss Direct).

18.     Drug release from a hydrogel tablet is influenced by the solubility of the drug, the initial wetting of the tablet, how fast the gel layer forms and how thick it is, and the erosion of the gel layer.  *See* Tr. 1042:6 – 1043:22 (Chambliss Direct); DDX 9-9.

19.     The rate of gelation and the thickness of the gel layer is dependent on the polymer and excipients in the formulation and how the formulation is manufactured, and will control the initial release of the drug before the gel is fully formed (which is also referred to as the "burst effect").  *See* Tr. 1042:21 – 1043:5 (Chambliss Direct).

20.     The burst effect will also be influenced by the solubility and particle size of the drug.  *See* Tr. 1042:21 – 1043:8 (Chambliss Direct).

3

21.     Water soluble drugs will diffuse through the gel layer as it expands and erodes, but a water insoluble drug will not be able to diffuse through the gel layer and will depend on erosion of the gel layer to be actually released.  *See* Tr. 1043:9-22 (Chambliss Direct).

22.     Mirabegron free base is a water insoluble drug, but salt forms of mirabegron can be more water soluble and release through the gel layer.  *See* Tr. 1043:13-18, 1043:25 – 1044:15 (Chambliss Direct).

### C.  API FORM

23.     The properties of an API depend on the polymorphic, amorphic, or salt form of the drug.  *See* Tr. 1038:12-16 (Chambliss Direct).

24.     A polymorph is a solid material having more than one crystalline form, with each crystalline form having different properties, like solubility.  *See* Tr. 1044:18 – 1045:5 (Chambliss Direct); DDX 9-10.

25.     Mirabegron has at least two polymorphs, but an amorphous form could exist as well.  *See* Tr. 1045:6-18 (Chambliss Direct); Tr. at 1210:25 – 1211:14 (Chambliss Cross); DTX 2081.2; DDX 9-11.

26.     A salt is a molecule that has an acid and base linked together; mirabegron is a base, so it links it with an acid to make a salt.  *See* Tr. 1046:1-13 (Chambliss Direct); DDX 9-12.

27.     A salt form has different properties from the free elemental form.  *See* Tr. 1046:1-13 (Chambliss Direct) (elemental sodium versus sodium chloride example).

28.     Salts can also change the physical and chemical properties of an API, including its solubility in water.  *See* Tr. 1046:1-13 (Chambliss Direct); DDX 9-12.

29.     A POSA would not know how many salts of mirabegron there are, the specification of the '780 patent lists 23 salts, but some of those are actually classes of salts so there could be more than 23 salt forms of mirabegron.  *See* Tr. 1046:14-18 (Chambliss Direct).

4

## IV.    STATEMENT OF THE CASE

30.    The '780 patent claims are directed to a genus of "pharmaceutical compositions" that: (i) have certain structural features (including some form of mirabegron, a "hydrogel-forming polymer," and a "water-soluble additive"); and (ii) exhibit a particular functional dissolution profile ("drug dissolution rate") of "39% or less after 1.5 hours, and 75% or more after 7 hours." *See* Tr. 1049:6-12, 1049:23 – 1050:3 (Chambliss Direct); JTX-2, '780 patent at 20:19-47.

31.    The Asserted Claims recite both structural elements and a functional dissolution limitation.  *See* Tr. 1048:25 – 1049:5 (Chambliss Direct); JTX-2, '780 Patent at 20:19-47; DDX 9-17.

32.    For a composition to be covered by the Asserted Claims, it must meet both the structural limitations *and* the functional dissolution limitation.  *See* Tr. 1048:24 – 1049:5, 1053:14-20, 1054:6-16 (Chambliss Direct).

33.    Some, but not all, of the candidate compositions (that meet the structural limitations) will meet the functional dissolution limitation.  *See* Tr. 1071:3-8, 1141:13-16, 1148:18-25 (Chambliss Direct); Tr. 1357:15-18; 1358:6-18 (Little Cross).

34.    The compositions that meet the structural limitations are the "candidate compositions."  *See* Tr. 1048:25 – 1049:3, 1068:1-2 (Chambliss Direct); DDX 9-18.

35.    The subset of compositions meeting both the structural elements and the dissolution limitation is the genus of compositions that must be adequately enabled and described.  *See* Tr. 1047:12-16, 1048:24 – 1049:3, 1053:14-24 (Chambliss Direct); *see also* Tr. 1052:24 – 1053:7, 1071:4-8 (Chambliss Direct) (the size of this genus, as well as its location(s) within the genus of candidate compositions, is unknown); DDX 9-18.

36.    Defendants' expert, Dr. Chambliss, considered all of claim dependencies and limitations in his analysis of the breadth of the Asserted Claims, and reached the conclusion that

5

there are at least millions of candidate compositions encompassed by the Asserted Claims, but an unknown number of formulations that will also exhibit the functional dissolution rate. *See* Tr. 1048:6 – 1068:12 (Chambliss Direct) (breadth of claims analysis); Tr. 1052:24 – 1053:7, 1071:4-8 (size of genus meeting both structural limitations and dissolution requirement is unknown); *see generally* DDX 9-22 – DDX 9-32.

37.　　Astellas' expert, Dr. Little did not present competing calculations. *See* Tr. 1068:13 – 1069:1, 1069:10-17 (Chambliss Direct); 1343:12-19, 1344:17-19, 1347:10-15 (Little – Cross).

38.　　The '780 patent specification contains 17 examples, and Astellas contends that only Examples 2, 8, and 9 are working examples exhibiting the claimed functional dissolution rate. *See* Tr. 864:23 – 865:7 (Little Cross); Tr. 1116:23 – 1117:3 (Chambliss Direct); Tr. 1280:8-20 (Little Direct); Tr. 1350:10-13 (Little Cross); PDX-6024; PDX-8015; PDX-8031.

39.　　Even if Examples 2, 8 and 9 were assumed to be working examples, a POSA would not be able to extrapolate from those examples which of the many possible combinations and candidate compositions will also exhibit the required dissolution rate, because the specification contains only general background and laundry lists of potential ingredients for use in the claimed compositions. *See* Tr. 1105:17 – 1106:2; Tr. 1106:10 – 1115:19; Tr. 1132:3-18 (Chambliss Direct).

## V.　　INVALIDITY OF THE ASSERTED CLAIMS FOR LACK OF ENABLEMENT

### A.　SUMMARY OF INVALIDITY FOR LACK OF ENABLEMENT

40.　　Defendants have proved by clear and convincing evidence that the Asserted Claims are invalid for lack of enablement because the expert testimony of Dr. Chambliss demonstrates that seven of the eight *Wands* factors weigh in favor of lack of enablement, and only one is neutral. *See* Tr. 1047:7 – 1138:24 (Chambliss Direct); DDX 9-83.

### B. BREADTH OF THE CLAIMS

41.    The *Wands* factor concerning the breadth of the claims weighs heavily in favor of lack of enablement because the Asserted Claims include structural and functional claim limitations, the structural claim limitations have extraordinary breadth, and only some unknown subset of formulations will also meet the dissolution limitation.  *See* Tr. 1052:24 – 1053:7, 1071:3-8 (Chambliss Direct); DDX 9-17; DDX 9-33.

### 1.    The Asserted Claims Include Structural and Functional Claim Elements

42.    Asserted Claims 5 and 20 directly or indirectly depend from independent claim 1, and Asserted Claim 25 indirectly depends from independent claim 22:



*See* Tr. 1048:6-16 (Chambliss Direct); DDX 9-16.

43.    Independent claim 1 includes structural or composition elements that define a universe of "candidate formulations" and a functional dissolution limitation that the formulations must satisfy in order to meet the claim scope:



*See* Tr. 1048:17 – 1049:5, 1049:23 – 1050:3 (Chambliss Direct); JTX-2, '780 patent at 20:19-47; DDX 9-17.

44.     The major structural components of the candidate formulations are the drug mirabegron, the list of hydrogel-forming polymers with the broad range of molecular weights, the list of additives, and the transition word "comprising" which means that other ingredients can be used.  *See* Tr. 1049:6-12, 1049:16-22, 1058:13-19 (Chambliss Direct).

45.     Not all of the candidate formulations meet the functional dissolution limitation, and a POSA would not expect them all to.  *See* Tr. 1050:4-10 (Chambliss Direct).

46.     A POSA would understand that the structural claim scope covers millions of candidate formulations (i.e., the large circle on DDX 9-18), and that only a subset of those candidate formulations would also meet the required functional dissolution limitation (i.e., the smaller circle on DDX 9-18) with the red question mark:



*See* Tr. 1050:11-18, 1052:13 – 1053:7 (Chambliss Direct); DDX 9-18.

47.    A POSA would understand that the specification of the '780 patent must enable the genus of formulations that meet both the structural limitations and the functional dissolution limitation without excessive experimentation (i.e., the smaller circle on DDX 9-18).  *See* Tr. 1053:14-24 (Chambliss Direct).

48.    The teachings of the specification provide no guidance to a POSA on how large the genus of formulations is that meets both the structural limitations and the functional dissolution limitation, or where the genus is located within the universe of candidate formulations covered by the structural claim elements.  *See* Tr. 1052:24 – 1053:7, 1071:4-8 (Chambliss Direct); DDX 9-17, DDX 9-18.

### 2.   The Structural Claim Elements Cover Millions of Candidate Formulations

### a.   Independent Claim 1

49.    The structural elements in claim 1 include a "pharmaceutical composition" element, which:

- does not limit the physical form of the pharmaceutical composition;

- does not limit the route of administration, and covers oral and non-oral dosage forms;

- does not limit the type of dosage form, and covers tablets, granules, syrups, suppositories, etc.; and

- does not limit the manufacturing processes for making the dosage form.

*See* Tr. 1055:10-23 (Chambliss Direct); JTX-2, '780 Patent at 20:19-47; DDX 9-22.

50.    The structural elements in claim 1 include a "10 mg to 200 mg" mirabegron element, which:

- covers a broad 20-fold range in the amount of API in the pharmaceutical composition;

- covers wide concentration ranges because there is no size limit on the dosage form; and

- covers different forms of mirabegron, including pharmaceutically acceptable salts, and two or more polymorphs.

*See* Tr. 1055:24 – 1056:15 (Chambliss Direct); JTX-2, '780 Patent at 20:19-47; DDX 9-22; *see also* Tr. 1045:6-18 (mirabegron has at least two polymorphs) (Chambliss Direct).

51.    The structural elements in claim 1 include a "hydrogel-forming polymer" element, which:

- covers six different types of hydrogel-forming polymers (i.e., PEO, HPMC, HPC, CMC-Na, HEC, CVP), and many grades of each type, which have different physical and chemical properties that would affect the drug dissolution rate;

- allows for combinations of different types and grades of hydrogel-forming polymers; and

- does not limit the amount of the polymers, the concentration of the polymers, the ratio of the polymer to the API, or the ratio of the polymer to the water soluble additive.

*See* Tr. 1056:16 – 1057:6 (Chambliss Direct); JTX-2, '780 Patent at 20:19-47; DDX 9-22.

52.    The structural elements in claim 1 include a water soluble "additive" element, which:

- specifies a minimal threshold for water solubility, but has no upper limit;

- lists 22 different types of water soluble additives, and covers at least 151 different grades, with different physical and chemical properties, including polymers (e.g., PEG), sugars (e.g., lactose), sugar alcohols (e.g., D-mannitol), salts (e.g., sodium chloride), and acids (e.g., citric acid);

- allows for combinations of different types and grades of water soluble additives; and

- does not limit the amounts, concentrations or ratios of the water soluble additives to other ingredients in the formulation.

*See* Tr. 1057:9 – 1058:12 (Chambliss Direct); JTX-2, '780 Patent at 20:19-47, 10:16-43; DDX 9-22.

53.     Claim 1 uses the transitional word "comprising" which means that other ingredients can be added to the composition, such as binders, fillers, etc.  *See* Tr. 1049:16-22, 1058:13-19 (Chambliss Direct); JTX-2, '780 Patent at 20:19-47; DDX 9-22.

54.     Dr. Chambliss calculated that the structural elements of claim 1 cover 17,712,300 candidate formulations by multiplying:

- only the 51 hydrogel-forming polymer grades listed in the specification;

- only the 151 water-soluble additives listed in the 2003 HPE;

- only 10 different mirabegron amounts;

- only 10 ratios of mirabegron to hydrogel-forming polymer to water-soluble additive; and

- only the 23 potential salt forms listed in the specification.

*See* Tr. 1058:21 – 1060:8 (Chambliss Direct); DDX 9-23.

55.     Dr. Chambliss's calculation is a conservative estimate of the number of candidate formulations because it:

- assumed one dosage form made one way for the "pharmaceutical composition" structural claim element;

- limited the "10 mg to 200 mg" mirabegron structural claim element to 10 different amounts, one polymorphic form, and the 23 salts listed in the specification;

11

- limited the "hydrogel-forming polymer" structural claim element to the 51 grades listed in the specification, and did not include combinations of hydrogel-forming polymers;

- limited the water soluble "additive" structural claim element to the 151 grades listed in the HPE 2003, and did not include combinations of water soluble additives;

- limited the mirabegron to hydrogel-forming polymer to water soluble additive ratio to 10; and

- did not include additional excipients that could be used due to the claim term "comprising."

*See* Tr. 1058:21 – 1060:8, 1060:19 – 1063:20 (Chambliss Direct); JTX-2, '780 Patent at 6:60-7:3 (listing 23 salts); JTX-2, '780 Patent at 7:50 - 9:4, 9:21-47 (listing 51 grades of PEO, HPMC, HPC, CMC-NA, HEC, and CVP); DTX-2111 (HPE 2003) at 158-59, 247, 255, 326, 328-29, 371, 374, 449, 456, 458, 474-77, 479, 508-09, 556, 596, 598, 622, 644, 694, 697; DDX 9-24 – DDX 9-27.

56.     A POSA would understand that combinations of "hydrogel-forming polymers" and "water soluble additives" could be used in the claimed formulations because the claims say "at least one" selected from the group.  *See e.g.*, Tr. 1171:4-7 (Chambliss Cross); JTX-2, '780 Patent at 20:27-28, 33-34 (claim 1).

### b.  Asserted Claims 5 and 20

57.     Asserted Claim 5 depends from independent claim 1, and narrows claim 1 by reducing the number of different types of hydrogel-forming polymers to PEO, HPMC, and HPC. *See* Tr. 1063:21 – 1064:19 (Chambliss Direct); JTX-2, '780 Patent at 20:61-65; DDX 9-28.

58.     Asserted Claim 20 indirectly depends from independent claim 1, and narrows claim 1 by excluding salts through claim 16 and restricting the dosage form to different types of tablets through claim 18.  *See* Tr. 1063:21 – 1064:8, 1064:20-24 (Chambliss Direct); JTX-2, '780 Patent at 21:30-33, 22:1-2, 22:6-8; DDX 9-28.

59.     Dr. Chambliss calculated that the structural elements of claim 5 cover 12,850,100 candidate formulations by multiplying:

- only the 37 grades of PEO, HPMC, and HPC listed in the specification;

- only the 151 water-soluble additives listed in the 2003 HPE;

- only 10 different mirabegron amounts;

- only 10 ratios of mirabegron to hydrogel-forming polymer to water-soluble additive; and

- only the 23 potential salt forms listed in the specification.

*See* Tr. 1065:1-21 (Chambliss Direct); JTX-2, '780 Patent at 7:50 – 9:4; DDX 9-29.

60.     Dr. Chambliss calculated that the structural elements of claim 20 cover 1,540,200 candidate formulations by multiplying:

- only the 51 hydrogel-forming polymer grades listed in the specification;

- only the 151 water-soluble additives listed in the 2003 HPE;

- only 10 different mirabegron amounts;

- only 10 ratios of mirabegron to hydrogel-forming polymer to water-soluble additive; and

- only 2 polymorphic forms of mirabegron.

*See* Tr. 1065:22 – 1066:21 (Chambliss Direct); DTX 2081.2; DDX 9-30.

### c.   Asserted Claim 25

61.     Asserted Claim 25 indirectly depends from independent claim 22.  *See* Tr. 1066:22 – 1067:11 (Chambliss Direct); JTX-2, '780 Patent at 22:13-29, 33-34; DDX 9-31.

62.     Independent claim 22 is broader than independent claim 1 because it recites a "means for forming a hydrogel" and a "means for ensuring penetration of water" and covers more hydrogel-forming polymers and water soluble additives than claim 1.  *See* Tr. 1066:22 – 1067:11 (Chambliss Direct); JTX-2, '780 Patent at 20:19-47, 22:13-25; DDX 9-31.

13

63.     Asserted Claim 25 narrows independent claim 22 by excluding salts through claim 23 and restricting the dosage form to different types of tablets.  *See* Tr. 1067:12-17 (Chambliss Direct); JTX-2, '780 Patent at 22:13-29, 33-34; DDX 9-31.

64.     Dr. Chambliss calculated that the structural elements of claim 25 cover 1,540,200 candidate formulations by multiplying:

- only the 51 hydrogel-forming polymer grades listed in the specification;

- only the 151 water-soluble additives listed in the 2003 HPE;

- only 10 different mirabegron amounts;

- only 10 ratios of mirabegron to hydrogel-forming polymer to water-soluble additive; and

- only 2 polymorphic forms of mirabegron.

*See* Tr. 1067:18 – 1068:8 (Chambliss Direct); DTX 2081.2; DDX 9-32.

### 3. Dr. Little Did Not Attempt to Calculate the Claim Scope or Analyze the Breadth of the Asserted Claims as Written

65.     Dr. Little did not attempt to calculate the scope of the Asserted Claims.  *See e.g.*, Tr. 1344:17-19, 1345:2-7 (Little Cross).

66.     Dr. Little did not assess whether the full scope of the Asserted Claims is enabled, and only considered whether a POSA could "operate *within*" the claims:

> **A.** . . . . A person of ordinary skill in the art looks at this through their eyes whenever they see it, they would not need every grade of every one of these things *to be able to operate within the claims*.

Tr. 855:12-15 (Little Cross).

> **Q.** So all of the grades of all of the polymers in the specification could be used, correct?
>
> **A.** They could in the context of the hydrogel forming system.  So it's not like they could just be used a little bit, right?  It's a means for forming a hydrogel, *so you have to be operating within what a person of ordinary skill in the art knows* how to make one of these systems.

Tr. 849:21 – 850:2 (Little Cross).

> **Q.**  You haven't even estimated a guess as to the number of compositions covered by these claims, correct?
>
> **A.**  I disagree. I went through the Court and *showed how many compositions you would need to get a [the] dissolution element*, so I have testified to that.

Tr. 1345:21-25 (Little Cross).

67.    Dr. Little was only assessing whether a POSA could find one embodiment in his Section 112 analyses.  *See* PDX-8027 ("***Finding a working embodiment*** is not 'searching for a needle in a haystack.'" (emphasis added)).

68.    Dr. Little assessed the Asserted Claims through a POSA's eyes and not as they are written:

> **Q.**  My question is, does it, does the claim require a grade of these additives?
>
> **A.**  It doesn't explicitly mention it, but I'll use the word you saw before when you said see, a person of ordinary skill in the art looks at this and they see it through the person of ordinary skill person's eyes.
>
> **Q.**  Claim 1 doesn't require any particular amount, concentration or ratios of these additives, correct?
>
> **A.**  That's the same answer, that they don't see those direct things in here, but they see it through their eyes.

Tr. 853:18 – 854:2 (Little Cross).

### a.  Dr. Little Made Admissions Corroborating Dr. Chambliss's Calculations for the Breadth of the Claims

69.    Dr. Little admitted that if Dr. Chambliss had done calculations according to the claim language rather than conservatively, then "you're talking about the number of stars in the sky, it's so many different zeros, you couldn't even imagine multiplying it together." *See* Tr. 1299:7-18 (Little Direct).

70.    Dr. Little admitted that the patent would be thousands or millions of pages long if it had guidance on the lists of additives in the specification.  *See* Tr. 855:6-12 ("[t]he alternative to

what you're saying is that you would have patents that are thousands, millions of pages long.")
(Little Cross).

71.     Dr. Little admitted that claim 1: (i) allows for six types of hydrogel-forming polymers, Tr. 843:13-24 (Little Cross); (ii) does not limit the amount of the hydrogel-forming polymer, Tr. 844:8-11 (Little Cross); and (iii) does not limit the ratio of hydrogel-forming polymer to other ingredients, Tr. 844:12-14 (Little Cross).

72.     Dr. Little admitted that the molecular weight of the hydrogel-forming polymer in claim 1 just needs to be 100,000-8 million. *See* Tr. 844:21-25 (Little Cross).

73.     Dr. Little admitted that there are "more than a few" grades of hydrogel-forming polymers that are known and used in the field, and it is more than just Polyox.  *See* Tr. 845:1-6 (Little Cross).

74.     Dr. Little admitted that all of the grades of the hydrogel-forming polymer PEO listed in the patent would fall within claim 1.  *See* Tr. 845:16-24 (Little Cross).

75.     Dr. Little admitted that the hydrogel-forming polymers listed in the patent are not an exhaustive list.  *See* Tr. 845:25 – 846:10 (Little Cross).

76.     Dr. Little admitted that claim 22 allows for at least all of the hydrogel-forming polymers listed in the patent.  *See* Tr. 848:16-25 (Little Cross).

77.     Dr. Little admitted that claim 22 does not limit the amount, concentration or ratios for the hydrogel-forming polymer.  *See* Tr. 849:11-15 (Little Cross).

78.     Dr. Little admitted that claim 1 allows for each of the 22 water soluble additives listed. *See* Tr. 853:1-8 (Little Cross).

79.     Dr. Little admitted that claim 1 does not require any particular amount, concentration or ratios of the water soluble additives.  *See* Tr. 853:24-854:2 (Little Cross).

80.     Dr. Little admitted that the claims are not limited to PEO and PEG.  *See* Tr. 858:1-4; 858:5-14 (same); 859:11-23 (same) (Little Cross).

81.     Dr. Little admitted that the claims are not limited to Myrbetriq®.  *See* Tr. 859:2-5; 859:24 – 860:2 (same) (Little Cross).

82.     Dr. Little admitted that the claims allow for combinations of hydrogel-forming polymers.  *See* Tr. 859:11-13 (Little Cross).

83.     Dr. Little admitted that the claims are not limited to the grades of PEO and PEG in Examples 2, 8 and 9.  *See* Tr. 872:11-20 (Little Cross).

84.     Dr. Little admitted that the claims do not require anything regarding a food effect. *See* Tr. 843:6-12 (Little Cross).

### C.  PREDICTABILITY OR UNPREDICTABILITY OF THE ART; NATURE OF THE INVENTION; AND STATE OF THE PRIOR ART

85.     The *Wands* factor concerning the predictability or unpredictability in the art, the nature of the invention, and the state of the prior art each weigh heavily in favor of lack of enablement because:

- drug dissolution rates are very unpredictable because they are the result of interplay between many factors and must be determined experimentally;

- the chemical arts, formulation science, and drug dissolution rates are all complex and unpredictable; and

- the state of the prior art is reflected in the file history by Astellas' express admission that the dissolution rates of hydrogel formulations are unpredictable.

*See* Tr. 1104:18 – 1105:10 (Chambliss Direct); DDX 9-62.

### 1.  The Drug Dissolution Rate of a Hydrogel Formulation is Unpredictable and Must be Measured Experimentally Because it is the Result of Many Factors

86.     A POSA would have understood that the drug dissolution rate from a hydrogel formulation is unpredictable and must be determined experimentally, as reflected in the teachings

of the prior art.  *See* Tr. 1071:10 – 1072:14 (Chambliss Direct); DTX 2125.26, Niazi I at 25 ("*Finished product testing*, *particularly* assay, content uniformity, *and dissolution, are required.*" (emphasis added)); DDX 9-36.

87. A POSA would have understood that the dissolution rate of a hydrogel formulation is unpredictable because it is a result of many factors, including:

- the physical-chemical properties of the API, including its water solubility dictated by its form (i.e., it's polymorphic form, whether it's in the free base or salt form) and particle size, and concentration in the formulation;

- the hydrogel-forming polymer in the formulation, including its type, grade, amount, and ratio to other ingredients in the formulation;

- the water soluble additive in the formulation, including its type, grade, amount, and ratio to other ingredients in the formulation;

- other excipients in the formulation, including their type and amount; and

- the dosage form itself, including its shape and size.

*See* Tr. 1073:5-18 (Chambliss Direct); DDX 9-37.

88. A POSA would have understood that hydrogel formulations are complex systems due to the "interplay of many variables," which "makes the dissolution rate unpredictable."  *See* Tr. 1073:21 – 1074:5 (Chambliss Direct).

89. Astellas' own publication, that lists one of the named inventors of the '780 patent as an author (i.e., Kazuhiro Sako), from June of 2008 teaches that the drug dissolution rate of a hydrogel formulation is a function of inter-related variables, including the molecular weight of the drug, the drug solubility, the drug to polymer ratio, tablet shape, and viscosity of the hydrogel-forming polymer.  *See* Tr. 1074:6 – 1075:5 (Chambliss Direct); DTX 2076.1, Kojima 2008 at 556 ("Many researchers have extensively investigated the drug release characteristics of HPMC matrices.  It has been reported that the molecular weight of a drug, drug solubility, drug to polymer

18

ratio, tablet shape, and viscosity of HPMC affect in-vitro drug release." (citations omitted)); DDX 9-38.

### a. API Factors

90.     A POSA would have understood that the solubility of the API will influence the drug dissolution rate of a hydrogel formulation, as reflected in teachings of the prior art.  *See* Tr. 1075:23 – 1076:11 (Chambliss Direct); DTX 2146.3, Lachman 1986 at 221 ("Dissolution depends in part on the solubility of the drug substance in the surrounding medium."); DDX 9-40.

91.     A POSA would have understood that different polymorphic forms of a drug will have different physical properties, including solubility, which will influence the drug dissolution rate of a hydrogel formulation, as reflected in teachings of the prior art. *See* Tr. 1076:19 – 1077:7 (Chambliss Direct); DTX 2112.13, Aulton at 10 ("different polymorphs vary in physical properties such as solubility, dissolution …"); DDX 9-41.

92.     A POSA would have understood that different salt forms of a basic compound like mirabegron will have different solubility, which will influence the drug dissolution rate of a hydrogel formulation, as reflected in teachings of the prior art.  *See* Tr. 1077:16 – 1078:3 (Chambliss Direct); DTX 2112.11, Aulton at 8 ("Solubilities of acidic or basic compounds are pH dependent and can be altered by forming salts, with different salts exhibiting different equilibrium solubilities."); DDX 9-42.

93.     A POSA would not have been able to predict whether a salt form of a compound would have higher or lower solubility than the free base form.  *See* Tr. 1078:4-10 (Chambliss Direct).

94.     Astellas' own non-prior art publication, Kasashima 2016, shows that salts of mirabegron have a dramatic influence on the drug dissolution rate, with the top curve in Figure 5

representing the dissolution rate of mirabegron free base and the lower curves representing the dissolution rates of different sulfate salts of mirabegron:



Fig. 5. Dissolution Profiles of Physical Mixture (PM), Octyl Sulfate (OS) Salt/Complex, Lauryl Sulfate (LS) Salt/Complex, Myristyl Sulfate (MS) Salt/Complex, and Cetyl Sulfate (CS) Salt/Complex in Phosphate Buffer at pH 6.8
Error bars represent standard deviations of three measurements.

*See* DTX 2142.4, Kasashima 2016 at 1307 (Fig. 5); Tr. 1079:5 – 1080:11 (Chambliss Direct); DDX 9-44.

95.    The '780 patent specification lists sulfates as a type of salt for mirabegron that can be made and used in the pharmaceutical compositions of the claimed inventions.  *See* Tr. 1080:2–11 (Chambliss Direct); JTX 2, '780 patent at 6:60 – 7:3 (listing sulfuric acid as a salt former)).

96.    A POSA would have understood that the particle size of a drug will directly affect the drug dissolution rate of a hydrogel formulation, as reflected in teachings of the prior art:

20



Fig. 18.2 Effect of particle size of phenacetin on dissolution rate. (Finholt, P. (1974) Influence of formulation on

*See* DTX 2112.82-83, Aulton at 317 ("The dissolution rate of a drug is directly related to the surface area exposed to the dissolution media.") and 318 (Fig. 18.2); Tr. 1078:11 – 1079:4 (Chambliss Direct); DDX 9-43.

97.     A POSA would have understood that the amount of the API in a hydrogel formulation (i.e., the drug load) will influence the drug dissolution rate, as reflected in teachings of the prior art.  *See* Tr. 1080:20 – 1081:20 (Chambliss Direct); DTX 2078.1, Velasco 1999 at 75 ("Whereas interactions between water, polymer and drug are the primary factors in release control, various formulation variables influence [the] drug release rate to a greater or lesser degree.  Thus, ***drug loading***[,] ***drug:polymer ratio***, drug particle size[,] HPMC particle size, HPMC viscosity grade and compression pressure have been identified as modifiers of drug release." (emphasis added and internal citations omitted)); DDX 9-45.

### b.  Hydrogel-Forming Polymer Factors

98.     A POSA would have understood that the type of hydrogel-forming polymer in a hydrogel formulation will influence the drug dissolution rate, as reflected in teachings of the prior art.  *See* Tr. 1082:17 – 1083:19 (Chambliss Direct); DTX 2073.4, 1987 Dow METHOCEL

Brochure at 2 ("[D]rug release rates have been sustained longer with HPMC than with equivalent additions of methylcellulose (MC), hydroxyethylcellulose (HEC), hydroxypropylcellulose (HPC), or carboxymethylcellulose (See Figure 1)."); DDX 9-47.

99.     Figure 1 of the 1987 Dow METHOCEL Brochure presents drug dissolution curves for hydrogel formulations made with equivalent amounts of different types of hydrogel-forming polymers, and shows that the HPMC formulations sustained the drug release for longer than the formulations made with other types of hydrogel-forming polymers (i.e., methylcellulose (MC), hydroxyethylcellulose (HEC), hydroxypropylcellulose (HPC), carboxymethylcellulose CMC)):



See DTX 2073.4, 1987 Dow METHOCEL Brochure at 2 (Fig. 1); Tr. 1082:12 – 1083:19 (Chambliss Direct); DDX 9-47.

100.    HPMC, MC, HEC, HPC and CMC are all listed in the specification of the '780 patent as hydrogel-forming polymers that can be used in the pharmaceutical compositions of the claims, and the 1987 Dow METHOCEL Brochure demonstrates that different types of hydrogel-forming polymers cannot be swapped out for one another without affecting the drug dissolution rate.  See Tr. 1082:12 – 1083:19 (Chambliss Direct); DTX 2073.4, 1987 Dow METHOCEL Brochure at 2; DDX 9-47; see also JTX 2, '780 patent at 7:39-49 (listing acceptable polymers).

101.    A POSA would have understood that the grade of the hydrogel-forming polymer in a hydrogel formulation will influence the amount of swelling and drug dissolution rate, as reflected in teachings of the prior art.  *See* Tr. 1084:3 – 1085:8 (Chambliss Direct); DTX 2111.70, HPE 2003 at 460 (Fig. 1 (swelling capacity of PEO)); DDX 9-48.

102.    Figure 1 in the HPE 2003 entry for PEO presents data on the swelling capacity of tablets made with different molecular weight grades of PEO, and shows that: (i) tablets made with 200,000 molecular weight grade PEO swelled very little for a short duration of time (i.e., less than 6 hours); and (ii) tablets made with 7,000,000 molecular weight grade PEO swelled to eight times their original size and the swelling continued for over 30 hours:



**Figure 1:** Swelling capacity of polyethylene oxide (Polyox WSR). Measured for four molecular weight grades; 28 mm tablets in 300 mL of water.

*See* DTX 2111.70, HPE 2003 at 460 (Fig. 1 (swelling capacity of PEO)); Tr. 1084:3 – 1085:8 (Chambliss Direct); DDX 9-48.

103.    The Asserted Claims cover hydrogel-forming polymers with the molecular weight range of 100,000 to 8,000,000, and Figure 1 in the HPE 2003 entry for PEO shows why there are different drug release rates when different grades of hydrogel-forming polymers are used.  *See* Tr. 1084:3 – 1085:8 (Chambliss Direct); DTX 2111.70, HPE 2003 at 460 (Fig. 1 (swelling capacity

23

of PEO)); DDX 9-48; *see also, e.g.*, JTX 2, '780 patent at 20:19-47 (exemplary claim 1, of which claim 5 depends, of the Asserted Claims).

104.    Sako '024 is a prior art publication from the Astellas family of patents which further demonstrates that a POSA would have understood that the grade of the hydrogel-forming polymer in a hydrogel formulation will impact the drug dissolution rate.  *See* Tr. 1085:20 – 1087:2 (Chambliss Direct); DTX 2042.5, Sako '024 at Fig. 7; DDX 9-49.

105.    Figure 7 of Sako '024 presents drug dissolution data for a series of formulations made with different molecular weight grades of PEO, and shows that only two of the six formulations would release more than 75% of the drug at 7 hours as required by the dissolution limitation of the Asserted Claims:



*See* DTX 2042.5, Sako '024 at Fig. 7; Tr. 1086:5 – 1087:2 (Chambliss Direct); DDX 9-49.

106.    A POSA would have understood that the amount of the hydrogel-forming polymer in a hydrogel formulation will impact the drug dissolution rate, as reflected in teachings of the prior art.  *See* Tr. 1088:16 – 1089:15 (Chambliss Direct); DTX 2042.4, Sako '024 at Fig. 4; DDX 9-50.

24

107.    Figure 4 of Sako '024 presents drug dissolution data for a series of formulations made with different amounts of the same molecular weight grade of PEO, and shows that only three of the five formulations would release more than 75% of the drug at 7 hours as required by the dissolution limitation of the Asserted Claims:



See DTX 2042.4, Sako '024 at Fig. 4; Tr. 1088:16 – 1089:15 (Chambliss Direct); DDX 9-50.

### c.  Water Soluble Additive Factors

108.    Hydrogel-forming polymers swell to differing degrees, depending in part on other additives in the formulation; this property is known as the "gelation index."  *See* Tr. 1090:19 – 1091:23, 1092:5 – 1093:12 (Chambliss Direct); DTX 2042.16-17, Sako '024 at Table 3; DDX 9-52.

109.    A POSA would have understood that the type and grade of the water soluble additive in a hydrogel formulation will impact the drug dissolution rate, as reflected in teachings of the prior art.  *See* Tr. 1090:19 – 1091:23, 1092:5 – 1093:12 (Chambliss Direct); DTX 2042.16-17, Sako '024 at Table 3; DDX 9-52.

110.    Table 3 of Sako '024 is titled "Influence of Solubility of Various Additives on Gelation Index" and shows how much tablets will swell when they are made with a particular

grade of PEO and the additives listed in the chart, which are all claimed by the '780 patent (except

for Inositol and Dextrose Anhydrous):



| Additive | Solubility** | G (%) |
|---|---|---|
| No additive | | 29.7 ± 2.9 |
| Lactose | 8 ml | 24.4 ± 1.9 |
| D-Mannitol | 6 ml | 26.8 ± 1.9 |
| Inositol | 6 ml | 42.0 ± 1.5 |
| Glycine | 4 ml | 80.9 ± 0.7 |
| PEG20000 | 4 ml | 86.2 ± 0.3 |
| Pluronic F68** | 4 ml | 95.1 ± 0.4 |
| PVP K30 | 2 ml | 82.2 ± 2.5 |
| Dextran 40 | 2 ml | 85.9 ± 1.0 |
| Meglumine | 2 ml | 93.4 ± 0.8 |
| Dextrose Anhydrous | 2 ml | 94.2 ± 1.5 |
| Lysine-HCl | 2 ml | 95.1 ± 1.3 |
| β-Alanine | 2 ml | 99.3 ± 0.2 |
| PEG6000 | 1 ml | 87.1 ± 0.2 |
| Citric acid | 1 ml | 93.2 ± 0.3 |
| Maltose Anhydrous | 1 ml | 93.7 ± 0.7 |
| Xylitol | 1 ml | 94.0 ± 1.4 |
| Sucrose | 1 ml | 94.2 ± 1.1 |
| D-Sorbitol | 1 ml | 97.0 ± 0.4 |
| D-Fructose | 1 ml | 100 |

*Polyoxyethylene[160]polyoxypropylene[30]glycol (n = 3, Mean ± S.E.)
**Volume of water required for dissolving 1 gram measured in accordance
with the method for solubility measurement in JP (25 ± 5° C.)

**TABLE 3**
**Influence of Solubility of Various Additives on Gelation Index**

*See* DTX 2042.16-17, Sako '024 at Table 3; Tr. 1090:19 – 1091:23, 1092:5 – 1093:12 (Chambliss

Direct); DDX 9-52.

111.    Table 3 of Sako '024 shows that there was 29% swelling in tablets made with this

particular grade of PEO and no additive (top row); swelling was reduced with two of the claimed

water soluble additives (i.e., lactose and D-mannitol (rows 2 and 3)); and swelling increased to

97% and 100% for two different claimed water soluble additives (i.e., D-sorbitol and D-fructose

(bottom two rows)).  Notably, (i) lactose and fructose are both sugars, but one did not enhance

swelling while the other enhanced swelling 4-5 fold; and (ii) D-sorbitol and D-mannitol have the

same chemical structure but different 3D configuration, and one enhanced swelling to almost

100% while the other had minimal effect.  *See* Tr. 1090:19 – 1091:23, 1092:5 – 1093:12

(Chambliss Direct); DTX 2042.16-17, Sako '024 at Table 3; DDX 9-52.

26

112.    Table 3 of Sako '024 shows that the water soluble additives covered by the Asserted Claims have tremendously different effects on gelation, which will impact the drug dissolution rate of a hydrogel formulation.  *See* Tr. 1090:19 – 1091:23, 1092:5 – 1093:12 (Chambliss Direct); DTX 2042.16-17, Sako '024 at Table 3; DDX 9-52.

113.    A POSA would have understood that the amount and ratio of the water soluble additive in a hydrogel formulation will impact the drug dissolution rate, as reflected in teachings of the prior art.  *See* Tr. 1093:13 – 1094:16 (Chambliss Direct); DTX 2042.3, Sako '024 at Fig. 2; DDX 9-53.

114.    Figure 2 of Sako '024 shows how varying the amount and ratio of one particular water soluble additive, PEG, in a hydrogel formulation will impact gelation:



*See* DTX 2042.3, Sako '024 at Fig. 2; Tr. at 1093:13 – 1094:16 (Chambliss Direct); DDX 9-53.

115.    Figure 2 of Sako '024 shows that: tablets made with a particular grade of PEO and no water soluble additive will swell 30%; increasing the PEG ratio in the formulation to 10% will increase swelling to 50%; increasing the PEG ratio in the formulation to 15% will increase swelling

27

to about 85%; and the amount of swelling plateaus with PEG ratios above 15%.  *See* Tr. 1093:13 – 1094:16 (Chambliss Direct); DTX 2042.3, Sako '024 at Fig. 2; DDX 9-53.

116.    A POSA would understand that the shape of the curve in Figure 2 of Sako '024 was dictated by the specific grade of PEO and the specific grade of PEG used in the study, and that it could not be extrapolated to other combinations of hydrogel-forming polymers and water-soluble additives.  *See* Tr. 1093:13 – 1094:16 (Chambliss Direct); DTX 2042.3, Sako '024 at Fig. 2; DDX 9-53.

117.    A POSA would have understood that different types of water soluble additives can increase or decrease the drug dissolution rate of a hydrogel formulation, as reflected in teachings of the prior art.  *See* Tr. 1094:17 – 1095:11 (Chambliss Direct); DTX 2077.43, Lieberman at 238 ("Commonly, ***water-soluble excipients*** in the matrix tablet ***can increase drug release***.  However, addition of ***water-soluble materials may achieve a slower rate*** by increasing viscosity of the gel through interaction with hydrophilic polymers or by competition with matrix material for water." (emphasis added)); DDX 9-54.

### d.  Other Excipient Factors

118.    A POSA would have understood that adding other excipients to a hydrogel formulation, in accordance with the transitional word "comprising" of the Asserted Claims, will impact the drug dissolution rate, as reflected in teachings of the prior art.  *See* Tr. 1096:13 – 1097:15 (Chambliss Direct); DTX 2022.18-19, 2000 Dow Brochure at 18-19 ("The effect of fillers on drug release is dependent on the drug substance, the polymer level, and the level of the filler itself in the hydrophilic matrix tablet."); DDX 9-56.

119.    Figure 15 of the 2000 Dow Brochure presents drug dissolution rate data for a series of formulations made with the same drug and molecular weight grade of HPMC, but different

types of water insoluble fillers, and shows that different water insoluble fillers result in dramatically different drug release rates:



*See* DTX 2022.19, 2000 Dow Brochure at 19 (Fig. 15); Tr. 1096:13 – 1097:15 (Chambliss Direct); DDX 9-56.

120.    A POSA would have understood that adding other excipients to a hydrogel formulation, in accordance with the transitional word "comprising" of the Asserted Claims, could result in interactions between the ingredients which impact the drug dissolution rate, as reflected in teachings of the prior art. *See* Tr. 1097:22 – 1098:22 (Chambliss Direct); DTX 2022.23, 2000 Dow Brochure at 23; DDX 9-57.

121.    For example, the 2000 Dow Brochure teaches that the interaction of the hydrogel-forming polymer "with other molecules present in the formulation or in the medium is complex," and that "[t]oo much insoluble material in the formulation can inhibit polymer-polymer interaction and gelation by presenting a simple physical barrier." *See* DTX 2022.23, 2000 Dow Brochure at 23; Tr. 1097:22 – 1098:22 (Chambliss Direct); DDX 9-57.

### e.  Dosage Form Factors

122.    A POSA would have understood that the size and shape of the dosage form itself will impact the drug dissolution rate of a hydrogel formulation, as reflected in teachings of the prior art.  *See* Tr. 1098:23 – 1100:7 (Chambliss Direct); DTX 2114.13, Rekhi 1999 at 339; DDX 9-59.

123.    Figure 9 of Rekhi 1999 presents drug dissolution rate data for two tablet shapes of the exact same formulation, and shows that a capsule shaped tablet (represented by the square) would release more than 75% of the drug at 7 hours as required by the dissolution limitation of the Asserted Claims but a round shaped tablet (represented by the upside down triangle) would be outside of the claim limit:



Fig. 9. Effect of tooling shape on drug release on run 8: (■) capsule; (▼) round; (●) surface area corrected, round.

*See* DTX 2114.13, Rekhi 1999 at 339 (Fig. 9); Tr. 1098:23 – 1100:7 (Chambliss Direct); DDX 9-59.

### 2.  The Prosecution History of the '780 Patent Confirms that Drug Dissolution Rates are Unpredictable

124.    During the prosecution of the '780 patent's predecessor application, the '313 application, Astellas expressly represented to the U.S. Patent Office that drug dissolution rates are

unpredictable:

> **B.   Dissolution Rates are Unpredictable**
>
> Further still, Takasu *et al.*, Sako *et al.*, and Michel *et al.* do <u>not</u> teach or suggest a pharmaceutical composition of mirabegron with the claimed dissolution rate. Even assuming *arguendo* that a controlled release formulation of mirabegron could be formulated in the system of Sako *et al.*, one of skill in the art would have no reasonable expectation of successfully achieving the claimed dissolution rate.
>
> Specifically, Applicants respectfully submit that Sako *et al.* and Michel *et al.* do not teach the same formulation as in the present claims simply because they refer to a <u>hydrogel</u>. It is clear that two hydrogel formulations can have substantially different dissolution rates even if they contain the same amounts of the same active ingredient. There is simply no reason to presume that substituting mirabegron for the active ingredients in the hydrogel formulations taught in Sako *et al.* and Michel *et al.* would have necessarily resulted in a pharmaceutical composition with the claimed dissolution rate.

*See* DTX 2025.783, '313 App. PH, 1/26/2017 Response to Office Action at 15; Tr. 1101:2-24 (Chambliss Direct); DDX 9-60.

125.     Specifically, to overcome an obviousness rejection by the Examiner in view of other Sako publications disclosing hydrogel formulations made with PEG and PEO, Astellas represented that:

- a POSA would not be able to swap out mirabegron for a different API in the formulations taught in Sako and have a reasonable expectation of success in achieving the drug dissolution rate; and

- two different hydrogel formulations can have substantially different dissolution rates even if they contain the same amounts of the same active ingredient.

*See* Tr. 1101:2-24 (Chambliss Direct); DTX 2025.783, '313 App. PH, 1/26/2017 Response to Office Action at 15; DDX 9-60.

126.     Astellas' representations to the U.S. Patent Office confirm that a POSA would have understood that drug dissolution rates from hydrogel formulations were unpredictable at the time of the invention, and that the formulations must actually be tested to ascertain what it is. *See* Tr. 1101:2-24 (Chambliss Direct); DTX 2025.783, '313 App. PH, 1/26/2017 Response to Office Action at 15; DDX 9-60.

31

### 3. The Prosecution History of the '780 Patent Confirms that the Structural Elements of the Asserted Claims Cover Hydrogel Formulations that Do Not Meet the Functional Dissolution Limitation

127.     The prosecution history of the '780 patent confirms that the structural elements of the Asserted Claims cover hydrogel formulations that do not meet the functional dissolution limitation.  *See* Tr. 1102:18 – 1104:17 (Chambliss Direct); DTX 2025.688, '313 App. PH, 2/10/2016 Declaration of Y. Takaishi ¶¶ 7-9, Tables A and B; DDX 9-61.

128.     During the prosecution of the '780 patent's predecessor application, the '313 application, Astellas submitted a declaration from inventor Y. Takaishi with the drug dissolution data for Examples 13 and 15 in the specification, which showed that these formulations do not meet the functional dissolution limitation of the Asserted Claims because they released the drug too fast (i.e., 65% dissolution at 1.5 hours):



*See* DTX 2025.688, '313 App. PH, 2/10/2016 Declaration of Y. Takaishi ¶ 7, Table A; Tr. 1102:18 – 1103:13; 1126:25 – 1127:11; 1146:1-10 (Chambliss Direct); DDX 9-61.

129.     A POSA would have understood from the prosecution history of the related '313 application that Examples 13 and 15 in the actual '780 patent specification—which were formulations made with PEO and PEG (Example 13), and PEO and D-Mannitol (Example 15)— meet the structural elements of the Asserted Claims but do not meet the functional dissolution limitation.  *See* Tr. 1102:18 – 1103:13; 1126:25 – 1127:11; 1146:1-10 (Chambliss Direct); JTX 2,

'780 Patent at 17:4-11 (Example 13 includes mirabegron, PEO and PEG), 17:21-29 (Example 15 includes mirabegron, PEO and D-mannitol); DTX 2025.688, '313 App. PH, 2/10/2016 Declaration of Y. Takaishi ¶ 7, Table A; DDX 9-61.

130.     Table B in the Takaishi Declaration summarizes the composition and dissolution data for three 200 mg mirabegron formulations, referred to as OCAS-F, OCAS-M, and OCAS-S, which were made with different amounts and ratios of the same grade of PEO and the same grade of PEG, and shows that the OCAS-S formulation does not meet the functional dissolution element of the Asserted Claims because it released the drug too slow (i.e., 54% dissolution at 7.0 hours):

| | | OCAS-F | OCAS-M | OCAS-S (Too slow) |
|---|---|---|---|---|
| | | | | Table B |
| Formulation | Mirabegron | 200 | 200 | 200 |
| | PEO(MW:2000K) | 50 | 70 | 125 |
| | PEG 6000 | 145.6 | 125.6 | 95.35 |
| | Dibutylhydroxytoluene | 0.4 | 0.4 | 0.4 |
| | Magnesium Stearate | 4 | 4 | 4.25 |
| | Film coating | 12 | 12 | 12.8 |
| | Total | 412 | 412 | 437.8 |
| Dissolution | 1.5 hr | 31% | 18% | 9% |
| | 4.5 hr | 83% | 61% | 34% |
| | 7.0 hr | 98% | 88% | 54% |
| | relative bioavailability | 95% | 94% | 66% |

*See* DTX 2025.688, '313 App. PH, 2/10/2016 Declaration of Y. Takaishi ¶¶ 7-9, Table B; Tr. 1102:18 – 1104:17 (Chambliss Direct); DDX 9-61.

131.     The OCAS-S formulation in Table B of the Takaishi Declaration meets the structural limitations of the Asserted Claims but not the functional dissolution limitation.  *See* Tr. 1103:14 – 1104:14 (Chambliss Direct); DTX 2025.688, '313 App. PH, 2/10/2016 Declaration of Y. Takaishi ¶¶ 7-9, Table B; DDX 9-61.

132.     Table B in the Takaishi Declaration shows that minor changes to the ratio of ingredients in a hydrogel formulation containing mirabegron, PEO and PEG will impact the drug

dissolution rate.  *See* Tr. 1103:14 – 1104:14 (Chambliss Direct); DTX 2025.688, '313 App. PH, 2/10/2016 Declaration of Y. Takaishi ¶¶ 7-9, Table B; DDX 9-61.

133.   A POSA would have understood from the prosecution history of the related '313 application that not all compositions that meet the structural elements of the Asserted Claims will meet the functional dissolution limitation.  *See* Tr. 1102:18 – 1104:17 (Chambliss Direct); DTX 2025.688, '313 App. PH, 2/10/2016 Declaration of Y. Takaishi ¶¶ 7-9, Tables A and B; DDX 9-61.

**4.   Dr. Little Admitted that Drug Dissolution Rates Need to be Determined Experimentally and that Numerous Factors Influence the Dissolution Profile**

134.   Dr. Little admitted that the specification does not disclose software, or the use of it, to predict drug dissolution rates for the candidate compositions.  *See* Tr. 1337:23 – 1338:7 (Little Cross); *see also* Tr. 1114:24 – 1115:6 (Chambliss Direct).

135.   Dr. Little admitted that one needs to perform a dissolution test in order to know a composition's dissolution profile:

> Q.  Look at example 11, you see it was tested at, you think P100 means paddle 100 speed, right, that's what you think?
>
> A.  Yes.
>
> Q.  And it's at 38 percent already at 1.5 hours, correct?
>
> A.  It would be measured at 38 percent at 1.5 hours, yes.
>
> Q.  So if that formulation was tested at paddle speed 200, what do you think, you think it would bump up above 38, 39 percent, be into the forties?
>
> A.  *We don't know*.
>
> Q.  You would have to test it, right?
>
> A.  So if you performed the test, you would have higher agitation speeds, so if it was going to be a particular value, *you would expect it to be either the same or higher depending upon the formulation*.

Q. My question is, you can't tell just looking at it, just sitting here, if we bump the paddle speed up to 200, whether that would still be in the claims under 39 percent, you can't tell just from looking, we have to run the test, right?

A. *Yes, without any other information, you would need to run the test, yes*.

(Tr. 867:11 – 868:7 (Little Cross) (discussing PTX-67)).

136.    Dr. Little admitted that: (i) an excipient can change tablet properties, including the dissolution profile (Tr. 885:8-11 (Little Redirect)); (ii) not all PEO-PEG formulations meet the functional dissolution limitation (Tr. 828:19-829:2, 829:3-25 (Little Cross); *see also* DTX-2638.9, Mirabegron NDA – 3.2.P. at 9)); (iii) gel strength affects dissolution (Tr. 884:16 – 885:2 (Little Redirect)); (iv) gel strength is based on the tablet (Tr. 885:6 5 (Little Redirect)); (v) different conditions can change gel strength (Tr. 884:16 – 885:5 (Little Redirect)); and (vi) "tuning" only one variable (PEO grade) changed the dissolution rate (Tr. 832:1-5 (Little Cross)).

### 5.  Dr. Buckton Corroborated that Gel Strength and Dissolution Rates are Influenced by Numerous Factors

137.    Dr. Buckton testified that different molecular weight grades of PEO will have "quite different properties" that will influence gel strength.  *See* Tr. 645:1-6 (Buckton Direct).

138.    Dr. Buckton testified that simply using more of a lower molecular weight PEO will not give the same viscosity as a higher molecular weight grade of PEO.  *See* Tr. 645:10 – 646:18 (Buckton Direct).

139.    Dr. Buckton testified that "there is no basis to predict how different gels with different gel strengths will behave under different dissolution conditions."  *See* Tr. 640:1 – 641:5 (Buckton Direct).

140.    Dr. Buckton testified that the difference between PEG 6000 and PEG 8000 affects gel structure.  *See* Tr. 647:2-12 (Buckton Direct).

141.    Dr. Buckton testified that HPC affects gel strength and dissolution even when used as a binder.  *See* Tr. 651:8-19 (Buckton Direct).

142.    Dr. Buckton testified that whether two different formulations with different PEO grades have the same gel strength depends on the "totality of the excipient profile."  *See* Tr. 670:15 – 671:4 (Buckton Cross).

143.    Dr. Buckton testified that tablets can have different dissolution properties due to differences in gel strength, how they are manufactured, and how they are formulated.  *See* Tr. 698:8-16 (Buckton Cross).

### D.  AMOUNT OF DIRECTION OR GUIDANCE PRESENTED; PRESENCE OR ABSENCE OF WORKING EXAMPLES

144.    The *Wands* factors concerning the amount of direction or guidance presented, and the presence of absence of working examples each weigh heavily in favor of lack of enablement because:

- there is no guidance regarding which candidate formulations will also meet the functional dissolution limitation;

- the only guidance is on structure, and it is in the form of laundry lists of formulation options with general information; and

- there are, at best, only 3 working examples (assuming that they were tested at the correct paddle rotation speed of 200 RPM), which are a very narrow slice of the full claim scope because they all comprise the same grades of PEO and PEG.

*See* Tr. 1131:9 – 1132:18 (Chambliss Direct); DDX 9-78 & 9-79.

145.    A POSA would look to the specification of the '780 patent for guidance on how to get from the millions of candidate formulations covered by the structural claim scope (i.e., the big circle in DDX 9-64) to the genus of compositions that also meet the functional dissolution limitation (i.e., the smaller circle in DDX 9-64 with the red question mark), but find only a "laundry list of ingredients and very general information":



*See* Tr. 1105:22 – 1106:2, 1106:10 – 1115:19, 1132:3-18 (Chambliss Direct); DDX 9-64.

## 1. No Guidance in the Specification of the '780 Patent

### a. Hydrogel-Forming Polymers

146.    A POSA would have understood that the teachings of the specification on the use of hydrogel-forming polymers are very limited.  *See* Tr. at 1106:10 – 1107:8 (Chambliss Direct).

147.    The '780 patent specification states that "the release period of time of the drug from the formulation can be arbitrarily controlled by adjusting the viscosity of the polymers which is used as the hydrogel-forming polymer," and that "[t]he hydrogel-forming polymer used in the present invention is not particularly limited," but it does not provide information on which polymers or viscosity grades to pick.  *See* Tr. 1106:10-24 (Chambliss Direct); JTX 2, '780 Patent at 7:34-42; DDX 9-65.

148.    A POSA would have understood that the specification's disclosure that the drug release "can be arbitrarily controlled" refers to trial and error experimentation, meaning you make the formulations, adjust the grade of the polymer, and test the formulations.  *See* Tr. 1106:25 – 1107:8 (Chambliss Direct); JTX 2, '780 Patent at 7:34-42; DDX 9-65.

149.   The specification of the '780 patent teaches that combinations of polymers can be used, and discloses laundry lists of different hydrogel-forming polymers that were being sold over several columns. *See* Tr. 1107:9 – 1108:8 (Chambliss Direct); JTX 2, '780 Patent at 10:1-3, 7:50-51, 8:8-9, 8:60-61; DDX 9-66.

150.   The list of hydrogel-forming polymers in the specification do not teach a POSA how to achieve the drug dissolution rate required by the Asserted Claims with a particular combination of one or more hydrogel-forming polymers and one or more water soluble additives. *See* Tr. 1108:9-22 (Chambliss Direct).

151.   The list of hydrogel-forming polymers in the specification does not provide a POSA with guidance or insight into which hydrogel-forming polymers, or the amounts, concentrations, grades, or ratios to other ingredients, can be used to yield the drug dissolution rate required by the Asserted Claims.   *See* Tr. 1108:23 – 1109:3 (Chambliss Direct).

152.   A POSA would not know which hydrogel-forming polymers and what amounts, concentrations, grades, or ratios to other ingredients, will work in a particular formulation to achieve the drug dissolution rate required by the Asserted Claims from the specification of the '780 patent. *See* Tr. 1109:4-10 (Chambliss Direct).

153.   The specification of the '780 patent does not teach a POSA that all of the listed hydrogel-forming polymers will work in a formulation to achieve the drug dissolution rate required by the Asserted Claims. *See* Tr. 1109:11-16 (Chambliss Direct).

**b.  Water Soluble Additives**

154.   A POSA would have understood that the teachings of the specification on the use of water soluble additives are very limited. *See* Tr. 1109:17 – 1111:5 (Chambliss Direct).

155.   The '780 patent specification refers to the water soluble additive as a hydrophilic base, teaches that combinations can be used, and states that "[t]he content of the hydrophilic base

38

is not particularly limited." *See* Tr. 1109:17 – 1110:3 (Chambliss Direct); JTX 2, '780 Patent at 10:44-49; DDX 9-67.

156.    The '780 patent discloses that the purpose of the additive is to ensure penetration of water into the pharmaceutical composition, provides some data on the water solubility the additive should have, and simply states that "[w]hen the hydrophilic base has a high solubility to water, the effect that allows water to penetrate into the formulation is high." *See* Tr. 1110:4-19 (Chambliss Direct); JTX 2, '780 Patent at 10:7-15; DDX 9-67.

157.    There is no guidance on the use of water soluble additives beyond the specification's qualitative teaching that high solubility allows for higher penetration of water into the composition, and a non-exhaustive list of different types of additives. *See* Tr. 1110:4-19 (Chambliss Direct); JTX 2, '780 Patent at 10:7-34; DDX 9-67.

158.    The specification does not provide a POSA with guidance or insight into which water soluble additives, or the amounts, concentrations, grades, or ratios to other ingredients, can be used in combination with a particular polymer to yield the drug dissolution rate required by the Asserted Claims. *See* Tr. 1110:20-25 (Chambliss Direct).

159.    A POSA would not know which water soluble additives will work and which will not to achieve the drug dissolution rate required by the Asserted Claims from the specification, and would have to rely on trial and error experimentation to make that determination. *See* Tr. 1111:1-5 (Chambliss Direct).

160.    The specification of the '780 patent does not teach a POSA that all of the listed water soluble additives will work in a formulation to achieve the drug dissolution rate required by the Asserted Claims. *See* Tr. 1111:20-24 (Chambliss Direct).

### c. Other Excipients

161.    The specification discloses that other excipients can be used to make the claimed pharmaceutical compositions and provides a non-exhaustive list of different classes of excipients, including fillers, binders, and lubricants.  *See* Tr. 1111:25 – 1112:15 (Chambliss Direct); JTX 2, '780 Patent at 11:4-14; DDX 9-68.

162.    A POSA would understand that the addition of these other excipients can increase or decrease the drug dissolution rate of a composition.  *See* Tr. 1112:16-20 (Chambliss Direct).

163.    The specification does not teach anything about the use of other excipients that would allow a POSA to know whether a formulation will achieve the drug dissolution rate required by the Asserted Claims without trial and error experimentation.  *See* Tr. 1112:21 – 1113:1 (Chambliss Direct).

### d. Dr. Little Admitted that there is No Guidance in the Specification

164.    Dr. Little admitted that there is no guidance in the specification on what combinations of ingredients will meet the functional dissolution rate.  *See* Tr. 503:1-7 (Little Direct) (stating that column 7 of the '780 patent contains a "list" of hydrogel-forming polymers that can be used); *id*. at 508:15-23 ('780 patent at 10:16-34 contains a "list" of water-soluble additives); *id*. at 848:3-12 (Little Cross) (specification contains no adjustment instructions); *id.* at 850:7-25 (no instruction in specification on how to adjust amounts/ratios of HPC); *id*. at 851:13 – 852:15 (no examples for the majority of hydrogel forming polymers identified in the claims in the specification); *id*. at 854:20 – 855:1 (no instruction on how to adjust amounts/ratios of water-soluble additives); *id.* at 856:5-10 (no knobs to tune, no instructions).

165.    Dr. Little relied on information outside of the specification to support his enablement opinions.  *See* Tr. 844:4-7 (Little Cross) (there are known amounts in the field that

would limit hydrogel-forming polymer amount that POSA would use); *id.* at 846:25 – 847:5 (POSA needs no instruction on amounts, concentrations, ratios); *id.* at 849:23 – 850:2 (you have to be operating within what a POSA knows how to make one of these systems); *id.* at 850:20 – 851:12 (no need for instruction on amounts, concentrations, ratios for HPC); *id.* at 851:1 – 852:15 (POSA doesn't need examples for each hydrogel-forming polymer); *id.* at 852:4-15 (no examples in specification for majority of polymers does not change his opinion that a POSA doesn't need it); *id.* at 853:1-23 (POSA looks through a POSA's eyes; doesn't need any limitations in claim for water-soluble additive); *id.* at 853:1-8 (POSA would know not to use every grade of water-soluble additive); *id.* at 853:10-14 (claim doesn't specify water-soluble additive grade, but that does not mean a POSA doesn't know how to use it); *id.* at 853:24 – 854:2 (no amounts, concentrations, or ratios needed because a POSA would see it through their eyes); *id.* at 854:25 – 855:1 (instruction not something a POSA would need or expect to see); *id.* at 854:20 – 855:1 (list does not tell POSA additives, amounts ratios but a POSA does not need that or expect to see that); *id.* at 855:2-23 (POSA looks through their eyes…does not need every grade to be able to operate within the claims)).

### e. Design of Experiments and DOE Software

166.    The specification of the '780 patent does not disclose or discuss DOE modeling or software to predict drug dissolution rates.  *See* Tr. 1114:24 –1115:6 (Chambliss Direct); *see also id*. at 1115:7-11 (specification teaches to make a formulation and test it to determine the dissolution rate).

167.    A DOE approach would not appreciably impact the quantity of experimentation necessary to practice the full scope of the Asserted Claims.  *See* Tr. 1113:9 – 1114:7 (Chambliss Direct) (DOE software is used to organize the formulations that are made and tested during formulation optimization studies, which take place after formulation screening studies are

41

conducted to select types and grades of excipients; simple example is to investigate three different levels of three different ingredients with 27 formulations); *see also* Tr. at 1115:12-19 (DOE software will tell the formulator to make more formulations) (Chambliss Direct).

## 2. Presence or Absence of Working Examples

168.    The specification of the '780 patent discloses 17 formulation examples, but the dissolution test results disclosed in the patent are limited to Examples 2, 8 and 9.  *See* JTX 2, '780 patent at 14:45 – 17: 58 (Examples 1-17), 18:53 – 19:8 (dissolution test and Table 4).

169.    A POSA would understand that examples are irrelevant if there are no dissolution test results according to the claimed method because they do not teach whether the formulation is a working embodiment or not.  *See* Tr. 1116:2-17 (Chambliss Direct).

### a. Examples 2, 8 and 9 are Not Working Examples

170.    A POSA would understand from the specification and prosecution history of the '780 patent that Examples 2, 8 and 9 were tested with a paddle rotation speed of 50 RPM, and that they are not working examples of the Asserted Claims because they were not tested with the claimed method, which requires a paddle rotation speed of 200 RPM.  *See* Tr. 1117:20 – 1120:15 (Chambliss Direct).

171.    The description of the dissolution test in the specification teaches the skilled person that a 50 RPM paddle rotation speed was used for the dissolution testing conducted on Examples 2, 8 & 9:

> 1. Dissolution test
>    The pharmaceutical compositions prepared in Examples 2, 8, and 9 were subjected to a dissolution test carried out in accordance with a USP dissolution test (paddle method). As a test fluid, 900 mL of a phosphate buffer (pH 6.8) was used. The pharmaceutical composition prepared in Comparative Example 1 was tested in accordance with a dissolution test, method 2 described in the Japanese Pharmacopoeia. As a test fluid, 900 mL of a Mc. Ilvain buffer (pH 6.8) was used, and the paddle rotation speed was 50 rpm. The results are shown in Table 4. The dissolution rate after

**TABLE 4**

|          | Example 2 | Example 8 | Example 9 | Comparative Example 1 |
|----------|-----------|-----------|-----------|-----------------------|
| 0.5 hr.  | —         | —         | —         | 95%                   |
| 1.5 hr.  | 35%       | 39%       | 32%       | —                     |
| 2.5 hr.  | 57%       | 61%       | 54%       | —                     |
| 4.5 hr.  | 93%       | 95%       | 92%       | —                     |

*See* Tr. 1117:9 – 1118:14 (Chambliss Direct); JTX 2, '780 patent at 18:53-62, 19:1-8; DDX 9-70.

172.   The description of the dissolution test in the specification does not convey to a skilled person that Examples 2, 8 and 9 were tested with a paddle rotation speed of 200 RPM. *See* Tr. 1118:15-18 (Chambliss Direct); JTX 2, '780 patent at 18:53-62; DDX 9-70.

173.   The prosecution history of the '780 patent family teaches a POSA that a paddle rotation speed of 50 RPM was used in the dissolution testing conducted on Examples 2, 8 and 9:

> By contrast, the pharmaceutical composition for modified release of the present invention shows a rapid dissolution rate of 90% or more at 4.5 hours, as shown in Table 4 of the present specification.
>    Additionally, in the dissolution test methods used, the paddle rotation speeds were 200 rpm in '602 (see, paragraph [0176]) and 50 rpm in the present specification (see, paragraph [0082]), respectively. Generally, it is technical common knowledge for those skilled in the art that the higher the paddle rotation speed is, the more rapid dissolution profile is obtained. If the dissolution test of '602 is carried out at the same paddle rotation speed as that of the present specification, the formulations of A-1 to A-5 of '602 (and Examples 4 to 7 and 10 of Sugihara *et al.*) would show slower dissolution profiles.

*See* Tr. 1118:23 – 1120:7 (Chambliss Direct); DTX 2025.251, '313 App. PH, 8/26/2013 Response to Office Action at 13; DDX 9-71.

174.    A POSA would understand that Astellas represented to the U.S. Patent Office that the paddle rotation speed was "50 rpm in the present specification" to differentiate their invention from the '602 reference which used a paddle rotation speed of 200 rpm, and that there would be no point of differentiation if the paddle rotation speed in the specification was 200 rpm.  *See* Tr. at 1119:2-19 (Chambliss Direct); DTX 2025.251, '313 App. PH, 8/26/2013 Response to Office Action at 13; DDX 9-71.

175.    The evidence shows that the dissolution testing for Examples 2, 8, and 9 was conducted at 50 rpm, and that therefore, they are not working examples. *See also* Tr. 1120:10-12 (Chambliss Direct); *see also id.* at 1121:23 – 1123:21 ("50 to 200 rpm" range disclosed in section discussing embodiments that do not meet dissolution element), 1123:6-21 (200 rpm not disclosed in section discussing test conditions for modified release formulations), 1123:22-25 (POSA would not believe Examples 2, 8 and 9 are working examples), 1143:12-25 (nowhere does it say that 200 rpm is the paddle speed); JTX 2, '780 Patent at 5:38-63 ("pharmaceutical composition for modified release" refers to a composition tested "under the above conditions": 50 rpm); DDX 9-72.

> i.    **Astellas' Erroneous Contentions that Examples 2, 8 and 9 are Working Examples**

176.    PTX-67 does not establish that Examples 2, 8, and 9 were tested at a paddle rotation speed of 200 rpm because the document is unsigned, there is no information on where the data and information came from, and there are no citations to laboratory notebooks to authenticate the information from a formulator standpoint.  *See* Tr. 1120:19 – 1121:3 (Chambliss Direct); *id*. at 1142:24 – 1143:6; *id*. at 1228:22 – 1229:7 (Chambliss Redirect).

177.    PTX-67 is a confidential Astellas' document that would not have been available to a POSA to influence their understanding from the specification and prosecution history that a 50

rpm paddle speed was used for the dissolution testing conducted on Examples 2, 8 and 9.  *See* Tr. 1121:4-8 (Chambliss Direct); *id*. at 1229:8-10 (Chambliss Redirect).

178.    Dr. Little admitted that PTX-67 is a confidential Astellas' document that would not have been available to a POSA.  *See* Tr. 868:8-11 (Little Infringement Cross); 1349:12 – 1350:5 (Little Validity Cross).

179.    A POSA would not have been able to make Examples 2, 8 and 9 and test them at a 200 rpm paddle speed because there is a lack of information in the patent examples that would allow them to reproduce the same tablets, and the dissolution rate could be faster or slower based on the differences in the manufacturing processes used.  *See* Tr. 1121:9-21, 1142:24 – 1143:6 (Chambliss Direct).

180.    A POSA would have understood that the '313 application has the exact same specification as the '780 patent, and that Astellas' representation to the U.S. Patent Office that the paddle rotation speed is "50 rpm in the present specification" applied to the '780 patent and the dissolution testing conducted on Examples 2, 8 and 9.  *See* Tr. at 1229:11-22 (Chambliss – Redirect); DTX 2025.251, '313 App. PH, 8/26/2013 Response to Office Action at 13; DDX 9-71.

181.    The disclosure of a paddle rotation speed range of 50 to 200 rpm in the '780 patent specification does not teach a POSA that a 200 RPM paddle rotation speed was used for the dissolution testing conducted on Examples 2, 8 and 9.  *See* Tr. 1121:23 – 1123:21 (Chambliss Direct) (50 to 200 rpm paddle speed disclosed in a section discussing embodiments that do not meet dissolution element (i.e., less than 75% dissolution after 1.5 hours); *id*. at 1123:6-21 (200 rpm paddle speed is not disclosed in specification section discussing test conditions for modified release formulations); *id.* at 1143:12 – 1144:8; JTX 2, '780 patent at 5:38-63, 6:21-33; DDX 9-72.

182.    A POSA would not believe that Examples 2, 8 and 9 are working examples of the claimed inventions.  *See* Tr. 1123:22-25 (Chambliss Direct).

### b. Examples 2, 8 and 9 are Extremely Narrow

183.    Examples 2, 8 and 9 are extremely narrow and would not enable the full scope of the Asserted Claims even if they were assumed to be working embodiments by a POSA.  *See* Tr. 1124:1 – 1131:8 (Chambliss Direct); JTX 2, '780 patent at 17:62 – 18:18 (Tables 1& 2), 14:56-57 ("PEG 6000; the same compound was used in the following Examples."); DDX 9-74 to DDX 9-78.

184.    A POSA would understand that the grade of PEO and the same grade of PEG was used in Examples 2, 8 and 9, and that the dissolution rates of Examples 2, 8 and 9 are very similar because the inventors varied the ratios of these ingredients in a narrow range:

TABLE 1

| Examples | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| compound A (g) | 10 | 10 | 10 | 10 | 10 | 10 |
| PEO WSR N-60K (g) | 2.5 | 3.5 | 6.25 | — | — | — |
| HPMC 90SH-4000SR (g) | — | — | — | 5 | — | — |
| HPMC 90SH-100000SR (g) | — | — | — | — | 5 | — |
| HPMC 90SH-100SR (g) | — | — | — | — | — | 7.5 |
| PEG (g) | 7.5 | 6.5 | 5 | 5 | 5 | 2.5 |

TABLE 2

| Examples | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|
| compound A (g) | 400 | 400 | 1500 | 1500 | 400 |
| PEO WSR N-60K (g) | 140 | 140 | 1050 | 1050 | 100 |
| PEG (g) | 251.2 | 251.2 | 1764 | 1764 | 290 |
| HPC-SL (g) | — | — | 135 | 135 | — |
| magnesium stearate (g) | 8 | 8 | 30 | 30 | 8 |
| BHT (g) | 0.8 | 0.8 | 4 | 4 | 2 |
| film coating agent (g) | — | 23.7 | 134 | 134 | — |

*See* Tr. 1124:15 – 1125:3 (Chambliss Direct); JTX 2, '780 patent at 17:62 – 18:18 (modified above), 14:56-57 ("PEG 6000; the same compound was used in the following Examples."); DDX 9-74.

185.    A POSA would consider Examples 2, 8 and 9 to be a single species of one molecular weight grade of PEO and one grade of PEG within the broad scope of the Asserted claims, which cover PEO grades with molecular weights that range from 100,000 to 8,000,000 and many different grades of PEG.  *See* Tr. 1125:4-11 (Chambliss Direct); JTX 2, '780 patent at 20:19-47 (claim 1), 20:61-65 (asserted claim 5), 21:30-33 (claim 16), 22:1-2 (claim 18), 22:6-8 (asserted claim 20), 22:13-25 (claim 22), 22:26-29 (claim 23), 22:33-34 (asserted claim 25).

46

186.    A POSA would understand that even within the narrow space of hydrogel formulations that have one molecular weight grade of PEO and one grade of PEG there will be formulations that do not meet the dissolution limitation:

| Table B | | | OCAS-F | OCAS-M | OCAS-S **Too slow** |
|---|---|---|---|---|---|
| Formulation | Mirabegron | | 200 | 200 | 200 |
| | PEO(MW:2000K) | | 50 | 70 | 125 |
| | PEG 6000 | | 145.6 | 125.6 | 95.35 |
| | Dibutylhydroxytoluene | | 0.4 | 0.4 | 0.4 |
| | Magnesium Stearate | | 4 | 4 | 4.25 |
| | Film coating | | 12 | 12 | 12.8 |
| | Total | | 412 | 412 | 437.8 |
| Dissolution | 1.5 hr | | 31% | 18% | 9% |
| | 4.5 hr | | 83% | 61% | 34% |
| | 7.0 hr | | 98% | 88% | 54% |
| relative bioavailability | | | 95% | 94% | 66% |

*See* Tr. 1122:25 – 1126:20 (Chambliss Direct); DTX 2025.688, '313 App. PH, 2/10/2016 Declaration of Y. Takaishi Table B; DDX 9-75.

187.    A POSA would understand that Examples 2, 8, and 9 are a "very thin slice" of the Asserted Claims, are "not at all" commensurate with Asserted Claims, and are not representative of Asserted Claims. *See* Tr. 1124:5 – 1125:24 (Chambliss Direct).

188.    A POSA would understand that the specification does not disclose drug dissolution rate data for any formulations made with a water soluble additive other than PEG 6000, or for any formulations made with the hydrogel-forming polymers HPMC, HEC, CVP, HPC, or CMC. *See* Tr. at 1127:12-16, 1131:9-15 (Chambliss Direct).

189.    A POSA would understand that Examples 2, 8 and 9 represent a very narrow slice of the scope of the structural elements covered by the Asserted Claims, and that it is not possible to extrapolate from the narrow PEO-PEG species of Examples 2, 8 and 9 to the full scope of the claims, even if they were assumed to be working examples:



*See* Tr. 1131:20 – 1132:18, 1133:22 – 1134:3, 1146:11-19 (Chambliss Direct); DDX 9-78 and DDX 9-79.

### E.  QUANTITY OF EXPERIMENTATION NECESSARY

190.    The *Wands* factors concerning the quantity of experimentation necessary weighs in favor of lack of enablement because practicing the full scope of the Asserted Claims requires a very high level of experimentation.  *See* Tr. 1132:19 – 1134:8, 1138:11-24 (Chambliss Direct); DDX 9-83.

191.    A POSA would have understood that practicing the full scope of the Asserted Claims would require an excessive amount of experimentation because the structural elements cover millions of candidate formulations, the specification provides no guidance to the formulations that also meet the functional dissolution limitation, and a multitude of formulations would need to be made and tested in order to practice the full scope of the claims.  *See* Tr. 1133:8-13 (Chambliss Direct); DDX 9-81.

192.    A POSA would have understood that Examples 2, 8 and 9 in the specification, if they were assumed to be embodments, do not provide enough guidance to determine which of the millions of candidate formulations will meet the functional dissolution limitation, because the drug

dissolution rate of these formulations cannot be extrapolated to other polymers and water soluble additives.  *See* Tr. 1133:22 – 1134:3 (Chambliss Direct).

193.     A POSA would have to engage in trial and error testing and an excessive amount of experimentation to figure out which of the millions of candidate formulations meet the functional dissolution limitation of the Asserted Claims.  *See* Tr. 1134:4-8 (Chambliss Direct).

194.     A POSA would understand that running a dissolution test is routine, but the quantity of experimentation necessary to practice the full scope of the Asserted Claims is very high because there are millions of candidate formulation and they would not know which ones would meet the drug dissolution rate limitation.  *See* Tr. at 1134:9-24, 1135:1-3 (Chambliss Direct).

### 1.   Defendants' ANDA Product Development Work is Irrelevant

195.     Defendants' ANDA product development work is irrelevant because it was conducted after Myrbetriq® was approved in 2012 (i.e., at least half a decade after the September 2008 priority date of the '780 patent), and it does not reflect the state of the art at the time of the invention.  *See* Tr. 1135:4 – 1138:10 (Chambliss Direct).

196.     The approval of Myrbetriq® provided Defendants with significantly more guidance than the specification of the '780 patent, because: (1) the label teaches the amounts and form of mirabegron, and that the formulations include PEG as the water soluble additive and PEO as the hydrogel-forming polymer; and (2) with samples in hand, a formulator would know the size, weight, and shape of the tablets and be able to determine the grades of PEG and PEO in the formulation and the concentrations of the ingredients through reverse engineering.  *See* Tr. 1135:19 – 1136:24, 1137:1-12 (Chambliss Direct); JTX 39.15-16; DDX 9-82.

197.     The Asserted Claims cover much more than just the Myrbetriq® embodiment, and Myrbetriq® is not commensurate with the full scope and breadth of the Asserted Claims.  *See* Tr. 1135:19 – 1136:10 (Chambliss Direct); JTX 39.15-16; DDX 9-82.

49

198.    Defendants' ANDA work reinforces the breadth of the Asserted Claims and the quantity of experimentation required because despite: (i) knowing the ingredients of Myrbetriq; (ii) listing Myrbetriq as the "reference listed drug" in their ANDAs; (iii) purportedly using "software-guided development" in some cases; and (iv) Sandoz reverse engineering of Myrbetriq; Defendants *still* had to make many formulations to achieve a comparable dissolution profile in the dissolution tests required by FDA for purposes of submitting an ANDA.  *See* PDX-8011; Tr. 1136:11 – 1138:10 (Chambliss Direct).

### F.  RELATIVE SKILL OF THOSE IN THE ART

199.    The *Wands* factors concerning the relative skill of those in the art is neutral to enablement, because even though dissolution testing is routine, the quantity of experimentation is very high because there are millions of candidate formulations and a POSA would not know which ones would meet the drug dissolution rate.  *See* Tr. 1134:13-24, 1135:1-3, 1138:15-24; DDX 9-83.

## VI.   THE INVENTORS' WORK CORROBORATES LACK OF ENABLEMENT AND WRITTEN DESCRIPTION

200.    The inventors never had possession of the full claim scope.  *See* Tr. 1127:17-22, 1128:8 – 1130:23 (Chambliss Direct); DTX 2084.11, EA/A178 CTD M3 Planning Meeting at 11; DDX 9-76.

201.    The inventors screened three different types of hydrogel-forming polymers—HPMC, HPC and PEO, in a fixed drug (mirabegron) to additive (mannitol) to polymer ratio (i.e., 200:200:100)—and found that only PEO worked in their system when tested with the paddle method at 200 rpm:

50



*See* Tr. 1127:17 – 1131:8 (Chambliss Direct); DTX 2084.11, EA/A178 CTD M3 Planning Meeting at 11; DDX 9-77.

202.   The inventors found that the different grades of HPMC released the drug too fast because the gel matrix was too soft, and that the different grades of HPC yielded too fast, viscosity-independent release.  *See* Tr. 1129:2 – 1130:23 (Chambliss Direct); DTX 2084.11, EA/A178 CTD M3 Planning Meeting at 11; DDX 9-77.

203.   The three types of hydrogel-forming polymers screened by the inventors are covered by dependent claim 5, which has the narrowest polymer limitation.  *See* Tr. 1128:8-23 (Chambliss Direct).

204.   The inventors' work demonstrates that the different types of hydrogel-forming polymers covered by the Asserted Claims are not interchangeable. *See* Tr. 1129:2 – 1130:23 (Chambliss Direct); DTX 2084.11, EA/A178 CTD M3 Planning Meeting at 11; DDX 9-77.

205.   There is no evidence suggesting that the inventors ever made or tested pharmaceutical compositions with the hydrogel-forming polymers HPMC, HPC, CVP, HEC, and CMC that had the drug dissolution rate required by the Asserted Claims as of the priority date of the '780 patent in September of 2008.

206.    The testimony of the inventors confirms that their work was specifically focused on PEO.  *See* Tr. 984:2 – 985:22 (Sako); Tr. 1001:11 – 1002:7; 1003:6 – 1006:17, 1007:1 – 1010:3, 1010:16 – 1013:24 (Takaishi).

207.    The inventors further testified that they had no recollection of ever working on various aspects of the Asserted Claims, including:  the basis for the claimed molecular weight range of 100,000 to 8 million, *see* Tr. 986:19-23 (Sako); why the different types of hydrogel-forming polymers recited in the claims were selected, *see* Tr. 985:25 – 986:2 (Sako); making formulations with the hydrogel-forming polymers CMC, HEC, or CVP, *see* Tr. 991:12-23 (Sako); and evaluating how replacing PEO with a different hydrogel-forming polymer would change the gel characteristics of a tablet, *see* Tr. 1025:21 – 1026:6 (Takaishi).

### 1.   The Inventors Corroborated Dr. Chambliss's Testimony on the Breadth of the Claims

208.    Dr. Takaishi's testimony confirms that the specification states that mirabegron can be used in a free form or in different salt forms.  *See* Tr. 1021:16-20 (Takaishi).

209.    Dr. Takaishi's testimony confirms that the specification lists over 10 different grades of PEO, over 20 different types of HPMC, 5 different types of HPC, 6 different types of CMC, 2 different types of HEC, and 6 different types of CVP for use in the claimed invention. See Tr. 1022:12-16, 1022:17-2, 1022:22 – 1023:1, 1023:2-5, 1023:6-9, 1023:10-13 (Takaishi).

210.    Dr. Sako's testimony confirms that the molecular weight of the hydrogel-forming polymer in claim 1 is 100,000 to 8 million, and that there is no restriction on the amount or viscosity of the hydrogel-forming polymer.  *See* Tr. 986:15-18, 987:9-13, 988:3-6 (Sako).

211.    Dr. Sako's testimony confirms that there is no restriction on the amount of the additive in claim 1.  *See* Tr. 989:2-6 (Sako).

212.   Dr. Sako's testimony confirms that several or a large number of formulations could be made with the various polymers and additives recited by claim 1.  *See* Tr. 989:21 – 990:23 (Sako).

213.   Dr. Takaishi's testimony confirms that different combinations of hydrogel-forming polymers and additives can be used in a pharmaceutical composition to achieve the claimed drug dissolution rate.  *See* Tr. 1021:11-15 (Takaishi).

### 2. The Inventors Corroborated Dr. Chambliss's Testimony on the Level of Predictability or Unpredictability

214.   Dr. Sako's testimony confirms that many factors influence the dissolution rate.  See Tr. 987:23 – 988:2 (Sako).

215.   Dr. Sako's testimony confirms that the dissolution rate can be influenced by:

- the choice of hydrogel-forming polymer, Tr. 997:18-21;

- the viscosity of the hydrogel-forming polymer, Tr. 988:12-15;

- the amount of the hydrogel-forming polymer, Tr. 987:14-22;

- the amount of additive, Tr. 989:7-10; and

- the drug to polymer ratio, Tr. 997:11-17; and

- the quantity of the drug substance, Tr. 997:7-10.

216.   Dr. Sako's testimony confirms that the dissolution rate is the result of the interplay of excipients, as well as the major effect from the quantity of the drug substance.  *See* Tr. 997:7-10 (Sako); *see also id*. at Tr. 996:17 – 997:6 (Sako) (discussing slide 11 of DTX 2159: when there is 200 mg of mannitol used at the start, control is difficult to achieve with these grades of PEO [N-60k, WSR-301, WSR Coagulant]).

217.   Dr. Takaishi testified that the HPMC and HPC formulations evaluated released drug more quickly than the PEO formulations.  See Tr. 1004:16 – 1005:5 (Takaishi) (discussing

DTX 2159); *id.* at 1006:7-13 (discussing DTX 2159), *id.* at 1016:24 – 1017:13 (discussing DTX 2732).

218.    Dr. Takaishi testified that dissolution is affected in OCAS formulations by the viscosity and amount of PEO, the amount of PEG, and polymer degradation.  *See* Tr. 1015:7-10 (Takaishi) (discussing DTX 2732); *id.* at 1015:18 - 1016:17 (discussing DTX 2732); *id.* at 1018:23 – 1019:18 (discussing DTX 2732: PEO is key component in controlling drug release, oxidation of PEO accelerates dissolution; degradation could not be suppressed by airtight packaging and use of antioxidant was inevitable); *id.* at 1020:12-25 (amount and viscosity of hydrogel-forming polymer can influence dissolution and can become primary factors in dissolution); *id.* at 1021:1-3 (the amount of additive can influence drug dissolution); *id.* at 1011:17-21 (discussing DTX 2161: Opadry coatings were used on phase 1 tablets because release rate was accelerated on exposure to light); *id.* at 1015:11-14 (discussing DTX 2732: oxidative degradation of PEO can be accelerated by water content in tablets).

219.    Dr. Takaishi testified that he did not know if there was a way to predict the dissolution rate of the pharmaceutical composition with one hydrogel-forming polymers versus another, and that he did not know what the starting point would be for adjusting excipients using a hydrogel-forming polymer such as HPMC, or making a composition using CMC.  *See* Tr. 1025:7-10, Tr. 1025:20-25, Tr. 1026:1-6 (Takaishi).

220.    Dr. Takaishi testified that he did not know whether replacing PEO in an OCAS formulation with a different hydrogel-forming polymer such as HPMC would change the gelling characteristics, and he did not remember studying that. See Tr. 1026:21 – 1027:4 (Takaishi).

54

## VII.   INVALIDITY FOR LACK OF WRITTEN DESCRIPTION SUPPORT IN THE SPECIFICATION.

### A. SUMMARY OF INVALIDITY FOR LACK OF WRITTEN DESCRIPTION

221.    Defendants have proved by clear and convincing evidence that the Asserted Claims are invalid for lack of written description because the specification does not disclose either a representative number of species falling within the scope of the genus, or structural features common to the members of the genus, so that a POSA can visualize or recognize the members of the genus of formulations that meet both the structural and functional elements.  *See* Tr. 1139:21 – 1140:24 (Chambliss Direct); DDX 9-87.

### B. THE RELEVANT GENUS THAT MUST BE SUPPORTED BY THE SPECIFICATION

222.    A POSA would have understood that the genus that must be supported by the specification is the candidate formulations that meet both the structural and functional limitations of the Asserted Claims (i.e., the small circle in DDX 9-86 with the red question):



*See* Tr. 1139:21 – 1140:14 (Chambliss Direct); DDX 9-86.

223.    A POSA would have understood that the key question is whether the genus of candidate formulations that meet both the structural and functional limitations of the Asserted Claims could be visualized or recognized based on the specification.  *See* Tr. 1138:25 – 1139:18 (Chambliss Direct).

224.     A POSA would understand that it is not enough to disclose possession of a species that only abides in a corner of the genus.  *See* Tr. at 1138:25 – 1139:20 (Chambliss Direct).

C.  THE SPECIFICATION DOES NOT DISCLOSE A REPRESENTATIVE SPECIES

225.     A POSA would understand that examples in the patent without dissolution test results do not support the genus of the Asserted Claims because not all compositions meeting the structural limitations will also meet the dissolution limitation.  *See* Tr. at 1141:5-16 (Chambliss Direct).

**1.   Examples 2, 8 and 9 are Not Embodiments of the Asserted Claims**

226.     A POSA would understand from the specification and prosecution history of the '780 patent that Examples 2, 8 and 9 were tested with a paddle rotation speed of 50 RPM, and that they are not working embodiments of the Asserted Claims because they were not tested with the claimed method, which requires a paddle rotation speed of 200 RPM.  *See* Tr. 1141:17 – 1142:16 (Chambliss Direct); JTX 2, '780 patent at 18:53-62, 19:1-8; DDX 9-70; DTX 2025.251, '313 App. PH, 8/26/2013 Response to Office Action at 13; DDX 9-71; *see also* Tr. 1117:13 – 1120:15 (Chambliss Direct).

227.     A POSA would understand that a difference in paddle rotation speed would influence the drug dissolution test results, consistent with the patent prosecution history, because increasing the paddle rotation speed increases the dissolution rate.   *See* Tr. at 1142:17-23 (Chambliss Direct); DTX 2025.251, '313 App. PH, 8/26/2013 Response to Office Action at 13 ("Generally, it is common technical knowledge for those skilled in the art that the higher the paddle rotation speed is, the more rapid dissolution profile is obtained."); DDX 9-71.

**2.   Examples 2, 8 and 9 are Extremely Narrow**

228.     A POSA would have understood that Examples 2, 8 and 9 are not a representative species because they are extremely narrow.  *See* Tr. 1144:21 – 1145:14 (Chambliss Direct); *see*

*also* Tr. 1124:1 – 1132:18 (Chambliss Direct); JTX 2, '780 patent at 17:62 – 18:18 (Tables 1 &
2), 14:56-57 ("PEG 6000; the same compound was used in the following Examples."); DDX 9-74
to DDX 9-78.

229.    A POSA would understand that the same grade of PEO and the same grade of PEG
was used in Examples 2, 8 and 9, and that the dissolution rates of Examples 2, 8 and 9 are very
similar because the inventors varied the ratios of these ingredients in a narrow range.  *See* Tr.
1145:5-10 (Chambliss Direct); *see also* Tr. 1124:15 – 1125:3 (Chambliss Direct); JTX 2, '780
patent at 17:62 – 18:18, 14:56-57 ("PEG 6000; the same compound was used in the following
Examples."); DDX 9-74.

230.    A POSA would understand that not all compositions meeting the structural
elements of the Asserted Claims will meet the dissolution limitation, and that the disclosure of
formulations without dissolution testing results does not inform the scope of the claims.  *See* Tr.
1145:15-25; *see also* Tr. 1116:2-17 (Chambliss Direct).

231.    The prosecution history of the '780 patent family confirms that a POSA would have
understood that not all compositions meeting the structural elements of the Asserted Claims will
meet the dissolution limitation, including Examples 13 and 15 in the specification and OCAS-S.
*See* Tr. 1145:15 – 1146:10 (Chambliss Direct); *see also* Tr. 1102:18 – 1103:13, 1125:25 – 1126:15
(Chambliss Direct); DDX 9-75; DTX 2025.688, '313 App. PH, 2/10/2016 Declaration of Y.
Takaishi ¶ 7, Table B; .JTX 2, '780 Patent at 17:5-12 (Example 13 includes mirabegron, PEO and
PEG), 17:20-30 (Example 15 includes mirabegron, PEO and D-mannitol).

232.    A POSA would have understood that Examples 2, 8 and 9 would not be a
representative species of the genus of the Asserted Claims, if they were assumed to be
embodiments, because they are a narrow slice of the claim scope comprising one specific grade of

PEO and one specific grade of PEG.  *See* Tr. 1146:11 – 1147:7 (Chambliss Direct); DDX 9-93; *see also* Tr. 1131:20 – 1132:18 (Chambliss Direct); DDX 9-78 and DDX 9-79.

233.    A POSA would have understood that any guidance provided by Examples 2, 8 and 9 would not translate to the different types of hydrogel-forming polymers covered by the Asserted Claims:



*See* Tr. 1146:11-19 (Chambliss Direct); DDX 9-93; *see also* Tr. 1131:20 – 1132:18 (Chambliss Direct); DDX 9-78 and DDX 9-79.

234.    A POSA would have understood that Examples 2, 8 and 9 would be a small species within a corner of the genus of the Asserted Claims, if they were assumed to be embodiments:



*See* Tr. 1146:11 – 1147:7 (Chambliss Direct); DDX 9-94.

### D. The Specification Does Not Disclose Structural Features Characteristic of the Genus

235.    A POSA would have understood that the specification does not disclose common features of composition that meet both the structural elements and the dissolution limitation of the Asserted Claims, because it only provides background information on the hydrogel-forming polymers and additives that can be used in the claimed compositions.  *See* Tr. 1147:25 – 1149:14 (Chambliss Direct); DDX 9-96; *see also* Section V(D).

236.    A POSA would understand that a pharmaceutical composition with a structure comprised of mirabegron, a hydrogel-forming polymer, and a water soluble additive would not necessarily result in the required drug dissolution rate.  *See* Tr. 1148:18-25 (Chambliss Direct).

237.    A POSA would understand that the structure of mirabegron, a hydrogel-forming polymer, and a water soluble additive is just a list of three ingredients.  *See* Tr. 1149:1-4 (Chambliss Direct).

## VIII.    ISSUES OF FACT REGARDING INVALIDITY OF THE ASSERTED CLAIMS FOR INDEFINITENESS

238.    Defendants have presented clear and convincing evidence that the Asserted Claims are indefinite for lack of a temporal limitation on when the drug dissolution testing is performed.  *See* Tr. 1149:20 – 1151:10, 1151:20 – 1154:15, 1155:7-11 (Chambliss Direct); PDX-6117.

239.    It is undisputed that at the time of the invention PEO was known to be susceptible to degradation, which may lead to material changes in the drug dissolution profile of a formulation over time.  Tr. 1149:20 – 1151:10 (Chambliss Direct); Tr. 582:18 – 583:2 (Little Direct); JTX-6.15 ("POLYOX Water-Soluble Resins will degrade to lower molecular weights with time and elevated temperature."); DTX-2178.5-6 (Maggi 2003 showing that PEO can degrade upon exposure to UV light and increase the "burst effect").

240.     It is undisputed that the Asserted Claims lack a temporal limitation reciting when the required dissolution testing should be performed, relative to when the composition is created. *See* Tr. 1149:20 – 1151:10 (Chambliss Direct); Tr. 877:8-13 (Little Cross).

241.     The Asserted Claims have no shelf-life limitation.  *See* Tr. 1362:22 – 1363:3 (Little Cross).

242.     The lack of a temporal limitation means that a formulation could infringe at one point in time and not infringe at another, using the same dissolution test.  *See* Tr. 1153:18-22 (Chambliss Direct); *see also* Tr. 1154:3-15 (explaining that the Example 8 tablets in the specification comprised of PEO and PEG release 39% of the drug at 1.5 hours according to Table 4 when they were tested and the dissolution could increase to more than 40% if tested at a later point in time due to PEO degradation); *see also* JTX-2, '780 patent at 19:1-8 (Table 4).

243.     Astellas' infringement theory confirms that the Asserted Claims can cover compositions that do not infringe when tested using the required dissolution test method, but could at another point in time.  *See* Tr. 875:15 – 876:6 (Little Cross); *see also* Tr. 582:18 – 583:2 (Little Direct); *see also* Tr. at 416:24 – 417:12 (Thisted Cross) (no data to confirm that the model is valid beyond sixty days of manufacture); Tr. at 788:17-20 (Little Cross) (infringement opinions rely on Dr. Thisted's model).

244.     A POSA would not know when to run the dissolution test to determine if a formulation was inside or outside the scope of the Asserted Claims because there is no guidance in the specification or prosecution history of the '780 patent.  *See* Tr. 1153:24 – 1154:2 (Chambliss Direct).

PHILLIPS, MCLAUGHLIN & HALL, P.A.

*/s/ Megan C. Haney*
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
Megan C. Haney (#5016)
1200 N. Broom St
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com
mch@pmhdelaw.com

*Attorneys for Lupin Ltd. and*
*Lupin Pharmaceuticals, Inc.*

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Pilar G. Kraman*
Pilar G. Kraman (#5199)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com

*Attorneys for Zydus Pharmaceuticals (USA)*
*Inc. and Zydus Lifesciences Limited*

Dated:  March 15, 2023

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

*/s/ Dominick T. Gattuso*
Dominick T. Gattuso (#3630)
Elizabeth A. DeFelice (#5474)
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law
edefelice@hegh.law

*Attorneys for Defendant Sandoz Inc. and Lek*
*Pharmaceuticals d.d.*