# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ASTELLAS PHARMA INC., *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| v. | ) | C.A. No. 20-1589-JFB-CJB |
| | ) | |
| SANDOZ INC., *et al.*, | ) | ▮ |
| | ) | |
| *Defendants*. | ) | **Public Version Filed: March 22, 2023** |
| | ) | |
| | ) | |

## DEFENDANTS' OPENING POST-TRIAL BRIEF

i

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................... 1

II.   PROCEDURAL POSTURE ............................................................................... 2

III.  STATEMENT OF THE CASE............................................................................ 3

IV.   THE ASSERTED CLAIMS ARE INVALID FOR LACK OF ENABLEMENT............. 5

      A.    Breadth of the Claims ......................................................................... 7

            1.    Claim 1 ...................................................................................... 9

            2.    Claim 5 .................................................................................... 10

            3.    Claim 20 .................................................................................. 11

            4.    Claim 25 .................................................................................. 11

            5.    Courts Routinely Rely on Numerical Calculations When Assessing
                  the Breadth of the Claims ........................................................ 12

            6.    Astellas Proffered No Serious Rebuttal on the Breadth of the
                  Claims, and Instead Invited Legal Error .................................... 12

                  a.    Dr. Little Did Not Analyze Whether the *Full Scope* of the
                        Asserted Claims Is Enabled ............................................. 13

                  b.    Dr. Little Did Not Analyze the Breadth of the Asserted
                        Claims "As Written"......................................................... 14

                  c.    Expert Testimony Cannot Serve as an End-Run Around the
                        Enablement Requirement................................................. 14

                  d.    Astellas's Admissions Corroborate Dr. Chambliss's
                        Calculations for the Breadth of the Claims...................... 15

      B.    The Predictability/Unpredictability of the Art, Nature of the Invention, and
            State of the Prior Art .......................................................................... 16

            1.    Dissolution Rates Are Unpredictable and Must Be Determined
                  Experimentally......................................................................... 17

                  a.    Astellas Admitted During Prosecution that "Dissolution
                        Rates Are Unpredictable" ............................................... 19

                  b.    Dr. Little Did Not Meaningfully Engage on
                        Unpredictability ............................................................. 21

i

C.  Amount of Direction/Guidance Presented in the Specification and the Presence/Absence of Working Examples in the Specification. ........................... 23

    1.  Lack of Direction/Guidance in the Specification ...................................... 24

    2.  Absence of Working Examples in the Specification ................................. 27

    3.  Examples 2, 8 and 9 Are Not Working Examples ................................... 28

    4.  Regardless, Examples 2, 8, and 9 Are Too Narrow to Enable the Asserted Claims ...................................................................................... 30

D.  Quantity of Experimentation Necessary to Practice the Full Scope of the Claimed Invention .......................................................................................... 31

    1.  Defendants' ANDA Development Work Does Not Support Enablement—If Anything, It Supports Lack of Enablement ................... 32

E.  Relative Skill in the Art ................................................................................. 34

F.  Extensive Precedent Addressing Similar Functional Claims Compels a Finding of Lack of Enablement Here ............................................................ 34

    1.  *AstraZeneca* (N.D. W.Va.). ..................................................................... 35

    2.  *Roxane* (Fed. Cir). ................................................................................. 37

    3.  *Idenix* (Fed. Cir.). .................................................................................. 38

    4.  *Wyeth* (Fed. Cir.). .................................................................................. 39

    5.  *Amgen II* (Fed. Cir.). .............................................................................. 40

    6.  *Enzo* (Fed. Cir.). .................................................................................... 40

    7.  *Baxalta* (D. Del.) (Dyk, J., sitting by designation). ................................ 41

V.  THE ASSERTED CLAIMS ARE SEPARATELY INVALID FOR LACK OF WRITTEN DESCRIPTION ..................................................................................... 42

A.  The '780 Patent Specification Lacks Disclosure Showing that the Named Inventors Possessed the Full Scope of the Claimed Invention ........................... 43

    1.  Three Examples All Comprised of the Same Grade of PEO and PEG Are Not Representative of the Vast Claimed Genus—or Even All of the Claimed PEO-PEG Compositions ............................................. 45

2.    Background Information Does Not Constitute an Adequate Disclosure of Structural Features Characteristic of the Claimed Genus ................................................................. 49

3.    Dr. Little's Shotgun Approach to Written Description Was Legally Irrelevant and Insufficient ................................................................. 50

      a.    The Food Effect Problem ................................................................. 50

      b.    Inventors Could Have "Had Possession Mentally," the Art Is "Mature," and POSAs Could "Make Compositions" ............... 51

            i.     "Had Possession Mentally" ................................................................. 51

            ii.    Art is Mature and These Are Systems a POSA Knows ................................................................. 51

            iii.   POSA Could Make Some Claimed Compositions and Would Not Think I Have No Idea How to Make that Work ................................................................. 53

            iv.    "[A]djusting the Release Period by Controlling the Viscosity of the Polymer" Is Not a Structural Feature Characteristic of the Claimed Genus ................................................................. 53

4.    Astellas's Internal Documents Show that the Inventors Claimed much more than They Actually Invented ................................................................. 54

5.    Extensive Precedent Addressing Similar Functional Claims Compels a Finding of Lack of Written Description Here ................................................................. 55

VI.   THE ASSERTED CLAIMS ARE INVALID FOR INDEFINITENESS ................................................................. 58

## <u>TABLE OF AUTHORITIES</u>

### Cases

*AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*,
   759 F.3d 1285 (Fed. Cir. 2014) ...................................................................... passim

*ALZA Corp. v. Andrx Pharms., LLC*,
   603 F.3d 935 (Fed. Cir. 2010) .................................................................. 24, 27, 32

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003) ............................................................................ 43

*Amgen Inc. v. Sanofi*,
   872 F.3d 1367 (Fed. Cir. 2017) ...................................................................... 43, 53

*Amgen Inc. v. Sanofi*,
   No. 14-131-RGA, 2019 WL 4058927 (D. Del. Aug. 28, 2019) ............................ 24

*Amgen Inc. v. Sanofi*,
   No. 14-131-RGA, 987 F.3d 1080 (Fed. Cir. 2021) .............................................. 24

*Amgen Inc. v. Sanofi, Aventisub LLC*,
   987 F.3d 1080 (Fed. Cir. 2021) ........................................................................ 7, 40

*Anascape, Ltd. v. Nintendo of Am., Inc.*,
   601 F.3d 1333 (Fed. Cir. 2010) ...................................................................... 15, 21

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010) ..................................................................... passim

*AstraZeneca AB v. Mylan Pharms. Inc.*,
   No. 1:18CV193, 2022 WL 16857400 (N.D.W. Va., Nov. 9, 2022) ................................. passim

*Baxalta Inc. v. Genentech, Inc.*,
   579 F. Supp. 3d 595 (D. Del. 2022) ............................................................ 24, 35, 41

*Biogen Int'l GmbH v. Mylan Pharms. Inc.*,
   18 F.4th 1333 (Fed. Cir. 2021) ........................................................................ 43, 56

*Boston Sci. Corp. v. Johnson & Johnson Inc.*,
   679 F. Supp. 2d 539 (D. Del. 2010) ...................................................................... 55

*Boston Sci. Corp. v. Johnson & Johnson*,
   647 F.3d 1353 (Fed. Cir. 2011) .......................................................... 53, 54, 55, 56

*Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*,
   541 F.3d 1115 (Fed. Cir. 2008) ...................................................................... 45, 56

iv

*Chamberlain Grp., Inc. v. Lear Corp.*,
  756 F. Supp. 2d 938 (N.D. Ill. 2010) ................................................................... 34

*Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*,
  928 F.3d 1340 (Fed. Cir. 2019) ................................................................. passim

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
  879 F.3d 1332 (Fed. Cir. 2018) ........................................................................ 42

*Fromson v. Advance Offset Plate, Inc.*,
  755 F.2d 1549 (Fed. Cir. 1985) ........................................................................ 42

*Genentech, Inc. v. Novo Nordisk A/S*,
  108 F.3d 1361 (Fed. Cir. 1997) ........................................................... 27, 30, 33

*Gill v. Wells*,
  89 U.S. 1, 25 (1874)......................................................................................... 53

*Idenix Pharms. LLC v. Gilead Scis., Inc.*,
  941 F.3d 1149 (Fed. Cir. 2019) ................................................................. passim

*In re '318 Patent Infringement Litig.*,
  583 F.3d 1317 (Fed. Cir. 2009) ........................................................................ 32

*In re Barr Lab'ys, Inc.*,
  930 F.2d 72 (D.C. Cir. 1991)............................................................................... 2

*In re Curtis*,
  354 F.3d 1347 (Fed. Cir. 2004) ........................................................................ 48

*In re Wands*,
  858 F.2d 731 (Fed. Cir. 1988) ............................................................................ 6

*Inguran, LLC v. ABS Glob., Inc.*,
  No. 17-cv-446-wmc, 2019 WL 943515 (W.D. Wis. Feb. 26, 2019) ....................... 60

*Iridescent Networks, Inc. v. AT&T Mobility, LLC*,
  933 F.3d 1345 (Fed. Cir. 2019) .......................................................................... 6

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
  10 F.4th at 1330 (Fed. Cir. 2021) ..................................................................... 44

*Liebel–Flarsheim Co. v. Medrad, Inc.*,
  481 F.3d 1371 (Fed. Cir. 2007) .......................................................................... 8

*Lipocine Inc. v. Clarus Therapeutics, Inc.*,
  541 F. Supp. 3d 435 (D. Del. 2021).......................................................... passim

*Lockwood v. Am. Airlines, Inc.*,
    107 F.3d 1565 (Fed. Cir. 1997) .................................................................. 43, 52

*MagSil Corp. v. Hitachi Global Storage Techs., Inc.*,
    687 F.3d 1377 (Fed. Cir. 2012) .................................................................... 6, 8

*McRO, Inc. v. Bandai Namco Games Am. Inc*,
    959 F.3d 1091 (Fed. Cir. 2020) ...................................................................... 31

*Metso Minerals Indus., Inc. v. FLSmidth-Excel LLC*,
    No. 07-CV-926, 2010 WL 1929781 (E.D. Wis. May 13, 2010) ..................... 34

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004) ...................................................................... 28

*MorphySys AG v. Janssen Biotech, Inc*.,
    358 F. Supp. 3d 354 (D. Del. 2019)................................................................ 42

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)....................................................................... 58, 59, 60

*Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd*.,
    323 F. Supp. 3d 566 (D. Del. 2018)......................................................... 44, 56

*Person Pharms. LLC v. Alvogen Malta Operations Ltd*.,
    945 F.3d 1184 (Fed. Cir. 2019) ...................................................................... 44

*Pharm. Res., Inc. v. Roxane Lab'ys, Inc.*,
    253 F. App'x 26, 30 (Fed. Cir. 2007) ............................................................ 12

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d. 1299 (Fed. Cir. 2008) ............................................................. 15, 21

*Sitrick v. Dreamworks, LLC*,
    516 F.3d 993 (Fed. Cir. 2008) ....................................................................... 24

*Space Sys./Loral, Inc. v. Lockheed Martin Corp.*,
    405 F.3d 985 (Fed. Cir. 2005) ....................................................................... 43

*Trs. of Boston Univ. v. Everlight Elecs. Co.*,
    896 F.3d 1357 (Fed. Cir. 2018) ....................................................................... 6

*Wyeth & Cordis Corp. v. Abbott Lab'ys*,
    720 F.3d 1380 (Fed. Cir. 2013) .............................................................. passim

## Statutes

21 U.S.C. § 355 (j)(2)(A)(vii)(IV) ...................................................................... 2

21 U.S.C. § 355(b)(1) ................................................................................................ 2

21 U.S.C. § 355(b)(2) ................................................................................................ 2

21 U.S.C. § 355(c)(2) ................................................................................................ 2

21 U.S.C. § 355(j)(2)(B) ............................................................................................ 2

35 U.S.C. § 112 .................................................................................................. 1, 42

## Regulations

21 C.F.R. § 314.53(e) ................................................................................................ 2

## TABLE OF ABBREVIATIONS

| ABBREVIATION | TERM |
|---|---|
| The '780 patent | U.S. Patent No. 10,842,780 |
| The '313 application | U.S. Patent Application No. 12/568,313 |
| Abbreviated New Drug Application | ANDA |
| API | Active Pharmaceutical Ingredient |
| CMC-sodium | Carboxymethyl cellulose sodium |
| CVP | Carboxyvinyl polymer |
| DOE | Design of Experiments |
| FDA | U.S. Food & Drug Administration |
| HEC | Hydroxyethyl cellulose |
| HFA 227 | 1,1,1,2,3,3,3-heptafluoropropane |
| HFP | Hydrogel forming polymer |
| HPC | Hydroxypropyl cellulose |
| HPMC | Hydroxypropyl methylcellulose |
| HCV | Hepatitis C virus |
| INV | Invalidity |
| MW | Molecular weight |
| New Drug Application | NDA |
| NI | Noninfringement |
| PEG | Polyethylene glycol |
| PEO | Polyethylene oxide |
| PFF | Defendants Proposed Findings of Fact |
| PK | Pharmacokinetics |
| PolyOx | Dow trade name for Polyethylene oxide products |
| POSA | Person of ordinary skill in the art |
| PTO | Patent & Trademark Office |
| PVP | polyvinylpyrrolidone |
| TU | Testosterone undecanoate |
| USP | United States Pharmacopeia |
| WSA | Water soluble additive |

## TABLE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| JTX-2 | The '780 patent |
| JTX-39 | Myrbetriq Label (Revised April 2021) |
| DTX-2004 | Walter G. Chambliss CV and Testimony Disclosure |
| DTX-2022 | Dow METHOCEL Brochure, published in July 2000 ("2000 Dow Brochure") |
| DTX-2025 | The '313 application prosecution history ('313 App. PH") |
| DTX-2042 | U.S. Patent Application Publication No. 2003/0203024 A1, which published on October 30, 2003 ("Sako '024") |
| DTX-2073 | Formulating Sustained Release Pharmaceutical Products With METHOCEL, Dow Chemical Company, 1987 ("1987 Dow Methocel Brochure") |
| DTX-2076 | Hiroyuki Kojima et al., *Extended Release of a Large Amount of Highly Water-Soluble Diltiazem Hydrochloride by Utilizing Counter Polymer in Polyethylene Oxides (PEO)/Polyethylene Glycol (PEG) Matrix Tablets*, 70 EUR. J. OF PHARMACEUTICS AND BIOPHARMACEUTICS 556 (2008) ("Kojima 2008") |

| Exhibit No. | Description |
|---|---|
| DTX-2077 | Rong-Kun Chang, *Sustained Drug Release from Tablets and Particles Through Coating*, *in* PHARMACEUTICAL DOSAGE FORMS: TABLETS VOLUME 3 (Herbert A. Lieberman et. al. eds., 2nd Ed., 1990) ("Lieberman") |
| DTX-2078 | M. Victoria Velasco et al., *Influence of Drug:Hydroxypropylmethylcellulose Ratio, Drug and Polymer Particle Size and Compression Force on the Release of Diclofenac Sodium from HPMC Tablets*, 57 J. OF CONTROLLED RELEASE 75 (1999) ("Velasco 1999") |
| DTX-2081 | NDA Module 3.2.S.1.3 Drug Substance |
| DTX-2084 | EA/A178 CTD M3 Planning Meeting |
| DTX-2111 | HANDBOOK OF PHARMACEUTICAL EXCIPIENTS 89-92, 97-100, 158-160, 200-202, 247-49, 255-56, 283-86, 289-93, 297 305, 323-32, 371-77, 381-82, 447-50, 454-59, 460-61, 469-83, 508- 13, 556-59, 596-99, 622-25, 644-45, 694-97 (Raymond C. Rowe et al. eds., 4th ed. 2003) ("2003 HPE") |
| DTX-2112 | PHARMACEUTICS: THE SCIENCE OF DOSAGE FORM DESIGN, Chapters 1, 9, 15, 18 (Michael E. Aulton ed., 1988) ("Aulton") |
| DTX-2114 | Gurvinder Singh Rekhi et al., *Identification of Critical Formulation and Processing Variables for Metoprolol Tartrate Extended-Release (ER) Matrix Tablets*, 59 J. CONTROLLED RELEASE 327 (1999) ("Rekhi 1999") |
| DTX-2125 | HANDBOOK OF PHARMACEUTICAL MANUFACTURING FORMULATIONS COMPRESSED SOLID FORMULATIONS VOLUME I (Sarfaraz K. Niazi ed., 2004) (Niazi I") |
| DTX-2142 | Yuuki Kasashima et al., Oral Sustained Release of a Hydrophilic Drug Using the Lauryl Sulfate Salt/Complex, 64 CHEM. PHARM. BULL. 1304 (2016) ("Kasashima 2016") |
| DTX-2146 | THE THEORY AND PRACTICE OF INDUSTRIAL PHARMACY 221 (Leon Lachman et al. eds., 1986) ("Lachman 1986") |
| DTX-2178 | L. Maggi et al., *Photostability of Extended-Release Matrix Formulations*, 55 EUR. J. OF PHARMACEUTICS AND BIOPHARMACEUTICS 99 (2003) ("Maggi 2003") |
| DDX 9-1 to 9-105 | Demonstrative Exhibits of Walter G. Chambliss, Ph.D. – Invalidity |
| PDX-6001 to PDX-6130 | Demonstrative Exhibits of Steven R. Little, Ph.D. – Infringement |
| PDX-8001 to PDX-8064 | Demonstrative Exhibits of Steven R. Little, Ph.D. – Validity |

## I.    INTRODUCTION

This is a classic case of a patentee claiming broadly but disclosing narrowly. The '780 Patent claims more than the named inventors enabled, and more than they invented and described. This is exactly the type of overreach that the enablement and written description requirements were designed to prevent. Indeed, the '780 Patent epitomizes the broad, unsupported genus claims that the Federal Circuit has uniformly invalidated in a long line of cases starting with *Ariad* in 2010.

The *quid pro quo* of the patent bargain is clear—in exchange for the limited monopoly provided by the '780 Patent, Astellas was required to provide a patent specification commensurate with the claims, such that a person of ordinary skill in the art ("POSA"):

     i.    could make and use the full scope of the claimed invention without undue experimentation (enablement);

    ii.    would believe the patentee actually invented the full scope of what is claimed due to a commensurate description in the specification (written description); and

   iii.    would be informed with reasonable certainty as to the scope of the invention as a result of having been provided with objective boundaries of the claim scope (definiteness).

Here, as the clear and convincing evidence at trial demonstrated, Astellas did not live up to its end of the bargain. Instead, Astellas claimed much more (so much so that Astellas's expert, Dr. Steven Little, did not even attempt to calculate the breadth of the claims, much less specifically refute the calculations of Defendants' expert, Dr. Walter Chambliss). Despite the breadth of the claims, the specification is insubstantial, containing at best three working examples, and general information instead of meaningful guidance. This is particularly problematic given the claims' required functional dissolution profile that "pose[s] high hurdles" for fulfilling the requirements of Section 112.

As a result, the Asserted Claims are invalid under 35 U.S.C. § 112 for three separate and

discrete reasons: lack of enablement, lack of written description, and indefiniteness.

## II.   PROCEDURAL POSTURE

This is a consolidated action for alleged infringement of the '780 Patent brought under the Hatch-Waxman Act, which has the express purpose of "get[ting] generic drugs into the hands of patients at reasonable prices—fast." *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991).

This case is the second litigation concerning Myrbetriq® filed by Astellas against the Defendants. Myrbetriq was first approved by the FDA and launched by Astellas in June 2012. (*E.g.*, Tr. 97:19-20 (Nitti Direct)). In August and September 2016, Lupin, Zydus and Sandoz each notified Astellas that it had filed an ANDA seeking approval to market a generic version of Myrbetriq before the expiration of the patents then listed in FDA's Orange Book in connection with Myrbetriq.[1] In October 2016, Astellas filed suit against each Defendant. The cases were consolidated under *Astellas Pharma Inc. et al. v. Actavis Elizabeth LLC et al.*, C.A. No. 16-905-JFB-CJB (the 2016 Litigation). Due to settlements and dismissals, the 2016 Litigation was closed on October 5, 2020. (D.I. 604).

---

[1] In order to obtain FDA approval to sell a drug that has not been previously approved, a company generally must file a new drug application ("NDA"). *See* 21 U.S.C. §§ 355(b)(1) and (b)(2). In addition to safety and efficacy information, an NDA applicant files with FDA the number and expiration date of any patent that claims "the drug" or a method of using "the drug" for which the applicant submitted the application with respect to which a claim of infringement could reasonably be asserted. 21 U.S.C. §§ 355(b)(1), (c)(2). FDA publishes this information in its *Approved Drug Products with Therapeutic Equivalence Evaluations*, commonly known as the "Orange Book." *See* 21 C.F.R. § 314.53(e). Pursuant to the Hatch-Waxman Act, a drug company may file an Abbreviated New Drug Application ("ANDA") seeking approval to market drug already-approved by FDA. Generally, an ANDA is "abbreviated" in that it substitutes bioequivalence data for the full studies of safety and efficacy found in an NDA. With certain exceptions inapplicable here, an ANDA applicant seeking approval to market a generic drug before expiration of a listed patent must submit a "paragraph IV certification," stating that the listed patent is invalid, unenforceable, and/or will not be infringed by the generic drug. *See* 21 U.S.C. § 355 (j)(2)(A)(vii)(IV). The ANDA applicant must then notify the patentee and NDA-holder of factual and legal bases for that certification. *See* 21 U.S.C. § 355(j)(2)(B).

On February 14, 2017—while the 2016 Litigation was pending—Astellas filed the application leading to the asserted '780 Patent. (*See, e.g.,* JTX-2.1; Tr. 702:2-4 (Buckton Redirect)). The '780 Patent application was a continuation of the '313 application (*see* JTX-2.1), meaning that the '780 Patent and '313 application share the same specification (Tr. 1036:22 – 1037:4 (Chambliss Direct); 1220:4-5 (Chambliss Cross)), and that statements made in the '313 application prosecution regarding the shared specification are equally relevant here. The '780 Patent issued on November 24, 2020 (JTX-1.1), and Astellas filed this suit against Defendants that same day. (D.I. 1).

## III.    STATEMENT OF THE CASE

The '780 Patent claims are directed to a genus[2] of "pharmaceutical compositions" that: (i) have certain structural features (e.g., some form of mirabegron, a HFP, and a WSA); and (ii) particular functional dissolution rate of "39% or less after 1.5 hours, and 75% or more after 7 hours." (JTX-0002, '780 patent at Cl. 1) ("the Dissolution Limitation"). The claims thus recite both structural limitations and the Dissolution Limitation:



DDX 9-17.

As such, for a composition to be covered by the claims, it must meet both the structural

---

[2] A group of compositions recited in a patent claim is referred to as a "genus" of compositions. Each individual composition that is part of that group or genus is referred to as a "species."

limitations *and* the Dissolution Limitation. (JTX-0002, '780 Patent at 20:19-47; PFF ¶¶ 31-32, 42-43, 62; DDX 9-17).

It is undisputed that some, but not all, of the candidate compositions (that meet the structural limitations) will meet the functional Dissolution Limitation. (PFF ¶ 33). Therefore:

    i.    the compositions that meet the structural limitations are the "candidate formulations" (PFF ¶ 34; DDX 9-18); and

    ii.    the subset of compositions meeting both the structural elements and the Dissolution Limitation is the genus of compositions that must be adequately enabled and described. (PFF ¶ 35; *see also* DDX 9-18).



DDX 9-18.

**Asserted Claims.** Astellas asserted only dependent claims 5, 20 and 25 ("the Asserted Claims") against Defendants at trial. However, because each of the Asserted Claims are multiple-dependent claims, the claims from which they depend are relevant as well. The Asserted Claims, and the claims from which they depend, are related as follows: Claim 5 depends directly from Claim 1; Claim 20 depends from Claim 18, which depends from Claim 16, which depends from Claim 1; Claim 25 depends from Claim 23, which depends from Claim 22. *See* JTX-2, '780 Patent at 20:19 – 22:34; DDX 9-16. Thus, the limitations of Claim 1 are relevant to the analysis of

Asserted Claim 5; the limitations of Claims 1, 16, and 18 are relevant to the analysis of Asserted Claim 20; and the limitations of Claims 22 and 23 are relevant to the analysis of Asserted Claim 25.

As discussed in more detail *infra*, Defendants' invalidity expert, Dr. Chambliss, considered all of the various claim dependencies and limitations in his analysis of the breadth of the Asserted Claims. He concluded that there are at least millions of candidate compositions encompassed by the Asserted Claims, but an unknown number of formulations that will also exhibit the functional Dissolution Limitation. (*See generally* PFF ¶ 36; DDX 9-22 – DDX 9-32). The extraordinary number of candidate compositions is unrebutted. Tellingly, Dr. Little did not meaningfully engage on the breadth of the claims issue and did not present competing calculations. (PFF ¶ 37).

**Specification**. As noted above, the '780 Patent specification is the same one appearing in the '313 application. Astellas contends that only 3 of the 17 examples set forth in the shared specification—Examples 2, 8 and 9—are working examples exhibiting the claimed functional Dissolution Limitation. (PFF ¶ 38). Even assuming *arguendo* that Examples 2, 8 and 9 are working examples, it is not possible for a POSA to extrapolate from those examples to the myriad of possible combinations captured by the extraordinarily broad claims because the specification contains only general background and laundry lists of potential ingredients for use in the claimed compositions. There is no guidance in the specification as to which of the candidate compositions will also exhibit the required dissolution rate. (PFF ¶ 39).

## IV.   THE ASSERTED CLAIMS ARE INVALID FOR LACK OF ENABLEMENT

At its most basic level, a patent represents an exchange: the patentee teaches others how to make and use the full scope of a new invention, and in exchange for that disclosure receives the right to exclude others from making or using that invention for a limited time.

As such, the enablement requirement prevents patentees from overreaching and excluding

others from inventions that the specification has not sufficiently informed the public how to make and use. *See, e.g.*, *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1353 (Fed. Cir. 2019) ("[E]nablement serves the dual function . . . of ensuring adequate disclosure of the claimed invention and of preventing claims broader than the disclosed invention.").

Enablement is a question of law that depends on underlying factual determinations. *Wyeth & Cordis Corp. v. Abbott Lab'ys*, 720 F.3d 1380, 1384 (Fed. Cir. 2013) ("*Wyeth*"). Specifically, the enablement requirement "asks whether 'the specification teaches those in the art to make and use the invention without undue experimentation.'" *Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*, 928 F.3d 1340, 1345 (Fed. Cir. 2019) ("*Enzo*") (cleaned up) (quoting *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988)). Undue experimentation "is a conclusion reached by weighing many factual considerations" known as the *Wands* factors: the breadth of the claims; the predictability of the art; the nature of the invention; the state of the prior art; the amount of direction or guidance disclosed in the patent; the presence or absence of working examples in the patent; the quantity of experimentation necessary to practice the full scope of the claims; and the relative skill of those in the art. *See Wands*, 858 F.2d at 737.

Critically, Section 112 demands that "the specification must enable the full scope of the claimed invention." *Trs. of Boston Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1364 (Fed. Cir. 2018). "The scope of the claims must be less than or equal to the scope of the enablement to ensure that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims." *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012). As such, "a patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage." *Id.*

Further, the "use of broad functional claim limitations raises the bar for enablement" and poses

"high hurdles in fulfilling the enablement requirement." *Amgen Inc. v. Sanofi, Aventisub LLC*, 987 F.3d 1080, 1087 (Fed. Cir. 2021) ("*Amgen II*"). Accordingly, for claims with functional limitations—like those here—the enablement inquiry "can be particularly focused on the breadth of those requirements, especially where predictability and guidance fall short"; and "it is important to consider the quantity of experimentation that would be required to make and use, not only the limited number of embodiments that the patent discloses, but also the full scope of the claim." *Id.* at 1086. In short, the "key enablement question" for claims with structural and functional limitations is whether a POSA would know, without undue experimentation, which candidate formulations would meet the functional limitation. *Idenix Pharms. LLC v. Gilead Scis., Inc.*, 941 F.3d 1149, 1156, 1165 (Fed. Cir. 2019) ("*Idenix*") (claims invalid for lack of enablement and written description). Here, the Asserted Claims are invalid for lack of enablement because a POSA would not know, without undue experimentation, which of the millions of candidate formulations would meet the functional Dissolution Limitation—i.e., that person would not be enabled to practice the full scope of the invention. Indeed, as Dr. Chambliss explained—and key concessions from Dr. Little show—seven of the eight *Wands* factors weigh decidedly in favor of lack of enablement.

## A.  BREADTH OF THE CLAIMS

As a threshold issue—and contrary to the thrust of Astellas's arguments—the breadth-of-claims *Wands* factor "considers the scope of the claim as written, not just the subset of the claim that a POSA might practice." *Idenix* at 1162.

Astellas simply gets it wrong by arguing that the dissolution limitation makes the claims narrow. Such argument looks at the enablement problem "backwards," leaving the POSA searching for a needle in a haystack as explained by the Federal Circuit in *Idenix*:

> First, Idenix argues that "[w]hen required to take all of the claim

> limitations into account, Gilead's witnesses described the claims as embracing only a 'small' number of compounds." *This analysis is backwards*. Gilead's expert testified that, in order for the '597 patent to teach which . . . nucleosides effectively treat HCV, the patent would need to detail "how to get from a large number [of candidate compounds] to a relatively speaking small number [of effective compounds]." *In other words, the '597 patent leaves a POSA searching for a needle in a haystack to determine which of the "large number" of . . . nucleosides falls into the "small" group of candidates that effectively treats HCV*. The size disparity between those two groups requires significant experimentation, which weighs against enablement, not for it.

*Idenix* at 1162 (fourth and fifth alterations in original) (citations omitted).[3]

In addition to considering the number of candidate compositions within the scope of the structural limitations as written, the breadth analysis recognizes that, the "transition 'comprising' creates a presumption that the recited elements are only a part of the [claimed compositions]," and "that the claim does not exclude additional, unrecited elements." *MagSil*, 687 F.3d at 1383. The inventors' choice to use such open claim language "does not grant them any forgiveness on the scope of required enablement." *Id.*; *see also Liebel–Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007) ("The irony of this situation is that Liebel successfully pressed to have its claims include a jacketless system, but, having won that battle, it then had to show that such a claim was fully enabled, a challenge it could not meet."). Thus, the open-ended "comprising" language further broadens the scope and diversity of the claims here, by encompassing various other formulation components not expressly recited in the claims.

The Asserted Claims recite broad structural limitations, covering at least millions of candidate formulations. This does not change, as Dr. Chambliss testified in detail, even when the narrowing aspect of the dependent claims are considered or other variables that expand the scope of the claims are disregarded. Moreover, no one, let alone the experts in the case, can identify what subset of

---

[3] All emphasis herein added unless otherwise noted.

those candidate formulations will meet the functional dissolution limitation absent undue experimentation. (*See* PFF ¶ 48; JTX-2, '780 Patent at 20:19-47; DDX 9-17).

### 1. Claim 1

Claim 1 of the '780 Patent—from which Asserted Claims 5 and 20 depend—is extremely broad because:

- the term "[a] pharmaceutical composition" allows for different routes of administration (e.g., oral, non-oral) and different dosage forms (tablets, granules, powders, solutions, suspensions, gels, suppositories, etc.) that can be made by any known processes (PFF ¶ 49; JTX-2, '780 Patent at 20:19-47; DDX 9-22);

- the term "10 mg to 200 mg [of mirabegron]" allows for different forms of mirabegron (e.g., polymorphs,[4] free base, salts[5]) in a wide (20-fold) concentration range (PFF ¶ 50; JTX-2, '780 Patent at 20:19-47; DDX 9-22);

- the "HFP[6]" term allows for six different types and many grades of HFPs (which have different physical and chemical properties[7]), allows for combinations[8] of different types and grades

---

[4] A polymorph is a solid material having more than one crystalline form, with each crystalline form having different properties (PFF ¶ 24; DDX 9-10). There are at least two polymorphic forms of mirabegron. (PFF ¶ 25; DTX 2081.2, Myrbetriq NDA Module 3.2.S.1.3 at 2; DDX 9-11).

[5] A salt is a molecule that has an acid and base linked together; mirabegron is a base, so one links it with an acid to make a salt. (PFF ¶ 26; DDX-12). A salt form has different properties from the free elemental form. (PFF ¶¶ 27-28).

[6] An HFP is a polymer that can absorb water or other fluids, and upon absorbing the fluid, swells and forms a gel. (PFF ¶ 16; DDX 9-8). HFPs swell to differing degrees, depending in part on other additives in the formulation; this property is known as the "gelation index." (PFF ¶ 108; DTX 2042.16-17; DDX 9-52).

[7] A "grade" of an excipient does not refer to its purity; rather, "grade" refers to the fact that the excipients come in different physical forms (e.g., different particle sizes or molecular weights) which have different physical and chemical properties that influence the properties of the formulation. (PFF ¶ 13).

[8] Contrary to Astellas's intimation (PFF ¶ 56), there can be no serious dispute that the claim phrase "at least one" allows for combinations, and is broadening. *See, e.g., Lipocine Inc. v. Clarus*

of HFPs, and contains no limits on the amounts, concentrations or ratios of the HFPs (PFF ¶ 51; JTX-2, '780 Patent at 20:19-47; DDX 9-22);

- the "WSA" term allows for twenty-two different types and many grades of additives (which have different physical and chemical properties)[9], has no upper limit on solubility, allows for combinations of different types and grades of WSAs, and contains no limits on the amounts, concentrations or ratios (PFF ¶ 52; JTX-2, '780 Patent at 20:19-47; DDX 9-22); and

- "comprising" allows for unlimited combinations of other excipients (e.g., any type of binder, filler, etc.) (PFF ¶ 53; JTX-2, '780 Patent at 20:19-47; DDX 9-22).[10]

And even when "comprising" is not taken into account and one considers only: the 51 HFP grades listed in the specification; the 151 WSAs listed in the 2003 HPE; only 10 different mirabegron amounts; 10 ratios of mirabegron to HFP to WSA; and the 23 potential salt forms listed in the specification. Dr. Chambliss calculated that there are *17,712,300* possible candidate compositions covered by the structural elements of Claim 1. (PFF ¶¶ 54-55; DDX 9-23 – 9-27).

### 2. Claim 5

Claim 5 depends from Claim 1. (PFF ¶¶ 42, 57; JTX-2, '780 Patent at 20:19-47; DDX 9-16; DDX 9-28). The only variable narrowed by Claim 5 is the type of HFP, which is restricted to three of the six HFPs listed in Claim 1: PEO, HPMC, and HPC. (DDX 9-28). Even when "comprising" is not taken into account and one considers only: the 37 HFP grades listed in the specification for

---

*Therapeutics, Inc.*, 541 F. Supp. 3d 435, 450 (D. Del. 2021) (Bryson, J., sitting by designation). There, Judge Bryson found claims invalid for lack of written description where, *inter alia*, they lacked "any meaningful degree of specificity regarding the identity of the excipients," because even the most specific claim was not "highly specific with respect to its formulation, because it covers any composition that includes oleic acid and Cremophor RH 40, and *at least one of* a monoglyceride, a diglyceride, a triglyceride, and an antioxidant." *Id.* (emphasis in original).

[9]  *See* Tr. 1057:9 – 1058:12  (Chambliss Direct); DTX 2042.16-17; DDX 9-52).

[10]  Astellas does not dispute the open nature of the Asserted Claims.

PEO, HPMC, HPC; only the 151 WSAs listed in the 2003 HPE; only 10 different mirabegron amounts; only 10 ratios of mirabegron to HFP to WSA; and only the 23 potential salt forms listed in the specification; Dr. Chambliss calculated that there are still *12,850,100* possible candidate compositions covered by the structural elements of Claim 5. (PFF ¶ 59; DDX 9-29).

### 3. Claim 20

Claim 20 depends from claim 18, which depends from claim 16, which depends from claim 1. (PFF ¶¶ 42, 58; JTX-2, '780 Patent at 20:19-47; DDX 9-16; DDX 9-28). Claim 16 excludes salt forms of mirabegron, claim 18 restricts the dosage form to various types of tablets, and Claim 20 recites a method for treating OAB with that tablet. (PFF ¶ 58; DDX 9-28). Even when "comprising" is not taken into account and one considers only the 51 HFP grades listed in the specification; only the 151 WSAs listed in the 2003 HPE; only 10 different mirabegron amounts; only 10 ratios of mirabegron to HFP to WSA; and only two polymorphic forms of mirabegron; Dr. Chambliss calculated that there are still *1,540,200* possible candidate compositions covered by the structural elements of Claim 20. (PFF ¶ 60; DDX 9-30).

### 4. Claim 25

Claim 25 depends from claim 23, which depends from independent claim 22. Claim 22 is even broader than claim 1 because it is a "means-plus-function" claim. Rather than reciting specific HFPs and WSAs, it instead recites a "means for forming a hydrogel" and a "means for ensuring penetration of water into the pharmaceutical composition." (PFF ¶ 62). Claim 23 narrows Claim 22 by excluding mirabegron salt forms, and Claim 25 restricts the dosage form to various types of tablets. (PFF ¶ 63). Even when "comprising" is not taken into account and one considers only: the 51 HFP grades listed in the specification for the HFP; only the 151 WSAs listed in the 2003 HPE; only 10 different mirabegron amounts; only 10 ratios of mirabegron to HFP to WSA; and only two polymorphic forms of mirabegron; Dr. Chambliss calculated that there are still *1,540,200* possible

11

candidate compositions covered by the structural elements of Claim 25. (PFF ¶ 64; DDX 9-32).

### 5. Courts Routinely Rely on Numerical Calculations When Assessing the Breadth of the Claims

Contrary to Astellas's (and Dr. Little's) suggestion at trial, courts routinely rely on numerical calculations such as those performed by Dr. Chambliss when evaluating claim breadth, especially where, as here, the claims recite both structural and functional elements. *See Idenix* at 1157 ("'billions and billions' of compounds literally meet the structural limitations"; "even taking into account the knowledge and approach of a POSA, the candidate compounds number 'likely[] millions, or at least many, many thousands'" (alteration in original)); *Wyeth* at 1385 (breadth of the claims supports undue experimentation because "there is no genuine dispute that practicing the full scope of the claims would require synthesizing and screening *each* of at least tens of thousands of compounds." (emphasis in original)); *Pharm. Res., Inc. v. Roxane Lab'ys, Inc.*, 253 F. App'x 26, 30 (Fed. Cir. 2007) ("*Roxane*") (the asserted claims "encompass hundreds of possible surfactants" and "nothing in the language of the claims limits the concentration of surfactant," and therefore "the district court properly determined that the claims at issue 'have an extraordinarily broad scope'"); *AstraZeneca AB v. Mylan Pharms. Inc.*, No. 1:18CV193, 2022 WL 16857400, at *12 (N.D.W. Va., Nov. 9, 2022) ("*AstraZeneca*") ("[T]he Court finds that the asserted claim[s] broadly encompass tens of thousands, if not millions, of candidate formulations. As such, the breadth of the claims factor weighs against enablement.").

### 6. Astellas Proffered No Serious Rebuttal on the Breadth of the Claims, and Instead Invited Legal Error

Despite the opportunity to present rebuttal figures, Dr. Little did not attempt to calculate claim scope. (Tr. 1344:17-19; 1345:2-7). Nor did he dispute Dr. Chambliss's math. *See* Tr. at 1068:18-20). Instead, he only vaguely testified—without any support—that the calculations were "arbitrary," (Tr. 1344:17-19), that a POSA would not believe that such calculations "make sense,"

(Tr. 1344:4-6), and that a POSA would not conduct such calculations, (Tr. 1344:22 – 1345:1). Unable to directly rebut Dr. Chambliss's testimony, Astellas instead advanced legally erroneous positions.

### a.  Dr. Little Did Not Analyze Whether the *Full Scope* of the Asserted Claims Is Enabled

First, while Dr. Little claims to have assessed whether the full scope of the claims is enabled, he appears to have instead considered whether a POSA could "operate *within*" the claims, not across their full scope as the law requires:

> **A.** . . . . A person of ordinary skill in the art looks at this through their eyes whenever they see it, they would not need every grade of every one of these things *to be able to operate within the claims*.

(Tr. 855:12-15 (Little Cross)).

> **Q.** So all of the grades of all of the polymers in the specification could be used, correct?
>
> **A.** They could in the context of the hydrogel forming system. So it's not like they could just be used a little bit, right? It's a means for forming a hydrogel, *so you have to be operating within what a person of ordinary skill in the art knows* how to make one of these systems.

(Tr. 849:21 – 850:2 (Little Cross)).

> **Q.** You haven't even estimated a guess as to the number of compositions covered by these claims, correct?
>
> **A.** I disagree. I went through the Court and *showed how many compositions you would need to get the dissolution element*, so I have testified to that.

(Tr. 1345:21-25 (Little Cross); PFF ¶ 66).

In fact, Dr. Little's own demonstrative makes clear that for his Section 112 analyses, he was only assessing whether a POSA could find one embodiment, rather than all of the embodiments covered by the full scope of the claims. (*See* PFF ¶ 67; PDX-8027 ("Finding a working embodiment is not 'searching for a needle in a haystack.'")).

13

**b.  Dr. Little Did Not Analyze the Breadth of the Asserted Claims "As Written"**

Second, instead of assessing the Asserted Claims "as written," which is what the Federal Circuit requires, *see Idenix* at 1162, Dr. Little testified without any documentary or factual support that a POSA would see the Asserted Claims through "their eyes," which *de facto* narrows the claims:

> **Q.** My question is, does it, does the claim require a grade of these additives?
>
> **A.** It doesn't explicitly mention it, but I'll use the word you saw before when you said see, a person of ordinary skill in the art looks at this and they see it through the person of ordinary skill person's eyes.
>
> **Q.** Claim 1 doesn't require any particular amount, concentration or ratios of these additives, correct?
>
> **A.** That's the same answer, that they don't see those direct things in here, but they see it through their eyes.

(Tr. 853:18 – 854:2 (Little Cross); PFF ¶ 68).[11]

The Asserted Claims, as written, do not have any limitations directed to particular amounts, concentrations, or ratios for the claimed additives or HFPs. What Dr. Little contends can be "seen" through a POSA's eyes is not relevant for assessing claim breadth.

**c.  Expert Testimony Cannot Serve as an End-Run Around the Enablement Requirement**

Third, Astellas cannot rely on expert testimony to narrow the Asserted Claims based on the supposed knowledge of a POSA because it would be "an impermissible end-run around the

---

[11]  As such, Dr. Little appears to have been proffering a new construction of what the claims mean. This is both procedurally improper and legally incorrect because it is contradicted by the claims, specification, and prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("However, conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court. Similarly, a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." (cleaned up)).

requirement to enable the full scope of the claim." *Idenix* at 1159; *see also id.* at 1158-59 (rejecting argument that a "POSA would understand the 'focus' of the claim to be 'the inhibition of the NS5B polymerase' to effectively cure HCV" and "a POSA would know which candidates were likely to inhibit NS5B, and would test only those, resulting in a 'predictable and manageable' group of candidate compounds" because it "improperly attempt[ed] to narrow the claim to only those nucleosides that would inhibit the NS5B polymerase.").

Put another way, generalized statements such as those by Dr. Little as to how a POSA would "see" the claims are insufficient as a matter of law to support enablement. *See PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d. 1299, 1310 (Fed. Cir. 2008) (conclusory expert declaration averring what POSA would understand was insufficient to raise a genuine issue of material fact regarding what the specification disclosed to one skilled in the art); *Anascape, Ltd. v. Nintendo of Am., Inc.*, 601 F.3d 1333, 1341 (Fed. Cir. 2010) (patentee not entitled to earlier filing date where expert conclusorily opined on what the specification disclosed because generalized expert testimony "cannot override the objective content of [the specification]").

At bottom, Astellas cannot escape invalidity by arguing that the POSA would not practice the full scope of the claims by either ignoring the breadth of the claims, construing the claims narrower than as written, or focusing on some narrowed subset of possibilities.

### d. Astellas's Admissions Corroborate Dr. Chambliss's Calculations for the Breadth of the Claims

Fourth, Dr. Little made numerous admissions showing that the Asserted Claims are extremely broad. *See* e.g., PFF ¶ 69 (stating that if Dr. Chambliss had done calculations according to the claim language rather than conservatively, then "you're talking about the number of stars in the sky, it's so many zeros, you couldn't even imagine multiplying it all together); PFF ¶ 70 (with regard to the fact that the specification only contains lists of additives, rather than guidance: "[t]he

alternative to what you're saying is that you would have patents that are thousands, millions of pages long."). *See also* PFF ¶¶ 71-83.   Similarly, named inventors Dr. Kuzuhiro Sako and Mr. Yuuki Takaishi made various admissions supporting defendants' argument that the claims are extremely broad.  *See* PFF ¶¶ 207-212.

*   *   *

In sum, the breadth of claims *Wands* factor "weighs heavily in favor of lack of enablement" due to the "extraordinary breadth" of the Asserted Claims' structural limitations and the fact that the subset of compositions that will meet the functional Dissolution Limitation is "unknown." (Tr. 1070:24 – 1071:8 (Chambliss Direct); PFF ¶ 41); *Idenix* at 1159 (finding "many thousands" of candidate compounds overly vast); *Wyeth* at 1385 (finding "tens of thousands" of candidates overly vast); *Enzo* at 1349 (same).

## B. The Predictability/Unpredictability of the Art, Nature of the Invention, and State of the Prior Art

The unrebutted evidence demonstrates that dissolution rates are unpredictable because they are the result of the interplay of many factors, and thus, must be determined experimentally. Astellas admitted during prosecution that "Dissolution Rates are Unpredictable." (PFF ¶ 85; DDX 9-62). As is discussed in more detail herein, the unpredictability of dissolution rates, and the chemical arts and formulation science generally, means that the *Wands* factors of predictability/unpredictability of the art, nature of the invention, and state of the prior art all weigh in favor of lack of enablement.

Dr. Little did not dispute that various factors affect the dissolution rate of a pharmaceutical composition, nor that dissolution rates must be determined experimentally. Rather, he said that a POSA can "tune" a formulation to a desired dissolution rate. This, however, says nothing about the unpredictability of dissolution rates or whether the experimentation to do such "tuning" across

the full scope of the Asserted Claims is undue.

### 1. Dissolution Rates Are Unpredictable and Must Be Determined Experimentally

As explained in detail by Dr. Chambliss, a hydrogel formulation is a "complex system" due to the "interplay of many variables," which "makes the dissolution rate unpredictable." (PFF ¶ 88). Those variables include: (i) various properties of the active pharmaceutical ingredient ("API") (here, mirabegron), including solubility, form (polymorphs, salts), particle size and concentration; (ii) the type, grade, amount and ratios of the HFP(s) and WSA(s); (iii) other excipients; and (iv) the size and shape of the dosage form. (PFF ¶ 87).

**API.** The dissolution rate of a hydrogel formulation is affected by the API's various properties, including its solubility, particle size, amount, polymorphic form, and salt form.  (Solubility: PFF ¶ 90; DTX-2164.3; DDX 9-40); (particle size: PFF ¶ 96; DTX-2112.82-83; DDX 9-43); (amount: PFF ¶ 97; DTX-2078.1; DDX 9-45) (polymorphic form: (PFF ¶ 91; DTX-2112.13; DDX 9-41); (salt form: PFF ¶¶ 92-93; DTX-2112.11; DDX 9-42)).

Indeed, DTX-2142 (Kasashima 2016) discloses that even when the salt of mirabegron is limited to "sulfate salts"—which is but one of the 23 possibilities listed in the specification[12]—those sulfate salts have substantially different dissolution rates. (*See* PFF ¶¶ 94-95; DTX-2142.4 at Fig. 5 (comparing dissolution profiles of a mirabegron physical mixture, mirabegron octyl sulfate salt, mirabegron laurel sulfate salt, mirabegron myristyl sulfate salt and mirabegron cetyl sulfate salt); DDX 9-44).

**HFP.** The dissolution rate of a pharmaceutical formulation is also a function of various factors related to the HFP, including its type, grade, and amount. (Type: PFF ¶¶ 98-100; DTX-2073.4;

---

[12]  Tr. 1046:1 – 1047:1; JTX-2, '780 Patent at 6:60 – 7:3Cite.

DDX 9-47); (grade: PFF ¶¶ 101-105); (amount: PFF ¶¶ 105-107; DTX-2042.4; DDX 9-50).

Indeed, DTX-2042 (Sako '024) expressly discloses that depending on the proportion of PEO ("PolyOx 303") used, the Sako '024 compositions *both met and did not meet* the Asserted Claims' "at least 75% or more after 7 hours" limitation:

**Sako '024 at Fig. 4**



DTX-2042.4, Sako '024 at Figure 4 (as depicted on DDX 9-50).

**WSA.** The dissolution rate of a pharmaceutical formulation is also a function of various factors related to the WSA, including its type, grade, amount, and ratio. Further, WSAs can *either* increase or decrease the drug dissolution rate. (Type, grade: PFF ¶¶ 109-112; DTX-2042.16-17 (Table 3); DDX 9-52); (amount, ratio: PFF ¶¶ 113-116; DTX-2042.3 (Fig. 2); DDX 9-53); (increase, decrease: PFF ¶ 117; DTX-2077.3; DDX 9-54).

**Other Excipients.** Further, additional excipients can either increase or decrease the drug dissolution rate. (PFF ¶¶ 118-21; DTX-2022.23; DDX 9-57).

**Dosage Form.** In addition, the size and shape of the dosage form itself can impact the drug dissolution rate. For example, DTX-2114.13 (Rekhi 1999 at Fig. 9) shows that simply changing the dosage form shape from capsule to round materially changed the composition's release rate— the Rekhi 1999 capsule shape would meet the "at least 75% or more after 7 hours" limitation, but the round shape would not. (PFF ¶¶ 122-23; DTX-2114.13; DDX 9-59).

**Rekhi 1999 Fig. 9**



Fig. 9. Effect of tooling shape on drug release on run 8: (■) capsule; (▼) round; (●) surface area corrected, round.

DTX-2114.13, Rekhi 1999 Fig. 9 (as depicted on DDX 9-59).

**Kojima 2008 (DTX-2076).** Dr. Chambliss's overarching opinions regarding unpredictability are confirmed by Kojima 2008 (DTX-2076), which one of the '780 Patent inventors (Dr. Sako) contributed to. Kojima 2008 reports that the dissolution rate of a pharmaceutical composition is impacted by the drug's molecular weight and solubility, drug to polymer ratio, tablet shape, and viscosity of the HFP (HPMC). (DTX-2076.1, Kojima 2008 at 556; *see also* PFF ¶ 89; DDX 9-38).

### a. Astellas Admitted During Prosecution that "Dissolution Rates Are Unpredictable"

Consistent with the extensive evidence in the literature that creating a sustained-release formulation of mirabegron was based on the unpredictable interplay of several variables, Astellas admitted during prosecution that "Dissolution Rates are Unpredictable" and that one of ordinary skill in the art would "have no expectation of success of achieving the claimed dissolution rate."

> **B.    Dissolution Rates are Unpredictable**
>
> Further still, Takasu *et al.*, Sako *et al.*, and Michel *et al.* do not teach or suggest a pharmaceutical composition of mirabegron with the claimed dissolution rate. Even assuming *arguendo* that a controlled release formulation of mirabegron could be formulated in the system of Sako *et al.*, one of skill in the art would have no reasonable expectation of successfully achieving the claimed dissolution rate.
>
> Specifically, Applicants respectfully submit that Sako *et al.* and Michel *et al.* do not teach the same formulation as in the present claims simply because they refer to a hydrogel. It is clear that two hydrogel formulations can have substantially different dissolution rates even if they contain the same amounts of the same active ingredient.  There is simply no reason to presume that substituting mirabegron for the active ingredients in the hydrogel formulations taught in Sako *et al.* and Michel *et al.* would have necessarily resulted in a pharmaceutical composition with the claimed dissolution rate.

(DTX-2025.783, '313 App. PH, 1/26/2017 Resp. to Office Action (as depicted on DDX 9-60); *see also* PFF ¶¶ 123-26 (explaining DTX-2025; further noting that because dissolution rates are unpredictable, one must actually test a pharmaceutical composition to ascertain what it is).

Further, Astellas presented data showing that dissolution rates are unpredictable in the Takaishi Declaration (DTX-2025). (*See* DTX-2025; Tr. 1101:2-24 (Chambliss Direct)). In his "Table A," Mr. Takaishi averred that '780 Patent Examples 13 and 15 (which were mirabegron/ PEO/PEG and mirabegron/PEO-D/mannitol compositions, respectively) did not meet the claimed dissolution limitation because they were too fast (releasing 65% of the drug after 1.5 hours). (PFF ¶¶ 127-29; DTX-2025.688, '313 App. PH, 2/10/2016 Declaration of Y. Takaishi). And in Table B, Mr. Takaishi: (i) compared "OCAS-S," "OCAS-M" and "OCAS-F" formulations, which all contained the same grade of PEO and PEG, but in different ratios; and (ii) averred that "OCAS-S" did not meet the claimed dissolution limitation because it was too slow (releasing only 54% of the drug after 7 hours), but that OCAS-F and OCAS-M (which had the same grade of PEO and PEG) did meet the Dissolution Limitation. *See id.* Despite the fact that all of the formulations set forth in the Tables met the Asserted Claims' structural limitations, some met the claimed functional Dissolution Limitation, while some did not. This corroborates that drug dissolution rates are highly unpredictable. (*See* PFF ¶¶ 130-33; DDX 9-62).

20

**b. Dr. Little Did Not Meaningfully Engage on Unpredictability**

In contrast to Dr. Chambliss's detailed presentation of evidence of unpredictability in the art, Dr. Little's testimony was conclusory and lacked any evidentiary support.

Dr. Little opined—without citation or even any specificity—that there are "tools" to get a "better estimate" and "do some predictions in that space." (Tr. 1252:24 – 1253:4 (Little Direct)).[13] He later referred to purported DOE "software" and opined—again without any support—that such purported "software" was available in 2008. (Tr. 1287:25 – 1288:13 (Little Direct)). Further—in addition to citing no prior art literature on the use of such "software"—Dr. Little conceded that the specification discloses no such software, much less the use of it to predict drug dissolution rates for the candidate compositions. (PFF ¶ 134). And when push came to shove, Dr. Little admitted that one needs to perform a dissolution test in order to know a composition's dissolution profile:

> Q. Look at example 11, you see it was tested at, you think P100 means paddle 100 speed, right, that's what you think?
>
> A. Yes.
>
> Q. And it's at 38 percent already at 1.5 hours, correct?
>
> A. It would be measured at 38 percent at 1.5 hours, yes.
>
> Q. So if that formulation was tested at paddle speed 200, what do you think, you think it would bump up above 38, 39 percent, be into the forties?
>
> A. *We don't know.*
>
> Q. You would have to test it, right?
>
> A. So if you performed the test, you would have higher agitation speeds, so if it was going to be a particular value, *you would expect it to be either the same or higher depending upon the formulation*.
>
> Q. My question is, you can't tell just looking at it, just sitting here, if we bump the paddle speed up to 200, whether that would still be in the claims under 39 percent, you can't tell just from looking, we have to run

---

[13] *Compare with PowerOasis*, 522 F.3d. at 1310 (conclusory expert declaration averring what POSA would understand was insufficient to raise a genuine issue of material fact regarding what the specification disclosed to one skilled in the art); *Anascape, Ltd.*, 601 F.3d at 1341 (generalized expert testimony "cannot override the objective content of [the specification].")

the test, right?

A. *Yes, without any other information, you would need to run the test, yes.*

(PFF ¶ 135; Tr. 867:11 – 868:7 (Little Cross) (discussing PTX-67)).

Dr. Little also made several admissions regarding formulation principles that align with Dr. Chambliss's testimony on unpredictability, and thus corroborate Dr. Chambliss's opinion that dissolution rates are unpredictable. Dr. Little admitted: (i) an excipient can change tablet properties, including the dissolution profile (Tr. 885:8-11); (ii) not all PEO-PEG formulations meet the functional dissolution requirement (829:3-25)[14]; (iii) gel strength affects dissolution (884:16 – 885:2); (iv) gel strength is based on the tablet (885:6); (v) different conditions can change gel strength (884:16 – 885:5); and (vi) "tuning" only one variable (PEO grade) changed the dissolution rate (832:1-5) (All Little Direct). (PFF ¶ 136).

The inventors also made various admissions regarding formulation principles and dissolution rates that align with Dr. Chambliss's testimony on unpredictability, and thus corroborate his opinion that dissolution rates are unpredictable. (*See* PFF ¶¶ 214-30 (Sako: dissolution rate is result of interplay of excipients and drug quantity; various factors influence dissolution rates; the drug-to-polymer ratio, HFP type, HFP viscosity and the amount of WSA can influence the dissolution rate; control over dissolution is difficult with certain grades of PEO when mannitol is used as the WSA); *see also id.* (Takaishi: HPMC and HPC release drug more quickly than PEOs, and also released the drug too fast; PEO degradation in certain compositions accelerated dissolution rate; PEO viscosity and amount affect dissolution rate; did not know if one can predict the dissolution rate of the pharmaceutical composition with one HFP versus another)).

\*     \*     \*

---

[14]   *See also* DTX 2638 - Astellas NDA 3.2.P.5.6 Tables P.5.6-2 / P.5.6-3; Astellas saying some PEO-PEG batches are unacceptable; 830:18-831:6 (Little NI Zimmerman Cross)

In conclusion, the evidence shows that dissolution rates are "very unpredictable" because they are the "result of interplay of many factors," and thus "must be determined experimentally." (Tr. 1105:1-5 (Chambliss Direct); PFF ¶ 85). As for the nature of the invention, the prior art, formulation science, and dissolution rates are all complex and unpredictable. (Tr. 1105:5-7 (Chambliss Direct); PFF ¶ 85). And the state of the prior art is shown by Astellas's own admissions during prosecution that dissolution rates are unpredictable, that a POSA would not have a reasonable expectation of success in achieving the claimed Dissolution Limitation, and that not all compositions meeting the structural elements also meet the Dissolution Limitation. (Tr. 1105:7-10 (Chambliss Direct); PFF ¶¶ 85, 124-33). Thus, the *Wands* factors of predictability/unpredictability of the art, nature of the invention, and the state of the prior art each "weigh heavily" in favor of lack of enablement. (Tr. 1104:18-25 (Chambliss Direct); PFF ¶ 85).

### C. AMOUNT OF DIRECTION/GUIDANCE PRESENTED IN THE SPECIFICATION AND THE PRESENCE/ABSENCE OF WORKING EXAMPLES IN THE SPECIFICATION.

The '780 Patent specification contains no guidance to a skilled artisan as to which candidate compositions will meet the Dissolution Limitation; rather, it only contains general background information and laundry lists of ingredient options. There are also no working examples due to the failure to use a paddle rotation speed of 200 rpm in the dissolution testing of Examples 2, 8, and 9. And even assuming *arguendo* that those examples are working examples, they do not enable the vast Asserted Claims because they are extremely narrow, with all three formulations containing the same grades of PEO and PEG in similar ratios, and similar amounts of mirabegron.

Legal authority on this issue leaves little doubt that this type of specification cannot enable the broad asserted claims. *See, e.g.*, *Idenix* at 1161 (claims not enabled where specification did not provide meaningful guidance as to which nucleosides were effective against HCV, and the only working examples provided were exceedingly narrow relative to claim scope); *Baxalta Inc. v.*

23

*Genentech, Inc.*, 579 F. Supp. 3d 595, 614-15 (D. Del. 2022) ("*Baxalta*") (Dyk, J., sitting by designation) (finding lack of enablement where, *inter alia*: "[t]here [was] no guidance or direction as to how to identify antibodies that satisfy the claims' limitations other than by utilizing trial and error" and "[t]his lack of guidance [was] compounded by a limited number of 'working examples'").

### 1.   Lack of Direction/Guidance in the Specification

To enable the full scope of the Asserted Claims, the specification must teach a POSA *how to* determine which of the candidate formulations will also meet the claimed functional Dissolution Limitation—i.e., how to achieve the functional dissolution rate across the full scope of the claims. *See, e.g.*, *ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 941 (Fed. Cir. 2010) (affirming lack of enablement of functional claims where the specification "provide[d] 'no guidance as to *how to* achieve ascending release with non-osmotic oral dosage forms'"); *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1000-01 (Fed. Cir. 2008) (affirming summary judgment that functional claims lacked enablement where the specifications did not "teach *how to* implement the 'intercept logic functioning' of Controller 260C'"); *Baxalta* at 614 (finding lack of enablement where, *inter alia*, "[t]here [was] no guidance or direction as to *how to* identify antibodies that satisfy the claims' limitations other than by utilizing trial and error"); *Amgen Inc. v. Sanofi*, No. 14-131-RGA, 2019 WL 4058927, at *12-13 (D. Del. Aug. 28, 2019), *aff'd*, 987 F.3d 1080 (Fed. Cir. 2021) (granting JMOL that claims were not enabled because "the specifications do not provide guidance on *how to* predict the effect of the sequence on the function of the antibody).

Dr. Chambliss addressed this *Wands* factor head-on, analyzing whether the specification teaches a POSA how to get from the millions of candidate formulations to the genus of compositions that also meet the functional Dissolution Limitation, and concluding that the specification contains only a "laundry list of ingredients and very general information." (PFF

¶ 145; *see also id.* ¶¶ 146-63).

A review of the '780 Patent specification supports Dr. Chambliss's opinions. (*See* PFF ¶¶ 147-48, 155 ("arbitrarily controlled" means trial-and-error); JTX-2, '780 Patent at 7:34-42 (release rate can be "arbitrarily controlled" and the HFP "is not particularly limited"); DDX 9-65). The lists of HFPs are found at JTX-2, '780 Patent at 7:50 – 9:4; 9:21-50.  (*See* PFF ¶¶ 149-50; DDX 9-66). The specification also makes clear that the WSAs can be used in combination, and that the content is again "not particularly limited." (JTX-2, '780 Patent at 10:44-49; PFF ¶ 155; DDX 9-67). The list of exemplary WSAs is found at JTX-0002, '780 Patent at 10:7-34. (*See also* PFF ¶¶ 157-58; DDX 9-67). The specification also gives examples of various additional excipients that may be used. (JTX-2, '780 Patent at 11:4-14; *see also* PFF ¶ 161; DDX 9-68).

Astellas does not seriously contend that the specification contains specific guidance to identify working formulations from the various candidates—indeed, Dr. Little admitted there is no such guidance in the specification. (*See* Tr. 503:1-7 (Little Direct) (stating that column 7 of the '780 Patent contains a "list" of HFPs that can be used); *id*. at 508:15-23 ('780 Patent at 10:16-34 contains a "list" of WSAs). *See also id*. at 848:3-12 (Little Cross) (specification contains no adjustment instructions); *id.* at 850:7-25 (no instruction in specification on how to adjust amounts/ratios of HPC); 854:20 – 855:1 (no instruction on how to adjust amounts/ratios of WSAs); *id.* at 856:5-10 (no knobs to tune, no instructions); PFF ¶ 164).

Instead, Dr. Little testified that a POSA does not need such guidance, and even went so far as to state that a POSA would be "bored out of their mind" reading guidance to support the claims (Tr. 855:20-23), and that they would be "shocked" to see "knobs to tune" in the specification, (Tr. 856:3-4). But as the Federal Circuit has advised, such boring details are precisely the guidance that a POSA would need to determine, without undue experimentation, which combinations of

ingredients (including types grades, amounts, concentrations and ratios) and candidate compositions would meet the functional Dissolution Limitation.

Citing to everything but the specification (including general polymer catalogues), Dr. Little repeatedly fell back on his reliance as to what a POSA would see through "their eyes," improperly attempting to narrow the claims along the way. *See id.* at 844:4-7 (there are known amounts in the field that would limit HFP amount that POSA would use); *id.* at 846:25 – 847:5 (POSA needs no instruction on amounts, concentrations, ratios); *id.* at 849:23 – 850:2 (you have to be operating within what a POSA knows how to make one of these systems); *id.* at 849:8-25 (no need for instruction on amounts, concentrations, ratios for HPC); *id.* at 851:1 – 852:15 (POSA doesn't need examples for each HFP); *id.* at 852:4-15 (no examples in specification for majority of polymers does not change his opinion that a POSA doesn't need it); *id.* at 853:1-23 (POSA looks through a POSA's eyes; doesn't need any limitations in claim for WSA); *id.* at 853:1-8 (POSA would know not to use every grade of WSA); *id.* at 853:10-14 (claim doesn't specify WSA grade, but that does not mean a POSA doesn't know how to use it); *id.* at 853:24 – 854:2 (no amounts, ratios etc. needed because a POSA would see it through their eyes); *id.* at 854:25 – 855:1 (instruction not something a POSA would need or expect to see); *id.* at 854:20 – 855:1 (list does not tell POSA additives, amounts ratios but a POSA does not need that or expect to see that); *id.* at 855:2-23 (POSA looks through their eyes…does not need every grade to be able to operate within the claims); PFF ¶ 165).

Despite these efforts, Astellas cannot backfill the specification with the purported knowledge of a POSA to create an enabling disclosure. Courts have unambiguously rejected such strategies:

> As this court has repeatedly stated, "the rule that a specification need not disclose what is well known in the art is 'merely a rule of supplementation, not a substitute for a basic enabling disclosure.' To satisfy the plain language of § 112, ¶ 1, ALZA was required to provide an adequate

> enabling disclosure in the specification; it cannot simply rely on the knowledge of a person of ordinary skill to serve as a substitute for the missing information in the specification.

*ALZA*, 603 F.3d at 940-41 (citation omitted); *see also Enzo* at 1348 ("As we have said before, a patentee 'cannot simply rely on the knowledge of a person of ordinary skill to serve as a substitute for the missing information in the specification.'"). Indeed, "arguments [] focused almost exclusively on the level of skill in the art[] ignore the essence of the enablement requirement." *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997) (claims invalid for lack of enablement where specification failed to provide "reasonable detail").[15] For that reason alone, Dr. Little's repeated reliance on material admittedly outside the specification, including general catalogues, unnamed software, and post-priority ANDA development work, is improper as a matter of law.

### 2. Absence of Working Examples in the Specification

The '780 Patent specification also lacks working examples. Dr. Little admitted that for an example to be a working example, it needs to meet both the structural and functional limitations, and the dissolution testing must be conducted at 200 rpm. (Tr. 869:18 – 870:4 (Little Cross)). Astellas asserts that Examples 2, 8 and 9 are working examples. However, as Dr. Chambliss testified—and as is borne out by the specification itself—Astellas is incorrect. The evidence shows that the dissolution testing conducted on the formulations of Examples 2, 8 and 9 was conducted at 50 rpm instead of the required 200 rpm. Thus, there are no working examples in the specification. But even assuming *arguendo* that Examples 2, 8 and 9 are working examples, they are insufficient to enable the full scope of the Asserted Claims because they are all tablets

---

[15] And as noted above, allowing Astellas to narrow the claims based on Dr. Little's testimony about what a POSA sees through "their eyes" would be an "impermissible end-run around the requirement to enable the full scope of the claim." *Idenix* at 1159.

comprised of similar amounts of mirabegron, the same grade of PEO and PEG in similar ratios.

### 3.   Examples 2, 8 and 9 Are Not Working Examples

**The "Dissolution Test."** As a threshold matter, the only dissolution testing results disclosed

in the specification are in Table 4 for Examples 2, 8 and 9. *See* JTX-2, '780 Patent at 19:1-8 (Table

4). The "Dissolution test" is described at JTX-2, '780 Patent at 18:53-62, which states, in relevant

part, "the paddle rotation speed was 50 rpm. The results are shown in Table 4." (*Id.*; *see also* PFF

¶ 171; DDX 9-70). No other paddle speed is mentioned in the "Dissolution test" section of the

'780 patent. *See* JTX-2, '780 Patent at 18:53-62.

**The Prosecution History.** The prosecution history confirms that the dissolution testing for

Examples 2, 8 and 9 was conducted at 50 rpm. During the prosecution of the '313 application—

which has the same specification as the '780 Patent—Astellas told the PTO that while 200 rpm

paddle speeds were used in its '602 application, 50 rpm was used in the present specification:

> By contrast, the pharmaceutical composition for modified release of the present
> invention shows a rapid dissolution rate of 90% or more at 4.5 hours, as shown in Table 4 of the
> present specification.
>
>      Additionally, in the dissolution test methods used, the paddle rotation speeds were
> 200 rpm in '602 (see, paragraph [0176]) and 50 rpm in the present specification (see, paragraph
> [0082]), respectively.  Generally, it is technical common knowledge for those skilled in the art
> that the higher the paddle rotation speed is, the more rapid dissolution profile is obtained.  If the
> dissolution test of '602 is carried out at the same paddle rotation speed as that of the present
> specification, the formulations of A-1 to A-5 of '602 (and Examples 4 to 7 and 10 of Sugihara *et
> al.*) would show slower dissolution profiles.

(DTX-2025.251, '313 App. PH, 8/26/2013 Response to Office Action at 13; *see also* PFF ¶¶ 173-

74; DDX 9-71). These statements bind Astellas as a matter of law. *See Microsoft Corp. v. Multi-

Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004) ("Multi-Tech's statement made during

prosecution of the '627 patent is relevant to an understanding of the common disclosure in the

sibling '649 and '532 patents. . . . Multi-Tech's statement to the PTO . . . was a representation of

its own understanding of the inventions disclosed in all three patents.").

Given the harmony between the description of the "Dissolution test" in the specification (JTX-2 at 18:53-62) and Astellas's admission in the prosecution history (DTX-2025.251), the evidence shows that the dissolution testing for Examples 2, 8, and 9 was conducted at 50 rpm, and that therefore, they are not working examples (*see also* PFF ¶ 175; JTX-2, '780 Patent at 5:38-63 ("pharmaceutical composition for modified release" refers to a composition tested "under the above conditions": 50 rpm); DDX 9-72).

**Astellas's Arguments Fail.** Astellas argues that another portion of the specification—i.e., not the "Dissolution test" description—supports that Examples 2, 8 and 9 were tested at 200 rpm. (Tr. 1121:23 – 1123:5; 1313:19 – 1314:12 (Little Direct); 1352:19 – 1353:7 (Little Cross); JTX-2, '780 Patent at 6:21-33). That portion of the specification, however, generally refers to a paddle speed range of "50 to 200 rpm," without any specific reference to dissolution testing described elsewhere in the specification. (PFF ¶¶ 175, 180; JTX-2. 780 Patent at 6:21-33). As Dr. Little conceded, nothing in that section (or anywhere else in the specification) states that Examples 2, 8 and 9 were tested at 200 rpm.

Astellas also argues that PTX-67 shows that Examples 2, 8 and 9 were tested at 200 rpm. (Tr. 1120:19-23 (Chambliss Direct). This argument falls flat for two significant reasons. First, PTX-67 should be excluded from evidence as inadmissible hearsay with no indicia of reliability. It is an undated, unsigned, untitled, and unidentified spreadsheet containing both Japanese and English; there are no indicia of what it is, why it was created, or who created it, much less how it is connected to Examples 2, 8 and 9. *See* PTX-67. Indeed, no sponsoring witness, and certainly not Dr. Little, testified as to its bona fides, much less attempted to lay a proper foundation, or otherwise establish an exception to the hearsay rule. Thus, the Court can and should disregard PTX-67.

Second, even if the Court accepts PTX-0067 into evidence over Defendants' objections[16], PTX-67 is irrelevant because "[i]t is the specification, not the knowledge of one skilled in the art that must supply the novel aspects of an invention in order to constitute enablement. *Genentech, Inc.*, 108 F.3d at 1366. And as Dr. Little conceded, the POSA would not even have had access to PTX-67, and so could glean nothing from it. (*See* Tr. 868:8-11 (Little Cross); 1349:12 – 1350:5 (Little Cross); PFF ¶ 178). At bottom, the mystery spreadsheet at PTX-67 is simply another Astellas attempt to enable the claims with anything but the actual specification.

### 4. Regardless, Examples 2, 8, and 9 Are Too Narrow to Enable the Asserted Claims

Regardless, even assuming *arguendo* that Examples 2, 8 and 9 are working examples, they are far too narrow to be commensurate with the scope and diversity of the Asserted Claims. As set forth in the specification, and as explained by Dr. Chambliss, Examples 2, 8, and 9 are all comprised of similar amounts of mirabegron, a single grade of PEO and a single grade of PEG,[17] with only the ratios of the excipients varied in a narrow range. (*See* PFF ¶ 187 (Examples 2, 8, and 9 are a "very thin slice" of the Asserted Claims, are "nowhere near commensurate" with Asserted Claims  and are not representative of Asserted Claims); JTX-2, '780 Patent at 17:62 – 18:18 (Tables 1 and 2), 14:56-57 (PEG 6000 used in all of the examples); PFF ¶¶ 188-189 (no drug dissolution rate data for any formulations comprising HPMC, HEC, CVP, HPC, CMC-sodium or any water soluble additives other than PEG); JTX-2 at Examples generally; DDX 9-74). Such narrow species provide no guidance on all of the other PEO-PEG candidate compositions, much less candidate compositions using all other claimed polymers and additives.

---

[16] Tr. at 494:18-25.

[17] This means that there are also no examples using combinations of HFPs or WSAs. *See* Tr. at 1124:15 – 1125:3 (Chambliss Direct); PFF ¶ 184.

Further, as Dr. Chambliss testified unrebutted, even when dealing with "narrow" formulations with the same grades of PEO and PEG, not all compositions meeting the structural elements will meet the Dissolution Limitation. (PFF ¶ 186; PFF ¶ 129 (Example 13 is a PEO-PEG formulation; Example 15 is a PEG/D-Mannitol formulation; neither meets dissolution element according to prosecution history); PFF ¶ 201 (Dr. Chambliss discussing DTX 2084 (June 10-12, 2009 Team Meeting Slides, which show that even after the priority date, the inventors were screening HFPs, specifically HPMC, HPC and PEO [which correspond to Claim 5]; the inventors found that HPMC and HPC yielded dissolution rates that were too fast); DTX-2025.688, '313 App. PH, 2/10/2016 Declaration of Y. Takaishi ¶ 7, Table B; DTX-2084.11, EA/A178 CTD M3 Planning Meeting at 11; DTX 2084; DDX 9 – 75-DDX 9-76). Thus, given the unpredictability of drug dissolution rates (which must be established by testing), it is not possible for a POSA to extrapolate from the narrow PEO-PEG species of Examples 2, 8 and 9 to the full scope of the vast claims. (PFF ¶ 189).

*   *   *

In conclusion, the *Wands* factors regarding the amount of direction/guidance presented in the specification and the presence/absence of working examples in the specification, both "weigh heavily" against a finding of enablement. (Tr. 1132:3-18 (Chambliss Direct); PFF ¶ 144).

### D. QUANTITY OF EXPERIMENTATION NECESSARY TO PRACTICE THE FULL SCOPE OF THE CLAIMED INVENTION

The Federal Circuit has made clear that "undue experimentation can include undue experimentation in identifying, from among the many concretely identified compounds that meet the structural requirements, the compounds that satisfy the functional requirement." *McRO, Inc. v. Bandai Namco Games Am. Inc*, 959 F.3d 1091, 1100 n.2 (Fed. Cir. 2020). Here, the quantity of experimentation required to identify which of the millions of candidate compositions (which meet the structural limitations) will yield the required functional Dissolution Limitation is excessive,

and weighs in favor of lack of enablement.

As Dr. Chambliss explained, the structural limitations of the Asserted Claims conservatively cover millions of candidate formulations, and a POSA does not know which of the millions of candidate compositions will meet the dissolution limitation. Rather, a POSA would need to make and test at least thousands of formulations in order to practice the full scope of the claims. (Tr. 1133:8-13 (Chambliss Direct)).

"A specification that requires a POSA to 'engage in an iterative, trial-and-error process to practice the claimed invention' does not provide an enabling disclosure." *Idenix* at 1161 (quoting *ALZA*, 603 F.3d at 941). This is true despite the fact that a POSA knows how to conduct dissolution tests, and that any given dissolution test is routine. Indeed, the Federal Circuit has addressed this specific issue multiple times: "[w]here, as here, 'practicing the full scope of the claims would have required excessive experimentation, even if routine,' the patent is invalid for lack of enablement." *Id.* at 1163 (quoting *Wyeth* at 1384).

### 1. Defendants' ANDA Development Work Does Not Support Enablement— If Anything, It Supports Lack of Enablement

Dr. Little dodged the question of the quantity of experimentation necessary to determine which of the millions of candidate compositions will meet the functional Dissolution Limitation. Instead, continuing the theme of looking everywhere but the specification for support, Dr. Little relies almost exclusively on Defendants' ANDA development work to support enablement. This too fails, both legally and factually—if anything, such evidence supports lack of enablement.

*First*, "[e]nablement is determined as of the effective filing date of the patent's application." *In re '318 Patent Infringement Litig.*, 583 F.3d 1317, 1323 (Fed. Cir. 2009) (claims lacked enablement: "the '318 patent's proposed animal tests of galantamine for treating symptoms of Alzheimer's disease *were not available at the time of the application, and the district court*

*properly held that they could not be used to establish enablement*"). As such, evidence illuminating the state of the art *subsequent* to the priority date is not relevant to enablement or written description. As all of Defendants' ANDA development started well after the 2008 priority date (Tr. 861:10 – 862:17 (Little Cross); 1334:10-18 (Little Cross)), such work says nothing about the state of the art as of 2008. Dr. Little's assertion that Defendants' ANDA development somehow represents the state of the art from several years beforehand—made without any rationale, much less evidentiary support—does not establish otherwise. Indeed, this is particularly true given that Myrbetriq was approved in 2012, and *its label listed the ingredients of Myrbetriq*—as such, Defendants had much more information at their disposal than is provided by the specification. (PFF ¶¶ 195-96; JTX-39.15-16; DDX 9-82).

*Second,* it is the specification, "that must supply the novel aspects of an invention in order to constitute enablement," and Defendants' post-priority work is indisputably outside of the specification. *Genentech, Inc.*, 108 F.3d at 1366 (Fed. Cir. 1997).

*Third*, because Defendants' development work was focused on developing a generic version of Myrbetriq, every Defendant formulation but one used PEO and PEG—and it is undisputed that the Asserted Claims are far broader than Myrbetriq. As such, even if Defendants' ANDA development work was legally relevant (it is not), it says nothing about the quantity of experimentation necessary to practice the full scope of the Asserted Claims.

*Fourth*, Defendants' ANDA work actually supports *lack* of enablement because despite: (i) knowing the ingredients of Myrbetriq; (ii) listing Myrbetriq as the "reference listed drug" in their ANDAs (iii) purportedly using "software-guided development" in some cases; and (iv) Sandoz reverse engineering[18] Myrbetriq; Defendants *still* had to make many formulations to achieve a

---

[18]  To reverse engineer is to "to disassemble and examine or analyze in detail (a product or device)

33

comparable dissolution profile in the dissolution tests required by FDA for purposes of submitting an ANDA, which differ from that specified in the Asserted Claims. *See* PDX-8011. And this is just to make PEO-PEG compositions similar enough in USP I dissolution at 100 rpm or USP II dissolution at 50 rpm to Myrbetriq to permit further bioequivalence study. Juxtaposed against the extraordinary breadth of the claims, Defendants ANDA work confirms the excessive experimentation that would be necessary to practice the full scope of the claims here.

Finally, even if Defendants' post-priority ANDA work was relevant and somehow supportive of satisfying enablement (it is not), this allegation is inconsistent with Astellas's pre-litigation statements to the PTO about the state of the art: "dissolution rates are unpredictable" and a POSA would "have no expectation of success of achieving the claimed dissolution rate." (*See* PFF ¶¶ 124-26).

### E.  Relative Skill in the Art

The remaining factor—the relative skill of those in the art—is neutral. (PFF ¶ 199). Even under the POSA definitions given in this case, which are very similar, the relative skill is outweighed by the breadth of claims, unpredictability, lack of guidance or examples, and quantity of experimentation. (*Id.*; DDX 9-83).

### F.  Extensive Precedent Addressing Similar Functional Claims Compels a Finding of Lack of Enablement Here

---

to discover the concepts involved in manufacture usually in order to produce something similar." Miriam-Webster Online Dictionary at "reverse engineer." (https://www.merriam-webster.com/dictionary/reverse%20engineer). Reverse engineering is a particular type of post-priority work that cannot support enablement. *See Metso Minerals Indus., Inc. v. FLSmidth-Excel LLC*, No. 07-CV-926, 2010 WL 1929781, at *7 (E.D. Wis. May 13, 2010) ("[T]here is no logical connection between how long it would take one of ordinary skill in the art to reverse engineer one of Metso's crushers based on the '681 patent and whether one of ordinary skill in the art can practice the '681 patent without 'undue experimentation.'"); *Chamberlain Grp., Inc. v. Lear Corp.*, 756 F. Supp. 2d 938, 981 (N.D. Ill. 2010) ("Plaintiffs are correct to point out that . . . 'efforts to reverse engineer the [commercial embodiment] are . . . not relevant to the enablement analysis . . . .'").

"[W]here, as here, there are a large number of potential candidates, few working examples disclosed in the patent, and no guidance in the specification as to how to practice the full scope of the invention except to use trial and error to narrow down the potential candidates to those satisfying the claims' functional limitations—the asserted claims are not enabled." *Baxalta* at 615-16 (under heading of "Make-and-Screen Nature of Invention"). Indeed, in case after case—including in situations indistinguishable from this one—the Federal Circuit and other district courts have invalidated similarly broad, functional claims covering unpredictable technologies for lack of enablement.

### 1.  *AstraZeneca* (N.D. W.Va.).

*AstraZeneca*, **2022 WL 16857400.** The facts of *AstraZeneca* are strikingly similar to those here. In *AstraZeneca*, the claims were drawn to pharmaceutical compositions comprising just five excipients (formoterol, budesonide, PVP, PEG, and HFA 227) that were stable. **(*4).** Despite comprising just five excipients, the claims were "extraordinarily" broad, having "tens of thousands, if not millions, of candidate formulations" **(*11-12)** that "must be screened for stability."[19] **(*17).** The Court noted that the claims (like those here) did little to limit the excipients that could be used in the claimed formulations:

> Claim 1 encompasses any stable formulation from the combination of any grade and concentration of PVP, any grade and concentration of PEG, any dose of budesonide, any dose of formoterol, and any salt form of formoterol. The additional structural limitations of the asserted claims do little to narrow claim 1's breadth. While claim 2 identifies concentration ranges of PVP and PEG, it does not limit the grade of these ingredients or any other aspect of the formulation. Similarly, claim 3 merely limits the grade of PVP in the formulation.

---

[19] "Given the number of ways in which the five generic ingredients could vary within a formulation, [Mylan's expert] opined that an 'astronomical' number of candidate formulations would satisfy the structural limitations of the asserted claims and that a POSA would have to individually create and test them all to assess stability." *AstraZeneca* at *10.

**(*11).** The Court also rejected AstraZeneca's "attempts to narrow the breadth of the claims based on how a POSA would actually practice the invention" because *Wands* instructs to consider the scope of the claims as written. **(*12 (citing *Idenix, Enzo,* and *Wyeth*)).**

The Court also found that the claimed formulations were "complex, multi-dimensional systems" that "interact in interrelated and unpredictable ways"—and that thus, a POSA could not predict how the five ingredients would react in a formulation. **(*13).** I.e., stability could not be predicted in advance—it had to be tested. *Cf.* Tr. 1072:6-9, 1101:2-24, 1107:4-8, 1114:8-16 (Chambliss corresponding testimony).

Although the specification disclosed "between [30] and [40] different examples of stable formulations," they "rest[ed] in the same, small corner of the claimed genus." **(*13-14).** Also, the guidance offered by the specification did not significantly reduce the amount of experimentation required to create stable formulations across the full scope of the asserted claims because *inter alia*: (i) "not every combination of the five ingredients will result in a stable formulation, but the patent [was] silent as to which grades of PVP and PEG would yield stable formulations"; (ii) "each grade of PVP and PEG is effectively a different excipient that might behave in very different ways [and] different grades of excipients have completely different properties and 'different interactions with the environment that they're in chemically and physically'"; (iii) "excipients bind to different salt forms in different ways, so a POSA cannot assume that different salts of the same molecule will behave similarly in a formulation"; (iv) "the grade of PVP and PEG used was crucial to the formulation because different grades may interact with other ingredients in different and unexpected ways"; and (v) "ingredients may react quite differently to even adjacent excipient grades" and the interactions "could only be discovered by trial-and-error creation of various candidate formulations." **(*16).** The Court also found that the specification did not address the use

of different formoterol salt forms while still retaining stability. (*Id.*).

The Court also found that substantial trial and error testing was needed to obtain embodiments outside of disclosed examples. (**\*17**).

As the evidence clearly and convincingly demonstrated at trial, the evidence of non-enablement is even stronger here:

| | *AstraZeneca* | **This Case** |
|---|---|---|
| **Structure and Function** | Pharmaceutical composition comprising formoterol, budesonide, PVP, PEG, and HFA 227 that is stable (*4) | Pharmaceutical composition comprising mirabegron, HFP(s), WSA(s) with particular dissolution rate |
| **Structural Claim Scope** | "[T]ens of thousands of candidate formulations that must be screened for stability" (*11-12, *17) | Conservatively, at least millions of candidate formulations that must be tested |
| **Function Predictable / Unpredictable** | Altering concentration/grades impacts stability<br>No magic formula for predicting stability – needs to be tested (*13) | Altering type, amount, grade of ingredients impacts dissolution<br>Dissolution rates unpredictable; needs to be tested |
| **Guidance Presented** | Spec. does not resolve uncertainty re using different excipient grades/concentrations/amounts (*16) | Spec. does not resolve uncertainty re using different excipient grades/concentrations/amounts |
| **Working Exs.** | "[B]etween [30] and [40] different stable formulations"; "rest[ed] in the same, small corner of the claimed genus" (*13-14) | At best, 3 narrow working examples; all comprised of single grades of PEO and PEG in similar amounts and ratios<br>All rest in same corner of claimed genus |
| **Quantity of Experimen-tation** | Substantial trial and error testing to obtain embodiments outside of disclosed examples (*17) | Substantial trial and error testing required<br>Quantity of experimentation very high due to claim scope |

### 2. *Roxane* (Fed. Cir).

***Roxane*, 253 F. App'x 26.** Roxane is noteworthy because it—like this case—concerned formulation claims with a functional element. Here, the claimed formulations must meet the dissolution limitation; there the formulations needed to be "stable." The Federal Circuit affirmed summary judgment that the claims were invalid for lack of enablement. (**27**). The "extremely broad claims" allowed for "*any* surfactant in *any* concentration," and there were "hundreds of possible surfactants." (**28, 30**). Minor changes in the formulation could affect stability, and predictions could not be made in advance—rather, actual experimentation was required to determine if the

formulations were stable. **(29).** And despite the claims allowing for hundreds of possible surfactants, there were only three working examples using one surfactant, which the Court found was not "commensurate with the entire scope of the claims." **(30).** As for the quantity of experimentation, it was high due to the breadth of the claims and the fact that "predictions" could "not be made regarding whether or not particular combinations . . . would form a stable flocculated compound," and thus actual experimentation was required. **(29).** Here, in a similarly unpredictable field of art, the Asserted Claims are broader, with less guidance and working examples in the specification, which requires far greater experimentation.

### 3.   *Idenix* (Fed. Cir.).

*Idenix*, 941 F.3d 1149. In *Idenix*, the Federal Circuit affirmed the District of Delaware's (J. Stark) granting of JMOL for lack of enablement of claims directed to a method of treatment for the hepatitis C virus (HCV) using certain nucleosides. **(1153-54).** The Court found that the claims were broad, stating that "at least many, many thousands" of nucleosides met the structural limitations. **(1162).** In so doing, the Court rejected several of Index's arguments, many of which are identical to those Astellas makes here.

*First*, the Court specifically rejected Idenix's argument, like Astellas's here, that the claims were narrow when the functional requirement was considered, stating that approach was "backwards." *Compare Idenix* at 1161-62, *with* Tr. at 1336:23 – 1337:2-5 (Dr. Little: "The way I look at the claims is that you have a dissolution element and you can get to that dissolution profile using the compositional component of the claims.")

*Second*, the *Idenix* panel rejected Idenix's argument, as Astellas suggests here, that a POSA would focus on a narrow set of candidates, stating that the breadth of claims factor considers claims "as written." **(1162).**

*Third*, contrary to Dr. Little's theories here,[20] the Court rejected Idenix's argument that a "POSA would understand the 'focus' of the claim to be 'the inhibition of the NS5B polymerase'" because it "improperly attempt[ed] to narrow the claim to only those nucleosides that would inhibit the NS5B polymerase," which would be an "impermissible end-run around the requirement to enable the full scope of the claim." **(1158-59)**.

As for the specification, it failed to provide "specific guidance" as to which nucleosides would be effective to treat HCV, and thus provided "only a starting point, a direction for further research." **(1160)**. With regard to examples, "[o]f the 'billions of potential [] nucleosides,' the specification identified only four as being effective. **(1155-56, 1161)**. The Court found that not all nucleosides were effective against HCV, and that one would not know if a compound was effective against HCV until it was tested **(1161)**—just as the evidence here established for the millions of candidate compositions encompassed by the Asserted Claims. The Court also noted—contrary to Astellas' arguments here—that "it would be improper to rely on a POSA's knowledge of NS5B to fill the gaps in the specification."[21] **(1159)**.

### 4. *Wyeth* (Fed. Cir.).

***Wyeth*, 720 F3d 1380.** In *Wyeth*, the Federal Circuit held that claims covering methods of preventing restenosis with compounds having certain functionality requirements (e.g., immunosuppressive effects) were invalid for lack of enablement. **(1385-86)**. The specification described only one compound within the genus exhibiting the claimed functional properties, and taught "assays to screen for those properties." **(1385)**. The Court concluded that—even accepting

---

[20] *See* PFF at ¶¶ 65-68, 165.

[21] *See also id.* at 1060-61 ("[R]eliance on a POSA is insufficient to meet the enablement requirement. A patent owner is 'required to provide an enabling disclosure in the specification; it cannot simply rely on the knowledge of a person of ordinary skill to serve as a substitute for the missing information in the specification'").

that POSAs could "routinely use the assays disclosed in the specification to determine" the claimed effects—there was "no genuine dispute that practicing the full scope of the claims would require more than routine experimentation" because the art was unpredictable, and a POSA would have had to synthesize and then screen each of "at least tens of thousands of candidates" to determine which had the claimed function. **(1385-86).** Here, even if a POSA could routinely use a dissolution test, screening millions of candidate compositions far exceeds routine experimentation.

### 5. *Amgen II* (Fed. Cir.).

**Amgen**, 987 F.3d 1080. In *Amgen II*, the Federal Circuit addressed claims to antibodies defined by their function—binding to a particular target and thus blocking a particular biological interaction. **(1083).** The claims were found invalid because, as here, they were "indisputably broad," the invention was "in an unpredictable field of science with respect to satisfying the full scope of the functional limitations," and the specification provided only a "narrow scope of the working examples" (26 in total). **(1085, 1087-88).** Further, substituting one amino acid in the sequence of a described antibody could affect the antibody's function **(1087)**—just as modifying the identity or concentration of one excipient in the "complex" compositions here could result in material changes to the dissolution rate. In addition, as here, the evidence showed that a POSA would have to engage in trial and error testing, which would take "a substantial amount of time and effort" to reach the full scope of claimed embodiments. **(1088).**

### 6. *Enzo* (Fed. Cir.).

**Enzo**, 928 F.3d 1340. *Enzo* affirmed a summary judgment ruling finding claims invalid for lack of enablement; the claims recited a broad genus of labeled polynucleotides that were both hybridizable and detectable upon hybridization. **(1343, 1349).** The problem, as the *Enzo* panel put it, was that "even if . . . the specification [taught] how to create the broad range of labeled polynucleotides covered by the claims, . . . the specification still fail[ed] to teach one of skill in the

art which combinations will produce a polynucleotide that is hybridizable and detectable upon hybridization, as required by the claim language." **(1346).** The Court explained that—as here—the claims required a particular structure and functionality; the art was unpredictable; the claims were "quite broad," covering any structural combination of polynucleotide, label, linker, number of labels, and label location; and the specification provided "sparse" guidance on "how such variables would or would not impact the functionality of the claimed probes." **(1346-47).** Further, the evidence showed that—again as here—"each labeled polynucleotide would need to be tested to determine whether it is hybridizable and detectable upon hybridization." **(1348).** Notably, the parties disputed how many structural embodiments potentially fell within the scope of the claims, but the Court held that—even crediting the plaintiff's assertion that those embodiments would only number in the tens of thousands—testing those embodiments to practice the full scope of the claims would have required undue experimentation. **(1349).** Here, with a far greater number of candidate compositions, undue experimentation would be required to practice the full scope of the claims.

### 7. *Baxalta* (D. Del.) (Dyk, J., sitting by designation).

**Baxalta, 579 F. Supp. 3d. 595.** In *Baxalta*, the claims-at-issue recited an antibody by its functional characteristics. **(599).** Judge Dyk of the Federal Circuit, sitting by designation, granted summary judgment of invalidity for lack of enablement where the claims covered "millions of candidate antibodies" but the specification only provided eleven working examples, and those examples were all "monospecific murine antibodies or fragments thereof." **(599, 615).** There, as here, the specification did not disclose working examples of the many options recited in the claims. **(615).** The Court also found the unpredictable art was "compounded" by the "lack of guidance as to how to produce antibodies satisfying the full scope of the claims other than by trial-and-error." **(*Id.*).** The Court also found that the relative skill in the art was high, but noted that a POSA "could not predict in advance which antibodies would satisfy the claim limitations." **(*Id.*).** So too, here,

absent working examples in the specification, and with much less guidance on which candidate compositions would achieve the functional dissolution rate, the POSA could practice the full scope of the claims only by substantial trial and error testing, making the experimentation undue. [22]

\*   \*   \*

As detailed above, seven of the eight *Wands* factors weigh decidedly against enablement. Further, courts routinely invalidate narrower functional claims having more guidance and working examples, and requiring less experimentation. This Court too should enter judgment invalidating the Asserted Claims for lack of enablement under 35 U.S.C. § 112, ¶ 1.[23]

## V.   THE ASSERTED CLAIMS ARE SEPARATELY INVALID FOR LACK OF WRITTEN DESCRIPTION

Section 112's written description requirement—which is separate and distinct from the enablement requirement—mandates that the specification "show that the inventor actually invented the invention claimed." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) ("*Ariad*") (claims invalid for lack of written description). This "written-description requirement is satisfied only if the inventor conveys with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention and demonstrates that by disclosure in the specification of the patent." *Biogen Int'l GmbH v. Mylan*

---

[22] *See also MorphySys AG v. Janssen Biotech, Inc.*, 358 F. Supp. 3d 354, 371-375 (D. Del. 2019) (Stark, J.) (granting summary judgment of lack of enablement that "vast" claims directed to antibodies to treat blood cancer lacked an enabling disclosure where the specifications were "largely unhelpful," and although four working examples were disclosed, they did not teach a POSA how to predict the required functionality; thus, a POSA would have to engage in trial and error experimentation, which even if routine, would be undue; favorably comparing the *facts* to those of *Wyeth*, *Enzo*, and *Idenix*).

[23] Astellas makes much of the fact that the '780 patent was issued in the first place. "The Examiner's decision . . . is never binding on a court." *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1555 (Fed. Cir. 1985); *see also Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1341 (Fed. Cir. 2018) ("[w]e . . . affirm the obligation of the district court to reach an independent conclusion" regarding validity).

*Pharms. Inc.*, 18 F.4th 1333, 1341-42 (Fed. Cir. 2021) (cleaned up) (claims invalid for lack of written description).

One "may show possession of the claimed invention by describing it with all of its limitations using "'such descriptive means as *words*, structures, figures, diagrams, *formulas*, etc.'" *Biogen Int'l GmbH*, 18 F.4th at 1342 (quoting *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)).[24] Here, it is clear that the named inventors did not actually invent the broad genus of compositions claimed—and thus, the Asserted Claims are invalid for the separate and discrete reason that they lack written description.

The written description requirement is less "indulgent" than the enablement requirement— thus, even if the Court finds that the Asserted Claims are enabled, they are still invalid for lack of written description. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1334 (Fed. Cir. 2003) ("The enablement requirement is often more indulgent than the written description requirement."). Indeed, the Federal Circuit has made clear that "to satisfy the statutory requirement of a description of the invention, it is not enough for the specification to show how to make and use the invention, *i.e.*, to enable it." *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1377 (Fed. Cir. 2017) ("*Amgen I*").

### A. THE '780 PATENT SPECIFICATION LACKS DISCLOSURE SHOWING THAT THE NAMED INVENTORS POSSESSED THE FULL SCOPE OF THE CLAIMED INVENTION

For many of the same reasons the Asserted Claims are not enabled, the '780 Patent lacks sufficient disclosure showing the inventors possessed the entire genus of compositions meeting

---

[24] The Federal Circuit has explained "possession" in various ways. *See, e.g.*, *Space Sys./Loral, Inc. v. Lockheed Martin Corp.*, 405 F.3d 985, 987 (Fed. Cir. 2005) ("The [specification] shows that the *inventor possessed the technologic information for which exclusivity is claimed*, and discloses the invention to the public."); *Ariad* at 1353 ("[A] patent is not a hunting license. It is not a reward for the search, but compensation for its successful conclusion." (alteration in original)).

both the structural and functional limitations of the claims.

"When a patent claims a genus using functional language to define a desired result"—here, dissolution rates—"the specification must demonstrate that the applicant has made a generic invention that achieves the claimed result and do so by showing that the applicant has invented species sufficient to support a claim to the functionally-defined genus." *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1299 (Fed. Cir. 2014) (claims invalid for lack of written description). *See also Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th at 1330, 1335 (Fed. Cir. 2021) (same).

This requires disclosure of either: (i) a "representative [number of] species to support the entire genus"; or (ii) "structural features common to the members of the claimed genus" such that a POSA can "visualize or recognize the members of the genus." *Id*. (cleaned up). "The written description problem presented by generic claims 'is especially acute with genus claims that use functional language to define the boundaries of a claimed genus,'" as the claims here do with their functional dissolution requirement. *Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*, 323 F. Supp. 3d 566, 618 (D. Del. 2018) (Bryson, J., sitting by designation) (claims invalid for lack of written description), *aff'd sub nom. Person Pharms. LLC v. Alvogen Malta Operations Ltd.*, 945 F.3d 1184 (Fed. Cir. 2019). "[A]nalogizing the genus to a plot of land, if the disclosed species only abide in a corner of the genus, one has not described the genus sufficiently to show that the inventor invented, or had possession of, the genus. He only described a portion of it." *AbbVie*, 759 F.3d at 1300.

The specification here falls woefully short under either test. It discloses neither a representative number of species to support the entire genus, nor structural features common to all members of the claimed genus. Even if there are working examples in the specification (there are none), there

can be no real dispute that the inventors described only a tiny portion of the broad, functionally-defined genus that they claimed. As detailed at trial and *supra*, the Asserted Claims conservatively encompass millions of candidate formulations, which can be comprised of many different combinations of mirabegron forms, HFPs and WSAs, even *before* the various allowed grades, amounts, ratios, and other excipients are accounted for. (*See* Tr. 1146:20 – 1147:3 (Chambliss Direct); DDX 9-94).



DDX 9-94. Indeed, any disclosed species resides at the very corner of the genus, and cannot show possession of the entire genus.

### 1. Three Examples All Comprised of the Same Grade of PEO and PEG Are Not Representative of the Vast Claimed Genus—or Even All of the Claimed PEO-PEG Compositions

The specification can support a claimed genus by describing "a representative number of species falling within the scope of the genus." *AbbVie*, 759 F.3d at 1299. "A 'representative number of species' means that the species which are adequately described are representative of the entire genus. *Thus, when there is substantial variation within the genus, one must describe a sufficient variety of species to reflect the variation within the genus.*" *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1124 (Fed. Cir. 2008) (claims lacked written description); *see also AbbVie*, 759 F.3d at 1300 ("[M]erely drawing a fence around a perceived

genus is not a description of the genus. One needs to show that one has truly invented the genus, *i.e.*, that one *has conceived and described* sufficient representative species *encompassing the breadth of the genus*."). The number of species that must be described varies with the scope of the claimed genus and the state of the art. *AbbVie*, 759 F.3d at 1299-1300.

Here, the claimed genus encompasses millions of diverse candidates and whether any particular candidate will meet the functional dissolution limitation is unpredictable. Given these facts, the specification fails to provide species that are representative of the claimed genus.

**No Working Examples.** As a threshold issue, there are no working examples in the specification because Examples 2, 8 and 9 were tested with the wrong paddle speed.[25] Thus, because they have not been shown to actually work under the claimed conditions, Examples 2, 8 and 9 cannot be representative of the claimed genus. Further, the specification does not disclose any dissolution testing results for Examples 1, 3-7, and 10-17—thus, because not all compositions meeting the structural elements also meet the functional dissolution limitation, it cannot be assumed that Examples 1, 3-7, and 10-17 exhibit the claimed dissolution rate—i.e., actually work. Thus, they cannot be said to be representative of the claimed genus either.

**Too Narrow to Represent Claimed Genus.** But even assuming Examples 2, 8 and 9 are working examples (and thus species), they are all comprised of the same dosage form, grades of PEO and PEG, in similar ratios, with similar amounts of mirabegron. (Tr. 1124:9 – 1125:11, 1147:4-7 (Chambliss Direct). This means that Examples 2, 8 and 9 are extremely narrow, particularly when viewed against the vast number of candidate compositions, which can be comprised of myriad combinations of HFPs and WSAs (and other excipients) and thus have

---

[25]  As also discussed *supra*, Dr. Little cannot attempt to remedy that using PTX-67 (the mystery spread sheet), or any other ex-specification evidence.

substantial variation. "[W]hen there is substantial variation within the genus, one must describe a sufficient variety of species to reflect the variation within the genus." *Lipocine Inc. v. Clarus Therapeutics, Inc.*, 541 F. Supp. 3d 435, 457 (D. Del. 2021) ("*Lipocine*") (Bryson, J., sitting by designation) (claims lacked written description).

As for the claimed HFPs alone, Dr. Chambliss explained that they have a broad and diverse set of properties:

> six different types of hydrogel forming polymer, [which have] different chemistries, and within each type there are many grades. Those types and grades have different physical and chemical properties that would affect the drug dissolution rate. Then it also allows for a combination of those types and grades of hydrogel forming polymers and there is no limit on the amount of the polymers, the concentration of the polymers, no composition, or what's really important, the ratio of that polymer to your active ingredient, or the ratio of that polymer to your water soluble additive. It's totally silent on that.

(Tr. 1056:21-1057:6; *see also* Tr. 1040:6-11 (different grades have different physical and chemical properties)). Dr. Chambliss also explained that for the 22 claimed WSAs, there are "151 grades in [a] single reference book (HPE 2003)," which have a broad and diverse set of properties:

> different physical and chemical properties, for example, you see PEG, [which is] a polymer; you see mannitol, that's a sugar; sugar alcohol; you see lactose, that's a sugar, you see even salt is listed there. You see acids like citric acid, so an extremely broad range of different types of chemical compounds. Then it allows for combinations of those types and grades of water soluble additives, and I think I said before there is no limit on the additives or concentrations or ratio to any other ingredient in the formulation.

(Tr. 1058:2-12). Thus, examples having only PEG and PEO cannot be considered "representative" of the enormous and diverse genus of claimed compositions.

There can be no dispute that every other example in the specification except three use PEO as the HFP, and every example but one uses PEG as the WSA; it cannot be disputed that ~67% of the allowable HFPs and ~91% of WSAs are not represented in the specification at all.

Further, in view of the fact that that the Asserted Claims do not limit the amounts, concentrations and ratios of PEO and PEG, and also allow various grades of PEO and PEG (which have different physical and chemical properties), Examples 2, 8 and 9 are not even representative of all of the PEO-PEG compositions encompassed by the Asserted Claims. Indeed, whether the three PEO-PEG compositions even constitute more than one species is debatable. *See Lipocine* at 452 ("Therefore, for practical purposes, the six formulations for which results are given in Data Examples 48 and 49 actually represent only three different groups of formulations . . . .").

**Unpredictable Art.** The disclosed species' lack of representativeness of the Asserted Claims underscored by the lack of predictability in the art. *See, e.g.,* Tr. 1073:21 – 1074:5 (Chambliss Direct) (a hydrogel formulation is a "complex system" due to the "interplay of many variables," which "makes the dissolution rate unpredictable."). And a "patentee will not be deemed to have invented species sufficient to constitute the genus by virtue of having disclosed a single species when . . . the evidence indicates ordinary artisans could not predict the operability in the invention of any species other than the one disclosed." *In re Curtis*, 354 F.3d 1347, 1358 (Fed. Cir. 2004) (claims not supported by adequate written description).

\*   \*   \*

In view of the wide variety of HFPs and WSAs allowed by the claims—in various amounts, concentrations and ratios; not to mention the allowed other excipients and forms of mirabegron— Examples 2, 8 and 9 do not account for the substantial variation within the claimed genus, particularly given the unpredictability in the art. Rather, they only reside in the very "corner of the genus," which is not enough to show possession. (Tr. 1139:18-20). *See AstraZeneca* at *9, *21 ("between [30] and [40] different stable formulations" were not representative of the "at least tens of thousands of candidate formulations" because they were "comprised of a single formoterol salt, a single formoterol dose, four budesonide doses, a single PVP grade, and a single PEG grade.

48

These disclosed species each lie in the same corner of the genus and are insufficient to support the entire functionally defined genus."); *Idenix* at 1161, 1163-64 (finding lack of written description where four working examples and data were insufficient to show inventors possessed full scope of compounds meeting functional limitation).

### 2. Background Information Does Not Constitute an Adequate Disclosure of Structural Features Characteristic of the Claimed Genus

The "characteristic structural features" test asks whether there is "adequate written description . . . sufficient to distinguish the genus from other materials." *Ariad* at 1350. Here, it is undisputed here that not all compositions meeting the claims' structural elements will also meet the dissolution limitation; thus, the specification must have a disclosure allowing a POSA to distinguish the compositions meeting both the structural elements and the dissolution element from the mere candidate compositions—i.e., the specification must disclose what structural features are characteristic of compositions that yield the claimed dissolution rate, as opposed to the structural features of the candidate compositions generally. The specification does not do so.

The specification primarily provides "laundry lists" of excipients and "background information," neither of which constitutes "a description demonstrating that the inventors were in possession of the claimed inventions." *Lipocine* at 446, 451. This is because such disclosures say nothing about how to achieve the claimed dissolution limitation across the full scope of the claims—and thus, they do not teach a POSA how to "distinguish" the compositions that meet both the structural and dissolution limitations from the mere candidate compositions. Put another way, the specification here "fails to provide sufficient blaze marks to direct a POSA to the specific subset" of compositions exhibiting the required dissolution profile, because it "provides no indication" of what compositions outside of Examples 2, 8, and 9 will have that profile. *Idenix* at 1164. As a result, a POSA "is deprived of any meaningful guidance into what [compositions]

49

beyond [Examples 2, 8, and 9], if any, would provide the same result." *Id.*

Thus, the specification fails the "characteristic structural features" test, and the inventors did not show they were in possession of the full range of compositions encompassed by the Asserted Claims. Instead, they provided "only a research plan" and "le[ft] it to others to explore the unknown contours of the claimed genus," which is not enough. *AbbVie*, 759 F.3d at 1300.

### 3. Dr. Little's Shotgun Approach to Written Description Was Legally Irrelevant and Insufficient

Astellas did not address either of the written description tests head-on, and thus did not (and could not) rebut Defendants' clear and convincing evidence that the Asserted claims are invalid for lack of written description. Instead, as discussed below, Dr. Little took a shotgun approach to written description, making several disparate points that are irrelevant and insufficient to establish possession.

### a. The Food Effect Problem

As with enablement, the breadth of the claims is a primary inquiry in assessing written description. *See Lipocine* at 448 ("To begin with, the formulation and dosage limitations in the asserted claims are broad."). Despite this, Dr. Little's direct examination on invalidity began with a sleight of hand, substituting a discussion about the purported "food effect problem" and solutions to it for a discussion on the breadth of the claims. (Tr. 1312:2-12).

These "food effect" points are legally irrelevant because: (i) as Dr. Little admitted, the '780 Patent claims do not recite or require anything about food effect (Tr. 843:6-12); and (ii) written description requires that the specification "show that the inventor actually invented the *invention claimed*." *Ariad* at 1351. Because the '780 Patent claims nothing about "food effect," any discussion regarding food effect is irrelevant to written description.

**b.** **Inventors Could Have "Had Possession Mentally," the Art Is "Mature," and POSAs Could "Make Compositions"**

Dr. Little then testified—in one answer alone—that the inventors could have "had possession mentally" (Tr. 1315:6-7); "you're talking about systems [POSAs] know" (*id.* 1315:9-10); a POSA "could make the kind of things we're talking about here [and] "variant[s]" (*id.* at l315:10-12); the art is "mature" (*id.* at 1315:13); and so a POSA would not think "I have no idea how to make that work." (*id.* at l315:16-17). These arguments also fail.

**i.** **"Had Possession Mentally"**

"Requiring a written description of the invention limits patent protection to those who actually perform the difficult work of 'invention'—that is, conceive of the complete and final invention with all its claimed limitations—and disclose the fruits of that effort to the public." *Ariad* at 1353. Thus, while an inventor need not actually make every single composition (or other item) covered by patent claims, the specification must show that the inventor possessed the technologic information for which exclusivity is claimed. As discussed above, the specification contains only laundry lists of potential excipients, general background information, and (at best) three examples of PEO-PEG compositions meeting the claimed dissolution rate. In addition, Astellas's internal documents corroborate that the inventors only possessed PEO-PEG compositions. (*See infra* Section V(A)(4)). As such, there is no evidence that the inventors "had possession mentally" of the full scope of the claims, and Dr. Little's speculation should be given no weight.

**ii.** **Art is Mature and These Are Systems a POSA Knows**

As noted above, Dr. Little also stated that "you're talking about systems [POSAs] know," and that the art is "mature." (Tr. 1315:10; *id.* at 13). Dr. Little also later referred to a POSA's ability to "import knowledge." (Tr. 1316:8-13). Giving this confusing testimony the benefit of the doubt, it appears that Dr. Little was saying that the specification is adequate given the maturity of the art

and the POSA's background knowledge. This argument fails because the written description test "*requires an objective inquiry into the four corners of the specification*" to ascertain whether the inventors had possession of the invention as broadly as claimed. *Ariad* at 1351. And while the specification is viewed from the perspective of a POSA, "the hallmark of written description is disclosure." *Id.*

Thus, it is acceptable for details to be omitted if they are known in the art, but the specification must "adequately support the breadth of" the Asserted Claims. *See Lipocine* at 461 (finding claims invalid for lack of written description despite plaintiff's assertions that specification was adequate because the art was a predictable and mature field: "*[I]t is not enough to point out that the field was mature and that persons of skill in the art could determine, with appropriate experimentation, which embodiments would satisfy the claim limitations and which would not*.").[26] *Lockwood*, 107 F.3d at 1571-72 (regarding written description: "[w]hile the meaning of terms, phrases, or diagrams in a disclosure is to be explained or interpreted from the vantage point of one skilled in the art, all the limitations must appear in the specification.");For the same reason, the fact that some aspects of formulation are routine and that routine details are preferably omitted from a specification cannot carry the day for Astellas.

Likewise, Astellas argument that the specification is adequate because the claims' components were old, well-known, and commercially available, also fails. The Supreme Court declared long ago that even "[w]here the ingredients are all old [and] the invention in such a case consists entirely in the combination," the "requirement . . . that the invention shall be fully and exactly described

---

[26] Notably, Judge Bryson also pointed out that "Lipocine's contention that the science of oral TU formulations was well understood [and] the field of oral TU formulation development was predictable, is in tension with arguments Lipocine made during . . . prosecution." *Lipocine* at 466 (citation omitted); *cf.* DTX 2025 (Astellas telling PTO: "Dissolution rates are unpredictable").

applies with as much force to such an invention as to any other class." *Gill v. Wells*, 89 U.S. 1, 25 (1874). The Federal Circuit has reaffirmed that "[t]he test for written description is the same whether the claim is to a novel compound or a novel combination of known elements," and "whether [a] claim element is essential or auxiliary." *Boston Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1365 (Fed. Cir. 2011).

### iii.   POSA Could Make Some Claimed Compositions and Would Not Think I Have No Idea How to Make that Work

Dr. Little also testified that a POSA "could make the kind of things we're talking about here [as well as] variant[s]," and a POSA would not think "I have no idea how to make that work." (Tr. 1315:13-17). Dr. Little also later referred to a POSA's ability to "tun[e] viscosity to meet the dissolution profile." (Tr. 1316:8-13). These arguments fail because they concern enablement, not written description. *See Amgen I* at 1377 ("[T]o satisfy the statutory requirement of a description of the invention, it is not enough for the specification to show how to make and use the invention, *i.e.*, to enable it."); *Ariad* at 1356 ("invitation for further research" did not constitute disclosure).

### iv.   "[A]djusting the Release Period by Controlling the Viscosity of the Polymer" Is Not a Structural Feature Characteristic of the Claimed Genus

As for identifying structural features common to the claimed subset of compositions meeting the claimed dissolution rate—i.e., what the "characteristic structural features" test actually requires—Dr. Little did not point to any structural element disclosed in the specification that makes compositions either inside or outside the scope of the subset that will exhibit the claimed dissolution rate. Rather, he said "it's the adjusting the release period by controlling the viscosity of the polymer." (Tr. 1316:1-7 (Little Direct – Validity (discussing JTX-0002 at 7:34-38 ("…the release period of time can be arbitrarily controlled by adjusting the viscosity of the polymer…").

This argument fails because the action of *arbitrarily control[ing]* the release period by

adjusting the viscosity" is not a structural feature, much less one that allows a POSA to "distinguish the genus from other materials." *Ariad* at 1350. Indeed, Dr. Chambliss testified "arbitrarily control[ing]" means "trial and error." PFF ¶¶ 147-48, 155. That is, the specification's mention of controlling the viscosity says nothing about *which* of the candidate compositions will meet the claimed dissolution rate. *See Idenix* at 1164 (claims invalid for lack of written description where trial and error screening was needed to practice the claimed invention because the specification provided: (i) no indication that any nucleosides outside of those disclosed in [the 18 examples] could be effective to treat HCV—*much less any indication as to which of those undisclosed nucleosides would be effective*"; and (ii) "lists or examples of supposedly effective nucleosides, *but [did] not explain what makes them effective, or why*," so "a POSA is *deprived of any meaningful guidance into what compounds beyond the examples and formulas, if any, would provide the same result*."); *Boston Sci.*, 647 F.3d at 1366 (claims to drug-eluting stents, where drug was rapamycin or a macrocyclic triene analog thereof, were lacked written description where "the claims cover[ed] tens of thousands of possible [] analogs" but there was "*no guidance at all in the specification as to how to properly identify or choose the claimed analogs*" and "*no indication of which structural features of rapamycin analogs were necessary to achieve these results*").

\*   \*   \*

In sum, the specification discloses no structural features common to the claimed subset of compositions meeting the claimed dissolution rate, and Dr. Little's various arguments all fail.

### 4. Astellas's Internal Documents Show that the Inventors Claimed much more than They Actually Invented

As discussed above, the specification does not disclose working examples for the majority of the hydrogel forming polymers identified in the claims and specification. (Tr. 851:13 – 852:15 (Little Cross); PFF ¶ 164). Nor could it, as the specification's inadequacies stem from the fact that

the inventors did not actually make compositions as broadly as claimed—logically, the inventors "could not have described a knowledge that they did not possess." *Boston Sci. Corp. v. Johnson & Johnson Inc.*, 679 F. Supp. 2d 539, 555 (D. Del. 2010), *aff'd*, 647 F.3d 1353 (Fed. Cir. 2011).

The inventors screened three types of polymers: HPMC, HPC and PEO, which are the three polymers recited in Claim 5, which has the narrowest polymer limitations. (PFF ¶ 203). They found that HPMC and HPC did not work because the different grades of HPMC released the drug too fast (because the gel matrix was too soft), and the different grades of HPC yielded too-fast, viscosity-independent release.[27] (*See* PFF ¶¶ 201-02; DTX-2084.11; DDX 9-96, 9-97).

The remaining three HFPs allowed by the other Asserted Claims—CVP, HEC and CMC-sodium—are not mentioned in DTX-2084, and there is no evidence suggesting the inventors made and tested compositions using any of them.

Also, the testimony of the inventors confirms that their work was specifically focused on PEO; they testified that they had no recollection of ever working on various aspects of the Asserted Claims, including: the basis for the claimed molecular weight range of 100,000 to 8 million; why the different types of HFPs recited in the claims were selected; making formulations with the HFPs CMC, HEC, or CVP; and evaluating how replacing PEO with a different HFP would change the gel characteristics of a tablet. (*See* PFF ¶¶ 206-207).

### 5. Extensive Precedent Addressing Similar Functional Claims Compels a Finding of Lack of Written Description Here

As shown *supra*, courts routinely invalidate broad, functional claims covering unpredictable technologies, like those here, for lack of written description. *See Ariad*, 598 F.3d 1336; *Biogen*, 18

---

[27] This fact also cuts against Dr. Little's assertion that the specification's mention of adjusting the release rate by adjusting the viscosity of the polymer constitutes disclosure of a structure-function relationship.

F.4th 1333; *AbbVie*, 759 F.3d 1285; *Pernix*, 323 F. Supp. 3d 566; *Carnegie Mellon*, 541 F.3d 1115; *AstraZeneca*, 2022 WL 16857400; *Boston Sci.*, 647 F.3d 1353.

*Lipocine*, 541 F. Supp. 3d. 435, is particularly instructive here; in *Lipocine*, the Federal Circuit's Judge Bryson (sitting by designation) held that method claims with the functional element "that the method result in a [certain serum testosterone level]" were invalid for lack of written description for reasons corresponding to those here. **(439-40).**

*First*, while the specification presented "a laundry list of Composition Examples [for use in the method], only a small number of [them] were shown to satisfy the [functional] PK limitations of any of the asserted claims." **(463).** *Second*, Lipocine did not show that the Composition Examples exhibiting the claimed functionality were representative. (**463-64** ("[T]he few operative species of the invention [] do not show [] the inventors [] truly invented the genus as opposed to a research plan, leaving it to others to explore the unknown contours of the claimed genus." (cleaned up)). *Third*, the specification's "long list of [potential] excipients" failed "to demonstrate or even contribute to demonstrating that the inventors invented what they have claimed" because it lacked "the critical step of showing which of those excipients, in combination with other components of the . . . formulations, will satisfy" the functional PK element and thus "merely provid[ed] a starting point for a research program" to "determine which would work and which would not." **(463).**

Judge Bryson also rejected many Lipocine arguments corresponding to Astellas's here. (*See supra* p. 52 (discussing Judge Bryson's rejection of arguments that the field was predictable and mature; that POSAs could determine with experimentation which embodiments would satisfy the claim limitations; and POSAs would use their knowledge (including of prior art) to estimate the functionality of non-disclosed compositions)). Further, Judge Bryson also rejected Lipocine's arguments drawn to factorial design experiments, which were similar to Dr. Little's assertions

here. (*See* Tr. 1263:24 –1265:3, 1265:17 – 1266:20, 1295:13-24 (Little Direct)). Lipocine's expert stated:

> [A] skilled artisan could use the prior art to "prioritize" excipients [and] run "factorial design experiments" to "expose information about the most important features of the formulation," and then do "further development, including correlation to existing clinical results and/or additional clinical testing."

**(466-67).** Judge Bryson rejected this because "that is work the inventors should have done and should have included in the specification to demonstrate their possession of the claimed inventions." **(467).** Judge Bryson concluded:

> Lipocine's heavy reliance on the background and literature in the field is at odds with the requirement that, for the purposes of written description, the specification itself must demonstrate that the inventor has invented the full scope of the invention. It is not enough that a skilled artisan could use the specification, together with literature in the field, to discover what compositions could be used with the claimed methods to achieve the recited PK results.
> . . . .
> The underlying problem with the claims that require different combinations of excipients is that there is no basis from which to conclude that the functional limitations of any of those claims will be satisfied, except with respect to the few specific formulations that were the subjects of the clinical tests and simulations reported in the Data Examples.

**(465, 467).**

Just as Judge Bryson rejected Lipocine's arguments regarding a POSA's knowledge, the "mature" art, and the POSA's ability to make embodiments covered by the claims, so too should this Court reject Astellas's analogous arguments here. And as in *Lipocine*, the complete lack of representative species and disclosed structural features characteristic of the claimed genus here compel a finding that the Asserted Claims are invalid for lack of written description.[28]

---

[28]  *See also AstraZeneca* at *21 (claims invalid for lack of written description where they: (i) "cover[ed] . . . at least tens of thousands of candidate formulations, but the specification's examples only stud[ied] formulations comprised of a single formoterol salt, a single formoterol dose, four

*   *   *

In sum, the '780 Patent specification does not come close to showing possession of the entire subgenus of candidate compositions meeting the functional dissolution element. Thus, the Court should enter judgment invalidating the Asserted Claims for lack of written description.

## VI.     THE ASSERTED CLAIMS ARE INVALID FOR INDEFINITENESS

Rather than narrowly claiming particular dosage forms with specific ingredients in set amounts and ratios, Astellas chose to claim its compositions as having a particular functional dissolution profile. While there is nothing inherently wrong with functional claim limitations—and putting aside that they pose "high hurdles" for enablement and "acute" problems for written description— a patentee cannot blur claim boundaries by claiming a function in a way that lacks objective meaning. Here, the claims lack a temporal limitation—i.e., they do not specify when the required dissolution testing should be performed, relative to when the composition is created—which renders the Asserted Claims indefinite. This is shown by Astellas's assertion that compositions not exhibiting the required dissolution profile when tested still infringe the claims.

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.,* 572 U.S. 898, 901 (2014). The definiteness requirement balances "the inherent limitations of language" with the need "to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open to them." *Id.* at 909 (cleaned up). "Otherwise there would be a zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims." *Id.* at 909-10

---

budesonide doses, a single PVP grade, and a single PEG grade," so the "disclosed species each [lay] in the same corner of the genus and [were] insufficient to support the entire functionally defined genus"; and (ii) "contain[ed] common structural limitations but there [was] no correlation between such limitations and the functional stability requirement").

(cleaned up). The definiteness requirement serves as an important check on a patent applicant's "powerful incentives to inject ambiguity into their claims." *Id.* at 910.

There is no dispute that the Asserted Claims lack a temporal limitation reciting when the required dissolution testing should be performed, relative to when the composition is created.

There is also no dispute that PEO is susceptible to degradation, which may lead to material changes in the drug dissolution profile of a formulation over time, nor that this fact was known by the priority date. (PFF ¶ 239).

As Dr. Chambliss described, the lack of a temporal limitation means that a formulation could infringe at one point in time and not infringe at another, using the same dissolution test. (*See* PFF ¶ 242). For example, as shown in the specification's Table 4, Example 8's PEO-PEG tablets released 39% of the drug at the 1.5 hour time point when they were tested;[29] as this is at the top of the claimed range, those same tablets could theoretically release 40% of the drug after 1.5 hours if the testing was done after a period of time had elapsed, due to degradation of the PEO. (*See* PFF ¶ 242; JTX-2, '780 Patent at 19:1-8 (Table 4)). A POSA would not know when to run the dissolution test to determine if a formulation was inside or outside the scope of the Asserted Claims because there is no guidance in the specification or prosecution history of the '780 Patent. (*See* PFF ¶ 244). That is textbook indefiniteness.

Dr. Little's convoluted infringement theories, which allege infringement despite non-infringing dissolution test results, confirm as much. (*See* Tr. 582:18 – 583:2 (Little Direct); Tr. at 875:15 – 876:6 (Little Cross); PFF ¶ 243). And further contributing to the uncertainty regarding claim boundaries is the fact that Dr. Little's infringement theory relies on Dr. Thisted's model, which is only applicable to dissolution testing conducted within sixty days of manufacture. *See* Tr.

---

[29] The timing of the testing is not disclosed.

at 416:24 – 418:3 (Thisted Cross); Tr. at 788:17-20 (Little Cross). In sum, Astellas's infringement assertion, despite non-infringing dissolution testing results, shows that there is a "zone of uncertainty" preventing "clear notice of what is claimed." *Nautilus*, 572 U.S. at 909-10.[30]

Dr. Little attempted to create an illusion of certainty by testifying that the dissolution testing should occur "when you're going to make it and sell it." (*See* Tr. at 1324:18-19 (Little Direct)). However, Dr. Little admitted there is no shelf-life limitation in the claims. (PFF ¶ 241). As such, Dr. Little's "make it and sell it" approach is nothing more than a subjective standard that is incompatible with "reasonable certainty" about the scope of the invention. *See Inguran, LLC v. ABS Glob., Inc.*, No. 17-cv-446-wmc, 2019 WL 943515, at *8 (W.D. Wis. Feb. 26, 2019) (finding claims indefinite and rejecting plaintiff's proposed construction because "a you'll know it when you see it approach . . . is incompatible with the requirement that a patent claim informs with reasonable certainty those skilled in the art about the scope of the invention." (cleaned up)). In sum, the Asserted Claims do not provide the POSA with reasonable certainty of whether a composition falls inside or outside the claims.

The Court thus should enter judgment invalidating the Asserted Claims for indefiniteness.

\*   \*   \*

For at least the above reasons, the Court should find that the Asserted Claims are invalid for lack of enablement, lack of written description, and indefiniteness.

---

[30] Similarly, the lack of a temporal limitation in the asserted claims also means that they could be asserted against a non-infringing PEO-PEG tablet exhibiting too slow of a dissolution rate under the theory that the PEO will degrade and those tablets will infringe at a future point in time.

PHILLIPS, MCLAUGHLIN & HALL, P.A.

*/s/ Megan C. Haney*

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
Megan C. Haney (#5016)
1200 N. Broom St
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com
mch@pmhdelaw.com

*Attorneys for Lupin Ltd. and*
*Lupin Pharmaceuticals, Inc.*

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/   Pilar G. Kraman*

Pilar G. Kraman (#5199)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com

*Attorneys for Zydus Pharmaceuticals (USA)*
*Inc. and Zydus Lifesciences Limited*

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

*/s/ Dominick T. Gattuso*

Dominick T. Gattuso (#3630)
Elizabeth A. DeFelice (#5474)
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law
edefelice@hegh.law

*Attorneys for Defendant Sandoz Inc. and Lek*
*Pharmaceuticals d.d.*