**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ASTELLAS PHARMA INC., *et al.*,  ) | |
| ) | |
| ) | C.A. No. 20-1589 (JFB) (CJB) |
| Plaintiffs,  ) | CONSOLIDATED |
| ) | |
| v.  ) | |
| ) | |
| SANDOZ INC., *et al.*,  ) | |
| ) | |
| Defendants.  ) | |
| ) | |
| ) | |
| ) | |

**ASTELLAS' REBUTTAL POST-TRIAL BRIEF**

*Of counsel:*

MCDERMOTT WILL & EMERY

Simon D. Roberts
Jason A. Leonard
Nitya Anand
Vincent Li
Jayita Guhaniyogi
One Vanderbilt Avenue
New York, NY 10017-3852
(212) 547-5700

Stephen M. Hash
Alexander T. Piala
Kyle Sorenson
303 Colorado Street, Suite 2200
Austin, TX 78701
(512) 726-2600

Meng Xu
18565 Jamboree Road, Suite 250
Irvine, CA 92612-2565
(949) 851-0633

Connor Romm
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
(617) 535-4000

Rodney Swartz
650 Live Oak Avenue, Suite 300
Menlo Park, CA 94025-4885
(650) 815-7400

MCCARTER & ENGLISH, LLP
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
405 N. King St., 8th Floor
Wilmington, DE 19801
(302) 984-6331
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiffs Astellas Pharma Inc.,*
*Astellas Ireland Co., Ltd., and Astellas Pharma*
*Global Development, Inc.*

# TABLE OF CONTENTS

I. Introduction ................................................................................................ 1

II. Evidence Adduced at Trial ......................................................................... 3

    A. Prof. Little's testimony supports enablement ..................................... 3

        1. The '780 Patent's invention is the use of well-known systems with mirabegron to overcome the food effect problem ............................ 4

        2. The POSA is familiar with sustained release hydrogel forming polymer systems and the excipients used in those systems, and the '780 Patent specification reminds POSAs of that knowledge ................................ 6

        3. The POSA uses targeted dissolution development to arrive at the desired dissolution profile ........................................ 9

        4. The Defendants all used TDD to develop their ANDA products ........................................................................ 11

    B. Prof. Little's testimony supports written description ........................... 12

    C. Prof. Little's testimony supports definiteness ..................................... 15

    D. The prosecution history is consistent with Prof. Little's testimony and confirms the validity of the Asserted Claims ................................ 15

    E. Dr. Chambliss's testimony supports the validity of the Asserted Claims ................................................................................................. 17

III. Argument ................................................................................................... 18

    A. Defendants bear a heavy burden of proof ........................................... 18

    B. Applicable legal standards .................................................................. 19

        1. Enablement standard ................................................................ 19

        2. Written description standard .................................................... 21

        3. Definiteness standard ............................................................... 24

    C. The Asserted Claims are enabled in a well-known and predictable art ..................................................................................................... 24

        1. The threshold enablement analysis .......................................... 26

i

2.      The level of predictability in the art supports enablement
(Factor 5).................................................................................................. 27

3.      The breadth of the claims (Factor 1)............................................. 34

4.      The nature of the invention and state of the prior art
(Factors 2 and 3) ...................................................................................... 41

5.      The level of one of ordinary skill (Factor 4).............................. 42

6.      The amount of direction provided by the inventor and the
existence of working examples (Factors 6 and 7).................................. 42

7.      The quantity of experimentation needed to make or use the
invention based on the content of the disclosure (Factor 8) ................. 44

D.      The '780 Patent's specification demonstrates the inventors'
possession of the Asserted Claims........................................................................ 45

1.      The specification describes a correlation between the
structural components of the Asserted Claims and the functional
Dissolution Limitation ............................................................................ 47

2.      The specification discloses example formulations
representative of the claimed dissolution rate...................................... 50

3.      Defendants' arguments find no support in Astellas' data....................... 55

4.      Precedent does not "compel" defendants' desired result......................... 56

E.      The Asserted Claims are definite without a temporal requirement .................... 59

IV.    Conclusion .......................................................................................................... 60

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*,
  759 F.3d 1285 (Fed. Cir. 2014)...................................................................23, 50, 54, 58

*Ajinomoto Co. v. Int'l Trade Comm'n*,
  932 F.3d 1342 (Fed. Cir. 2019)...................................................................23, 48, 54, 56

*Alcon Research Ltd. v. Barr Labs., Inc.*,
  745 F.3d 1180 (Fed. Cir. 2014)............................................................................. *passim*

*Allergan, Inc. v. Sandoz Inc.*,
  796 F.3d 1293 (Fed. Cir. 2015)..............................................................................20

*In re Alonso*,
  545 F.3d 1015 (Fed. Cir. 2007)..............................................................................47

*Amgen Inc. v. Sanofi, Aventisub LLC*,
  987 F.3d 1080 (Fed. Cir. 2021)..............................................................................32, 34

*Amgen v. Hoechst Marion Roussel*,
  314 F.3d 1313 (Fed. Cir. 2003)..............................................................................21, 29

*Amgen v. Sanofi*,
  872 F.3d. 1367 (Fed. Cir. 2017)..............................................................................21

*Amgen, Inc. v. Chugai Pharm. Co., Ltd.*,
  927 F.2d 1200 (Fed. Cir. 1991)..............................................................................20

*Amgen, Inc. v. Sanofi*,
  No. 21-757 (U.S. 2023)..............................................................................33

*Ariad Pharms. v. Eli Lilly*,
  598 F.3d 1336 (Fed. Cir. 2010)............................................................................. *passim*

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
  222 F. Supp. 2d 423 (S.D.N.Y. Oct. 16, 2002)..............................................................60

*AstraZeneca AB v. Mylan Pharms.*,
  1:18-cv-193, 2022 WL 16857400 (N.D. W.Va. November 9, 2022)..........................33, 39, 58

*AstraZeneca AB v. Mylan Pharms. Inc*,
  No. 18-cv-193, D.I. 625 (N.D. W.Va. Mar. 8, 2023) (attached as Ex. A)..............................33

*Atlas Powder Co. v. E.I. Du Pont de Nemours & Co.*,
 588 F. Supp. 1455 (N.D. Tex. 1983) ......................................................20

*BASF Plant Sci., LP v. Commonwealth Sci. and Indus. Res. Org.*,
 28 F.4th 1247 (Fed. Cir. 2022) ..............................................................52

*Baxalta Inc. v. Genentech, Inc.*,
 579 F. Supp. 3d 595 (D. Del. Jan. 13, 2022) .........................................33

*Bilstad v. Wakalopulos*,
 386 F.3d 1116 (Fed. Cir. 2004).............................................................23

*Boston Sci. Corp. v. Johnson & Johnson*,
 647 F.3d 1353 (Fed. Cir. 2011).......................................................56, 58

*Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*,
 134 F.3d 1085 (Fed. Cir. 1998).............................................................19

*Carnegie Mellon v. Hoffman-La Roche, Inc.*,
 541 F.3d 1115 (Fed. Cir. 2008).............................................................58

*Cephalon, Inc. v. Watson Pharms., Inc.*,
 707 F.3d 1330 (Fed. Cir. 2013).......................................................29, 29

*Colorado v. New Mexico*,
 467 U.S. 310 (1984)..............................................................................19

*Confluent Surgical, Inc. v. HyperBranch Med. Tech., Inc.*,
 No. CV 17-688-LPS-CJB, 2019 WL 2897701 (D. Del. July 5, 2019) ..................59

*In re Curtis*,
 354 F.3d 1347 (Fed. Cir. 2004).............................................................58

*Enzo Biochem, Inc. v. Gen-Probe, Inc.*,
 323 F.3d 956 (Fed. Cir. 2002)...............................................................23

*Enzo Life Scis. Inc. v. Roche Molecular Sys. Inc.*,
 928 F.3d 1340 (Fed. Cir. 2019).......................................................33, 38

*Erfindergemeinschaft UroPep GbR v. Eli Lilly and Co.*,
 276 F. Supp. 3d 629 (E.D. Tex. Aug. 25, 2017)..........................23, 40, 57

*First Quality Tissue, LLC v. Irving Consumer Prods. Ltd.*,
 No. 19-cv-428, 2022 WL 958089 (D. Del. Mar. 30, 2022)...................55

*Fore Electrical Mfg. Co. v. St. Louis Electrical Works*,
 280 F. 49 (8th Cir. 1922) ......................................................................19

*Free Speech Coalition, Inc, v. Attorney General of the United States*,
   974 F.3d 408 (3d Cir. 2020)........................................................................33

*H. Lundbeck A/S v. Apotex Inc.*,
   No. 18-cv-88, 2019 WL 3206016 (D. Del. July 16, 2019) ......................................60

*Idenix Pharms. LLC v. Gilead Scis. Inc.*,
   941 F.3d 1149 (Fed. Cir. 2019)..............................................................35, 38

*Inline Connection Corp. v. AOL Time Warner Inc.*,
   472 F. Supp. 2d 604 (D. Del. 2007).............................................................35

*Invitrogen Corp v. Clontech Labs., Inc.*,
   429 F.3d 1052 (Fed. Cir. 2005)................................................................20

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
   10 F.4th 1330 (Fed. Cir. 2021) ...............................................................22

*In re Kalm*,
   378 F.2d 959 (C.C.P.A. 1967) ...............................................................22

*Liebel-Flarscheim Co. v. Medrad, Inc.*,
   481 F.3d 1371 (Fed. Cir. 2007).................................................................37

*Lipocine Inc. v. Clarus Therapeutics, Inc.*,
   541 F. Supp. 3d 435 (D. Del. June 1, 2021) ...........................................57, 58

*Lipton v. Mountain Creek Resort, Inc.*,
   No. 13-cv-4866, 2019 WL 4597205 (D.N.J. Sept. 23, 2019)................................35

*Lockwood v. Am. Airlines, Inc.*,
   107 F.3d 1565 (Fed. Cir. 1997).................................................................57

*McGinley v. Luv N' Care Ltd.*,
   819 F. App'x 913 (Fed. Cir. 2020) ...........................................................22

*In re Memorial Hospital of Iowa County, Inc.*,
   862 F.2d 1299 (7th Cir. 1988) ...............................................................33

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*,
   370 F.3d 1354 (Fed. Cir. 2004).................................................................19

*Microsoft Corp. v. i4i Ltd.*,
   564 U.S. 91 (2011)..........................................................................18, 19

*Monsanto Co. v. Scruggs*,
   459 F.3d 1328 (Fed. Cir. 2006).................................................................21

*Nalpropion Pharms., Inc. v. Actavis Lab'ys FL, Inc.*,
   934 F.3d 1344 (Fed. Cir. 2019)...................................................................22

*Nautilus, Inc. v. BioSig Instruments, Inc.*,
   572 U.S. 898 (2014)..............................................................................24, 59, 60

*Pernix Ireland Pain DAC v. Alvogen*,
   323 F. Supp. 3d 566 (D. Del Aug. 24, 2018) .........................................58

*Pharm. Res., Inc. v. Roxane Labs., Inc.*,
   253 Fed. Appx. 26 (Fed. Cir. 2007) ................................................33, 39

*Regents of Univ. of California v. Dako N. Am., Inc.*,
   No. C 05-03955 MHP, 2009 WL 1083446 (N.D. Cal. Apr. 22, 2009)...................51

*S3 Inc. v. NVIDIA Corp.*,
   259 F.3d 1364 (Fed. Cir. 2001) ...................................................................19

*Smith v. Snow*,
   294 U.S. 1 (1935).........................................................................................22

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*,
   665 F.3d 1269 (Fed. Cir. 2012)..............................................................22, 56

*Syngenta Crop Protection, LLC v. Willowood, LLC*,
   944 F.3d 1344 (Fed. Cir. 2019)...................................................................59

*Vifor Fresenius Med. Care Renal Pharma Ltd. v. Teva Pharms. USA, Inc.*,
   No. CV 18-390 (MN), 2022 WL 3562555 (D. Del. Aug. 18, 2022) ...................21

*Visual Memory LLC v. NVIDIA Corp.*,
   867 F.3d 1253 (Fed. Cir. 2017)..........................................................25, 30, 43

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988)................................................................20, 31

*Wyeth v. Abbott Labs.*,
   720 F.3d 1380 (Fed. Cir. 2013)...........................................................33, 38

**Statutes**

35 U.S.C. § 112(b) ...........................................................................................24

35 U.S.C. § 282.........................................................................................18, 19

**Other Authorities**

*Arbitrary*, Merriam-Webster (March 28, 2023), https://www.merriam-
   webster.com/dictionary/arbitrary .............................................................49

Fed. R. Civ. P. 26 ..................................................................................................................35

Robert A. Matthews, Jr., *Annotated Patent Digest* § 4:38 (March 2023) ......................................36

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| '780 Patent | U.S. Patent No. 10,842,780 |
| Tr. | February 6-10, 2023 Trial Transcript |
| SF | Uncontested/Stipulated facts, attached as Exhibit 1 of the Proposed Pretrial Order (D.I. 495), |
| PFOF | Plaintiffs' Proposed Findings of Fact On Infringement of the '780 Patent (D.I. 532) |
| DFOF | Defendants' Proposed Findings of Fact on Invalidity of the '780 Patent (D.I. 533) |
| RFOF | Plaintiffs' Responsive Proposed Findings of Fact On Validity of the '780 Patent |
| JTX-[####] | Joint Trial Exhibits |
| PTX-[####] | Plaintiffs' Trial Exhibits |
| DTX-[####] | Defendants' Trial Exhibits |
| OAB | Overactive Bladder |
| USP | United States Pharmacopoeia |
| USP I or basket | USP Apparatus I (basket) |
| USP II or paddle | USP Apparatus II (paddle) |
| USPTO | United States Patent and Trademark Office |
| FDA or USFDA | United States Food and Drug Administration |
| NDA | New Drug Application |
| ANDA | Abbreviated New Drug Application |
| Sandoz's ANDA | Sandoz's ANDA No. 209441 |
| Lupin's ANDA | Lupin's ANDA No. 209485 |
| Zydus's ANDA | Zydus's ANDA No. 209488 |
| POSA | Person of ordinary skill in the art |
| PEO | Polyethylene oxide |
| PEG | Polyethylene glycol |
| HPMC | Hydroxypropyl methylcellulose |
| HPC | Hydroxypropyl cellulose |
| CMCNa | Carboxymethyl cellulose sodium |
| HEC | Hydroxyethyl cellulose |
| CVP | Carboxyvinyl polymers |
| PVP | Polyvinylpyrrolidone |
| Plaintiffs or Astellas | Plaintiffs Astellas Pharma Inc. ("API"), Astellas Ireland Co., Ltd. ("AICL"), and Astellas PharmaGlobal Development, Inc. ("APGD") |
| DOE | Design of Experiments |
| TDD | Targeted Dissolution Development |

**TABLE OF WITNESSES**

| Witness | Description |
| --- | --- |
| Dr. Kazuhiro Sako | A named inventor of the Patent-in-Suit |
| Prof. Steven Little | Astellas' expert in the field of pharmaceutical formulation |
| Dr. Walter Chambliss | Defendants' expert in the field of pharmaceutical formulations |

I.          **Introduction**

As Astellas was developing Myrbetriq®, it faced a critical problem: the active ingredient, mirabegron, had a significant food effect that could harm patients. It nearly scrapped the project, until its inventors came up with an innovative solution. By applying well-known techniques for formulating sustained release tablets, Astellas' inventors were able to sufficiently mitigate the food effect to proceed with clinical trials and ultimately obtain regulatory approval.

Seeking to escape the plain fact that their ANDA products infringe Claims 5, 20 and 25 of the '780 Patent (the "Asserted Claims"), Defendants attack the validity of those claims as being deficient on enablement, written description, and definiteness grounds. But a patent issued by the U.S. Patent and Trademark Office ("USPTO") is presumed valid, and Defendants unsubstantiated arguments do not rebut that presumption. There is no dispute in this case that the inventions enshrined in the Asserted Claims are both novel and non-obvious—worthy of patent protection. Rather, the validity attacks Defendants make share a common feature: a mistaken belief that Astellas claimed more than it discovered. When the inventors sought a patent for their novel solution using well-understood art, they claimed more than the single specific sustained release formulation that constitutes the commercial embodiment, Myrbetriq®. Instead, the inventors claimed their full discovery—sustained release hydrogel formulations of mirabegron with particular dissolution characteristics that ameliorate mirabegron's food effect. This approach—claiming what the inventors discovered even if it extends beyond what they physically created—is ubiquitous and well accepted.

For its part, the '780 Patent's specification readily allows a POSA to practice the claims' full scope. Hydrogel forming sustained release formulations have been well understood for decades, and a POSA possesses the skills and training to readily manipulate the physical traits of such formulations, including their viscosity. Both the patent specification and prior art disclose

1

the relationship between viscosity and dissolution rate; a POSA would thus be able to adjust (*i.e.*, "tune") any given formulation to meet the Dissolution Limitation with ease using, at most, a handful of routine tests. The predictability and reproducibility of this method stands in stark contrast to the cases on which Defendants rely, where POSAs were left to guess and check every possible permutation to see which seemingly random variations met the functional limitation— the proverbial needle in a haystack. The fundamental flaw underlying Defendants' enablement and written description arguments is their erroneous position that the relevant art here is unpredictable. But as the evidence at trial showed, that is wrong. A POSA here is not left searching for blaze-marks in a dense forest; they need only ascertain whether their destination is uphill or downhill and walk in that direction—*i.e.*, by increasing the viscosity to slow the dissolution rate or decreasing the viscosity to increase the dissolution rate of the claimed formulations.

And there is no actual dispute that Astellas' inventors had possession of the invention at the time they filed the patent. A POSA reading the specification would understand that the inventors had discovered that applying the well-known hydrogel forming sustained release formulation technology to the problem the inventors faced and achieving particular dissolution characteristics would have the clinically desired result. Indeed, the specification says as much. Rather, Defendants' arguments on this point vastly overstate the written description requirement in this context. The law is clear: Astellas was not required to physically possess every—or, indeed, *any*—formulation covered by the claims. And Astellas was not required to provide working examples in the specification—though a POSA would understand that it did so.

Finally, Defendants' half-hearted indefiniteness argument falls far short of the mark. A temporal limitation is not required; in its absence, a product is within the scope of the claims

when it meets both the structural and functional limitations and is outside their scope when it does not. Defendants' expert understood this fact and its meaning for the boundaries of the claims, complaining instead that it made it difficult to assess infringement. But definiteness is not measured by the ease of a potential infringer to determine if its product meets the claims—it is measured by a POSA's ability to understand what is covered. Defendants may not like the scope of the claims, but they understand them fully.

At bottom, Defendants and their expert contest validity by feigning bafflement. They ignore the knowledge and tools that allow POSAs to easily navigate between formulations—despite the fact that they used the same knowledge and tools to develop their own products. In view of the credible evidence provided by Plaintiffs' expert, Prof. Little, countering Defendants' invalidity positions, Defendants simply have not carried their heavy burden of establishing invalidity by clear and convincing evidence.

## II.          Evidence Adduced at Trial

Defendants' Opening Post-Trial Brief (D.I. 534) presents their invalidity theories by selectively relying on their own expert's opinions and generally disregarding the contrary testimony and documentary evidence. But the full picture of the record adduced at trial tells a different story. From the perspective of a POSA—the required perspective for these analyses—the factual record demonstrates that the '780 Patent meets the enablement, written description, and definiteness requirements for the Asserted Claims.

### A.       Prof. Little's testimony supports enablement

There is no question that Dr. Chambliss and Prof. Little offered differing views of the issues underlying the enablement determination, and, in particular, how a POSA would approach practicing the claimed invention. Prof. Little testified credibly, from experience, and with

supporting evidence as to how a POSA would approach the Asserted Claims. As discussed in more depth below, Prof. Little summarized the POSA's approach as follows:

> They see that inventive thing here is this difference in dissolution profile to what was there before. When they see this claim, I think you see what Your Honor has seen looking at all these documents, that there is a dissolution profile, and then what you're doing is saying how do you achieve that dissolution profile? Well in this particular case, it says using these formulations that really people have been using for a very long time. They're familiar with the components, they're familiar with the systems, they're familiar with the mechanisms. So what somebody would do is look at the dissolution profile. So then you would do what everybody is doing here which is to make compositions and say how do I take that and move, and by the way, in a very directional fashion as explained in the prior art and the specification to get to that dissolution profile. And you could pick any one of those dissolution profiles, and you start with that and work your way to that profile.

Tr. 1241:15-1242:11. And while Dr. Chambliss contended that the specification of the '780 Patent would leave a POSA scratching his or her head, Prof. Little explained why that would not be the case. "[T]hese are established systems," and "the specification repeats some things that the person of ordinary skill in the art sort of already recognizes and sees in references." Tr. 1242:12-1243:9. Because the POSA "knows that stuff," "the specification doesn't need to go through all" of the details that Dr. Chambliss believed were missing. *Id.* Given Prof. Little's credible testimony, discussed further below, Defendants simply have not carried their heavy burden of establishing a lack of enablement by clear and convincing evidence.

### 1.   The '780 Patent's invention is the use of well-known systems with mirabegron to overcome the food effect problem

In painting a picture of a baffled POSA unable to practice the Asserted Claims, Defendants mischaracterize the invention of the '780 Patent. As Prof. Little explained, the invention of the '780 Patent is the use of "well-known systems that are hydrogel forming polymers. And by slowing the release of mirabegron, the formulation reduces the food effect. That's the context that you're looking at." Tr. 1282:9-1283:5. The '780 Patent makes it clear that the sustained release systems are merely "background art" and "the hydrogel forming

4

polymers . . . are not the invention. *It's the use of them* to get the particular release profile and that's important to understand and look at the claims through the lens of a person of ordinary skill in the art." Tr. 1282:9-1283:5 (emphasis added). That is how the POSA looks at the Asserted Claims—as the application of familiar and well-understood art to solve a novel problem. RFOF 117-127.

Prof. Little's explanation is fully consistent with the '780 Patent. The '780 Patent's specification discloses the application of known hydrogel formulation technology to solve an unknown—but critical—development problem with mirabegron: a food effect. JTX-0002.00006 (2:33-3:4). The '780 Patent also recognizes that such hydrogel formulation technology is generally disclosed in the prior art: "As a technique of preparing a formulation for modified release, a hydrogel sustained release tablet containing an additive which ensures penetration of water into the tablet, and a hydrogel-forming polymer is disclosed (see, for example, patent literature 3 [International Publication No. WO 94/06414])."[1] JTX-0002.00006 (1:63-67; 2:14-15).

Prof. Little's view is also consistent with the testimony of inventor Dr. Sako. Dr. Sako testified that prior to developing sustained release formulations that solved mirabegron's food effect problem, he had previously used sustained release hydrogel formulation technology to develop formulations of other drugs. Tr. 276:8-17. The inventive concept of the '780 Patent was *discovering* the dissolution rate that would address the food effect (Tr. 278:3-9, 279:1-8) and achieving it using *previously known* formulation technology. Dr. Sako explained that the

---

[1] International Publication No. WO 94/06414 (JTX-0003.01743-01772) is the international publication corresponding to U.S. Patent No. 6,699,503.

"commercialization and delivery [of Myrbetriq®] to [] patients . . . was something that could not have been done" without that invention. PFOF 18-20; Tr. 281:4-9; RFOF 122.

Despite this evidence, Dr. Chambliss put on blinders and presented a context-free view of the invention at the heart of the '780 Patent that focused on purported estimates of the number of allegedly different formulations encompassed by the claims. *See e.g.*, Tr. 1052:17-23. In contrast, Prof. Little offered a framework that put the Asserted Claims in the context of the state of the art and the '780 Patent's specification. He testified that the Asserted Claims are directed to "a very specific kind of controlled release formulation [the hydrogel forming polymer formulation] that is known in the field . . . then you have claimed excipients and dissolution rates." Tr. 1297:9-25; RFOF 118. As Prof. Little explained, the '780 Patent is directed to this "specific kind of . . . gel forming sustained release system" and does not include the many other ways to reduce mirabegron's food effect, including "non-formulation ways to do this" and "[a]ny number of different formulations," "routes of administration," or other methods that could have been pursued. Tr. 483:4-484:23; RFOF 118. A POSA would understand the claims in this context, rather than engaging in Dr. Chambliss's baseless counting exercise.

### 2. The POSA is familiar with sustained release hydrogel forming polymer systems and the excipients used in those systems, and the '780 Patent specification reminds POSAs of that knowledge

Sustained release hydrogel forming polymer formulations were well known in the art as of September 2008. Prof. Little testified that they "were probably the most well characterized extended release oral dosage form" at that time. Tr. 1243:15-1244:25. There were more approved sustained release hydrogel forming formulations when the '780 Patent's specification was drafted than any other type of sustained release formulation. RFOF 38. The field of sustained release hydrogel forming formulations was "decades old" as of September 2008. Tr. 1265:14-16.

And those well-known and well-characterized systems were not difficult to formulate from the POSA's perspective. Tr. 1244:1-4; RFOF 40, 51. Nor was it difficult to achieve a specific dissolution profile (*i.e.*, "tune" the formulation), because the POSA is taught how to use such systems, would have experience working with them, and is aided by a large body of literature that teaches the POSA how to use and manipulate the components of such systems. Tr. 1244:5-15; RFOF 34-96. Nor would a POSA have been unfamiliar with the excipients and additives listed in the Asserted Claims. Prof. Little noted that these "are not things that are new chemical entities . . . . They are things that have been used and well characterized over quite a long period of time." Tr. 1263:19-1265:3; RFOF 205.

Although the POSA had the requisite knowledge to practice the claimed invention based on the decades of prior teachings, Prof. Little pointed to information in the '780 Patent specification that would aid the POSA in practicing the claimed inventions. Tr. 1275:15-1276:5; RFOF 129. In particular, Prof. Little noted disclosures in the '780 Patent's specification teaching the POSA how to tune a formulation to the desired dissolution profile through a "pretty simple" method focused on "the viscosity of the polymer." Tr. 1275:15-1277:7; JTX-0002.00009 (7:34-38). Prof. Little explained that one key way to modify a formulation's dissolution rate was to adjust its viscosity. Tr. 1275:15-1277:7; RFOF 42-51, 53-55 There is a known correlation between the viscosity produced by a hydrogel forming polymer and its average molecular weight. RFOF 42-47. Using this correlation, a POSA would understand that the target viscosity of a hydrogel formulation could be adjusted by selecting the molecular weight of a given polymer used in a formulation to achieve that target. RFOF 42-47. Based on these relationships, a POSA would understand how to formulate all embodiments falling within the Asserted Claims' scope, and could manipulate the dissolution rates of these formulations any way they pleased.

RFOF 42-55. As Prof. Little clarified, when the specification uses the word "arbitrary," it is teaching this ability to freely adjust the dissolution rate through predictable tuning—the opposite of the "trial and error" suggested by Dr. Chambliss. Tr. 1275:15-1277:7.

Prof. Little's understanding of the art stands in stark contrast with Dr. Chambliss's. When presented with a list of hydrogel forming polymers, Dr. Chambliss argued that these polymers did not provide any tuning information. *See e.g.*, Tr. 1087:24-1088:7. But Prof. Little explained that Dr. Chambliss seemed to require the specification to explain how each of the identified polymers "relate to viscosity and relate to controlled release profiles and behavior." Tr. 1277:19-1279:4; RFOF 148. Prof. Little expressed his view that the list of polymers in the '780 Patent is "a very common thing that is included in lots of product literature . . . and a person of ordinary skill in the art brings their education into reading the list." Tr. 1277:19-1279:4. Prof. Little thus opined that the information provided by the specification is "plentiful," "more than a [POSA] needs," and is merely "repeat[ing] things that a person of ordinary skill in the art knows." Tr. 1279:14-22; RFOF 129.

As support for his opinions, Prof. Little walked the Court through exemplary exhibits reflecting the knowledge in the art as of September 2008, including JTX-0005.00010-011, 014 (discussing grade, molecular weights and viscosities associated with particular polymers), JTX-0065.00002 (patent prior art) and JTX-0071.00002, 006, 010 (Methocel brochure from 1982). RFOF 60-61, 65. And although Dr. Chambliss pointed to prior art references as proof that various factors *could* impact dissolution rates, Prof. Little set the record straight. RFOF 62-64. Of course certain factors *could* impact dissolution rates; but Dr. Chambliss's prior art is precisely what a POSA would *use* when reading the '780 Patent to know how to practice the Asserted Claims. RFOF 60-70. That the prior art taught a POSA what might impact dissolution and how it

might do so reinforced Prof. Little's view that the Asserted Claims are directed to a predictable—rather than unpredictable—art.[2]

### 3.    The POSA uses targeted dissolution development to arrive at the desired dissolution profile

While Dr. Chambliss suggested that the highly qualified POSA would be overwhelmed by the supposed breadth of the '780 Patent's claims, Prof. Little stated it differently. *See e.g.*, Tr. 1070:24-1071:8; RFOF 71-96. Prof. Little explained that POSAs used Targeted Dissolution Development ("TDD")—the process of predictably adjusting the variables of a hydrogel formulation to achieve a desired dissolution profile—as of September 2008. Tr. 1244:5-1246:9, 1252:19-1253:22; RFOF 71-96. And Prof. Little provided an example of his own use of TDD while still in graduate school (years before the priority date). Tr. 1244:5-1246:9; RFOF 83.[3] In fact, Prof. Little explained that TDD was so well established and predictable as of September 2008 that POSAs had at their disposal software tools, known as Design of Experiments ("DOE") software, that aided in their TDD efforts. Tr. 1263:19-1265:3; RFOF 90-96. Prof. Little testified that DOE software has been available to a POSA since at least the 1980s or 1990s. RFOF 93. Indeed, as Prof. Little described, predictive DOE software tailored for formulation development was available to the POSA for this very reason—because dissolution profiles can be predicted and targeted. Tr. 1295:13-1296:4; RFOF 96.

---

[2] As Prof. Little explained, the soundbite of prosecution history relied upon by Defendants for the suggestion that dissolution is "unpredictable" does not actually support that proposition (Tr. 1305:21-1308:23), and in any event, is overcome by the many pieces of prior art teachings and predictive tools available to POSAs as of the priority date.

[3] Prof. Little completed his studies in 2005, so his use of TDD while in graduate school is before the September 2008 priority date for the '780 Patent. Tr. 469:18-23; PTX-0309.

Prof. Little explained that, using a TDD-driven approach, a POSA seeking to make a formulation practicing the Asserted Claims would make between three and five—"a handful"—of formulations, check their dissolution profiles, and then adjust, if and as necessary. Tr. 1252:6-1253:15; RFOF 88. Thus, "you can get any profile that they're saying there with a limited number of experiments." Tr. 1252:19-1253:4; RFOF 88. A POSA would thus approach the Asserted Claims using TDD, which Prof. Little practiced in graduate school and which he continues to use to this day. Tr. 1252:19-1253:22; RFOF 71-96.

Although Dr. Chambliss suggested that a POSA evaluating the Asserted Claims could resort to nothing more than trial and error amongst all possible formulations, Prof. Little disagreed. Tr. 1087:8-18; RFOF 71, 143-144. For example, Prof. Little explained that when screening chemical compounds to determine whether they would bind to a particular receptor in the body, "it's very hard to determine how something would . . . bind," so one has to make "lots and lots and lots of these things" to try to achieve the desired function. Tr. 1260:2-22; RFOF 75. When screening chemical compounds in that context, "you're not doing it directionally, you're trying everything," meaning that you do not learn from one experiment to the next. Tr. 1260:2-22. But the development of a sustained release hydrogel forming formulation with the particular dissolution characteristics described in the '780 Patent is not like that. RFOF 75-76.

Unlike compound screening, where there is no directional movement to guide a POSA in the search for functional embodiments, in the context of TDD, "you actually have a directional movement through the space based on what you know." Tr. 1260:2-22; RFOF 76. This means that each experiment a POSA performs suggests the direction for the next experiments, narrowing the set of further experiments until success is achieved. Prof. Little made clear that TDD is thus the "opposite of some other fields" where the "space is just random," you cannot

make "choices based on the direction you think it would go," and when you make choices, they

do not help you direct any of the future experiments. Tr. 1260:23-1261:3, 1261:13-23; RFOF 76.

### 4.      The Defendants all used TDD to develop their ANDA products

Prof. Little's experience and opinions regarding the use of TDD are borne out by the

evidence in this case, where each of the generic filers used TDD to develop their ANDA

products. RFOF 97-116. And, as Prof. Little explained, these generic applicants are not the first

to use TDD; the use of TDD "has been going on for a very long time." Tr. 1254:18-1255:9;

RFOF 97. Prof. Little walked through each of the generic applicants' development programs,

explaining that they all utilized TDD to develop ANDA Products with dissolution profiles

matching that of Myrbetriq®.[4] Tr. 1275:6-11; RFOF 97-116. As Prof. Little testified, "they pick

different polymers . . . or different excipients . . . so they had a different starting point. What

happens is that they move using this targeted dissolution development method to the dissolution

profile that they're targeting, which in this case was the Myrbetriq® dissolution profile." Tr.

1255:22-1256:25, 1259:1-10. All of the generic applicants followed that well-worn path to

develop their ANDA products. Tr. 1259:1-10; RFOF 98. And contrary to Dr. Chambliss's

opinions, none of the generic applications made trillions, millions, thousands or even hundreds of

formulations. Tr. 1259:11-1260:1; RFOF 102.

The Defendants' task in matching the entire dissolution profile of Myrbetriq® was

actually much harder than it would be for the POSA to practice the two dissolution time points in

the Asserted Claims. Tr. 1262:23-1263:11, 1275:6-11; RFOF 87. Prof. Little agreed with Dr.

Chambliss that it would be easier—and require "far less iterations"—to meet the two open-ended

---

[4]

time points in the Dissolution Limitation than it would be to match the entire and exact
dissolution profile of Myrbetriq®. Tr. 1262:23-1263:11. And despite the more challenging
nature of their task, each of the Defendants was able to develop their ANDA Products without
undue experimentation.[5] RFOF 97-116.

### B.    Prof. Little's testimony supports written description

Prof. Little's testimony additionally set forth how a POSA would understand the
inventors' possession of the Asserted Claims. The specification of the '780 Patent sets forth the
problem the inventors were trying to solve: minimizing the food effect associated with
mirabegron. Tr. 1309:18-1310:1; RFOF 124; *see, supra*, § II.A.1. As Prof. Little explained, the
specification lays out in detail exactly how the inventors solved that problem: by using sustained
release hydrogel technology already well known in the art to develop mirabegron formulations
with particular dissolution characteristics. Tr. 1309:18-1312:15; RFOF 117-127; *see, supra*,
§ II.A.1. As discussed in detail above, and contrary to Dr. Chambliss's contentions, the state of
the art regarding sustained release hydrogel formulations was highly developed as of the priority
date of the '780 Patent. *See, supra*, § II.A.2; Tr. 1310:18-21; RFOF 34-55. The inventors pointed
out and relied on that advanced state of the art in the '780 Patent's specification. *See, supra*,
§ II.A.1; Tr. 1310:13-17.

The '780 Patent also discloses that the physical relationships between the various
structural components of the claimed sustained release hydrogels were known, such that a POSA
would know how to control the functional dissolution rate of such a hydrogel. *See, supra*,
§ II.A.2; Tr. 1310:22-1311:4, 1315:21-1316:14; RFOF 128-148. For example, the '780 Patent

---

[5] In fact, only a fraction of the experiments Defendants performed to arrive at their final ANDA
products were conducted for purposes of matching Myrbetriq®'s dissolution profile rather than
for achieving other pharmaceutical development aims. Tr. 1267:5-13.

discloses that the viscosity of the polymer in the disclosed formulation controls the dissolution rate of the formulation. Tr. 1242:19-21, 1316:1-7; RFOF 128; JTX-0002.00009 (7:34-38). The higher the viscosity, the slower the dissolution rate. Tr. 1276:17-24; RFOF 128. As Prof. Little explained, a POSA reading the specification would thus understand that it discloses how to use that structure/function relationship to tune sustained release hydrogel formulations to achieve the claimed Dissolution Limitation. *See, supra*, § II.A.2; Tr. 1316:8-14; RFOF 143. As such, a POSA reading the specification would understand that the inventors had possession of the Asserted Claims. Tr. 1316:15-19; RFOF 143, 224.

The '780 Patent goes even further than what is required to show that the inventors had possession of the Asserted Claims—by including working examples of the claimed formulations. Tr. 1317:20-1318:4; RFOF 149-165. Even though working examples are not required to show possession of an invention, Prof. Little pointed out that the specification discloses multiple formulations actually made by the inventors. JTX-0002.00012-014 (14:45-18:35); Tr. 1317:20-1318:8; RFOF 149-165 Prof. Little explained that many of those formulations, including at least Examples 2, 8, and 9, meet all the elements of the Asserted Claims. Tr. 1311:5-17; JTX-0002 at 00012-015 (14:64-15:4, 15:61-16:26, 18:50-19:9); RFOF 152. As he testified, Table 4 of the '780 Patent discloses the results of dissolution testing conducted on the Examples 2, 8, and 9 tablets, and demonstrates that those tablets met the Dissolution Limitation. Tr. 1311:18-1312:1; JTX-0002.00014-015 (18:50-19:9); RFOF 153.

Contrary to Dr. Chambliss's confusion, the '780 Patent makes clear that the inventors had actual possession of formulations meeting the structural limitations of the Asserted Claims that also met the functional Dissolution Limitation—when tested at a paddle speed of 200 rpm. The specification explicitly discloses that the dissolution testing for the claimed formulations can be

conducted at 200 rpm. JTX-0002.00008 (6:21-33) ("the paddle rotation speed is 50 to 200 rpm");
RFOF 141. And during prosecution of the Asserted Claims, Astellas pointed the Examiner to
paragraph [0027] of the as-filed specification (corresponding to the same section of the issued
patent). Tr. 1313:15-1314:8; RFOF 26. The Patent Examiner, evaluating the claims from the
perspective of a POSA and without the benefit of any internal Astellas information, did not
dispute that Astellas had written description support for working examples that were tested at
200 rpm and met the Asserted Claims. Tr. 1313:15-1314:8; RFOF 26-27.

　　　Dr. Chambliss erroneously opined that even if Examples 2, 8, and 9 are working
examples, they do not show that the inventors had possession of the entire scope of the Asserted
Claims. *See e.g.*, Tr. 1115:20-1116:17. But Prof. Little explained why that is incorrect when
evaluated from the perspective of a POSA:

> [I]f you have a few working examples in the space, recognize again that you're
> talking about systems that people know, so you could make the kind of things we're
> talking about here, and similarly you could make a variant of it that's talked about
> in the specification. Again, the field is pretty mature in this stage, so I don't think,
> for instance, somebody is looking at this and going well, there is this other system
> that they don't have a working example for and I have no idea how to make that
> work, I don't think that's what they're thinking.

Tr. 1314:23-1315:17. As Prof. Little explained, the specification provides sufficient structural
information for a POSA to recognize working examples across the full scope of the Asserted
Claims. Tr. 1318:22-25; RFOF 149-165. And, as discussed below (*see, infra*, § III.D.2), this
question regarding the scope of working examples arose during prosecution of the '780 Patent.
And although the Patent Examiner initially raised the same concern, the Patent Office
subsequently withdrew that argument and found that the Asserted Claims were patentable. *See,
infra*, § III.D.2.

14

Not only does the '780 Patent's specification show that the inventors had actual possession of formulations of the Asserted Claims, but it demonstrates that those formulations worked for their desired purpose—mitigating mirabegron's problematic food effect. As Prof. Little testified, clinical testing reported in the specification demonstrated that, when patients took the Example 8 formulation, mirabegron's food effect was greatly reduced. Tr. 1281:23-25; JTX-0002.00015 (19:47-20:5); RFOF 126-127. As the inventors stated, this actual proof of reduction demonstrated that that the food effect "could be significantly alleviated" by the invention of the Asserted Claims. JTX-0002.00015 (19:47-20:5).

### C. Prof. Little's testimony supports definiteness

Prof. Little testified that the Asserted Claims do not require a temporal limitation to be definite. Tr. 1322:16-19. Rather, to determine whether a formulation meets the structural limitations, a POSA would simply determine whether or not it falls within the Dissolution Limitation: "[I]f it falls in the dissolution rate limitation then it would meet those limitations. If it doesn't, then it doesn't." RFOF 226.

### D. The prosecution history is consistent with Prof. Little's testimony and confirms the validity of the Asserted Claims

The first patent application in the line of applications resulting in the '780 Patent was filed in September 2008. D.I. 531 at 8-9. But the '780 Patent itself did not issue until over 12 years later, on November 24, 2020.[6] *Id.* This 12-year prosecution history reflects the USPTO's rigorous review of the Asserted Claims and justifies their presumption of validity. In fact, Defendants' written description argument was considered and rejected by the USPTO.

---

[6] The '780 Patent expires on September 28, 2029, with pediatric exclusivity through March 28, 2030. PFOF 27.

In 2019, the Examiner rejected the Asserted Claims for lack of written description.

Pointing to Table 4, the Examiner stated:

> While Applicants disclose this one particular example which has a drug dissolution rate of 39% at 1.5 hours, nowhere do Applicants disclose that the compositions more generally would specifically have a drug dissolution rate from the pharmaceutical composition of '39% or less after 1.[5] hours'. While Applicants have a *specific* working example, this working example is limited to a single *specific* formulation.

RFOF 30. This rejection was essentially identical to the written description argument raised by Defendants.[7]

In response to the Examiner's rejection, the inventors amended the claims twice to limit the claimed scope of formulations. In the first amendment, Astellas modified the claims to 1) require the hydrogel polymers to have a molecular weight between 100,000 and 8,000,000; and 2) require a particular dissolution rate. RFOF 31. In the second amendment, Astellas *further* limited the scope by requiring the claimed hydrogel-forming polymers and water soluble additives to be selected from set of enumerated species. *Id.* It is only after these additional limitations narrowed the scope of the claims that the USPTO found the claimed genus was described, and it issued the claims with the as-amended Dissolution Limitation. RFOF 17-33. Thus, after a lengthy discussion with the USPTO regarding the scope of Astellas' invention, Astellas and the USPTO came to an agreement as to the appropriate scope of claims, which Astellas possessed and a POSA was enabled to practice based on the disclosures in the specification.

---

[7] Notably, unlike Defendants, the Examiner did not dispute that the '780 Patent disclosed that the Table 4 dissolution testing results for Examples 2, 8, and 9 were tested at 200 rpm. RFOF 27.

### E.    Dr. Chambliss's testimony supports the validity of the Asserted Claims

Notably, Dr. Chambliss agreed with many of Prof. Little's opinions, particularly as they relate to the state of the art and how a POSA would make formulations covered by the Asserted Claims. For example, Dr. Chambliss admitted that a POSA would use their knowledge of the prior art and their experience when attempting to formulate a new formulation—they would not start from scratch each time. RFOF 206. And with regard to sustained release hydrogel formulations, that knowledge was extensive as of September 2008. Dr. Chambliss agreed that hydrogel sustained release formulations for oral delivery were one of the most common sustained release formulations in use. RFOF 37-38. He also agreed that the hydrogel-forming polymers covered by the Asserted Claims were well-known in the art. RFOF 41. And Dr. Chambliss acknowledged that a POSA could obtain documentation from the manufactures of the polymers regarding the polymers' chemical and physical properties. Tr. 1160:17-1161:16.

Furthermore, Dr. Chambliss acknowledged that a POSA would take the same TDD-driven approach to developing formulations with the desired dissolution profile that Prof. Little discussed. RFOF 82. In performing TDD, Dr. Chambliss testified that a POSA would "start with a target dissolution profile." Tr. 1187:5-12. Dr. Chambliss explained that a POSA would then "determine which type of polymer, which grade of polymer, which drug they're using, what the dosage form is, [and] what the size and shape of the tablet will be." Tr. 1187:5-25. Next, a POSA would make three to five prototype formulations, changing one variable, to identify a formulation meeting the target dissolution profile. Tr. 1187:5-1190:5; RFOF 82. Dr. Chambliss agreed that a POSA "would prepare three to five formulations" and would not "make thousands or . . . millions" and would "[c]ertainly not" make trillions of formulations to find one meeting a target dissolution profile. Tr. 1187:5-1190:5. As Dr. Chambliss admitted, "an awful lot of people work with hydrogel systems and manage to get the dissolution profiles they want," without

making "thousands or hundreds of thousands or trillions of formulations." Tr. 1165:5-11. "A skilled person doesn't just start randomly making formulations, they have a goal in mind." RFOF 74.

Similarly, with respect to the testing disclosed in Table 4 of the '780 Patent, JTX.0002.00015, Dr. Chambliss agreed with Prof. Little that the prosecution history reflected that, when adding the Dissolution Limitation with its claimed paddle speed of 200 rpm, Astellas pointed to paragraph [0027] of the original specification, which states "the paddle rotation speed is 50 to 200 RPM." Tr. 1218:3-17. As noted above, that paragraph corresponds to JTX.0002.00008 (6:21-33) of the as-issued patent. *See, supra*, § II.D. And Dr. Chambliss further admitted that an internal Astellas spreadsheet (PTX-0067) corroborates that the dissolution testing of Examples 2, 8, and 9 reported in Table 4 of the '780 Patent were actually conducted at 200 rpm.[8] As Dr. Chambliss stated: "According to that spreadsheet, they were made -- tested at 200 RPMs." Tr. 1224:3-9.

Finally, regarding definiteness, Dr. Chambliss agreed that a POSA would have no problem determining if a tablet infringed at any particular point in time. RFOF 231.

## III.        Argument

### A.       Defendants bear a heavy burden of proof

"A patent shall be presumed valid." 35 U.S.C. § 282. A patent challenger "must overcome that presumption to prevail on an invalidity defense." *Microsoft Corp. v. i4i Ltd.*, 564

---

[8] Defendants have objected to PTX-0067 on authentication and hearsay. The parties agreed in the Pretrial Order that "[a]ny document that on its face appears to have been authored by an employee, officer, or agent of a party shall be deemed to be prima facie authentic." D.I. 495 ¶ 107. PTX-0067 was produced from Astellas' files, as indicated from the document's metadata. PTX-0067 satisfies the business records exception to hearsay under Fed. R. Evid. 803(6) based on the same metadata. And regardless, PTX-0067 is the type of information an expert can reasonably rely on in forming their opinion.

U.S. 91, 100 (2011). The patent challenger bears the burden of proving invalidity by clear and convincing evidence. *Id.* at 95. Clear and convincing evidence places in the fact finder "an abiding conviction that the truth of [the] factual contentions are highly probable." *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (citation omitted). The presumption of validity "exists at every stage of the litigation" and if the "challenger fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden on the validity issue." *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998).

There is a presumption that decisions made by the PTO Examiner are valid. These decisions are particularly pertinent because they were made contemporaneously with full view of the art at the time and not tainted by hindsight. *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004) ("A patent issued from the United States Patent and Trademark Office (PTO) bears the presumption of validity under 35 U.S.C. § 282."); *S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1367 (Fed. Cir. 2001) ("The claims as granted are accompanied by a presumption of validity based on compliance with, *inter alia*, § 112.").

Given the heavy burden borne by defendants seeking to invalidate patents, courts are compelled to uphold the validity of the patent when faced with competing expert testimony from credible experts. *Fore Electrical Mfg. Co. v. St. Louis Electrical Works*, 280 F. 49, 52 (8th Cir. 1922) (upholding validity where "[e]xpert witnesses for the two parties seem equally competent and well informed" because "[p]resumptively, appellants' patent is valid . . . and the burden was on the appellees to overcome that presumption.").

### B.    Applicable legal standards

#### 1.    Enablement standard

The enablement requirement is satisfied when the patent disclosure teaches a POSA in the art how to make and use the invention without undue experimentation. *Allergan, Inc. v.*

*Sandoz Inc.*, 796 F.3d 1293, 1309 (Fed. Cir. 2015). When determining if the amount of experimentation is undue, "[t]he key word is 'undue,' not 'experimentation'" *In re Wands*, 858 F.2d 731, 736-37 (Fed. Cir. 1988). Thus, even "extensive experimentation does not necessarily render the experiments unduly extensive where the experiments involve repetition of known or commonly used techniques." *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336-39 (Fed. Cir. 2013). "Enablement is not precluded by the necessity for some experimentation such as routine screening." *In re Wands*, 858 F.2d at 736-37; *see also Atlas Powder Co. v. E.I. Du Pont de Nemours & Co.*, 588 F. Supp. 1455, 1467 (N.D. Tex. 1983) ("That one skilled in the art must perform some preliminary tests or experiments before he can make or use the invention does not invalidate the patent."). Because the analysis is performed from the perspective of a person of ordinary skill, "a patent need not teach, *and preferably omits*, what is well known in the art." *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1261 (Fed. Cir. 2017) (emphasis added). As such, [35 U.S.C.] § 112 requires only a "reasonable correlation" between the disclosure and the claims. *Invitrogen Corp v. Clontech Labs., Inc.,* 429 F.3d 1052, 1071 (Fed. Cir. 2005).

When experimentation is required to practice the claims of a patent, courts use the "*Wands* factors" to determine if the amount of required experimentation is undue: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *In re Wands*, 858 F.2d at 737. However, the factors are "illustrative, not mandatory. What is relevant depends on the facts." *Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991).

Post-priority date activities may be relied upon to demonstrate that a claim is enabled. *Amgen v. Hoechst Marion Roussel*, 314 F.3d 1313, 1336 (Fed. Cir. 2003) (enablement was satisfied when the specification was "buttressed by numerous post-filing publications that demonstrated the extent of the enabling disclosure"). For example, "relevant post-priority evidence" showing that "practicing the invention did not require undue experimentation" is relevant to the enablement inquiry. *Amgen v. Sanofi*, 872 F.3d 1367, 1379 (Fed. Cir. 2017).

Where a POSA would readily understand functional claim limitations and could follow the working examples to make and use the inventions, courts will find such functional claim limitations meet the enablement requirement. *See, e.g.*, *Vifor Fresenius Med. Care Renal Pharma Ltd. v. Teva Pharms. USA, Inc.*, No. CV 18-390 (MN), 2022 WL 3562555, at *19-20 (D. Del. Aug. 18, 2022) (finding functional claim limitations "non-bioabsorbable" and "having an iron release rate of below 2.5% w/w" enabled because "[a] POSA, following the disclosure in the [] patent, could generate the claimed compositions that are essentially non-bioabsorbable without undue experimentation," and the patent "contains explicit guidance about how to make the claimed pharmaceutical compositions, including information about the type and brand of starch that can be used to make chewable tablets that achieve the claimed iron release rate").

### 2.      Written description standard

The purpose of the written description requirement is to demonstrate that the inventor possessed the invention at the time of filing. *Monsanto Co. v. Scruggs*, 459 F.3d 1328 (Fed. Cir. 2006). Claims are adequately described by the specification when "the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms. v. Eli Lilly*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). "[T]he written description requirement does not demand either examples or an actual reduction to practice; a constructive reduction to practice that in a definite

way identifies the claimed invention can satisfy the written description requirement." *Ariad*, 598

F.3d at 1352. Nor is every conceivable embodiment of the claimed invention required to be

disclosed in the specification. *Smith v. Snow*, 294 U.S. 1, 11 (1935) ("[I]t is not necessary

to . . . describe in the specifications all possible forms in which the claimed principle may be

reduced to practice."); *McGinley v. Luv N' Care Ltd.*, 819 F. App'x 913, 922 (Fed. Cir. 2020). In

fact, to satisfy the written description requirement, it is not "necessary that the exact terms of a

claim be used *in haec verba* in the specification." *Nalpropion Pharms., Inc. v. Actavis Lab'ys

FL, Inc.*, 934 F.3d 1344, 1350 (Fed. Cir. 2019). Instead, "the critical inquiry" is focused on

"whether the patentee has provided a description that 'in a definite way identifies the claimed

invention.'" *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1190-92 (Fed. Cir. 2014).

Because the written description analysis is performed from the perspective of a POSA,

"[w]hat is required to meet the written description requirement 'varies with the nature and scope

of the invention at issue, and with the scientific and technologic knowledge already in

existence.'" *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1335 (Fed. Cir. 2021).

For this reason, "a patentee can rely on information that is 'well-known in the art' to satisfy

written description." *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1285 (Fed.

Cir. 2012) (citation omitted).

Claims can encompass a "genus," which is a group of closely related embodiments of the

invention. *See In re Kalm*, 378 F.2d 959, 963 (C.C.P.A. 1967) (explaining that a genus in the

chemical arts is a "group of compounds closely related both in structure and in properties"). A

genus can be described by "either a representative number of species falling within the scope of

the genus or structural features common to the members of the genus so that one of skill in the

art can 'visualize or recognize' the members of the genus." *Ajinomoto Co. v. Int'l Trade Comm'n*, 932 F.3d 1342, 1358 (Fed. Cir. 2019) (*quoting Ariad*, 598 F.3d at 1350 (*en banc*).

a)  **The common structural features test can be satisfied by disclosing a correlation between structure and function**

"[F]unctional characteristics when coupled with a known or disclosed correlation between function and structure" can satisfy the common structural features test. *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 323 F.3d 956, 964 (Fed. Cir. 2002) (emphasis removed); *see also Amgen v. Sanofi*, 872 F.3d at 1376. In this way, "functional claim language can meet the written description requirement when the art has established a correlation between structure and function." *Ariad*, 598 F.3d at 1350; *see also Erfindergemeinschaft UroPep GbR v. Eli Lilly and Co.*, 276 F. Supp. 3d 629, 649 (E.D. Tex. Aug. 25, 2017) ("The broad genus of 'solubilizing agents' would not require representative species if persons of skill knew of many solvents that could dissolve the salt, and thereby serve as a 'solubilizing agent' in that invention."). A "perfect correspondence" is not required—the Federal Circuit "[has] spoken more modestly of a 'correlation between structure and function.'" *Ajinomoto*, 932 F.3d at 1360.

b)  **A functional claim element can also be described by disclosing a representative number of species**

Additionally, the Federal Circuit has held that written description of a genus can be satisfied through the disclosure of a representative number of species. *See Ariad*, 598 F.3d at 1350. A disclosure of sufficient species to allow "one of skill in the art [to] make predictable changes to the described [species] to arrive at other" embodiments of the invention describes a genus. *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1301 (Fed. Cir. 2014). Importantly, even a single species can be representative of a claimed genus if the art is well-understood. *See Bilstad v. Wakalopulos*, 386 F.3d 1116, 1124 (Fed. Cir. 2004)

23

("[T]his court has continued to apply the rule that disclosure of a species may be sufficient written description support for a later claimed genus including that species.").

### 3.   Definiteness standard

A patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b). A claim is definite if "viewed in light of the specification and prosecution history," it "inform[s] those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. BioSig Instruments, Inc.*, 572 U.S. 898, 910 (2014). "[D]efiniteness is to be evaluated from the perspective of someone skilled in the relevant art." *Id*. at 908.

### C.   The Asserted Claims are enabled in a well-known and predictable art

The specification of the '780 Patent enables a POSA to practice the full scope of the Asserted Claims. RFOF 9. Asserted Claims 5, 20, and 25 of the '780 Patent each require four basic elements:

1)   A sustained release formulation of mirabegron;
2)   A hydrogel forming polymer;
3)   A hydrophilic additive;
4)   A particular dissolution profile.[9]

RFOF 9; JTX-0002.00015-016 (20:19-47, 61-65, 22:6-8, 12-25, 32-33). The first three of these basic elements are structural elements, and it is undisputed that the claims themselves (Claims 5 and 20) or the specification (Claim 25) define the ingredients covered by those elements. PFOF 29-31; RFOF 9-15. As Prof. Little outlined, these well-known claimed hydrogel formulations all function the same way—regardless of which hydrogel-forming polymers and hydrophilic

---

[9] The claimed dissolution profile requires the amount of mirabegron released from one tablet to be: (1) 39% or less after 1.5 hours and; (2) 75% or more after 7 hours; (3) as calculated by the label claim (*i.e.*, 25 mg or 50 mg dosage strengths); (4) when measured in 900 mL of a USP buffer having a pH of 6.8 using a USP Apparatus II (paddle) with a rotation speed of 200 rpm.

additives are used. *See, supra,* § II.A.2. As a result, any of the hydrogel-forming polymers and hydrophilic additives disclosed in the '780 Patent would be viewed as suitable for use in hydrogel formulations by a POSA. RFOF 10-15.

The "functional" dissolution profile is also well-defined, requiring only two dissolution measurements by a specific USP methodology at specific timepoints. RFOF 16. The '780 Patent specification guides a POSA to achieve that claimed function by disclosing a common structural mechanism—viscosity. As explained by Prof. Little, "viscosity [is] a structural feature of sustained release hydrogels that a person of ordinary skill can tune to." Tr. 1277:4-7; *see, supra,* § II.A.2. Therefore, a POSA would know how to adjust a formulation from a starting point to meet a target dissolution profile by changing the ingredients in the formulation in known ways to achieve a target viscosity. *See, supra,* § II.A.2.

More importantly, the process of formulating a sustained release hydrogel formulation that achieves a specific dissolution profile is well established. RFOF 71-116. The inventors of the '780 Patent discovered that formulating mirabegron using this known hydrogel formulation technology mitigated mirabegron's unexpected food effect when the formulation has specific dissolution characteristics. *See supra*, § II.A.1; PFOF 19-20. As a result, the '780 Patent specification describes the application of decades-old hydrogel formulation technology with mirabegron to achieve the claimed dissolution profile, which is a novel use of this technology. RFOF 68-69, 117-127. But given the long track record of preparing hydrogel formulations in the art, the specification need not include every known detail of this conventional technology in the patent specification. *Visual Memory*, 867 F.3d at 1261 ("[A] patent need not teach, *and preferably omits*, what is well known in the art.") (emphasis added).

25

Faced with this reality, Defendants attempt to rebrand the hydrogel formulations disclosed in the '780 Patent as nascent, trailblazing formulation technology, lacking critical guidance necessary to practice the "functional" aspects of the Asserted Claims. But they are contradicted at every turn. Indeed, Defendants repeatedly admitted that hydrogel formulations are known and old technology. *See, supra*, § II.E; RFOF 62-63, 68. Despite these admissions, Defendants attempt to fit the facts of this case into inapplicable caselaw they contend supports their positions. But even a cursory review reveals this square peg in a round hole argument for what it is.

### 1.      The threshold enablement analysis

In their opening brief, Defendants argue that the Asserted Claims are not enabled when analyzed under the factors enunciated in *In re Wands*. D.I. 534 at 5-42. As part of their *Wands* factor analysis, Defendants lead with "the breadth of the claim." *Id.* at 7-16. In doing so, Defendants mischaracterize that single factor as a "threshold issue," which improperly suggests that this factor is determinative of the enablement question. *Id*. But breadth of the claims is *not* a threshold issue in the enablement analysis. Indeed, the only threshold enablement question requires the patent challenger to establish "that *any* experimentation is necessary to practice the claimed methods" before the *Wands* factors are even examined. *Alcon*, 745 F.3d at 1189 (emphasis added). Notably, Dr. Chambliss's testimony confirms that he neglected to undertake this threshold inquiry and jumped directly into the *Wands* factors analysis which is his sole basis for arguing the claims are not enabled. RFOF 167; Tr.1047:24-1048:5. As a result, should the Court find that Defendants fell short on this offer of proof, then it need not consider the *Wands* factors at all and can reject Defendants' enablement defense outright.

Even assuming Defendants had provided evidence demonstrating that experimentation is required to practice the Asserted Claims, the *Wands* factors demonstrate that any such

experimentation is not undue. RFOF 170-207. More importantly, and as discussed further below, each of the eight *Wands* factors support that the claims are enabled.

### 2.      The level of predictability in the art supports enablement (Factor 5)

There is little doubt that preparing hydrogel formulations with specific dissolution characteristics was known, predictable technology as of the '780 Patent's filing date.[10] RFOF 71-116, 170-176. As a result, this factor weighs heavily in favor of enablement. RFOF 170-176.

### a)      Hydrogel formulation technology is known, predictable art

As Prof. Little testified, even students with far less experience than a POSA could—within a single experiment involving one to five formulations—prepare a hydrogel formulation meeting a desired dissolution profile. *See, supra*, § II.A.3. So too could a POSA, who is more skilled and knowledgeable than mere students at preparing hydrogel formulations. RFOF 79, 83, 88, 173. This is not surprising as hydrogel formulation technology has been used in sustained release formulations since the early 1990s, well before the '780 Patent was filed in 2008. RFOF 69. Numerous handbooks, publications, patents, and trade materials extensively detail how to use different hydrogel formulation components to affect dissolution rate, dating back decades. RFOF 60-70. And, as discussed above (*see, supra*, § II.A.3), DOE software was available as of September 2008 to assist the POSA in tuning those formulations to achieve the target dissolution rate. RFOF 93. Thus, the need for experimentation might be obviated due to the high degree of experience the POSA has with these types of hydrogel sustained release formulations in combination with DOE, as it is possible that the first formulation made meets the Dissolution Limitation.

---

[10] As explained above, Defendants' mistaken, repeated contention regarding unpredictability in the art infects both their enablement and written description arguments. Accordingly, Astellas begins its analysis here.

Perhaps some of the best evidence of how a POSA would approach the claims comes from Defendants themselves. In seeking to develop generic versions of Myrbetriq®, Defendants were presented with a situation analogous to that of a POSA reading the claims of the '780 Patent. Tr. 1254:18-1255:9; RFOF 104. Although after the priority date of the '780 Patent, each Defendant *independently* utilized the well-known process of TDD to develop their ANDA products to match Myrbetriq®. RFOF 97-116. Using TDD, each Defendant performed routine experimentation to formulate products that matched the dissolution profile of Myrbetriq®—a substantially more demanding goal than simply falling within the scope of the claims. RFOF 97-116. And Defendants' own research also shows that this process works for more than just the specific polymer (PEO) and additive (PEG) used in Myrbetriq®. As discussed above (*see, supra,* § II.A.3), ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████; Tr. 1271:25-1272:8; PTX-5004.00017, 031-043, 049. Because the specification and claims of the '780 Patent provide target dissolution characteristics, albeit limited and easily attainable ones, it would be routine for a POSA to employ a process analogous to that of Defendants: taking any potential combination of hydrogel forming polymer and hydrophilic additive and tuning that formulation to meet the claimed target dissolution profile disclosed in the patent specification. RFOF 97-116. Had Defendants' goal been merely to meet the two dissolution time points in the claim rather than match the entire Myrbetriq® profile, then Defendants may not have needed any experimentation at all.

To sidestep the fact that hydrogel formulation development is routine and straightforward, Defendants deflect by arguing that their efforts are not legally relevant. But it is well-settled that post-filing evidence is relevant to an enablement inquiry when that evidence reflects how a POSA would address the problem associated with the claims at issue. *See Amgen v. Hoechst Marion Roussel*, 314 F.3d at 1336 (affirming that enablement was satisfied when the specification was "buttressed by numerous post-filing publications that demonstrated the extent of the enabling disclosure"). That is the case here, particularly where *every Defendant* utilized the same targeted dissolution design approach. This is especially so where Prof. Little confirmed the same approach was employed as of the priority date (and earlier).

At bottom, the evidence in this case demonstrates that the preparation of hydrogel formulations as required by the Asserted Claims is a predictable art, which leans in favor of enablement under this *Wands* factor. RFOF 170-176.

> ### b) The Court should reject Dr. Chambliss's erroneous opinions concerning predictability in the art

In an attempt to overcome the overwhelming evidence of predictability in the art as applied to these formulations, Dr. Chambliss pointed to scattershot factors that he asserts *could influence* the dissolution rate. D.I. 534 at 17-23. However, Dr. Chambliss failed to show that a POSA would view these factors as rendering the art unpredictable. *Cephalon*, 707 F.3d at 1338 (An expert's "*ipse dixit* statements . . . cannot be enough to constitute clear and convincing evidence."). In fact, the very graphs, charts, and tables Dr. Chambliss used during his testimony are what teaches a POSA how to anticipate changes to hydrogel formulations by introducing and controlling for those factors—perhaps without any experiments at all. As Prof. Little explained, Dr. Chambliss's exhibits demonstrate that the art is *predictable*. RFOF 64; *See e.g.*, DTX-2073,

DTX-2077, DTX-2078. Dr. Chambliss's attempt to show the art is unpredictable thus actually confirms the opposite.

Furthermore, Defendants argue for facts that confirm predictability. For example:

- "A POSA would have understood that the solubility of the API will influence the drug dissolution rate of a hydrogel formulation, as reflected in teachings of the prior art." DFOF 90.

- "A POSA would have understood that different polymorphic forms of a drug will have different physical properties, including solubility, which will influence the drug dissolution rate of a hydrogel formulation, as reflected in teachings of the prior art." DFOF 91.

- "A POSA would have understood that different salt forms of a basic compound like mirabegron will have different solubility, which will influence the drug dissolution rate of a hydrogel formulation, as reflected in teachings of the prior art." DFOF 92.

- "A POSA would have understood that the type of hydrogel-forming polymer in a hydrogel formulation will influence the drug dissolution rate, as reflected in teachings of the prior art." DFOF 98.

The list goes on. DFOF 96, 97, 101, 106, 109, 113, 117, 118, 120, 122. This litany of admissions proves Plaintiffs' point: the prior art is replete with information on how the various factors can be adjusted to achieve a targeted dissolution rate. And this information "need not" be included in the specification as it is well known in the art. *See Visual Memory*, 867 F.3d at 1261.

Dr. Chambliss further attempted to cite to specific references he believed demonstrate unpredictability in the art. RFOF 62-63. But they do no such thing. Instead, the publications Dr. Chambliss proffered *support* Prof. Little's predictability opinion by explaining how different formulation choices affect dissolution rate. RFOF 62-63. For example, Dr. Chambliss pointed to the Sako '024 patent (DTX-2042), which he alleges shows that the proportion of PEO in the formulation could change whether the formulation would meet the Dissolution Limitation. RFOF 62; DTX-2042.00004-005. Sako '024 does not support unpredictability, but instead shows the opposite: a POSA would have had at their disposal information that demonstrates how PEO

30

influences the dissolution behavior of hydrogel formulations. RFOF 62. An understood, directional relationship like this is the essence of predictability.

Similarly, Defendants point to a manufacturer's brochure for the claimed hydrogel forming polymer, Methocel, *published in the 1980's*. RFOF 63; DTX-2073.00004. Far from evidencing non-enablement, this decades-old brochure teaches a POSA how Methocel functions when included in a hydrogel formulation. RFOF 63-64. Based upon this publication, and the many others available that characterized this and other polymers, a POSA would understand how these ingredients could be integrated into a hydrogel formulation. RFOF 63-67; DTX-2073.00004. Indeed, similar information was available from manufacturers for the other components identified in the '780 Patent. RFOF 66. Instead of demonstrating unpredictability, these resources demonstrate why TDD successfully achieves the desired dissolution profile —the well understood relationships between ingredients and dissolution rates renders the art predictable. RFOF 56-70.

Defendants' last resort is to abstractly argue that the art is unpredictable because dissolution must be measured experimentally. But it is undisputed that dissolution testing is routine. RFOF 78. Whether experimentation is required is not the legal test; rather the question is whether such testing is undue. *In re Wands*, 858 F.2d at 736-37 ("The key word is 'undue,' not 'experimentation'"). Here, if experimentation is even required, it is not undue, but admittedly routine, even according to Dr. Chambliss. RFOF 78; *see also In re Wands*, 858 F.2d at 736-37 ("Enablement is not precluded by the necessity for some experimentation such as routine screening."). The need for such routine testing does not detract from the predictability of the art.

         **c)**        **Astellas never admitted during prosecution that dissolution as required by the Asserted Claims is unpredictable**

Defendants allege that statements made during the prosecution of a related application show that the art is unpredictable. Defendants misstate the evidence. The comments made during prosecution of the '313 Application relate to the ability of a POSA *to predict the dissolution profile that would overcome mirabegron's food effect*, not the ability to achieve that profile once identified and disclosed in a patent specification. *See* Tr. 1305:21-1307:4. That is, without the Dissolution Limitation that Astellas' inventors discovered as a target, developing formulations that ameliorate mirabegron's food effect would not be predictable. *Id.* Indeed, determining the correct dissolution characteristics to overcome that food effect required extensive experimentation and clinical tests. But once those characteristics was determined, it was a much less complex task for the POSA to formulate hydrogel formulations of mirabegron with the requisite dissolution parameters from the patent specification. *See* RFOF 71-116. As noted, Defendants did just that when they sought to produce their own generic versions of Myrbetriq®. RFOF 97-116.

         **d)**        **The case law relied upon by Defendants is limited to unpredictable art, and so do not apply here**

Defendants rely on a number of cases to argue the non-enablement of the Asserted Claims. Tellingly, not one of those cited cases involves a court finding claims to be invalid for lack of enablement when the subject matter of the claims was predictable. As a result, none of Defendants' cases provide a basis to find the Asserted Claims non-enabled.

In both *Amgen* and *Baxalta*, the evidence showed that the claimed function was unpredictable. *Amgen Inc. v. Sanofi, Aventisub LLC*, 987 F.3d 1080, 1088 (Fed. Cir. 2021) (explaining that "only [] a small subset of examples" of the invention "can be predictably

generated");[11] *Baxalta Inc. v. Genentech, Inc.*, 579 F. Supp. 3d 595 (D. Del. Jan. 13, 2022) ("The field of antibodies is inherently unpredictable."). And the inventions of *Wyeth*, *AstraZeneca*,[12] and *Roxane* were not well enough understood to be predicted. *Wyeth v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013) (explaining that POSA did not know how to "structurally modify" the invention "to yield a compound having the recited functional effects"); *AstraZeneca AB v. Mylan Pharms.*, 1:18-cv-193, 2022 WL 16857400 at *13 (N.D. W.Va. November 9, 2022) (plaintiff's expert conceding "identifying stable formulations of budesonide, formoterol, PVP, PEG, and HFA 227 was completely unpredictable"); *Pharm. Res., Inc. v. Roxane Labs., Inc.*, 253 Fed. Appx. 26 (Fed. Cir. 2007) ("There is no known method in the art to predict whether a change in inactive ingredients will produce a stable suspension."). And finally, in *Enzo*, not only did the plaintiff's own expert admit that "it [was] against the prevailing wisdom" that the functional element could be met, but the patent did not even show that the invention was possible. *Enzo Life Scis. Inc. v. Roche Molecular Sys. Inc.*, 928 F.3d 1340 (Fed. Cir. 2019); *see id*. at 1347 ("[M]erely stating that a labeled polynucleotide will work as a probe is not sufficient to enable one of skill in the art to know that it would indeed function.").

---

[11] Defendants invoke *Amgen* while omitting the fact that the Supreme Court recently granted certiorari and held oral argument in that case on issues relating to enablement of genus claims. *See generally* Oral Argument Tr., *Amgen, Inc. v. Sanofi*, No. 21-757 (U.S. Mar. 27, 2023). There, the parties agreed that "the cumulative effort" to produce *every* embodiment encompassed by the claims is not dispositive of the enablement inquiry. *Id.* at 25:6-16 (counsel for Amgen), 61:19-25 (counsel for Sanofi); 96:6-97:1 (counsel for the United States). The parties to that case thus agree that the calculations Dr. Chambliss emphasized are simply not what matters.

[12] While Defendants rely heavily on *AstraZeneca*, they conspicuously fail to note that the district court's opinion and order have since been vacated. *See AstraZeneca AB v. Mylan Pharms. Inc*, No. 18-cv-193, D.I. 625 (N.D. W.Va. Mar. 8, 2023) (attached as Ex. A). Of course, vacated opinions can still be cited—like any other piece of writing. *Free Speech Coalition, Inc, v. Attorney General of the United States*, 974 F.3d 408, 427 (3d Cir. 2020). But while a vacated opinion is "available to read," its significance is "cloud[ed] and diminish[ed]" by vacatur. *In re Memorial Hospital of Iowa County, Inc.*, 862 F.2d 1299, 1302 (7th Cir. 1988).

Defendants' brute-force attempt to analogize to these cases ignores the record. The thread running through *every one* of the Defendants' cases is the substantial unpredictability of the art heightening the amount of experimentation required to practice the claims. The relevance of these decisions is nullified by the substantial evidence in this case—including extensive prior art regarding hydrogel forming formulations and their components and Dr. Little's unrebutted testimony that there is directional movement—showing that formulating hydrogel forming formulations was a well-understood and predictable decades-old art.

For each of the foregoing reasons, *Wands* Factor 5 heavily favors enablement.

### 3.   The breadth of the claims (Factor 1)

Defendants argue that the "breadth of claims" factor leans decidedly in their favor, characterizing the breadth as "extraordinary." D.I. 534 at 16. To get there, however, Defendants rely on purportedly conservative calculations from their expert, Dr. Chambliss, to argue that the claims encompass "millions of candidate formulations." *Id.* at 8. But Defendants' calculations are baseless as Dr. Chambliss failed to show why each of the "variables" he identified to support his calculations would actually impact how a POSA viewed the scope of the claims.

And while many hydrogel formulations are within the scope of the Asserted Claims, the mere amount of work needed to explore all possible formulations covered by the Asserted Claims is not dispositive of enablement. *See*, *e.g.*, *Amgen v. Sanofi, Aventisub*, 987 F.3d at 1088 ("We do not hold that the effort required to *exhaust* a genus is dispositive."). Rather, enablement should be viewed through the lens of a POSA, as Prof. Little explained at trial. *See infra at* § III.C.3.c). When viewed through the proper lens, this *Wands* factor weighs in favor of enablement. RFOF 182.

34

a)      **Dr. Chambliss's "millions of candidate formulations" calculations are baseless**

Defendants rely heavily on Dr. Chambliss's calculations of the number of "candidate formulations" allegedly covered by the structural limitations of the Asserted Claims.[13] D.I. 534 at 8-12. They use these calculations to argue that the claims are extremely broad. *Id.* at 8-9. But Dr. Chambliss's calculations are based upon conclusory statements of opinion. Tr. 1055:10-1068:8. Such unsubstantiated conclusory statements about potential "variables" that *could* impact dissolution are legally insufficient to support non-enablement. *Alcon*, 745 F.3d at 1189 ("[Defendant] adduced no evidence at trial that changing any of the 'variables' or '[v]arious parameters' identified by the district court would render [patentee's] claimed invention inoperable, nor was there any evidence that experimenting with those variables was required for an ordinarily skilled artisan to [practice the claimed invention].") A close inspection of Dr. Chambliss's calculations shows that to be the case here, too.

In explaining Dr. Chambliss's calculations, Defendants first discuss his analysis of Claim 1. D.I. 534 at 9-10. But Claim 1 is not an Asserted Claim, so its scope is irrelevant to the enablement inquiry.[14] *See Idenix Pharms. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149 (Fed. Cir.

---

[13] Astellas renews its objection to the admissibility of the calculations Dr. Chambliss introduced at trial as outside of the scope of his report. *See* Tr. 1050:11-1052:9; Fed. R. Civ. P. 26. Dr. Chambliss's report contained a variety of calculations, but none that corresponded to the numbers he stated at trial. And courts in this Circuit are reluctant to allow an expert "to testify beyond the scope of his or her report." *Lipton v. Mountain Creek Resort, Inc.*, No. 13-cv-4866, 2019 WL 4597205, at *7 (D.N.J. Sept. 23, 2019). This is especially true when, as here, the failure to include a specific opinion in the expert's report undermines the opposing party's ability to challenge that opinion. *See, e.g., Inline Connection Corp. v. AOL Time Warner Inc.*, 472 F. Supp. 2d 604, 615 (D. Del. 2007) (precluding expert testimony on subjects outside the scope of deposition and report where the opposing party had no opportunity to respond).

[14] Similarly, the scope of the disclosure in the patent specification is also irrelevant as it is the claims that must be enabled. *See Idenix*, 941 F.3d at 1159 (explaining that the enablement requirement is directed to the "full scope of the claim").

2019) (explaining that enablement is directed to the "full scope of the *claim*") (emphasis added). Turning to the Asserted Claims, Defendants then explain how Dr. Chambliss arrived at his final calculations. D.I. 534 at 10-12. But Dr. Chambliss presented a list of "variables" he believes *could* impact dissolution, but offers no compelling explanation why any of these variables impact *enablement* as opposed to merely optimizing dissolution. Dr. Chambliss argued, for instance, that Claim 5 would encompass pharmaceutical compositions outside of the oral hydrogel formulations discussed throughout the patent specification[15] (Tr. 1055:10-23), but does not provide any factual support why this claim term encompasses other dosage forms (*i.e.*, solutions, granules, suppositories, etc.) given the claims as granted, versus those originally applied for, expressly require a hydrogel formulation tested using a standardized dissolution apparatus (USP II) for oral dosage forms (Tr. 130:11-14, 21-24). Dr. Chambliss also argued that there are "different forms of mirabegron" over a wide range, including salts (D.I. 534 at 9), but there is no evidence that a POSA would consider the form or concentration of mirabegron to affect their analysis of the scope of the claim (Tr. 1055:24-1056:15, 1061:24-1062:10, 1075:20-1076:11, 1075:20-1076:11, 1076:19-1077:7, 1077:16-1078:10). He further noted that several different types and grades of HFP and WSA are available, and that "combinations" of them are allowed by the claims (D.I. 534 at 9-10); but, similarly, Dr. Chambliss presented no evidence that a POSA would consider the different grades of HFP and WSA to expand the scope of the Asserted Claims or impact their ability to practice them.[16]

---

[15] This opinion also appears to be an end-run around the Court's order requiring claim construction long ago. *See* D.I. 88 at 15. As a result, the Court should reject this argument wholesale.

[16] Defendants also claim the inclusion of the term "comprising" in the claims renders them broad. This is nonsense. "The term 'comprising' is one of the most commonly used transition terms." *See* Robert A. Matthews, Jr., *Annotated Patent Digest* § 4:38 (March 2023). Its use is

36

Defendants simply did not present any evidence—beyond expert supposition—that variations in those factors would impact a POSA's assessment of the claims' scope. Just because a variable *can* be optimized doesn't mean that that variable is impactful for the enablement analysis: "Adjusting variables may be relevant to *optimizing* the [claimed formulation], but [Defendants] proffered no evidence that any experimentation, let alone undue experimentation, with those variables would be necessary in order to *practice* the claimed invention." *Alcon, 745 F.3d at 1189* (emphasis in original). Without more, Dr. Chambliss's calculations that the claims encompass "millions of candidate formulations," are baseless. *See. e.g., id.* ("[Defendant] adduced no evidence at trial that . . . 'experimenting with those variables was required for an ordinarily skilled artisan to [practice the claimed invention].'").

Dr. Chambliss's calculations are also at odds with his own formulation experience. During cross-examination, he confirmed that he did not start with "millions" of formulations, but rather "looked at the characteristics of that drug that now you're to develop and used your knowledge of previous formulations to get started," and that is what a POSA would do here. Tr. 1156:24-1157:16; RFOF 206. Indeed, both Prof. Little and Dr. Chambliss agreed that a POSA would not make hundreds, thousands, millions, billions, or trillions of formulations in order to practice the claims, but instead would rely on TDD to develop a formulation meeting the

---

ubiquitous and invalidation of these claims on this basis would render thousands of obviously appropriate patents suspect. Nor does the caselaw support Defendants' position. In *MagSil*, the enablement issue focused on the claim term "change in the resistance by at least 10%," and not the claim transition phrase "comprising." 687 F.3d at 1384. In fact, *MagSil* even distinguishes the "at least 10%" claim element in dispute from the open transition of "comprising" in its analysis. *Id*. at 1379, 1384. The *Liebel-Flarsheim* case fares no better, as it does not discuss the transitional phrase "comprising" at all, but rather that the patentee had fought to add a "jacketless system" to its claim term "an injector system with and without a pressure jacket," and therefore needed to enable it, but failed to do so. *Liebel-Flarscheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007).

Asserted Claims. RFOF 84-89, 205-206. And both experts agreed that TDD was routinely used to obtain formulations meeting a desired dissolution profile in as little as three to five attempts. RFOF 79-83 88, 89.

At bottom, Dr. Chambliss offered little more than a generalized concern that "when 'you have a lot of variables on top of one another, the experimentation gets out of control quickly.'" *Alcon*, 745, F.3d at 1189 (Fed. Cir. 2014). The Federal Circuit has expressly held that "such an unsubstantiated and conclusory statement is not sufficient." *Id.*

### b) Defendants' cited case law does not support their calculations

In an effort to support their theory of breadth covering "millions" of formulation calculations, Defendants boldly state that "courts routinely rely on numerical calculations such as those performed by Dr. Chambliss." D.I. 534 at 12. And while some courts have relied on calculations to assess the breadth of claims, those cases are not analogous to this one. For example, Defendants rely on *Idenix*, *Wyeth*, and *Enzo* to support such calculations. D.I. 534 at 12, 16. But in each of those cases, the factual record showed that it was undisputed that the claims covered numerous, separate compounds, where even small changes between those compounds lead to unpredictable results. *Idenix*, 941 F.3d at 1159 ("At trial, Idenix's expert agreed that the field of modifying nucleosides for anti-HCV activity was 'in its infancy' and 'unpredictable.'"); *Wyeth*, 720 F.3d at 1385 ("Wyeth's own witnesses testified that even minor alterations to the sirolimus molecule could impact its immunosuppressive and antirestenotic properties."); *Enzo*, 928 F.3d at 1347 (basing its opinion on "the unpredictability of the art at the time and the serious doubts held by those of skill in the art regarding whether" the claimed embodiments could work). None of these factual scenarios are present here.

Likewise, Defendants' reliance on *Roxane* and *AstraZeneca* to support Dr. Chambliss's calculations is improper. D.I. 534 at 12. Neither case applies. In *Roxane*, the claim at issue

covered "[a]n oral pharmaceutical composition in the form of a stable flocculated suspension in water," and included a "surfactant." 253 Fed. Appx. at 27-28. But the factual record showed that "the type and concentration of the surfactant in solution is critical to creating a stable flocculated suspension." *Id.* at 27. While the court commented that "the claims encompass hundreds of possible surfactants," the non-enablement determination hinged on the unpredictable nature of the claims, not any calculations. *Id.* at 30. Indeed, one of the named inventors "testified that predictions could not be made regarding whether or not particular combinations of ingredients…would form a stable flocculated compound." *Id.* at 29.

Similarly, in *AstraZeneca*, the defendant argued that "undue experimentation would be required to find any other formulation that satisfies the asserted claims' structural and functional limitations because any change to a single ingredient impacts the whole formulation." 2022 WL 16857400 at *6. But there, "the specification taught that changes in the PVP concentration down to the fourth decimal point impacted the stability of the formulation." Based on this finding, "[Defendant's expert witness] determined there were 10,000 possible PVP concentrations and 200 concentrations of PEG that a POSA could consider." *Id.* at *10. Thus, unlike here, there was factual evidence in *AstraZeneca* to support distinguishing certain "variables" to calculate separate, unpredictable formulations that were within the scope of the claims.[17]

### c)     Prof. Little properly viewed the Asserted Claims as a POSA

To deflect from their failure to provide facts or law to support their calculation-based breadth theories, Defendants fault Prof. Little for not performing his own. D.I. 534 at 12-13. But as Prof. Little explained, "when a person of ordinary skill in the art looks at these claims, they

---

[17] As discussed above, this opinion was vacated, so there is no indication whether the Federal Circuit would also approve of the use of these calculations. *See supra* at n. 1212.

certainly do not see that many formulations, not even close." Tr. 1344:7-16; RFOF 89.

According to Prof. Little, a POSA would readily understand how to tune the hydrogel

formulation to achieve the claimed dissolution profile, rendering the mathematical exercise

irrelevant. *See supra* at §§ II.A.2-3. As a result, the Court should not be swayed by these baseless

calculations and should instead focus on how a POSA would see the claim: directed to a specific

type of sustained release formulation with a particular dissolution profile.

Defendants attempt to sidestep that analysis by arguing that it is legal error for Prof. Little

to view the scope of the claims as a POSA. D.I. 534 at 12-13. But that is exactly what the law

requires: "[T]he enablement requirement is viewed from the perspective of one of ordinary skill

in the art." *Erfindergemeinschaft*, 276 F. Supp. 3d at 659; *see also Ariad*, 598 F.3d at 1351. Prof.

Little did not attempt to change the interpretation of the claims themselves; he merely explained

how a POSA would assess their scope. Prof. Little's analysis of the claims as a POSA is entirely

appropriate. Nonetheless, Defendants criticize Prof. Little for allegedly not addressing "the full

scope" of the claims "as written." D.I. 534 at 13-14. These arguments, however, are bootstrapped

to Dr. Chambliss's baseless calculations because they fault Prof. Little for not considering the

"variables" Dr. Chambliss proposed. In reality, as Prof. Little testified, these "variables"

Defendants threw at him do not need any analysis. *See, supra*, § II.A.2-II.A.3.

Defendants close their "breadth" analysis with alleged "admissions" from Prof. Little and

the inventors. D.I. 534 at 15-16. First, the statements Defendants cite from Prof. Little are not

admissions that the claims are too broad to be enabled, but rather that Dr. Chambliss's argument

is logically flawed and irrelevant to the analysis. Second, the purported "admissions" from Dr.

Sako and Mr. Takaishi are irrelevant—the details of their research from a decade previous and

their interpretation of patent language not in dispute is of no moment. These so-called
"admissions" fall flat and do not support Defendants' breadth argument.

*    *    *

The large numbers generated by Dr. Chambliss are not based upon facts. They are
conclusory and unsupported. What is more, they are irrelevant—a POSA would view the claims
as narrowly tailored to certain hydrogel formulations of mirabegron. Thus, this *Wands* factor
favors enablement. RFOF 182.

### 4. The nature of the invention and state of the prior art (Factors 2 and 3)

The inventors realized that slowing mirabegron's release by formulating it in a sustained
release hydrogel could overcome mirabegron's food effect. PFOF 19-20; RFOF 121. The
inventors confirmed this with a clinical trial. RFOF 127. The invention is directed to the use of a
well known, well established sustained hydrogel formulation, that, with the claimed dissolution
profile, overcomes mirabegron's undesirable food effect. PFOF 19-20; RFOF 38-40, 121, 210.
The invention is thus not a new type of formulation, but rather a novel application of an old
technology to address a significant problem that had to be overcome in order for there to be an
effective mirabegron treatment.

And, as discussed above, the prior art related to the formulation of sustained release
hydrogels to achieve a particular dissolution profile was well developed, such that a POSA
would know how to select and combine the claimed formulation components to get the
Dissolution Limitation. *See, supra*, § II.A.2. The claimed hydrogel forming polymers and
hydrophilic additives were similarly well understood and well characterized. RFOF 41, 56-58,
60-63. A POSA would be very familiar with how those components acted and interacted in a
hydrogel formulation as well as how those components would be adjusted to achieve the claimed
dissolution profile. RFOF 34-37, 44, 46, 47, 50, 53, 54, 71-83, 128, 136, 143, 187. Indeed, both

41

Prof. Little and Dr. Chambliss acknowledged that tuning sustained release hydrogels to achieve a specific dissolution profile was routine. RFOF 50, 54, 81.

Accordingly, both of these *Wands* factors weigh in favor of enablement. RFOF 189.

### 5.     The level of one of ordinary skill (Factor 4)

A POSA in the relevant art would have a Ph.D. or equivalent and substantial relevant experience. PFOF 56, 57. It is undisputed that the level of skill in the art was very high. RFOF 190-192. As such, this *Wands* factor weighs in favor of enablement. RFOF 193.

### 6.     The amount of direction provided by the inventor and the existence of working examples (Factors 6 and 7)

The specification of the '780 Patent provides ample guidance for a POSA to make and use the claimed invention. As explained above, the patent first sets out the problem—the problematic food effect observed in immediate-release mirabegron. RFOF 117, 119, 124, 125. Then, it explains that the solution to the problem is a particular dissolution rate. RFOF 117, 119, 120, 124, 125. The patent further describes the physical principles by which the dissolution rate can be modified through changes in viscosity. RFOF 143. Further still, the patent provides a series of hydrogel-forming polymers—along with their associated viscosities—appropriate for use in formulation, as well as several example formulations that achieve the required dissolution rate. RFOF 128, 134, 135, 145-147. Finally, the patent supplements those teachings with references to additional resources that explain in greater detail the well-understood mechanics of sustained release formulation. JTX-0002.00002-004, 006 (1:63-67); RFOF 129.

This combination of teachings is more than sufficient guidance to allow a person of skill in the art to swiftly achieve working embodiments throughout the entire claimed genus of formulations. RFOF 129. The patent provides both problem and solution in such sufficient and plain language that a POSA would be able to appreciate not just what the solution is in general

42

terms, but also how they would approach solving the problem using any particular combination of claim elements. RFOF 124, 125; JTX-0002:00006-007 (2:18-3:4). Indeed, the specification sets forth the recipe a POSA would use to practice the claims. It identifies: the (1) target dissolution rate; (2) ingredients to be used; (3) how they are tuned, including how structural characteristics (such as average molecular weight or viscosity of hydrogel forming polymers) are related to dissolution; and (4) how they are tested. RFOF 128, 130, 133-147, 149-165, 177, . As Prof. Little described and Dr. Chambliss agreed, combining these elements to achieve a desired dissolution rate could be done reliably in 3-5 formulations. RFOF 79-83 88, 89. In this light, the guidance is clearly sufficient—it allows a POSA to swiftly achieve the claimed invention.

To the extent a formulator needed any more information regarding a particular claimed ingredient, that information was well known in the art (as evidenced by at least the previously discussed prior art relied on by Defendants*). See, supra,* § III.C.2.b). Defendants' argument that the inventors should have explicitly incorporated the language from these decades-old handbooks, patents, and manufacturer brochures into the specification is contrary to Federal Circuit's precedent and common sense. *See Visual Memory*, 867 F.3d at 1261 ("a patent need not teach, *and preferably omits*, what is well known in the art.") (emphasis added). This is particularly the case, where, as here, the invention is directed to technology that was well characterized and routine. RFOF 37, 50, 69.

Buttressing the specification's teaching are working examples, including one which was tested in patients and shown to alleviate the food effect, that the USPTO explicitly assessed before allowing the Asserted Claims. JTX0002.00015 (19:47-20:5); RFOF 126, 127. The specification includes 17 exemplary sustained release hydrogel formulations, including at least three that were shown have the claimed dissolution rate: Examples 2, 8 and 9. RFOF 149-154;

JTX-0002.00012-015 (14:45-18:35, 18:51-19:9). The patent further includes a comparative example of an immediate release formulation, that a POSA would understand could be contrasted with the formulation of the invention. RFOF 158.

Defendants assert that because Examples 2, 8 and 9 are formulated with just PEO and PEG, those examples do not enable a POSA to make formulations with other polymers or additives. D.I. 534 at 30-31. Defendants are incorrect. As noted, all of the disclosed hydrogel forming polymers in the claimed formulation function by the same structural mechanism, *i.e.*, to form the polymeric backbone of the hydrogel. PFOF 33-35; RFOF 14, 34-36, 132-134. A POSA would understand that HPMC, HPC, CMC, HC and CVP are substitutable for PEO. RFOF 53, 54, 81, 202. Likewise, all of the claimed hydrophilic additives function to bring water into the drug. PFOF 14, 36, 37; RFOF 34-36, 138, 139. A POSA would thus understand that all of the claimed hydrophilic additives are substitutable for PEG. RFOF 34-36, 81, 138, 139.[18]

Accordingly, both of these *Wands* factors weigh in favor of enablement. RFOF 204.

### 7. The quantity of experimentation needed to make or use the invention based on the content of the disclosure (Factor 8)

Nominal experimentation, if any, is required to make and use the claimed invention. As Prof. Little testified, targeted dissolution development was routinely practiced by in the field and a POSA would be readily able to develop the claimed formulation in a single experiment. RFOF

---

[18] Defendants also argue that Examples 2, 8, and 9 are not working examples because they were tested at 50 rpm, not 200. D.I. 534 at 28. But Defendants are factually wrong, as Dr. Chambliss himself admitted. *See, supra*, §II.E; *infra*, § III.D.2.b). Astellas simply made an immaterial mistake during the prosecution of the '313 application—a different application reviewed by a different examiner. Tr. 1220:14-17. And when Astellas added the 200 rpm limitation to the '780 Patent's claims, the Examiner agreed that Examples 2, 8, and 9 were working examples tested at 200 rpm. *See, supra*, § II.D.

71-116, 143, 147, 205. Moreover, POSAs had at their disposal numerous tools, including predictive software, that would assist them in their development efforts. RFOF 90-96, 206.

Dr. Chambliss's testimony that a POSA would have to individually test every possible formulation is directly rebutted not only by the evidence showing that the art is, in fact, predictable, but the testimony of *both* Dr. Chambliss and Prof. Little explaining that it would only take 3-5 formulations to determine how to achieve the claimed dissolution rate with any particular set of ingredients. RFOF 79-83 88, 89. Defendants cannot argue that a POSA would be forced to individually assess every formulation to know if it worked, while their expert admits it would only take a single experiment to tune a formulation to meet the claimed Dissolution Limitation. As such, this *Wands* factor weighs in favor of enablement. RFOF 205-207.

*     *     *

For all the reasons set forth above, based on an analysis of the *Wands* factors, Defendants have not met their heavy burden and the Asserted Claims are enabled.

### D.    The '780 Patent's specification demonstrates the inventors' possession of the Asserted Claims

The Federal Circuit has explained that a patent must contain "a written description *of the invention*." *Ariad,* 598 F.3d at 1344 (emphasis added). The '780 Patent specification satisfies this requirement. Importantly, the written description analysis must be conducted with an appreciation of what "the invention" is and what differentiates it from information already known in the prior art. *See id*. at 1351-52 (criticizing two cases reaching different outcomes on written description concerning relationship between DNA and amino acid sequences due to "progress in the field" in the intervening years between decisions) (citations omitted)).

The fundamental flaw in Defendants' written description argument is that it faults the '780 Patent specification for not repeating, chapter and verse, subject matter that is decades old:

45

hydrogel formulation technology that was already well known to those of ordinary skill. As Dr. Chambliss admitted, as of September 2008, extensive knowledge already existed for sustained release hydrogel formulations; they were already one of the most common sustained release formulations in use for oral delivery were. *See, supra*, § II.E. He also agreed that the particular hydrogel-forming polymers covered by the Asserted Claims were well known in the art. *Id*.

It is apparent that the invention of the Asserted Claims is not sustained release hydrogel formulations *per se*, but rather, the appreciation that when this known formulation technology is combined with mirabegron and tuned to achieve the Dissolution Limitation, the resulting formulations diminish mirabegron's food effect. RFOF 117-127, 209-210. The '780 Patent specification discloses far beyond what it necessary to meet the written description requirement for the novel aspect of the invention.

The '780 Patent specification makes clear that sustained release hydrogel formulations were already known—the inventors never claimed to be the inventors of that technology. JTX.0002.00006 (1:63-67). To the contrary, the specification explains that the "object of the present invention is to provide a pharmaceutical composition for modified release comprising" mirabegron having "no limitation on food intake." *Id.* (2:21-29). Plainly then, the specification makes it very clear that the invention is the use of known, decades-old, and well-understood hydrogel forming sustained release technology with mirabegron to create formulations having the Dissolution Limitation to overcome the drug's food effect.

Defendants offer a boilerplate written description attack, alleging that the '780 Patent specification "discloses neither a representative number of species to support the entire genus, nor structural features common to all members of the claimed genus." D.I. 534 at 44. As

discussed below, Defendants are wrong on both fronts, and, moreover, cannot prove as much by clear and convincing evidence.

> **1.    The specification describes a correlation between the structural components of the Asserted Claims and the functional Dissolution Limitation**

As is plain from the '780 Patent, each of the Asserted Claims have structural features common to all members of their compositions, including, but not limited to, mirabegron. RFOF 9-16. In addition, all members must contain a hydrogel forming polymer and an additive. *Id.* Moreover, the '780 Patent discloses the correlation between the claimed formulation's structure (*i.e.*, its ingredients) and its claimed function (*i.e.*, its dissolution characteristics), thus providing "common structural features." *See Ariad*, 598 F.3d at 1350.

Specifically, the '780 Patent correlates the viscosity of the formulation—one of its structural features—with the dissolution rate. RFOF 128, 143-146, 220; JTX-0002.00009 (7:35-38) ("[T]he release period of time of the drug from the formulation can be arbitrarily controlled by adjusting the viscosity of the polymer which is used as the hydrogel-forming polymer."). This correlation provides the common structural features necessary to describe the dissolution rate, satisfying the written description requirement. *See Ariad*, 598 F.3d at 1350 ("[F]unctional claim language can meet the written description requirement when the art has established a correlation between structure and function."); *see also In re Alonso*, 545 F.3d 1015, 1019 (Fed. Cir. 2007) (explaining that a correlation between structure and function provides sufficient "relevant identifying characteristics").

While the explicit disclosure of that correlation in the '780 Patent is alone sufficient to describe the claimed dissolution rate, the record also shows that a POSA would have knowledge of the correlation even without the '780 Patent's aid. Using viscosity to control dissolution rate was standard in the formulation art at the time of filing. RFOF 39, 48, 50, 65, 77, 136. As Prof.

Little explained—and Dr. Chambliss confirmed—viscosity and dissolution rate are correlated. RFOF 45-46, 48, 52, 65, 68, 70, 77, 128, 136, 145. The higher the viscosity, the slower the dissolution rate. RFOF 44, 46, 212, 216. The viscosity, in turn, is based on the molecular weight of the hydrogel polymers. RFOF 43-44, 55-56, 59, 65, 134-135, 212. These well-known relationships allowed formulators to "tune" the dissolution rate of a proposed formulation by choosing grades of the hydrogels with the desired viscosity. RFOF 50, 143. In fact, both Prof. Little and Dr. Chambliss presented figures from decades-old trade brochures and patent applications showing this correlation. RFOF 62, 65, 68, 70, 136, 213. Dr. Chambliss even used this correlation in his own expert opinion *twice*—first to explain how polyethylene degradation affected dissolution rate, and then to explain how water soluble additives can "decrease the drug dissolution" by "increas[ing] the viscosity of the gel." Tr. 1094:17-1095:11, 1149:15-1150:7. The Federal Circuit has explained that such general correlations between structure and function are sufficient to describe a functional limitation. *See Ajinomoto*, 932 F.3d at 1360 (explaining that a correlation that "generally increase[s]" describes the claimed function).

> ### a)  Defendants' argument that there is no correlation between viscosity and dissolution rate contradicts the record

While Defendants contend that the correlation between viscosity and dissolution rate is unpredictable, the only support they offer for this position is a single cryptic statement from Dr. Chambliss's direct testimony. There, Dr. Chambliss testified that to be "arbitrarily controlled" means "trial and error." Tr. 1106:25-1107:8. And Defendants—armed with only that vague statement—argue that the '780 Patent teaches that the correlation between viscosity and dissolution rate is not predictable. Defendants' argument runs into two problems: (1) it is contrary to all other testimony and evidence; and (2) it strains the meaning of "arbitrary."

First, the record is replete with evidence showing the correlation between viscosity and dissolution rate. *See supra* §§ II.A.2, III.D.1. Not only did both experts mention the correlation, but Prof. Little explained: (1) the physical principles underlying it; and (2) how formulators use it during formulation development. *Id.* Prof. Little's opinion was buttressed by evidence showing formulators use such correlations to achieve desired dissolution rates in only 3-5 attempts, despite the alleged "billions" of possible formulations to choose. RFOF 82, 215. Both experts agreed that formulators knew of and used the correlation between viscosity and dissolution rate to predict dissolution rate at the time of filing. RFOF 213. And Dr. Chambliss went even further, actually using the correlation in formulating his opinions. Tr. 1094:17-1095:11, 1149:15-1150:7; RFOF 52. For Defendants to deny the existence of a correlation used in their own expert's opinion strains credulity.

Second, Dr. Chambliss's interpretation of the word "arbitrary" makes no sense. As explained in *Merriam-Webster*, the most natural definition for "arbitrary" here is: "based on or determined by individual preference or convenience rather than by necessity or the intrinsic nature of something." *Arbitrary*, Merriam-Webster (March 28, 2023), [https://www.merriam-webster.com/dictionary/arbitrary](https://www.merriam-webster.com/dictionary/arbitrary). That is, the dissolution rate is "arbitrary" in the sense that it is based on the preference of a POSA. And, as Dr. Little explained, that's exactly what it means in the '780 Patent—"[i]t's saying that a person of ordinary skill in the art understands how to tune these and in fact, that's what's being stated here." Tr. 1276:17-20.

On this record the Defendants cannot meet their burden to show—by clear and convincing evidence—that the correlation between viscosity and dissolution rate did not exist.

### 2. The specification discloses example formulations representative of the claimed dissolution rate

Defendants' argument that the specification fails to provide a representative number of species to support "the entire genus" is equally unfounded. Because the correlation between viscosity and dissolution rate is sufficient to describe the Dissolution Limitation, the '780 Patent does not need to provide *any* representative species. *Ariad*, 598 F.3d at 1352. ("[T]he written description requirement does not demand either examples or an actual reduction to practice."). Nevertheless, it does. RFOF 149-165, 223. Based on the example formulations in the '780 Patent, a POSA would be able to identify the genus of formulations capable of satisfying the Dissolution Limitation. Defendants dispute this with two arguments: (1) Defendants allege that the example formulations were not measured at 200 rpm, and thus cannot be "representative species" for the purpose of written description; and (2) Defendants allege that the example formulations are insufficiently representative of the claimed formulations. Both are incorrect.

### a) The patent discloses formulations representative of the claimed dissolution rate

The '780 Patent discloses working example formulations that meet (*i.e.*, embody) the Asserted Claims. RFOF 149-165, 223. These example formulations sufficiently represent the genus if a POSA can make predictable changes to those examples to arrive at other species throughout the genus. *See AbbVie*, 759 F.3d at 1301 (explaining that the ability of "one of skill in the art [to] make predictable changes to the described [species] to arrive at" other species in the genus is evidence of representation). According to Prof. Little, due to the advanced state of the art, a POSA would be able to make predictable changes to the example formulations to and practice the claims' full scope. *See, supra*, §§ II.A.2 and II.B. The example formulations therefore represent the entire genus.

Although Defendants insist there is "substantial variation" within the genus that warrants a higher showing of representative species, they failed to provide any evidence to demonstrate that purported "substantial variation." Defendants' unsupported arguments cannot stand. *See, e.g.*, *Regents of Univ. of California v. Dako N. Am., Inc.*, No. C 05-03955 MHP, 2009 WL 1083446, at *9 (N.D. Cal. Apr. 22, 2009) (because defendant had not provided "clear and convincing evidence of substantial variation within the performance of the [genus], the 'representative species' requirement is low. To hold otherwise would place improper and undue limitations on the breadth of the claimed invention.") Here, Prof. Little testified that each of the claimed polymers and each of the claimed additives would behave similarly, such that a POSA would know how to adjust the variables to achieve the Dissolution Limitation. *See, supra,* § II.A.2. Defendants have provided no evidence otherwise.

The '780 Patent discloses three formulations that have the claimed dissolution rate. RFOF 150, 152-153, 216, 223. Each of these formulations contains mirabegron, a viscous hydrogel-forming polymer, and a water-soluble additive. RFOF 151. The viscosity of the hydrogel-forming polymer in each of these formulations slows the release of mirabegron. RFOF 44, 46, 212, 216. These formulations are representative of the entire genus of claimed hydrogel formulations—because all of the claimed formulations work the same way, a POSA would be able to identify other working formulations based on these examples. RFOF 34-36, 221. A POSA looking at these examples would therefore understand the inventors possessed the entire genus of claimed, conceptually and mechanically similar formulations. RFOF 154, 219, 224.

The USPTO's findings buttress Prof. Little's conclusions. As discussed above, during prosecution, Astellas and the Examiner negotiated the scope of the Asserted Claims until the Examiner agreed that they covered only subject matter that was disclosed in the specification.

*See, supra*, § II.D. Thus, both Prof. Little's testimony and the USPTO's actions demonstrate that these formulations were representative of the broader genus.

  **b)**  **The example formulations in the '780 Patent provide written description support for a dissolution rate measured at 200 rpm**

  The Defendants argue "as a threshold issue" that the examples disclosed in the specification cannot describe the Asserted Claims because the examples were allegedly performed at 50 rpm while the Dissolution Limitation covers a dissolution rate measured at 200 rpm. D.I. 534 at 46. Defendants are wrong. There is no requirement that a patent specification have working examples to meet the written description requirement. *Ariad*, 598 F.3d at 1352. Moreover, Dr. Chambliss himself acknowledged that he knew from an "internal confidential document . . . [Examples 2, 8, and 9 in the specification of the '780 Patent] they were made— tested at 200 RPMs"—the claimed paddle speed. *See* § II.E. Regardless, the '780 Patent contains sufficient disclosure to demonstrate to a POSA that the inventors possessed the inventions.

  As Prof. Little explained, a POSA would understand that Examples 2, 8, and 9 were measured at a rate between 50 and 200 rpm. RFOF 160-162, 216. Defendants' contention that a POSA would believe that the experiments were performed at 50 rpm is incorrect—the line Defendants point to is referring to a different experiment, dissolution of Comparative Example 1. RFOF 159, 164-165. Regardless, the exact rate at which the examples were tested is not dispositive. The Federal Circuit has held that examples do not need to embody the claims—the question is whether the examples are representative of the claims. *BASF Plant Sci., LP v. Commonwealth Sci. and Indus. Res. Org.*, 28 F.4th 1247, 1265-66 (Fed. Cir. 2022) (disclosure of *Arabidopsis* plants was representative of canola plants because "if you had [the invention] in *Arabidopsis*, then you had it in canola"). Thus, examples can provide written description for a claim so long as they show a POSA that the inventor possessed the claimed invention. There is

no hard-and-fast requirement that the reported results be derived under the claims' precise conditions for examples to adequately prove possession of the claims.

And here, the '780 Patent's examples are representative—the USPTO agreed that the disclosure that the examples were performed within a range of 50 to 200 rpm was sufficient to show that the inventors possessed the invention. *See, supra,* § II.B, RFOF 30, 149-165, 223. Defendants present no evidence to the contrary. The examples therefore provide representative species sufficient to describe the claimed dissolution rate.

### c) The example formulations are representative of the entire breadth of claimed formulations

Defendants' arguments that the described formulations are insufficiently representative rely on two unfounded assumptions—first that the different formulation components are "broad" and "diverse," and second that the art is unpredictable. D.I. 534 at 47-48. But not only did the USPTO explicitly consider and reject that argument, but Defendants' assumptions are contradicted by the record. Defendants thus cannot meet their clear-and-convincing burden to prove that the disclosed formulations are insufficiently representative of the claimed genus.

First, as discussed above (*see, supra,* § II.D), Defendants' exact argument was raised by the Examiner and overcome by Astellas during prosecution of the '780 Patent. In its discussions with the USPTO, Astellas narrowed its proposed claims to only: (1) particular hydrogel forming polymers, (2) particular molecular weights for those polymers; (3) particular water-soluble additives; and (4) a particular dissolution rate. *Id.* After Astellas narrowed its claims, the USPTO agreed the claimed formulations were described and granted the '780 Patent. *Id.*

Second, Defendants argue that the various formulation components represent a "broad" and "diverse" set of properties, but, even if that were true, Defendants do not explain how this diversity relates to the claimed dissolution rate. It is undisputed that the claimed hydrogel-

forming polymers work the same way—they form a hydrogel matrix that increases the viscosity of the formulation. RFOF 34-36, 221. This increase in viscosity slows down the release of the drug. RFOF 44, 46, 212, 216. Dr. Chambliss provided no testimony suggesting that any of the claimed hydrogel-forming polymers functioned differently. And similarly, the claimed additives all work the same way and achieve the same result. RFOF 203. It is also uncontested that the claimed hydrogel polymers and other formulation components were well-known and well-understood in the art. RFOF 34-55, 136, 205, 210, 222.

The fact that the Defendants fail to point to unpredictable differences between the different formulation components makes it impossible for them to satisfy their burden. Prof. Little explained that a POSA would be able to extrapolate from the disclosed examples to identify other formulations likely to work. RFOF 34-36, 53-54, 77, 221; *see AbbVie*, 759 F.3d at 1301 (explaining that the ability of "one of skill in the art [to] make predictable changes to the described [species] to arrive at" other species in the genus is evidence of representation). And Dr. Chambliss, while suggesting that the different claimed formulation components might have some physical or chemical differences, never contested that they all function in the same general way to achieve the same result in a sustained release formulation. Not only do each of these formulation components behave similarly, but they were "already well explored in the relevant art," much like other situations where courts have found species representative of a genus. *See*, *e.g.*, *Ajinomoto*, 932 F.3d at 1359.

Thus—as recognized by both Prof. Little and the USPTO—the examples in the patent are representative of the entire genus, and the Defendants have failed to prove by clear and convincing evidence that the Asserted Claims are invalid for lack of written description.

### 3.  Defendants' arguments find no support in Astellas' data

Defendants also make a passing attempt to argue that an internal Astellas document supports Defendants' written description arguments. As an initial matter, Defendants' attempt to bolster their lack of written description argument by relying on documents beyond the four corners of the '780 Patent specification is legally impermissible. *First Quality Tissue, LLC v. Irving Consumer Prods. Ltd.*, No. 19-cv-428, 2022 WL 958089, at *9 (D. Del. Mar. 30, 2022) (rejecting a defendant's attempt to prove lack of written description by "rel[ying] on extrinsic evidence to show that" values "reported in the Specification were not derived" in the same manner as specified in the claims because "[l]ack of written description cannot be proven by the sort of extrinsic evidence [the defendant] offers here"); *Ariad*, 598 F.3d at 1351 (holding that written description "requires an objective inquiry into the four corners of the specification"). And even if it were permissible to rely on such information, Defendants improperly characterize both the nature of the document and its content.

DTX-2084 is a retrospective summary of the work performed to develop Myrbetriq®. It shows three experiments performed to assess possible hydrogels.[19] One of the three experiments revealed a hydrogel formulation with the desired dissolution rate. DTX-2084.00011. The retrospective goes on to describe the subsequent experiments performed to develop the formulation into the final Myrbetriq® commercial product. DTX-2084.00012–35.

---

[19] Defendants argue that these experiments postdate the '780 Patent, but Defendants proffer no evidence of this. DTX-2084 explains that the screening experiments were used to develop the MR-M formulation—which is the formulation described in Example 8 of the '780 Patent. *Compare* '780 Patent at Example 8 *with* DTX-2084.00013. It is not logical that the screening experiments used to develop an Example in the patent were somehow performed after the patent was filed.

Defendants argue that these data show a lack of possession of any hydrogel other than the one that worked in the initial screen. But what these data actually show is that Astellas—without the benefit of the patent—performed a few early screening experiments, almost immediately found a working embodiment, and therefore did not pursue other potential options. Astellas' initial and almost instantly successful screening experiments performed without the teachings of the patent cannot be clear and convincing evidence of a lack of possession, especially since Defendants provide no evidence that the other two formulations were even attempted to be tuned to meet the claimed Dissolution Limitation.

### 4. Precedent does not "compel" defendants' desired result

Defendants' analysis of the precedent elides the key difference between the Asserted Claims and the cited cases—that the dissolution rate claimed here was a long-studied and predictable property that results from physical phenomena well-understood in the art. And because the relationship between dissolution rate and the composition of the formulation was so well understood, the amount of description required is less than in a nascent art.

#### a) The state of the art is an essential consideration when assessing written description.

Defendants' contention that well-known information in the art cannot be used to support the written description of a genus claim contradicts binding precedent. *Streck, Inc. v. Research & Diagnostic Sys., Inc*., 665 F.3d 1269, 1285 (Fed. Cir. 2012) ("[A] patentee can rely on information that is 'well-known in the art' to satisfy written description.") (*quoting Boston Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366 (Fed. Cir. 2011)).

Both district courts and the Federal Circuit regularly review the state of the art to determine if a claim is adequately described. *Id*. In *Ajinomoto*, for instance, the Federal Circuit found a functional claim term was described based on its description in two prior art articles. 932

F.3d at 1359-60 (basing its finding of a "common structural feature" on "a 1983 article by Hawley and McClure" and a "1986 article by Horwitz and Loeb"). And in *Erfindergemeinshaft*, the Eastern District of Texas—analyzing Federal Circuit precedent—explained that even a "broad genus" does not require representative species if the art was advanced. *See*, *e.g.*, *Erfindergemeinshaft*, 276 F. Supp. 3d at 648 ("[W]hen a genus is well understood in the art and not itself the invention but is instead a component of the claim, background knowledge may provide the necessary support for the claim.").

Defendants attempt to seek refuge from this blackletter law by invoking *Lipocine* and *Lockwood*, but neither case says what the Defendants want. D.I. 534 at 52. In *Lipocine*, the district court found that the claimed pharmacokinetic teachings were *not* in the background art. *See Lipocine Inc. v. Clarus Therapeutics, Inc.*, 541 F. Supp. 3d 435, 466 (D. Del. June 1, 2021) ("[S]killed artisans could not rely on the prior art to 'predict the pharmacokinetic results' of formulations."). *Lipocine* thus stands for the unsurprising proposition that, if information is not in the background art, the background art cannot provide that information. *Id*. And *Lockwood* is even further off base. In *Lockwood*, it was "undisputed that one of the intervening applications [did] not describe an individual terminal containing a video disk player." *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1573 (Fed. Cir. 1997). The facts here cannot be analogized to *Lockwood*—unlike *Lockwood*, the '780 Patent unambiguously discloses the Dissolution Limitation; the Defendants merely contest the *sufficiency* of that disclosure. Neither case supports the Defendants' contention that the prior art cannot help to describe a genus claim.

> **b)   Predictability must be considered when assessing written description.**

Defendants attempt to analogize these facts to a swath of cases where written description was lacking—but in every case Defendants cite, the claimed functional element was poorly

understood, and there was no known correlation between that functional element and the associated structural components. *See Ariad*, 598 F.3d at 1358 ("The state of the art at the time of filing was primitive and uncertain, leaving Ariad with an insufficient supply of prior art knowledge with which to fill the gaping holes in its disclosure."); *AbbVie*, 759 F.3d at 1301 ("However, the record here does not indicate such an established correlation [between structure and function]."); *Pernix Ireland Pain DAC v. Alvogen*, 323 F. Supp. 3d 566, (D. Del Aug. 24, 2018) ("There was no other evidence at trial indicating what component or combination of components was responsible for the pharmacokinetic results obtained from the hepatic impairment study on Zohydro ER."); *Carnegie Mellon v. Hoffman-La Roche, Inc.*, 541 F.3d 1115, 1125 (Fed. Cir. 2008) ("Notably, the record indicates that at the time of the invention, only three bacterial polA genes, viz., *E. coli*, *K. aerogenes*, and *K. pneumoniae*, out of thousands of bacterial species had been cloned, and only E. coli was described in the patents."); *AstraZeneca AB v. Mylan Pharms.*, 1:18-cv-193, 2022 WL 16857400 at *21 (N.D.W. Va. November 9, 2022) ("Next, the asserted claims contain common structural limitations but there is no correlation between such limitations and the functional stability requirement."); *Boston Sci.*, 647 F.3d at 1366 ("Although it is true that functional claim language can meet the written description requirement when there is an established correlation between structure and function, Appellants fail to establish any such correlation."); *Lipocine Inc. v. Clarus Therapeutics, Inc.*, 541 F. Supp. 3d 435, 466 (D. Del. June 1, 2021) ("Even in the course of this litigation, Lipocine's experts have testified that 'significant clinical research and study would be required for a POSITA to determine the effective dosing and titration scheme for an oral TU [testosterone replacement therapy].'"); *In re Curtis*, 354 F.3d 1347, 1358 (Fed. Cir. 2004) ("[O]rdinary artisans could not

predict the operability in the invention of any species other than the one disclosed."). Defendants fail to present a case where the art was either well understood or predictable, let alone both.

Every case Defendants cite to is on fundamentally different factual footing. The reason is simple—when the art is well-understood and predictable, functional limitations are easy to describe. Defendants' insinuations to the contrary fail as a matter of law.

      **E.**      **The Asserted Claims are definite without a temporal requirement**

Defendants' own expert had no trouble assessing the claims' scope when he explained that the formulations could "infringe at one point in time and not infringe at another." D.I. 534 at 59. Prof. Little agreed: when a formulation meets the Dissolution Limitation, it is an infringing formulation—because it is within the scope of the claims. Tr. 1320:6-11; RFOF 227. And when the formulation does not meet the Dissolution Limitation, it is not an infringing formulation. Tr. 1320:6-11; RFOF 227. These assessments—by themselves—demonstrate that the specification "inform[s] those skilled in the art about the scope of the invention with reasonable certainty," rendering the claims valid. *Nautilus*, 572 U.S. at 910. There is no "ambiguity" in the claims. *Id.*

Defendants' only argument is that "[a] POSA would not know when to run the dissolution test." D.I. 534 at 59. But a POSA would know when to test—at the time the infringement occurs. *See Syngenta Crop Protection, LLC v. Willowood, LLC*, 944 F.3d 1344, 1360 (Fed. Cir. 2019) ("[I]nfringement occurs *when* 'whoever without authority makes, uses, offers to sell, or sells . . . or imports . . . any patented invention.'") (quoting 35 U.S.C. § 271) (emphasis adjusted). Defendants' contention that the infringement analysis in this case is "convoluted"—due to the lack of fresh samples—is not relevant to definiteness. *See Confluent Surgical, Inc. v. HyperBranch Med. Tech., Inc.*, No. CV 17-688-LPS-CJB, 2019 WL 2897701 at n 10 (D. Del. July 5, 2019) ("The test for indefiniteness does not depend on a potential infringer's

ability to ascertain the nature of its own accused product to determine infringement.") (*quoting SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340 (Fed. Cir. 2005)).

And since definiteness does not require "absolute precision," *Nautilus*, 572 U.S. at 910, temporal requirements are not required for definiteness. *See H. Lundbeck A/S v. Apotex Inc.*, No. 18-cv-88, 2019 WL 3206016, at *6 (D. Del. July 16, 2019) ("[Q]uantitative measurements, temporal limitations, or specific methods of testing are not always required to render a claim not-indefinite."). In a directly analogous situation, the Southern District of New York assessed the infringement of an ANDA product that changed composition over time. *See*, *e.g.*, *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 540 (S.D.N.Y. Oct. 16, 2002) ("ANDA products" infringe even if the claimed features "form during the enteric coating process or after manufacture."). The court had no difficulty assessing the scope of the claims—they simply encompassed all situations in which the structural and functional limitations were satisfied. This is typical—courts regularly refuse to read temporal limitations into claims because they are not required—and Defendants failed to proffer a single case suggesting otherwise.

## IV.        Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court find that Defendants have failed to prove by clear and convincing evidence that the Asserted Claims of the '780 Patent are invalid and enter judgment that the Asserted Claims are valid.

Dated: March 29, 2023

*Of Counsel*:

Simon D. Roberts
Jason A. Leonard
Nitya Anand
Vincent Li
Jayita Guhaniyogi
One Vanderbilt Avenue
New York, NY 10017-3852
(212) 547-5700

Stephen M. Hash
Alexander T. Piala
Kyle Sorenson
303 Colorado Street, Suite 2200
Austin, TX 78701
(512) 726-2600

Meng Xu
18565 Jamboree Road, Suite 250
Irvine, CA 92612-2565
(949) 851-0633

Connor Romm
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
(617) 535-4000

Rodney Swartz
650 Live Oak Avenue, Suite 300
Menlo Park, CA 94025-4885
(650) 815-7400

MCCARTER & ENGLISH, LLP
*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
405 N. King St., 8th Floor
Wilmington, DE 19801
(302) 984-6331
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiffs*