IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ASTELLAS PHARMA INC., *et al.* | |
| Plaintiffs, | **1:20CV1589** |
| v. | |
| ZYDUS, INC., *et. al.* | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Defendants. | |

This matter comes before the Court on remand from the Federal Circuit after a bench trial.  This is a patent infringement case concerning United States Patent No. 10,842,780 ("'780 Patent"), a patent for a sustained release formulation of mirabegron, marketed by Astellas under the brand name Myrbetriq®.  The defendants are two pharmaceutical companies, Lupin and Zydus (the Generics Manufacturers), who manufacture a generic version of the drug.  Only validity is before the Court.

At trial, the Generics Manufactures pursued three invalidity theories: (1) the '780 Patent did not enable the person skilled in the art (POSA) to practice the full scope of the invention, (2) the '780 Patent's written description was insufficient to demonstrate that Astellas possessed the full scope of the claimed invention, and (3) the '780 Patent failed to teach the POSA when to perform dissolution testing, rendering it indefinite.

The Court concludes the Generics Manufactures did not prove their asserted invalidity defenses by clear and convincing evidence.  First, the '780 Patent is enabled because the POSA can practice the full scope of the claimed invention using routine and well understood experimentation.  Second, the '780 Patent is not invalid for lack of written description because, although it claims a genus of hydrogel sustained release formulations, it discloses representative species and a relationship between the

formulation's structure and function demonstrating possession of the genus.  Third, the '780 Patent is not indefinite because the POSA would understand to test unexpired samples.

Having rejected the invalidity theories posited by the Generics Manufactures in this litigation, the Court finds in Astellas's favor on the validity issue.  Infringement, damages, and any additional invalidity theories[1] will be litigated at the consolidated jury trial in 2026.  Per Fed. R. Civ. P. 52, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

This is a patent dispute.  The '780 Patent claims a sustained release formulation of a drug used to treat overactive bladder.  The question before the Court is whether the '780 Patent is valid.

### A.  The Parties

Astellas is a pharmaceutical company that owns the '780 Patent and manufactures Myrbetriq®.   Zydus and Lupin are pharmaceutical companies who specialize in manufacturing generic drugs.  While the parent companies of the parties are incorporated overseas, their American subsidiaries are incorporated in Delaware.  The Court has exclusive dispute jurisdiction over their dispute under 28 U.S.C. § 1338.

When this case went to trial, neither Zydus nor Lupin had manufactured a generic version of Myrbetriq®.  Instead, the infringement case was based on Abbreviated New

---

[1] Zydus and Lupin have filed a Motion to Clarify or Provide Relief from Stipulation at D.I. 732, seeking to assert additional validity theories in 2026.  This order does not resolve that issue, which is being briefed by the parties.  Nor does this order resolve any additional theories at issue in the Ascent and MSN branch of this litigation.

Drug Applications (ANDA) filed by the Generics Manufactures.[2] Astellas sued for patent infringement, requesting declaratory and injunctive relief. D.I. 1. The Generics Manufacturers counterclaimed for a declaration that the '780 Patent was invalid. *See* D.I. 48 (Lupin); D.I. 60 (Zydus).

### B. The POSA

The Court begins with the threshold issue of the POSA. After all, the Court is required to adopt the perspective of a scientist in the relevant field to assess, among other things, whether a patent is enabled, definite, and contains appropriate written description. *See* Robert A. Matthews, Jr., 3 Annotated Patent Digest § 20:56, 22:14, 23:19 (collecting authority on enablement, written description, and indefiniteness). The parties offer similar definitions of the POSA. Dr. Little, Astellas's validity expert described the POSA as "someone with at least a Ph.D. in pharmaceutical sciences or a related field and approximately two to three years of experience, research, and/or training in formulation and characterization of pharmaceutical dosage forms." D.I. 527 at 207, Tr. 500:3–14 (Little). Dr. Chambliss offered a "similar" definition: someone "with a bachelor's, or more likely a master's or doctoral degree in in pharmaceutical science," consulting with other subject matter experts. D.I. 529 at 140–41, Tr. 1037:10–1038:5 (Chambliss). The Court agrees that the POSA would have a master's degree or Ph.D. in pharmaceutical sciences and experience formulating and characterizing dosage forms. The Court finds these proposed definitions are consistent with other evidence in the record regarding drug

---

[2] 21 U.S.C. § 355(j) allows the FDA to approve a generic version of a drug based on the safety and efficacy studies conducted on the brand-name drug. 35 U.S.C. § 271(e)(2) permits an innovative manufacturer to seek an injunction to prevent a generic drug manufacturer from entering the market, if the generic product would infringe a patent held by the innovative manufacturer. Here, this allowed Astellas to go to trial based on a technical act of infringement.

design and the type of scientist who would review the specification and practice the invention. Dr. Little and Dr. Chambliss, who have Ph.Ds. and combined decades of experience working with pharmaceutical dosage forms, meet the definition of the POSA. D.I. 529 at 529–30, Tr. 1037:10–1038:5 (Chambliss); D.I. 527 at 207, Tr. 500:18–21 (Little).

### C. Scientific and Technical Background: Sustained-release Hydrogels and Dissolution Testing.

The scientific and technical background of sustained-released drugs and dissolution testing is not by any means new.

At the most basic level, pharmaceutical development involves using a chemical, the active ingredient, to treat a clinical problem. DTX 2112.00001; Tr. 1039:2–23 (Chambliss); D.I. 527 at 185, Tr. 478:9 (Little). Here, the active ingredient is a chemical called mirabegron and the clinical problem is overactive bladder. *Id.*, Tr. 478:5–8 (Little); D.I. 526 at 94, Tr. 94:16–19 (Nitti). A pharmacologist has many techniques at their disposal for introducing an active ingredient into the body, such as a pill, an intravenous drip, or a topical cream. DTX 2112.00002. Here, Astellas developed a tablet oral dosage form. *See* JTX 0002.00006. Basically, the patient swallows a tablet containing the active ingredient and the stomach breaks down the tablet, releasing the active ingredient into the blood stream. DTX 2112.00070–71.

There are two general categories of oral dosage forms: immediate release and sustained release formulations. An immediate release formulation does not contain any ingredient intended to limit the rate of release in the stomach, so the active ingredient is released as quickly as the stomach can break down the pill. D.I. 527 at 186, Tr. 479:2–14 (Little). For most immediate release formulations, 90% the active ingredient is

released within an hour. *Id.*, Tr. 479:3–6 (Little). On the other hand, a sustained release formulation contains an ingredient or structure that slows or controls the release of the active ingredient. *Id.* at 187–88, Tr. 480:22–481:5 (Little); JTX 0074.00080–81. Thus, by using a sustained release formulation, the inventor can ensure: (1) the active ingredient is released into the bloodstream over a preferred timeline and (2) the concentration of the active ingredient in the bloodstream stays within a preferred range. JTX 0071.00004; JTX 0074.00080–81.

To illustrate this concept, consider the following chart from a 1982 Dow Chemical Brochure, demonstrating dissolution profiles for an immediate release formulation versus a variety of sustained release formulations:



JTX 0071.0008. Notice that the immediate release formulation (the control) dissolves quickly, while the sustained release formulations dissolve over a longer period. Notice too, that sustained release formulations can vary in speed of release. The Court next

discusses the ingredients of the type of sustained release formulation at issue here and how those ingredients impact the speed of release.

The type of sustained release technology at issue here is called a sustained release hydrogel.[3]  A sustained release hydrogel consists of three key component parts[4]: the active ingredient, a hydrogel-forming polymer, and a water-soluble additive.  D.I. 527 at 194, Tr. 487:6–20 (Little).  A hydrogel-forming polymer is a chemical compound that swells when exposed to water.  In a sustained release hydrogel, many of these polymers are knitted together in layers.  Id. at 192–93, Tr. 485:21–486:24 (Little); D.I. 529 at 144, Tr. 1041:21–25 (Chambliss).  As the polymer contacts the fluid in the stomach, it takes water in, swells to a gel-like consistency, and dissolves, exposing the next layer to the stomach acid.  Id. at 145–46, Tr. 1042:10–1043:22 (Chambliss); D.I. 527 at 192–93, Tr. 485:21–486:24 (Little).  The water-soluble additive helps this process along.  Specifically, as the gel layer breaks down, the water-soluble additive exits the chemical structure, allowing fluid to enter and hydrate the next layer.  Id. at 194, Tr. 487:6–18 (Little).  Nestled within the matrix of the hydrogel-forming polymer and the water-soluble additive is the active ingredient.  Id. at 193, Tr.  486:1–5 (Little).  As the layers of polymer swell and break down, they release the active ingredient.  Id., Tr. 486:15–19 (Little).  During this process, the layers of polymer under the gel-forming layer stay dry and do not release the active ingredient.  Id., Tr. 486:15–18 (Little).

---

[3] Sustained release hydrogels are not the only technique for achieving sustained release of an active ingredient.  JTX 00081-82.  But, as detailed bellow, the '780 patent only claims sustained release hydrogel formulations of mirabegron.  So, the Court does not address the vast and interesting world of alternative sustained release formulations.

[4] Of course, this explanation is simplified and focuses on the component parts that track the structural claims of the '780 Patent.  The POSA uses other tools like binders and stabilizers to address specific problems, such as formulation stability.  D.I. 529 at 142, Tr. 1039:22-23 (Chambliss)

Many factors affect the speed at which the layers of the sustained release hydrogel break down.  D.I. 529 at 176, Tr. 1073:5–18 (Chambliss).  One key feature is the viscosity of the formulation.  D.I. 526 at 290, Tr. 290:8–11 (Berginc); D.I. 527 at 211, Tr. 504:16–505:6 (Little); DTX 2112.00046.  Basically, a hydrogel-forming polymer with a higher viscosity has more polymers knitted together (making it heavier and creating a thicker fluid when added to water).  D.I. 527 at 214, Tr. 507:10–21 (Little).  Because there are more chemical bonds to break down, it takes longer for the stomach to break down a more viscous polymer and hydrate the next layer.  *Id.*  Thus, there is an inverse relationship between the viscosity of the hydrogel-forming polymer and the speed of the active ingredient release.  DTX 2073.00016; DTX 2077.00043; DTX 2042.00005; D.I. 527 at 214, Tr. 507:17–21 (Little); D.I. 530 at 93, Tr. 1276:22–23 (Little); D.I. 529 at 189, 1086:5–22 (Chambliss); D.I. 529 at 19, Tr. 916:8–9 (Fassihi).  To illustrate this concept, consider another chart from the same Dow Chemical brochure, this one including the viscosity of the polymers (measured in centipoise (cps)):



Figure 6 — Effect of Molecular Weight or Viscosity of METHOCEL on Vitamin C Tablet Dissolution†

JTX 0071.00007.[5]  Notice how the formulation using the least viscous polymer takes less than four hours to fully dissolve, while the formulation using the most viscous polymer takes twenty-six hours to dissolve.  *Id.* Basically, the more viscous the hydrogel-forming polymer, the slower the release of the active ingredient.  *Id.*; *see also* DTX 2042.00005. A POSA can slow the dissolution rate using by using a heavier hydrogel-forming polymer with a higher viscosity or by increasing the concentration of the polymer in the tablet.  D.I. 530 at 93, Tr. 1276:22–24 (Little); D.I. 527 at 279, Tr. 572:12–573:17 (Little) ("[T]he viscosity of the polymer as we have been describing is something that would slow the release. Lower the viscosity, which would be fast release; higher viscosity would be slower release.").

With this background in mind, the Court turns to the method a pharmacologist uses to measure and model the release of the active ingredient.  This process is called dissolution testing. D.I. 526 at 128, Tr. 128:6–23 (Gray).  In a dissolution test, a scientist places a sample of a drug in a buffer solution.  *Id.*  There, a mechanical apparatus agitates the sample, allowing it to dissolve into the buffer solution.  *Id.*  Then, at specified time points, the scientist takes samples of the buffer fluid to and uses the concentration to measure how much of the sample has dissolved.  *Id.* at 132, Tr. 132:13–21 (Gray).  Based on these observations, the scientist constructs a dissolution profile, which illustrates the dissolution of the drug over time.  *Id.* at 132–33, Tr. 132:24–133:2 (Gray).  Though performed in a test tube, this dissolution profile models the concentration of the drug in

---

[5] Similar figures showing the viscosity/dissolution rate relationship appear in other technical brochures across the decades.  *See e.g.*, JTX 0008.00014 (2006); DTX 2073.00014 (1987).  Indeed, the 1987 brochure recognizes "the viscosity of the gel is critical to controlling drug release rate." DTX 2073.00014; *see also* JTX 0071.00017. Formulation treatises and prior patent art recognize the same.  *See e.g.*, DTX 2077.00043 (1990) ("Viscosity characteristics of polymers are of great importance in determining the final release process of the metric tablet.  Generally, the drug-release rate is slower for a higher viscosity-grade polymer."); DTX 2042.00005 (2003).

the bloodstream over time.  *Id.* at 127, Tr. 127:13–19 (Gray).  Everyone agrees performing and interpreting dissolution tests is routine and well within the skillset of the POSA.  D.I. 529 at 237, Tr. 1134:13–15, 1191:14–17 (Chambliss); D.I. 530 at 81–82, Tr. 1264:25–1265:3 (Little).

Sustained release hydrogels are the one of the most common technologies for achieving sustained release.  D.I. 530 at 60, Tr. 1243:23–25 (Little) ("There were more [sustained release hydrogel] products approved . . . than any other of that type"); D.I. 529 at 260, Tr. 1157:21–25 (Chambliss) ("Q: And in terms of what we're talking about today, hydrogel sustained release formulations, that's one of the most common sustained release formulations that's in use; correct? A: For oral delivery, yes.").  They are also well characterized, meaning their properties and behavior is well understood.  D.I. 530 at 60, Tr. 1243:21–23 (Little) ("I think I would go so far to say they were probably the most well characterized extended release oral dosage form . . ..").  Commercial manufacturers sell materials needed to formulate a sustained release hydrogel, including hydrogel-forming polymers with specific viscosities.  *Id.* at 101–02, Tr. 1284:22–1285:1 (Little).  These companies disclose the physical properties of the component ingredients.  *See e.g.*, JTX 0005.00010–11; JTX 0006.00015; DTX 2072.00009.  Overall, in 2008, sustained release hydrogels had been studied by pharmacologists and used by pharmaceutical manufactures for decades.

**D. Astellas Uses Mirabegron as a Treatment of Overactive Bladder and Invents a Sustained Release Formulation of Mirabegron.**

With the technical and industry background in mind, the Court turns to the subject of the '780 Patent: Myrbetriq®.  Myrbetriq® is a hydrogel sustained release formulation of mirabegron, used to treat overactive bladder.

9

Overactive bladder is a common ailment characterized by an intense need to urinate, increased urinary frequency, and incontinence. D.I. 526 at 95, Tr. 95:12–24 (Nitti). Prior to 2012, physicians treated overactive bladder using a class of drugs called antimuscarinics, but their clinical utility was limited by unpleasant side effects including dry mouth and constipation. D.I. 526 at 98–100, Tr. 98:7–12; Tr. 99:8–100:3 (Nitti). At a high level of generality, antimuscarinics worked by binding to a specific kind of receptor found in both the bladder and other body systems. Id. at 99, Tr. 99:10–13 (Nitti). So, while they successfully prevent bladder contractions, they also impact the functioning of other body systems. Id., Tr. 99:16–19 (Nitti).

Mirabegron emerged as an alternative treatment for overactive bladder. Specifically, mirabegron acts as a Beta-3 agonist, meaning it stimulates a Beta-3 receptor in the bladder, inducing bladder relaxation. D.I. 526 at 102, Tr. 102:10–15 (Nitti). This mechanism of action treats overactive bladder without affecting the other body systems associated with the side effects of antimuscarinics. Id., Tr. 102:19–23 (Nitti).

At first, Astellas developed commercial overactive bladder treatment using an immediate release formulation of mirabegron. JTX 001.0007 at 1:49–16; D.I. 527 at 185–86, Tr. 478:17–21, 479:15–24 (Little). These early efforts were plagued by a new issue. Specifically, Astellas's immediate release version of mirabegron showed a food effect. JTX 001.0007 at 1:49–16; D.I. 526 at 106–07, Tr. 106:11–107:18 (Nitti); D.I. 526 at 271, 281, Tr. 271:11–272:10, 281:10–282:7 (Sako). Basically, a food effect is present when a drug behaves differently when taken on an empty stomach than on a full stomach. D.I. 526 at 105–06, Tr. 105:19–106:7 (Nitti). Here, when a patient took the drug on an empty stomach, the concentration of mirabegron spiked in the bloodstream causing tachycardia

(heightened heart rate) and a corresponding risk of cardiovascular events. *Id.* at 115, Tr. 115:21–25 (Nitti).    These cardiovascular risks were especially pronounced for mirabegron's target population—older adults. D.I. 526 at 109, Tr. 109:12–22 (Nitti).  This proved problematic for physician uptake and regulatory approval. *See* D.I. 526 at 107–09, Tr. 107:19–108:7 (Nitti); *id.* at 115, Tr. 115:18–20 (Nitti).

The food effect and sustained release solution were known to Astellas as early as 2003. D.I. 272, Tr. 272:20-22 (Sako); D.I. 278, at 278, Tr. 278:10-13 (Sako) ("Q: At that time in 2003, did you think that a[] [sustained release] formulation containing mirabegron would work to minimize the food effect? A: Yes, I thought there was potential for that."). At that time, Astellas considered shutting down research into mirabegron as an overactive bladder treatment. D.I. 526 at 271-73, Tr. 271:5-273:1 (Sako).  Astellas brought on the inventor of the '780 Patent, Dr. Sako to specifically study and propose a solution to the food effect issue. *Id.* at 271, Tr. 271:11–14 (Sako).  Dr. Sako formulated a hydrogel sustained release formulation of mirabegron that released the drug into the body over a four-hour period, mimicking the absorption profile of mirabegron in the fed state (i.e., when it was taken on a full stomach). *Id.* at 274–80, Tr. 274:6–276:17, 278:3–13, 279:4–280:24 (Sako).  Clinical testing showed that this sustained release formulation did not cause the cardiovascular side effects Astellas observed in the immediate release formulation. *Id.* at 107–08, Tr. 107:19–108:12 (Nitti).  In short, using the hydrogel sustained release formulation to obtain a specific dissolution profile solved the food effect issue.

### E.  The '780 Patent

The '780 Patent is Astellas's attempt to patent its invention: using a hydrogel sustained release formulation to achieve a dissolution rate that resolved mirabegron's food effect.

### 1.  The Prosecution History

Astellas's path to the '780 Patent was winding. Astellas first applied for a patent in 2008, but it was not approved until 2020.    JTX-0002.00001 (priority date); JTX-0003.01928 (final approval).  Over a decade, the PTO rejected earlier versions of the application on enablement, obviousness, and written description grounds but approved the '780 Patent as it appears today.  DTX 2025.00708–43 (rejection); JTX 0003.01855–57 (approval).  The file history is sprawling, so the Court summarizes only the key issues that bear on the validity issues and contentions of the Parties.  Astellas first applied for a patent in 2008.  JTX 0001.00002.[6] The initial application differed in several significant ways from the '780 Patent.  The original application did not contain any specific functional limitation.  DTX 2025.00240. In 2013, Astellas added a broader dissolution limitation of "75% or less after 1.5 hours, and 75% or more to 100% or less after 7 hours."  DTX 2025.00240.  This initial dissolution limitation did not claim a specific method for measuring dissolution rate.  JTX 0003.00008. Nor did identify specific hydrogel-forming polymers or water-soluble additives.  JTX 0003.01689–90.  Ultimately, the PTO rejected the original application on enablement and written description grounds.

In response, Astellas narrowed the grounds to the current patent claims. Specifically, Astellas narrowed the dissolution limitation to "39% or less after 1.5 hours,

---

[6] The '780 Patent is a continuation of Application No. 12/568,313.

and at least 75% after 7 hours."  JTX 0003.00569.  Along with the narrowed dissolution limitation it added the specific form of dissolution testing to the claim and candidate ingredients for formulating a sustained release hydrogel capable of meeting the dissolution limitation.  JTX 0003.01689–90.  After Astellas made those changes, the PTO dropped their written description and enablement objections to the patent.    JTX 0003.01853–57.

One other backwater in the '780 Patent's winding prosecution history bears mentioning.  During the prosecution process, the PTO issued an obviousness rejection, concluding the invention was suggested by prior art that used sustained release hydrogels to achieve a specified dissolution profile.  DTX 2025.778–79.  In response, Astellas argued the invention was not obvious because "dissolution rates are unpredictable."  DTX 2025.783.  More specifically, Astellas wrote:

> B.    Dissolution Rates are Unpredictable
>
> Further still, Takasu *et al.*, Sako *et al.*, and Michel *et al.* do not teach or suggest a pharmaceutical composition of mirabegron with the claimed dissolution rate.  Even assuming *arguendo* that a controlled release formulation of mirabegron could be formulated in the system of Sako *et al.*, one of skill in the art would have no reasonable expectation of successfully achieving the claimed dissolution rate.
>
> Specifically, Applicants respectfully submit that Sako *et al.* and Michel *et al.* do not teach the same formulation as in the present claims simply because they refer to a hydrogel. It is clear that two hydrogel formulations can have substantially different dissolution rates even if they contain the same amounts of the same active ingredient.  There is simply no reason to presume that substituting mirabegron for the active ingredients in the hydrogel formulations taught in Sako *et al.* and Michel *et al.* would have necessarily resulted in a pharmaceutical composition with the claimed dissolution rate.

*Id.* The PTO withdrew the obviousness rejection.

## 2. The Specification

The '780 patent describes the patented invention as "pharmaceutical composition for modified release capable of reducing food effects, which are observed in conventional tablets, by combining an active ingredient with specific ingredients to control a releasing rate of the active ingredient." JTX 001.00007, at 1:15–20. "More particularly, the present invention relates to a pharmaceutical composition comprising [mirabegron], an additive which ensures penetration of water into the pharmaceutical composition (hereinafter sometimes referred to as a hydrophilic base), and a polymer which forms a hydrogel, in which the changes in AUC and Cmax caused by the intake of food can be decreased by controlling a releasing rate of the active ingredient." *Id.* at 1:21–30.

The Background Art discloses prior literature regarding mirabegron, its clinical utility for treating overactive bladder, mirabegron's food effect, and the use of hydrogel sustained release formulations to attain a desired dissolution rate. *Id.* at 1:34–2:15.

The Specification provides additional information about the hydrogel sustained release formulation. JTX 0001.00010–11. Specifically, it provides the names, molecular weights, and viscosities of commercially available candidate hydrogel-forming polymers. JTX 0001.00011. It also lists the names of candidate water soluble additives, all commercially available. JTX 0001.00011 at 10:6–43. The specification describes the process for making an example formulation. JTX 0001.00012–13 at 12:8–14:44. The specification describes that "the release period of time of the drug from the formulation can be arbitrarily controlled by adjusting the viscosity of the polymer which is used as the hydrogel-forming polymer." JTX 0001.00010 at 7:34–38. Finally, the specification teaches the POSA the conditions for dissolution testing and the claimed dissolution

profile. Specifically, the specification instructs the POSA to use the method described "in the United States Pharmacopoeia under the conditions that 900 mL of an appropriate test fluid (such as a USP buffer, pH 6.8) is used and the paddle rotation speed is 50 to 200 rpm."[7] JTX 0001.00009 at 6:21–33.

Based on these features, the '780 Patent discloses several example formulations. JTX 00013–16. Specifically, Examples 2, 8, and 9 meet both the structural limitations (each is comprised of mirabegron, a hydrogel-forming polymer, and a water-soluble additive) and the dissolution limitation. *Id*. The Generics Manufacturers contend these examples do not fall within the claim limitations. The Court disagrees for reasons discussed in depth, *infra* Conclusions of Law Section C.3.1. The dissolution rates of the example formulations were compared with the dissolution rate of an immediate release formulation in the following chart:

### TABLE 4

|         | Example 2 | Example 8 | Example 9 | Comparative Example 1 |
|---------|-----------|-----------|-----------|-----------------------|
| 0.5 hr. | —         | —         | —         | 95%                   |
| 1.5 hr. | 35%       | 39%       | 32%       | —                     |
| 2.5 hr. | 57%       | 61%       | 54%       | —                     |
| 4.5 hr. | 93%       | 95%       | 92%       | —                     |

JTX 0001.00016, tbl. 4. Each of the example formulations were created using the same hydrogel-forming polymer (polyethylene oxide) and water-soluble additive (polyethylene glycol). *See* JTX 0001.00015 tbl. 1.

---

[7] The Paddle Method is a form of dissolution testing, in which the sample is agitated using a mechanical apparatus. "50 to 200 rpms" refers to the speed of the paddle (i.e., the number of times paddle turned during a minute). *See* JTX 0007.00003; Tr. 206:17-18 (Gray).

### 3. The Asserted Claims

Astellas asserts Claims 5, 20, and 25 of the '780 Patent. Each of the asserted claim contains three structural elements and one functional limitation. The structural elements are: (1) mirabegron, (2) a hydrogel-forming polymer, and (3) a water-soluble additive. The functional limitation requires that a certain amount of the sample be left at 1.5th and 7th hour of dissolution testing. More precisely, the asserted claims of the '780 Patent claim:

| Element | Claim 5 | Claim 20 | Claim 25 |
|---|---|---|---|
| Dosage Form | "[A] pharmaceutical composition comprising" | "A tablet" | "A tablet" |
| Structural: Mirabegron | "10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl] acetic acid anilide, or a pharmaceutically acceptable salt thereof" | "10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl] acetic acid anilide" | "10 mg to 200 mg of (R)-2-(2-aminothiazol-4-yl)-4'-[2-[(2-hydroxy-2-phenylethyl)amino]ethyl] acetic acid anilide, or a pharmaceutically acceptable salt thereof" |
| Structural: A hydrogel-forming polymer | "a hydrogel-forming polymer having an average molecular weight of 100,000 to 8,000,000 . . . wherein the hydrogel-forming polymer is at least one compound selected from the group consisting of polyethylene oxide, hydroxypropyl methylcellulose, and hydroxypropyl cellulose." | "a hydrogel-forming polymer having an average molecular weight of 100,000 to 8,000,000 . . . wherein the hydrogel-forming polymer is at least one compound selected from the group consisting of polyethylene oxide, hydroxypropyl methylcellulose, hydroxypropyl cellulose, carboxymethyl cellulose sodium, hydroxyethyl cellulose, and a carboxyvinyl polymer," | "a means for forming a hydrogel" |
| Structural: A water- | " an additive having a water solubility of at least 0.1 g/mL at 20±5° | "an additive having a water solubility of at least 0.1 g/mL at 20±5° | "a means for ensuring penetration of water into |

16

| soluble additive | C. . . . wherein the additive is at least one selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, D-sorbitol, xylitol, lactose, sucrose, anhydrous maltose, D-fructose, dextran, glucose, polyoxyethylene hydrogenated castor oil, polyoxyethylene polyoxypropylene glycol, polyoxyethylene sorbitan higher fatty acid ester, sodium chloride, magnesium chloride, citric acid, tartaric acid, glycine, (3-alanine, lysine hydrochloride, and meglumine" | C., . . . wherein the additive is at least one selected from the group consisting of polyethylene glycol, polyvinylpyrrolidone, D-mannitol, D-sorbitol, xylitol, lactose, sucrose, anhydrous maltose, D-fructose, dextran, glucose, polyoxyethylene hydrogenated castor oil, polyoxyethylene polyoxypropylene glycol, polyoxyethylene sorbitan higher fatty acid ester, sodium chloride, magnesium chloride, citric acid, tartaric acid, glycine, (3-alanine, lysine hydrochloride, and meglumine" | the pharmaceutical composition" |
| Functional: The Dissolution limitation | "wherein a drug dissolution rate from the pharmaceutical composition is 39% or less after 1.5 hours, and at least 75% after 7 hours, as measured in accordance with United States Pharmacopoeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm." | "wherein a drug dissolution rate from the pharmaceutical composition is 39% or less after 1.5 hours, and at least 75% after 7 hours, as measured in accordance with United States Pharmacopoeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm." | "wherein a drug dissolution rate from the pharmaceutical composition is 39% or less after 1.5 hours, and at least 75% after 7 hours, as measured in accordance with United States Pharmacopoeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm." |

JTX 0001.00016 at 20:19–46, 20:61–65, 21:30–33, 22:1–2, 22:13–29, 22:32–33. The parties' validity arguments do not distinguish between the claims.

17

**F.  The ANDA Filers Develop Generic Versions of Myrbetriq®**

Once Myrbetriq® was approved by the FDA, other pharmaceutical companies, (the ANDA Filers), started to develop their own sustained release formulations of Mirabegron. Hoping to rely on the safety and efficacy studies submitted by Astellas to the FDA, the ANDA Filers tried to achieve Myrbetriq's® exact dissolution profile.  *See* D.I. 526 at 238, Tr. 238:3–20 (Weisman).  Each of the ANDA filers were able to do so.  The materials submitted to the FDA contain many references to using the viscosity of the hydrogel-forming polymer to tune dissolution profile.  For two, *see e.g.,* PTX 1005.00048–49 (Actavis); PTX 4029:00081 (Lupin).  The following table outlines the number of formulations made by each ANDA Filer:

| Manufacturer | Number of formulations |
|---|---|
| Actavis | 17 |
| Apotex | Fewer than 50 |
| Aurobindo | Fewer than 15 |
| Lupin | Fewer than 40 |
| Prinston[8] | Fewer than 10 |
| Sandoz | Fewer than 52 |
| Sawai | Fewer than 58 |
| Zydus | Fewer than 23 |

D.I. 530 at 86–91, Tr. 1269:9–1274:15.  Note, while making these formulations, the ANDA Filers had other formulation goals, so not every formulation was aimed at reproducing Myrbetriq's® dissolution rate.  Or, in Dr. Little's words, "[o]nly a fraction of what you're seeing here was actually used to target the dissolution profile."  D.I. 530 at 84, Tr. 1267:12–13 (Little).  And the dissolution "requirements" for an ANDA filing "would be much more stringent than what you're talking about with the asserted claims."  *Id.* at 92, Tr.

---

[8] Prinston's formulation used HPMC rather than PEO.

1275:9–11 (Little); D.I. 530 at 80, Tr. 1263:3–11 (Little) ("It's going to be dramatically easier to match two of the data points in that profile than it would be to match the Myrbetriq product. So, you could pick any particular profile that's described in the claim, and you could say those points were there, and it would be easier than trying to match a product with dissolution points all along the line.  It would be far less iterations that you would need to make in order to get the profile."); D.I. 530 at 9–10, Tr. 1192:21–1193:1 (Chambliss) ("If you said that there was a requirement at three hours, 5 hours, 6 hours, and 7 hours, versus a requirement only at one-and-a-half hours and seven hours, it's easier to hit the one-and-a-half hours and seven hours than the more detailed profile, I agree").  Dr. Little's testimony is consistent with the Court's review of the ANDA Filers' descriptions of their formulation process, which showed that they were able to precisely tune the dissolution rate using known qualities of sustained release hydrogels and did not resort to random trial and error experimentation.  *See id.* at 68–69, Tr. 1251:15–1252:4 (Little); PTX 1005; PTX 1006; PTX 2013; PTX 2020; PTX 3002; PTX 3003; PTX 4029; PTX 5004; PTX 6006.

### G.  The Parties' Experts Opine on the Validity of the '780 Patent.

Along with the facts above, the parties offered expert testimony regarding the validity of the '780 Patent. Astellas's primary validity expert was Dr. Little.  The Generics Manufacturers' primary validity expert was Dr. Chambliss.  Both experts are well-credentialed and experienced.   Generally, the Court found both experts credible.  However, when specific expert conclusions were inconsistent with the weight of the other evidence, the Court disregarded them.  The Court will address discrepancies between expert testimony and the record as they come up.

### 1. Enablement

Dr. Little testified that creating the hydrogel sustained release formulation was straightforward. D.I. 530 at 100, Tr. 1283:18–22 (Little); D.I. 530 at 68–69, Tr. 1251:15–1252:4 (Little). The '780 Patent disclosed candidate ingredients, provided working examples, and a target dissolution rate that would have been familiar to the POSA. D.I. 530 at 59–60, Tr. 1242:12–1243:9 (Little); id. at 155, 1338:8–19 (Little). Hydrogel sustained release formulations were well understood, there are many resources teaching how to make and use them. Id. at 57–58, Tr. 1240:19–1243:9 (Little); id. at 61 1244:1–15 (Little) ("And just given the amount of time, there is a large, large body of literature that shows over and over again the same kind of things that you see stated in the patent specification."); id. at 102, 1285:2–10 (Little). Dr. Little, contrasted well-understood sustained release hydrogels with more complex formulation problems, where the effects of the variables are unknown, that sometimes requires the POSA to work through millions of different compounds to find one that works. Id. at 77, Tr. 1260:2–22 (Little). Based on their knowledge of sustained-release hydrogels, the POSA could work "towards that profile" and "certainly wouldn't be just making" every combination of ingredients. Id. at 79, Tr. 1262:20–22 (Little); id. at 69–70, Tr. 1252:19–1253:22 (Little) ("[Y]ou can get any profile that they're saying there with a limited number of experiments."). The Court agrees with Dr. Little that sustained release hydrogels were well characterized, commonly used, and well understood in 2008. This is supported by the wide variety of sources in the record discussing, in detail, the behavior of sustained release hydrogels. *See supra* Findings of Fact Section C.

Given these parameters, Dr. Little testified that the POSA in 2008 would be able to synthesize a working formulation without undue experimentation.  Specifically, the patent disclosed known working examples of formulations that met the dissolution requirement.  D.I. 530 at 97, Tr. 1280:8–13 (Little).  Helping the POSA along, the POSA would have access to computer programs that helped predicted the dissolution profile of combinations of candidate ingredients.  Id. at 112–13, Tr. 1295:9–1296:4 (Little).  And, because the dissolution rate of a sustained release hydrogel formulation is tied to its viscosity no matter what ingredients are used, the POSA could change the viscosity of the formulation to tune the dissolution profile to meet the dissolution limitations of the '780 Patent.  Id. at 93–94, Tr. 1276:11–1277:7 (Little).  Dr. Little predicted, starting from mirabegron, a hydrogel-forming polymer, and a water-soluble additive disclosed in the patent, a POSA would reach a working formulation within five or six tries.  Id. at 163, Tr. 1346:2–6 (Little).  Overall, the behavior of hydrogel-forming polymers and water-soluble additives were well understood and predictable and the POSA would have no trouble practicing the full scope of the invention.  Id. at 69–70, 1252:10–1253:22 (Little) ("Q: When you read the specification and claims of the '780 patent, did you have any questions that you could practice the full scope of those claims?  A: No question whatsoever.").

The Court agrees with Dr. Little's description of the formulation process and that the POSA in 2008 would know how to speed up or slow down the dissolution rate by adjusting the formulation's viscosity.  Indeed, a Dow Chemical Brochure from 1980 suggested the same approach:



JTX 0071.00016; *see also* 2073.00014–16.  Thus, the technique described by Dr. Little would have been disclosed in the prior art and known to the POSA in 2008.

Dr. Chambliss testified that the POSA's task is much harder.  Specifically, he contended that there are, conservatively, [9] 1,540,200 possible formulations fell within the structural elements of Claim 20.  D.I. 529 at 170–71, Tr. 1067:18–1068:8 (Chambliss). And, because many factors influence the dissolution rate of a formulation the POSA would need to perform dissolution testing to determine whether a given formulation that meets the structural limitations also meets functional limitation.  *Id.* at 207–08, Tr. 1104:18–

---

[9] This calculation did not account for other possible additives or binders.

1105:10 (Chambliss). Specifically, the key variables were the dosage form (i.e. the tablet shape) (D.I. 529 at 201–02, Tr. 1098:23–1100:7 (Chambliss)), the solubility of the form of mirabegron (D.I. 529 at 178–79, Tr. 1075:23–1076:11 (Chambliss)), drug particle size (D.I. 529 at 181–82, Tr. 1078:11–1079:4 (Chambliss)), grade or molecular weight of the hydrogel-forming polymer (D.I. 529 at 185–86, Tr. 1082:17–1083:19 (Chambliss)), the type or grade of the water soluble additive (D.I. 529 at 193–95, Tr. 1090:19–1091:23, 1092:5–1093:12 (Chambliss)), and the influence of other excipients (D.I. 529 at 199–200, Tr. 1096:13–1097:15 (Chambliss)). Basically, the '780 Patent claims many ingredient combinations and a small percentage of them met the dissolution requirement, meaning the POSA would need to engage in "trial and error experimentation" to determine which formulations met the dissolution requirement. D.I. 529 at 237, Tr. 1134:4–8 (Chambliss). Dr. Chambliss also testified that the POSA would understand the examples in the specification to have been run at 50 rpms and, thus, did not meet the asserted claims. *Id.* at 244–45, Tr. 1141:17–1142:16 (Chambliss).

The Court agrees with Dr. Chambliss's math, that all the factors identified in his testimony affect the dissolution profile of a formulation, and that the POSA would need to perform dissolution testing to know whether a given formulation fell within the scope of the '780 Patent's claims. In other words, the POSA could not predict, knowing only the ingredients, the exact dissolution profile of a given formulation. But the Court does not agree that the POSA would engage in trial-and-error experimentation, the '780 Patent does not disclose changing viscosity of the hydrogel-forming polymer as a method of tuning the formulation, or that the examples in the patent were run at 50 rpm. The Court

finds Dr. Little's explanations of these issues more consistent with the Patent specification, and the prior art.

That is not to say there is no overlap between the experts. Both agreed that sustained release hydrogels were established technology. D.I. 530 at 60, Tr. 1243:15–21 (Little); D.I. 529 at 262, 267, Tr. 1159:21–25; 1164:24–1165:7 (Chambliss). Both agree the POSA would start with a target dissolution profile, choose component ingredients, and tune variables until the POSA achieved a formulation that met the dissolution requirements. D.I. 530 at 4–7, Tr. 1187:5–1190:5 (Chambliss); D.I. 530 at 163, Tr. 1346:2–6 (Little). And to perform this process, the POSA would not "make thousands or . . . millions" and would "[c]ertainly not" make trillions of formulations to find one meeting a target dissolution profile. D.I. 530 at 4–7, Tr. 1187:5–1190:5 (Chambliss); D.I. 530 at 163, Tr. 1346:2–6 (Little).

## 2. Written Description

On written description, Dr. Chambliss repeated his conclusions regarding the breadth of the claims and the nonexistence of example formulations in the specification. D.I. 529 at 242–43, Tr. 1139:21–1140:24 (Chambliss). He also testified that all the examples disclosed in the specification were not representative. Specifically, while the specification disclosed several hydrogel-forming polymers, the examples used the same hydrogel-forming polymer (PEO). *Id.* at 248, Tr. 1145:9–10 (Chambliss). To illustrate this point, Dr. Chambliss showed the following demonstrative representing the ingredient

combinations   and   highlighting   the   examples   disclosed   in   the   patent:



DTX 9-94.  He also pointed to a retrospective spreadsheet showing formulations created using two different hydrogel-forming polymers (HPC and HPMC) did not meet the dissolution limitation.   DTX 2084.00011; D.I. 529 at 231–33, Tr. 1128:10–1130:23 (Chambliss).  The Court agrees with Dr. Chambliss about the number of combinations, the types of polymers used in the specification examples, and that the formulations listed in DTX 2084 were created using HPC and HPMC and did not meet the dissolution limitation.  The Court does not agree that the samples were run at 50rpm or that the specification fails to disclose a structure-function relationship.  The Court will discuss both issues in depth *infra* Conclusions of Law Section C.3.

Dr. Little repeated his conclusions that sustained release hydrogels were well characterized, predictable, and could be tuned by changing the viscosity of the hydrogel-forming polymer.  He also disagreed with Dr. Chambliss and asserted the claims were run

at 200rpm.  In support, he pointed to language in the specification and a spreadsheet produced in discovery showing the paddle speeds of the examples in the specification. D.I. 530 at 169–71, Tr. 1352:3–1354:1; *id.* at 97, Tr. 1280:21–2 (Little).

### 3. Indefiniteness

Dr. Chambliss testified that hydrogel-forming polymers, including PEO, degrade as they dry out. D.I. 529 at 252–53, Tr. 1149:24–1150:3 (Chambliss).  So, the dissolution rate changes depending on the age of the sample.  Thus, a sample may infringe when fresh and not infringe when expired.  *Id.*, Tr. 1149:15–1150:7 (Chambliss).  Dr. Little agreed that hydrogel-forming polymers degrade over time.  But he testified that the POSA would understand to test for infringement using fresh samples or "when you're going to make it and sell" it. D.I. 530 at 141, Tr. 1324:9–19 (Little).

## H.  Procedural History

After trial on enablement, written description, and indefiniteness, the Court found in favor of the Generics Manufacturers on a different ground, finding that the '780 Patent was an invalid attempt to patent a natural law applied via routine, conventional, and well-known methods.  *See* D.I. 571.  The Federal Circuit reversed. *Astellas Pharma, Inc. v. Sandoz Inc.*, 117 F.4th 1371, 1379 (Fed. Cir. 2024).  The panel determined the Court erred in finding the '780 Patent invalid on a theory that was not developed by the parties. *Id.* The Federal Circuit remanded instructing the Court to "take an objective, measured, and thorough look into the legal issues and evidence of record to resolve only those disputes that exist between the parties." *Id.* at 1381.

While the case was on appeal, certain disputes metamorphosed.  Specifically, the Generics Manufacturers launched their competing generic sustained release mirabegron

products.  D.I. 652 at 2.  This changed the landscape for infringement and introduced a damages issue.  *Id.* at 4–6.  But the factual landscape for validity remained unchanged from the issues submitted to the bench in 2023.  *Id.* at 4.  So, the Court restricts its analysis to validity.  *Id.* at 10.  A jury will answer whether these products infringe, whether there are additional invalidity issues and whether Astellas is entitled to damages in 2026.  *Id.*

## CONCLUSIONS OF LAW

The Court concludes that the Generics Manufacturers did not meet their burden of showing, by clear and convincing evidence, that the '780 Patent is invalid for lack of enablement, lack of written description, or indefiniteness.

### A. Legal Standard

Under its authority to "promote the Progress of Science and the useful Arts" Congress created an extensive scheme governing the issuance and validity of patents. U.S. Const. Art. I, § 8.  To obtain a patent, an inventor first applies with the Patent and Trademark Office (PTO).  The PTO then examines the application to determine, among other things, whether the claimed patent is enables the POSA to make and use the invention, contains an appropriate written description of the invention, and is definite.  35 U.S.C. § 2(a)(1); 35 U.S.C. § 112(a) (requiring a patent to meet the enablement, written description, and definiteness conditions).  If "it appears that the applicant is entitled to a patent under the law" the PTO issues the patent.  35 U.S.C. § 131.

Once the PTO issues a patent, the patent-holder is permitted to sue alleged infringers in federal court.  35 U.S.C. § 271.  In litigation, an alleged infringer can raise a defense of invalidity.  *Id.*  In other words, the alleged infringer argues the PTO got it wrong and the patent should not have been granted.  35 U.S.C. § 282; *Microsoft Corp. v. I4I Ltd.*

*P'ship*, 564 U.S. 91 (2011).  But, given that the PTO necessarily considered, and rejected, the purported ground for invalidity, "[a] patent shall be presumed valid."  35 U.S.C. § 282(a).  Thus, the alleged infringer must demonstrate invalidity by "clear and convincing evidence."  *Microsoft Corp.*, 564 U.S. at 95.  Enablement and indefiniteness are ultimately questions of law, supported by questions of fact.  *Microsoft Corp.*, 564 U.S. at 96–97.  Written description is a "question of fact."  *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 127 F.4th 896, 914 (Fed. Cir. 2025).[10]

## B. Enablement

The '780 Patent is enabled because the POSA could practice the full scope of the claimed formulations without undue experimentation.

### 1. Legal Framework

The enablement requirement is found in 35 U.S.C. § 112(a), which requires that the specification to describe the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the [invention]."  "If a patent claims an entire class of processes, machines, manufactures, or compositions of matter, the patent's specification must enable a person skilled in the art to make and use the entire class."  *Amgen Inc. v. Sanofi*, 598 U.S. 594, 610 (2023) (*Amgen III*).[11]  But, the

___

[10] There appears to be some tension between *Microsoft Corp.* which spoke of a single standard for all invalidity theories and Federal Circuit case law creating a separate standard for written description.  *Compare Microsoft Corp.*, 564 U.S. at 96 ("[T]he ultimate question of patent *validity* is one of law.") (cleaned up) (emphasis added) *with Mylan Pharms. Inc.*, 127 F.4th at 914 (setting a different standard for written description).  Ultimately, this distinction does not make a difference in this case, so the Court will leave this issue to the commentators and the Circuit to sort out.  *See e.g.* Paul R. Gugliuzza, *Law, Fact, and Patent Validity*, 106 Iowa L. Rev. 607, 635–39 (2021) (criticizing this approach); Shahrokh Falati, *A Singular Disclosure Requirement is Necessary for Patent Law*, 24 Colum. Sci. & Tech. L. Rev. 249, 290 (2023) (same); Jesse S. Keene, *Fact or Fiction: Reexamining the Written Description Doctrine's Classification As A Question of Fact*, 18 Fed. Circuit B.J. 25, 27 (2008) (same).

[11] The parties make much in their briefing about whether there is a heightened standard for enabling genus claims.  Generics Manufacturers argue establishing enablement is more challenging because Astellas is claiming a genus of sustained release hydrogel formulations, while Astellas argues the Generics Manufacturers are improperly trying to raise the bar for enablement.  *See* D.I. 674; D.I. 675.  This is a false

enable the full scope of the claimed invention, the specification need not provide a how-to list for every conceivable embodiment.  *Id.*  Instead, the specification may disclose "an example (or a few examples) if the specification also discloses 'some general quality . . . running through' the class that gives it 'a peculiar fitness for the particular purpose.'"  *Id.* at 610–11 (quoting *Consolidated Electric Light Co. v. McKeesport Light Co.*, 159 U.S. 465, 475 (1895)).

A patent may enable the full scope of the invention even if it requires "the skilled artist to engage in some measure of adaptation or testing."  *Amgen III*, 598 U.S. at 611.  Specifically, the "specification may call for a reasonable amount of experimentation to make and use a patented invention" with reasonableness assessed based on "the nature of the invention and the underlying art."  *Id.* at 612.  Even "extensive experimentation does not necessarily render the experiments unduly extensive where the experiments involve repetition of known or commonly used techniques."  *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336–39 (Fed. Cir. 2013).  As the Federal Circuit pithily put it, "[t]he key word is 'undue,' not experimentation."  *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

Undue experimentation is "not a single, simple factual determination, but rather a conclusion reached by weighing many factual considerations."  *Id.*  To determine whether experimentation is undue, the Court considers:

> (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in

---

conflict.  As the Supreme Court recognized in *Amgen III*, "there is one statutory enablement standard" but "the more a party claims for itself the more it must enable."  *Amgen III*, 598 U.S. at 615–16.  So, both parties are stating accurate and compatible truisms about enablement, not asserting meaningfully different standards.

the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

*Id*. The *Wands* factors are not a rote checklist but rather a useful set of factual inquiries to assess how the POSA would approach and make use of the patent specification. While the Supreme Court did not explicitly invoke the *Wands* factors in *Amgen III*, both the PTO and the Federal Circuit have concluded they remain the appropriate test. *Guidelines for Assessing Enablement in Utility Applications and Patents in View of the Supreme Court Decision in Amgen Inc. et al. v. Sanofi et al.*, 89 Fed. Reg. 1563, 1566 (Jan. 10, 2024); *Baxalta Inc. v. Genentech, Inc.*, 81 F.4th 1362, 1367 (Fed. Cir. 2023).

Enablement jurisprudence is marked by a core tension. On one hand, "the specification, not the knowledge of those skilled in the art, 'must supply the novel aspects of an invention' to satisfy the enablement requirement." *Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012). But on the other, the POSA is a skilled artisan with the background knowledge and skillset necessary to make sense of a patent disclosure. As such, "a patent need not teach, and preferably omits, what is well known in the art." *Id.*; *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1261 (Fed. Cir. 2017) (making the same point more recently). This tension is at the heart of, and resolves, this case.

## 2. The '780 Patent is enabled.

The '780 Patent is enabled because, applying the *Wands* factors, the evidence presented at trial does not show the POSA would need to resort to "random trial-and-error discovery" to practice the invention. *Amgen III*, 598 U.S. at 615. True, as stated by Dr. Chambliss, practicing the invention requires experimentation. D.I. 529 at 175, Tr. 1072:4–5 (Chambliss). But making candidate formulations and performing dissolution testing is

"routine" and helped along by the "reasonable amount of guidance regarding the direction of experimentation" provided by the specification. *Wyeth & Cordis Corp. v. Abbott Lab'ys*, 720 F.3d 1380, 1386 (Fed. Cir. 2013). And the methods and knowledge used by the POSA to create a working formulation were not the "novel aspects of the invention" but rather information that was "well known in the art" and, thus, were properly omitted from the specification. *Streck, Inc.*, 665 F.3d at 1288. The Court addresses each of the *Wands* factors then closes with a holistic assessment of the invention.

### a. The *Wands* Factors support enablement.

*Quantity of Experimentation.* The POSA does not have to engage in a large quantity of fruitless experimentation to practice the invention, favoring enablement. The proper frame is not the amount of experimentation to exhaust the genus (i.e., to make every formulation embraced by the patent) but rather the amount of experimentation necessary to practice in the invention (i.e., to make a working formulation). *See e.g. Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1372–73 (Fed. Cir. 1999) (relying on years of failure to make a working embodiment across many attempts); *Amgen Inc. v. Sanofi, Aventisub LLC*, 987 F.3d 1080, 1088 (Fed. Cir. 2021) (*Amgen II*) ("We do not hold that the effort required to *exhaust* a genus is dispositive. It is appropriate, however, to look at the amount of effort needed to obtain embodiments outside the scope of the disclosed examples and guidance."). Here, Dr. Little and Dr. Chambliss testified that the POSA, starting with a target dissolution profile and preferred ingredients, would not make hundreds, thousands, or millions of formulations to reach a working embodiment. D.I. 530 at 6, Tr. 1189:15–22 (Chambliss); D.I. 530 at 82, Tr. 1265:4–13 (Little). Dr. Little testified that a POSA could start with any combination of the disclosed ingredients and

follow the guidance in the patent to achieve a working formulation in as few as three to five candidate formulations. D.I. 530 at 69–70, Tr. 1252:13–1253:4 (Little). This is broadly consistent experience with the experience of the ANDA Filers who were able to recreate Myrbetriq's® exact dissolution profile using 10 to 60 formulations, despite starting from different ingredients.[12]  *See supra* Findings of Fact Section F.

None of the companies made millions or even thousands of candidate formulations or started over from scratch after an unsuccessful trial. *Id.* Indeed, both experts agreed that that replicating Myrbetriq's® exact dissolution profile is more difficult than meeting the '780 Patent's dissolution limitation. D.I. 530 at 80, Tr. 1263:3–11 (Little); D.I. 530 at 9–10, Tr. 1192:21–1193:1 (Chambliss). Thus, the quantity of experimentation favors enablement.

*Guidance in the Specification.*  The specification provides detailed guidance for practicing the invention, favoring enablement. The specification must do more than send the POSA on a "'research assignments'" to "to engage in the same iterative, trial-and-error process the inventors followed to discover the [embodiments] they elected to disclose." *Baxalta Incorporated*, 81 F.4th at 1366 (quoting *Amgen III*, 598 U.S. at 614). The Patent provides specific ingredients, the process for formulating the ingredients into a pharmaceutical composition, a target dissolution rate, and the means of testing to determine whether the pharmaceutical composition meets the dissolution rate. JTX 0001.00009–13. If the composition does not meet the dissolution rate, the patent tells

---

[12] The Court considers this evidence because "post-priority-date evidence" showing "at practicing the invention did not require undue experimentation" is relevant to the enablement inquiry. *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1379 (Fed. Cir. 2017) (*Amgen I*). Here, the evidence at trial showed that the techniques used by the ANDA Filers were decades old and the Generics Manufacturers did not show any evidence that the applicable science or formulation techniques changed between the 2008 and the ANDA Filers' experimentation. Thus, the ANDA Filers efforts are relevant to the undue experimentation inquiry.

the POSA to adjust the viscosity of the hydrogel-forming polymer.  JTX 0001.00010 at 7:34–38 ("[T]he release period of time of the drug from the formulation can be arbitrarily controlled by adjusting the viscosity of the polymer which is used as the hydrogel-forming polymer.").  If the dissolution rate was too fast, the POSA would increase the viscosity and if it was too slow, the POSA would decrease the viscosity.  JTX 0071.00016; D.I. 530 at 93, Tr. 1276:22–24 (Little); D.I. 527 at 279, 572:12–573:17 (Little).  Far from sending the POSA on a research project or granting a "hunting license," the '780 Patent provides a detailed roadmap for achieving a working formulation.  *Amgen III*, 598 U.S. at 614.

*Working Examples.*    The specification discloses working examples favoring enablement.  While "a patentee is not required to provide actual working examples," the presence of working examples helps the POSA practice the invention by showing what has worked before.  *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1310 (Fed. Cir. 2015). Here, Examples 2, 8, and 9 meet both the structural limitations (each is comprised of mirabegron, a hydrogel-forming polymer, and a water-soluble additive) and the dissolution limitation (each showed a dissolution profile of "39% or less after 1.5 hours, and at least 75% after 7 hours").  The Generics Manufactures contest whether the examples meet the dissolution limitation and are representative of the genus.  The Court does not find these contentions persuasive for reasons discussed *infra* Conclusions of Law Section C.3.a.

*Nature of the Invention.*    The nature of the invention, the use of a familiar technology to solve a new clinical problem, favors embodiment.  The '780 Patent is not a "a breakaway from the prior art, and thus, the preparation of such dosage forms [is] routine."  *ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 941 (Fed. Cir. 2010).

*State of the Prior Art*.  The state of the prior art was mature and well characterized, favoring enablement.  Experimentation is more likely to be routine when the art is mature or well characterized. *ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 941 (Fed. Cir. 2010).  Here, both dissolution testing and sustained release hydrogels are commonly practiced and well understood.  Dissolution testing is routine and has detailed and uniform standards for its performance.  D.I. 529 at 237, Tr. 1134:13–15 (Chambliss); D.I. 530 at 8, 1191:14–17 (Chambliss); D.I. 530 at 80–82, Tr. 1263:21–1265:3 (Little); PTX 007. Likewise, sustained release hydrogels are not new or cutting-edge technology.  Rather, as of 2008, they were, in the words of Dr. Little, "probably the most well characterized extended-release oral dosage form." D.I. 530 at 60, Tr. 1243:21–23 (Little).  Or, in the words of Dr. Chambliss, "one of the most common sustained release formulations . . . for oral delivery." D.I. 529 at 260, Tr. 1157:21–25 (Chambliss).  The prior art is replete with guidance about the features and uses of the hydrogel-forming polymers and water-soluble additives disclosed in the '780 Patent. *See e.g.*, DTX 2077; DTX 2042; JTX 0065; DTX 2073. Put another way, the POSA practicing the invention would be unlikely to encounter a new problem in formulating a sustained release hydrogel that had not been addressed by the prior art.  DTX 2077.00043; DTX 2042.00005; JTX 0065.00002; DTX 2073.00004. Likewise, the relationship between viscosity and dissolution rate disclosed in the '780 Patent was well-established by the prior art. *See e.g.*, JTX 0008.00014 (2006); DTX 2073.00014 (1987); JTX 0071.00017; DTX 2042.00005 (2003).  So, the POSA practicing the '780 Patent is not writing on a blank slate but rather practicing a mature and well-characterized art.

*The Relative Skill of Those Practicing the Art.* Designing and formulating a pharmaceutical composition requires a high degree of training and skill favoring enablement. The POSA is highly educated (holding a Ph.D. in a relevant science) and experienced in creating pharmaceutical compositions. *See supra* Findings of Fact Section B.

*The Predictability of the Art*. The POSA could rely on predictable aspects of the art to make a formulation that meets the dissolution limitation, favoring enablement. If the art is unpredictable, POSA is left to "to randomly try a large set of combinations and then record the successful ones." *Amgen III*, 598 U.S. at 614. As previously noted, sustained release hydrogels are a mature and well-understood technology. There is ample guidance demonstrating the effect of plethora of variables on the dissolution rate of a sustained release hydrogel. *See e.g.*, DTX 2077.00043; DTX 2042.00005; JTX 0065.00002; DTX 2073.00004. Sales materials from commercial distributors disclose the relevant properties of hydrogel-forming polymers and water-soluble additives. JTX 0005.00010–11; JTX 0006.00015; DTX 2072.00009. Computer programs created using these findings can predict the dissolution rate of a given formulation. D.I. 530 at 11–132, Tr. 1295:9–1296:4 (Little). More to the point, the dissolution profile of a pharmaceutical composition is predicted by a well-characterized inverse relationship with viscosity. DTX 2073.00016; DTX 2077.00043; DTX 2042.00005; D.I. 527 at 214, Tr. 507:17–21 (Little); D.I. 530 at 93, Tr. 1276:22–23 (Little); D.I. 529 at 189, Tr. 1086:5–22 (Chambliss). Moreover, the viscosity of the formulation can be tuned by the POSA, allowing the POSA to take advantage of that direct relationship, using commercially available materials. JTX 0071.0001; D.I. 530 at 93, Tr. 1276:22–24 (Little); D.I. 527 at 279, Tr. 572:12–573:17

(Little).  Indeed, the Generics Manufacturer were able to manipulate all the variables discussed by Dr. Chambliss, including viscosity, to precisely achieve their desired dissolution rate.  *See supra* Findings of Fact Section H. Put another way, the POSA knows a lot about sustained release hydrogels and can apply that knowledge to precisely manipulate the dissolution rate of the formulation.  So, the art of creating a sustained release hydrogel is not only well-characterized but predictable.

The Generics Manufacturers suggest that the technology is not predictable because the POSA would need to perform dissolution testing to determine if a given formulation meets the claim's functional limitation. D.I. 534 at 26.  But the law neither requires the POSA to predict a formulation's dissolution rate on paper nor create a working embodiment, on the first try, with no independent testing or experimentation. Instead, patent law's enablement requirement allows for "routine screening" (*In re Wands*, 858 F.2d at 736–37) and "some measure of adaptation or testing" (*Amgen III*, 598 U.S. at 596).  Concluding that performing dissolution testing, the bread and butter of pharmacology, creates enough uncertainty to amount to undue experimentation would be tantamount to adopting a "no experimentation" rule.

*The Breadth of the Claims*.  The number of candidate formulations is large which opposes enablement.  The Court accepts Dr. Chambliss's math that there are many combinations (numbering in the millions) of the candidate ingredients disclosed in the patent. D.I. 529 at 170–71, Tr. 1067:18–1068:8 (Chambliss).  This is presumably by design.  The '780 Patent claims a whole genus of a particular type of sustained release formulation of mirabegron, else the Generics Manufacturers would be able to circumvent the parent protection by using a similar (but not covered) hydrogel-forming polymer and

water-soluble additive.  But the number of formulations claimed is not especially probative, much less dispositive of the enablement question.  Specifically, the Generics Manufactures introduced no evidence that any of these formulations cannot be reached using the familiar and well-developed techniques for formulation design.  So, while this factor opposes enablement, it does overcome Astellas's strong showing on the other *Wands* factors.

Assessing the *Wands* factors holistically, the POSA practicing '780 Patent would encounter familiar science and specification guidance at every turn.  Specifically, the POSA selects a commercially available hydrogel-forming polymer and water-soluble additive from those listed in the specification.  If the POSA has questions, she looks for answers in decades of prior art.  From there the POSA makes prototype formulations relying on their experience and guidance in the specification.  The POSA performs familiar dissolution testing using the procedure disclosed in the specification and can tell whether their prototype meets the dissolution limitation.  If the initial prototype is unsuccessful, the POSA is not out of luck.  Rather, they know where to go based on the guidance in the patent and a well-known physical property of sustained release hydrogel.  If the release was too slow, the POSA decreases the viscosity of the formulation; too fast, the POSA increases the viscosity.

Against that backdrop, starting with a preferred combination of ingredients, practicing the full scope of the invention is short work for the POSA.  This is routine experimentation not random trial and error.  Or, more colorfully, the POSA practicing the '780 patent is not a lost hiker groping through the dark deep woods without a flashlight.

Instead, the POSA is a commuter, navigating her daily commute through well-lit subway system with a map on the wall.

### b. Courts addressing similar technology on a similar record have found the claims enabled.

The Court's conclusion is consistent with other courts who have considered patents covering similar technology.   For example, the '780 Patent contains greater disclosure than the patent the Federal Circuit held enabled in *Eli Lilly & Co. v. Actavis Elizabeth LLC*, 435 F. App'x 917 (Fed. Cir. 2011).   There patent for a treatment for ADHD claimed a method involving "administering to the patient an effective amount" of the drug and disclosed an example immediate release formulation.   *Id.* at 922.   The specification provided "[t]he usual methods of pharmaceutical scientists are applicable." *Id.*   The ANDA filer argued the patent was not enabled because it failed to disclose guidance or an exemplar for a sustained release formulation.   *Id.*   The Federal Circuit disagreed because the evidence at trial showed that the POSA would know how to create an appropriate pharmaceutical composition and "no evidence that known procedures for determination of . . . formulation did not apply."   *Id. See also ALZA Corp.*, 603 F.3d at 937 (concluding as of 1997, "it was well known how to develop sustained-release dosage forms, also known as 'controlled release' or 'extended release'").  These cases indicate that procedures for creating a sustained release formulation are the type of information well known in the art and need not be disclosed in the specification.

District court decisions involving drug formulation technology have come to similar conclusions.  For example, the court in *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.* addressed formulation claims on a similar record and concluded they were enabled. *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 714 F. Supp. 3d 652, 758 (N.D.W. Va.

2024).  Specifically, the court concluded—like the Court here—the POSA was aware of the properties of the ingredients listed in the specification, the ingredients disclosed did not interact in an unpredictable manner, and the POSA was able to "pursue[] a more linear process that would not require making and testing each permutation of the structural elements of the claim, and that would have been aided by formulation design systems." *Id.*  Put simply, when the POSA has specification "guidance and tools for automating formulation design . . . the POSA could practice the claims with minimal and routine—not undue—experimentation." *Id.* at 756.  Similarly, the Court in *Supernus Pharms, Inc. v. Torrent Pharms. Ltd.*, concluded a patent that required the POSA to—based on the results of dissolution testing – adjust one factor (in that case the amount of a coating) to achieve a desired dissolution rate was enabled. *Supernus Pharms., Inc. v. Torrent Pharms. Ltd.*, No. CV 21-06964 (GC) (DEA), 2024 WL 1208663, at *57 (D.N.J. Jan. 30, 2024).  Indeed, the patent here offers the POSA *more* guidance than the patent-in-suit there., which did not provide any specific method for performing dissolution testing. *Id.* at *48–49.  *See also Alza Corp. v. Mylan Lab'ys, Inc.*, 388 F. Supp. 2d 717, 731 (N.D.W. Va. 2005) (concluding a patent for a "dosage form" was enabled because "many known non-osmotic systems, including a polymer matrix dosage form, existed so that one of ordinary skill could make and practice the limitations of the '355 patent based on the prior art.").  Thus, courts considering similar claims on a similar record have those claims enabled.

### c.  The Generics Manufacturers' theory of enablement is untenable.

Consider the implications of accepting the Generics Manufacturers' position.  "A patent is not a scientific treatise, but a document that presumes a readership skilled in the field of the invention." *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338,

1347 (Fed. Cir. 2000).  Indeed, as the Federal Circuit recognized "[r]equiring inclusion in the patent of known scientific/technological information would add an imprecise and open-ended criterion to the content of patent specifications, could greatly enlarge the content of patent specifications and unnecessarily increase the cost of preparing and prosecuting patent applications, and could tend to obfuscate rather than highlight the contribution to which the patent is directed."  *Id.* at 1346–47.  Yet, the Generics Manufacturers' view of enablement transforms the '780 Patent into a general-purpose resource about sustained release hydrogels rather than a focused description of the pharmaceutical at issue.  35 U.S.C. § 112(a)'s enablement requirement does not mandate this result.

### 3.  The Generics Manufacturers' Arguments

The Generics Manufactures raise several arguments for why, the '780 Patent is, nevertheless, not enabled.  None change the Court's conclusion.

#### a.  Making and using a sustained release hydrogel was well known in the art and did not need to be disclosed in the specification.

*First,* The Generics Manufacturers argue, even accepting the POSA would know how to formulate a sustained release hydrogel that met the dissolution requirement, that knowledge cannot be used to "backfill the specification."  D.I. 534 at 36–37.  True, "the rule that a specification need not disclose what is well known in the art is merely a rule of supplementation, not a substitute for a basic enabling disclosure."  *ALZA Corp.*, 603 F.3d at 940.  But "the specification, not the knowledge of those skilled in the art, 'must supply the *novel* aspects of an invention' to satisfy the enablement requirement."  *Streck, Inc.*, 665 F.3d 1269 (emphasis added).  Here, Astellas did not invent the sustained release hydrogel, the most common sustained release dosage form.  Nor did Astellas invent the concept of using viscosity to achieve a specified dissolution profile, something that was

well-established in the art as early as the 1980s.   JTX 0071.00016.   Rather, Astellas's invention was using a well-known tool (the sustained release hydrogel) to achieve a dissolution profile that solved a specific clinical problem.   The dissolution rate and solution to a clinical problem—not the details of creating the sustained release hydrogel—are the novel aspects of the invention that had to be disclosed.

Tellingly, when asked at oral argument what the patent should have disclosed to enable the patent, the Generics Manufacturers suggested Astellas could have included a chart showing the direct relationship between hydrogel-forming polymer viscosity and dissolution rate.   D.I. 685 at 84, Tr. 84:15–22.   But this runs headlong into the principle that a patent "need not teach, and preferably omits, what is well known in the art."   *Streck, Inc.*, 665 F.3d 1269.   Thus, the information about the qualities of the excipients and the technique of using viscosity to tune the dissolution rate of the formulation, were well known in the art and did not need to be disclosed in the specification to enable the '780 Patent.

### b. The existence of other factors affecting dissolution rate does not make the specification's disclosure of the viscosity-dissolution rate relationship insufficient.

*Second*, the Generics Manufactures point to different factors known to affect the dissolution profile of a sustained release hydrogels.   Because many variables contribute to the dissolution rate, they argue, the POSA is left to trial-and-error experimentation.   D.I. 534 at 67.   The Court is not convinced.   Certainly, viscosity alone does not fully predict a formulation's dissolution profile.   The active ingredient, water soluble additive, hydrogel-forming polymer, and other additives used affect the dissolution rate.   *See generally* DTX 2077.   But that is not the point.   Nothing in the record shows that these other factors make it impossible adjust the dissolution profile using viscosity.   For example, there is no

evidence in the record that any of the hydrogel-forming polymers are viscosity-neutral or release mirabegron at a rate untied to viscosity.  Nor is there evidence that any of the water-soluble additives exert such a powerful influence that viscosity is irrelevant.  Nor is there evidence that the intended dissolution profile disclosed in the '780 Patent is so complex as to require specialized combinations of ingredients.  Put another way, just because a system is complex does not mean it is unpredictable, especially when one variable has a well-understood inverse relationship with the desired outcome.[13]

Dr. Chambliss conceded as much, admitting that keeping other variables constant, the POSA could change the dissolution rate by changing the grade of the hydrogel-forming polymer.  D.I. 530 at 6, Tr. 11:89:4–5 (Chambliss) ("That's after—as I said fixing the type of hydrogel-forming polymer, the grade of hydrogel-forming polymer, which water-soluble additive, the amount of the drug, the form of the drug, what type of dosage form.  You would then vary one of those variables, for example the grade of the polymer to achieve different dissolution rates going from fast to slow.").

In sum, while viscosity is not the only factor impacting a formulation's dissolution profile, the Generics Manufacturers have not shown clear and convincing evidence that these other factors require the POSA to engage in random trial and error experimentation.

### c. The technology here is more predictable, less complex, and better characterized than cases in which courts have found no enablement.

*Third*, relying on the large number of combinations of the ingredients disclosed in the specification, the Generics Manufacturers attempt to analogize this case to cases in

---

[13] The Court notes that the dissolution requirement here is not especially demanding.  It does not require the POSA to reach an unusual or technically challenging dissolution profile.  *See e.g.*, *ALZA Corp.*, 603 F.3d at 941. Rather, it requires the formulation to meet a limitation at two time points.  As both experts testified, this task is much easier that recreating a drug's specific dissolution profile.  D.I. 530 at 80, Tr. 1263:3–11 (Little); D.I. 530 at 9-10, Tr. 1192:21–1193:1 (Chambliss).

which courts found claims not enabled.  D.I. 534 at 44–52.  But the enablement inquiry is sensitive to differences between scientific fields and the Court should be careful to avoid apples to oranges analogizing between unlike technologies.  *In re Wands*, 858 F.2d at 737 (focusing on the "state of the prior art" and "the predictability and unpredictability of the art").  And the technical problems at issue in the Generics Manufacturers' cases are inapt comparators to the technical problem here.

The Generics Manufacturers' formulation cases involve a substantially less predictable and characterized technical problems than the formulations here.  For example, *ALZA Corp.* dealt with a patent for an osmotic and non-osmotic "ascending release" formulations, which released more of the active ingredient later in dosage cycle, rather than at a steady clip (similar to the formulation here). 603 F.3d at 937.  In contrast, to a standard sustained-release formulation, "the field of ascending release dosage forms was not mature at the time" of the invention, the inventors had significant difficulties formulating a non-osmotic dosage form, and the specification contained no guidance on creating the non-osmotic dosage form.  *Id.* at 941–43.  Against this backdrop, the patent failed to enable the non-osmotic dosage form.  *Id.* at 943.  In *AstraZeneca AB v. Mylan Pharms. Inc.* the court was faced with a similarly complex formulation problem. *AstraZeneca AB v. Mylan Pharms. Inc.*, No. 1:18CV193, 2022 WL 16857400, at *18 (N.D.W. Va. Nov. 9, 2022).  Specifically, the patent-in-suit covered an asthma medication that suspended the active ingredient in pressurized air.  *Id.* at 3–4.  The record at trial showed that "altering the concentration or grade of any ingredient impacted the stability of the whole formulation" and "there was no magic formula for predicting how the ingredients would react."  *Id.* at 13.  Thus "identifying stable formulations . . . was

completely unpredictable." *Id.*  Against that backdrop, "a POSA would be required to create and assess each candidate to determine whether it met the claims' functional stability requirement." *Id.* at 18.  ***See also,*** *Pharm. Res., Inc. v. Roxane Lab'ys, Inc.*, 253 F. App'x 26, 29 (Fed. Cir. 2007) (addressing a similarly unpredictable and unstable formulation).  Making a basic sustained release hydrogel formulation does not present the technical complexities that drove the courts' reasoning in these cases.

Likewise, the Generic Manufacturers' antibody cases addressed fields mired in uncertainty.  Take *Amgen III*.  There, the patent holder claimed all antibodies that bound to specific amino acids on the exterior of a cell.  *Amgen III*, 598 U.S. at 613.  Unlike the technology here, antibody technology is nascent and unpredictable, to the point where "scientists cannot always accurately predict exactly how trading one amino acid for another will affect an antibody's structure and function." *Id.* at 600.  Thus, the POSA could only practice the invention through trying combinations of antibodies at random until they identified a combination that bound to the cellular site.  *Id.* at 614–15.  This "random trial-and-error discovery" "was not enablement" but rather "a hunting license." *Id.* at 614. Other antibody cases have similarly focused on the unpredictability of antibody science. *See* *Baxalta Incorporated*, 81 F.4th at 1366.  Here, by contrast, the POSA to make predictable changes based on known qualities of sustained release hydrogels to make a successful formulation out of an unsuccessful one.  The POSA does not start from scratch each time.

Other cases cited by the Generics Manufactures involve nascent scientific fields involving unpredictable interactions between chemicals.  *Idenix Pharms. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149 (Fed. Cir. 2019).  There, the Federal Circuit confronted a patent

for a genus of compounds——created by attaching nucleosides to a chemical base——that treated Hepatitis C by binding to a specific site of the structure that replicated the virus. *Id.* at 1154–56. True, the claims there involved many candidate chemicals. *Id.* at 1157 (noting "billions and billions of compounds literally meet the structural limitations"). But that was not the whole story. Instead, because the art was "in its infancy" and "unpredictable" the POSA could only practice the invention by choosing nucleosides at random, potentially testing thousands, and seeing what worked. *Id.* at 1159. *Wyeth*, another case involving unpredictable chemical compounds, reached a similar conclusion, emphasizing the need to engage in random directionless testing to create a working embodiment. *Wyeth and Cordis Corp.*, 720 F.3d at 1386–86 ("Here, the specification similarly discloses only a starting point for further iterative research in an unpredictable and poorly understood field."); *see also Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*, 928 F.3d 1340, 1347–48 (Fed. Cir. 2019) (holding there was no enablement of a broad DNA genus claim "[g]iven such unpredictability in the art"). The field here is not nascent, unpredictable, or poorly understood, so these cases offer little help to the Generics Manufacturers.

In sum, the fields in the Generics Manufactures' cases are a far cry from the field here, in which the POSA would use predictable aspects of sustained release hydrogels to pursue a linear path to a working embodiment with limited, routine, experimentation.

### d. Astellas's comments in the prosecution history do not transform a predictable art into an unpredictable one.

*Fourth*, unable to show that sustained release hydrogels are actually unpredictable the Generics Manufacturers claim, based a line in the prosecution history, that Astellas admitted they were. D.I. 534 at 29–30. But this purported smoking gun does not bear

the weight they put on it.  In context, Astellas was responding to an obviousness rejection, in which, the patent office suggested the invention was obvious because Astellas could plug mirabegron into a particular sustained release system disclosed in the prior art.  DTX 2025.783.  To respond, Astellas stated, correctly, that changing the active ingredient can alter the dissolution profile of the pharmaceutical composition.  And not all sustained release hydrogels have the same dissolution rate.  *Id.*  Astellas successfully persuaded the PTO that the invention is not obvious because the Astellas could not predict whether mirabegron would work in a sustained release hydrogel or plug mirabegron into an existing system and guarantee the same dissolution rate.[14]  *Id.*  Other responses regarding obviousness make it clear this was Astellas's position before the PTO.  JTX 0003.00559 ("Simply put at the time of the present invention, there would have been no guidance for reasonably predicting suitability of mirabegron for administration via sustained release formulations, much less akin to the formulations taught in Seroff and Sako, with the claimed dissolution rate of 39% or less after 1.5 hours and at least 75% after 7 hours, from the beginning of a dissolution test.").  This is very different from admitting a POSA creating a sustained release hydrogel would face a totally unpredictable field or rely on trial-and-error experimentation to make a working formulation.  This section of the prosecution history does not move the needle on enablement.

To summarize: the Generics Manufacturers have not overcome the ample trial evidence showing that practicing the invention involves the routine application of settled science to instructions clearly laid out in the specification.  They have not met their burden

---

[14] Obviousness is not before the Court.  The Court has not considered the contested merits of obviousness and expresses no opinion on whether this is a winning argument.

of showing by clear and convincing evidence that the '780 Patent failed to enable the scope of its claims.

### C. Written Description

The '780 Patent is not invalid for lack of written description because it discloses working examples and a relationship between structure and function. Thus, Astellas demonstrated possession of the genus of sustained release hydrogel formulations of mirabegron.

#### 1. Legal Framework

The written description requirement is found in 35 U.S.C. § 112(a) which requires the specification to "contain a written description of the invention." This written "description must 'clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.'" *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (quoting *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1562–63 (Fed. Cir. 1991). More specifically, "the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.*

The demands of written description "vary depending on the context" and "the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Ariad Pharms, Inc.*, 598 F.3d at 1351. "[T]he written description requirement does not demand either examples or an actual reduction to practice" but disclosure of examples in specification can "demonstrate possession." *Id.* at 1352. To the extent a claim contains structural and functional aspects, Astellas can show possession by

demonstrating "the art has established a correlation between structure and function." *Id. at 1350*.  "'[A] a patentee may rely on information that is 'well-known in the art' for purposes of meeting the written description requirement,' because 'the specification is viewed from the perspective of one of skill' in the relevant art." *Ajinomoto Co. v. Int'l Trade Comm'n*, 932 F.3d 1342, 1359 (Fed. Cir. 2019) (quoting *Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366 (Fed. Cir. 2011)).

### 2.  The '780 Patent does not lack written description.

The written description requirement is met here because the '780 Patent discloses representative species and a structural feature across the genus, demonstrating Astellas possessed the invention at the time of the patent.  The genus in this case is sustained release hydrogel formulations of mirabegron that meet the dissolution requirements.  Thus, to fall within the scope of the '780 Patent a formulation must meet both structural elements (the parts of the sustained release hydrogel) and a functional element (the dissolution limitation).   JTX 0001.00016 at 20:19–46, 20:61–65, 21:30–33, 22:1–2, 22:13–29, 22:32–33.

The specification discloses three representative species.   "[D]isclosure of a species may be sufficient written description support for a later claimed genus including that species." *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1125 (Fed. Cir. 2004).   Here, the Specification describes in detail the ingredients and process for creating three formulations that meet the structural and functional limitations.  Examples 2, 8, and 9 meet both the structural limitations (each is comprised of mirabegron, a hydrogel-forming polymer, and a water soluble) and the dissolution limitations (each showed a dissolution profile of "39% or less after 1.5 hours, and at least 75% after 7 hours").  JTX 00013–16.

The examples are also representative of the genus.  All members of the genus use the same component parts, prepared and tested using the same methods, to introduce the same active ingredient based on the same sustained release mechanism.  Thus, the Court concludes the '780 Patent disclosed representative species.

Along with the representative species, the specification discloses a relationship between structure (viscosity) and function (dissolution rate).  A patent can satisfy written description by showing a relationship between the structural and functional elements of the claim (i.e., that the structure produces the function).  *Ariad Pharms, Inc.*, 598 F.3d at 1350.  Here, the '780 Patent discloses "the release period of time of the drug from the formulation can be arbitrarily controlled by adjusting the viscosity of the polymer which is used as the hydrogel-forming polymer."  JTX 0001.00010 at 7:34–38.  This indicates that the functional outcome (the dissolution rate) is associated with the structure of the formulation (it's viscosity).  This satisfies the written description requirement and shows possession of the genus.  It is of no moment that the '780 patent did not state the direction of the relationship between viscosity and dissolution rate, because this relationship "well-known in the art" and need not appear in the four corners of the patent to demonstrate possession of the genus.  *Ajinomoto Co.*, 932 F.3d at 1359; *see supra* Findings of Fact Section C.

To summarize: the '780 Patent discloses representative species of sustained release hydrogels and a relationship between the structure of the sustained release hydrogel and its dissolution rate.  This demonstrates possession of the genus and satisfies 35 U.S.C. § 112(a)'s written description requirement.

### 3.  The Generics Manufacturers' Arguments

Seeking to undermine the representative species and structure relationship, the Generics Manufactures make three primary arguments.  None are supported by the factual record.

### a.  The examples in the specification meet the dissolution limitation because they were run at 200 rpms.

*First*, the Generics Manufacturers argue the specification does not disclose *any* representative species because the POSA would understand the examples in the disclosure to have been tested at 50 rather than 200 rpms.  D.I. 534 at 38–39.  This argument relies on an unnatural reading of the specification and is inconsistent with the record.

Basically, the Generics Manufacturers focus on the following section of the specification:

EXPERIMENTAL EXAMPLES

1. Dissolution test
   The pharmaceutical compositions prepared in Examples 2, 8, and 9 were subjected to a dissolution test carried out in accordance with a USP dissolution test (paddle method). As a test fluid, 900 mL of a phosphate buffer (pH 6.8) was used. The pharmaceutical composition prepared in Comparative Example 1 was tested in accordance with a dissolution test, method 2 described in the Japanese Pharmacopoeia. As a test fluid, 900 mL of a Mc. Ilvain buffer (pH 6.8) was used, and the paddle rotation speed was 50 rpm.

JTX 0002.00014.   They argue: (1) the only paddle speed in the description of Experimental Example 1 is 50 rpm, (2) so the POSA would understand that Examples 2, 8, and 9 to have been run at 50 rpm, and (3) thus, Examples 2, 8, and 9 are not working examples because the claims require a 200-rpm paddle speed.  This argument does not hold up to scrutiny for three reasons.

50

One, the text of the '780 Patent does not support this inference.  The 50 rpm paddle speed appears in a different sentence discussing Comparative Example 1 (the immediate release formulation) that was tested using a different method from Examples 2, 8, and 9. It would be odd for the POSA to read this section as saying Examples 2, 8, and 9 were run at 50 rpm because the fourth sentence does not refer back to the second and the third sentence introduces an entirely new example and form of testing.  Moreover, the USP dissolution test allows for a paddle speed ranging from 50 rpm to 200 rpm and '780 Patent claims a dissolution limitation based on testing performed at 200 rpm.  The natural reading of the specification, combined with the claims, is that the samples were run at 200 rpm.  Put another way, why would the patent claim a dissolution requirement that was inconsistent with its exemplar formulations?  Thus, within the four corners of the '780 Patent, there is no basis to conclude the examples in the specification were run at 50 rpm.[15]

Two, the logical reading of the specification is consistent with Astellas's actions in front of the PTO.  Throughout the prosecution history, Astellas represented to the PTO that the examples disclosed in the specification met the dissolution limit.  *See e.g.*, JTX 0003.00048 ("[T]he specification provides examples of formulations that meet the claimed dissolution rate.").  In response, the Generics Manufacturers point to one statement in the prosecution history stating that the experiments were run at 50rpm and claims this was the true paddle speed.  DTX 2025.251.  Astellas responds this was an erroneous

---

[15] This is point alone is dispositive because the written description inquiry is "an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Allergan USA, Inc. v. MSN Lab'ys Priv. Ltd.*, 111 F.4th 1358, 1373 (Fed. Cir. 2024) (quoting *Ariad Pharms., Inc.*, 598 F.3d at 1351). The Court addresses the other points, to the extent the paddle speed issue bears on the enablement inquiry.

statement in a decade-long patent prosecution process.  D.I. 541 at 55 n. 18.  Faced with contradictory statements in the prosecution history, the Court finds Astellas's explanation more credible because Astellas's position is more consistent with its behavior before the PTO.  Specifically, if the Court accepts experiments were really run at 50 rpm, it also must accept Astellas chose to claim a different paddle speed and misrepresented to the PTO that the examples met the dissolution requirements.  The record does not show any business or strategic benefit for lying to the PTO about this detail rather than rewriting the claims.  So, Astellas's mistake theory is better supported by the record.

Three, confirming the above,[16] an Astellas spreadsheet produced in this litigation, which appears to summarize the experiments involving Examples 2, 8, and 9, states that they were run at 200 rpm.  PTX 0067.  At trial, the Generics Manufacturers objected that Astellas did not lay enough foundation to authenticate the spreadsheet, and that the spreadsheet is hearsay.  D.I. 527 at 201, Tr. 494:18–25.  The Court overrules those objections.

Fed. R. Evid. 901(a) requires "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  This can be accomplished through the exhibit's "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."  Here, the metadata shows that Astellas created this document, and the example numbers and dissolution data exactly mirror those found in the specification.  Compare PTX 0067 (spreadsheet) with JTX 001 ('780 Patent) The Generics Manufacturers offered no

---

[16] The Court's conclusion on this point is same, with or without the PTX 0067.  The exhibit merely confirms the natural reading of the specification and the most likely explanation for Astellas's behavior during the prosecution history.

evidence of its inauthenticity.  So, the Court concludes there is sufficient indicia of authenticity to show by a preponderance of evidence that the spreadsheet is what it purports to be.  *See Acorda Therapeutics Inc. v. Apotex Inc.*, No. CIV.A. 07-4937 GEB-M, 2011 WL 4074116, at *6 (D.N.J. Sept. 6, 2011) (concluding the same on a similar record).

Fed. R. Evid. 803 bars the admission of hearsay defined by Fed. R. Evid. 801(c) as "a statement that the declarant does not make while testifying at the current trial or hearing; and" is "offer[ed] in evidence to prove the truth of the matter asserted."  Here, the statement that the experiments were run at 200 rpm in the spreadsheet was made out of court and Astellas is using it to prove the truth of the matter asserted, that they were run at 200 rpm.  Fed. R. Evid. 803(6) allows for hearsay to come in if it is a "[r]ecord[] of a regularly conducted activity."  A record falls within this exception if it: (1) "was made at or near the time by—or from information transmitted by—someone with knowledge;" (2) "kept in the course of a regularly conducted activity of a business;" and (3) "making the record was a regular practice of that activity."  *Id.*  To take advantage of the exception Astellas must show these requirements "by the testimony of the custodian or another qualified witness" and that the Generics Manufacturers have not shown "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  *Id.*  "Despite the reference in the Rule to a qualified witness . . . that the testimony of the custodian or other qualified witness is not a sine qua non of admissibility in the occasional case where the requirements for qualification as a business record can be met by documentary evidence, affidavits, or admissions of the parties, i.e., by circumstantial evidence, or by a combination of direct and circumstantial evidence."  *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 288 (3d Cir. 1983);*United States v.*

*Pelullo*, 964 F.2d 193, 201 (3d Cir. 1992).[17]  For example, in *Condus v. Howard Sav. Bank* the court concluded a consulting report could come in as a business record when the record was integral to the consulting firm's business and the record showed details of the specific engagement that produced the report.  *Condus v. Howard Sav. Bank*, 986 F. Supp. 914, 918 (D.N.J. 1997).  Here, the evidence shows that Astellas is a pharmaceutical company which performs the type of in vivo testing reported on the spreadsheet as a part of drug development.  These numbers are incorporated into patents and reported to the FDA, supporting the inference that dissolution test data was kept in the ordinary course of drug development near the time the tests were conducted.  *See* D.I. 526 at 237, Tr. 237:10–17 (Weisman).  The specific results reported in the spreadsheet match the results reported in the '780 Patent and its description of Myrbetriq's® development and creation of the example formulations.  *Compare* PTX 0067 *with* JTX 001.  Thus, the Court can match the results to the development of a specific drug and infer from record evidence regarding the drug development process, when and how the spreadsheet was made.  The Generics Manufacturers have not proffered any reason to distrust the record.  The Court concludes, based on the circumstantial evidence, that the spreadsheet was created at the time of the Myrbetriq's® development trials, in the normal course of drug development, and that such a record is a regular part of drug development.  So, the Court overrules the Generics Manufacturers' hearsay objection.

In sum, because the text of the '780 Patent and Astellas's behavior during prosecution history supports the examples being run at 200 rpm and internal

---

[17] Evidentiary rulings in patent cases are resolved applying the law of the regional circuit. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1225 (Fed. Cir. 2014).

documentation confirms it, the Court rejects the Generics Manufacturers' assertion that the samples were run at 50 rpm.

### b. The example species are representative of the genus.

*Second*, attacking the examples from a different angle, the Generics Manufacturers claim that the disclosed examples are a few out of hundreds of thousands of permutations of the disclosed ingredients.  The Generics Manufactures' compare the permutations to a "a plot of land, if the disclosed species only abide in a corner of the genus, one has not described the genus sufficiently to show that the inventor invented, or had possession of, the genus." *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1230 (Fed. Cir. 2014).  True, but "[i]t is important not to take the analogy of a plot of land too far in thinking of written description issues because, even if one builds a house only in one corner of the plot, one may still own the whole plot." *Id.* Specifically, "[i]f the difference between members of the group is such that the person skilled in the art would not readily discern that other members of the genus would perform similarly to the disclosed members, i.e., if the art is unpredictable, then disclosure of more species is necessary to adequately show possession of the entire genus." *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1125 (Fed. Cir. 2004).  Here, as discussed extensively above, the specification involves known methods and features of sustained release hydrogel.  And the evidence at trial did not show any of the other hydrogel-forming polymers or water-soluble additives behaved in such a way that these known methods and features did not apply.  At best, the Generics Manufacturers point to specific examples of formulations using other hydrogel-forming polymers that did not meet the dissolution

limit.[18]  But, they did not show that the POSA would not be able to alter the viscosity of the formulation to speed up the dissolution rate and reach a working embodiment.  Thus, while the Generics Manufactures point to differences between components of candidate formulations, they "do[] not explain why these differences . . . mean" the example formulations "are so different from other forms that they are unrepresentative."  *Exelixis, Inc. v. MSN Lab'ys Priv. Ltd.*, No. CV 22-228-RGA, 2024 WL 4491176, at *14 (D. Del. Oct. 15, 2024).  Put another way, while Astellas built its house on one corner of the plot of land, the rest of the plot was not wild unmapped mountains but rather a fully surveyed and manicured field.

Buttressing this conclusion, contrast the facts here with *Alza Corp. v. Mylan Labs., Inc.*, a case in which the district court invalidated a pharmaceutical patent as lacking written description.  *Alza Corp.*, 388 F. Supp. 2d at 729–31.  There, the patent claimed two dosage forms of the drug: an osmotic form and a non-osmotic form but described only the osmotic form in the specification.  *Id.* at 729.  The court concluded the written description in the patent did not encompass non-osmotic forms, because these forms used an entirely different technique for drug delivery that did not overlap with the osmotic form.  *See id.* at 721, 730.  Here, by contrast, every embodiment claimed by the '780 Patent is the same dosage form—a sustained release hydrogel.  They all delay release in the same manner, are made of the same ingredients, and behave according to the

---

[18] The Generics Manufacturers rely heavily on DTX 2084.00011, a slideshow from Astellas showing specific HPMC and HPC formulations that did not meet the dissolution rate.  But, as Dr. Chambliss admitted, there is nothing in the slideshow indicating that Astellas attempted to tune these formulations.  Instead, Dr. Chambliss indicated that Astellas was making formulations based on existing art to "find out what worked."  D.I. 529 at 275–76, Tr. 1172:22–1173:22 (Chambliss).  So, at best, this evidence shows that two random HPMC and HPC formulations from the prior art did not work.  It does not show Astellas tried—and failed— to use the methods disclosed in the '780 patent and known to the POSA to make a working HPMC and HPC formulation.  This is not clear and convincing evidence that Astellas failed to adequately describe their invention.

same physical properties.  Thus, even accounting for the differences between ingredients, the example formulations all share a common essence that was not present in *Alza Corp.*

### c. The Generics Manufacturers' attack on the disclosed structure-function relationship relies on a scientifically inaccurate and unnatural reading of the specification.

*Third*, the Generics Manufactures argue the patent does not, in fact, disclose a structure function relationship between hydrogel-forming polymer viscosity and dissolution rate because the specification says the dissolution rate can be "arbitrarily controlled" by adjusting viscosity.  Their argument goes something like: (1) the POSA would read this to mean viscosity's effect on dissolution rate is arbitrary, (2) arbitrary means random, (3) therefore, the POSA cannot use viscosity to tune the dissolution rate, and (4) thus practicing the '780 Patent requires trial and error experimentation.  D.I. 534 at 63–64.  This syllogism is factually flawed.  The evidence presented at trial from both parties shows viscosity's impact on dissolution rate is not random.  And everyone agrees this inverse relationship was well-known to the POSA in 2008.  Besides being inconsistent with the science, the definition of arbitrary used by Dr. Chambliss is difficult to reconcile with the next word of the specification—controlled.  To control is "[t]o exercise power or authority over; to determine the behaviour or action of, to direct or command; to regulate or govern."  Control, Oxford English Dictionary (2015).  The Generics Manufacturers read patent language as saying the POSA could direct or command the dissolution rate using a variable with a random impact on dissolution rate.  This is contradictory and self-defeating.  By contrast, Astellas's preferred definition of arbitrary as "based on or determined by individual preference or convenience rather than by necessity or the intrinsic nature of something," is scientifically accurate and makes sense in context.  D.I. 541 at 60 (quoting Arbitrary, Mirriam-Webster (March 28, 2024),

https://www.merriamwebster.com/dictionary/arbitrary).  The Court cannot conclude that the POSA would ignore a well-established correlation between structure and function based on a strained reading of one word in the specification.

To summarize: the '780 Patent discloses both exemplar formulations and a relationship between structure and function.  The Generics Manufacturers have not shown clear and convincing evidence that the formulations are not representative or that the viscosity/dissolution rate relationship does not govern the rest of the genus. Therefore, the written description shows that Astellas possessed the genus at the time of the application.

### D. Indefiniteness

The Generics Manufactures argue that the lack of a temporal limitation for dissolution testing renders the '780 Patent indefinite because the expired product has a different dissolution profile than the unexpired product.  The Court disagrees.

### 1. Legal Framework

25 U.S.C. § 112(b) provides a patent "specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention."  A patent claims must, "viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). While "absolute precision is unattainable" "a patent must be precise enough to afford clear

notice of what is claimed." *Id.* at 909–10. A claim that fails to provide clear notice is invalid as indefinite. *Id.* at 902; 25 U.S.C. § 282(b)(3). A claim term is indefinite if it "departs the realm of recognized methods of measurement" and "leave[s] the skilled artisan to consult the 'unpredictable vagaries of any one person's opinion.'" *Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620, 635 (Fed. Cir. 2015) (quoting *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1374 (Fed. Cir. 2014).

## 2. The '780 Patent is not indefinite.

The lack of an explicit temporal limitation does not render the '780 patent invalid as indefinite. To meet the definiteness requirement, while "'[s]ome modicum of uncertainty' may be tolerated . . . the patent and prosecution history must disclose a single known approach or establish that, where multiple known approaches exist, a person having ordinary skill in the art would know which approach to select." *Dow Chemical Co.*, 803 F.3d at 630. Here, the claims disclose a specific method of dissolution testing that the POSA should use to determine if the allegedly infringing product meets the dissolution limit. *See* JTX 0001.00016 at 20:42–47 (requiring the dissolution profile of the sample to be "measured in accordance with United States Pharmacopoeia in 900 mL of a USP buffer having a pH of 6.8 at a paddle rotation speed of 200 rpm"). The patent office approved the '780 Patent without requesting temporal limitations or raising indefiniteness issues. JTX 0003.01853–57. Dr. Little testified that the POSA would test an unexpired sample. D.I. 530 at 141, Tr. 1324:9–19 (Little). The Generics Manufacturers' infringement experts had no trouble opining on infringement at trial and understood the claims to require testing of unexpired samples. *See e.g.*, D.I. 528 at 9, Tr. 614:12–23 (Buckton); D.I. 529 at 32, Tr. 929:20–22 (Fassihi) ("Astellas's experts; Dr. Little, Ms. Gray, and Dr.

Thisted, do not present evidence that representative samples of Zydus' ANDA products will meet all the limitations required by the asserted claims. Neither Astellas nor Zydus ever conducted dissolution testing as required by the asserted claims on unexpired, representative samples of Zydus' ANDA products."). Indeed, the thrust of the Generics Manufacturers' infringement arguments was that Astellas could not meet its burden on infringement based on dissolution testing of expired samples. D.I. 543 at 20–27. There is no evidence in the trial record of any alternative method of dissolution testing in which the POSA would be called on to use expired samples that would have confused the POSA. Nor have the Generics Manufacturers cited any authority (and the Court's research has identified none) finding a patent indefinite under analogous circumstances. There is no basis to find the '780 Patent indefinite.

Overall, there is no evidence, let alone clear and convincing evidence, that the lack of temporal limitation in the specification caused the question of infringement to "depart[] the realm of recognized methods of measurement . . . leave[ing] the skilled artisan to consult the 'unpredictable vagaries of any one person's opinion.'" *Dow Chemical Co.,* 803 F.3d at 635.

## CONCLUSION

Patent law's enablement, written description and definiteness requirements do not require every pharmaceutical patent to be a pharmacology treatise. The POSA would read the claims of the '780 Patent against the backdrop of a well-understood body of drug formulation science. With that background, the POSA could practice the invention, know that Astellas possessed the scope of the invention, and understand whether the patent

was infringed.   The Generics Manufactures did not show otherwise by clear and convincing evidence.

THEREFORE, IT IS ORDERED:

1.  On the issues of enablement, written description, and definiteness of the '780 Patent, the Court finds for Astellas and against Zydus and Lupin.

Dated this 15th day of April, 2025.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge