IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ASTELLAS PHARMA INC., *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> ZYDUS, INC., *et. al.* <br><br> Defendants. | 1:20CV1589 <br><br> **MEMORANDUM AND ORDER** |

This matter is before the Court on the parties' motion for claim construction. D.I. 698. This is a patent infringement case involving United States Patent No. 12,097,189 ("The '189 Patent"), a patent for a sustained released mirabegron formulation used to treat overactive bladder under the brand name Myrbetriq®. Astellas owns the patent. Defendants, Zydus, Lupin, Ascent, and MSN (the Generics Manufacturers) manufacture or want to manufacture a generic version of the drug. The Court previously addressed similar claims in the context of United States Patent No.11,707,451 ("The '451 Patent"), a member of the same patent family. See *Astellas Pharma Inc. v. Lupin Ltd.*, No. CV 23-819-JFB-CJB, 2024 WL 4626225 (D. Del. Oct. 30, 2024) (*Astellas III*). The parties agree on some constructions. But the Generics Manufacturers ask the Court to adopt the same construction for "reduced food effect" in the '189 Patent as the '451 Patent. But the Generics Manufacturers ignore material differences in the language of the claims. Where the '451 Patent provided no definition of "reduced food effect," the '189 Patent does. The Court, therefore, adopts the following constructions:

| Term | Astellas's Construction | The Generics Manufactures' Construction | The Court's Construction |
|---|---|---|---|
| "Continuous drug release for at least 4 hours after oral administration." | Plain and ordinary meaning (stipulated). | Plain and ordinary meaning (stipulated). | Plain and ordinary meaning. |
| "an immediate release formulation" | Immediate release formulation of Comparative Example 1 (stipulated) | Immediate release formulation of Comparative Example 1 (stipulated) | Immediate release formulation of Comparative Example 1 |
| "a hydrogel-forming polymer" | Plain and ordinary meaning (stipulated). | Plain and ordinary meaning (stipulated). | Plain and ordinary meaning. |
| "reduced food effect"[1] | A reduction in a change in mirabegron absorption, where the reduction is a 10% or more reduction in the rate of decrease of $C_{max}$ measured as a difference in $C_{max}$ in the fed and fasted states associated with the sustained release formulation as compared to a difference in $C_{max}$ in the fed and fasted sates associated with an immediate release formulation. | A clinically significant reduction, where the reduction is expressed by a positive percent reduction in the rate of decrease of $C_{max}$ and AUC, in a change in mirabegron absorption measured as a difference in $C_{max}$ and AUC in the fed and fasted states associated with the sustained release formulation as compared to a difference in $C_{max}$ and AUC in the fed and fasted states associated with an immediate release formulation. | A reduction in a change in mirabegron absorption, where the reduction is a 10% or more reduction in the rate of decrease of $C_{max}$ measured as a difference in $C_{max}$ in the fed and fasted states associated with the sustained release formulation as compared to a difference in $C_{max}$ in the fed and fasted sates associated with an immediate release formulation. |

## BACKGROUND

This is the third time the Court has addressed the "reduced food effect" term in the Myrbetriq® litigation, so its discussion of the relevant scientific and technical background

---

[1] The Generics Manufacturers propose a different construction for "a difference in the rate of decrease of 10% or more." Because the Court adopts Astellas's construction and Astellas's construction accurately captures the math, the Court does not separate construct "a difference in the rate of decrease of 10% or more."

2

is abridged. *Astellas Pharma Inc. v. Lupin Ltd.*, No. CV 23-819-JFB-CJB, 2024 WL 1832483, at *6–11 (D. Del. Apr. 19, 2024) (Burke, M.J.) (*Astellas I*) *report and recommendation adopted Astellas Pharma Inc. v. Lupin Ltd.*, No. CV 23-819-JFB-CJB, 2024 WL 1759149 (D. Del. Apr. 24, 2024) (order denying preliminary injunction); *Astellas III*, 2024 WL 4626225, at *4–11. A detailed discussion of these issues can be found in the Court's prior *Markman* opinion. *Astellas III*, 2024 WL 4626225 at *1–11.

### A. Scientific and Technical Background

The '189 Patent covers a sustained release formulation of mirabegron used to treat overactive bladder. D.I. 768-1 at 20–21. Overactive bladder is a condition characterized by increased urinary frequency and urgency. *Id.* at 20. Mirabegron is a chemical that binds to certain cellular receptors in the bladder, causes the bladder to relax, and alleviates overactive bladder. *Id.*[2] A sustained release formulation is a dosage form that limits the release of the active ingredient—allowing for introduction of the active ingredient over a desired timeline and concentration range. *Id.* at 20–23. A sustained release formulation is different from an immediate release formulation which releases the active ingredient as fast as the stomach can dissolve the pharmaceutical composition. *Id.*

The immediate release formulation of mirabegron suffered from a food effect, meaning the medication behaved differently when taken on an empty stomach versus a full one. *Id.* at 20, 42. Specifically, when a patient took the immediate release mirabegron formulation on an empty stomach, the concentration of mirabegron spiked in the bloodstream and caused the patient's heart rate to race (this is called tachycardia). *Id.* In

---

[2] The Court's recent Findings of Fact and Conclusions of Law regarding the validity of United States Patent No. 10,842,780 ("'780 Patent") contains a more detailed discussion regarding the use of mirabegron to treat overactive bladder and the technical field of sustained release formulations. D.I. 739 at 4–11.

contrast, when the patient took the immediate release formulation on a full stomach, the concentration of mirabegron remained below a certain level and the patient did not experience the cardiovascular side effects. *Id.* Scientists measure a drug's food effect using pharmacokinetic measures. Two are relevant here. Area under the curve (AUC) is the total exposure to the drug over the time tested. *Astellas III*, 2024 WL 4626225 at *2.[3] A higher AUC means the patient was exposed to more of the drug. *Id.* Maximum concentration ($C_{max}$) is the peak concentration of the drug in the bloodstream during the testing period. *Id.* A higher $C_{max}$ means the concentration in the patient's blood spiked to higher levels. *Id.*

The sustained release formulation replicates the absorption profile seen in the fed state and releases the mirabegron over four hours. D.I. 768-1 at 20. Basically, controlling the release of the drug meant the drug was released on a longer time frame and spiked to a lower level. *Id.* Accordingly, patients who took the sustained release formulation of mirabegron on an empty stomach showed a lower AUC and lower $C_{max}$ when compared to patients who took the immediate release formulation on an empty stomach. *See id.* at 42 (summarizing pharmacokinetic testing). And the patients taking the sustained release formulation did not experience the tachycardia symptoms that plagued the immediate release formulation. *Id.* So, using a sustained release formulation solved the food effect issue.

B.  **The Myrbetriq® Litigation**

Astellas markets its sustained release formulation as Myrbetriq®. The Generics Manufacturers—Lupin, Zydus, Ascent, and MSN—currently manufacture or intend to

---

[3] For the ease of the reader, the Court is relying on *Astellas III*'s discussion of expert testimony regarding the basic pharmacokinetic concepts. This information would be well-known to the POSA.

manufacture a generic version of the drug. Astellas sued the various defendants alleging their produces currently infringe or will infringe their patents. The Court has exclusive jurisdiction over their dispute under 28 U.S.C. § 1338. The Court consolidated the cases involving Myrbetriq® to resolve all the patents and claims on a uniform timeline. *See* D.I. 652 at 9–11.

### C. The First *Markman* Opinion

In the consolidated litigation, Astellas asserts two method patents related to the use of a sustained release mirabegron formulation to treat overactive bladder with reduced food effect. The Court previously construed the claims of the '451 Patent, including the term "reduced food effect."[4] *Astellas III*, 2024 WL 4626225 at *1–11.

The '451 Patent did not define "reduced food effect" so the Court looked to the specification. *Id.* at *6. There, Astellas framed the food effect in terms of two pharmacokinetic variables – $C_{max}$ and AUC. *Id.* The POSA determined whether food effect was "reduced" comparing these variables in the fed and fasted state between the immediate and sustained release formulation. *Id.* To do so, the POSA would use the rate of decrease calculated using the formula disclosed in the specification. *Id.* If the percent reduction in the rate of decrease is positive, the food effect is reduced. *Id.* Moreover, the Court concluded the POSA would know this reduction was significant by looking to whether it alleviated the tachycardic symptoms observed in the immediate release formulation. *Id.* at *9. Based on the specification the Court adopted the following construction of reduced food effect:

---

[4] Prior to consolidation, the Court also held *Markman* proceedings in the case against Ascent involving the '780 Patent. *Astellas Pharma Inc. v. Ascent Pharms., Inc.*, No. CV 23-486-JFB-CJB, 2024 WL 3825324 (D. Del. Aug. 15, 2024) (*Astellas II*). The issues in that *Markman* order are irrelevant to the issues here.

5

> A clinically significant reduction, where the reduction is expressed by a positive percent reduction in the rate of decrease of $C_{max}$ and AUC, in a change in mirabegron absorption measured as a difference in $C_{max}$ and AUC in the fed and fasted states associated with the sustained release formulation as compared to a difference in $C_{max}$ and AUC in the fed and fasted states associated with an immediate release formulation.

*Id.* at *14.

The Court also addressed the Generics Manufacturers' indefiniteness arguments, constructing the term to avoid the pitfalls noted by Judge Burke in the preliminary injunction proceedings. *Compare Astellas I*, 2024 WL 1832483 at *6–7 (questioning how to measure reduction in food effect and how to tell when that reduction is significant) *with Astellas III*, 2024 WL 4626225 at *6–9 (finding answers to those questions). Specifically, the Court's construction identified a method for assessing what a food effect is, when the food effect is reduced, and when that reduction is significant. *Astellas III*, 2024 WL 4626225 at *6–9. Also relevant to the indefiniteness analysis, the specification suggested a 10% reduction in the rate of decrease in of $C_{max}$ and AUC was significant. *Id.* at *9. The Court noted this objective baseline avoided indefiniteness but declined to incorporate it as a claim limitation. *Id.* at *9 n.7.

### D. The '189 Patent

The '189 Patent is a decedent of the '451 Patent, a method patent directed to the treating overactive bladder using mirabegron with "reduced food effect." D.I. 768-1 at 42. The two patents share a common specification and expire at the same time.[5] In

---

[5] The two patents share the same expiration date because of the obviousness-type double patenting doctrine, which "preclude[s] a second patent on an invention which 'would have been obvious from the subject matter of the claims in the first patent, in light of the prior art.'" *Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 940 (Fed. Cir. 1992) (quoting *In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985)). Here, Astellas executed a terminal disclaimer, which avoids a double patenting rejection by "disclaiming that portion of the second patent which would extend beyond the expiration of the first." *Id.*; *see* 37 C.F.R. § 1.321(b)–(c). So, the '189 Patent's filing date (and, by extension, its expiration date) relates back to the filing date of the '451 Patent, which itself relates back to the filing date of the '780 Patent.

prosecution, Astellas represented that the '189 Patent was a narrower version of the '451 Patent. D.I. 768-1 at 274. The following chart illustrates the relevant differences in claim language:

| The '451 Patent | The '189 Patent |
|---|---|
| "A method for treating overactive bladder such that the treating is with a reduced food effect, the method comprising administering orally to a subject in need thereof a tablet comprising 10 mg to 200 mg of [mirabegron][6] in a sustained release formulation . . .wherein the reduced food effect is compared to that after oral administration of an immediate release formulation comprising [mirabegron]." | "A method for treating overactive bladder such that the treating is with a reduced food effect, the method comprising administering orally to a subject in need thereof a tablet comprising 10 mg to 200 mg of [mirabegron] in a sustained release formulation . . .wherein the reduced food effect is compared to that after oral administration of an immediate release formulation comprising [mirabegron], and is a difference in a rate of decrease of $C_{max}$ of 10% or more . . .." |

## LEGAL STANDARD

The claims of the patent define the metes and bounds of the patent. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). The claims determine what the inventor patented and "delimit the" patent holder's "right to exclude." *Id.* At the claim construction stage, the role of the Court is to "determin[e] the meaning and scope of the patent claimed asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). A claim construction order will dictate how the court will instruct the jury regarding a claim's scope. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d

---

[6] Ascent, in the introduction to its *Markman* brief, floats a theory that the '451 and '189 Patents do not disclose mirabegron but rather a different chemical compound. D.I. 767 at 8–11. The fact does not play a role in the Generics Manufacturers' *Markman* arguments and Ascent admitted at oral argument that this assertion is irrelevant to the claim construction analysis. D.I. 819 at 40, 40:6–7. The Court appreciates counsel's candor and need not discuss the argument further.

7

1351, 1359 (Fed. Cir. 2008). Claim construction falls "exclusively within the province of the court." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318 (2015) (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996)).

The goal of claim construction is to articulate how a person of ordinary skill in the art at the time of the patent would understand the claim term. *Phillips*, 415 F.3d at 1313. The process of construing a claim term begins with the words of the claims. *Phillips*, 415 F.3d at 1312–14; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "[A]bsent contravening evidence from the specification or prosecution history, plain and unambiguous claim language controls the construction analysis." *DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1347 (Fed. Cir. 2008) (citing *Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1295 (Fed. Cir. 2000)). However, the claims "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 979); *see Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014) (stating in claim construction, the court "gives primacy to the language of the claims, followed by the specification"). Additionally, the prosecution history, while not literally within the patent document, serves as intrinsic evidence for purposes of claim construction. *See Phillips*, 415 F.3d at 1317. If a claim term remains ambiguous after an examination of intrinsic evidence, the court may resort to extrinsic evidence. *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001).

## DISCUSSION

The Court proceeds in three parts. First, it addresses the threshold issue of the POSA. Second, it summarizes the claim terms that the parties, while maintaining their

arguments made in previous Markman proceedings, stipulated to. Third, it addresses "reduced food effect," the term where there is some daylight between the Parties.

### A. The POSA

The Court adopts the same definition of the POSA for the '189 Patent as the '451 Patent. For context, claim construction is approached from the perspective of someone skilled in the relevant art at the time the patent was filed. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 908 (2014). In the first *Markman* order, the Court concluded the POSA is:

> a multidisciplinary team with (1) a Ph.D. in pharmaceutical sciences or a related field and approximately two to three years of experience, research, and/or training in pharmacokinetics, food effects, formulation, and characterization of pharmaceutical dosage forms; alternatively, a POSA could have had a bachelor's degree in pharmaceutical sciences or a related field with a greater amount of experience, research, and/or training in pharmacokinetics, food effects, formulation, and characterization of pharmaceutical dosage forms; and (2) a medical doctor with at least two years of practical experience administering pharmaceutical drugs to treat overactive bladder ("OAB") with symptoms of urgency, urinary frequency and/or urge urinary incontinence, in human patients.

*Astellas III*, 2024 WL 4626225 at *4. Here, the '451 Patent' and '189 Patent shares a common specification related to the same product in the same field. The parties over no reason to depart from the Court's prior order. So, the Court uses the same definition of the POSA.

### B. Stipulated Constructions

Prior to the *Markman* hearing, the parties stipulated to certain constructions, based on the Court's prior orders.[7] In line with these stipulations, the Court adopts the following constructions for the '189 Patent:

---

[7] The parties preserved their claim construction arguments for appeal and validity arguments for dispositive motions, trial, and appeal.

9

| Term | Construction | Citation |
|---|---|---|
| "Continuous drug release for at least 4 hours after oral administration." | Plain and ordinary meaning. | *Astellas III*, 2024 WL 4626225 at *13–14; D.I. 716. |
| "an immediate release formulation" | Immediate release formulation of Comparative Example 1 | *Astellas III*, 2024 WL 4626225 at *13; D.I. 716. |
| "a hydrogel-forming polymer" | Plain and ordinary meaning. | *Astellas II*, 2024 WL 3825324 at *5–6; Case No. 23-486, D.I. 170. |

### C. "Reduced food effect"

The Parties diverge on the term "reduced food effect." The Generics Manufacturers argue the reduced food effect term imports all the limitations of the '451 Patent *plus* an additional 10% reduction in rate of decrease in $C_{max}$. D.I. 767 at 23. Astellas, on the other hand, argues the '189 chooses to define reduced food effective exclusively in terms of $C_{max}$. Astellas has the better of the argument. *Id.* at 16–17.

#### 1. The intrinsic evidence supports Astellas's construction

The claim language, specification, and prosecution history support Astellas's proposed construction.[8]

The claim language here all but resolves this dispute. The best evidence for the meaning of the claim is the language of the claim. *DSW, Inc.*, 537 F.3d at 1347. Here, the claim language is clear: "reduced food effect . . . *is* a difference in a rate of decrease of $C_{max}$ of 10% or more . . . ." (emphasis added). The word "is" is definitional. *C.R. Bard, Inc. v. AngioDynamics, Inc.*, 748 F. App'x 1009, 1016 (Fed. Cir. 2018). So, the claim tells the POSA how to assess food effect—by using the rate of decrease $C_{max}$—and what

---

[8] The intrinsic record resolves the claim construction dispute, and the Parties have not submitted other materials, so the Court need not resort to extrinsic evidence. *Interactive Gift Exp., Inc.*, 256 F.3d at 1332.

percent reduction in rate of decrease constitutes a reduced food effect—10%. Thus, the claim defines food effect, offering powerful evidence in support of Astellas's position.

The specification supports using $C_{max}$ to assess reduced food effect and the 10% reduction baseline. Claims "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 979). Here, among other variables, the specification discusses the food effect in terms of $C_{max}$. D.I. 768-1 at 20. The specification tells the POSA how to calculate the rate of decrease and a higher rate of decrease indicates greater variability between the fed and fasted state. *Id.* at 23. The specification then uses this measure as one of the key reported variables in the food effect study described in Experimental Example 10. *Id.* at 42. Indeed, the Solution to the Problem specifically references a 10% reduction in $C_{max}$. *See id.* at 21–22. Recall, the problem with the prior immediate release formulation of mirabegron was the tachycardic symptoms caused by the spike in drug concentration—the phenomenon captured by $C_{max}$. *Id.* at 20–22. The specification makes this connection explicit, finding a positive correlation between $C_{max}$ and increased heart rate from baseline in Experimental Example 9. *Id.* at 41; *see also id.* at 18, fig. 11. Experimental Example 10 confirms the connection between $C_{max}$ and clinical utility – finding in the sustained release formulations in the fasted state showed "the increase in heart rate is 13bpm or less." *Id.* at 42. Indeed, Astellas framed the "Solution to the Problem" as "preventing the occurrence of adverse effects that it can be used to anticipate such as an increase in heart rate by controlling $C_{max}$ in a fasted state to a specific value or less." *Id.* at 21. And, explaining the "Advantageous Effect of the Invention," Astellas stated "because the pharmaceutical composition for modified release of the present invention can control $C_{max}$ in a fasted state

11

to a specific value or less, $C_{max}$ can be reduced to a specific value or less . . . and adverse effects, such as an increase in hear rate, can be anticipated and prevented in advance." *Id.* at 22. So, defining the reduced food effect in terms of the rate of decrease of $C_{max}$ is amply supported by the specification.[9]

Astellas's $C_{max}$-focused construction is supported by the prosecution history. A patent's prosecution history is part of the intrinsic record and can shed light on the meaning of disputed claim terms. *Phillips,* 415 F.3d at 1317. Here, Astellas added the "is a difference in a rate of decrease of $C_{max}$ of 10% or more" "for further clarification of the claimed invention." D.I. 768-1 at 49 (new language); *id.* at 53 (explanation). Thus, the prosecution history confirms that this claim language was intended to be definitional and added for the purpose of clarifying the meaning of "reduced food effect."

All sources of intrinsic evidence point in the same direction: the '189 Patent defined "reduced food effect" as a 10% reduction in rate of decrease of $C_{max}$. Astellas's proposed construction accurately updates the Court's prior construction to account for this definition, so the Court adopts it.

### 2. The Generics Manufacturers' arguments do not compel a different conclusion.

Resisting this conclusion, the Generics Manufactures try three arguments. None persuade.

*First*, the Generics Manufacturers invoke the principle that the Court should interpret the same claim term consistently across related patents. D.I. 767 at 23. True,

---

[9] Notably, the experimental examples do not disclose similar findings regarding AUC or discuss AUC in the preamble to the Solution to the Problem or Advantageous Effect of the Invention—undercutting the Generics Manufacturers' assertion that reduction in AUC is so integral to the invention that it must be imported into the construction notwithstanding the contrary claim language.

but the Court may "draw distinctions between" related patents "where necessary." *NTP, Inc. v. Rsch. In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005). Here, despite their familial relationship, it is "necessary" to "draw distinctions" between the '189 Patent and the '451 Patent.

To start, the '189 Patent uses materially different claim language. In claim construction "[t]he actual words of the claim are the controlling focus" and are higher on the "hierarchy of analytic tools" than the specification. *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998). Here, the '189 Patent—unlike the '451 Patent—defines "reduced food effect" and defines it only in terms of $C_{max}$. Armed with better evidence of the term's meaning, the Court need not hunt for clues in the specification to establish the boundaries of "reduced food effect." So, although the '451 and '189 Patents share "materially the same specification," the '189 Patent's "notably different claims" compel a different construction. *InterDigital Commc'ns, Inc. v. ZTE Corp.*, 711 F. App'x 998, 1004 (Fed. Cir. 2017).

Ignoring this definitional language has consequences. Accepting the Generics Manufacturers' arguments would import AUC and clinical significance limitations that are not recited in the claim. Nor is there any language in the claim suggesting Astellas intended to import these limitations. "'Even if all embodiments discussed in the patent' included a specific limitation,"—here a positive percent difference in rate of decrease of AUC between the immediate and sustained release formulation and alleviation of the tachycardic symptoms—"it would not be 'proper to import from the patent's written description limitations that are not found in the claims themselves." *Cadence Pharms. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1368 (Fed. Cir. 2015) (*quoting Flo Healthcare*

13

*Sols., LLC v. Kappos*, 697 F.3d 1367, 1375 (Fed. Cir. 2012)). And, if reduced food effect has the same meaning for the '451 and '189 Patents, what is the point of adding claim language specifically defining reduced food effect? *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous."). So, using the '451 definition leads to a construction that fails under ordinary principles of claim construction.

*Second*, the Generics Manufactures claim Astellas represented to the Patent Office that the '189 Patent was a narrower version of the '451 Patent when it was, in fact, broader. D.I. 767 at 23; *see* D.I. 768-1 at 274 ("[Patent Prosecution counsel] indicated that the claims are a narrower version of the claims allowed in [the '451 Patent]."). This argument has two flaws. One, the prosecution history preceded the Court's first *Markman* order. Astellas's position narrowed significantly in response to concerns raised by Judge Burke during the preliminary injunction proceedings. *Astellas III*, 2024 WL 4626225 at *5–12. And, during the *Markman* proceedings the parties and the Court looked to the specification to define the metes and bounds of an otherwise open-ended claim term. *Id.* Put another way, the first *Markman* order narrowed a facially broad claim in response to indefiniteness issues identified by Judge Burke. So, Astellas's view of the breadth of the claims back in 2024 is not especially helpful for understanding the scope of the claims today. Two, the '189 Patent is narrower than the '451 Patent. For example, under the Court's construction of the '451 Patent a sustained release formulation that: (1) showed a 9% difference in rate of decrease of $C_{max}$, (2) a 15% difference in rate of decrease of AUC, and (3) a clinically significant resolution of tachycardic symptoms would infringe. But this sustained release formulation would not infringe the '189 Patent because it does

not meet the brightline $C_{max}$ limitation. So, Astellas's prosecution history comments do not compel a different claim construction.

*Third*, the Generics Manufacturers claim that adopting Astellas's construction will "eliminate clinical significance." D.I. 189 at 19, 19:21–23. But the Generics Manufacturers have not raised any new invalidity theories at this stage. And it is unclear how this argument affects the Court's claim construction analysis. As Astellas's counsel put it at oral argument: "we can put aside for today the issue of whether it's valid, whether there's anything novel about it, but what it says is the reduction of food effect is a difference in a rate of decrease of $C_{max}$ at 10% or more. And if Your Honor is correct . . ., that creates a validity problem for us, well then, shame on us, but that is the correct construction." D.I. 819 at 34, 34:4–11. Exactly. Astellas's construction is the best construction, and the parties can address any associated validity issues down the road.

To summarize: "[p]roper claim construction . . . demands interpretation of the entire claim in context, not a single element in isolation." *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999). The '451 and '189 Patent use the same term against the backdrop of different claim language. Under these circumstances, it is "necessary" to "draw distinctions between the" '189 and '451 "[P]atents." *NTP, Inc.*, 418 F.3d at 1293.

**CONCLUSION**

The claims of the '189 Patent define "reduced food effect" differently than the claims of the '451 Patent—mandating a different construction.

THEREFORE, IT IS ORDERED:

1. The Parties Motions for Claim Construction are granted.

2. The Court adopts the following constructions for the '189 Patent:

| Term | Construction |
|---|---|
| "Continuous drug release for at least 4 hours after oral administration." | Plain and ordinary meaning. |
| "An immediate release formulation" | Immediate release formulation of Comparative Example 1 |
| "a hydrogel-forming polymer" | Plain and ordinary meaning. |
| "Reduced food effect" | A reduction in a change in mirabegron absorption, where the reduction is a 10% or more reduction in the rate of decrease of $C_{max}$ measured as a difference in $C_{max}$ in the fed and fasted states associated with the sustained release formulation as compared to a difference in $C_{max}$ in the fed and fasted sates associated with an immediate release formulation. |

Dated this 10th day of June, 2025.

BY THE COURT:

s/ Joseph F. Bataillon  
Senior United States District Judge